**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

DISTRICT OF DELAWARE

Case number *(if known)* _____ Chapter **11**

☐ Check if this is an amended filing

## Official Form 201
# Voluntary Petition for Non-Individuals Filing for Bankruptcy

04/25

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.

| | | |
|---|---|---|
| 1. | **Debtor's name** | **US Magnesium LLC** |
| 2. | **All other names debtor used in the last 8 years** <br> Include any assumed names, trade names and *doing business as* names | |
| 3. | **Debtor's federal Employer Identification Number** (EIN) | **01-0705446** |

| | | |
|---|---|---|
| 4. | **Debtor's address** | **Principal place of business** <br><br> **238 N 2200 W** <br> **Salt Lake City, UT 84116** <br> Number, Street, City, State & ZIP Code <br><br> **Salt Lake** <br> County | **Mailing address, if different from principal place of business** <br><br> <br> P.O. Box, Number, Street, City, State & ZIP Code <br><br> **Location of principal assets, if different from principal place of business** <br><br> <br> Number, Street, City, State & ZIP Code |

| | | |
|---|---|---|
| 5. | **Debtor's website** (URL) | |

| | | |
|---|---|---|
| 6. | **Type of debtor** | ■ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP)) <br> ☐ Partnership (excluding LLP) <br> ☐ Other. Specify: _____ |

Debtor    **US Magnesium LLC**                                             Case number (if known) _____
     Name

**7. Describe debtor's business**

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

■ None of the above

B. *Check all that apply*

☐ Tax-exempt entity (as described in 26 U.S.C. §501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. §80a-3)

☐ Investment advisor (as defined in 15 U.S.C. §80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See
http://www.uscourts.gov/four-digit-national-association-naics-codes.

    3314

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check one:*

☐ Chapter 7

☐ Chapter 9

■ Chapter 11. *Check **all** that apply*:

    ☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,424,000 (amount subject to adjustment on 4/01/28 and every 3 years after that).

    ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

    ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and it chooses to proceed under Subchapter V of Chapter 11.

    ☐ A plan is being filed with this petition.

    ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

    ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

    ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**
If more than 2 cases, attach a separate list.

■ No.
☐ Yes.

| District | When | Case number |
|---|---|---|
| District _____ | When _____ | Case number _____ |
| District _____ | When _____ | Case number _____ |

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

■ No
☐ Yes.

Debtor   **US Magnesium LLC**    Case number *(if known)* _____
_____Name_____

List all cases. If more than 1,
attach a separate list

| | | | |
|---|---|---|---|
| Debtor | | Relationship | |
| District | _____ When _____ | Case number, if known | _____ |

---

**11. Why is the case filed in this district?**    *Check all that apply:*

■ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

---

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

■ No

☐ Yes.   Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** *(Check all that apply.)*

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

   What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?** _____
                          Number, Street, City, State & ZIP Code

**Is the property insured?**

☐ No

☐ Yes.   Insurance agency _____

         Contact name _____

         Phone _____

---

**Statistical and administrative information**

**13. Debtor's estimation of available funds**    *Check one:*

☐ Funds will be available for distribution to unsecured creditors.

■ After any administrative expenses are paid, no funds will be available to unsecured creditors.

---

**14. Estimated number of creditors**

☐ 1-49
☐ 50-99
☐ 100-199
■ 200-999

☐ 1,000-5,000
☐ 5001-10,000
☐ 10,001-25,000

☐ 25,001-50,000
☐ 50,001-100,000
☐ More than100,000

---

**15. Estimated Assets**

☐ $0 - $50,000
☐ $50,001 - $100,000
☐ $100,001 - $500,000
☐ $500,001 - $1 million

☐ $1,000,001 - $10 million
☐ $10,000,001 - $50 million
☐ $50,000,001 - $100 million
■ $100,000,001 - $500 million

☐ $500,000,001 - $1 billion
☐ $1,000,000,001 - $10 billion
☐ $10,000,000,001 - $50 billion
☐ More than $50 billion

---

**16. Estimated liabilities**

☐ $0 - $50,000
☐ $50,001 - $100,000
☐ $100,001 - $500,000
☐ $500,001 - $1 million

☐ $1,000,001 - $10 million
☐ $10,000,001 - $50 million
☐ $50,000,001 - $100 million
■ $100,000,001 - $500 million

☐ $500,000,001 - $1 billion
☐ $1,000,000,001 - $10 billion
☐ $10,000,000,001 - $50 billion
☐ More than $50 billion

---

Debtor    **US Magnesium LLC**                                            Case number (*if known*) _____
          Name

| **Request for Relief, Declaration, and Signatures** |

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   09/10/2025
              MM / DD / YYYY

X _____          **Ron Thayer**
Signature of authorized representative of debtor    Printed name

Title   **President**

**18. Signature of attorney**

X _____          Date   09/10/2025
Signature of attorney for debtor                           MM / DD / YYYY

**Michael Busenkell**
Printed name

**Gellert Seitz Busenkell & Brown, LLC**
Firm name

**1201 N. Orange Street**
**Suite 300**
**Wilmington, DE 19801**
Number, Street, City, State & ZIP Code

Contact phone   **302-425-5812**      Email address   **mbusenkell@gsbblaw.com**

**3933 DE**
Bar number and State

**ACTION BY WRITTEN CONSENT
OF THE MANAGERS OF
US MAGNESIUM, LLC**

**September 9, 2025**

The undersigned, the mangers (the "**Managers**") of US Magnesium, LLC, a Delaware limited liability company (the "**Company**"), acting by written consent, do hereby consent and agree to the adoption of the resolutions set forth below taking or authorizing the actions specified therein with the same force and effect as if such resolutions were approved and adopted at a duly constituted meeting of the managers of the Company.

WHEREAS, the Managers have evaluated and considered the information and recommendations of their executive officers (including its Chief Restructuring Officer) of, and counsel to, the Corporation concerning the financial condition of the Corporation; and

NOW, THEREFORE, BE IT:

RESOLVED, that in the judgment of the Managers, it may become desirable and in the best interests of the Company, its creditors, members and other interested parties, that a petition for reorganization of the Corporation be filed under the provisions of Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**");

RESOLVED, that the Chief Restructuring Officer or President (the "**Authorized Officers**") are hereby authorized, empowered and directed, on behalf of the Company, to take all necessary actions and make all necessary preparations for the Corporation to be in a position to commence a case under Chapter 11 of the Bankruptcy Code (the "**Chapter 11 Case**"), and to commence the Chapter 11 Case, in the venue that the Authorized Officers deem appropriate and at such time that the Authorized Officers deem appropriate, in the exercise of their discretion and professional expertise;

RESOLVED, that the Authorized Officers of the Company shall be and hereby are authorized and directed to do and perform all such acts and things to be prepared to execute and file all petitions, plans, pleadings, schedules, lists, statements, applications, documents, certificates and other papers, and to take such other steps as may be deemed necessary or desirable in order to conduct a case under Chapter 11 of the Bankruptcy Code and to effectuate a reorganization of the Company under Chapter 11 as is deemed appropriate;

RESOLVED, that the Company shall continue to employ, subject to any requisite bankruptcy court approval, Carl Marks LLC as its restructuring advisor and Ron Mayo as its Chief Restructuring Officer, to advise the Company in carrying out its duties under the Bankruptcy Code, and to take any and all actions to advance the Company's rights and obligations; and in connection therewith, the Authorized Officers are hereby authorized and directed to cause to be filed an appropriate application for authority to retain the services of Carl Marks LLC and Ron Mayo;

RESOLVED, that the Company shall employ, subject to any requisite bankruptcy court approval, the law firm of Gellert Seitz Busenkell and Brown, LLC as general reorganization

counsel to represent and assist the Company in carrying out its duties under the Bankruptcy Code, and to take any and all actions to advance the Company's rights and obligations, including filing any pleadings; and in connection therewith, the Authorized Officers are hereby authorized and directed to cause to be filed an appropriate application for authority to retain the services of Gellert Seitz Busenkell & Brown, LLC;

RESOLVED, that the Company shall employ, subject to any requisite bankruptcy court approval, the firm of SSG Advisors, LLC as its investment banker; and in connection therewith, the Authorized Officers are hereby authorized and directed to cause to be filed an appropriate application for authority to retain the services of SSG Advisors, LLC;

RESOLVED, that the Company shall employ, subject to any requisite bankruptcy court approval, such other professionals and persons as the Authorized Officers determine are necessary in order to conduct the Chapter 11 Case and to operate the business while subject to the jurisdiction of the Bankruptcy Court;

RESOLVED, that in the judgment of the Managers, it is necessary and appropriate to enter into a debtor-in-possession financing agreement with Wells Fargo Bank, National Association ("**DIP Lender**") on the terms identified in the attached **Exhibit A** (the "**Loan**") to (a) finance the ordinary course operating expenses of the Company, (b) to fund the costs of the Company's chapter 11 proceeding, and (c) for general corporate purposes of the Company;

RESOLVED, that the Authorized Officers are hereby authorized to perform the acts on behalf of the Company necessary to enable the Company to borrow the Loan; to negotiate, execute and deliver to DIP Lender on behalf of the Company, for the Loan, a credit and security agreement, a promissory note, and any other documents required by DIP Lender in connection with the Loan; and to negotiate, execute and deliver to DIP Lender on behalf of the Company from time-to-time amendments to the Loan and amendments, modifications, or restatements of any or all of such documents;

RESOLVED, that in addition to the specific authorizations heretofore conferred upon the Authorized Officers, the Authorized Officers and such other officers of the Company as any Authorized Officer shall from time to time designate, and any employees or agents (including counsel) designated by or directed by any such Authorized Officer, be authorized and empowered to cause the Company to enter into, execute, deliver, certify, file and/or record, and perform such agreements, instruments, motions, declarations, affidavits, applications for approvals or ruling of governmental or regulatory authorities, certificates and other documents, and to take such other actions as in the judgment of such officer shall be or become necessary, proper and desirable to conduct the Chapter 11 Case and to effectuate a reorganization or liquidation of the Company as is deemed appropriate; and

RESOLVED, that any and all actions heretofore or hereafter taken by the officers or directors of the Company in the name of and on behalf of the Company in furtherance of any or all of the foregoing resolutions are hereby ratified and confirmed in their entirety.

This Action by Written Consent of the Managers may be delivered via facsimile or electronic mail with the intention that it shall have the same force and effect as the original executed counterpart thereof.

**IN WITNESS WHEREOF**, the undersigned has duly executed this Action by Written Consent of the Managers as of the date first above written.

RON THAYER

SHAUN MARTIN

3

This Action by Written Consent of the Managers may be delivered via facsimile or electronic mail with the intention that it shall have the same force and effect as the original executed counterpart thereof.

**IN WITNESS WHEREOF**, the undersigned has duly executed this Action by Written Consent of the Managers as of the date first above written.

_____
RON THAYER

_____
SHAUN MARTIN

# **EXHIBIT A**

RATIFICATION AND AMENDMENT AGREEMENT

This RATIFICATION AND AMENDMENT AGREEMENT (the "Ratification Agreement"), dated as of September __, 2025, is by and between US MAGNESIUM LLC, a Delaware limited liability company and a debtor and debtor-in-possession ("Borrower" or "Debtor"), and WELLS FARGO BANK, NATIONAL ASSOCIATION, a national banking association ("Lender").

W I T N E S S E T H:

WHEREAS, Borrower has commenced a case under Chapter 11 of the Bankruptcy Code (as hereinafter defined) in the United States Bankruptcy Court for the District of Delaware and Borrower has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its businesses as debtor-in-possession;

WHEREAS, prior to the commencement of the Chapter 11 Case (as hereinafter defined), Lender made loans and advances and provided other financial accommodations to Borrower secured by substantially all of the assets and properties of Borrower as set forth in the Pre-Petition Financing Agreements (as hereinafter defined);

WHEREAS, Borrower is requesting that the Bankruptcy Court (as hereinafter defined) enter a Financing Order (as hereinafter defined) pursuant to which Lender may make post-petition loans and advances, and provide other financial accommodations, to Borrower secured by substantially all the assets and properties of Borrower as set forth in the Financing Order and the Financing Agreements (as hereinafter defined);

WHEREAS, Borrower has requested that Lender make post-petition loans and advances and provide other financial or credit accommodations to Borrower and make certain amendments to the Pre-Petition Loan Agreement (as hereinafter defined) and the other Pre-Petition Financing Agreements, and Lender is willing to do so, subject to the terms and conditions contained herein; and

WHEREAS, Borrower desires to reaffirm its obligations to Lender pursuant to the Pre-Petition Financing Agreements and acknowledge its continuing liabilities to Lender thereunder in order to induce Lender to make such post-petition loans and advances, and provide other financial accommodations, to Borrower secured by substantially all the assets and properties of Borrower as set forth herein and in the Financing Order;

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lender and Debtor mutually covenant, warrant and agree as follows:

1.    **DEFINITIONS.**

1.1    Additional Definitions.  As used herein, the following terms shall have the respective meanings given to them below and the Pre-Petition Loan Agreement and the other

Pre-Petition Financing Agreements shall be deemed and are hereby amended to include, in addition and not in limitation, each of the following definitions:

(a)    "Ace Commercial Tort Claim" means all tort claims of any nature arising out of the physical damage to a gas turbine at Borrower's Rowley Facility, including, without limitation, the action by Borrower in *US Magnesium LLC* v. *ACE American Insurance Company* (Civil Case No. 250400910) filed with the Court of Common Pleas, Philadelphia County, Pennsylvania and all damages, relief at law or equity, payments, income or fees, and any other proceeds (including, without limitation, insurance proceeds) of any kind or in any form related to such claims.

(b)    "Adequate Protection Liens" means, collectively, the adequate protection liens as such liens are defined in the Financing Order.

(c)    "Bankruptcy Code" means the United States Bankruptcy Code, being Title 11 of the United States Code as enacted in 1978, as the same may have heretofore been or may hereafter be amended, recodified, modified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

(d)    "Bankruptcy Court" means the United States Bankruptcy Court or the United States District Court for the District of Delaware.

(e)    "Bankruptcy Events" means the commencement of the Chapter 11 Case, the events and conditions leading up to the commencement of the Chapter 11 Case, and the occurrence and existence of any defaults under agreements that have no effect under the terms of the Bankruptcy Code as a result of the commencement thereof.

(f)    "Bidding Procedures" means the bidding procedures governing the Sales Transaction as approved by the Bankruptcy Court pursuant to the Bidding Procedures Order and any other order of the Bankruptcy Court affecting the Sales Transaction, which shall be in form and substance satisfactory to Lender.

(g)    "Bidding Procedures Order" means an order of the Bankruptcy Court approving the Bidding Procedures for the Sales Transaction, scheduling the date for an auction for the Sales Transaction and scheduling a hearing to consider approval of the Sales Transaction, establishing related objection and other deadlines, and approving related notices and forms, in each case in form and substance satisfactory to Lender.

(h)    "Budget" means the eighteen (18) week budget prepared by Borrower and the Chief Restructuring Officer, which is set forth on Exhibit A hereto, setting forth on a weekly basis for the periods covered thereby, (a) the projected total cash receipts from sales and the projected total operating costs, expenses and disbursements of Borrower, and (b) the projected net expenses and projected net operating cash flow of Borrower, in form and substance satisfactory to Lender, delivered to Lender in accordance with the terms and conditions of the Ratification Agreement.

(i)    "Budget Compliance Report" has the meaning set forth in Section 5.3(b) of the Ratification Agreement.

8564238.13                                    2

(j)    "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by Lender to Debtor, Debtor's lead counsel in the Chapter 11 Case, counsel to any Committee and the U.S. Trustee following the occurrence and during the continuation of an Event of Default, stating that the Post-Trigger Date Carve Out has been invoked.

(k)    "Chapter 11 Case" means the case under Chapter 11 of the Bankruptcy Code commenced by Debtor which is being administered under the Bankruptcy Code and is pending in the Bankruptcy Court.

(l)    "Commercial Tort Claim Security Agreement" means the Supplemental Commercial Tort Claim Security Agreement, dated as of October 16, 2019, between Borrower and Lender, as may be amended, modified, supplemented, extended, renewed, restated.

(m)    "Committee" means any official committee of unsecured creditors in the Chapter 11 Case pursuant to Section 1102 of the Bankruptcy Code.

(n)    "Chief Restructuring Officer" means Mr. Ron Mayo or such other chief restructuring advisor selected by Borrower and acceptable to Lender.

(o)    "CRO Engagement Agreement" means the Advisory Agreement, dated August 3, 2025, between Borrower and Carl Marks Advisory Group LLC, as may be amended, modified, supplemented, extended, renewed, restated or replaced in accordance with the terms of the Ratification Agreement.

(p)    "DIP Credit Facility" means the senior secured DIP Term Loans provided by Lender to Borrower as debtor and debtor-in-possession during the Chapter 11 Case as set forth in the Ratification Agreement and the Financing Order.

(q)    "DIP Exit Fee" shall have the meaning set forth in Section 6 of the Ratification Agreement.

(r)    "DIP Reserve" means an amount or amounts determined by Lender in its discretion to account for (i) the Post-Trigger Date Carve Out, (ii) any unpaid administrative expense claims of the Borrower or other priority claims in the Chapter 11 Case that, in Lender's determination, may require payment prior to the payment in full of all Obligations, and (iii) the amount of any liens or claims in or against the Collateral that are pari passu with or senior to any liens and claims of Lender, each of the forgoing in an amount as determined by Lender in its discretion; provided, however that the DIP Reserve shall not exceed $1,050,000 in the aggregate. The Lender shall provide the Borrower with two (2) Business Days' notice prior to the implementation of any new DIP Reserve following the Ratification Effective Date or any change in the methodology on the calculation of an existing DIP Reserve (provided, however, that failure to provide such notice shall not preclude the effectiveness of such DIP Reserve).

(s)    "DIP Term Loans" means, collectively, the Tranche A DIP Term Loans and the Tranche B DIP Term Loans.

(t)      "DIP Term Loan Commitment" means the sum of the Tranche A DIP Term Loan Commitment and the Tranche B DIP Term Loan Commitment.

(u)      "DIP Term Loan Commitment Amount" means, as of any date of determination, the sum of the Tranche A DIP Term Loan Commitment Amount and the Tranche B DIP Term Loan Commitment Amount.

(v)      "Final Financing Order" means the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing of the Bankruptcy Court, which order shall be in form and substance satisfactory to the Lender in its sole discretion and from which no appeal or motion to reconsider has been filed, together with all extensions, modifications and amendments thereto, consented to by the Lender, which among other matters, but not by way of limitation, authorizes the Borrower to obtain credit, incur the Post-Petition Obligations, and grant Liens therefor and grants superpriority expense claims to Lender with respect to all obligations due Lender, subject to no priority claim or administrative expenses of the Chapter 11 Case or any other entity (other than as specifically set forth in the Financing Order).

(w)      "Financing Order" means, individually and collectively, the Interim Financing Order, the Final Financing Order and such other orders relating thereto or authorizing the granting of credit by Lender to Borrower on an emergency, interim or permanent basis pursuant to Section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in the Chapter 11 Case.

(x)      "First Day Orders" means the orders entered by the Bankruptcy Court in respect of first day motions and applications to be filed by Debtor in respect of the Chapter 11 Case.

(y)      "Interim Financing Order" means the order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing in form and substance satisfactory to the Lender in its sole discretion, together with all extensions, modifications, and amendments thereto consented to by the Lender, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Borrower to execute and perform under the terms of the Pre-Petition Financing Agreements, as amended and supplemented by the terms and conditions of the Ratification Agreement.

(z)      "Investment Banker" means SSG Capital Advisors, LLC or such other investment banking firm selected and retained by Borrower acceptable to Lender pursuant to the Investment Banking Agreement.

(aa)      "Investment Banking Agreement" means the engagement agreement, dated August 21, 2025, between Borrower and SSG Advisors, LLC or such other engagement letter between Borrower and a replacement investment banker, as may be amended, modified, supplemented, extended, renewed, restated or replaced in accordance with the terms of the Ratification Agreement.

(bb)      "LC Tranche A DIP Term Loans" means the Tranche A DIP Term Loans made pursuant to Section 2.8(e) hereof to fund Letter of Credit Disbursements in the Chapter 11 Case of up to $821,588.

(cc)    "Loan Agreement" means the Pre-Petition Loan Agreement as ratified, amended, supplemented and otherwise modified by the Ratification Agreement, as the same now exists or may hereafter be amended from time to time.

(dd)    "Material Budget Deviation" has the meaning set forth in Section 5.3(b) of the Ratification Agreement.

(ee)    "Obligations" means, collectively, all Pre-Petition Obligations and all Post-Petition Obligations.

(ff)    "Petition Date" means the date of the commencement of the Chapter 11 Case.

(gg)    "Post-Petition Collateral" means, collectively, all now existing and hereafter acquired real and personal property of Debtor's estate, wherever located, of any kind, nature or description, including any such property in which a lien is granted to Lender pursuant to the Financing Agreements, the Financing Order or any other order entered or issued by the Bankruptcy Court, and shall include, without limitation:

(i)    all of the Pre-Petition Collateral;

(ii)    all Accounts;

(iii)    all general intangibles, including, without limitation, all Intellectual Property;

(iv)    all goods, including, without limitation, Inventory and Equipment;

(v)    all Real Property and leasehold interests and fixtures;

(vi)    all chattel paper, including, without limitation, all tangible and electronic chattel paper;

(vii)    all instruments, including, without limitation, all promissory notes;

(viii)    all documents;

(ix)    all deposit accounts;

(x)    all letters of credit, banker's acceptances and similar instruments and including all letter-of-credit rights;

(xi)    all supporting obligations and all present and future liens, security interests, rights, remedies, title and interest in, to and in respect of Receivables and other Collateral, including (i) rights and remedies under or relating to guaranties, contracts of suretyship, letters of credit, credit insurance and other insurance related to the Collateral, (ii) the

right, title and interest in and to all insurance policies, including all rights and remedies under or relating to any business interruption insurance, liability insurance, D&O insurance and property insurance and any losses or claims thereunder, (iii) goods described in invoices, documents, contracts or instruments with respect to, or otherwise representing or evidencing, Receivables or other Collateral, including returned, repossessed and reclaimed goods, and (iv) deposits by and property of account debtors or other persons securing the obligations of account debtors;

(xii)    all (i) investment property (including securities, whether certificated or uncertificated, securities accounts, security entitlements, commodity contracts or commodity accounts) (ii) Equity Interests of Skull Valley Joint Venture, and (ii) monies, credit balances, deposits and other property of Debtor now or hereafter held or received by or in transit to Lender or its Affiliates or at any other depository or other institution from or for the account of Debtor, whether for safekeeping, pledge, custody, transmission, collection or otherwise;

(xiii)   all commercial tort claims under the Pre-Petition Loan Agreement, including, without limitation, all Commercial Tort Claim Collateral;

(xiv)    to the extent not otherwise described above, all Receivables;

(xv)     all Records;

(xvi)    effective upon entry of a Final Financing Order, all claims, rights, interests, assets and properties recovered by or on behalf of Borrower or any trustee of Borrower (whether in the Chapter 11 Case or any subsequent case to which the Chapter 11 Case is converted), including, without limitation, all property recovered as a result of transfers or obligations avoided or actions maintained or taken pursuant to (among others) Sections 542, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code; and

(xvii)   to the extent not covered by the foregoing clauses, all proceeds and products in whatever form of all or any part of the other Collateral, including all rents, profits, income and benefits and all proceeds of insurance and all condemnation awards and all other compensation for any event of loss with respect to all or any part of the other Collateral (together with all rights to recover and proceed with respect to the same), and all accessions to, substitutions for and replacements of all or any part of the other Collateral.

(hh)    "Post-Petition Obligations" means all Obligations (as defined in the Pre-Petition Loan Agreement) of Debtor arising from, related to or in connection with any Loans, Letters of Credit or other advances on and after the Petition Date together with all other obligations, liabilities or indebtedness of up to $10,000,000 of Pre-Petition Obligations that Lender is entitled to treat as administrative claims in accordance with the Financing Order and whether arising on or after the conversion or dismissal of the Chapter 11 Case, and whether arising under or related to the Ratification Agreement, the Loan Agreement, the other Financing Agreements, a Financing Order, by operation of law or otherwise, and whether incurred by Debtor as principal, surety, endorser, guarantor or otherwise and including, without limitation, all principal, interest, financing charges, letter of credit fees, unused line fees, servicing fees, line increase fees, debtor-in-possession facility fees, early termination fees, other fees, commissions,

costs, expenses and attorneys', accountants' and consultants' fees and expenses incurred in connection with any of the foregoing. For the avoidance of doubt, the Post-Petition Obligations shall include that portion of the outstanding Pre-Petition Obligations owed to Lender in connection with or related to the Loans that have been "rolled-up" from time to time as provided in the Financing Order.

(ii)        "Post-Trigger Date Carve Out" shall have the meaning set forth in the Financing Order.

(jj)        "Pre-Petition Collateral" means, collectively, (i) all "Collateral" as such term is defined in the Pre-Petition Loan Agreement as in effect immediately prior to the Petition Date, and (ii) all other security for the Pre-Petition Obligations as provided in the Pre-Petition Loan Agreement and the other Pre-Petition Financing Agreements immediately prior to the Petition Date.

(kk)        "Pre-Petition Loan Agreement" means the Loan and Security Agreement, dated June 24, 2002, by and between Lender and Borrower, as amended by Amendment No. 1 to Loan and Security Agreement, dated as of October 28, 2002, Amendment No. 2 and Waiver to Loan and Security Agreement, dated as of June 21, 2004, Amendment No. 3 to Loan and Security Agreement, dated as of January 21, 2005, Amendment No. 4 to Loan and Security Agreement, dated as of March 7, 2005, Amendment No. 5 to Loan and Security Agreement, dated as of June 1, 2005, Amendment No. 6 to Loan and Security Agreement, dated as of October 2, 2006, Amendment No. 7 to Loan and Security Agreement, dated as of October 11, 2007, Amendment No. 8 to Loan and Security Agreement and Waiver, dated as of April 10, 2009, Amendment No. 9 to Loan and Security Agreement, dated June 1, 2009, Amendment No. 10 to Loan and Security Agreement, dated as of October 1, 2010, Amendment No. 11 to Loan and Security Agreement, dated as of September 21, 2011, Amendment No. 12 to Loan and Security Agreement, dated as of January 3, 2012, Amendment No. 13 to Loan and Security Agreement, dated as of March 15, 2012, Amendment No. 14 to Loan and Security Agreement, dated as of October 31, 2013, Amendment No. 15 to Loan and Security Agreement, dated as of March 31, 2015, Amendment No. 16 to Loan and Security Agreement, dated as of May 1, 2015, Amendment No. 17 to Loan and Security Agreement, dated as of July 31, 2015, Amendment No. 18 to Loan and Security Agreement, dated as of October 30, 2015, Amendment No. 19 to Loan and Security Agreement, dated as of February 22, 2016, Amendment No. 20 to Loan and Security Agreement, dated as of December 16, 2016, Amendment No. 21 to Loan and Security Agreement, dated as of February 28, 2019, Amendment No. 22 to Loan and Security Agreement, dated as of August 1, 2019, Amendment No. 23 to Loan and Security Agreement, dated as of December 10, 2019, Amendment No. 24 to Loan and Security Agreement, dated as of March 31, 2020, Amendment No. 25 to Loan and Security Agreement, dated as of August 21, 2020, Amendment No. 26 to Loan and Security Agreement, dated as of November 30, 2020, Amendment No. 27 to Loan and Security Agreement, dated as of December 30, 2020, Amendment No. 28 to Loan and Security Agreement, dated as of January 22, 2021, Amendment No. 29 to Loan and Security Agreement, dated as of April 28, 2022, Amendment No. 30 to Loan and Security Agreement, dated as of June 29, 2022, Amendment No. 31 to Loan and Security Agreement, dated as of July 22, 2022, Amendment No. 32 to Loan and Security Agreement, dated as of August 11, 2022, Amendment No. 33 to Loan and Security Agreement, dated as of October 31, 2022, Amendment No. 34 to Loan and Security Agreement, dated as of January 31,

2022, Amendment No. 35 to Loan and Security Agreement, dated as of March 7, 2023, Amendment No. 36 to Loan and Security Agreement, dated as of May 5, 2023, Amendment No. 37 to Loan and Security Agreement, dated as of June 26, 2023, Amendment No. 38 to Loan and Security Agreement, dated as of July 12, 2023, Amendment No. 39 to Loan and Security Agreement, dated as of October 2, 2023, Amendment No. 40 to Loan and Security Agreement, dated as of November 20, 2023, Amendment No. 41 to Loan and Security Agreement, dated as of May 29, 2024, and Forbearance Agreement and Amendment No. 42 to Loan and Security Agreement, dated as of February 19, 2025 and as in effect immediately prior to the Petition Date.

(ll)    "Pre-Petition Financing Agreements" means the Financing Agreements (as defined in the Pre-Petition Loan Agreement), as in effect immediately prior to the Petition Date.

(mm)    "Pre-Petition Obligations" means all Obligations (as such term is defined in the Pre-Petition Loan Agreement) arising at any time before the Petition Date.

(nn)    "Professionals" means the Debtor's and any Committee's professionals, retained by either of them by order of the Bankruptcy Court under Sections 327, 328 or 1103(a) of the Bankruptcy Code.

(oo)    "Purchase Agreement" means the asset purchase agreement that may be entered into between Borrower, as seller, and a buyer acceptable to Lender pursuant to which the buyer shall purchase all or substantially all of the assets and business of Borrower including, without limitation, the Utah Mineral Lease Documents (including the schedules and exhibits to such purchase agreement), which purchase agreement shall be in form and substance acceptable to Lender.

(pp)    "Purchase Documents" means (a) the Purchase Agreement and (b) all material agreements, documents and instruments, including all schedules and exhibits thereto, at any time executed and/or delivered in connection therewith, all of which agreements, documents and instruments shall be in form and substance acceptable to Lender.

(qq)    "Ratification Agreement" means the Ratification and Amendment Agreement, dated as of September __, 2025, by and between Borrower and Lender, as the same may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(rr)    "Ratification Effective Date" means the date on which all of the conditions precedent in Section 9 of the Ratification Agreement have been satisfied (or waived) by Lender in its discretion.

(ss)    "Sale Order" means an order entered by the Bankruptcy Court approving the Sales Transaction, which order shall be in form and substance satisfactory to Lender, and shall provide for, among other things, the receipt by Lender of all net cash proceeds from any Sales Transaction to be applied to the payment in full of all Obligations in such manner as Lender shall determine in accordance with the Financing Agreements.

(tt)    "Sales Transaction" means a sale of all or substantially all of the Borrower's assets and business pursuant to Section 363 of the Bankruptcy Code, including,

without limitation, all right, title and interest of Borrower in respect of the Utah Mineral Lease Documents, on terms and conditions satisfactory to Lender.

(uu)    "Salt Lake City Mortgage" means the Deed of Trust, Fixture Filing and Assignment of Rents and Leases, dated on or about the Ratification Effective Date, by Borrower in favor of Lender with respect to the Salt Lake City Property, as may be amended, modified, supplemented, extended, renewed, restated or replaced.

(vv)    "Salt Lake City Property" means the Real Property located at 238 North 2200 West, Salt Lake City, UT 84116 in Salt Lake County, UT, together with all buildings, structures, fixtures and other improvements relating thereto.

(ww)    "Salt Lake City Purchase Agreement" means the purchase and sale agreement for the sale by Borrower, as seller, to a purchaser acceptable to Lender with respect to the purchase of the Salt Lake City Property (including the schedules and exhibits thereto), which agreement shall be in form and substance acceptable to Lender.

(xx)    "Salt Lake City Purchase Documents" means (a) the Salt Lake City Purchase Agreement and (b) all material deeds, agreements, documents and instruments, including all schedules and exhibits thereto, with respect to the sale of the Salt Lake City Property at any time executed and/or delivered in connection therewith, all of which deeds, agreements, documents and instruments shall be in form and substance acceptable to Lender.

(yy)    "Salt Lake City Sale Order" means an order entered by the Bankruptcy Court approving the sale of the Salt Lake City Property, which order shall be in form and substance satisfactory to Lender, and shall provide for, among other things, the receipt by Lender of all net cash proceeds from the sale of the Salt Lake City Property to be applied to the payment in full of all Obligations in such manner as Lender shall determine in accordance with the Financing Agreements.

(zz)    "Skull Valley Joint Venture" means the business and assets of the joint venture owned by Skull Valley, including all right, title and interest of Skull Valley to own and operate the water delivery system located in Tooele County, Utah, including all water rights, machinery, equipment and other property set forth in the agreements, documents and instruments providing for the Skull Valley Joint Venture.

(aaa)    "Skull Valley" means Skull Valley Water Group, LLC, a Utah limited liability company, its successors and assigns.

(bbb)    "Tranche A DIP Term Loan Commitment" means the commitment of Lender to make the Tranche A DIP Term Loans (including any LC Tranche A DIP Term Loans) as set forth in Section 2.8 of the Loan Agreement.

(ccc)    "Tranche A DIP Term Loan Commitment Amount" means, as of any date of determination, the amount equal to (i) (A) $5,000,000 consisting of Tranche A DIP Term Loans made pursuant to Section 2.8(c) hereof plus (B) $821,588 consisting of LC Tranche A DIP Term Loans made pursuant Section 2.8(e) hereof minus (ii) the original principal amount

of all Tranche A DIP Term Loans (including any LC Tranche A DIP Term Loans) made prior to such date.

(ddd)   "Tranche A DIP Term Loans" means the delayed draw term loans, including any LC Tranche A DIP Term Loans, made by Lender to Borrower up to the Tranche A DIP Term Loan Commitment Amount in accordance with Section 2.8 of the Loan Agreement.

(eee)   "Tranche A DIP Term Note" means the Tranche A DIP Term Loan Promissory Note, dated as of the Ratification Effective Date, by Borrower payable to the order of Lender, in form and substance acceptable to Lender, evidencing any Obligations of Borrower to Lender arising from the Tranche A DIP Term Loans, as may be amended, modified, supplemented, extended, renewed, restated or replaced.

(fff)   "Tranche B DIP Term Loan Commitment" means the commitment of Lender to make the Tranche B DIP Term Loan as set forth in Section 2.8 of the  Loan Agreement.

(ggg)   "Tranche B DIP Term Loan Commitment Amount" means, as of any date of determination, the amount equal to (i) $5,000,000 minus (ii) the original principal amount of all Tranche B DIP Term Loans made prior to such date.

(hhh)   "Tranche B DIP Term Loan Participant" means Renco Group, Inc. as the purchaser of the Tranche B DIP Term Loan Participation, together with its successors and assigns to the extent permitted under the Tranche B DIP Term Loan Participation Agreement.

(iii)   "Tranche B DIP Term Loan Participation" means the undivided, junior subordinated interests in Lender's right title and interest in and to the Tranche B DIP Term Loan Commitment purchased by Tranche B DIP Term Loan Participant from Lender pursuant to the Tranche B DIP Term Loan Participation Agreement.

(jjj)   "Tranche B DIP Term Loan Participation Agreement" means the Tranche B DIP Term Loan Participation Agreement, dated as of the Ratification Effective Date, between Lender and Tranche B DIP Term Loan Participant, as the same now exists or may from time to time be amended, modified, supplemented, extended, renewed, restated or replaced.

(kkk)   "Tranche B DIP Term Note" means the Tranche B DIP Term Loan Promissory Note, dated as of the Ratification Effective Date, by Borrower payable to the order of Lender, in form and substance acceptable to Lender, evidencing any Obligations of Borrower to Lender arising from the Tranche B DIP Term Loans, as may be amended, modified, supplemented, extended, renewed, restated or replaced.

(lll)   "Tranche B DIP Term Loans" means the delayed draw term loans made by Lender to Borrower up to the Tranche B DIP Term Loan Commitment Amount in accordance with Section 2.8 of the Loan Agreement.

(mmm) "Utah Mineral Lease" means the Agreement, dated July 31, 1969, between the State of Utah acting through Utah Trust Lands Administration (formerly known as the Utah State Land Board) and the Utah Department of Natural Resources with respect to the

mineral leases and use rights by Borrower of the land owned by the State of Utah located in Tooele County, Utah and Box Elder County, Utah granting the right to Borrower to use the land and water rights to extract, produce, mine and develop the salts, lithium, brine and other minerals and chemicals from the Great Salt Lake as provided therein, as amended, modified, supplemented, extended, renewed, restated or replaced.

(nnn)   "Utah Mineral Lease Documents" means, collectively, (a) the Utah Mineral Lease and (b) any royalty agreements, options, access agreements or leases related to the Utah Mineral Lease, as amended, modified, supplemented, extended, renewed, restated or replaced.

1.2    <u>Amendments to Definitions</u>.

(a)    <u>Base Rate Margin</u>. The definition of "Base Rate Margin" in the Pre-Petition Loan Agreement is hereby replaced with the following:

"Base Rate Margin" means 7.5%.

(b)    <u>Borrower and Debtor</u>.  All references to the terms "Borrower",  or "Debtor" in the Loan Agreement or the other Financing Agreements shall be deemed, and each such reference is hereby amended, to mean and include the Debtor, as defined herein, and its successors and assigns (including any trustee or other fiduciary hereafter appointed as Debtor's legal representative, as applicable, or with respect to Debtor or the property of the estate of Debtor whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of Debtor).

(c)    <u>Collateral</u>.  All references to the term "Collateral" in the Loan Agreement or the other Financing Agreements, or any other term referring to the security for the Pre-Petition Obligations, shall be deemed, and each such reference is hereby amended to mean, collectively, the Pre-Petition Collateral and the Post-Petition Collateral.

(d)    <u>Commercial Tort Claim Collateral</u>.  The definition of "Commercial Tort Claim Collateral" in the Pre-Petition Loan Agreement is hereby amended to include, in addition and not limitation, the Ace Commercial Tort Claim and Section 5.2(g) of the Pre-Petition Loan Agreement is hereby amended to include, in addition and not in limitation, the reference to the Ace Commercial Tort Claim.  On and after the Ratification Effective Date, the provisions of Section 2.2 of the Commercial Tort Claim Security Agreement shall apply to the Ace Commercial Tort Claim.

(e)    <u>Financing Agreements</u>.  All references to the term "Financing Agreements" in the Loan Agreement or the other Financing Agreements shall be deemed, and each such reference is hereby amended, to include, in addition and not in limitation, the Ratification Agreement and all of the Pre-Petition Financing Agreements, as ratified, assumed and adopted by Borrower pursuant to the terms of the Ratification Agreement, as amended and supplemented thereby, and the Financing Order, as each of the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(f)     Interest Rate. The definition of "Interest Rate" in the Pre-Petition Loan Agreement is hereby replaced with the following:

"Interest Rate" means as of the Ratification Effective Date and at all times thereafter, as to all Obligations (except for undrawn Letters of Credit) that have been charged to the loan account pursuant to the terms hereof, shall bear interest subject to adjustment as provided in Section 3.1(b) hereof, as follows:

(a) as to all Revolving Loans and all Term Loans (other than the DIP Term Loans), a rate per annum equal to the Base Rate Margin plus .5%;

(b) as to all DIP Term Loans, a rate per annum equal to the Base Margin Rate plus 1.0%.

(g)     Letter of Credit Limit. The definition of "Letter of Credit Limit" in the Loan Agreement and the other Financing Agreements is hereby replaced with the following:

"Letter of Credit Limit" means as of the Ratification Effective Date and at all times thereafter, $821,588.

(h)     Loan Agreement.  All references to the term "Agreement" in the Pre-Petition Loan Agreement or the term "Loan Agreement" in the other Financing Agreements shall be deemed, and each such reference is hereby amended, to mean the Loan Agreement (as defined in the Ratification Agreement), and as ratified, assumed and adopted by Borrower pursuant to the terms hereof and the Financing Order.

(i)     Loans.  The definition of "Loans" in the Pre-Petition Loan Agreement is hereby amended to include, without limitation, and all references to the term "Loans" in the Loan Agreement and the other Financing Agreements shall be deemed and each such reference is hereby amended to include, in addition and not in limitation, the DIP Term Loans, including, without limitation, all Tranche A DIP Term Loans (including all LC Tranche A DIP Term Loans) and all Tranche B DIP Term Loans.

(j)     Material Adverse Effect.  All references to the term "material adverse effect" or "material adverse change" in the Loan Agreement, the Ratification Agreement or the other Financing Agreements shall be deemed, and each such reference is hereby amended, to add at the end thereof:  "; provided, that, the Bankruptcy Events shall not, individually or collectively, constitute a material adverse effect or material adverse change".

(k)     Maturity Date.  The definition of "Maturity Date" in the Pre-Petition Loan Agreement is hereby deleted in its entirety and the following substituted therefor:

"Maturity Date" means the earliest to occur of (a) January 9, 2026, (b) the consummation of the sale or sales of all or substantially all of the Borrower's assets and properties or of all equity interests of Borrower, (c) the last date Borrower is authorized to borrow funds under the Loan Agreement pursuant to the Interim Financing Order, unless the Final Financing Order has been entered prior to such date, and in such event,

then the last date Borrower is authorized to borrow funds under the Loan Agreement pursuant to the Final Financing Order, or (d) unless Lender otherwise agrees in writing in its discretion, the occurrence of an Event of Default.

(l)    Maximum Credit. The definition of "Maximum Credit" in the Loan Agreement and the other Financing Agreements is hereby replaced with the following:

"Maximum Credit" means, at any time on and after the Forbearance Effective Date, the amount equal to the lesser of (a) $80,821,588 and (b) the sum of (i) the Revolving Loan Limit then in effect, plus (ii) the then outstanding principal amount of Term Loan C, plus accrued and unpaid interest thereon, plus (iii) the then outstanding amount of the DIP Term Loans.

(m)    Obligations. All references to the term "Obligations" in the Loan Agreement, the Ratification Agreement or the other Financing Agreements shall be deemed, and each such reference is hereby amended, to mean both the Pre-Petition Obligations and the Post-Petition Obligations.

(n)    Reserves. The definition of "Reserves" in the Pre-Petition Loan Agreement is hereby amended to include, without limitation, any all references to the term "Reserves" in the Loan Agreement and the other Financing Agreements shall be deemed and each such reference is hereby amended to include, in addition and not in limitation, the DIP Reserves.

(o)    Revolving Loan Limit. The definition of "Revolving Loan Limit" in the Loan Agreement and the other Financing Agreements is hereby replaced with the following:

"Revolving Loan Limit" means as of the Ratification Effective Date and at all times thereafter, $43,000,000.

1.3    Interpretation.

(a)    For purposes of the Ratification Agreement, unless otherwise defined or amended herein, including, but not limited to, those terms used or defined in the recitals hereto, all terms used herein shall have the respective meanings assigned to such terms in the Pre-Petition Loan Agreement, as amended, supplemented or otherwise modified by the Ratification Agreement.

(b)    All references to any term in the singular shall include the plural and all references to any term in the plural shall include the singular unless the context of such usage requires otherwise.

(c)    All terms not specifically defined herein which are defined in the Uniform Commercial Code, as in effect in the State of New York as of the date hereof, shall have the meaning set forth therein, except that the term "Lien" or "lien" shall have the meaning set forth in § 101(37) of the Bankruptcy Code.

## 2. ACKNOWLEDGMENTS.

2.1 <u>Pre-Petition Obligations</u>. The Borrower hereby acknowledges, confirms and agrees that, as of September 9, 2025, Borrower is indebted to (a) Lender in respect of all Pre-Petition Obligations, (a) in an aggregate principal amount of $67,039,013.02 consisting of the following: (i) Revolving Loans made pursuant to the Pre-Petition Loan Agreement in the aggregate principal amount of $40,451,903.55, (ii) Term Loans in the aggregate principal amount of $25,000,000, comprised of Term Loan C in the principal amount of $25,000,000, plus accrued and unpaid interest through August 31, 2025 in the amount of $765,521.47, and (iii) Letters of Credit in the undrawn face amount of $821,588; (b) all the foregoing amounts, together with all interest accrued and accruing thereon, and all fees, costs, expenses and other charges relating thereto, are unconditionally owing by Borrower to Lender, without offset, defense or counterclaim of any kind, nature or description whatsoever; and (c) Borrower's obligation and liability for the payment and performance of all other Obligations pursuant to the Loan Agreement and the other Financing Agreements is unconditionally owing to Lender without offset, defense or counterclaim of any kind, nature or description whatsoever.

2.2 <u>Acknowledgment of Security Interests</u>. Borrower hereby acknowledges, confirms and agrees that Lender has and shall continue to have (a) valid, enforceable and perfected first priority and senior security interests in and liens upon all Pre-Petition Collateral heretofore granted to Lender pursuant to the Pre-Petition Financing Agreements as in effect immediately prior to the Petition Date to secure all of the Pre-Petition Obligations, and (b) valid and enforceable first priority and senior security interests in and liens upon all Post-Petition Collateral granted to Lender under the Financing Order or hereunder or under any of the other Financing Agreements or otherwise granted to or held by Lender, in each case, subject only to the Liens permitted hereunder.

2.3 <u>Binding Effect of Documents</u>. Borrower hereby acknowledges, confirms and agrees that: (a) each of the Pre-Petition Financing Agreements to which they are party prior to the Petition Date was duly executed and delivered to Lender by Borrower and each is in full force and effect as of the date hereof, (b) the agreements and obligations of Borrower contained in the Pre-Petition Financing Agreements constitute the legal, valid and binding obligations of Borrower enforceable against it in accordance with the terms thereof, and Borrower has no valid defense, offset or counterclaim to the enforcement of such obligations, and (c) Lender is and shall be entitled to all of the rights, remedies and benefits provided for in (i) the Financing Agreements (subject to the entry and terms of the Financing Order) and (ii) the Financing Order.

## 3. ADOPTION AND RATIFICATION.

3.1. Borrower (a) ratifies, assumes, adopts and agrees to be bound by all of the Pre-Petition Financing Agreements and (b) agrees to pay all of the Pre-Petition Obligations in accordance with the terms of such Pre-Petition Financing Agreements, as supplemented and amended by the Ratification Agreement, and in accordance with the Financing Order. All of the Pre-Petition Financing Agreements are hereby incorporated herein by reference and hereby are and shall be deemed adopted and assumed in full by Borrower, as Debtor and Debtor-in-Possession and considered as agreements between Borrower, on the one hand, and Lender, on the other hand. Borrower hereby ratifies, restates, affirms and confirms all of the terms and

conditions of the Pre-Petition Financing Agreements, as amended and supplemented pursuant hereto and the Financing Order, and Borrower, as Debtor and Debtor-in-Possession, agrees to be fully bound by the terms of the Financing Agreements.

3.2.    Notwithstanding anything in Section 3.1 of the Ratification Agreement to the contrary, the Lender acknowledges that the Specified Defaults and certain Events of Default have occurred and are continuing under the Pre-Petition Loan Agreement and the other Pre-Petition Financing Agreements, including, but not limited to, as a result of the commencement of the Chapter 11 Case and the other Bankruptcy Events (collectively, the "Specified Defaults"). From and after the Ratification Effective Date, for purposes of determining whether any Default or Event of Default has occurred under the Loan Agreement or any other Financing Agreement, Lender hereby agrees that all such Specified Defaults shall be excluded from any determination of such Default or Event of Default  and only Defaults and Events of Default (as provided  in the Loan Agreement) occurring from and after the Ratification Effective Date shall constitute Defaults and Events of Default under the Loan Agreement.  For the avoidance of doubt, none of the Specified Defaults shall give any right to the Lender or any Lender to exercise or enforce any of their respective rights or remedies under the Loan Agreement or the other Financing Agreements on the basis of the occurrence and/or existence of any one or more of the Specified Defaults.

### 4.    <u>GRANT OF SECURITY INTEREST</u>.

As additional collateral security for the prompt performance, observance and payment in full of all of the Obligations, Borrower, as Debtor and Debtor-in-Possession, hereby grants, pledges and assigns to Lender and also confirms, reaffirms and restates the prior grant to Lender of, continuing senior priority security interests in and liens upon, and rights of setoff against, all of the Collateral.

### 5.    <u>ADDITIONAL REPRESENTATIONS, WARRANTIES AND COVENANTS</u>.

In addition to the representations, warranties and covenants made by Borrower to Lender under the Loan Agreement and the other Financing Agreements (in each case, for the avoidance of doubt, as amended by or provided in the Ratification Agreement), Borrower hereby represents, warrants and covenants to Lender the following (which shall survive the execution and delivery of the Ratification Agreement), the truth and accuracy of which, or compliance with, to the extent such compliance does not violate the terms and provisions of the Bankruptcy Code, shall be a continuing condition precedent to the making of Loans by Lender:

5.1    <u>Financing Order</u>.  Borrower shall not seek to have any Financing Order vacated, modified, reversed on appeal, or vacated or modified by any order of the Bankruptcy Court (other than as consented to by Lender).

5.2    <u>Use of Proceeds</u>.  All Loans provided by Lender to Borrower pursuant to the Financing Order, the Loan Agreement or otherwise, shall only be used by Debtor to the extent (a) provided for in the Budget in accordance with the Ratification Agreement, (b) permitted by the Loan Agreement as amended by the Ratification Agreement or (c) as authorized

by the Bankruptcy Court and consented to by the Lender for (i) general working capital needs to the extent provided in the Budget, (ii) the repayment of the Obligations and (iii) the payment of fees, expenses, and costs incurred in connection with the Ratification Agreement and the Chapter 11 Case, including the payments of any adequate protection payments approved in the Financing Order.

        5.3    Budget.

        (a)    Borrower and the Chief Restructuring Officer shall have prepared and delivered to Lender, in form and substance satisfactory to Lender, the Budget covering the 18-week period commencing with the full week ending on September 14, 2025 through and including the full week ending on January 11, 2026. The Budget shall not be updated, amended or modified without the prior written consent of Lender.

        (b)    Not later than 5:00 p.m. (Eastern time) on the Wednesday of each week commencing with the Wednesday following the first full week ending after the Petition Date, Borrower shall furnish to Lender a weekly report (the "Budget Compliance Report") that sets forth on a cumulative week to date basis from the Petition Date through and including the immediately preceding Friday, (i) a comparison of (x) the actual amount of the Total Expenses of Borrower to (y) the projected amount of the Total Expenses of Borrower and (ii) an explanation of the reason for any deviation in the projected Total Expenses to the actual Total Expenses. As used herein, (i) "Total Expenses" means the sum of the line items in the Budget entitled "Total Operating Disbursements", "Total Financing Costs", "Total Ordinary Course Professionals" and "Total Restructuring Professional Fees" and (ii) a "Material Budget Deviation" means, at any time as set forth in the Budget Compliance Report, the actual amount of Total Restructuring Costs on a cumulative basis exceeds the projected amount of Total Restructuring Costs on a cumulative basis by more than five percent (5%); provided, that, if the amount of the Lender's counsels attorneys' fees exceeds the actual amount of the line item in the Budget for "Lender Counsel", the amount of any such excess shall not be included in the calculation of "Total Expenses" for purposes of determining whether a Material Budget Deviation has occurred.

        (c)    Debtor hereby confirms, acknowledges and agrees that, unless waived in writing by Lender, (i) the occurrence of a Material Budget Deviation or (ii) the failure to deliver any reports with respect to any Budget, in form and substance satisfactory to Lender in its sole discretion, shall constitute an Event of Default. Notwithstanding any approval by Lender of the Budget, Lender will not, and shall not be required to, provide any DIP Term Loans to Borrower pursuant to the Budget, but shall only provide DIP Term Loans in accordance with the terms and conditions set forth in the Loan Agreement as amended by the Ratification Agreement, the other Financing Agreements and the Financing Orders.

        (d)    Notwithstanding any amounts set forth in the Budget relating to the costs and expenses of Lender that are reimbursable by Borrower or any other amounts owing by Borrower to Lender (including, without limitation, attorneys and consulting fees and expenses) in accordance with the Loan Agreement and the other Financing Agreements, such budgeted amounts shall not limit, impair, modify or waive the Debtor's obligation to pay the actual

amounts due to Lender in respect of such costs, expenses and other amounts owing to Lender in accordance with the Loan Agreement and the other Financing Agreements.

5.4 <u>DIP Milestones</u>. In addition to the continuing representations, warranties and covenants heretofore and hereafter made by Debtor to Lender, whether pursuant to the Financing Agreements or otherwise, and not in limitation thereof, Debtor covenants and agrees to satisfy each of the following conditions:

(a)     On the Petition Date, Debtor shall file motions, each in form and substance satisfactory to Lender, requesting approval from the Bankruptcy Court, of the First Day Orders, including the cash management of Debtor;

(b)     On the Petition Date, Debtor shall file motions, each in form and substance satisfactory to Lender, requesting approval from the Bankruptcy Court, of the DIP Credit Facility under the Financing Order on the terms and conditions contemplated by the Loan Agreement, granting to Lender the security interests and liens and superpriority administrative expense claim status set forth herein and in the Financing Order, modifying the automatic stay and other provisions required by Lender and its counsel;

(c)     On or before the date that is three (3) days after the Petition Date, the Bankruptcy Court shall have entered, each in form and substance satisfactory to Lender, (i) the Interim Financing Order, and (ii) interim First Day Orders, each in form and substance satisfactory to Lender, approving the "first day" applications and motions of Debtor, including the cash management of Debtor;

(d)     On or before the date that is three (3) days after the Petition Date, Debtor shall file a motion, in form and substance satisfactory to Lender, (i) to approve the Bidding Procedures and the Bidding Procedures Order with respect to the Sales Transaction and the Purchase Agreement and (ii) to approve the Bidding Procedures and the Bidding Procedures Order with respect to the Sales Transaction pursuant to Section 363 of the Bankruptcy Code;

(e)     On or before the date that is eighteen (18) days after the Petition Date, the Bankruptcy Court shall have approved, in form and substance acceptable to Lender, the Final Financing Order;

(f)     On or before the date that is sixty (60) days after the Petition Date (unless such date is extended by Lender in its sole discretion), a hearing on the Sales Transaction shall have been held by the Bankruptcy Court and the Bankruptcy Court shall have entered, in form and substance acceptable to Lender, the Sale Order, and the consummation of the Sales Transaction shall have occurred on or before the date that is five (5) days after the Sale Order has been entered by the Bankruptcy Court; and

(g)     On or before the date that is sixty (60) days after the Petition Date (unless such date is extended by Lender in its sole discretion), the sale of the Salt Lake City Property shall have been approved pursuant to the Salt Lake City Sale Order on terms and conditions acceptable to Lender, and the consummation of the sale of the Salt Lake City Property shall have occurred on or before the date that is five (5) days after the Salt Lake City Sale Order has been entered by the Bankruptcy Court, with all net proceeds from the closing of such sale to

be remitted to Lender for application to the Obligations in accordance with the Ratification Agreement.

Debtor confirms, acknowledges and agrees that notwithstanding anything to the contrary contained in the Loan Agreement, any failure to comply with the requirements set forth in this Section 5.4 shall constitute an additional immediate Event of Default under the Financing Agreements.

   5.5 <u>ERISA</u>.  Borrower hereby represents and warrants with, to and in favor of Lender that (a) there are no liens, security interests or encumbrances upon, in or against any assets or properties of Borrower arising under ERISA, whether held by the Pension Benefit Guaranty Corporation (the "PBGC") or the contributing sponsor, or a member of the controlled group thereof, of any pension benefit plan of Borrower and (b) no notice of lien has been filed by the PBGC (or any other Person) pursuant to ERISA against any assets or properties of Borrower.

   5.6 <u>Chief Restructuring Officer</u>.

    (a) Debtor shall retain, and shall continue to retain at all times during which the Obligations remain outstanding, Ron Mayo, or such other Person(s) acceptable to Lender, as its Chief Restructuring Officer at the sole cost and expense of the Debtor, on terms and conditions acceptable to Lender pursuant to  a CRO Engagement Agreement. The Chief Restructuring Officer (in conjunction with the Independent Manager of Borrower) shall (i) review and approve the terms of debtor-in-possession financing facilities for the Loan Parties and related adequate protection arrangements in respect of the Debtor's credit facilities, (ii) review and approve the terms of any plan or pre- or post-petition asset purchase agreement, to enter into binding and definitive agreement(s) on behalf of the Debtor with respect to the foregoing, (iii) supervise the structuring and conduct a sale or plan process for the Debtor, including negotiating the terms of any competing bids, and (iv) in connection with the preceding clauses (i), (ii) and (iii), but subject to such notice and court approvals as may be required, to enter into binding agreements on behalf of the Debtor. Debtor hereby irrevocably authorizes and direct the Chief Restructuring Officer to consult with Lender and to share with Lender and its advisors, upon reasonable request therefor, all financial reports, budgets and any variances from same, other financial information, operational issues, matters related to the Collateral, all reports prepared or reviewed by the Chief Restructuring Officer, information on the sale and maintenance of the Debtor's businesses and assets and such other matters as Lender may reasonably request. Debtor agrees to provide the Chief Restructuring Officer with complete access to all of the books and records of the Debtor, all of premises of the Debtor and to all management and employees of Debtor as and when deemed necessary by the Chief Restructuring Officer.

    (b) Any amendment, modification or termination of the retention agreement with the Chief Restructuring Officer without the prior written consent of Lender shall constitute an Event of Default. Debtor acknowledges and agrees that the Debtor shall cause the Chief Restructuring Officer, as further described in clause (a) above, (i) to keep Lender fully informed of the progress of the business and operations of the Debtor and to respond to any reasonable inquiries of Lender regarding the maintenance of the Debtor's business and the sale of its assets, and (ii) to communicate and cooperate with Lender and share all information, as

reasonably requested thereby, with Lender regarding the Debtor, and the sale and maintenance of the Debtor's business and assets.

(c)     If the Chief Restructuring Officer resigns, the Debtor shall promptly notify Lender in writing of such resignation (but in any event by no later than the end of the day that Debtor learns of such resignation).   Any replacement or successor Chief Restructuring Officer shall be reasonably acceptable to Lender, shall be retained pursuant to a new retention agreement on terms and conditions reasonably acceptable to Lender within five (5) Business Days immediately following the notice of resignation of the resigning Chief Restructuring Officer, and shall be approved by the Bankruptcy Court. Failure to comply with the terms and conditions of this Section 5.6 shall constitute an Event of Default.

5.7     Investment Banker.

(a)     Debtor shall retain, and shall continue to retain at all times during which the Obligations remain outstanding, and at the sole cost and expense of Debtor, an Investment Banker, acceptable to Lender on terms and conditions acceptable to Lender pursuant to an Investment Banking Agreement, in each case in Lender's sole discretion. It being acknowledged that as of the date hereof SSG Advisors, LLC is acceptable to Lender.   The Investment Banker shall work with the Chief Restructuring Officer and management of Debtor to coordinate and conduct all aspects of the marketing and sale of substantially all of the assets and properties of Debtor.   Debtor hereby irrevocably authorizes and directs the Investment Banker to consult with Lender and to share with Lender all information and materials produced or received in connection with (i) the sale to an acceptable purchaser of substantially all of Debtor's businesses and assets, or any portion thereof and (ii) any other restructuring or financial transaction contemplated by Debtor in the Chapter 11 Case.  Debtor shall not amend, modify or terminate the retention of the Investment Banker without the prior written consent of Lender.

(b)     Debtor acknowledges and agrees that Debtor shall cause the Investment Banker to (i) keep Lender fully informed of the progress of the marketing and sale of the assets and properties of the Borrower and/or any other restructuring or financial transaction, including, without limitation, providing Lender with weekly telephonic updates regarding the foregoing, (ii) respond fully to any inquiries of Lender regarding such marketing and sale process and any restructuring or financial transaction, and (iii) communicate and fully cooperate with Lender and share all information requested by Lender with Lender regarding the marketing and sale of Debtor's assets and properties and/or other restructuring transaction. Failure to comply with the terms and conditions of this Section 5.7 shall constitute an Event of Default.

5.8     Post-Closing Covenants.  Borrower hereby covenants and agrees to deliver to Lender the following items, in form and substance acceptable to Lender:

(a)     within sixty (60) days after the Petition Date, in form and substance acceptable to Lender, a Pledge and Security Agreement with respect to the Equity Interests of Borrower in the Skull Valley Joint Venture, duly executed and delivered by Borrower, together with such agreements, documents, consents and instruments as deemed necessary or desirable by Lender to protect and enforce its Collateral;

19

(b)      within fifteen (15) days after the Petition Date, in form and substance acceptable to Lender, certificates of liability insurance and commercial property insurance with respect to the assets and properties of Borrower, including lender's loss payable endorsement and additional insured endorsements; and

(c)      within five (5) days after the Petition Date, in form and substance acceptable to Lender, the original of the Salt Lake City Mortgage, duly executed and delivered by Borrower, in form acceptable for recording in the real estate records of Salt Lake County, Utah.

For the avoidance of doubt, failure to deliver any of the items in accordance with this Section 5.8 shall constitute an Event of Default.

## 6.      **DIP EXIT FEE.**

Debtor shall pay to Lender an exit fee in the amount of $200,000 (the "DIP Exit Fee") on account of the DIP Credit Facility provided by Lender to Borrower in the Chapter 11 Case. The DIP Exit Fee shall be fully earned on the Ratification Effective Date and payable upon the consummation of the Sales Transaction or the sale of all or substantially all of the assets of Debtor. The DIP Exit Fee may be charged directly to the loan account of Borrower maintained by Lender.

## 7.      **AMENDMENTS.**

7.1      DIP Credit Facility.      Subject to the terms and conditions of this Agreement, the Loan Agreement and the Financing Orders, Lender is agreeing to provide Borrower the DIP Term Loan Commitment up to the DIP Term Loan Commitment Amount. Section 2 of the Pre-Petition Loan Agreement is hereby amended by adding a new Section 2.8 immediately after Section 2.7 as follows:

"2.8      DIP Term Loan Facility.

(a) Subject to and upon the terms and conditions contained herein, in the Ratification Agreement and the Financing Orders, Lender agrees to make to Borrower from time to time the DIP Term Loans in the aggregate principal amount of up to $10,821,588 consisting of the Tranche A DIP Term Loans in the aggregate principal amount of up to (i) $5,000,000 pursuant to Section 2.8(c) hereof and (ii) LC Tranche A DIP Term Loans in the aggregate principal amount of up to $821,588 pursuant to Section 2.8(e) hereof,  and (iii) the Tranche B DIP Term Loans in the aggregate principal amount of up to $5,000,000.

(b) The DIP Term Loans requested pursuant to Section 2.8(c) hereof will be funded on a pro rata basis, fifty percent (50%) of which will consist of proceeds of a Tranche A Term Loan and fifty percent (50%) of which consist of proceeds of a Tranche B DIP Term Loan.  Each Tranche B DIP Term Loan shall be funded using proceeds of the Tranche B DIP Term Loan Participation equal to fifty (50%) of the DIP Term Loan being requested by

Borrower. On the Ratification Effective Date, Lender shall have received from Tranche B DIP Term Loan Participant the purchase price of a Tranche B DIP Term Loan Participation in the amount equal to fifty percent (50%) of the "Net Expenses" (as such term is set forth in the Budget) for the first two (2) weeks covered in the Budget. Lender shall have no obligation to make any such DIP Term Loans unless Lender has received from Tranche B Term Loan Participant the proceeds equal to fifty percent (50%) of the amount of the DIP Term Loan being requested and the failure of Tranche B DIP Term Loan Participant to fund the purchase price of any Tranche B Term Loan Participation shall constitute an Event of Default. The proceeds of all DIP Term Loans approved by Lender pursuant to this Section 2.8(b) shall be used to fund the costs, expenses and items set forth in the Budget.

(c)  The obligation of Lender to make any DIP Term Loan pursuant to Section 2.8(b) is subject to the satisfaction of, or waiver of, immediately prior to or concurrently with the making of, any such DIP Term Loan of each of the following conditions precedent:

(i) Lender shall have received a written request by Borrower to make a DIP Term Loan not later than 1:00 p.m. on the Business Day prior to the date of the requested funding of such DIP Term Loan, which notice shall include (A) the amount of the DIP Term Loan being requested and the funding date of the DIP Term Loan and (B) the disbursements to be paid pursuant to the Budget using the proceeds of such DIP Term Loan; provided, however, that under no circumstances shall Borrower request, or shall Lender be obligated to fund, a DIP Term Loan in an amount in excess of the amount necessary to allow Borrower to make all disbursements due to be paid in accordance with the Budget over the immediately following two (2) week period; and

(ii)  all other conditions precedent set forth in Section 9 of the Ratification Agreement and Section 4.2 hereof shall have been satisfied as determined by Lender.

(d)  Upon receipt of the written request for a DIP Term Loan by Borrower pursuant to Section 2.8(c) hereof, Lender shall send a copy of the written notice to Tranche B Term Loan Participant setting forth the amount of the proceeds of the Tranche B Term Loan Participation needed to fund fifty percent (50%) of the requested DIP Term Loan.  Tranche B Term Loan Participant shall remit to Lender by no later than 10:00 a.m. on the date of the requested funding, the amount of the purchase price of the Tranche B DIP Term Loan Participation needed to fund the Tranche B DIP Term Loan. Upon receipt of the proceeds of the Tranche B DIP Term Loan Participation, Lender shall make the full amount of the DIP Term Loan being requested pursuant to Section 2.8(c) hereof. Upon the making of a Tranche A DIP Term Loan pursuant to Section 2.8(c), the Tranche A DIP Term Loan Commitment Amount shall be reduced by the amount of such Tranche A DIP Term Loan.

21

Upon the making of a Tranche B DIP Term Loan, the Tranche B DIP Term Loan Commitment Amount shall be reduced by the amount of such Tranche B DIP Term Loan.  Lender shall have no obligation to make the portion of any DIP Term Loan if after giving the effect to the requested DIP Term Loan, the DIP Term Loan Commitment Amount minus the DIP Reserve shall be less than $-0-.

(e) If Lender receives a request for a draw under a Letter of Credit in the Chapter 11 Case in accordance with Section 2.6 hereof, Lender agrees to make the payment in respect of such Letter of Credit in the amount equal to the Letter of Credit Disbursement. The amount of the Letter of Credit Disbursement made shall immediately and automatically be deemed to be a LC Tranche A DIP Term Loan under the Loan Agreement (notwithstanding any failure to satisfy any condition precedent set forth in Section 2.8(c) hereof) and shall bear interest at the rate then applicable to DIP Term Loans. Borrower's obligation to pay the amount of such Letter of Credit Disbursement to Lender shall be automatically converted into an obligation to pay the resulting LC Tranche A DIP Term Loan.  Upon the making of a LC Tranche A DIP Term Loan pursuant to this Section 2.8(e), the Tranche A DIP Term Loan Commitment Amount shall be reduced by the amount of such LC Tranche A DIP Term Loan.  All LC Tranche A DIP Term Loan s shall be deemed to constitute Tranche A DIP Term Loans only and not Tranche B DIP Term Loans.

(f) Each Tranche A DIP Term Loan (including each LC Tranche A DIP Term Loan) made available to Borrower is (i) to be repaid, together with interest in accordance with the terms of the Ratification Agreement, the Financing Orders, this Agreement, the Tranche A Term Note and the other Financing Agreements, and (ii) secured by all of the Collateral.  Each Tranche B DIP Term Loan made available to Borrower is (x) to be repaid, together with interest in accordance with the terms of the Ratification Agreement, the Financing Orders, this Agreement, the Tranche B Term Note and the other Financing Agreements, and (y) secured by all of the Collateral.

(g) The Tranche A DIP Term Loans (including all LC Tranche A DIP Term Loans) shall be evidenced by the Tranche A DIP Term Note in the principal amount of up to $5,821,588 and the Tranche B DIP Term Loans shall be evidenced by the Tranche B DIP Term Note in the principal amount of up to $5,000,000.  Once borrowed any amounts paid or prepaid in respect of the Tranche A DIP Term Loans (including all LC Tranche A DIP Term Loans) or the Tranche B DIP Term Loans may not be reborrowed.

(h) The Tranche A DIP Term Loans (including all LC Tranche A DIP Term Loans) and the Tranche B DIP Term Loans shall be repaid in accordance with Section 9.6(d) of the Loan Agreement and the Financing Orders."

7.2     Rate of Interest.  Section 3.1(a) and (b) of the Pre-Petition Loan Agreement is hereby replaced with the following:

"(a) Subject to Section 3.1(b) hereof, Borrower shall pay to Lender interest at the Interest Rate on the outstanding principal amount of the Obligations.

(b) Upon the occurrence and during the continuation of an Event of Default, upon written notice by Lender to Borrower (except that such notice shall not be required for any payment default hereunder or under the Ratification Agreement), then (i) all Loans and all other Obligations (except for undrawn Letters of Credit) shall bear interest at a per annum rate equal to two (2) percentage points above the per annum rate otherwise applicable thereto, and (ii) the Letter of Credit Fees payable under Section 3.3(c) hereof shall be increased to two (2) percentage points above the per annum rate otherwise applicable thereto."

7.3     Payments.  Section 9.6 of the Pre-Petition Loan Agreement is hereby amended by adding a new Section 9.6(d) and Section 9.6(e) immediately after Section 9.6(c) as follows:

"(d)     Notwithstanding anything to the contrary contained in this Agreement or any of the other Financing Agreements, Lender shall apply any such payments or proceeds first, to the Pre-Petition Obligations (other than Term Loan C) until such Pre-Petition Obligations are paid and satisfied in full, second, to the Post-Petition Obligations (including, without limitation, all Obligations arising in connection with the Tranche A DIP Term Loan) until such Post-Petition Obligations are paid and satisfied in full, third, to the Pre-Petition Obligations consisting of Term Loan C and fourth to the Post-Petition Obligations consisting of the Tranche B DIP Term Loans.

(e)     Notwithstanding anything to the contrary in this Agreement, to the extent not previously paid in full in cash or other immediately available funds, all DIP Term Loans and other Loans shall be due and payable in full on the Maturity Date, and may not be reborrowed thereafter."

7.4     Letters of Credit.  Notwithstanding anything to the contrary contained in the Pre-Petition Loan Agreement or the other Financing Agreements, any issued and undrawn Letters of Credit under the Pre-Petition Loan Agreement as of the Petition Date shall be deemed to be Letters of Credit under the DIP Credit Facility. On and after the Ratification Effective Date, (a) unless otherwise agreed to in Lender's sole discretion, Lender shall have no obligation to issue any new Letters of Credit under the Loan Agreement or the Ratification Agreement or increase the amount of such existing Letters of Credit issued and outstanding as of the Petition Date and (b) if Lender makes a payment under a Letter of Credit, the amount of the Letter of Credit Disbursement shall immediately and automatically be made as and be deemed to be an LC Tranche A DIP Term Loan in accordance with Section 2.8(e) of the Loan Agreement). All Letter of Credit Disbursements made in the Chapter 11 Case shall be deemed to be LC Tranche A DIP

Term Loans under the Loan Agreement, and Borrower's obligation to pay the amount of such Letter of Credit Disbursement to Lender shall be automatically converted into an obligation to pay the resulting LC Tranche A DIP Term Loan.

7.5    SOFR Option.   Notwithstanding anything to the contrary contained in the Pre-Petition Loan Agreement or the other Financing Agreements (a) the Borrower's right to request SOFR Loans in accordance with the Loan Agreement is hereby terminated and of no further force or effect, (b) no Borrowing made on or after the Petition Date shall bear interest at a rate determined by reference to the Adjusted Term SOFR, (c) all SOFR Loans shall automatically be converted to Base Rate Loans on the Petition Date, and (d) Borrower shall not request, and Lender shall have no obligation to provide, any SOFR Loans.

7.6    Indebtedness.   Notwithstanding anything to the contrary contained in Section 7.3 of the Pre-Petition Loan Agreement or any other provision of the Loan Agreement or any of the other Financing Agreements, Borrower shall not, and shall not permit any Subsidiary, after the date hereof, to, create, incur, assume, guarantee, or otherwise become directly or indirectly, liable with respect to any Indebtedness, except (a) as provided in the Financing Orders, and (b) with the express prior written consent of Lender.

7.7    Liens.   Section 7.4 of the Pre-Petition Loan Agreement is hereby replaced with the following:

"7.4    Liens.   Borrower shall not, directly or indirectly, allow or suffer to exist any Liens, other than (a) all Liens existing on the Petition Date that constituted Liens permitted in and under the Pre-Petition Loan Agreement and the other Pre-Petition Financing Agreements to the extent such liens were legal, valid, binding, enforceable and non-avoidable as of the Petition Date, and are not otherwise subject to any defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law, (b) the Adequate Protection Liens, and (c) Liens on the Collateral in respect of the Post-Trigger Date Carve Out".

7.8    Loans, Investments, Guarantees, Etc.  Notwithstanding anything to the contrary contained in Section 7.5 of the Pre-Petition Loan Agreement or any other provision of the Loan Agreement or any of the other Financing Agreements, Borrower shall not, and shall not permit any Subsidiary, after the date hereof, to, directly or indirectly, make any loans or advance money or property to any Person, or invest in (by capital contribution, dividend or otherwise) or purchase or repurchase the stock or Indebtedness or all or a substantial part of the assets or property of any Person, or guarantee, assume, endorse, or otherwise become responsible for (directly or indirectly) the Indebtedness, performance, obligations or dividends of any Person or agree to do any of the foregoing, except (a) as provided in the Financing Orders, and (b) with the express prior written consent of Lender.

7.9    Transactions with Affiliates. Notwithstanding anything to the contrary contained in Section 7.6 of the Pre-Petition Loan Agreement or any other provision of the Loan Agreement or any of the other Financing Agreements, Borrower shall not, and shall not permit any Subsidiary to, directly or indirectly (a) purchase, acquire or lease any property from, or sell,

transfer or lease any property to, any shareholder, officer, director, agent, employee or Affiliate or (b) make any payments of any dividends, management, consulting or other fees or any payments in respect of any Indebtedness owing to any shareholder, officer, director or Affiliate of Borrower, except (i) as provided in the Financing Orders, and (ii) with the express prior written consent of Lender.

7.10    Dividends.  Notwithstanding anything to the contrary contained in Section 7.7 of the Pre-Petition Loan Agreement or any other provision of the Loan Agreement or any of the other Financing Agreements, Borrower shall not, and shall not permit any Subsidiary to, directly or indirectly, declare or pay any cash dividends or dividends payable in property now or hereafter outstanding or make any other distribution, or set apart any sums for such purpose, or redeem, retire, defease, purchase or otherwise acquire any Equity Interests of Borrower (or set aside or otherwise deposit or invest any sums for such purpose) for any consideration or apply or set apart any sums, or make any other distribution (by reduction of capital or otherwise) in respect of any such Equity Interests or agree to do any of the foregoing, except (a) as provided in the Financing Orders, and (b) with the express prior written consent of Lender.

7.11    Sale of Assets, Consolidation, Merger, Dissolution, Etc. Section 7.10 of the Pre-Petition Loan Agreement is hereby replaced with the following:

"7.10    Sale of Assets, Consolidation, Merger, Dissolution, Etc. Borrower shall not, directly or indirectly, (a) merge into or with or consolidate with any other Person or permit any other Person to merge into or with or consolidate with it except as permitted by the Ratification Agreement and the Financing Orders, or (b) sell, assign, lease, transfer, abandon or otherwise dispose of any stock or Indebtedness to any other Person or any of its properties or assets to any other Person (except: (i) sales of Inventory in the ordinary course of business, the Sales Transaction in accordance with the Sale Order, the sale of the Salt Lake City Property in accordance with the Salt Lake City Sale Order, and the sale of any other of its assets or properties in accordance with an order of the Bankruptcy Court, in form and substance satisfactory to Lender, in each case to the extent permitted by the Ratification Agreement and the Financing Orders, or (c) liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution), except as permitted by the Ratification Agreement and the Financing Orders, or (d) agree to do any of the foregoing, except as permitted by the Ratification Agreement and the Financing Orders."

7.12    Inventory and Equipment Covenants.  Notwithstanding anything to the contrary contained in the Pre-Petition Loan Agreement or any of the other Financing Agreements, Borrower shall not, and shall not permit any Subsidiary to, directly or indirectly, remove any Inventory or Equipment from the locations set forth in the Loan Agreement, without the prior written consent of Lender, except for sales of Inventory and Equipment in accordance with the terms of the Ratification Agreement and except to move Inventory and Equipment directly from one location permitted in the Loan Agreement to another such location permitted in the Loan Agreement.

8564238.13

7.13   <u>Financial Statements and Other Information</u>. For the avoidance of doubt, Borrower shall continue to deliver to Lender, in form and substance acceptable to Lender, the borrowing base certificates on a monthly basis and other information with respect to the Accounts, Inventory and other Collateral in accordance with the Loan Agreement and the other Financing Agreements or as Lender may otherwise request.

7.14   <u>Fixed Charge Coverage Ratio</u>.   Section 7.19 of the Pre-Petition Loan Agreement is hereby replaced with the following:

"7.19   [Intentionally Omitted.]"

7.15   <u>Excess Availability</u>.   Section 7.24 of the Pre-Petition Loan Agreement is hereby replaced with the following:

"7.24   [Intentionally Omitted.]"

7.16   <u>Events of Default</u>.   Section 8 of the Pre-Petition Loan Agreement is hereby amended by (a) replacing the period at the end of Section 8.1(n) with the following "; or" and (b) adding the immediately following Section 8.1(n) as follows:

"(o) the occurrence of any condition or event which permits Lender to exercise any of the remedies set forth in the Financing Order, including, without limitation, any "Event of Default" (as defined in any Financing Order); or

(p) the termination or non-renewal of the Financing Agreements as provided for in any Financing Order; or

(q) Debtor suspends or discontinues all or any material part of its business, or is enjoined by any court or governmental agency from continuing to conduct all or any material part of its business, or a trustee or examiner with expanded powers is appointed for Debtor or any of its properties; or

(r) any act, condition or event occurring after the Petition Date that, in Lender's sole discretion, has or could reasonably expect to have a Material Adverse Effect; or

(s) conversion of the Chapter 11 Case to a Chapter 7 case under the Bankruptcy Code; or

(t) dismissal of the Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily; or

(u) grant of a lien on or other interest in any property of Debtor, other than a Lien permitted by any Financing Order, which is superior to or ranks in parity with Lender's Lien upon the Collateral; or

(v) the grant of an administrative expense claim in the Chapter 11 Case which is superior to or ranks in parity with the rights of the Lender (other than administrative expense claims permitted by any Financing Order or the Ratification Agreement); or

(w) the failure of Debtor to comply with any Financing Order or the Ratification Agreement, or any Financing Order shall be modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of Lender; or

(x) the appointment of a trustee pursuant to Sections 1104(a)(1) or 1104(a)(2) of the Bankruptcy Code; or

(y) the appointment of an examiner with special powers pursuant to Section 1104(a) of the Bankruptcy Code; or

(z) the filing of a plan of reorganization or liquidation by or on behalf of Debtor which does not provide for payment in full of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein, unless otherwise consented to by the Lender; or

(aa) the confirmation of any plan of reorganization or liquidation in any of the Chapter 11 Case of Debtor which does not provide for payment in full of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein, unless otherwise consented to by Lender; or

(bb) the filing of a motion by Debtor that is not dismissed or denied within thirty (30) days after the date of filing such motion seeking, or the entry of any order permitting, recovery from any portion of the Collateral (or from Lender) any costs or expenses of preserving or disposing of the Collateral under section 506(c) or section 552(b) of the Bankruptcy Code (or otherwise); or

(cc) a motion is filed that is not dismissed within twenty (20) days after the filing thereof that seeks to take possession of any of the assets or business of Debtor; or

(dd) a motion is filed that is not dismissed within twenty (20) days after the filing thereof that seeks to prohibit the Debtor from selling any of its Inventory, Equipment or other assets; or

(ee) any Material Budget Deviation."

7.17   Right of Inspection; Access; Field Exams.   Section 9.2 of the Loan Agreement is hereby replaced with the following:

"9.2 <u>Right of Inspection; Access; Field Exams</u>. Lender and its respective representatives shall at all times, have free access to and right of inspection of the Collateral and have full access to and the right to examine and make copies of the books and records of Borrower to confirm and verify all Accounts, to perform general audits, conduct field examinations, appraisals or valuations of the assets and properties of Borrower and to do whatever else Lender deems necessary to protect the interests of Lender. Lender may at any time remove from the premises of Borrower or require Borrower or any accountants and auditors employed by Borrower to deliver any books and records and Lender may, without cost or expense to it, use such of Borrower's personnel, supplies, computer equipment and space at its places of business as may be reasonably necessary for the handling of collections."

7.18   Term. Section 10.1(a) of the Pre-Petition Loan Agreement is hereby replaced with the following:

"(a)   This Agreement and the other Financing Agreements shall become effective as of the date hereof and shall continue in full force and effect for a term ending on the Maturity Date."

7.19   <u>Governing Law</u>. Section 11.1 of the Pre-Petition Loan Agreement is hereby amended by deleting the first sentence thereof in its entirety and replacing it with the following:

"11.1 THE VALIDITY OF THIS AGREEMENT AND THE OTHER FINANCING AGREEMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER FINANCING AGREEMENT IN RESPECT OF SUCH OTHER FINANCING AGREEMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO, AND ANY CLAIMS, CONTROVERSIES OR DISPUTES ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH (I) THE LAWS OF THE STATE OF NEW YORK AND (II) TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE."

7.20   <u>Jurisdiction</u>. Section 11.2 of the Pre-Petition Loan Agreement is hereby amended by deleting the first sentence thereof in its entirety and replacing it with the following:

"THE   PARTIES   AGREE   THAT   ALL   ACTIONS   OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER FINANCING AGREEMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE BANKRUPTCY COURT AND THE

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE, AND ANY APPELLATE COURT FROM ANY THEREOF; PROVIDED, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE LENDER ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND."

## 8.   **RELEASE**.

### 8.1   Release of Pre-Petition Claims.

(a)     Upon the earlier of (i) the entry of the Final Financing Order or (ii) the entry of an Order extending the term of the Interim Financing Order beyond thirty (30) calendar days after the date of the Interim Financing Order, in consideration of the agreements of Lender contained herein and the making of any Revolving Loans by Lender, Borrower, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, on behalf of themselves and their respective successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably release, remise and forever discharge Lender and its respective successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (Lender and all such other parties being hereinafter referred to collectively as the "Releasees" and individually as a "Releasee"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever but, for the avoidance of doubt, excluding any claims or causes of action for gross negligence or willful misconduct (individually, a "Pre-Petition Released Claim" and collectively, "Pre-Petition Released Claims") of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which Borrower, or any of its successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any nature, cause or thing whatsoever which arises at any time on or prior to the Ratification Effective Date, including, without limitation, for or on account of, or in relation to, or in any way in connection with the Pre-Petition Loan Agreement, as amended and supplemented through the date hereof, and the other Financing Agreements.

(b)     Upon the earlier of (i) the entry of the Final Financing Order or (ii) the entry of an Order extending the term of the Interim Financing Order beyond thirty (30) calendar days after the date of the Interim Financing Order, Borrower and its successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Pre-Petition Released Claim released, remised and discharged by Borrower pursuant to this Section 8.1.  If Borrower violates the foregoing covenant, Borrower agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

8.2     Release of Post-Petition Claims. Upon the payment in full of all of the Obligations, in consideration of the agreements of Lender contained herein and the making of any Revolving Loans by Lender, Borrower hereby covenants and agrees to execute and deliver in favor of Lender a valid and binding termination and release agreement, in form and substance satisfactory to Lender.  If Borrower violates such covenant, Borrower agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

8.3     Releases Generally.

(a)     Borrower understands, acknowledges and agrees that the releases set forth above in Sections 8.1 and 8.2 hereof may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such releases.

(b)     Borrower agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final and unconditional nature of the releases set forth in Section 8.1 hereof and, when made, Section 8.2 hereof.

## 9.     CONDITIONS PRECEDENT.

The amendments, representations and warranties, covenants, defaults and all other agreements and obligations contained in the Ratification Agreement shall only become effective upon the satisfaction (or waiver) of all of the following conditions precedent (the time of such satisfaction (or waiver) referred to herein):

9.1     as of the Petition Date, the Pre-Petition Financing Agreements shall not have been terminated;

9.2     Debtor shall have a commenced voluntary case under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware by no later than September __, 2025.  Debtor shall have fully complied with all notice and other requirements of the Bankruptcy Code in a manner acceptable to Lender (and its counsel) in its sole discretion, with respect to the Interim Financing Order and Lender shall have received such evidence thereof as it shall require in its sole discretion.  All of the motions for and the forms of the First Day Orders entered by the Bankruptcy Court at the time of the commencement of the Chapter 11 Case shall be in form and substance satisfactory to Lender in its sole discretion;

9.3     no trustee or examiner with expanded powers shall have been appointed or designated with respect to Borrower, as Debtor and Debtor-in-Possession, or its business, properties and assets and no motion or proceeding shall be pending seeking such relief;

9.4     the Interim Financing Order, in the form and substance acceptable to Lender, has been duly entered, is valid, subsisting and continuing and has not been vacated, reversed, or modified by any order of the Bankruptcy Court (other than as consented to by Lender) and is not subject to any pending appeal or stay;

9.5     a cash management order amending and ratifying the cash management arrangements of Borrower on terms acceptable to Lender has been duly entered, is valid, subsisting and continuing and has not been vacated, reversed, or modified by any order of the Bankruptcy Court (other than as consented to by Lender) and is not subject to any pending appeal or stay;

9.6     Lender shall have received this Agreement, duly executed and delivered by Borrower;

9.7     Lender shall have received, in form and substance acceptable to Lender, the Tranche B DIP Term Loan Participation Agreement, duly authorized, executed and delivered by Tranche B DIP Term Loan Participant;

9.8     Lender shall have received by wire transfer to a deposit account of Lender in cash or immediately available funds the initial amount of the Tranche B DIP Term Loan Commitment Amount required by Section 2.8(b) of the Loan Argeement;

9.9     Lender shall have received, in form and substance acceptable to Lender, the Tranche A DIP Term Note, duly executed and delivered by Borrower;

9.10    Lender shall have received, in form and substance acceptable to Lender, the Tranche B DIP Term Note, duly executed and delivered by Borrower;

9.11    the implementation of the terms of the Ratification Agreement and the other Financing Agreements, as modified pursuant to the Ratification Agreement, all of which contains provisions, representations, warranties, covenants and Events of Default, as are satisfactory to Lender and its counsel;

9.12    Borrower shall have fully complied with all notice and other requirements of the Bankruptcy Code and the applicable Bankruptcy Rules with respect to any relevant Financing Order in a manner prescribed by the Bankruptcy Code and the applicable Bankruptcy Rules;

9.13    receipt by Lender, each in form and substance satisfactory to Lender, of (i) the initial Budget (it being understood and agreed that the Budget, as approved by Lender and attached to the Ratification Agreement as Exhibit A, shall satisfy this condition);

9.14    other than the voluntary commencement of the Chapter 11 Case, no material impairment of the priority of Lender's security interests in the Collateral shall have occurred from August 6, 2025, being the completion date of the latest field examination of Lender to the Petition Date;

9.15    other than the Bankruptcy Events, no Material Adverse Effect shall have occurred since August 1, 2025;

9.16    none of the materials previously furnished to Lender by Borrower contains any material misstatements in, or omit to state, any material facts necessary to make the

statements therein taken as a whole, in the light of the circumstances under which they were made, not misleading in any material respect;

9.17    Lender shall hold perfected, first priority security interests in and liens upon the Collateral and Lender shall have received such evidence thereof as it requires; and

9.18    other than the Specified Defaults, no Default or Event of Default shall have occurred or be existing under any of the Financing Agreements, as modified pursuant hereto, and assumed by Borrower.

## 10.    ADDITIONAL CONDITIONS PRECEDENT TO ALL LOANS.

In addition to the satisfaction of the conditions precedent under Section 9 of the Ratification Agreement with respect to the effectiveness of the noted Sections of the Ratification Agreement, the following are conditions to Lender's obligation to extend further loans, advances or other financial accommodations to Borrower pursuant to the Loan Agreement:

10.1    with respect to further credit after expiration of the Interim Financing Order, on or before the expiration of the Interim Financing Order, the Bankruptcy Court shall have entered the Final Financing Order; Lender shall not provide any Revolving Loans (or other financial accommodations) other than those authorized under the Interim Financing Order unless, on or before the expiration of the Interim Financing Order, the Final Financing Order shall have been entered, and there shall be no appeal or other contest with respect to either the Interim Financing Order or the Final Financing Order and the time to appeal to contest such order shall have expired;

10.2    requests for further credit shall be for purposes and in amounts in accordance with the Budget (subject to the variances permitted under Section 5.3(c) of the Ratification Agreement);

10.3    the representations and warranties of Debtor contained in the Ratification Agreement and the other Financing Agreements shall be true and correct in all material respects on and as of the date of any such further credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date);

10.4    subject to the Financing Order, all fees and expenses required to be paid to Lender pursuant to the Ratification Agreement and the Loan Agreement, as amended thereby, shall have been paid or shall be paid concurrently with the making of the Revolving Loans after the Ratification Effective Date; and

10.5    other than the Specified Defaults, no Default or Event of Default shall have occurred or be existing under any of the Financing Agreements, as amended, supplemented or otherwise modified pursuant the Ratification Agreement and assumed by Borrower.

11. **MISCELLANEOUS.**

11.1   <u>Amendments and Waivers</u>.  Neither the Ratification Agreement nor any other instrument or document referred to herein or therein may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

11.2   <u>Further Assurances</u>.  Borrower shall, at its expense, at any time or times duly execute and deliver, or shall use its best efforts to cause to be duly executed and delivered, such further agreements, instruments and documents, including, without limitation, additional security agreements, collateral assignments, UCC financing statements or amendments or continuations thereof, landlord's or mortgagee's waivers of liens and consents to the exercise by Lender of all the rights and remedies hereunder, under any of the other Financing Agreements, any Financing Order or applicable law with respect to the Collateral, and do or use its best efforts to cause to be done such further acts as may be reasonably necessary or proper in Lender's opinion to evidence, perfect, maintain and enforce the security interests of Lender, and the priority thereof, in the Collateral and to otherwise effectuate the provisions or purposes of this Ratification Agreement, any of the other  Financing Agreements or the Financing Order.  Upon the request of Lender, at any time and from time to time, Borrower shall, at its cost and expense, do, make, execute, deliver and record, register or file updates to the filings of Lender with respect to the Intellectual Property with the United States Patent and Trademark Office, the United States Copyright Office, the financing statements, mortgages, deeds of trust, deeds to secure debt, and other instruments, acts, pledges, assignments and transfers and will deliver to Lender such instruments evidencing items of Collateral as may be requested by Lender.

11.3   <u>Headings</u>.  The headings used herein are for convenience only and do not constitute matters to be considered in interpreting the Ratification Agreement.

11.4   <u>Counterparts</u>.  This Ratification Agreement, any documents executed in connection herewith and any notices delivered under this Ratification Agreement, may be executed by means of (a) an electronic signature that complies with the federal Electronic Signatures in Global and National Commerce Act, state enactments of the Uniform Electronic Transactions Act, or any other relevant and applicable electronic signatures law; (b) an original manual signature; or (c) a faxed, scanned, or photocopied manual signature.  Each electronic signature or faxed, scanned, or photocopied manual signature shall for all purposes have the same validity, legal effect, and admissibility in evidence as an original manual signature.  Lender reserves the right, in its sole discretion, to accept, deny, or condition acceptance of any electronic signature on the Ratification Agreement or on any notice delivered to Lender under the Ratification Agreement.  The Ratification Agreement and any notices delivered under the Ratification Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall, together, constitute only one instrument. Delivery of an executed counterpart of a signature page of the Ratification Agreement and any notices as set forth herein will be as effective as delivery of a manually executed counterpart of the Ratification Agreement or notice.

11.5   <u>Additional Events of Default</u>.  The parties hereto acknowledge, confirm and agree that the failure of Borrower to comply with any of the covenants, conditions and

agreements contained herein or in any other agreement, document or instrument at any time executed by Borrower in connection herewith shall constitute an Event of Default under the Financing Agreements.

11.6    <u>Costs and Expenses</u>.    Subject to the terms of the Financing Order, Borrower shall pay to Lender and any Lender on demand all costs and expenses that Lender pays or incurs in connection with the negotiation, preparation, consummation, administration, enforcement, and termination of the Ratification Agreement and the other Financing Agreements and the Financing Order.    Subject to the terms of the Financing Order, the foregoing shall not be construed to limit any other provisions of the Financing Agreements regarding costs and expenses to be paid by Borrower.    Subject to the terms of the Financing Order, all sums provided for in this Section 11.6 shall be part of the Obligations, shall be payable on demand, and shall accrue interest after demand for payment thereof at the highest rate of interest then payable under the Financing Agreements.    Lender is hereby irrevocably authorized to charge any amounts payable hereunder directly to any of the account(s) maintained by Lender with respect to Borrower.

11.7    <u>Effectiveness</u>.    The Ratification Agreement shall become effective upon the execution hereof by the Debtor and Lender and the entry of the Interim Financing Order.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Ratification Agreement to be duly executed as of the day and year first above written.

BORROWER:                              US MAGNESIUM LLC, as Debtor and Debtor-in-Possession

                                       By:    _____
                                       Name:
                                       Title:

[Signatures Continue on the Following Page]

[Signature Page to Ratification Agreement]

LENDER:                             WELLS FARGO BANK, N.A.,
                                    as Lender


                                    By:    _____
                                    Name:
                                    Title:

EXHIBIT A
to
RATIFICATION AND AMENDMENT AGREEMENT

Budget

(See attached)

A-1

**Fill in this information to identify the case:**

Debtor name    **US Magnesium LLC**

United States Bankruptcy Court for the:   DISTRICT OF DELAWARE

Case number (if known)   _____

☐ Check if this is an amended filing

## Official Form 202
# Declaration Under Penalty of Perjury for Non-Individual Debtors    12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐   *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)
☐   *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
☐   *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)
☐   *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)
☐   *Schedule H: Codebtors* (Official Form 206H)
☐   *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)
☐   *Amended Schedule* _____
■   *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)
☐   Other document that requires a declaration _____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   09/10/2025     X _____
                               Signature of individual signing on behalf of debtor

                               **Ron Thayer**
                               Printed name

                               **President**
                               Position or relationship to debtor

Fill in this information to identify the case:

| | |
|---|---|
| Debtor name | US Magnesium LLC |
| United States Bankruptcy Court for the: | **DISTRICT OF DELAWARE** |
| Case number (if known): | _____ |

☐ Check if this is an

amended filing

## Official Form 204

### Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

12/15

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31).  Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| **AMERI-SOURCE SPECIALTY PRODUCTS 5123 SOUTH COMMERCE DRIVE MURRAY, UT 84107** | **Ajay Goel** agoel412@aol.com | **Trade debt** | | | | $526,399.02 |
| **BLANK ROME LLP ONE LOGAN SQUARE PHILADELPHIA, PA 19103-6998** | **Martin Krezalek** martin.krezalek@blankrome.com 212-885-5130 | **Trade debt** | | | | $427,965.74 |
| **BURBIDGE MITCHELL & GROSS 215 S STATE STREET SUITE 920 SALT LAKE CITY, UT 84111** | **Richard Burbidge** rburbidge@burbidgemitchell.com 801-355-6677 | **Trade debt** | | | | $1,346,162.75 |
| **FIVE PEAK INC PO BOX 1865 Roosevelt, UT 84066** | shane@5peakequipment.com 435-323-1228 | **Trade debt** | | | | $681,724.00 |
| **FORGEN, LLC 6020 W OAKS BLVD SUITE 220 ROCKLIN, CA 95765** | **George Little** glittle@forgen.com 916-335-0349 | **Trade debt** | | | | $6,082,336.85 |
| **INDECK POWER EQUIPMENT COMPANY 1111 WILLIS AVENUE Wheeling, IL 60090** | **Alan Langsam** alangsam@indeck-power.com 847-547-8300 X3534 | **Trade debt** | | | | $412,648.32 |
| **KAISER ALUMINUM WARRICK, LLC 4000 WEST STATE ROAD 66 Newburgh, IN 47630** | **John Donnan** 629-252-7040 | **Judgment** | | | | $67,863,406.40 |

Debtor  **US Magnesium LLC**                                  Case number *(if known)* _____
            Name

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| LINDE INC. P.O. BOX 91385 CHICAGO, IL 60693-1385 | Jeffrey Weiss jeffrey.weiss@linde.com 203-417-4968 | Trade debt | | | | $579,686.13 |
| MAMMOTH MACHINERY 205 S 1200 W NORTH SALT LAKE, UT 84054 | Ken Allen ken@mammothmachinery.com 801-699-3037 | Trade debt | | | | $923,498.04 |
| MICHAEL EDMONDS Address on file | | Deferred Compensation | | | | $735,084.00 |
| ODIN CONSTRUCTION SOLUTIONS 2901 Douglas Blvd. Suite 300 Roseville, CA 95661 | Jordan Brown lbrown@odinenv.com 916-793-9919 | Trade debt | | | | $1,708,849.70 |
| PARSONS, BEHLE & LATIMER P.O. BOX 45898 SALT LAKE CITY, UT 84145-0898 | Michael A. Zody mzody@parsonsbehle.com 801-532-1234 | Trade debt | | | | $420,458.19 |
| SISECAM CHEMICALS RESOURCES LLC 400 PERIMETER CENTER TERRACE NE SUITE #350 ATLANTA, GA 30346 | Ronny Cain rcain@sisecam.com 307-371-4677 | Trade debt | | | | $2,220,648.77 |
| SUSAN SLADE Address on file | | Deferred Compensation | | | | $587,253.00 |
| THATCHER CHEMICAL CO PO BOX 27407 SALT LAKE CITY, UT 84127 | Aaron Cox aaron.cox@tchem.com 801-972-4587 | Trade debt | | | | $330,485.85 |
| TOOELE COUNTY TREASURER 47 SOUTH MAIN STREET ROOM 218 TOOELE, UT 84074-2194 | Michael Jensen michael.Jensen@tooeleco.gov 435-843-3191 | Property Taxes | | | | $6,690,507.88 |
| TRINITY INDUSTRIES LEASING COMPANY PO BOX 358041 PITTSBURGH, PA 15251-5041 | Joel Bailey joel.bailey@trin.net 214-589-6530 | | Unliquidated Disputed | | | $0.00 |

Debtor    **US Magnesium LLC**                                    Case number *(if known)* _____
          Name

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| **UNION PACIFIC RAILROAD PO BOX 843465 DALLAS, TX 75284-3465** | **uprr_acct_2@up.com 603-257-9056** | **Trade debt** | | | | **$1,665,802.06** |
| **UNIVAR SOLUTIONS 62190 COLLECTIONS CENTER DRIVE CHICAGO, IL 60693-0621** | **Dave Lundin david.lundin@univarsolutions.com 614-613-3350** | **Trade debt** | | | | **$1,268,175.27** |
| **US ENVIRONMENTAL PROTECTION AGENCY SUPERFUND PAYMENTS-CINCINNATI FINANCE CE P.O. BOX 979076 ST. LOUIS, MO 63197-9000** | **Max Greenblum CINWD_AcctsReceivable@epa.gov 303-312-6108** | **Gov't Oversight Fees** | | | | **$919,567.86** |

# United States Bankruptcy Court
## District of Delaware

In re   **US Magnesium LLC**

Debtor(s)

Case No. _____

Chapter   **11**   _____

## LIST OF EQUITY SECURITY HOLDERS

Following is the list of the Debtor's equity security holders which is prepared in accordance with rule 1007(a)(3) for filing in this Chapter 11 Case

| Name and last known address or place of business of holder | Security Class | Number of Securities | Kind of Interest |
|---|---|---|---|
| **The Renco Group, Inc.**<br>**One Rockefeller Plaza**<br>**29th Floor**<br>**New York, NY 10020** | | **100%** | |

## DECLARATION UNDER PENALTY OF PERJURY ON BEHALF OF CORPORATION OR PARTNERSHIP

I, the **President** of the corporation named as the debtor in this case, declare under penalty of perjury that I have read the foregoing List of Equity Security Holders and that it is true and correct to the best of my information and belief.

Date   09/10/2025

Signature _____
**Ron Thayer**

*Penalty for making a false statement of concealing property:* Fine of up to $500,000 or imprisonment for up to 5 years or both.
18 U.S.C. §§ 152 and 3571.

Sheet 1 of 1 in List of Equity Security Holders

B2030 (Form 2030) (12/15)

# United States Bankruptcy Court
### District of Delaware

In re  **US Magnesium LLC**

Debtor(s)

Case No.

Chapter  **11**

# DISCLOSURE OF COMPENSATION OF ATTORNEY FOR DEBTOR(S)

1.  Pursuant to 11 U .S.C. § 329(a) and Fed. Bankr. P. 2016(b), I certify that I am the attorney for the above named debtor(s) and that compensation paid to me within one year before the filing of the petition in bankruptcy, or agreed to be paid to me, for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case is as follows:

|  |  |  |
|---|---|---|
| For legal services, I have agreed to accept | $ | 146,413.30 |
| Prior to the filing of this statement I have received | $ | 146,413.30 |
| Balance Due | $ | 0.00 |

2.  The source of the compensation paid to me was:

    ■ Debtor    ☐ Other (specify):

3.  The source of compensation to be paid to me is:

    ■ Debtor    ☐ Other (specify):

4.  ■ I have not agreed to share the above-disclosed compensation with any other person unless they are members and associates of my law firm.

    ☐ I have agreed to share the above-disclosed compensation with a person or persons who are not members or associates of my law firm.  A copy of the agreement, together with a list of the names of the people sharing in the compensation is attached.

5.  In return for the above-disclosed fee, I have agreed to render legal service for all aspects of the bankruptcy case, including:

    a.  Analysis of the debtor's financial situation, and rendering advice to the debtor in determining whether to file a petition in bankruptcy;
    b.  Preparation and filing of any petition, schedules, statement of affairs and plan which may be required;
    c.  Representation of the debtor at the meeting of creditors and confirmation hearing, and any adjourned hearings thereof;
    d.  [Other provisions as needed]
        **Negotiations with secured creditors to reduce to market value; exemption planning; preparation and filing of reaffirmation agreements and applications as needed; preparation and filing of motions pursuant to 11 USC 522(f)(2)(A) for avoidance of liens on household goods.**

6.  By agreement with the debtor(s), the above-disclosed fee does not include the following service:
    **Representation of the debtors in any dischargeability actions, judicial lien avoidances, relief from stay actions or any other adversary proceeding.**

---

### CERTIFICATION

I certify that the foregoing is a complete statement of any agreement or arrangement for payment to me for representation of the debtor(s) in this bankruptcy proceeding.

09/10/2025

*Date*

*/s/ Michael Busenkell*

**Michael Busenkell**
*Signature of Attorney*
**Gellert Seitz Busenkell & Brown, LLC**
**1201 N. Orange Street**
**Suite 300**
**Wilmington, DE 19801**
**302-425-5812  Fax: 302-425-5814**
**mbusenkell@gsbblaw.com**
*Name of law firm*

# United States Bankruptcy Court
### District of Delaware

In re   __US Magnesium LLC_____     Case No. _____
                                    Debtor(s)     Chapter   **11**

## CORPORATE OWNERSHIP STATEMENT (RULE 7007.1)

Pursuant to Federal Rule of Bankruptcy Procedure 7007.1 and to enable the Judges to evaluate possible disqualification or recusal, the undersigned counsel for ___US Magnesium LLC___ in the above captioned action, certifies that the following is a (are) corporation(s), other than the debtor or a governmental unit, that directly or indirectly own(s) 10% or more of any class of the corporation's(s') equity interests, or states that there are no entities to report under FRBP 7007.1:

**The Renco Group, Inc.**
**One Rockefeller Plaza**
**29th Floor**
**New York, NY 10020**

☐ None [*Check if applicable*]

09/10/2025
_____
Date

*/s/ Michael Busenkell*
_____
**Michael Busenkell**
Signature of Attorney or Litigant
Counsel for   US Magnesium LLC
**Gellert Seitz Busenkell & Brown, LLC**
**1201 N. Orange Street**
**Suite 300**
**Wilmington, DE 19801**
**302-425-5812 Fax:302-425-5814**
**mbusenkell@gsbblaw.com**