## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>US MAGNESIUM LLC, [1]<br><br>Debtor. | Chapter 11<br><br>Case No. 25-11696 |

### DECLARATION OF RON THAYER IN SUPPORT OF FIRST DAY MOTIONS

I, Ron Thayer pursuant to section 1746 of title 27 of the United States Code, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1.    I am the President and Manager of debtor US Magnesium LLC, a limited liability company incorporated under the laws of Delaware ("**USM**" or the "**Debtor**").  I have served as the President of the Debtor since 2012.

2.    As President of the Debtor, I am familiar with and knowledgeable about the Debtor's day-to-day operations, business and financial affairs, and books and records, as well as the circumstances leading to the commencement of this Chapter 11 Case (as defined below).  I submit this declaration (this "**Declaration**") to assist the Court and parties in interest in understanding the circumstances compelling the commencement of this Chapter 11 Case and in support of the Debtor's chapter 11 petition and First Day Pleadings (as defined below) filed contemporaneously herewith.  I am authorized to submit this Declaration on behalf of the Debtor.

3.    Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtor, my opinion based on experience, knowledge, and information

---

[1] The last four digits of the Debtor's federal tax identification number are 5446.  The Debtor's address is 238 N 2200 W, Salt Lake City, Utah 84116

concerning the Debtor's operations and financial condition, or from my discussions with the Debtor's advisors.  If called upon to testify, I would and could testify competently to the facts set forth in this Declaration on that basis.

4.      On the date hereof (the "**Petition Date**"), the Debtor commenced with the United States Bankruptcy Court for the District of Delaware (the "**Court**") a voluntary case (the "**Chapter 11 Case**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtor is authorized to continue to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Declaration is provided in support of the Debtor's chapter 11 petition and other motions and applications that the Debtor has filed with the Court, including the First Day Pleadings (as defined herein).

5.      This Declaration is organized in five sections.  Part I provides background information on the Debtor's corporate history and operations.  Part II outlines the Debtor's capital structure and other debt obligations.  Part III describes the circumstances leading to the filing of this Chapter 11 Case.  Part IV provides an overview of the sale process contemplated to occur within this Chapter 11 Case.  Part V describes the First Day Pleadings and expresses the Debtor's belief that the Court should approve the same.

**Preliminary Statement**

6.      USM was at one time the largest producer of primary magnesium in North America. It operates a facility adjacent to the Great Salt Lake in Rowley, Utah, approximately sixty miles west of Salt Lake City (the "**Facility**"), where magnesium has been produced from the waters of the Great Salt Lake since 1972.  USM's magnesium production business has faced headwinds over the last decade due primarily to prolonged periods of depressed market pricing as a result of offshore producers (and China in particular) flooding the international market with low-cost magnesium products.  Compounding these issues, USM lost an important commercial relationship

2

when Allegheny Technologies Inc.—which formerly produced titanium sponge products at its own facility on the Great Salt Lake adjacent to USM and which utilized molten magnesium sourced directly from USM in its production process—shut down its facility in 2016, eliminating a profitable revenue stream for USM. Finally, a series of essential equipment failures in September 2021, coupled with a COVID-19 associated inability to timely obtain critical materials, replacement parts and services from technicians, ultimately led to a mothballing of magnesium operations. There is no other significant producer of primary magnesium in the United States, and primary magnesium is a critical component to United States defense contractors. The cost to build a new primary magnesium production Facility in the U.S. is estimated to exceed $1 billion.

7.      Over the course of the past 10 years, USM's sole member, The Renco Group, Inc. ("**Renco**"), and affiliated entities have provided in excess of $400 million of funding to USM, through debt, equity and credit support, which USM has used to fund capital investments, operating losses, modifications of operations and restructuring efforts. Over that same period, USM has not paid any dividends or distributions to Renco.

8.      As part of its turnaround strategy and to reduce reliance on magnesium production, USM launched a new commercial project commencing in 2019 to produce lithium carbonate from tailings piles that had accumulated over many years from magnesium production. USM's strategy sought to capitalize on increased market demand and prices for lithium carbonate, driven primarily by an increased interest in electric vehicles and, in turn, increased manufacturing of lithium-ion batteries. USM developed and built a unique lithium carbonate production process and facility. Although USM was successful in developing this technology on a commercial scale, it has not yet been able to do so at a profit due to a number of factors including falling market prices for lithium carbonate, which had dropped precipitously from a high of ~$80,000 per ton in mid-2022 to less

than $10,000 per ton currently, representing an over 80% loss of its value over the last two and a half years.

9.      USM has developed and tested a new Direct Lithium Extraction (DLE) process as an enhancement to its current lithium processing operations that will reduce the cost of lithium extraction from current non-economic levels to solidly profitable levels. In order to bring the DLE processes into full-scale production, significant new capital investment will be required that can only be justified by resolution of the issues discussed below. Once completed and brought on-line the new technology will allow for capacity to produce 10,000 tons per year of lithium carbonate and would be expected to significantly increase current employee count.

10.      In addition to the adverse circumstances described above, the State of Utah—under public pressure to address decreased water levels in the Great Salt Lake ("GSL")—has been aggressive in its efforts against USM and other manufacturing concerns that utilize water from the GSL to dramatically curtail USM's water rights. The State of Utah has likewise endeavored to terminate the mineral lease between the parties, which was executed by their respective predecessors-in-interest in 1961. Without a mineral lease and access to GSL water rights, the Debtor cannot conduct normalized/profitable business operations or justify any new investments in facilities to produce lithium carbonate. In connection with its efforts to terminate USM's mineral lease and curtail its water rights, the State of Utah sought and obtained an *ex parte* order on December 13, 2024 appointing a receiver over USM and the Facility. This order was vacated one week later due to the lack of due process afforded USM and an inability of the State of Utah to demonstrate a threat of imminent harm to the environment by USM. Also on December 13, 2024, the State issued notices of cancellation in respect of the mineral lease as well as in respect of a separate memorandum of understanding related to lithium carbonate. The mineral lease is a USM-beneficial agreement and thus a critical asset of the USM bankruptcy estate.

11.     USM disputes the fundamental merit of allegations by the State of Utah that any of the purported violations cited in these notices or filings provide valid grounds to terminate the mineral lease.  USM holds steadfast in its belief that the State of Utah has endeavored to terminate the mineral lease in an effort to escape the beneficial rights and interests afforded to USM under the mineral lease, including, without limitation, water rights and mineral interests.

12.     Studies have shown that USM's water use has caused less than 2% of the human water depletion in the GSL.  Those same studies show that 80% of water depletion from the GSL is attributable to upstream agricultural use and urban/municipal use.[2]

13.     USM intends to utilize the bankruptcy process to facilitate a Section 363 sale of substantially all of its assets to maximize value to its creditors, including the assignment of its rights under its mineral lease and water rights. This proposed sale process is absolutely critical to realizing value from this Chapter 11 Case and USM's potential to become a domestic supplier of lithium carbonate and magnesium to help meet the United States' goal of establishing substantial critical minerals capacity.

## II.     General Background

### A.     Corporate History and Structure

14.     The Facility operated by USM was constructed in 1972 by National Lead, Inc.  In 1979, the Facility and its operations were purchased by AMAX, Inc., which operated the facility through its subsidiary AMAX Magnesium Corp.  In 1989, RENMAG, Inc. purchased AMAX Magnesium Corp. and changed its name to Magnesium Corporation of America ("**MagCorp**"). In 1993, Renco Metals Corporation became MagCorp's 100% direct equity owner.  USM began

---

2 *See* The Great Salt Lake Strategic Plan, Brian Steed, JD, PhD, Great Salt Lake Commissioner, dated January 15, 2024.

operations at the Facility following its acquisition of substantially all of MagCorp's assets out of bankruptcy in 2002.[3]

15.    USM is a wholly owned subsidiary of The Renco Group, Inc. and is a manager-managed Delaware limited liability company.  Its manager is Ron Thayer, who serves as its President.  On August 25, 2025, USM appointed an independent manager, Shaun Martin, in connection with USM's anticipated restructuring.  The independent manager is charged with reviewing any transactions proposed between USM and its member (or any of its affiliates) in connection with the Chapter 11 Case, and has the sole discretion to approve or not approve any such transaction.

### B.    Historical Operations

#### i.    Magnesium Production

16.    USM was once one of the world's largest producers of magnesium, which has a variety of applications across numerous industries, including automotive, aerospace, and defense. Magnesium processed at the Facility comes from the water in the Great Salt Lake, which the Facility gathers into solar evaporating ponds, creating a concentrated brine rich with magnesium chloride and other minerals.  That brine is then subjected to an electrolytic process by which the magnesium is separated from the magnesium chloride and converted into metal.  The magnesium in the Great Salt Lake is essentially a non-depleting resource, as it is constantly replaced by the rivers that flow into the lake.  In addition to magnesium metal, the Facility has historically produced other mineral salts, and chemicals including liquid chlorine, hydrochloric acid, ferric chloride, calcium chloride, and potassium salts.

---

[3] *See In re Magnesium Corporation of America*, Case No. 01-14312, Docket No. 283 (Bankr. S.D.N.Y.).

17.     Over the last decade, USM has faced a series of both unique and market-wide challenges in respect of magnesium production.  In 2016, Allegheny Technologies, Inc. ("**ATI**")— which built a facility next door to the USM's facility and which utilized molten magnesium sourced from USM to manufacture titanium products— shut down its facility.  ATI was one of USM's largest customers and the closing of the ATI facility had a significant, adverse impact on USM's business. USM's attempts to increase market share to offset the loss of ATI volumes proved unsuccessful due to increased low-cost offshore imports.

18.     Finally, in September 2021, USM suffered a catastrophic failure of critical components of its magnesium and chemical production processes.  Specifically, certain gas turbines and associated generators used in connection with the spray dryers to dehydrate magnesium chloride brine, unexpectedly failed.  This dramatically reduced the volume of magnesium chloride feed, which then had a cascading negative impact on the remaining steps of the production process and ultimately compromised USM's ability to produce magnesium at the Facility (collectively, the "**Force Majeure Event**").  The shortage of critical materials, parts and labor caused by COVID-19 stymied USM's repair efforts and ultimately lead to the cessation of magnesium production.  USM is currently pursuing business interruption claims under applicable insurance policies in respect of the Force Majeure Event.

19.     To restart magnesium production following the Force Majeure Event, USM would need to make substantial capital investments and see a significant increase in magnesium market prices.  Alternatively, a magnesium production restart could be catalyzed by the return of titanium production at the ATI facility or support from the United States Department of Defense. Magnesium operations remain idled as of the Petition Date.

ii.     Lithium Production

20.    Years before the Force Majeure event, USM began to diversify its operations away from magnesium by developing a process to produce lithium carbonate.  The value of lithium carbonate in 2022 was on the rise, due to the growing popularity of electric vehicles, which utilize lithium-ion batteries.  USM has the raw materials to produce lithium carbonate because it has substantial stockpiles of the extracted chloride ores left over and stockpiled as a byproduct from USM's magnesium production processes (the "**Feedstock**") which contain lithium chloride salt.

21.    To monetize its readily available access to lithium chloride independent of magnesium production, USM built a one-of-a-kind lithium processing facility.  This facility utilizes new and innovative technology (developed by USM) to convert lithium chloride salts from the Feedstock into liquid lithium chloride brine, which is then purified by removing magnesium and calcium.  The purified lithium chloride brine is then reacted with high purity soda ash to produce battery grade lithium carbonate.  USM owns approximately 1.5 million tons of Feedstock stored on site at the Facility which would otherwise be worthless but for USM's investment in and development of this technology.  This method of lithium chloride extraction developed by USM is truly unique—no other lithium carbonate manufacturer in North America utilizes this process.

22.    Though the technology developed by USM was successful insofar as it is capable of producing battery grade lithium carbonate from the Feedstock, production volumes have been limited, and the cost of production remains high.  As such, USM has not yet been able to profitably produce lithium carbonate.  This is primarily because market prices for lithium carbonate have since plummeted—losing approximately 80% of value over the last approximately two and a half years—as demand for lithium batteries has waned and Chinese competitors have ramped up lithium carbonate production. At the same time, USM's cost of critical inputs to process its feedstock of lithium salts increased.  USM has addressed these problems by developing newer technology known as "direct lithium extraction" or "DLE" which will allow USM to produce

lithium carbonate from the Feedstock far more efficiently.[4]  Alternative DLE technology is also available from third party providers. However, USM anticipates that significant capital investment will be required in order to modify, update, replace, and/or supplement USM's existing equipment to implement the new direct lithium extraction technology, which cannot be justified without resolution of mineral lease and water rights concerns.  Accordingly, lithium carbonate production at the Facility has likewise been idled.  It is anticipated that lithium carbonate production will resume after funding has been acquired for the identified capital improvements needed for lithium system modifications.

### C.    The Consent Decree

23.    On June 30, 2021, USM and others (the "**Settling Defendants**"), entered into a Consent Decree (the "**Consent Decree**") with the United States on behalf of the Environmental Protection Agency (the "**EPA**").  The Consent Decree resolved a Second Amended Complaint filed by EPA nearly twenty years earlier on December 5, 2002 in the United States District Court for the District of Utah (Case No. 01-cv-40), which alleged various violations of the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901-6992k (the "**RCRA**") were occurring at the Facility.  In particular, EPA alleged that certain waste streams associated with magnesium production were not exempt from RCRA under the Bevill Amendment and, as such, needed to be treated or eliminated.  Although USM strongly disputes these assertions, it entered the Consent Decree as part of an effort to fully and finally resolve more than 20-years of litigation with the EPA.

---

[4] NTD:  Description of DLE to be confirmed with USM.  Query whether the DLE technology referenced here is the same as the technology developed to increase efficiency of the production of lithium from Feedstock (as distinct from brine)

24.    The Consent Decree provided, among other things, for USM to repair, modify, and/or install certain production equipment and other infrastructure at the Facility to ensure that identified waste streams, as specified in the Consent Decree, generated in connection with magnesium production would be properly managed.  The Consent Decree also addressed EPA's contentions that, under the Comprehensive Environmental Response, Compensation & Liability Act, 42 U.S.C. § 9605 ("**CERCLA**"), USM was required to take certain actions with respect to a waste pond on its property.  The EPA agreed to establish waste pond closure requirements and established the work scope related to the retrofit of the waste pond to bring the pond in compliance with the Ground Water Discharge Permit issued to USM by the Utah Department of Environmental Quality.

25.    As part of the Consent Decree, EPA agreed to put proceeds it had received on account of its claims against the MagCorp bankruptcy estate ($32.9 million of present value) into five special accounts (the "**Special Accounts**").  The Special Accounts served a dual purpose: (1) to reimburse USM, under certain circumstances, for costs of completing work required under the Consent Decree, and (2) to serve as financial assurance for completion of the work required by the Consent Decree.

26.    As described in Part III.A of this Declaration, the EPA and USM are currently in dispute over whether and the extent to which USM is out of compliance with the Consent Decree.

**D.    Current Operations**

27.    As of the Petition Date, USM's operations are limited to the production of dust suppressants, de-icing products, and raw sodium chloride from existing lease property material stocks, which USM sells to end users pursuant to supply agreements, and via spot sales in some instances (collectively, the "**Current Business**").  USM's employee headcount has been reduced

significantly to match the current scope of operations. USM currently employs 22 full-time and 2 part-time employees.

## III.    Capital Structure

### A.    Prepetition Secured Indebtedness

28.    USM, as borrower, and Wells Fargo Bank, National Association ("**Wells Fargo**"), as lender, are party to that certain Loan and Security Agreement, dated June 24, 2002, as amended from time to time, currently through that certain Forbearance Agreement and Amendment No. 42 to Loan and Security Agreement dated as of February 19, 2025 (as may be further amended, supplemented, or otherwise modified from time to time, the "**Prepetition Credit Agreement**"). The obligations arising under the Prepetition Credit Agreement are secured by substantially all of the assets of the Debtor other than owned real property. As of the Petition Date, the Debtor has approximately $67 Million, including Letter of Credit limit of $821,588, in total funded debt obligations under the Prepetition Credit Agreement.

29.    USM, as borrower, and Renco Global Capital, Inc. ("**Renco Global**"), as lender, are party to that certain Subordinated Loan Agreement, dated as of June 26, 2023 (as may be amended, supplemented, or otherwise modified from time to time, the "**Renco Global Loan Agreement**"). The obligations arising under the Renco Global Loan Agreement are secured by a junior security interest in substantially all of the assets of the Debtor other than owned real property. The respective rights of Wells Fargo and Renco Global as lenders to USM are governed by that certain Intercreditor and Subordination Agreement, dated as of June 26, 2023. As of September 8, 2025, the Debtor has approximately $45 million in total funded debt obligations under the Renco Global Loan Agreement.

30.    In addition to the foregoing, on August 28, 2025, The Renco Group, Inc., as lender, and USM, as borrower, entered into that certain Subordinated Loan Agreement (as may be

amended, supplemented, or otherwise modified from time to time, the "**Subordinated Loan Agreement**"). Pursuant to the Subordinated Loan Agreement, The Renco Group, Inc. provided bridge funding to USM in the amount of $2,500,000 to ensure that USM's liquidity would be sufficient to allow it to prepare for and file this Chapter 11 Case. The obligations arising under the Subordinated Loan Agreement are secured by a junior lien in substantially all of the Debtor's assets.

### B.    Trade Payables

31.     In addition to the Company's secured indebtedness, as of the Petition Date, USM has accrued an estimated ~$37MM million to third-party suppliers, vendors, contractors and other ordinary course creditors. In addition, several of these creditors have now obtained judgments against USM including, most notably and recently, Kaiser Aluminum Warrick, LLC, which obtained a judgment in the amount of approximately $68 million plus interest at 9% on August 5, 2025 (the "**Kaiser Judgment**").[5] The Kaiser Judgment relates specifically to damages incurred from the Force Majeure Event and USM's inability to produce magnesium as a result thereof. Many other trade vendors incurred claims arising from USM's efforts to either (x) improve lithium carbonate operations or (y) comply with its requirements under the Consent Decree.

## IV.    Events Leading to This Chapter 11 Case

### A.    Issues with the EPA

32.     On July 18, 2024, the EPA sent USM a Notice of Noncompliance in respect of the Consent Decree, alleging that USM has failed to comply with the Consent Decree by: (i) failing to provide additional financial assurance, (ii) failing to complete modifications to the magnesium production process (even though it is no longer operating), (iii) failing to retrofit its waste pond,

---

[5] *Kaiser Aluminum Warrick, LLC v. US Magnesium LLC,* No. 22-cv-03105

and (vi) failing to deliver a Conditional Partial Assignment and Grant of Rights in favor of EPA to ensure that EPA would have access to necessary resources to implement the Salt Cap Closure Plan in the event of a default by USM (which also required consent of the State of Utah, which it has refused to give).

33.     USM has disputed the allegations that it has failed to comply with the Consent Decree.  To the contrary, USM has incurred millions in costs and expenses performing substantial work pursuant to the Consent Decree.   In regard to major expenditures related to Rowley site environmental work, USM has spent more than $23 million on CERCLA and RCRA-related work and has incurred another $11 million in connection with the same. USM also paid an additional $13 million in EPA fees and other oversight costs.

34.     In addition to the foregoing, USM has spent significant funds  conducting and complying with ground water reporting requirements under its Ground Water Discharge Permit, which was issued to it by the Utah Department of Environmental Quality ("**UDEQ**").  Specifically, USM is required to maintain certain monitoring wells along the perimeter of its waste ponds, through which any discharge or migration of contaminants from the site into the Great Salt Lake can be detected.  Results from this monitoring, which USM conducts through an independent third party, are then reported to UDEQ on a periodic basis.  Critically, no third party that has conducted monitoring and attendant reporting to UDEQ has ever indicated or reported the presence of regulated compounds in wastewater discharge from the site.  Notwithstanding the dire financial circumstances of USM, third party monitoring and reporting relating to the ground water wells continues.

35.     In respect of the RCRA magnesium process control items under the Consent Decree that the EPA suggests must be completed, as well as the supposed need for additional financial assurance, these items were only necessary to address the identified waste being generated by

ongoing magnesium production.  USM is not producing magnesium and has not done so in 3 years.

Accordingly, USM is not generating any of the wastes that required storage or treatment under the

Consent Decree.  Yet, EPA continues to insist that these projects be completed.  USM has assured

EPA that it will complete these projects if and when USM were to resume magnesium production.

36.      As to the retrofitting of the waste pond, USM did complete substantial work on that

project but ultimately was forced to stop progress when it ran out of financial resources and its

contractors refused to do further work.  USM has attempted to explain to the EPA that it has no

money to perform further work and has repeatedly implored the EPA to release funds from the

Special Accounts – money set aside expressly for the contemplated work – to enable USM to do

so.  Unfortunately to date, EPA's response to USM's requests has been to demand even more

money from USM in the form of additional financial assurance.

37.      USM shares EPA's goal of retrofitting the waste pond as soon as practicable.  In

connection with its Chapter 11 Case, USM intends to attempt to reach alignment with EPA (and

Utah Division of Water Quality) on a pragmatic approach to completing the waste pond retrofit on

a schedule that considers current facts and circumstances including, the current state of

magnesium/lithium carbonate operations and the realities of the current marketplace for these

materials.  Given a reasonable plan for completion, and agreement on the release of funds from

the Special Accounts, the proposed stalking horse purchaser fully intends to assume and to satisfy

requirements under the Consent Decree.

### B.      Issues with the State of Utah

#### i.      The Mineral Lease and the Lithium MOU

38.      USM operates its business pursuant to a Mineral Lease with the State of Utah's

Division of Forestry, Fire & State Lands ("**FFSL**"), which lease was originally executed by the

parties' respective predecessors-in-interest in 1961, and which was later amended in 1969.[6]  The Mineral Lease authorizes the lessee "the right to use all of the leased premises . . . for the extraction of magnesium chloride and other salts from the waters of the Great Salt Lake, together with the right to mine, extract or remove salts from the surface of the lands leased thereunder subject to payment of royalties . . . and the production, manufacture, processing and sale thereof . . . ."  *See* Mineral Lease, § 8.

39.    The Mineral Lease provides in Section 13 that it is made pursuant to the provisions of all applicable law, "and to such rules and regulations as may be hereafter promulgated by the State, provided that any such law and any such rules and regulations do not impair the rights granted hereunder or enlarge any obligations hereby assumed."  *See* Mineral Lease, § 13.

40.    As provided in the Mineral Lease, the word "salts" means "all salts and other minerals or chemicals extracted from the waters of the Great Salt Lake, or the surface of leased acreage."  *See* Mineral Lease, § 1.  This definition includes lithium.

41.    The Mineral Lease provides for the payment of royalties to the State from USM for extracted magnesium chloride at the rates set forth in Section 17 therein.  With respect to "any other salts" that are beneficially recovered and sold by USM, the Mineral Lease provides that USM shall pay FFSL a royalty at the rate fixed by regulation, if any, then in effect.  Otherwise, "said royalty shall be as fixed by agreement between the parties *See* Mineral Lease, at § 17.

42.    The State of Utah, at the time that USM determined to engage in lithium carbonate production, had not commenced rulemaking to designate either lithium or lithium carbonate within

---

[6] The Mineral Lease & Option Agreement, dated March 8, 1961, was entered into among the State Land Board (predecessor-in-interest to FFSL), as lessor, and James E. Hogle, George E. Hogle, James G. Macey, Bonneville-on-the-Hill, Rico-Argentine Mining Company, and Kearns-Tribune Corporation (predecessors in interest to USM), as lessee, and was later amended by that certain Agreement, dated July 31, 1969, among the State Land Board and H-K, Inc. and National Lead Company (collectively, the "<u>Mineral Lease</u>").

controlling administrative rule and/or regulation as they pertain to royalty rates attributable to extracted minerals, ores, and/or commercial materials. Therefore, in accordance with Section 17 of the Mineral Lease, the parties entered into a Memorandum of Understanding Between US Magnesium LLC and the Utah Division of Forestry, Fire & State Lands Concerning Interim Royalty Agreement for Lithium Carbonate Mining, Extraction and/or Production from the Great Salt Lake, dated October 24, 2019 (the "**Lithium MOU**").[7]

43.     Under the Lithium MOU, USM agreed to pay royalties for lithium carbonate at the rate of .5% per ton for the first two years of production, 1.5% per ton for the third year of production, 2.5% per ton for the fourth year of production, and 3.8% for the fifth year of production and for so long thereafter as lithium carbonate is extracted and sold in commercial paying quantities, or until market conditions dictate otherwise. The Lithium MOU contemplated that "upon completion of FFSL rulemaking as specified in this MOU, the above-stated royalty rates and royalty structure will be incorporated into an entirely separate 'Lithium Carbonate Royalty Agreement,' which terms and conditions will govern the rights, responsibilities and obligations between FFSL and US MAG regarding the lithium project and all of the terms and conditions of this MOU will be void and of no further legal or equitable effect." The State of Utah alleges that USM has not paid the State certain royalty amounts allegedly due. USM disputes this assertion.

ii.     Efforts to Terminate

44.     On December 13, 2024, without warning, FFSL sent notices to USM seeking to terminate both the Mineral Lease and the Lithium MOU. FFSL contends that it has the right to terminate the Mineral Lease because USM allegedly breached various provisions. USM contends that the alleged breaches lack merit.

---

[7] A copy of the Lithium MOU is attached here as **Exhibit A**.

45.     In respect of the Lithium MOU, FFSL contends that because USM and FFSL did not enter into a "Lithium Carbonate Royalty Agreement" following the formal rulemaking which designated lithium carbonate as a royalty bearing substance, which FFSL suggests occurred in October 2024, the Lithium MOU is now terminated and of no force and effect.  FFSL also claims, based on Utah Code § 65A-6-4(2)(d) that because the Mineral Lease does not expressly include the right to extract lithium chloride, a separate royalty agreement is required.

iii.     Receivership Action

46.     Also on December 13, 2024, FFSL filed a complaint in the Third Judicial District Court in Salt Lake County, along with an *ex parte* motion for the appointment of a receiver.[8]  The complaint, like the notices, is focused on purported violations of the Consent Decree as well as Utah environmental protection laws, and included causes of action for trespass, public nuisance, and other counts seeking the appointment of a receiver under Utah Code § 78B-21-101 *et seq*. or Utah R. Civ. P. 66, respectively.  Following these filings, the Court responded immediately and entered an *ex parte* order appointing a receiver over USM and its assets on the same day.

47.     On December 19, 2024, USM moved to vacate the receivership order, following which a hearing was held on December 20, 2024.  At that hearing, the Court granted the motion to vacate the receivership order given that USM was given no notice and had no opportunity to be heard, and because FFSL presented no evidence to support its contention that *ex parte* relief was necessary to prevent a threat of imminent harm to the environment.   However, USM agreed to allow the receiver to remain in place solely to monitor any environmental harm.  The receiver engaged a consultant to assess the existence of any imminent threat cited by FFSL as the basis for *ex parte* relief.  That consultant visited the Facility and did not find that an imminent threat to the

---

[8] *Utah Division of Forestry, Fire and State Lands v. US Magnesium LLC,* Civil No. 240909983.

environment exists.  At no time since appointment of the limited scope receiver has the receiver notified the Court of any environmental issues or concerns associated with the Facility.

48.     At the hearing on December 20, 2024, the Court ordered an evidentiary hearing on January 3, 2025.  However, prior to the evidentiary hearing, the parties agreed to stay the proceedings to allow them to focus on settlement discussions which would involve negotiation of a new mineral lease, water usage agreement and a lithium royalty agreement.  The parties engaged in settlement negotiations for months, but these discussions ultimately broke down.

**V.     Contemplated Sale Process**

49.     On August 21, 2025, USM engaged SSG Capital Advisors, LLC ("**SSG**") to explore potential going concern transactions and strategic alternatives for USM.  SSG has been working closely with the Debtor's management team and advisors to become well-acquainted with the Debtor's business operations, capital structure and various legal issues likely to arise in this Chapter 11 Case.  SSG has prepared an extensive list of potential purchasers, a confidentiality agreement for the sale process, and marketing materials including an Executive Summary, in order to go to market immediately after the First Day Hearing.  SSG has also populated a virtual data room to provide potential purchasers with diligence materials upon execution of the confidentiality agreement.

50.     USM has received a proposed asset purchase agreement from an affiliate of Renco (the "**Renco Purchaser**"), under which Renco Purchaser would serve as the stalking horse purchaser for substantially all assets of USM, which would be acquired pursuant to section 363 of the Bankruptcy Code.  Leading up to the Petition Date, USM, including the Independent Manager, and its professional advisors negotiated the terms of the Renco Purchaser offer, culminating in an agreement (the "**Stalking Horse APA**").  USM will continue to market its business as a going concern in accordance with its bid procedures motion.

51.     The Stalking Horse APA contemplates, among other things, the assignment to Renco Purchaser of the Mineral Lease and Lithium MOU, and the assumption by Renco Purchaser of liabilities under the Consent Decree-conditioned upon agreement with EPA (and Utah Division of Water Quality) as to the plan for completing various projects under the Consent Decree.

## VI.    First Day Pleadings

52.     Contemporaneously herewith, USM has filed a number of pleadings aimed at facilitating a smooth transition for USM into chapter 11, stabilizing existing business operations, and facilitating the efficient administration of this Chapter 11 Case, including the following (collectively, the "**First Day Pleadings**"):

> **B.     Motion for Entry of Interim and Final Orders Authorizing the Debtor to (I) Maintain, Continue, and Renew its Property, Casualty, Liability and Other Insurance Policies and Agreements, and (II) Honor all Obligations in Respect thereof (the "<u>Insurance Motion</u>")**

53.     The Debtor maintains various insurance programs providing coverage for, among other things, cargo stock, pollution, general liability, employment benefits liability, workers' compensation liability, employment practices liability, commercial property, international package,, business auto directors and officers liability, and commercial umbrella (collectively, the "<u>Insurance Programs</u>"). The Insurance Programs include coverage primarily from the insurance policies listed on <u>Exhibit A</u> to the Insurance Motion (the "<u>Insurance Policies</u>"), which the Debtor has obtained through third-party insurance carriers (the "<u>Insurance Carriers</u>"). The Debtor also maintains a Surety Bond program and provides Letters of Credit ("LCs") as performance security for certain obligations.

54.     The Debtor seeks entry of an order authorizing, but not directing, the Debtor to (a) continue and, to the extent necessary, revise, extend, renew, supplement, or change its prepetition Insurance Policies, Surety Bonds and LCs, or enter into new policies, Surety Bonds and LCs, if

necessary, in the ordinary course of business and (b) pay all prepetition obligations in respect thereof, including brokerage and administrative fees (collectively, the "Insurance Obligations") in the ordinary course of business and pay prepetition obligations in respect thereof.

C. **Motion for an Order (I) Authorizing the Debtor to (A) Continue and Maintain its Consolidated Cash Management System, (B) Continue and Maintain its Existing Bank Accounts, (C) Use Existing Business Forms and (D) Continue to Perform Intercompany Transactions; and (II) Granting Related Relief (the "Cash Management Motion")**

55. Cash Management System. In the ordinary course of its business, the Debtor manages its cash, receivables, and payables through a cash management system (the "**Cash Management System**"). The Cash Management System is designed to efficiently collect, transfer, and disburse funds, a schematic of which is attached as Exhibit 1 to the Proposed Orders to the Cash Management Motion. The Cash Management System is comparable to the centralized cash management systems commonly used by businesses similar in size and scale to the Debtor.

56. The Debtor maintains accounting controls in connection with its Cash Management System and is able to accurately trace the funds flowing through the Cash Management System to ensure that all transactions are adequately documented and readily ascertainable. As a result, the Debtor is able to accurately document and record the transactions occurring within the Cash Management System for the benefit of all parties in interest.

57. The Debtor's Bank Accounts. As of the Petition Date, the Debtor maintained 8 bank accounts, 7 of which are owned by the Debtor (the "**Debtor Bank Accounts**") and 1 of which is owned by a non-Debtor entity (the "non-Debtor Bank Account" and together with the Debtor Bank Accounts, the "**Bank Accounts**" maintained at multiple banks, collectively the "**Cash Management Banks**").

58.     The Bank Accounts serve as the main operating accounts for paying items including payroll, operating fees, and bank fees.  All funds received in ordinary course by the Debtor are deposited into the Bank Accounts.

59.     As of the Petition Date, the Bank Accounts are identified on Exhibit 2 attached to the Proposed Orders to the Cash Management Motion and are described in the following table:

| Account | Account Description |
|---|---|
| Master Account<br><br>X5742 | The Debtor maintains an account at Wells Fargo x5742 as its main operating account into which funds are wired or otherwise transferred.<br><br>Funds from the Master Account are, in turn, then transferred to the Debtor's disbursement accounts including: (a) Disbursement Account, (b) Payroll Account, (c) FSA Account, (d) Health Insurance Account, (e) Deferred Compensation Account and the non-Debtor Utility Account. As of the petition date, the Debtor has approximately $1,000 in this account. |
| Lockbox<br><br>X4777 | The Debtor maintains an account at Wells Fargo x4777 for the collection of outstanding trade accounts receivable (the "**Lockbox Account**").  Funds deposited into this account are automatically swept daily by Wells Fargo and applied to the outstanding balance of the existing Revolving Credit Facility. |
| Disbursement Account<br><br>x8059 | The Debtor maintains an account at Wells Fargo x8059 for the payment of virtually all trade vendors via ACH, wire, checks, etc. (the "Disbursement Account"). Cash is transferred daily from the Master Account in an amount sufficient to fund the Debtor' obligations in the ordinary course. |
| Employee Payroll<br><br>X3800 | The Debtor maintains an account at Wells Fargo x3800 from which the Debtor processes standard payroll obligations and related obligations ("the Payroll Account"). The Payroll Account is manually funded for each payroll cycle with cash in the amount needed to cover each forthcoming payroll run. Excess |

| | |
|---|---|
| | funds, if any, would be swept back into the Master Account. |
| Employee Benefits<br><br>x7470<br><br>x8503<br><br>x6860 | The Debtor maintains an account at Wells Fargo x7470 for the remittance of funds related to its Flexible Spending Account ("FSA Account") program. Cash is transferred daily from the Master Account in an amount sufficient to fund the Debtor' obligations in the ordinary course.<br><br>The Debtor maintains an account at Wells Fargo x8503 for the payment of Health Insurance claims from the prior self-insured Plan ("Health Insurance Account"). Cash is wired from the Master Account in an amount sufficient to fund the Debtor's obligations as required. As of the petition date, the Debtor has approximately $230 in this account.<br><br>The Debtor maintains an account at Wells Fargo x6860 in connection with its Deferred Compensation Plan. Cash is wired from the Master Account in an amount sufficient to fund the Debtor's obligations as required. As of the petition date, the Debtor has approximately $1,200 in this account. |
| Non-debtor Bank Account<br><br>X7178 | The Cash Management System integrates a Bank Account at Zions Bank held by a certain non-Debtor affiliate, as set forth on Exhibit 2 to the Cash Management Motion.<br><br>Non-debtor Skull Valley Water Group, LLC maintains an account at Zions Bank to fund the procurement of water necessary to supply the Debtor's operations.<br><br>The Debtor wires funds from the Master Account in an amount sufficient to fund the Debtor's obligations as required. |

60.   <u>P-Card Program</u>.   As part of the Cash Management System, the Debtor maintains a corporate credit card program (the "Corporate Credit Card Program"), pursuant to which certain employees are issued purchasing credit cards (the "P-Cards" and the P-Card component of the

Corporate Credit Card Program, the "P-Card Program"), through Wells Fargo.[9]  The Debtor only provides P-Cards to employees if there is a justifiable business need, with approximately 5 employees currently holding these cards. The credit limit for each P-Card varies by employee.  The aggregate limit of all P-Cards is $25,000.

61.    The P-Cards are used by the Debtor's employees to pay for certain work-related expenses, including, but not limited to, office supplies, vendor payments, and small, non-recurring purchases made on behalf of the Debtor. Historically, the Debtor spends approximately $10,000 in the aggregate per month on account of the P-Card Program. The Debtor estimates that there is approximately $10,000 outstanding on account of the P-Cards as of the Petition Date.

62.    Employees' continued use of the P-Cards for work-related purposes is essential to the Debtor's postpetition operations. Accordingly, the Debtor seeks authority, but not direction, to issue P-Cards pursuant to the P-Card Program, subject to any terms and conditions thereof, and to pay prepetition or postpetition amounts, if any, owed with respect thereto, including any administrative fees and charges owed in connection therewith, in each case, in the ordinary course of business consistent with past practice.

63.    <u>Intercompany Transactions</u>.    In the ordinary course of business, the Debtor regularly engages in routine transactions with a non-Debtor affiliate (collectively, the "**Intercompany Transactions**") resulting in intercompany receivables and payables (the "**Intercompany Claims**"). The Debtor accounts for and records all Intercompany Transactions and Intercompany Claims in its centralized accounting system, and any such transfers are monitored and reconciled on a monthly basis.

---

[9] A copy of that certain WellsOne Commercial Card Express Agreement, dated as of May 18, 2009, by and between the Debtor and Wells Fargo is attached as Exhibit 3 to the Proposed Orders

64.     Procurement Transactions with a non-Debtor affiliate occur as part of the ordinary course operations of the Cash Management System and are essential for the procurement of certain utilities.  For instance, Skull Valley Water Group ("**Skull Valley**"), a non-Debtor, will continue to operate as a supplier of water to the Debtor, using ordinary course of business practices.

65.     For the foregoing reasons, it is in the best interests of the Debtor, its estate, its creditors, and all other parties in interest that the Court grant the relief requested in the Cash Management Motion.

**D.      Motion for Entry of an Order Authorizing the Debtor to (I) Pay Prepetition Wages and Other Compensation, and (II) Continue Employee Benefit Programs ("Wages Motion")**

66.     The Debtor employs approximately twenty-two (22) full-time and two (2) part-time employees in Salt Lake City and Rowley, Utah (collectively, the "**Employees**").  None of the Employees are represented by a union or collective bargaining unit.

67.     Wages.  The Debtor pays wages ("**Wages**") to its Employees.  ADP processes payment of these Wages and the related payroll taxes.  On average, the Debtor pays approximately $160,000 in Wages and taxes on a semi-monthly basis.

68.     As of the Petition Date, the Debtor is unaware of any Employees who individually are owed Wages greater than the $17,150.00 cap established by section 507(a)(4) of the Bankruptcy Code.

69.     Leave Policies.  The Debtor offers Employees other forms of compensation, including vacation days, holidays, civic duties leave, and bereavement days.  These forms of compensation are, in certain cases, required by statute, and in all cases, usual, customary, and necessary for the Debtor to retain qualified employees to operate its business.  Failure to provide these benefits could contravene applicable law and harm Employee morale and encourage the

premature departure of Employees.  The Debtor therefore requests authority to continue these programs in the ordinary course of business during this Chapter 11 Case.

70.   <u>Vacation Days</u>. Prior to the Petition Date, the Debtor offered its Employees the following:

| During first year of employment. | Awarded 80 hours of vacation benefits during the first calendar year of employment, prorated based on date of hire. |
|---|---|
| After completing the first year of employment and through the 4th year of continuous employment (2-4 years). | Awarded 80 hours of vacation benefits on January 1<sup>st,</sup> following the Employee's date of hire. |
| After completing the 4th year of employment and through the 9th year of continuous employment (5-9 years). | Awarded 120 hours of vacation benefits on January 1<sup>st,</sup> following the 4th year of continuous employment. |
| After completing the 9th year of employment and through the 19th year of continuous employment (10-19 years). | Awarded 160 hours of vacation benefits on January 1<sup>st,</sup> following the 9th year of continuous employment. |
| After completing 19 years of continuous service (20 years or more). | Awarded 200 hours of vacation benefits on January 1<sup>st,</sup> following the 19th year of continuous employment. |

The Debtor allowed Employees to roll over up to zero hours after the vacation year of January 1 to December 31.

71.   <u>Bereavement Leave and Civic Duties</u>.  Prior to the Petition Date, the Debtor offered its Employees bereavement leave, and granted leave to Employees with civic duty obligations, including jury duty.

72.   <u>Holiday Pay</u>.  The Debtor provides paid time off for the following holidays: New Year's Day, Good Friday, Memorial Day, Independence Day, Pioneer Day, Labor Day, First Monday of Deer Hunt Season, Thanksgiving Day, Day After Thanksgiving, Christmas Eve and Christmas Day.

73.     <u>Health and Welfare Benefits</u>.   Prior to the Petition Date, the Debtor offered its Employees various health and welfare benefits, including medical, dental, vision, health savings, life, long-term disability, pension and 401(k).   Employees are eligible to enroll on the first day of the month after 60 days of employment.

74.     The Debtor contributes approximately $30,000 semi-monthly towards the cost of these Health and Welfare benefits.   Employee premiums are deducted pre-tax.

75.     <u>Expense Reimbursements</u>.   In the ordinary course of its business, some of the Debtor's employees incur expenses on behalf of the Debtor.   Employees that incur expenses on behalf of the Debtor are required to submit signed expense reports with supporting documentation, which are reimbursed each pay period upon approval.   As of the Petition Date, the Debtor estimates that aggregate expense reimbursements of approximately $2,000 remain outstanding, substantially all of which the Employees incurred through the use of personal funds.

76.     <u>Deferred Compensation Plan</u>.   Prior to the Petition Date, the Debtor maintained a Deferred Compensation Plan for certain of its senior executives.   The plan was frozen in 2020. The Debtor has no plan to pay any accrued and vested benefits going forward.

77.     For the foregoing reasons, I believe it is in the best interests of the Debtor, its estate, its creditors, and all other parties in interest that the Court grant the relief requested in the Wages Motion.

### Motion for an Order Providing Adequate Assurance of Utility Payments (<u>"Utility Motion"</u>)

1.     Various Utilities provide the Debtor with traditional utility services, such as telephone and communications, information technology, electricity, and other similar services that are necessary for the continued operation of the Debtor's day-to-day affairs.   Uninterrupted utility service is critical to the Debtor's ability to operate its business and maximize value for the benefit

of its creditors.  Loss of utility service would substantially disrupt the Debtor's operations and result in revenue loss, which could irreparably harm the value of the Debtor's estate.

2.     The proposed Adequate Assurance Deposits listed on **Exhibit A** to the Utility Motion, which are calculated based on one-half of the approximation of one month's worth of utility service as calculated by the Debtor according to the last historical 12-month period, are sufficient adequate assurance of the Debtor's future payments to the Utility providers.  As set forth in **Exhibit A** to the Utility Motion, the proposed Adequate Assurance Deposits total $43,550.

3.     For the foregoing reasons, it is in the best interests of the Debtor, its estates, its creditors, and all other parties in interest that the Court grant the relief requested in the Utility Motion.

78.     Several of the First Day Pleadings request authority to pay certain pre-petition claims.  I understand from my advisors that in chapter 11 matters that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court shall not consider motions to pay pre-petition claims during the first twenty-one days of the bankruptcy case "except to the extent relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003.  In light of Bankruptcy Rule 6003, USM has narrowly tailored its requests for immediate authority to pay certain pre-petition claims to only those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtor and its bankruptcy estate.  Other relief will be deferred for consideration at a later hearing.

79.     I have consulted with my colleagues at USM, as well as with USM's professional advisors, regarding the relief requested in the First Day Pleadings, and understand each of the First Day Pleadings and the relief requested therein.  To the best of my knowledge and belief, the factual statements contained in each of the First Day Pleadings are true and accurate, and each such factual statement is incorporated into this Declaration by reference.

80.     Based on my knowledge, and after reasonable inquiry, I believe that the approval of the relief requested in the First Day Pleadings is (a) necessary to enable the Debtor to transition into, and operate efficiently and successfully in, chapter 11 with minimal disruption or loss of productivity and value, (b) critical to the Debtor achieving a successful restructuring; and (c) in the best interest of the Debtor's estate and its stakeholders.  I believe that, if the Court does not grant the relief requested by the Debtor in the First Day Pleadings, the Debtor's business and its estate will very likely suffer immediate and irreparable harm.  Accordingly, for the reasons set forth herein and in the First Day Pleadings, the Court should grant the relief requested in each of the First Day Pleadings.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

*(Signature page to follow)*

Dated: **9/10/2025**

**Ron Thayer**
**President**

# EXHIBIT A

MEMORANDUM OF UNDERSTANDING

BETWEEN US MAGNESIUM LLC

AND

THE STATE OF UTAH

DEPARTMENT OF NATURAL RESOURCES

DIVISION OF FORESTRY, FIRE AND STATE LANDS

CONCERNING INTERIM ROYALTY AGREEMENT FOR LITHIUM CARBONATE MINING, EXTRACTION AND/OR PRODUCTION FROM THE GREAT SALT LAKE

This MEMORANDUM OF UNDERSTANDING ("MOU") is hereby made and entered into by and between US MAGNESIUM LLC ("US MAG") and the State of Utah, Department of Natural Resources, Division of Forestry, Fire and State Lands ("FFSL").

## I. BACKGROUND AND PURPOSE

The Great Salt Lake is a valuable natural resource of international, national and statewide importance. It is understood and agreed the State of Utah, by and through application of federal law ("equal footing doctrine"), has fee title ownership of the bed and banks of all navigable water bodies located within the State's boundaries. It is also understood and agreed the Great Salt Lake has been determined to be a navigable water body and that the State of Utah has ownership of not only the bed of the Great Salt Lake, but all minerals extracted from its waters. It is also understood and agreed Utah's legislature has delegated FFSL as the agency with exclusive authority to manage the Great Salt Lake and to issue leases and/or royalty agreements for any and all extracted salt, ores, minerals and/or other valuable commodities.

It is further understood and agreed US MAG is a private commercial entity that has been operating magnesium extraction and production facilities in or around Rowley, Utah, for the past 48 years. US MAG harvests salts from the Great Salt Lake to produce numerous commercially marketable materials, including magnesium chloride.

It is further understood and agreed US MAG is now entering a separate commercial project designed to produce, market and sell lithium carbonate ("lithium project"). The lithium project involves production of high purity lithium carbonate from residual chloride salts remaining from electrolysis of magnesium chloride at the Rowley production site. The process will utilize stockpiled and extracted chloride ore containing primarily calcium, sodium, potassium, magnesium and lithium values.

It is further understood and agreed lithium and/or lithium carbonate are unique, commercially valuable minerals, ores and/or materials that are not currently listed and/or designated in FFSL's rules pertaining to royalty rates attributable to extracted minerals, ores and/or commercial materials. Because FFSL and US MAG intend on negotiating and entering a stand-alone, separate royalty agreement involving the extracted materials associated with the lithium project, FFSL must first commence rulemaking to designate these extracted materials within controlling administrative rule and/or regulation.

1

The purpose of this MOU is to establish an interim agreement between FFSL and US MAG regarding the respective interim royalty rate and interim procedures to be followed during the interim period between execution of this MOU and completion of formal rulemaking. Upon completion of the formal rulemaking process, it is expressly understood and agreed any of the terms and conditions specified in this MOU will lapse, and the terms and conditions specified in a separately executed Lithium Royalty Agreement will govern and control all aspects of the lithium project including, but not limited to, any royalty rate and royalty structure attributable to any extracted lithium-bearing salt, ore, mineral, commodity, and/or trace mineral.

## II. GOALS

US MAG and FFSL share joint goals in entering this MOU. It is the goal of both FFSL and US MAG that a guiding, governing and/or enforceable interim agreement be in place while awaiting completion of the formal rulemaking process so that lithium is recognized by administrative rule as a mineral and/or ore whereby royalties attach at a specified rate. FFSL has an obligation of following any administrative rule promulgated to guide management responsibilities and/or activities. Further, per administrative rule, FFSL is "obligated to receive full value for the public trust resources leased to persons for profit."

Similarly, FFSL has the obligation of following the Comprehensive Management Plan and/or Mineral Leasing Plan established for management of the Great Salt Lake. Contained within these documents, and in applicable statute, FFSL has the obligation to "promote the development of lake brines, minerals, chemicals, and petro-chemicals."

As a private commercial entity, US MAG has an obligation to run a profitable extraction and production enterprise. The lithium project is estimated to cost between $60 million and $80 million of capital expenditures. With this significant capital outlay, US MAG has a vested interest in obtaining certainty and predictability in any lithium royalty structure going forward.

## III. STATEMENT OF MUTUAL BENEFITS

As described in this MOU, a clearly defined royalty structure will benefit both FFSL and US MAG. A clearly defined royalty structure will provide clarity as to applicable royalty rates, establish an initial royalty structure including, but not limited to, any escalation factors triggering increases in royalty percentages, and establish roles and responsibilities as the lithium project commences. A memorialized royalty rate and royalty structure will result in administrative efficiencies and decreased transaction costs for both FFSL and US MAG. Further, a memorialized MOU will advance the goal of achieving statutory mandates pertaining to effective management of the natural resources described herein.

## IV. CITATION TO APPLICABLE AUTHORITY

      A.  *Utah v. United States*, 403 US 9 (1971).
      B.  Utah Admin. Code R. 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(2)(d)(i) (2015).
      C.  Utah Code Ann. § 65A-10-8 (2018).
      D.  Great Salt Lake Comprehensive Management Plan.
      E.  Great Salt Lake Mineral Leasing Plan.
      F.  Utah Admin. Code R. 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.
      G.  *Deseret Livestock Co. v. State*, 171 P.2d 401 (Utah 1946).

## V. INTERIM ROYALTY RATE AND STRUCTURE

### A. Initial Royalty Rate and Escalation Structure

FFSL and US MAG agree the following royalty rate and royalty structure will apply to any lithium extraction and/or lithium production presently contemplated by the lithium project[1]:

| | |
|---|---|
| Lithium Carbonate: | .5% per ton for the first two (2) years of production. |
| Escalation Factor: | After the first two (2) years of production, the royalty rate shall increase at a rate of 1% per annum for the next two (2) years. For the fifth year of production, and so long thereafter as lithium carbonate is produced in commercial paying quantities, or until market conditions dictate otherwise, the royalty rate will be 3.8%. Said royalty increases shall be attributable to any lithium carbonate extracted, produced and/or sold after January 1 of each successive year. |
| 5-year Royalty Rate: | 3.8% per ton after five (5) years of production, and so long thereafter as lithium carbonate is extracted and sold in commercial paying quantities, or until market conditions dictate otherwise. |
| Readjustment: | Per administrative rule and/or current administrative policy, FFSL reserves the right to readjust and/or reevaluate any royalty rate, royalty term, and/or royalty structure at any time after the interim MOU period and/or five (5) years of production so as to achieve a fair royalty for use of public resources. US MAG and FFSL expressly agree FFSL may increase or decrease the royalty rate and/or royalty structure depending on established market conditions and that this readjustment provision will be contained in any subsequent royalty agreement with or without corresponding administrative rule. |
| Application: | The royalty rates expressed herein, and in any subsequent royalty agreement, are to be applied to the gross sales of each ton of lithium carbonate produced by US MAG. |
| Limitation: | It is expressly understood and agreed by FFSL and US MAG the above-referenced royalty rate(s) and royalty structure are applicable to lithium carbonate only. In the event other lithium products are extracted and sold during the term of this MOU, including but not limited to lithium |

---

[1] This MOU and the terms and conditions specified (including, but not limited to, the royalty rate and royalty structure) are based on the "lithium project" now proposed by US MAG. To the extent the lithium project has material and/or substantive revisions and/or modifications to the present plan as represented by US MAG, FFSL reserves the right to alter, amend, modify or renegotiate any and all terms and conditions contained herein and/or in any subsequent royalty agreement.

hydroxide, a separate MOU and/or royalty agreement, under separately negotiated terms and conditions, will be required.[2]

Processing:    It is expressly understood and agreed the above-referenced royalty rate contemplates and includes any and all processes, processing and/or refinement procedures and that no further reduction to the royalty rate and/or any deduction(s) eroding and/or negatively impacting the royalty rate will occur as a result of any additional processes, processing or refinement.

### B. Incorporation into Final Royalty Agreement

Subject to any additional information (of a material and/or substantive nature) regarding lithium carbonate extraction, production and/or processes developed and/or exchanged between US MAG and FFSL during the interim MOU period, the above-referenced 5-year Royalty Rate shall be the final negotiated royalty rate attributable to lithium carbonate production as contemplated by the lithium project so long as production of lithium carbonate is continually produced in paying quantities from the minerals, salts and/or ores of the Great Salt Lake. The above-referenced 5-year Royalty Rate is also subject to any readjustment required based on unexpected, unknown and/or unforeseeable environmental, commercial and/or market conditions and/or any other condition eroding or reducing established royalty revenue to FFSL and/or any other market, commercial and/or environmental condition that is prohibitive or otherwise interferes with FFSL receiving full value for public trust resources.

Upon completion of FFSL rulemaking as specified in this MOU, the above-stated royalty rates and royalty structure will be incorporated into an entirely separate "Lithium Carbonate Royalty Agreement," which terms and conditions will govern the rights, responsibilities and obligations between FFSL and US MAG regarding the lithium project and all of the terms and conditions of this MOU will be void and of no further legal or equitable effect.

### C. No Deductions

FFSL and US MAG agree no deductions for shipping, processing, marketing, and/or any other deductions reducing the royalty rate and/or resulting revenue to FFSL will be allowed or authorized. This specified and strict prohibition of shipping, marketing, processing and/or manufacturing related deductions shall be incorporated, without limitation, in any subsequent "Lithium Carbonate Royalty Agreement."

## VI. INTERIM ROLES AND RESPONSIBILITES

### A. Responsibilities of US MAG.

US MAG agrees to conduct its operations pertaining to the lithium project to the degree and level of any prudent operator engaged in similarly situated commercial extraction and production activities. Including within this role and responsibility is to maintain and operate appropriate weight and measure facilities and to account and memorialize in a commercially reasonable manner and/or under commercially acceptable accounting practices all documentation necessary to fully and fairly account for

---

[2] In the event US MAG provides sufficient financial and industrial processing information related to lithium hydroxide, FFSL may consider utilizing, among other factors, the base royalty rate of 3.8% for lithium hydroxide.

the production, extraction and royalty calculation methodologies attributable to the lithium project. US MAG will also keep FFSL and its staff fully apprised of any and all developments (commercial, environmental, or otherwise) having any impact on the royalty rate, royalty structure, or royalty revenue contemplated in this MOU.

### B. Responsibilities of FFSL.

FFSL agrees to proceed as expeditiously as possible with rulemaking so that lithium is placed within the existing regulatory structure. FFSL also agrees to draft and circulate a proposed Lithium Carbonate Royalty Agreement as soon as practical so that a fully executed royalty agreement is in place immediately following rulemaking.

## VII. GENERAL PROVISIONS

In further consideration of the joint and several obligations specified in this MOU, it is mutually agreed and understood by and between FFSL and US MAG that:

A. Unless otherwise specified, this MOU is not intended to and does not create any right, benefit, or trust responsibility, substantive or procedural, enforceable at law or equity, by any party against the State of Utah and its respective agencies, officers, or any affiliated person.

B. This MOU does not affect or modify existing regulations or FFSL responsibilities other than by and through the terms and conditions detailed herein. This MOU does not commit any FFSL activity or policy other than specified and the terms and conditions of this MOU do not interfere with the scope of FFSL's overall policies, rules or statutory authority.

C. Unless otherwise expressly agreed in writing, FFSL and US MAG and their respective officers, agents and/or employees will manage their own activities and utilize their own resources, including expenditures of their own funds, in pursuing the purposes of this MOU.

D. Any information furnished to FFSL and/or US MAG under this MOU is subject to the Freedom of Information Act (5 § U.S.C. 552) and/or any applicable state laws or regulations pertaining to public information and/or confidential or otherwise legally protected information.

E. Each party will be responsible for its own acts and results thereof and shall not be responsible for the acts of the other party and the results thereof. Each party therefore agrees that it will assume all risk and liability to itself, its agents or employees, for any injury to persons or property resulting in any manner from the conduct of its own operations, and the operations of its agents or employees, under this MOU, and for any loss, cost, damage, or expense resulting at any time from failure to exercise proper precautions, of or by itself or its own agents or its own employees, while occupying or visiting the projects under and pursuant to this MOU.

F. All activities and programs conducted under this MOU shall be in compliance with the nondiscrimination provisions contained in Titles VI and VII of the Civil Rights Act of 1964, as amended; Civil Rights Restoration Act of 1987 (Public Law 100-250); and other

5

nondiscrimination statues namely, Section 504 of the Rehabilitation Act of 1973, Title IX of the Education Amendment of 1972, the Age Discrimination Act of 1975, and any equivalent state law or regulation. In addition, all activities and programs shall be in accordance with regulations of the Secretary of Agriculture (7 C.F.R. 15, Subparts A & B), and/or any state law equivalent which provide that no person in the United States shall on the grounds of race, color, national origin, age, sex, religion, marital status, or handicap be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity receiving federal financial assistance.

G. All activities conducted under this MOU shall be in compliance with the Drug Free Workplace Act of 1988, as amended (Public Law 100-690, Title V, Subtitle D) and/or any relevant or applicable state law or regulation.

H. This MOU takes effect upon the signature of US MAG and FFSL and shall remain in effect until formal rulemaking designating lithium carbonate as a royalty bearing substance, including the applicable royalty rate and structure, occurs and a Lithium Carbonate Royalty Agreement is memorialized and executed.

I. Either party may request changes to this MOU. Any changes, modifications, revisions or amendments to this MOU which are mutually agreed upon by and between the parties to this MOU shall be incorporated by written instrument, and effective when executed and signed by all parties to this MOU.

J. The construction, interpretation and enforcement of this MOU shall be governed by the laws of Utah. The courts of Utah shall have jurisdiction over any action arising out of this MOU and over the parties, and venue shall be in any court of competent jurisdiction located in Salt Lake County, Utah.

K. This MOU represents the entire and integrated agreement and/or understanding of the parties and supersedes all prior negotiations, representations and agreements, whether written or oral.

L. FFSL and its directors, officers, agents and/or employees do not waive, and expressly reserve any and all sovereign immunity protection(s) available under the laws of Utah by entering into this MOU and fully retain all immunities and defenses provided by law with respect to any action or omission based on or occurring as a result of this MOU.

M. The parties do not intent to create in any other individual or entity the status of a third-party beneficiary, and this MOU shall not be construed so as to create such status. The rights, duties and obligations contained in this MOU shall operate only between the parties to this MOU and shall inure solely to the benefit of the parties to this MOU. The parties to this MOU intend and expressly agree that only parties signatory to this MOU shall have any legal or equitable right to enforce this MOU, to seek any remedy arising out of a party's performance or failure to perform any term or condition of this MOU, or to bring an action for the breach of this MOU.

N.  FFSL reserves the right to include any additional clause, provision or section in the Lithium Carbonate Royalty Agreement that protects the Division, its personnel and agents, and the public trust resources FFSL is obligated to protect and preserve.

O.  At the conclusions of the interim MOU period, and before the Lithium Carbonate Royalty Agreement is executed, FFSL and US MAG agree to exchange any and all commercial and/or financial information relevant and attributable to the lithium project that would assist FFSL and US MAG in determining whether the royalty rate and/or royalty structure contained in this MOU approximates full value for public trust resources.  FFSL reserves the right to review and assess the exchanged commercial and/or financial information and make such necessary and reasonable adjustments to the royalty rate and royalty structure prior to execution of any Lithium Royalty Agreement.  FFSL will fully protect any commercial and/or financial information exchanged as protected confidential information.

P.  In the event US MAG fails to produce lithium carbonate in paying quantities for a period in excess of ninety (90) days, FFSL retains the exclusive right to terminate this MOU and/or any resulting Lithium Carbonate Royalty Agreement.  In the event any operative agreement is terminated for failure to produce in paying quantities, US MAG and FFSL may enter into another royalty agreement based on newly negotiated terms and/or negotiate a separate operative agreement containing "shut-in" royalties for any period US MAG fails to produce lithium carbonate in paying quantities.

## VIII.  EFFECTIVE DATE

IN WITNESS WHEREOF, the Parties hereto have executed this MOU as of the last written date below:

_Ron T. Thayn_ — PRESIDENT                          _10/24/19_
U.S. Magnesium LLC                                              DATE


_____                   _____
Utah Department of Natural Resources              DATE
Division of Forestry, Fire and State Lands