**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br>BY HOTEL SPE-3 LLC, a Delaware Limited Liability Company, 1101 WABASH DEVELOPMENT MEZZ, LLC, a Delaware Limited Liability Company, WABASH 11TH MEZZ LLC, a Delaware Limited Liability Company, PACIFIC TAI MEZZ LLC, a Delaware Limited Liability Company, 1101 WABASH DEVELOPMENT SPE LLC, a Delaware Limited Liability Company, WABASH 11TH LLC, an Illinois Limited Liability Company, 1101 WABASH DEVELOPMENT LLC, an Illinois Limited Liability Company, PACIFIC TAI, LLC, an Illinois Limited Liability Company, SB YEN'S MANAGEMENT GROUP, INC, an Illinois Corporation,<br><br>**Debtors.**[1] | Chapter 11<br><br>Case No. 26-10324 (JKS)<br><br>(Joint Administration Requested) |

**DECLARATION OF TED MANDIGO IN SUPPORT OF DEBTORS'
CASH COLLATERAL AND DEBTOR IN POSSESSION FINANCING MOTIONS**

I, Ted Mandigo, declare, pursuant to 28 U.S.C §1746, under penalty of perjury that :

1.     I am over the age of eighteen and competent to provide this declaration (this "Declaration").

2.     I am a Certified Public Accountant with TR Mandigo & Co. Hotel Consulting Firm, (the "Firm") located at 338 N. Highland Ave., Elmhurst, Illinois, 60126.

---

[1] The Debtors in these chapter 11 cases and the last four digits of their respective identification numbers are By Hotel SPE-3 LLC (3619); 1101 Wabash Development Mezz, LLC (9294); Wabash 11th Mezz LLC (4278); Pacific Tai Mezz LLC (3717); 1101 Wabash Development SPE LLC (9201); Wabash 11th LLC (3098); 1101 Wabash Development LLC (3365); Pacific Tai, LLC (9675); and SB Yen's Management Group, Inc. (1132). The location of the Debtors' corporate headquarters and the Debtors' service address is 806 N York Rd., Hinsdale, IL 60521.

3.      I have forty years of hospitality accounting and consulting services. I have served as an advisor to developers, lenders and chain operators on market feasibility, operations, revenue management and financial issues relating to hotel, food service and resort operations. I have substantial experience in litigation support including damages claims, safety and security issues, bankruptcy, contract compliance, human resources, revenue management, condemnation, market and financial analysis, forensic analysis, and value.

4.      Before my employment with the Firm, I was a partner and national director of hospitality consulting services for two international accounting and consulting firms in audit and consulting roles, and I also previously served as the director of litigation services for a major appraisal firm. My certifications include CPA-Certified Public Accountant Illinois; MHS (Master Hotel Supplier-AH&M; CHRM-(Certified Hotel Revenue Manager), and Charter Member ISHC (International Society of Hospitality Consultants).

5.      I have conducted numerous market demand and feasibility studies for owners, lenders and investors, including impact analyses for franchise and affiliation organizations. I have also assisted with acquisition and financing of properties, valuations of individual properties and portfolios, revenue management, and operational analysis and profit improvement studies. I have provided litigation support relating to safety and security, property values, operating procedures, and contract disputes. Internationally, I have worked on projects completed in Australia, Hong Kong, Austria, Venezuela, St. Croix, Panama and England, and assisted on projects in Russia, New Guinea, and Nicaragua.

6.      I am familiar with the business and the books and records of above-captioned debtors and debtors in possession (the "Debtors") and have consulted for the Debtors leading up to the instant bankruptcy filings. I am providing this Declaration in support of two motions filed

172277857.3  2

by the Debtors: (1) the Debtors' *Emergency Motion for Authority to Use Cash Collateral Pursuant to Sections 105, 361, 362, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(B) and Request for Interim and Final Hearings* (the "Cash Collateral Motion"); and (2) the Debtors' *Emergency Motion for Entry of Interim and Final Orders Under Bankruptcy Code Section 364(C)(3) Authorizing the Debtors to Obtain Junior Secured Postpetition Financing and Request for Interim and Final Hearings* (the "DIP Motion," and together with the Cash Collateral Motion, the "Motions"). I am familiar with the relief sought in the Motions.

## THE CASH COLLATERAL MOTION[2]

7.      The Cash Collateral Motion seeks authorization from the Court for the Debtors to use Cash Collateral to meet the ordinary cash needs of the Debtors, and for such other purposes as may be approved in writing by the Senior Creditors, for the payment of:

   a. Reasonable and necessary operating expenses incurred in the ordinary course of business;

   b. Maintenance and preservation of the property of the estate;

   c. Payroll and related tax obligations;

   d. Property taxes and insurance premiums; and

   e. Payment of expenses associate with the chapter 11 cases, including professional expenses incurred in the administration of the bankruptcy case.

8.      The Debtors' Cash Collateral is comprised of five Bank Accounts in total, including (i) three Operating Accounts, comprised of one Operating Account with Huntington National Bank (Acct. No. ending 2220), and two Operating Accounts with International Bank of Chicago (Acct. Nos. ending 2828 and 2801), and (ii) two lockbox accounts with Key Bank (Acct. Nos. ending

---

[2] Capitalized terms used in this subsection but not defined herein shall have the meanings ascribed to them in the Cash Collateral Motion.

7999 and 8539) (account ending in 8539 is a CMA lockbox). Agent may have a security interest in one or more of these Bank Accounts and, prior to the Petition Date, may have possessed rights of setoff with respect thereto. These accounts capture substantially all hotel operating receipts, including room revenue, food and beverage, and ancillary receipts, and therefore constitute or contain Cash Collateral of the Senior Creditors.

9. The Debtors intend to continue utilizing the existing Bank Accounts with customary chapter 11 controls to segregate, account for, and report on Cash Collateral usage. In my professional experience, maintaining these established treasury channels during the interim period (while instituting Court-approved controls and reporting) minimizes operational disruption and preserves estate value by ensuring uninterrupted collections and disbursements.

10. I believe that access to existing Cash Collateral on an interim basis will provide the Debtors with the liquidity necessary to ensure that the Debtors have sufficient working capital and liquidity to operate their businesses, and thus preserve and maintain the value of the Debtors' estates. Without such access to liquidity, the Debtors' ability to navigate through the chapter 11 process will be jeopardized, to the detriment of all creditors (including the Senior Creditors, *i.e.* the creditors with an interest in cash collateral). Put simply, the Debtors have an immediate need to use Cash Collateral to ensure sufficient liquidity throughout the pendency of these chapter 11 cases.

11. The Debtors' hotels are labor- and service-intensive operations. Cash is required on a continuous basis to fund payroll and associated taxes; utilities and essential property-level services; franchise-related obligations; insurance and property taxes; routine repairs and maintenance; and the professional and administrative costs of these chapter 11 cases. Without immediate authority to use Cash Collateral (and, separately, availability under the DIP

Facility (as defined in the DIP Motion)), the Debtors would be unable to meet near-term obligations, would experience rapid deterioration in guest service and brand compliance, and would face the prospect of an abrupt cessation of operations—outcomes that would materially impair the value of the Hilton Property and the Best Western Property and, by extension, the Senior Creditors' collateral base.

12.     Based on my review of near-term cash needs and projected receipts, the Debtors' access to Cash Collateral on an interim basis is essential to stabilize operations and to bridge to a final hearing. In my judgment, each category of proposed spend is necessary to maintain going-concern value and avoid irreparable harm during the interim period.

13.     The Debtors propose to make disbursements strictly in accordance with the cash collateral budget attached to the Interim Order, subject only to the permitted variances and other limitations expressly set forth in the Interim Order. The budget includes the ordinary-course and case-administration expenditures that must be paid to avoid immediate and irreparable harm.

14.     In addition to adherence to the Court-approved budget, the Debtors will maintain customary controls over Cash Collateral, including centralized approval of disbursements, the continued use of existing cash management systems, and enhanced, periodic variance reporting to the Senior Creditors as contemplated by the Interim Order. These measures, in my experience, are consistent with best practices in hospitality restructurings and provide transparency respecting the receipt and application of Cash Collateral.

15.     To protect the Senior Creditors against any diminution in the value of their interests in the collateral resulting from (i) the Debtors' use of Cash Collateral, (ii) the use, sale, or lease of other collateral, and (iii) the imposition of the automatic stay, the Interim Order provides an adequate protection package that includes: (a) Replacement Liens in favor of Agent for the benefit

of the Senior Lenders on the same categories of property (and proceeds, products, rents, and profits thereof) that secured the prepetition obligations, with the same priority and effect as the liens they replace; and (b) ongoing monthly interest payments to Agent, in the amount of $153,272.28, for the benefit of the Senior Lenders.

16.     In my opinion, this adequate protection package is fair and sufficient under the circumstances. First, the Replacement Liens preserve the Senior Creditors' position on a dollar-for-dollar basis to the extent of any diminution in value attributable to the authorized uses. Second, the payment of current interest addresses time-value-of-money considerations during the interim period. Collectively, these forms of protection align with market practice in comparable first-day cash collateral arrangements for hotel enterprises.

17.     Moreover, the Senior Creditors' collateral position is quite safe—the properties in the Senior Creditors' collateral package have been appraised in excess of $200,000,000 as recently as 2024, a valuation that is also well-tracked by the substantial cash flow emanating from the properties.  Further upside in the properties is also likely—a nearby soccer stadium just broke ground and is now under construction, and the City of Chicago has made proposals to relocate the Chicago Bears NFL Football Team to a new stadium site very close to the hotels.  With these new amenities, business and cash flow are expected to further increase in the future.  As such, there is an ample "cushion" to prevent any diminution in value that would impact the Senior Creditors' positions, and the proposed adequate protection package is more than adequate under the circumstances.

18.     Under the Interim Order, the Debtors' right to use Cash Collateral terminates on the earliest of:  (i) May 5, 2026 at 5:00 p.m. Eastern; (ii) the occurrence of any specified Termination Event, including failure to comply with the budget (subject to permitted variances),

172277857.3   6

unauthorized uses, nonpayment of U.S. Trustee fees, appointment of a chapter 11 trustee or an examiner with expanded powers, termination of franchise agreements, conversion or dismissal of these cases, or entry of an order materially modifying the Interim Order; or (iii) entry of a subsequent interim or final order governing cash collateral. The Interim Order also provides for a limited modification of the automatic stay solely to permit implementation of its terms.

19.    Authorizing the interim use of Cash Collateral will enable the Debtors to (a) maintain staffing and guest services at the Hilton and Best Western properties; (b) protect the physical plant and brand standards; (c) preserve franchise relationships and key vendor support; and (d) fund the administrative costs needed to prosecute these chapter 11 cases efficiently. In my judgment, these outcomes directly protect and enhance the value of the Senior Creditors' collateral and maximize recoveries for all stakeholders.

20.    Conversely, denying the requested relief would, in my experience, trigger immediate and irreparable harm: payroll interruptions, vendor and utility stoppages, insurance risk, loss of brand eligibility, and rapid erosion of going-concern value. Such harms would impair—not protect—the Senior Creditors' position.

21.    For the reasons above, I believe the Debtors' proposed interim use of Cash Collateral, on the terms set forth in the Interim Order and budget (including the adequate protection package described herein), is necessary, reasonable, and in the best interests of the estates.

## THE DIP MOTION[3]

22.    As set forth in the DIP Motion, the DIP Facility consists of a single-draw, junior secured postpetition loan in the principal amount of $1,000,000, which becomes fully available to

---

[3] Capitalized terms used in this subsection but not defined herein shall have the meanings ascribed to them in the DIP Motion.

172277857.3  7

the Debtors immediately upon entry of the Interim Order. I believe this structure is critical because the Debtors require immediate liquidity to stabilize operations and fund essential expenses at the outset of these chapter 11 cases. The single-draw feature ensures that the Debtors have prompt access to the full amount of the financing without the delays or administrative burdens associated with multiple funding requests. As described in the DIP Motion, the DIP Facility is subject to disgorgement pending entry of a Final Order, and the loan is secured by junior liens on the Hilton Property, the Best Western Property, and the proceeds thereof. In my judgment, the size, structure, and immediacy of the DIP Facility are appropriately tailored to the Debtors' urgent liquidity needs and provide the minimum capital necessary to preserve the value of the estates during the initial phase of these chapter 11 cases.

23.     Based on my review of the Debtors' financial condition and cash-flow projections, the Debtors do not have sufficient liquidity to operate their businesses, preserve the value of their assets, or administer these chapter 11 cases without immediate access to the DIP Facility. As of the Petition Date, the Debtors' available cash on hand is inadequate to fund payroll, utilities, insurance, property taxes, vendor obligations, and other essential operating expenses. The Debtors' hotels rely on continuous staffing, maintenance, and vendor support to remain operational, and any interruption in these services would result in a rapid and significant deterioration in asset value. As stated in the DIP Motion, "the DIP Facility (and the use of cash collateral) are the Debtors' sole sources of funding for their operations and the costs of administering the chapter 11 process," and without such access, "the Debtors would immediately cease operations." I believe these statements are accurate and illustrate the necessity of the DIP Facility for preserving enterprise value for the Debtors and thereby maximizing stakeholder recoveries.

24.     Prior to filing these chapter 11 cases, the Debtors and their advisors evaluated potential sources of financing, including unsecured credit, senior secured financing, and alternative debtor-in-possession facilities. No third-party lender was willing to extend credit to the Debtors on an unsecured basis or on terms junior to the existing Senior Obligations. As the DIP Motion explains, "No third party lenders were prepared to offer debtor in possession financing to the Debtors, particularly on a junior basis to the existing Senior Obligations." The DIP Lenders were the only parties willing to provide the Debtors with the liquidity necessary to stabilize operations, and the terms they offered were the most favorable available under the circumstances. In my business judgment, the Debtors conducted a reasonable and appropriate process to identify financing options, and the DIP Facility represents the only viable path to preserve value for all stakeholders.

25.     The DIP Facility is essential to maintaining the Debtors' hotels as going concerns and preserving the value of the Hilton Property and the Best Western Property, which constitute the Debtors' primary assets. Without the DIP Facility, the Debtors would be forced to shut down operations, resulting in immediate and irreparable harm to the estates. As the DIP Motion states, "the Debtors' ability to finance their business operations, and the availability of sufficient working capital and liquidity to the Debtors through access to the DIP Facility is vital to the preservation and maintenance of the value of the Debtors' estates." I agree with this statement—the DIP Facility will allow the Debtors to maintain staffing, pay critical vendors, preserve franchise relationships, and continue the sale and restructuring process in an orderly manner.

26.     I understand that the DIP Facility was negotiated in good faith and at arm's length between the Debtors and the DIP Lenders. In my view, the terms of the DIP Facility—including the junior lien position, the single-draw structure, and the reservation of rights for a potential (but

172277857.3  9

not required) conversion of DIP debt to equity upon emergence—are fair and reasonable in light of the Debtors' financial condition, the risk profile of the loan, and the absence of alternative financing sources. As noted in the DIP Motion, "The proposed DIP Facility as offered by the DIP Lenders is the best financing option that the Debtors could obtain under the circumstances," and the junior security interest "is a necessary component of the DIP Facility and is a sound exercise of the Debtors' business judgment." Based on my experience and analysis, the DIP Facility is appropriately tailored to the Debtors' needs and is in the best interests of the estates.

27.     The DIP Facility also has certain termination events and milestones that must be met, or partial disgorgement of amounts paid under the DIP Facility may occur. In particular, the failure of the Debtors to meet any of the following milestones may result in partial disgorgement:

   a.  Final Order entered by May 5, 2026.

   b.  The Debtors' filing of a chapter 11 plan and disclosure statement on or prior to the date that is 12 months after the Petition Date, and exclusivity extended timely.

   c.  Confirmation of a chapter 11 plan prior to the date that is 18 months following the Petition Date.

28.     The failure of the Debtors to meet any of the foregoing milestones will result in a partial disgorgement of the funds provided by the DIP Facility calculated on a *per diem* basis. The amount of disgorgement will be measured by multiplying the sum of $1,828.15 per day (*i.e.*, $1,000,000 divided by 547, representing 18 months), with the number of days calculated as the difference between (i) the number of days between the date that is 18 months from the Petition Date and the Petition Date, and (ii) the number of days elapsed between the Petition Date and the date that the milestone was missed (and/or rendered impossible). I believe this structure balances the need for the Debtors to access the DIP Facility, while simultaneously requiring that the Debtors

172277857.3  10

have a degree of accountability in ensuring that the chapter 11 plan confirmation process proceeds in a timely and efficient matter.

29.    The Debtors require immediate access to the DIP Facility on an interim basis to avoid irreparable harm. The Debtors' cash needs are immediate and ongoing, and the inability to access the DIP Facility before a final hearing would jeopardize payroll, vendor relationships, insurance coverage, and the continued operation of the hotels. As the DIP Motion explains, "The Debtors will therefore be unable to proceed with operating their businesses without the ability to access the DIP Facility, and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest." In my judgment, interim approval of the DIP Facility is necessary to stabilize operations and protect the value of the estates pending a final hearing.

### CONCLUSION

30.    For the reasons set forth above and in the Motions, the Motions should be granted. The Debtors require the granting of the Motions to continue operations and pay employees, and to deliver a value-maximizing resolution to these bankruptcy cases for all stakeholders.

Further Affiant sayeth not.

*Theodore Mandigo*
Ted Mandigo

State of Pennsylvania
County of Delaware

SWORN TO AND SUBSCRIBED before me this __06__ day of March 2026, by Ted Mandigo, to certify which witness my hand and official seal of office.

*Dolores A Fickenscher*
Notary Public

Notarized online using audio-video communication

Commonwealth of Pennsylvania - Notary Seal
Dolores A Fickenscher, Notary Public
Potter County
My commission expires Aug 25, 2028
Commission number 1377143

172277857.3   11