IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>US MAGNESIUM LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 25-11696 |

**DECLARATION OF J. SCOTT VICTOR IN SUPPORT OF DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO (A) OBTAIN POSTPETITION FINANCING, (B) GRANT SENIOR SECURED PRIMING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS AND (C) UTILIZE CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION; (III) MODIFYING THE AUTOMATIC STAY; (IV) SCHEDULING FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

Pursuant to 28 U.S.C. § 1746, I, J. Scott Victor, declare as follows:

1. I am over the age of 18 and have personal knowledge of the matters discussed in this declaration (this "Declaration").

2. I am a Founding Partner and Managing Director at SSG Advisors, LLC ("SSG"), which is the proposed investment banker to US Magnesium LLC, as debtor and debtor in possession (the "Debtor"), in the above-captioned chapter 11 case (these "Chapter 11 Cases").

3. I make this Declaration in support of the Debtor's Motion For Interim and Final Orders (I) Authorizing The Debtor to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims and (C) Utilize Cash Collateral; (II) Granting Adequate Protection; (III) Modifying The Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief (the "DIP Motion").

---

[1] The last four digits of the Debtor's federal tax identification number are 5446. The Debtor's address is 238 N 2200 W, Salt Lake City, Utah 84116

1

## MY BACKGROUND AND QUALIFICATIONS

1. I have over 40 years of restructuring experience and have closed over 300 transactions. I have served as an investment banker in more than 100 cases before this Court since 2001.

2. SSG has extensive experience negotiating and managing restructuring transactions (both outside of court and in chapter 11) and negotiating, structuring, and marketing debtor-in-possession financings. In my current role, I am responsible for tracking and staying current on market trends for special situations capital markets, including debtor-in-possession financings.

3. I am also familiar with the cash flow forecasts prepared by the Debtor's management. I understand that these forecasts reflect cash receipts and disbursements anticipated by the Debtor's during the relevant thirteen-week period and take into consideration a number of factors, including but not limited to management's anticipated impact of the chapter 11 filing on the Debtor's operations.

## SSG'S RETENTION

4. Prior to the Petition Date, the Debtor engaged SSG to act as the Debtor's investment banker. The SSG team has worked closely with the Debtor's management and other retained professionals, and has become knowledgeable and familiar with the Debtors' capital structure, liquidity needs, and business operations.

## THE DEBTOR'S NEED FOR DIP FINANCING

5. The Debtor requires immediate access to the DIP Facility to, among other things, continue to operate its facility, pay its employees, fund the administrative costs of this Chapter 11 Case, and provide sufficient runway to prosecute a value-maximizing disposition of the Debtor's assets. The Debtor is entering chapter 11 with limited cash on hand. Without access to the DIP

Facility, and the associated use of the lenders' cash collateral, the Debtor would not be able to fund costs associated with this Chapter 11 Case thereby causing immediate and irreparable harm to the Debtor's estates and its constituents.

6. The Debtor, with the assistance of its advisors, evaluated cash flow and liquidity needs in a chapter 11 scenario to determine how much postpetition financing the Debtor would need to operate its businesses and pay the expenses of a chapter 11 process. Under the Debtor's current cash flow forecasts, the proposed DIP Facility and use of cash collateral provide the Debtor with sufficient liquidity to operate its business, maintain ordinary course operations, meet their financial commitments through this Chapter 11 Case, and fund the administrative costs to complete a potential sale and plan process.

7. The proposed DIP Facility is necessary to (a) continue operations during the anticipated sale and plan process, and (b) avoid immediate and potentially irreparable harm to the Debtor's estate.

### THE DEBTORS' EFFORTS TO OBTAIN DIP FINANCING

8. Beginning in September 2025, the Debtor, with the assistance of SSG, implemented a marketing process to determine potential debtor-in-possession financing options. The Debtor and its advisors worked diligently to evaluate financing opportunities from the Debtor's existing secured lenders and potential third-party lenders. I led that marketing process on behalf of SSG.

9. Additionally, the Debtor's unpledged assets that could be used to support a financing are limited. As a result, the Debtor, together with SSG, determined that any postpetition financing would require pledging as collateral assets already subject to prepetition liens.

10. While soliciting financing interest from the Debtor's existing secured lenders, SSG simultaneously approached third parties to gauge interest in alternative financing proposals. SSG

3

initially solicited proposals for DIP financing from eleven (11) potential third-party lenders. The list of potential lenders was populated through the broad experience of the SSG team, reaching across the firm's relationships to find potential lenders who were likely to have interest in the potential transaction.

11. Of the potential DIP lenders solicited by SSG, one (1) executed a non-disclosure agreement and received access to the Debtor's diligence materials. Several of these potential DIP lenders participated in preliminary discussions with SSG by phone or virtual meeting but no third party DIP lender ultimately provided a term sheet for a potential DIP financing.

12. Any potential third party DIP lender would require liens that would prime the liens held by the Debtor's prepetition secured lenders. It became clear to the Debtor that priming liens would be a necessary feature of any DIP financing available to the Debtor. Based on discussions with all potential DIP lenders, I believe that no lender was willing to extend financing to the Debtor on a non-priming basis. I believe that there is significant value in avoiding a contested priming fight at the outset of these cases with the largest of the Debtor's prepetition secured lenders.

13. On September 10, 2025, the Debtor and its advisors finalized a Ratification and Amendment Agreement (the "DIP Agreement") with Wells Fargo Bank, National Association ("Wells"). The DIP Agreement is attached as Exhibit A to the Interim DIP Order.

### ARM'S LENGTH AND GOOD FAITH NEGOTIATION

14. The Debtor and Wells exchanged multiple drafts of the DIP Agreement outlining the terms of the proposed DIP Facility. In addition, the Debtor and Wells negotiated the Interim DIP Order on an arm's-length basis. Having personally participated in these negotiations, I believe that Wells acted in good faith at all times, and the negotiations were conducted at arm's length and were proper under the circumstances.

## **THE TERMS OF THE DIP FACILITY**

15. The DIP Facility consists of $10 million in postpetition secured financing. The Debtor will use the proceeds of the DIP Facility and cash collateral for working capital, and for other general corporate purposes of the Debtor, each in accordance with the DIP Agreement, Interim DIP Order, and Approved Budget.

16. Based on my experience and knowledge of the market, as well as my understanding of the Debtor's capital structure and need for postpetition financing, I believe that the DIP Facility is reasonable under current market conditions and in the best interests of the Debtor's estate.

## **NEED FOR INTERIM RELIEF**

17. Based on discussions with the Debtor and its other advisors, I believe that the Debtor's access to the DIP Facility is necessary to maintain the Debtor's business, and will supplement the Debtor's liquidity needs, help the Debtor preserve the value of its estate, and increase the prospect of potentially executing a successful sale and confirming a chapter 11 plan. It is my professional opinion that, absent the Court's entry of the Interim DIP Order, the Debtor's business, residents, and estates will be immediately and irreparably harmed.

18. Based on my experience in negotiating debtor-in-possession financings and involvement in this DIP financing as well as my discussions with the Debtor and its other advisors, I believe that the DIP Facility is reasonable and necessary under the circumstances and that without it the Debtor would not have sufficient liquidity to prosecute this case in a value-maximizing manner and, consequently, would risk facing enterprise-wide liquidation.

\*   \*   \*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: September 10, 2025                                              */s/ J. Scott Victor*
                                                                                                                              J. Scott Victor
                                                                                                                              Managing Director
                                                                                                                              SSG Advisors, LLC