# EXHIBIT "A"

03/06/2023

10:38am

Received by
EPA Region VIII
Hearing Clerk

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION 8**

| IN THE MATTER OF: | NOTICE OF VIOLATION |
|---|---|
| US Magnesium LLC<br>238 N 2200 W<br>Salt Lake City, UT 84116 | Docket No. CAA-08-2023-0003<br><br>Proceedings Pursuant to<br>the Clean Air Act,<br>42 U.S.C. §§ 7401-7671q |

## NOTICE OF VIOLATION

The U.S. Environmental Protection Agency alleges US Magnesium LLC (US Mag) has violated or is violating implementing regulations of the Clean Air Act (the Act) included in the National Emissions Standards for Hazardous Air Pollutants for Primary Magnesium Refining, 40 C.F.R. part 63, subpart TTTTT (MACT TTTTT).

**I.    STATUTORY AND REGULATORY BACKGROUND**

1.    The Act's purpose is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1).

2.    Section 112(d)(1) of the Act, 42 U.S.C. § 7412(d)(1), requires EPA to promulgate emission standards for sources of hazardous air pollutants (HAPs), including for primary magnesium refining facilities, to achieve emissions reductions of HAPs reflecting application of the maximum achievable control technology for each source category.

3.    HAPs emitted by facilities in the primary magnesium refining source category include chlorine, hydrochloric acid, dioxin/furan, and trace amounts of several HAP metals. In particular, chlorine is one of the hazardous air pollutants for which EPA has promulgated national standards due to its adverse effects on human health and the environment. Short-term exposures to chlorine can cause acute health effects observed even at low concentrations, including respiratory irritation. Long-term exposure (months to years) may cause eye and throat irritation and airflow obstruction.

4.    Pursuant to Section 112(d) of the Act, 42 U.S.C. § 7412(d), EPA promulgated the National Emission Standards for Hazardous Air Pollutants (NESHAP) General Provisions, at 40 C.F.R. Part 63, Subpart A, which contains general provisions that apply as specified in the relevant NESHAP, 40 C.F.R. § 63.1(a)(4)(i).

5.    In 2003, the EPA promulgated "National Emissions Standards for Hazardous Air Pollutants for Primary Magnesium Refining" under Section 111 of the Act. 68 Fed. Reg. 58,615

(October 10, 2003). These standards are set forth in 40 C.F.R part 63, subpart TTTTT, which includes 40 C.F.R. §§ 63.9880–9942 (MACT TTTTT).

6. Subpart TTTTT, at 40 C.F.R. § 63.9890, sets forth emission standards for owners and operators of primary magnesium refineries.

7. Subpart TTTTT, at 40 C.F.R. § 63.9890, requires each source melt/reactor system stack at a primary magnesium refinery to comply with the emission standards in Table 1 to this subpart.

8. Table 1 to Subpart TTTTT of Part 63 requires each source melt/reactor system stack to not discharge to the atmosphere any gases that contain chlorine in excess of 100 lbs/hr.

9. Subpart TTTTT, at 40 C.F.R. § 63.9900(a), requires that "As required by § 63.6(e)(1)(i), you must always operate and maintain your affected source, including air pollution control and monitoring equipment, in a manner consistent with good air pollution control practices for minimizing emissions at least to the levels required by this subpart."

10. Subpart TTTTT, at 40 C.F.R. § 63.9910(a), requires that the owner or operator "must be in compliance with the emission limitations, work practice standards, and operation and maintenance requirements in this subpart at all times, except during periods of startup, shutdown, and malfunction as defined in § 63.2."

11. Per 40 C.F.R. § 63.2: "Malfunction means any sudden, infrequent, and not reasonably preventable failure of air pollution control and monitoring equipment, process equipment, or a process to operate in a normal or usual manner which causes, or has the potential to cause, the emission limitations in an applicable standard to be exceeded. Failures that are caused in part by poor maintenance or careless operation are not malfunctions." As clarified in the Subpart TTTTT preamble language published in the Federal Register, Vol. 68, No. 197, page 58617, "By-passing the control device for maintenance activities is not considered a startup, shutdown, or malfunction event."

## II. FACTUAL BACKGROUND

12. US Mag is a "person" within the meaning of section 302(e) of the CAA, 42 U.S.C. § 7602(e).

13. US Mag owns or operates the Rowley plant (Facility), which is located in Utah, on the western edge of the Great Salt Lake.

14. The Facility produces magnesium metal from the waters of the Great Salt Lake. The water is evaporated in a system of solar evaporation ponds and the resulting brine solution is purified and dried in the spray dryers to produce a magnesium chloride powder. The magnesium chloride powder is then melted and further purified in the melt/reactor before going through an electrolytic process to separate magnesium metal from chlorine. The magnesium is then refined and/or alloyed and cast into molds.

15. The chlorine gas from the melt/reactor is combusted with natural gas in the chlorine reduction burner (CRB) and converted into hydrochloric acid (HCl). The HCl is removed from the gas stream through a scrubber train before being vented out the melt/reactor system stack.

16. The CRB is a critical control device responsible for controlling chlorine emissions from the melt/reactor system stack.

17. The Facility's melt/reactor system stack is subject to the 100 lbs/hour chlorine emission limit of Subpart TTTTT, Table 1, pursuant to 40 C.F.R. § 63.9890.

18. On August 1, 2022, the EPA issued a Request for Information (RFI), pursuant to Section 114 of the Act, to US Mag regarding the Facility and requesting records and copies of regulatory reports that, in part, identify all periods the CRB was bypassed while the melt/reactor system stack was operational since January 1, 2016. US Mag provided a response to the RFI on September 13, 2022.

19. US Mag's response stated that the Facility regularly bypasses the CRB during upset events, maintenance, and scheduled rebuilds. The Facility's production process (i.e., melt/reactor system stack) often continues operating while the CRB (control device) is offline/bypassed for maintenance or rebuilds. During these times, the chlorine emissions continue to pass through the wet scrubber; however, removal is significantly reduced without the CRB. The facility estimates zero percent control efficiency during these events for emission calculations and reporting.

20. According to US Mag's response, the Facility bypassed the CRB while the melt/reactor system stack remained operational during 795 of the 2,404 days between January 1, 2016 and July 31, 2022.

21. In total, US Mag's response identified 2,358 hours of melt/reactor system stack operation while the CRB was bypassed, during 1,100 discrete instances over the 795 days.

22. During the 2,358 hours of CRB bypass, according to US Mag's mass balance calculations, the Facility emitted 9,373 tons of chlorine.

23. US Mag's Facility melt/reactor system stack chlorine average emission rate during these CRB bypass events was 7,950 lbs/hr.

24. MACT TTTTT allows for exceedances of the melt/reactor system stack emission rate of 100 lbs/hour, pursuant to Subpart TTTTT, Table 1, only during periods of startup, shutdown, and malfunction. There is no exceedance exemption for periods of maintenance.

25. The US Mag Facility's 2,358 hours of CRB bypass, documented in their response to EPA's RFI, include instances of CRB bypass during upset events, maintenance, and scheduled rebuilds.

26. In US Mag's RFI response, the Facility only reported 245.5 hours of CRB bypass – out of 2,358 hours – as due to malfunction, through the submittal of unavoidable breakdown reports.

27.     The vast majority of the Facility's CRB bypass events are caused by reoccurring issues. Due to the regular and reoccurring nature of these events these would not meet the definition of "Malfunction," at 40 C.F.R. 63.2:

> "**Malfunction** *means any sudden, infrequent, and not reasonably preventable failure of air pollution control and monitoring equipment, process equipment, or a process to operate in a normal or usual manner which causes, or has the potential to cause, the emission limitations in an applicable standard to be exceeded. Failures that are caused in part by poor maintenance or careless operation are not malfunctions*"

### III.    FINDINGS OF VIOLATION

28.     Based on the above Findings of Fact, the EPA finds that US Mag has violated 40 C.F.R. § 63.9890, 40 C.F.R. § 63.9900 and 40 C.F.R. § 63.9910.

### IV.    ENFORCEMENT AUTHORITY

29.     Section 113(a)(3) of the Act, 42 U.S.C. § 7413(a)(3), provides that whenever, on the basis of any information available to the Administrator, the Administrator finds that any person has violated, or is in violation of, any requirement or prohibition of section 112 of the Act, 42 U.S.C. § 7412, including a requirement or prohibition of any rule promulgated under section 112 of the Act, the Administrator may issue an administrative penalty order under section 113(d) of the Act, issue an order requiring compliance with such requirement or prohibition, or bring a civil action in accordance with section 113(b) of the Act for injunctive relief or civil penalties.

Date Issued: _March 6, 2023_

SUZANNE BOHAN
Digitally signed by SUZANNE BOHAN
Date: 2023.03.06 08:25:27 -07'00'

Suzanne J. Bohan, Director
Enforcement and Compliance Assurance Division

4



**REGION 8**
DENVER, CO  80202

July 18, 2024

Ref: 8ECA-RO-E

<u>SENT VIA EMAIL</u>

Jeffrey Mensinger
Environmental Manager
US Magnesium LLC
jmensinger@usmagnesium.com

Michael A. Zody
Parsons Behle & Latimer
mzody@parsonsbehle.com

Re:  Notice of Noncompliance with US Magnesium LLC Consent Decree
     (Case No. 2:01CV0040B)

Dear Mr. Mensinger and Mr. Zody:

This letter serves as a Notice of Noncompliance regarding the US Magnesium LLC (USM) Consent Decree (CD). This letter seeks your swift effort and cooperation in returning USM to compliance with requirements of the above-mentioned CD. Currently, USM is out of compliance with the CD in a number of areas:

1. As required by Paragraph 47(a)(1) and Appendix 13 of the CD, USM failed to appropriately adjust the amount of Financial Assurance for the Closure and Post-Closure of the Retrofitted Waste Pond by the April 8, 2024 deadline, and is therefore out of compliance.

2. As required by Paragraph 17 and Appendix 14 of the CD, USM failed to either cease operation of the electrolytic cells in Building 4 or retrofit with wet anode dust handling by the July 15, 2022 deadline (pursuant to an extension granted on June 30, 2022 by the EPA), and is therefore out of compliance.

3. As required by Paragraph 18 and Appendices 5 and 14 of the CD (as well as the approved Courtyard Capping Design deliverable and its attached Construction Plan and Scope of Work), USM has not properly addressed the grizzly vault adjacent to Building 3, on the west side of the Courtyard (as defined in paragraph 8.u. of the CD), by cracking, backfilling with aggregate and capping to the level of the courtyard. Pursuant to Appendix 14, this work was due to be completed by December 27, 2022. On

Re:    Notice of Noncompliance with US Magnesium LLC Consent Decree (Case No. 2:01CV0040B)

> January 23, 2023, EPA approved a USM request for extension to July 28, 2023. However, the project remains uncompleted and USM is therefore out of compliance.

4.   As required by Paragraph 15 and Appendices 3 and 14 of the CD, USM failed to initiate construction of the filtration system project by the June 12, 2023 deadline (pursuant to an extension granted on January 23, 2023 by the EPA), and is therefore out of compliance.

Further, as required by Section VII and Appendix 12 of the CD, USM is required to perform all actions necessary to retrofit the Current Waste Pond and eliminate uncontrolled releases of hazardous substances by implementing Appendix 12. Pursuant to Paragraph 28 and 32 of the CD, USM is also required to comply with the Ground Water Discharge Permit. However, USM appears to have ceased implementation of the CERCLA Response Action as required and is in danger of late performance. On May 22, 2024, USM informed the Utah Department of Environmental Quality that scheduled construction of the Retrofitted Waste Pond would not proceed on schedule.

In addition, Appendix 4(A) of the CD requires that "[w]ithin sixty (60) Days of the Effective Date of the Consent Decree, US Mag will execute the USEPA-accepted Conditional Partial Assignment and Grant of Rights….In an Event of Default as defined in Appendix G, it is the intent of the Parties to ensure that USEPA will have access to the necessary resources to implement the Salt Cap Closure Plan…." Now almost three years since the Effective Date of the CD, USM has still not executed the Conditional Partial Assignment and Grant of Rights. Although USM has submitted a USM-executed conditional assignment, correspondence from the State of Utah to both EPA and USM, of August 23, 2023, makes clear that the conditional assignment – as currently drafted – would not adequately serve to ensure EPA has necessary resources to implement the Salt Cap Closure Plan, as intended and required by the CD. As long as both ready access to necessary resources and ability to implement the Salt Cap Closure Plan, in an Event of Default, remains in doubt, EPA will maintain concerns as to whether the Salt Cap Closure and Post-Closure Plan is protective of human health or the environment, as referenced in Paragraph 16(a)(2) of the CD.

The EPA reserves the right to take action pursuant to Section XIV of the CD, which allows for accrual of stipulated penalties, per violation and per day, for violations of Sections VI and X of the CD.

Thank you for your prompt attention to this important matter. For questions regarding this letter, please contact Annette Maxwell, at (303) 312-6068 or Maxwell.Annette@epa.gov, or Max Greenblum at (303) 312-6108 or Greenblum.Max@epa.gov.

Sincerely,

SUZANNE BOHAN
Digitally signed by SUZANNE BOHAN
Date: 2024.07.18 12:54:59 -06'00'

Suzanne J. Bohan, Director
Enforcement and Compliance Assurance Division

cc:  Annette Maxwell, EPA
     Max Greenblum, EPA

2



**REGION 8**

DENVER, CO 80202

October 17, 2024

Ref: 8ORC

Rob Hartman
Environmental Manager
US Magnesium LLC
rhartman@usmagnesium.com

Re:    Follow-Up to Notice of Noncompliance
       US Magnesium LLC Consent Decree (Case No. 2:01cv0040B)

Dear Mr. Hartman:

This correspondence replies to US Magnesium LLC's (USM's) response, of September 16, 2024, to EPA's Notice of Noncompliance, dated July 18, 2024, and is in regard to EPA's continued concerns with USM's material violation, or noncompliance, with the above-mentioned US Magnesium LLC Consent Decree (CD).

Compliance with the CD is not excused or tolled by USM's operational or financial status or world markets. No such clause is included in the language of the CD. Section XV of the CD includes the only provision allowing for delay of performance of CD obligations by USM, but it is contingent on a demonstration of force majeure. The CD states that force majeure does not include USM's "financial inability to perform any obligation" and must, among other requirements, be an "event arising from causes beyond the control of Defendant USM." Pursuant to the CD, any attempt to justify USM's delayed performance of CD obligations must meet the criteria for force majeure and USM has not demonstrated as much.

EPA also disagrees with USM's characterization of the purpose of the financial assurance held in special accounts. The purpose of this financial assurance is to ensure that USM, and not public funding sources, bears the financial burden of completing required cleanup actions. EPA's special accounts, or financial assurance, is intended to hold funds accounting for USM's work obligations in case of USM insolvency or inability or unwillingness to comply with its environmental obligations. As noted in EPA's Notice of Noncompliance, USM is required by Paragraph 47(a)(1) and Appendix 13 of the CD to appropriately adjust the amount of financial assurance for Closure and Post-Closure of the Retrofitted Waste Pond. USM's obligation under the CD is to adjust the provided financial assurance to the amount of $11,829,513, intended to ensure that public funding is not

*Re:    Follow-Up to Notice of Noncompliance*
*US Magnesium LLC Consent Decree (Case No. 2:01cv0040B)*

necessary for eventual closure for the Retrofitted Waste Pond. And, as noted in previous EPA correspondence of May 11, 2023, and May 1, 2024, because USM is in material violation of the CD, EPA's obligation to disburse funds from special accounts is terminated. Additionally, EPA will not agree to a disbursement of financial assurance that puts public funding sources at further risk of incurring the costs of USM's environmental obligations.

Lastly, your contention in the first paragraph that your response is made in the context of settlement negotiations is incorrect. The parties are not engaged in settlement negotiations at the present time. USM is currently in violation of the CD and has not invoked the force majeure provision or otherwise sought dispute resolution on these issues. EPA's July 18, 2024, letter was a Notice of Noncompliance, seeking USM's prompt action to return the facility to compliance with its terms. USM's response to the notice attempting to explain or excuse its non-compliance does not constitute a settlement communication within the meaning of Rule 408 of the Federal Rule of Evidence. Accordingly, Rule 408 does not apply to this exchange.

EPA urges USM to identify steps that can be taken to return to CD compliance as soon as possible, particularly regarding requirements for financial assurance, and welcomes discussion focused on this goal. If you have any questions regarding this letter, please contact Max Greenblum at (303) 312-6108 or Greenblum.Max@epa.gov

Sincerely,

SUZANNE BOHAN
Digitally signed by SUZANNE BOHAN
Date: 2024.10.17 16:20:32 -06'00'

Suzanne J. Bohan, Director
Enforcement and Compliance Assurance Division

cc:
Max Greenblum, EPA
Annette Maxwell, EPA

2



**REGION 8**
DENVER, CO 80202

June 11, 2025

Ref: 8ECA-RO-E

**<u>SENT VIA EMAIL</u>**
**<u>READ RECEIPT REQUESTED</u>**

Rob Hartman
Environmental Manager
US Magnesium LLC
rhartman@usmagnesium.com

     Re:    Notice of Noncompliance (Financial Assurance)
               US Magnesium LLC Consent Decree (Case No. 2:01cv0040B)

Dear Mr. Hartman:

This letter serves as a Notice of Noncompliance regarding the Financial Assurance-related requirements of the US Magnesium LLC (USM) Consent Decree (CD) and seeks your swift effort and cooperation in returning USM to compliance with the Financial Assurance-related requirements of the above-mentioned CD. The issues regarding USM's noncompliance with the financial assurance requirements in the CD identified below are exclusive of the CD noncompliance issues identified in EPA's prior correspondence to USM.

As required by Paragraph 47(a)(1) and Appendix 13 of the CD, USM failed to appropriately adjust the amount of Financial Assurance for the Closure and Post-Closure of the Retrofitted Waste Pond by June 5, 2025, and is therefore out of compliance with the CD.

On March 6, 2025, EPA approved USM's updated revised Cost Estimate for Closure and Post-Closure of the Retrofitted Waste Pond of $12,095,843. Pursuant to Paragraph 47(a)(1) of the CD, USM was then required to adjust the amount of Financial Assurance within 90 days, or by June 5, 2025.

The current balance of EPA Special Account 2 is $0, the balance of Special Account 3 is $4,077,983 and the balance of Special Account 4 is $6,524,773, for a total of $10,602,756. Therefore, USM is required to adjust the amount of Financial Assurance by an additional $1,493,087, in accordance with Appendix 13 of the CD.

Re: Notice of Noncompliance (Financial Assurance)
US Magnesium LLC Consent Decree (Case No. 2:01cv0040B)

If you have any questions regarding this letter, please contact Max Greenblum, EPA attorney, at (303) 312-6108 or Greenblum.Max@epa.gov.

        Sincerely,

        SUZANNE BOHAN
        Digitally signed by SUZANNE BOHAN
        Date: 2025.06.11 07:27:38 -06'00'

        Suzanne J. Bohan, Director
        Enforcement and Compliance Assurance Division

cc: Annette Maxwell, EPA
    Max Greenblum, EPA



**REGION 8**

DENVER, CO  80202

August 13, 2025

Ref: 8ECA-RO-E

<u>**SENT VIA EMAIL**</u>
<u>**READ RECEIPT REQUESTED**</u>

Rob Hartman
Environmental Manager
US Magnesium LLC
rhartman@usmagnesium.com

Re:   EPA Determination of Significant Risk Pursuant to Avian Risk Mitigation Plan,
        US Magnesium LLC Consent Decree (Case No. 2:01cv0040B)

Dear Mr. Hartman:

This letter serves as notice of a U.S. Environmental Protection Agency determination, pursuant to Section C of Appendix 9 (Avian Risk Mitigation Plan) of the above-mentioned US Magnesium LLC (USM) Consent Decree (CD), of significant risk to upland and probing birds in the Retrofitted Waste Pond (RWP). Therefore, pursuant to Paragraph 24 and Appendix 9 of the CD, USM is required to submit a Work Plan to reduce unacceptable avian risk, through implementation of mitigation measures to protect terrestrial birds, within 90 days.

Through significant past EPA and USM consultation, substantial data was gathered and a risk assessment completed in the recently finalized Baseline Ecological Risk Assessment Report (BERA) for Operable Unit 1 of the US Magnesium Superfund site, particularly regarding avian risk in the RWP. The BERA used hazard quotients (HQs) and estimates on likelihood of avian exposure to contaminated sediment, soil, water, and prey to determine if Site-related chemicals pose significant risk to birds.

The BERA included risk evaluation findings for both upland habitats – berms around ponds and areas of pond bottom that never or rarely are covered with water – and lakebed habitats within the RWP. USM's recent operational status has resulted in lower wastewater flows to the RWP. Therefore, the amount of upland habitat for birds in the RWP has increased. As noted in Section E of Appendix 9, review of avian risk presented by

Re: EPA Determination of Significant Risk Pursuant to Avian Risk Mitigation Plan
US Magnesium LLC Consent Decree (Case No. 2:01cv0040B)

the RWP shall consider changes to RWP conditions, particularly those resulting in increased exposure of birds to contaminated sediments.

Upland habitat in the RWP area supports, among other species, horned lark, tree swallow, mourning dove, and American kestrel.[1] Berms and other areas in the vicinity of the waste ponds (including areas rarely or never covered with water during current USM operating conditions) are utilized for nesting and foraging by several avian species, with these areas impacted by elevated concentrations of numerous contaminants.[2] Within lakebed habitats in the RWP, snowy plovers, tree swallows, mourning dove, American kestrel, and American avocet, among other species, have been observed.[3] Surface water in the RWP was historically acidic, depending on seasonal variation in water levels and the influx of wastewater from the facility's operation. As a result, there has been limited growth of prey organisms and most avian receptors have not used the RWP as a regular foraging area. However, several species have been observed in contact with the water in the RWP, so some birds may attempt to forage in or drink from the ponds, resulting in acute risks from exposure or potential mortality from repeated exposures.[4] Risk estimates in the BERA considered dietary dose HQs, egg tissue HQs, Site-specific toxicity studies, and ecological field studies.

Among the conclusions of the BERA, were the following[5]:

- There is risk to a number of avian species due to ingestion of tetrachlorodibenzo-p-dioxin (TCDD) toxic equivalency (TEQ) in solids and/or diet, particularly in and around the RWP.
- There is risk to a substantial fraction of eggs from nests in the vicinity of the RWP from elevated levels of TCDD TEQ and polychlorinated biphenyls (PCBs).
- Long-term or seasonal exposures to acid water in the RWP may be causing morbidity to individual birds. There is uncertainty as to whether acute oral exposures to birds in the acid water from the ponds results in acute toxicity.
- Birds have been less likely to preferentially choose to nest at the RWP, due to poor quality habitat, lack of access to non-acidic freshwater, and low availability of food.

HQs greater than or equal to 1.0 demonstrate potential for adverse effects (with an HQ of less than 1.0 indicating that the contaminant alone is unlikely to cause adverse effects).[6] If multiple contaminants of potential ecological concern exist at a site, it may be appropriate to sum the HQs for receptors that could be simultaneously exposed to the contaminants

---

[1] See BERA § 4.1.
[2] See BERA § 4.3.3.
[3] See BERA § 4.1.
[4] See BERA § 4.3.2.
[5] See BERA § 4.4.
[6] See *Ecological Risk Assessment Guidance for Superfund: Process for Designing and Conducting Ecological Risk Assessment*, EPA 540-R-97-006, OSWER 9285.7-25, PB97-963211 (June 1997).

Re:      EPA Determination of Significant Risk Pursuant to Avian Risk Mitigation Plan
           US Magnesium LLC Consent Decree (Case No. 2:01cv0040B)

that produce effects by the same toxic mechanism.[7] Higher HQ values correspond to increasing likelihood of adverse effect.[8]

Table ES-1 of the BERA identifies HQs for birds in RWP (PRIs 4-7), and, notably, includes HQs as high as 98[9] (specifically, for TCDD TEQ in lakebed areas). Generally, over 5 unique contaminants (including TCDD TEQ, hexachlorobenzene (HCB), vanadium, and aluminum) pose HQs above 1 in upland areas throughout the RWP. In lakebed areas in the RWP, more contaminants (also including TCDD TEQ, HCB, vanadium and aluminum, as well as phenol, selenium, and chromium) pose HQs over 1, with numerous contaminants with HQs over 5, and TCDD TEQ and aluminum with HQs over 15.

Table ES-1, Summary of Risk Findings, from the BERA:

| Exposure Area | PRI 4 | PRI 5 | | PRI 6 | | PRI 7 |
|---|---|---|---|---|---|---|
| Habitat | Upland | Upland | Lakebed | Upland | Lakebed | Lakebed |
| pH | -- | -- | 0.41-7.95 | -- | 0.25-1.01 | 0.85-6.85 |
| Birds | TCDD TEQ (50)<br>HCB (12)<br>Vanadium (4.9)<br>Iron (2.2)<br>Aluminum (1.8) | TCDD TEQ (14)<br>Aluminum (6.2)<br>Copper (2.3)<br>HCB (1.7)<br>Vanadium (1.5)<br>Selenium (1.1) | TCDD TEQ (98)<br>Aluminum (21)<br>HCB (15.)<br>Phenol (14)<br>Vanadium (7.2)<br>Barium (3)<br>Zinc (2.9)<br>Iron (2.6)<br>Pentachlorobenzene (1.7)<br>Total PCBs (1.3)<br>Chromium (1.2) Selenium (1) | Aluminum (12)<br>Copper (3.9)<br>TCDD TEQ (2.5)<br>Vanadium (2.5)<br>Selenium (1.4) | TCDD TEQ (39)<br>Aluminum (22)<br>Vanadium (7.1)<br>HCB (6.4)<br>Phenol (4)<br>Barium (2.3)<br>Iron (2.1)<br>Selenium (1) | TCDD TEQ (29)<br>Aluminum (18)<br>Vanadium (6.8)<br>Iron (3.3)<br>Chromium (2.2)<br>Selenium (1.8)<br>Mercury (1.2) |

In determining the presence of significant risk to birds in the RWP, EPA has further considered USM's operational status, and the resulting impact of reduced water levels and locations of now-exposed, highly contaminated sediments. Areas that were previously considered lakebed habitat and covered by acidic water that deterred bird usage are now available as terrestrial habitat and increasing long-term exposure potential to upland birds. These changes to usage patterns, habitat, and risk of exposure to sediments in the RWP only increase expected adverse effect on avian species.[10] As noted above (and particularly in Table ES-1 of the BERA), numerous contaminants present a risk of adverse effect (or, HQs over 1.0) to birds with longer-term exposure scenario or increase foraging in upland areas of the RWP.[11]

As detailed above, based on the BERA, consideration of the factors listed in Section C of the Appendix 9, and past consultation regarding risk assessment between EPA and USM,

---

[7] See *Ecological Risk Assessment Guidance for Superfund: Process for Designing and Conducting Ecological Risk Assessment*, EPA 540-R-97-006, OSWER 9285.7-25, PB97-963211 (June 1997).
[8] See BERA § 2.5.4.2 (HQs serve as an indicator of the potential for adverse effects, and may be useful as a semi-quantitative index; i.e., a location with a HQ of 60 is of more concern, indicating increased potential risk or severity, than a location with a HQ of 6).
[9] A HQ of 98 suggests that estimated bird exposures to TCDD TEQ is up to 98 times higher than a level known to reduce egg hatchability.
[10] See BERA §§ 4.2.1.2, 4.2.2.1, 4.3.3 & 4.4.
[11] See BERA §§ 4.2.1.2, 4.2.2.1, 4.3.3 & 4.4.

3

Re:   EPA Determination of Significant Risk Pursuant to Avian Risk Mitigation Plan
      US Magnesium LLC Consent Decree (Case No. 2:01cv0040B)

EPA has determined there is significant risk to birds in the RWP, which requires USM to proceed with Step 2 of the Statement of Work (Section D) in Appendix 9 and submit a Work Plan to reduce unacceptable avian risk to EPA within 90 days. To reflect the considerations of the Avian Risk Mitigation Plan, and increase proposed impact of a Work Plan, EPA proposes a focus on terrestrial birds now more likely to use the upland habitat in the RWP.[12]

If you have any questions regarding this letter, please contact Annette Maxwell at (303) 312-6068 or Maxwell.Annette@epa.gov.

Sincerely,

SUZANNE BOHAN
Digitally signed by SUZANNE BOHAN
Date: 2025.08.13 11:05:19 -06'00'

Suzanne J. Bohan, Director
Enforcement and Compliance Assurance Division

cc:   Annette Maxwell, EPA
      Max Greenblum, EPA
      Tabetha Lynch, EPA
      Terry Adelsbach, USFWS
      Scott Everett, UDEQ
      Kelsey Robinson, UDEQ

---

[12] More specifically, a Work Plan would be most impactful if focused on upland areas in PRI 4 posing significant risk to the horned lark (TEQ HQ of 50) and the tree swallow (TEQ HQ of 47), and PRI 5 lakebed (now dry, terrestrial) posing significant risk to the American kestrel (TEQ HQ of 41, or 25 if kestrels use all of PRI 5) and the mourning dove (TEQ HQ of 35, or 40 if doves use all of PRI 5). Ideal risk mitigation action would include removal of the contaminated sediment/soil or covering/capping it.