# EXHIBIT C

**Blackline**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| In re:<br>~~BY HOTEL SPE-3 LLC, a Delaware Limited Liability Company, 1101 WABASH DEVELOPMENT MEZZ, LLC, a Delaware Limited Liability Company, WABASH 11TH MEZZ LLC, a Delaware Limited Liability~~ | Chapter 11<br><br>Case No. 26-10324 (JKS)<br><br>(Joint Administration Requested) |
|---|---|

Formatted Table

**AMENDED DECLARATION OF SU-MEI YEN IN SUPPORT OF DEBTORS' FIRST DAY,**
**CASH COLLATERAL, AND DEBTOR IN POSSESSION FINANCING MOTIONS**

I, Su-Mei Yen, declare, pursuant to 28 U.S.C § 1746, under penalty of perjury that :

1.    I am over the age of eighteen and competent to provide this declaration (this "Declaration").

2.    I am a Managing Member of the above-captioned debtors and debtors in possession (the "Debtors"). In this capacity, I am familiar with the Debtors' day-to-day operations, financial condition, and the circumstances leading to the commencement of these chapter 11 cases.

3.    I submit this Declaration in support of the Debtors' First Day Motions, including but not limited to: (a) the Debtors' *Emergency Motion for Authority to Use Cash Collateral Pursuant to Sections 105, 361, 362, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(B) and Request for Interim and Final Hearings* (the "Cash Collateral Motion"); (2) the Debtors' *Emergency Motion for Entry of Interim and Final Orders Under Bankruptcy Code Section 364(C)(3) Authorizing the Debtors to Obtain Junior Secured Postpetition Financing and Request for Interim and Final Hearings* (the "DIP Motion"); (3) the

---

[1] The Debtors in these chapter 11 cases and the last four digits of their respective identification numbers are By Hotel SPE-3 LLC (3619); 1101 Wabash Development Mezz, LLC (9294); Wabash 11th Mezz LLC (4278); Pacific Tai Mezz LLC (3717); 1101 Wabash Development SPE LLC (9201); Wabash 11th LLC (3098); 1101 Wabash Development LLC (3365); Pacific Tai, LLC (9675); and SB Yen's Management Group, Inc. (1132). The location of the Debtors' corporate headquarters and the Debtors' service address is 806 N York Rd., Hinsdale, IL 60521.

173048000.~~2~~4 1

Debtors' *Emergency Motion for Entry of a Final Order (A) Authorizing Payment Of Certain Prepetition Workforce Claims, Including Wages, Salaries, and Other Compensation; (B) Authorizing Payment of Certain Employee Benefits and Confirming Right to Continue Employee Benefits On Postpetition Basis; (C) Authorizing Payment of Withholding and Payroll-Related Taxes; (D) Authorizing Payment of Workers' Compensation Obligations; and (E) Authorizing Payment of Prepetition Claims Owing to Administrators and Third Party Providers* (the "Wages Motion"); and (d4) the *Debtors' Motion for Order (A) Authorizing Continuation of, and Payment of Prepetition Obligations Relating to Insurance Policies, and (B) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto* (the "Insurance Motion," and together with the Cash Collateral Motion, the DIP Motion, and the Wages Motion, the "First Day Motions").

4.      I was born, raised and educated in Taiwan.  I received a degree in accounting from Soochow University in Taipei. I arrived in the United States in 1972. I have been in the hospitality industry in the Chicago area since the late 1970's and have complied a long-standing record of success.  Among other things, I have an industry reputation of reviving hotels that others have written off as in terminal decline.  For example, in 1992, I bought the shuttered Whitehall Hotel located at 105 E. Delaware Place in downtown Chicago.  That hotel has been thriving under my leadership since then.

5.      In over 40 years in the hotel industry, I have never had to sell a hotel.  During the pandemic, many hotels in Chicago closed for a period of time.  We never closed one day to ensure our staff remained employed.

6.      The two hotel properties that are the subject of these bankruptcy cases are located at 1101 South Wabash Avenue in Chicago and 1100 South Michigan Avenue in Chicago.

173048000.24 2

This property includes two separate both facilities, a Hilton property and a Best Western property (the "Hotel Businesses"). Wabash 11th, LLC, 1101 Wabash Development LLC, and Pacific Tai, LLC own both properties. Organizational charts of all the Debtors are attached to this Declaration as **Exhibit A**.

7. In August 2019, we borrowed a mortgage loan in the principal amount of $146,737,500 from Delphi CRE Funding LLC. The loan is secured by both hotel properties.

8. Six months after the pandemic, the Debtors' senior lenders exploited the need for a forbearance to insist on a new revised yearly extension by raising LIBOR plus spread and each year, and asking for additional fees and to pay down the loan. We have been servicing the loan by raising personal funds and from proceeds from our other facilities. The interest rate we are currently paying is more than 8%, which is not sustainable.

9. In June 2024, before we stopped paying monthly interest, the Debtors' senior lenders issued a very unreasonable extension offer. Since then we have attempted to engage with the senior creditors to find a good-faith resolution that would preserve the best value. But, to date, they have refused to engage.

10. The senior lenders' request for an appointment of On August 12, 2025, the Debtors' senior lenders filed a foreclosure action against certain of the Debtors in the Circuit Court of Cook County, Chancery Division, Case No. 2025CH08364, seeking to foreclose the Hotel Businesses and to appoint a receiver, precipitating this chapter 11 filing. I believe this request for a receiver makes no sense and would actually be value destroying. The unwarranted appointment of a receiver over the operations of the Hotel Businesses would precipitate devastating effects on their viability. A transition in management would result in substantial increases in operating costs. These costs would include substantial increased operating expenses should the receiver engage

173048000.24 3

other third-party management companies—as contemplated by Plaintiff in its proposed order. Furthermore, of the Hotel Businesses, the Best Western presently enjoys the benefit of a grandfathered franchise fee. However, as a result of any change in management, the Best Western property would default to the current franchise fee scale, thereby causing a significant increase in affiliation costs. It is also anticipated that upon the appointment of a receiver over the Hotel Businesses, their franchisors would impose onerous property improvement programs ("PIP"), which are estimated, at minimum, to increase costs of $15,000 per room for capital costs of approximately $7,500,000 in additional cash outlay.

11.    Hotel properties such as the Hotel Businesses typically have a "ramp-up" period ranging from six months to eighteen months.  The Hotel Businesses were in this "ramp-up" period when the COVID-19 pandemic first began, approximately six months after opening. This unfortunate timing impacted occupancies and rates, and therefore net operating income. As such, the Hotel Businesses required substantial additional operating funds during this period, which were provided through other hotel operations and personal resources to keep the properties open and operating. During the beginning of the COVID-19 pandemic, market occupancy in Chicago was only 24%, with 17,000 hotel rooms temporarily closed because of catastrophic drops in demand due to COVID-19.

12.    The attempts to get modifications to loan terms during these force majeure conditions were appropriate.  However, in dealing with the senior lenders, the modifications ultimately resulted in unsustainable increases in interest rates, and the spread, added penalties and fees all substantially increased the burden on the properties.

13.    Notably, Hotel Businesses are currently non-union, thanks to the extraordinary efforts of management to manage the businesses in a fashion that compensates and recognizes the

173048000.24 4

contribution of employees to the success of the operation.  The property, with 514 rooms, is a prime target for union organizing and will almost immediately be pressed for a union operating agreement should management change hands.

14.    Moreover, as mentioned above, there are currently PIP requirements that the franchisors permit to either be implemented over time, or that have been grandfathered in as acceptable under current management.  New ownership/management would trigger PIP inspections and renewed efforts to achieve upgrades to current standards for the franchises, amounting to a requirement of a substantial capital investment by the new operators.  The senior lenders' proposed management company has no operations in the immediate area and would incur and pass on the costs of temporary staffing, transportation costs and other out-of-pocket costs for transition management to employees through reduced wages and employment, as well as to customers. In addition, there would be a significant learning curve for the new management company to understand and adjust to the nuances of the Chicago market, pricing strategy and other operational challenges.

15.    In 40 years, I have never sold or closed any properties, not even for one day, surviving four financial crises: the financial crash in the late 20th century, the Y2K crisis, the 2009 crash, and COVID-19.  I have sustained operations by diligent and cost effective management and cross-utilization of funds among the properties, including the heroic efforts to sustain the opening and operation of the subject properties during the ramp-up period and COVID-19 pandemic.

16.    The abrupt appointment of a receiver over the Hotel Businesses would also invariably precipitate a significant turnover of employees resulting in substantial declines in service levels and increases in hiring and training costs. These consequences will, in turn, severely

173048000.24 5

damage the reputation of the Hotel Businesses both in the employment and customer markets for years to come.

17.    The only reason we are seeking chapter 11 relief is the senior lenders' unreasonable obstinacy.  It is my hope that with the Court's guidance, the senior lenders will finally come to the table to discuss a common-sense resolution.  In 2019, coinciding the Debtors' financing through its current senior lenders, the Debtors appointed independent managers as a condition to closing the loan.  These independent managers unanimously consented to the chapter 11 filing.  *See* Independent Manager Consent [Doc. 1, pp. 9–15], attached hereto as **Exhibit B**.

18.    I have reviewed the First Day Motions, and the facts set forth therein are true and correct to the best of my knowledge, information, and belief based on my review of the Debtors' books and records, information supplied by employees and advisors, and my involvement in the Debtors' financial and operational management.

19.    The relief requested in the First Day Motions is critical to ensuring the Debtors' ability to maintain operations, preserve enterprise value, and protect the interests of creditors, employees, vendors, and stakeholders.

20.    In regards to cash collateral, the Debtors require immediate access to cash collateral to operate their businesses, pay employees, maintain utilities, satisfy franchise obligations, and preserve the value of the Hilton and Best Western hotel properties.  I incorporate by reference the facts regarding cash collateral set forth in the Cash Collateral Motion.

21.    Likewise, the Debtors require access to postpetition financing under the DIP Facility (as defined in the DIP Motion) to fund essential costs that cannot be met solely from Cash Collateral during these early stages of the chapter 11 cases.

173048000.24 6

22.     The Debtors will separately file additional First Day Motions, including the Wages Motion and the Insurance Motion.

23.     A description of each First Day Motion and why I believe each should be granted is contained below.

## THE CASH COLLATERAL MOTION[2]

24.     The Cash Collateral Motion seeks authorization from the Court for the Debtors to use Cash Collateral to meet the ordinary cash needs of the Debtors, and for such other purposes as may be approved in writing by the Senior Creditors, for the payment of:

   a. Reasonable and necessary operating expenses incurred in the ordinary course of business;

   b. Maintenance and preservation of the property of the estate;

   c. Payroll and related tax obligations;

   d. Property taxes and insurance premiums; and

   e. Payment of expenses associate with the chapter 11 cases, including professional expenses incurred in the administration of the bankruptcy case.

25.     The Debtors' Cash Collateral is comprised of five Bank Accounts in total, including (i) three Operating Accounts, comprised of one Operating Account with Huntington National Bank (Acct. No. ending 2220), and two Operating Accounts with International Bank of Chicago (Acct. Nos. ending 2828 and 2801), and (ii) two lockbox accounts with Key Bank (Acct. Nos. ending 7999 and 8539) (account ending in 8539 is a CMA lockbox).  Agent may have a security interest in one or more of these Bank Accounts and, prior to the Petition Date, may have possessed rights of setoff with respect thereto.  These accounts capture substantially all hotel operating receipts,

---

[2] Capitalized terms used in this subsection but not defined herein shall have the meanings ascribed to them in the Cash Collateral Motion.

173048000.24 7

including room revenue, food and beverage, and ancillary receipts, and therefore constitute or contain Cash Collateral of the Senior Creditors.

26.     The Debtors intend to continue utilizing the existing Bank Accounts with customary chapter 11 controls to segregate, account for, and report on Cash Collateral usage. I believe maintaining these established treasury channels during the interim period (while instituting Court-approved controls and reporting) minimizes operational disruption and preserves estate value by ensuring uninterrupted collections and disbursements.

27.     I believe that access to existing Cash Collateral on an interim basis will provide the Debtors with the liquidity necessary to ensure that the Debtors have sufficient working capital and liquidity to operate their businesses, and thus preserve and maintain the value of the Debtors' estates. Without such access to liquidity, the Debtors' ability to navigate through the chapter 11 process will be jeopardized, to the detriment of all creditors (including the Senior Creditors, *i.e.* the creditors with an interest in cash collateral).  Put simply, the Debtors have an immediate need to use Cash Collateral to ensure sufficient liquidity throughout the pendency of these chapter 11 cases.

28.     The Debtors' hotels are labor- and service-intensive operations.  Cash is required on a continuous basis to fund payroll and associated taxes; utilities and essential property-level services; franchise-related obligations; insurance and property taxes; routine repairs and maintenance; and the professional and administrative costs of these chapter 11 cases. Without immediate authority to use Cash Collateral (and, separately, availability under the DIP Facility (as defined in the DIP Motion)), the Debtors would be unable to meet near-term obligations, would experience rapid deterioration in guest service and brand compliance, and would face the prospect of an abrupt cessation of operations—outcomes that would materially

173048000.24 8

impair the value of the Hilton Property and the Best Western Property and, by extension, the Senior Creditors' collateral base.

29.    Based on my review of near-term cash needs and projected receipts, the Debtors' access to Cash Collateral on an interim basis is essential to stabilize operations and to bridge to a final hearing.  I believe that each proposed spend is necessary to maintain going-concern value and avoid irreparable harm during the interim period.

30.    The Debtors propose to make disbursements strictly in accordance with the cash collateral budget attached to the Interim Order, subject only to the permitted variances and other limitations expressly set forth in the Interim Order.  The budget includes the ordinary-course and case-administration expenditures that must be paid to avoid immediate and irreparable harm.

31.    In addition to adherence to the Court-approved budget, the Debtors will maintain customary controls over Cash Collateral, including centralized approval of disbursements, the continued use of existing cash management systems, and enhanced, periodic variance reporting to the Senior Creditors as contemplated by the Interim Order.

32.    To protect the Senior Creditors against any diminution in the value of their interests in the collateral resulting from (i) the Debtors' use of Cash Collateral, (ii) the use, sale, or lease of other collateral, and (iii) the imposition of the automatic stay, the Interim Order provides an adequate protection package that includes: (a) Replacement Liens in favor of Agent for the benefit of the Senior Lenders on the same categories of property (and proceeds, products, rents, and profits thereof) that secured the prepetition obligations, with the same priority and effect as the liens they replace; and (b) ongoing monthly interest payments to Agent, in the amount of $153,272.28, for the benefit of the Senior Lenders.

173048000.24 9

33.     In my opinion, this adequate protection package is fair and sufficient under the circumstances.    First, the Replacement Liens preserve the Senior Creditors' position on a dollar-for-dollar basis to the extent of any diminution in value attributable to the authorized uses. Second, the payment of current interest addresses time-value-of-money considerations during the interim period.

34.     Under the Interim Order, the Debtors' right to use Cash Collateral terminates on the earliest of:  (i) ~~May 5, 2026 at 5:00 p.m. Eastern~~sixty (60) days following the effective date of a chapter 11 plan; (ii) the occurrence of any specified Termination Event, including failure to comply with the budget (subject to permitted variances), unauthorized uses, ~~nonpayment of U.S. Trustee fees,~~ appointment of a chapter 11 trustee or an examiner with expanded powers, termination of franchise agreements, conversion or dismissal of these cases, or entry of an order materially modifying the Interim Order; or (iii) entry of a subsequent interim or final order governing cash collateral.  The Interim Order also provides for a limited modification of the automatic stay solely to permit implementation of its terms.

35.     Authorizing the interim use of Cash Collateral will enable the Debtors to (a) maintain staffing and guest services at the Hilton and Best Western properties; (b) protect the physical plant and brand standards; (c) preserve franchise relationships and key vendor support; and (d) fund the administrative costs needed to prosecute these chapter 11 cases efficiently. In my view, these outcomes directly protect and enhance the value of the Senior Creditors' collateral and maximize recoveries for all stakeholders.

36.     Conversely, denying the requested relief would likely  trigger immediate and irreparable harm: payroll interruptions, vendor and utility stoppages, insurance risk, loss of brand

173048000.~~24~~ 10

eligibility, and rapid erosion of going-concern value.  Such harms would impair—not protect—the Senior Creditors' position.

37.    For the reasons above, I believe the Debtors' proposed interim use of Cash Collateral, on the terms set forth in the Interim Order and budget (including the adequate protection package described herein), is necessary, reasonable, and in the best interests of the estates.

## THE DIP MOTION[3]

38.    As set forth in the DIP Motion, the DIP Facility consists of a single-draw, junior secured postpetition loan in the principal amount of $1,000,000, which becomes fully available to the Debtors immediately upon entry of the Interim Order.  Subsequent credit extension may be available, subject to notice, an opportunity to object, and approval of the Court.  I believe this structure is critical because the Debtors require immediate liquidity to stabilize operations and fund essential expenses at the outset of these chapter 11 cases.  The single-draw feature ensures that the Debtors have prompt access to the full amount of the financing without the delays or administrative burdens associated with multiple funding requests.  As described in the DIP Motion, the DIP Facility is subject to disgorgement pending entry of a Final Order, and the loan is secured by junior liens on the Hilton Property, the Best Western Property, and the proceeds thereof.  The proceeds of the DIP Facility will be kept in a segregated account.  In my judgment, the size, structure, and immediacy of the DIP Facility are appropriately tailored to the Debtors' urgent liquidity needs and provide the minimum capital necessary to preserve the value of the estates during the initial phase of these chapter 11 cases.  In particular, the DIP Facility allows the Debtors

---

[3] Capitalized terms used in this subsection but not defined herein shall have the meanings ascribed to them in the DIP Motion.

173048000.24 11

flexibility to pay chapter 11 operating and professional costs, potential cure costs associated with the Debtors' franchise agreements for the Hotel Businesses, and maintain their existing operations.

39.     Based on my review of the Debtors' financial condition and cash-flow projections, the Debtors do not have sufficient liquidity to operate their businesses, preserve the value of their assets, or administer these chapter 11 cases without immediate access to the DIP Facility.  As of the Petition Date, the Debtors' available cash on hand is inadequate to fund payroll, utilities, insurance, property taxes, vendor obligations, and other essential operating expenses. The Debtors' hotels rely on continuous staffing, maintenance, and vendor support to remain operational, and any interruption in these services would result in a rapid and significant deterioration in asset value.  As stated in the DIP Motion, "the DIP Facility (and the use of cash collateral) are the Debtors' sole sources of funding for their operations and the costs of administering the chapter 11 process," and without such access, "the Debtors would immediately cease operations."  I believe these statements are accurate and illustrate the necessity of the DIP Facility for preserving enterprise value for the Debtors and thereby maximizing stakeholder recoveries.

40.     Prior to filing these chapter 11 cases, the Debtors and their advisors evaluated potential sources of financing, including unsecured credit, senior secured financing, and alternative debtor-in-possession facilities.  No third-party lender was willing to extend credit to the Debtors on an unsecured basis or on terms junior to the existing Senior Obligations.  As the DIP Motion explains, "No third party lenders were prepared to offer debtor in possession financing to the Debtors, particularly on a junior basis to the existing Senior Obligations."  The DIP Lenders are insiders, but were the only parties willing to provide the Debtors with the liquidity necessary to stabilize operations, and the terms they offered were the most favorable available under the

173048000.24 12

circumstances.  In my business judgment, the Debtors conducted a reasonable and appropriate process to identify financing options, and the DIP Facility represents the only viable path to preserve value for all stakeholders.

41.    In particular, the Debtors through their management and advisors reached out to multiple financial institutions and potential investors, including Morgan Stanley, BMO Capital Markets, and AGRA Capital to seek additional capital to take out its first lien indebtedness and/or provide funds for a bankruptcy process.  The Debtors also used the services of brokers Berkadia Commercial Mortgage LLC and Continental Partners, but ultimately, the only the DIP Lenders offered to take junior lien financing to fulfill the Debtors' immediate needs.  The Debtors will continue to search for financing throughout the chapter 11 cases to allow flexibility in their potential exit strategy and plan process.  Because the Debtors have a seasonal business (*i.e.*, hotels in Chicago are slower in winter and more profitable in warmer weather) and now have the rights and tools available to them through bankruptcy law, the Debtors expect that postpetition financing efforts will be more likely to be successful than prepetition.

41.42.  The DIP Facility is essential to maintaining the Debtors' hotels as going concerns and preserving the value of the Hilton Property and the Best Western Property, which constitute the Debtors' primary assets. Without the DIP Facility, the Debtors would be forced to shut down operations, resulting in immediate and irreparable harm to the estates.  As the DIP Motion states, "the Debtors' ability to finance their business operations, and the availability of sufficient working capital and liquidity to the Debtors through access to the DIP Facility is vital to the preservation and maintenance of the value of the Debtors' estates."  I agree with this statement—the DIP Facility will allow the Debtors to maintain staffing, pay critical vendors, preserve franchise relationships, and continue the sale and restructuring process in an orderly manner.

173048000.24 13

42.43.  The DIP Facility was negotiated in good faith and at arm's length between the Debtors and the DIP Lenders, including myself.  In my view, the terms of the DIP Facility—including the junior lien position, the single-draw structure, and the reservation of rights for a potential (but not required) conversion of DIP debt to equity upon emergence—are fair and reasonable in light of the Debtors' financial condition, the risk profile of the loan, and the absence of alternative financing sources. As noted in the DIP Motion, "The proposed DIP Facility as offered by the DIP Lenders is the best financing option that the Debtors could obtain under the circumstances," and the junior security interest "is a necessary component of the DIP Facility and is a sound exercise of the Debtors' business judgment."  I believe the DIP Facility is appropriately tailored to the Debtors' needs and is in the best interests of the estates.

43.44.  The Debtors require immediate access to the DIP Facility on an interim basis to avoid irreparable harm.  The Debtors' cash needs are immediate and ongoing, and the inability to access the DIP Facility before a final hearing would jeopardize payroll, vendor relationships, insurance coverage, and the continued operation of the hotels.  As the DIP Motion explains, "The Debtors will therefore be unable to proceed with operating their businesses without the ability to access the DIP Facility, and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest."  In my judgment, interim approval of the DIP Facility is necessary to stabilize operations and protect the value of the estates pending a final hearing.

**THE WAGES MOTION**

44.45.  The Debtors filed the Wages Motion seeking entry of a final order (a) authorizing the Debtors to (i) pay prepetition employee wages, salaries and other accrued compensation, (ii) pay prepetition employee business expenses, (iii) make contributions to prepetition benefit programs and continue such programs in the ordinary course of their business, (iv) honor workers'

173048000.24 14

compensation obligations, (v) make payments for which prepetition payroll deductions were made, (vi) pay processing costs and administrative expenses relating to the foregoing payments and contributions, and (vii) make payments to third parties incident to the foregoing payments and contributions, and (b) authorizing banks and other financial institutions to honor and process check and electronic transfer requests related to the foregoing.

45.46.  The Debtors currently employ 106 employees who are invaluable to the Debtors' business and essential to the Debtors' ability to continue business operations.  If the Debtors cannot assure the employees that they will promptly pay prepetition employee obligations and continue to hone employee benefits obligations, then employees will likely seek employment elsewhere which would adversely impact the Debtors' business including the ability to maximize its value. In the ordinary courts of business, the Debtors incur payroll and compensation obligations for their workforce and provide other benefits to employees for the performance of services, with all benefits and obligations being customary withing the Debtors' industry.

46.47.  In the ordinary course of business, the Debtors' payroll obligations to employees including salaries and wages are paid bi-weekly on Fridays via direct deposit and paper checks.  The Debtors' bi-weekly gross payroll is $295,000.  Following the Petition Date, the next scheduled payroll dates are March 20, 2026, and April 6, 2026.  As of the Petition Date, the Debtors owe $295,000 of accrued unpaid employee compensation obligations, with no employee owed more than $17,150 (*i.e.*, the priority wage cap).  The Debtors seek authorization to pay these unpaid employee compensation obligations.

47.48.  For each pay period, the Debtors deduct amounts directly from employees' pay including garnishments, child support, service charges, pre- and after-tax deductions pursuant to employee benefit plans such as health care benefits, insurance premiums, and 401k contributions,

173048000.24 15

and other amounts allowed by law.  In connection with paying wages to employees, the Debtors are legally required to withhold wage amounts related to federal, state, and local taxes, social security and Medicare taxes, and remit such amounts to taxing authorities.  Additionally, the Debtors make payments from their own funds to pay state and federal unemployment insurance, employment training taxes, and state disability insurance contributions.  As of the Petition Date, the Debtors have withheld all legal required amounts for remittitur to third-party recipients, and Debtors seek authorization to continue making deductions and satisfying payroll tax obligations.

48.49.  The Debtors offer employees paid time off in the form of sick and vacation pay.  Full-time employees become eligible for paid sick leave after twenty-nine days of continuous service and part-time employees accrue one hour of sick leave for every thirty-five hours worker, with eligible employees entitled to forty hours of sick leave per calendar year.  Eligible employees become eligible for paid leave following eighty-nine days of continuous service, with full-time employees accruing forty hours of paid leave and part-time employees accruing one hour of paid leave for every thirty-five hours worked up to the maximum of the applicable law per calendar year.  Subject to applicable law, eligible employees are entitled to cash payment for accrued but unused paid leave upon termination.  Employees are entitled to carry over accrued by unused sick leave from year to year up to a maximum of eighty hours.  These PTO programs are typical and customary, and continuing to offer them is necessary.  Because PTO is accrued and used by employees on a continuous basis, it is difficult to precisely calculate the cost of accrued PTO as of the Petition Date.  However, the Debtors estimate the value of such PTO is $310,000.  The Debtors request authority to honor their PTO policies in the ordinary course of business and to pay prepetition PTO amounts, with no individual employee being paid more than $17,150 and the Debtors not paying prepetition PTO in the aggregate exceeding $300,000.

173048000.24 16

49.50.  The Debtors implement various benefit plans and policies for employees including prescription and medical benefits, dental care, vision care, basic life and accidental death and dismemberment insurance, retirement savings 401(k) plan, and a health savings account plan.  The Debtors deduct specified amounts from participating employees' wages regarding these employee benefits plans.  All employee benefits are provided subject to employees satisfying certain requirements and employee contributions are collected through payroll deductions from participating employees.  The Debtors request authority to continue offering the employee benefits plans and honoring their benefits plans obligations in the ordinary course during the Chapter 11 cases.

50.51.  The Debtors are required to maintain worker's compensation insurance programs to provide their employees with workers' compensation insurance coverage for claims arising from or related to their employment with Debtors.  The Debtors maintain a workers' compensation policy with Travelers with an annual net cost of $337,311 paid annually and subject to an employer deductible of $1,000 for each accident.  The Debtors seek authority to continue to pay amounts associated with the workers' compensation program including premium amounts and deductibles in the ordinary course and to honor payments owed.

51.52.  Through their motion for authorization to pay prepetition wages, the Debtors seek to pay $295,000 of employee compensation obligations and $300,000 of PTO if cashed out or in the ordinary course.  The Debtors have not accrued any aggregate obligations for withholding, medical plans, life and AD&D insurance, 401(k) plan, or the workers' compensation policy. The Debtors request authorization for all applicable banks and financial institutions to receive, process, honor, and pay all checks and electronic payment requests related to the employee obligations and the employee plans and programs.

173048000.24 17

52.53.  The Debtors' ability to successfully operate is contingent on a reliable and loyal workforce, and to secure the reliability and loyalty of the workforce, the Debtors must be authorized to honor employee obligations and continue and maintain employee plans and programs in the ordinary course of business.

53.54.  A significant portion of the employee obligations are entitled to priority status up to $17,150 for wages, salaries, commissions, and vacation, severance, and sick leave pay pursuant to section 507(a)(4)(A) of the Bankruptcy Code.  Similarly, section 507(a)(5) of the Bankruptcy Code grants priority to contributions to employee benefit plans up to an aggregate of $17,150 multiplied by the number of employees covered, less any amounts paid to such employees under section 507(a)(4) of the Bankruptcy code.

54.55.  The Debtors should be authorized to pay the employee obligations under sections 1107(a) and 1108 of the Bankruptcy Code.  Payment of the employee obligations meets each element of the applicable legal standard, and the Debtors must be allowed to pay the employee obligations to avoid significant disruption to their operations.   Payment of the employee obligations is also warranted pursuant to section 363 of the Bankruptcy Code because the Debtors can articulate a business justification for such payments.

55.56.  Payment of certain withholding obligations is appropriate under section 541 of the Bankruptcy Code, because certain withholding obligations are the property of the taxing authorities and are required by federal and state laws.

56.57.  Payment of the employee obligations is warranted pursuant to section 105(a) of the Bankruptcy Code and under the doctrine of necessity because section 105(a) allows the Court to permit pre-plan payments of prepetition obligations that are essential to the continued operation of the Debtors' business and the doctrine of necessity authorizes payment or prepetition obligations

173048000.24 18

where payment is an essential element of the preservation of the debtor's potential for rehabilitation. Here, the majority of the employees rely on their compensation and benefits to satisfy their daily living expenses and maintain their health and well-being. Authorizing the Debtors to continue paying employee obligations is necessary to ensure the continued employment of employees and to prevent employees from seeking employment elsewhere.

57.58. Immediate relief requested by Debtors is justified because Debtors will suffer irreparable harm if they are not authorized to pay employee obligations which would cause employees to leave their employment with the Debtors in turn causing Debtors' business to fail.

58.59. To implement the payment of employee obligations, the Debtors seek a waiver of any stay of the effectiveness of the order approving this motion and waiver of the notice requirements of Bankruptcy Rule 6004(a) if applicable. The Debtors have provided notice of their Wages Motion to all parties entitled to receive notice.

**THE INSURANCE MOTION**

59.60. Through the Insurance Motions, the Debtors seek authorization to continue their existing insurance policies, pay certain prepetition insurance obligations, pay certain postpetition insurance obligations, renew, amend, extend, or purchase and finance insurance policies, and continue their insurance premium financing agreement all in the ordinary course of business.

60.61. In the ordinary course of business, the Debtors are the beneficiaries of certain insurance policies that provide coverage for property, general commercial liability, directors' and officers' liability, automobile and workers' compensation liability.

61.62. The Debtors pay premiums, and other required obligations such as broker fees, to maintain the policies, and believe they are currently on payment of all insurance obligations. The Debtors finance premium payments for one insurance policy pursuant to a premium financing

173048000.24 19

agreement with a premium financing company.  As of the Petition Date, the debtors are current on their premium financing obligations.  The premium financing agreement requires the Debtors to pay $38,371.35 monthly installments with the aggregate annual premium being $484,815.18, with an interest rate of 6.15%, and a down payment of $148,158.80.  $230,227.92 remains outstanding under the premium financing agreement and will come due postpetition in the ordinary course of business.  The Debtors therefore seek authority to pay prepetition obligations under the premium financing agreement, to pay any postpetition obligations due in the ordinary course of business, and to enter new agreements as needed to finance premiums under the insurance policies while paying premium financing obligations.

62.63.  The insurance policies are essential to the ongoing operation of the Debtors' business, with most of the policies renewed annually and paid monthly.  As of the Petition Date, the Debtors estimate that $230,227.92 remains outstanding on insurance policies financed through their premium financing company (as stated above), and $716,787.87 of direct payments to carriers or brokers, on an installment basis, remain outstanding.

63.64.  Although the Debtors are current on their insurance obligations, out of an abundance of caution, they seek authority to pay any prepetition obligations owed on the insurance policies in the ordinary course of business to ensure uninterrupted coverage.

64.65.  Insurance coverage is also required by applicable regulations, laws, and contracts governing the Debtors' commercial activities, and by the U.S. Trustee's requirement that a chapter 11 debtor maintain adequate coverage.  Therefore, the Debtors request authorization to continue prepetition practices related to insurance policies, to satisfy prepetition obligations, and to enter into and finance new insurance arrangements in the ordinary course of business or on a postpetition basis.

173048000.24 20

65.66. Satisfying the insurance obligations under the insurance policies and related financing agreements in the ordinary course of business is warranted.  The Bankruptcy Code authorizes the Debtors to enter into transactions without notice or a hearing in the ordinary course of business, and maintenance of the Debtors' insurance policies and insurance financing programs are within the ordinary course of the Debtors' business.

66.67.  Even if the continuation of the insurance policies was not considered to be in the ordinary course of business, the Debtors' proposed use of their assets represents a reasonable business judgment. The debtors should be permitted to exercise their reasonable business judgment to continue and renew the insurance policies to avoid exposure to liability for injuries, damages, and penalties for failure to maintain proper insurance.

**CONCLUSION**

67.68. Based on my experience managing the Debtors and my familiarity with their financial circumstances, I believe that the relief requested in the First Day Motions is necessary to avoid immediate and irreparable harm to the estates.  I respectfully submit that the First Day Motions should be granted.

Further Affiant sayeth not.

Dated: March 8, 2026

_____
Su-Mei Yen

173048000.24 21