**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BY HOTEL SPE-3 LLC,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 26-10324 (JKS)<br><br>(Joint Administration Requested)<br><br>**Related to D.I. 6 and 7** |

**SECURED LENDER'S LIMITED OBJECTION TO**
**(A) DEBTORS' EMERGENCY MOTION FOR AUTHORITY TO USE**
**CASH COLLATERAL, AND OBJECTION TO (B) DEBTORS' EMERGENCY**
**MOTION TO OBTAIN JUNIOR SECURED POSTPETITION FINANCING**

ACORE Capital Mortgage, LP, in its capacity as Administrative Agent of Delphi CRE Funding LLC ("Secured Lender"), by and through its undersigned counsel, hereby files this *Limited Objection* to (a) the Debtors' *Emergency Motion to Approve Use of Cash Collateral for Authority to Use Cash Collateral Pursuant to Sections 105, 361, 362, and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) and Request for Interim and Final Hearings* (the "Cash Collateral Motion") [Doc. No. 6] and this *Objection* to (b) the Debtors' *Emergency Motion for Entry of Interim and Final Orders Under Bankruptcy Code Section 364(C)(3) Authorizing the Debtors to Obtain Junior Secured Postpetition Financing and Request for Interim and Final Hearings* (the "DIP Motion") [Doc. No. 7] (together, the "Objection"). In support of this Objection, Secured Lender respectfully states as follows:

---

[1] The Debtors in these chapter 11 cases and the last four digits of their respective identification numbers are By Hotel SPE-3 LLC (3619); 1101 Wabash Development Mezz, LLC (9294); Wabash 11th Mezz LLC (4278); Pacific Tai Mezz LLC (3717); 1101 Wabash Development SPE LLC (9201); Wabash 11th LLC (3098); 1101 Wabash Development LLC (3365); Pacific Tai, LLC (9675); and SB Yen's Management Group, Inc. (1132). The location of the Debtors' corporate headquarters and the Debtors' service address is 806 N York Rd., Hinsdale, IL 60521.

### PRELIMINARY STATEMENT[2]

1. Secured Lender holds a first priority lien on virtually all of the assets of the Debtors, including its real property and cash, in addition to a first priority lien on certain of the Debtors' equity interests in other Debtors.

2. To Secured Lender's knowledge, Secured Lender is the only secured creditor in these cases or, at a minimum, the Debtors' largest secured creditor by a substantial margin.

3. The senior secured loan made by Secured Lender to certain of the Debtors in the original principal amount of nearly $150,000,000 has been in default for almost two (2) years and matured approximately eighteen (18) months ago. Yet, during this intervening time, Secured Lender has not received any payments (whether principal, interest or fees) on the Debtors' substantial indebtedness.

4. The filings of these bankruptcies, which occurred the day prior to a hearing scheduled on Secured Lender's motion to appoint a receiver over the Debtors' real property, appear to be another obstructionist tactic by the Debtors to avoid their liability to Secured Lender.[3]

5. Notwithstanding certain statements by the Debtors to the contrary, Secured Lender believes that the collateral securing the Debtors' indebtedness is insufficient to fully satisfy Secured Lender's claims such that Secured Lender is likely undersecured by potentially tens of millions.

6. Of course, the issue of whether the Secured Lender is undersecured raises broader questions about the feasibility of these cases and the Debtors' ability to successfully reorganize.

---

[2] Capitalized terms used but not otherwise defined in this Preliminary Statement shall have the meanings ascribed to such terms elsewhere in the Objection.

[3] Prior to the Petition Date, in the course of Secured Lender's efforts to consensually address the Debtors' defaults, certain irregularities came to light, which are not directly at issue before the Court but for which Secured Lender reserves all rights to address at a later date.

7.     However, for purposes of two of the motions directly before the Court, Secured Lender has significant concerns regarding the Debtors' emergency motions to further diminish Secured Lender's collateral package through the use of Secured Lender's Cash Collateral and the Debtors' intent to take on additional unsecured but super-priority debt in the form of the DIP Facility.

8.     Although Secured Lender appreciates the exigency of maintaining operations, the Debtors nonetheless have an obligation to ensure that its secured creditors' collateral positions are adequately protected and have sufficient information to address any potential diminution in value that may result.

9.     Regarding the Cash Collateral Motion, the Debtors have not met their burden to show that Secured Lender will be adequately protected from any diminution in value of the Debtors' collateral resulting from the use of its Cash Collateral.

10.     The Replacement Liens offered to Secured Lender are of little protection, and the proposed monthly interest payment is a fraction of the amount that Secured Lender would have been entitled to under the Loan Documents prior to the Petition Date.[4]

11.     Further, the proposed Budget is overly broad and fails to provide sufficient insight to Secured Lender to evaluate the proposed nature and uses of Secured Lender's Cash Collateral.

12.     Consequently, the Secured Lender believes additional time is needed to discuss further interim relief with the Debtors and respectfully requests that the interim relief presently before the Court be granted only though and including April 2, 2026.  During that period, Secured

---

[4]     To put things into perspective, the Debtors propose to pay $50,000 per month as adequate protection for the insider DIP loan of $1 million.  DIP Mot. ¶ 16.  Yet, despite acknowledging that Secured Lender is owed nearly $150 million in unpaid principal, Cash Collateral Mot. ¶ 8, or nearly 150 times what the proposed DIP Lender will be owed (assuming the Court approves the DIP Facility), the Debtors only propose to pay Secured Lender the sum of $153,272.28 per month.

3

Lender intends to work constructively with the Debtors and their counsel on a potential path forward.

13.     Regarding the DIP Motion, Secured Lender respectfully submits that the DIP Motion before the Court should be denied.  First, based on the information submitted, it is very unclear whether this DIP is actually necessary to fund ongoing operations at all.  Per the proposed Cash Collateral Budget, the Debtors appear to hold the $1 million proceeds of the DIP Facility in reserve for the next thirteen (13) weeks.

14.     Second, and more glaringly, the Debtors did not disclose the insider nature of the DIP Facility – where an affiliated insider of the Debtors is serving as DIP Lender – in the DIP Motion at all, and only did so in a separate amended pleading filed two days prior to the hearing on the DIP Motion.

15.     As this Court is readily aware, when an insider is proposing to be a DIP lender, both the Debtors and the DIP lender must meet a substantially high standard to show that the transaction is entirely fair in both substantive and procedural terms, especially in this case, where the proposed DIP Facility would take priority over all unsecured creditors (including potentially Secured Lender's deficiency claim) before the potential appointment of a creditors' committee.  Such a blatant attempt to divert value directly to an insider requires extra caution to ensure that the estates and all parties-in-interest are protected.

16.     For the foregoing reasons and as set forth in further detail below, Secured Lender respectfully requests that (a) the Court condition approval of the Cash Collateral Motion on an interim basis as modified herein and (b) deny the DIP Motion.

**RELEVANT BACKGROUND**

### A. The Loan and Loan Agreement

17. On or about August 30, 2019, Debtors Wabash 11th, LLC, 1101 Wabash Development LLC, and Pacific Tai, LLC (collectively, the "Borrower") entered into an agreement pursuant to which Secured Lender agreed to make a mortgage loan in the original principal amount of $146,737,500 to the Borrower (the "Loan").

18. The Loan is secured by, among other things, two parcels of real property located at 1101 South Wabash Avenue, Chicago, Illinois 60605 (the "Hilton Property") and 1100 South Michigan Avenue, Chicago, Illinois 60605 (the "Best Western Property" and, together with the Hilton Property, the "Real Property").

19. The Loan was memorialized in that certain Loan Agreement dated August 30, 2019, and amendments to the Loan Agreement dated September 7, 2022, June 2, 2023, and October 24, 2023 (collectively, the "Loan Agreement").

20. In connection with the Loan Agreement, Borrower executed six Secured Promissory Notes, each dated August 30, 2019, in the aggregate amount of $146,737,500[5] (collectively the "Note").

21. The Loan is secured by that certain Mortgage, Assignment of Leases and Rents, Security Agreement, and Fixture Filing dated August 30, 2019 (the "Mortgage"). The Mortgage was duly recorded in the Cook County Recorder of Deeds' Office on September 6, 2019, as Document Number 1924941003.

---

[5] Note A-1-1 is in the original principal amount of $62,100,000, Note A-1-1F is in the original principal amount of $4,200,000, Note A-1-2 is in the original principal amount of $24,000,000, Note B-1-1 is in the original principal amount of $38,637,500, Note B-1-1F is in the original principal amount of $2,800,000, and Note B-1-2 is in the original principal amount of $15,000,000.

22.     The Mortgage secures full repayment of the Loan and grants a first priority security interest in, among other things, Borrower's personal property, including its cash (the "Cash Collateral"), as well as the Real Property.

23.     In connection with the Loan Agreement, Secured Lender and Borrower executed that certain Assignment of Leases and Rents dated August 30, 2019 (the "Assignment of Leases").[6] The Assignment of Leases was duly recorded in the Cook County Recorder of Deeds' Office on September 6, 2019, as Document Number 1924941004.  The Assignment of Leases absolutely and unconditionally assigns to Secured Lender all present and future leases of, and all rents, issues and profits derived from, the Property (as defined in the Mortgage).

24.     The outstanding principal balance under the Loan as of February 27, 2026, is not less than $149,177,628.83, in addition to interest, fees, and other costs that arose prior to the Petition Date and which continue to accrue.

### B. Mezzanine Loan

25.     On or about August 30, 2019, Debtors Wabash 11th Mezz, LLC, 1101 Wabash Development Mezz LLC, and Pacific Tai Mezz, LLC (collectively, the "Mezzanine Borrower") entered into an agreement pursuant to which Secured Lender agreed to make a mezzanine loan in the original principal amount of $3,762,500 to the Mezzanine Borrower (the "Mezzanine Loan").

26.     The Mezzanine Loan was memorialized in that certain Mezzanine Loan Agreement dated August 30, 2019, and amendments to the Mezzanine Loan Agreement dated June 2, 2020, April 13, 2021, September 7, 2022, and October 24, 2023 (collectively, the "Mezzanine Loan Agreement").

---

[6]     The Assignment of Leases, together with the Loan Agreement, the Note, the Mortgage, and all other documents executed or issued in connection therewith, as amended or modified from time to time, the "Loan Documents".

27. In connection with the Mezzanine Loan Agreement, Mezzanine Borrower executed that certain Mezzanine Promissory Note 1 dated August 30, 2019, in the original principal amount of $2,762,500 in favor of Secured Lender and that certain Mezzanine Promissory Note 2 dated August 30, 2019, in the original principal amount of $1,000,000 in favor of Secured Lender (collectively, the "Mezzanine Note").

28. The Mezzanine Loan is secured by: (a) that certain Mezzanine Pledged and Security Agreement by and between Debtor Pacific Tai Mezz, LLC ("PT Mezz") and Secured Lender dated August 30, 2019, pursuant to which PT Mezz granted a first priority security interest in all of PT Mezz's rights, title and interest in, among other things, PT Mezz's equity interests in Debtor Pacific Tai, LLC; (b) that certain Mezzanine Pledged and Security Agreement by and between Debtor 1101 Wabash Development Mezz, LLC ("1101 Mezz") and Secured Lender dated August 30, 2019, pursuant to which 1101 Mezz granted a first priority security interest in all of 1101 Mezz's rights, title and interests in, among other things, 1101 Mezz's equity interests in Debtor 1101 Wabash Development LLC; and (c) that certain Mezzanine Pledged and Security Agreement by and between Debtor Wabash 11th Mezz, LLC ("Wabash Mezz") and Secured Lender dated August 30, 2019, pursuant to which Wabash Mezz granted a first priority security interest in all of Wabash Mezz's rights, title and interest in, among other things, Wabash Mezz's equity interests in Debtor Wabash 11th, LLC (collectively, the "Mezzanine Pledge Agreements" and, together with the Mezzanine Loan Agree, the Mezzanine Note, and all other documents executed or issued in connection therewith, as amended or modified from time to time, the "Mezzanine Loan Documents").

29.     The outstanding principal balance under the Mezzanine Loan as of February 27, 2026, is not less than $4,094,656.83, in addition to interest, fees, and other costs that arose prior to the Petition Date and which continue to accrue.

### C. Borrowers Default & Secured Lender's Enforcement Actions

30.     As conceded by the Debtors, themselves, they are currently in default under the Loan and the Mezzanine Loan.  *See* Cash Collateral Mot. ¶¶ 9, 11.

### i.     *Default under the Loan*

31.     Borrower failed to pay the Monthly Payment Amounts (as defined in the Loan Documents) required under both the Mortgage and the Loan Agreement in April 2024, May 2024, June 2024, July 2024, and August 2024.

32.     Under the Loan Agreement, Borrower's failure to pay Monthly Payment Amounts when due constituted an Event of Default (as defined in the Loan Agreement).

33.     Borrower further failed to pay the Loan upon maturity on September 10, 2024 (the "Maturity Date").

34.     Under the Loan Agreement, Borrower's failure to pay its indebtedness under the Loan Agreement and Mortgage in full on the Maturity Date constituted an Event of Default (as defined in the Loan Agreement).

35.     Secured Lender sent written notices to Borrower dated June 28, 2024, stating that the Missed Interest Payments constituted Events of Default (as defined in the Loan Agreement). Secured Lender also sent written notices to Borrower dated September 23, 2024, stating that Borrower's failure to pay the Loan upon the Maturity Date was an Event of Default (as defined in the Loan Agreement).

### ii.   Enforcement Actions

36.    Following Borrower's default under the Loan Documents, on August 12, 2025, Secured Lender filed that certain Verified Complaint to Foreclose Commercial Mortgage and for Breach of Contract (the "Foreclosure Complaint") in the Circuit Court of Cook County, Illinois, County Department, Chancery Division (the "State Court"), initiating the action captioned *ACORE Capital Mortgage, LP v. Wabash 11th, LLC, 1101 Wabash Development LLC, Pacific Tai, LLC, SB Yen's Management Group, Inc., Su-Mei Yen, Hsien Bert Yen, Unknown Owners, and Non-Record Claimants*, Case No. 2025CH08364 (the "Foreclosure Action").

37.    The Foreclosure Complaint sought, among other things, foreclosure of the Mortgage on the Real Property.

38.    Secured Lender also filed a motion in the Foreclosure Action to appoint a receiver for the Real Property (the "Receivership Motion").

39.    As of the Petition Date (as defined below), the Foreclosure Action and the Receivership Motion were each pending before the State Court.

40.    A hearing on the Receivership Motion was scheduled for March 9, 2026 – one day after the Petition Date.

### D.  The Bankruptcy Cases

41.    On March 8, 2026 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

42.    On the Petition Date, the Debtors filed the Cash Collateral Motion and the DIP Motion. As set forth in the *Declaration of Ted Mandigo in Support of Debtors' Cash Collateral and Debtor in Possession Financing Motions* (the "Mandigo Declaration") [Doc. No. 8], the Debtors seemingly believe that both the use of Cash Collateral and the DIP Facility (as defined

below) are needed immediately in order to avoid irreparable harm to the estates.  *See* Mandigo Decl. ¶¶ 20, 29.  The Mandigo Declaration also states that "the properties in the Senior Creditors' collateral package have been appraised in excess of $200,000,000 as recently as 2024"[7] such that "the Senior Creditors' collateral position is quite safe."  Mandigo Decl. ¶ 17.

43.    On March 10, 2026 – two days after the filing of the Cash Collateral Motion and the DIP Motion – the Debtors filed the *Amended Declaration of Su-Mei Yen in Support of Debtors' First Day, Cash Collateral, and Debtor in Possession Financing Motions* (the "First Day Declaration") [Doc. No. 20].  Exhibit C to the First Day Declaration includes a redline to the initial *Declaration of Su-Mei Yen in Support of Debtors' First Day, Cash Collateral, and Debtor in Possession Financing Motions* filed on the Petition Date [Doc. No. 4].

44.    As is evident from Exhibit C, the First Day Declaration was revised to state that "the DIP Lenders are insiders," and provides evidence of efforts that the Debtors allegedly made to obtain financing from third parties.  First Day Decl. ¶¶ 40-41.  Neither of these facts were set forth in the initial DIP Motion or the Mandigo Declaration.

### i.    Cash Collateral Motion

45.    Through the Cash Collateral Motion, the Debtors seek authority to use Secured Lender's Cash Collateral pursuant to a proposed Budget (as defined in the Cash Collateral Motion).  *See* Cash Collateral Mot. ¶¶ 18, 20.

46.    As adequate protection for Secured Lender, the Debtors propose to (a) grant Secured Lender replacement liens and (b) and make monthly interest payments to Secured Lender in the amount of $153,272.28 (the "AP Payment").  *See* Cash Collateral Mot. ¶ 20.

---

[7]    No appraisal or other support is attached to the Mandigo Declaration in support of this assertion.

47.     On March 10, 2026, the Debtors filed a revised form of order granting the relief requested in the Cash Collateral Motion on an interim basis [Doc. No. 15], which makes certain revisions to the form of interim order attached to the Cash Collateral Motion.

48.     On March 12, 2026, the Debtors filed a further revised form of order adjusting the variances permitted under the Budget (the "Revised Proposed CC Interim Order") [Doc. No. 27].

49.     Under the Revised Proposed CC Interim Order, the Debtors would be permitted to use Cash Collateral through the earliest to occur of (i) the date on which a Termination Event shall occur (as defined in the Cash Collateral Motion), (ii) May 5, 2026, if a final order authorizing use of cash collateral has not been entered, and (iii) a date that is thirty (30) days following confirmation of a chapter 11 plan.  Revised Proposed CC Interim Order ¶ 2.

50.     The Revised Proposed CC Interim Order also creates a carve-out, permitting payment of allowed professional fees of the Debtors and any creditors' committee prior to and after the occurrence of a Termination Event, notwithstanding anything else to the contrary in the order.  Revised Proposed CC Interim Order ¶ 10.

51.     A thirteen (13) week Budget is attached to the Cash Collateral Motion and Doc. No. 15 as Exhibit 1.

### ii.     DIP Motion

52.     Through the DIP Motion, the Debtors seek authority to obtain a single-draw, junior secured postpetition credit facility in the amount of $1,000,000 (the "DIP Facility") from SBY DeKalb Inn, LTD and any other lender that may join in the financing (the "DIP Lenders") pursuant to section 364(c) of the Bankruptcy Code.  *See* DIP Mot. ¶¶ 7, 23.

53.     The proposed Debtor-in-Possession Credit Agreement (Exhibit 1 to the DIP Motion) is governed by Delaware law.  *See* DIP Mot., Ex. A.1.

54.     The Debtors represent that the proceeds of the DIP Facility are intended to be used for "general business and restructuring purposes, including payment of vendors, attorneys, and expenses," "general working capital purposes," "the ordinary cash needs of the Debtors, and for such other purposes as may be approved in writing by secured creditors."  DIP Mot. ¶¶ 14, 21, 29.

55.     The DIP Motion makes repeated references to entry of the DIP Facility being appropriate as an "exercise of the Debtors' business judgment."  DIP Mot. ¶¶ 32-33.

56.     The DIP Motion states that "[n]o third party lenders were prepared to offer debtor in possession financing to the Debtors, particularly on a junior basis to the existing Senior Obligations."  DIP Mot. ¶ 18.

57.     The DIP Motion does not disclose the relationship between the DIP Lenders and the Debtors.

58.     The insider status of the DIP Lenders was only disclosed subsequently in the First Day Declaration.  *See* First Day Decl. ¶ 40.

59.     The DIP Motion similarly does not provide any details regarding the Debtors' prepetition efforts to obtain financing from third-parties.  Those details were also only disclosed for the first time in the First Day Declaration.  *See* First Day Decl. ¶ 41.

60.     The Debtors propose to make monthly payments to the DIP Lenders in the amount of $50,000.  DIP Mot. ¶ 16.

61.     On March 10, 2026, the Debtors filed a revised form of order granting the relief requested in the DIP Motion on an interim basis (the "Revised Proposed DIP Interim Order") [Doc.

No. 17]. The Revised Proposed DIP Interim Order makes certain revisions to the form of interim order attached to the DIP Motion.

62. Neither the DIP Motion nor the Revised Proposed DIP Interim Order include any sort of proposed budget for use of the proceeds of the DIP Facility and it is very unclear what purpose, if any, the DIP Facility is to be used for or the reason(s) why this facility is necessary.

<u>**LIMITED OBJECTION**</u>

I. <u>**Secured Lender is not Adequately Protected, and the Budget is Inadequate.**</u>

63. Secured Lender does not wish to impose undue hardship on or jeopardize the livelihoods of any of the Debtors' employees, trade counterparties, or any other parties-in-interest that rely on the Debtors remaining in continual operation. That said, Secured Lender, who only retained bankruptcy counsel two days prior to the scheduled hearing on the Cash Collateral Motion, has a number of concerns about the appropriateness of the relief requested.

64. Indeed, it is unclear precisely how long the Debtors expect to use Cash Collateral on an interim basis. The Budget is projected for thirteen (13) weeks (through the week ending June 6, 2026). The Revised Proposed CC Interim Order would provide for interim use potentially up through May 5, 2026 – approximately two-third of the budgeted period – unless, among other things, the Court enters a final order prior thereto.

65. For the reasons set forth in detail below, the Court should limit any interim relief granted for the Cash Collateral Motion through and including April 2, 2026, in order to allow Secured Lender and the Debtors sufficient time to address Secured Lender's concerns regarding additional interim, and ultimately final, relief.

### A. Adequate Protection

66.     Section 363 of the Bankruptcy Code provides that a trustee or debtor in possession may not utilize cash collateral unless the creditor holding an interest in such cash collateral absolutely consents or, after notice and a hearing, the court finds that the secured creditor's interest in the cash collateral is adequately protected.  11 U.S.C. § 363(c) and (e).

67.     Secured Lender does not consent to the proposed use of Cash Collateral.

68.     As such, the burden is on the Debtors to establish that Secured Lender's interest in the Cash Collateral is adequately protected.  *See* 11 U.S.C. § 363(p); *see also In re S. Side House, LLC,* 474 B.R. 391, 408 (Bankr. E.D.N.Y. 2012) ("It is well settled that the debtor bears the burden to demonstrate that a creditor is adequately protected.").

69.     The Debtors propose to provide Secured Lender with (a) Replacement Liens (as defined in the Cash Collateral Motion) and (b) the monthly AP Payment of $153,272.28.  The Debtors have failed to meet their burden that the foregoing adequately protects Secured Lender.

70.     First, the Debtors make no representation whatsoever regarding whether Secured Lender is oversecured or undersecured in the Cash Collateral Motion.  The only evidence presented is an oblique statement the Mandigo Declaration that Secured Lender's "collateral position is quite safe" based on alleged appraisals from 2024.  Mandigo Decl. ¶ 17.

71.     Second, replacement liens, while a common feature of adequate protection for use of cash collateral in chapter 11 cases, are of very limited value in the present case.  Secured Lender already has a first priority security interest in substantially all of the Borrower's assets, namely the Real Property.  *See supra* ¶ 22.  As such, additional liens on the same collateral for potential diminution claims serves very little by way of protection.

72.     In addition, further eroding the value of any proposed replacement liens is the fact that such replacement liens are to be subject to a carve-out of professional fees.  *See* Revised Proposed CC Interim Order ¶ 10.

73.     Finally, should Secured Lender be found to be undersecured, any value of the proposed replacement liens is even more ephemeral.

74.     Third, the Debtors have presented no explanation for how they determined that the amount of the AP Payment is appropriate or adequately protects Secured Lender's collateral position.

75.     This is especially problematic where, as noted above, the Debtors have taken no explicit position as to whether Secured Lender is oversecured or undersecured, and where Secured Lender has not received any payment under the Loan since March 2024.  *See supra* ¶ 31.  Indeed, under the Loan Documents, the monthly payment that would be owed to Secured Lender as of March 10, 2026, at the contract interest rate (notwithstanding the fact that the Debtors have been in default as of April 2024) is approximately $1,027,477.86.[8]  Especially given the lack of protection provided by replacement liens, the AP Payment is plainly insufficient.

76.     Fourth, the Revised Proposed CC Interim Order also lacks many of the features normally provided to secured lenders for the use of cash collateral by a debtor.  For example, there are no stipulations by the Debtors as to the validity of Secured Lender's prepetition liens and claims, a section 506(c) waiver, a provision affecting consideration of the equities of the case under section 552(b)(1), or a provision concerning the equitable doctrine of "marshaling" or other similar doctrines.  The Revised Proposed CC Interim Order even removes, without any explanation, the

---

[8]     This is particularly true where the Debtors seek to make monthly payments to insider DIP Lenders, as discussed *infra*, in the amount of $50,000 for a $1,000,000 DIP Facility – approximately 1/3 of the proposed payment to Secured Lender who holds a secured claim nearly 150 times the size of the DIP Facility.

protection that Cash Collateral cannot be used to challenge the Debtors' security interests, including the Replacement Liens.  Revised Proposed CC Interim Order, Ex. A ¶ 10.

77.     If the Debtors seek the protections afforded by the Bankruptcy Code, they should be required to "pay the freight" by ensuring that parties in interest, particularly secured creditors, are equally protected,

## B. The Budget

78.     Although the Debtors seek authority to use Cash Collateral solely pursuant to the Budget, the Budget fails to provide information for Secured Lender, the Court, or parties-in-interest to be appropriately informed.

79.     By way of example only, the Debtors expect to pay approximately $984,000 across the thirteen (13) week budget for "Restructuring Fees" with no explanation as to what this category involves (e.g., attorneys' fees, other professional fees).  Similarly with no explanation as to the constituent parts, the Debtors anticipate $80,000 in "CapEx", $520,000 in "Contingency," and $779,970 in "Vendors."  Further, among other issues, the Budget appears to potentially be understating costs associated with the Debtors' franchise agreements and does not seem to take into account revenue from on-site restaurants or costs associated with upcoming real estate taxes.

80.     For the benefit of Secured Lender, this Court and all parties-in-interest, the Debtors should submit a revised Budget with more detailed line item explanations for the foregoing categories.

81.     In addition, the Budget does not specify whether any individual category will be used for transfers to any of the Debtors' insiders.  As noted below, the Debtors have not been forthcoming as to the insider nature of the DIP Facility and so it is imperative that the Debtors provide explicit disclosure in their use of Secured Lender's Cash Collateral.  This is all the more

16

critical based on the Debtors' prepetition actions with Secured Lender that cautions further scrutiny of value potentially leaving the estate for the benefit of insiders.

## OBJECTION

### I.    Emergency Relief for the DIP Motion is Not Warranted.

82.    As noted above, the Debtors allege that, absent the availability of both Secured Lender's Cash Collateral and the DIP Facility, the Debtors will immediately cease operations. *See* DIP Mot. ¶ 15; Cash Collateral Mot. ¶ 16.

83.    The Budget, however, which Secured Lender understands to represent the full scope of the Debtors' ordinary cash needs for the next thirteen (13) weeks, does not appear to require the DIP Facility in order for the Debtors to meet their weekly expenses.  Indeed, each week in the Budget shows a positive beginning and ending cash balance irrespective of the DIP Facility. Even more notably, the Budget does not show the balance of the DIP Facility being used at all, instead remaining fixed in the amount of $1,000,000 for the entirety of the Budget period following the initial draw in the week ending March 21, 2026.

84.    Given the foregoing, it is not clear that the Debtors have an immediate need to access the DIP Facility at all, let alone on an emergency basis prior to the formation of any creditors' committee where the DIP Facility would provide the DIP Lenders a super- priority claim over any unsecured claims.

85.    Further, the insider nature of the transaction is not disclosed in the DIP Motion, and this raises questions about whether the Debtors have met the appropriate legal standard.

86.    Although courts in this Circuit will generally apply business judgment deference to requests for financing under section 364(c) from third-party lenders, where the lender is an "insider," a "proposed DIP transaction must therefore withstand entire fairness review—the most

17

onerous standard under Delaware law—which requires proof that the transaction was the product of both fair dealing and fair price." *In re SPAC Recovery Co.*, No. 25-12109 (JPM), 2026 WL 18778, at *7 (Bankr. S.D.N.Y. Jan. 2, 2026) (applying Delaware law) (internal citation omitted); *see also In re Los Angeles Dodgers LLC,* 457 B.R. 308, 313 (Bankr. D. Del. 2011).  That burden rests on both the Debtors and the DIP Lenders to demonstrate that the transaction as a whole is objectively fair on both procedural and substantive grounds.  *In re SPAC Recovery Co.*, 2026 WL 18778, at *7.

87.     In light of the insider nature of the transaction and the limited disclosure by the Debtors, the Debtors and the DIP Lenders should be required to meet their burden under this higher standard.  This is particularly true where the Debtors would seek to make monthly payments of $50,000 directly to an insider.

88.     In sum, for the foregoing reasons, this Court should not approve the DIP Motion at this time.  If the Debtors choose to submit a new motion on regular, not emergency notice, such motion should specifically address: (i) the Debtors' need for the DIP Facility at all and (ii) the Debtors' and the DIP Lenders' burdens under the appropriate legal standard.

## **RESERVATION OF RIGHTS**

89.     Secured Lender reserves and preserves any and all rights afforded to it, either at law or in equity, to: (a) enforce its rights and interests under the Loan Documents and Mezzanine Loan Documents, including, without limitation, the right to: (i) seek relief from the automatic stay with respect to the Collateral (as defined in the Loan Documents);[9] and (ii) take such other action as it may deem necessary and appropriate to preserve, protect, and enforce its rights against any of

---

[9]     Secured Lender expressly reserves and preserves all rights to seek relief from the automatic stay to enforce its rights and remedies under the Loan Documents or the Mezzanine Loan Documents.

the Debtors and/or the Debtors' bankruptcy estates; (b) supplement its objections to the Debtors'

proposed use of Cash Collateral and provision of adequate protection prior to any final hearing on

the Cash Collateral Motion; (c) supplement its objections to the Debtors' DIP Motion, the Cash

Collateral Motion and Budget prior to any final hearing on the DIP Motion or Cash Collateral

Motion; and/or (d) take such other action as it may deem necessary and appropriate, including, but

not limited to, seeking the dismissal and/or conversion of these cases and/or the appointment of a

chapter 11 trustee.

**CONCLUSION**

WHEREFORE, Secured Lender respectfully requests that this Court (a) condition any interim relief requested in the Cash Collateral Motion on the terms set forth herein, (b) deny the DIP Motion, and (c) grant such other relief as is necessary and proper.

Dated: March 12, 2026
   Wilmington, Delaware

Respectfully submitted,

*/s/ Lawrence J. Kotler*
Lawrence J. Kotler, Esq. (DE No. 4181)
Sommer L. Ross, Esq. (DE No. 4598)
DUANE MORRIS LLP
1201 North Market St, Suite 501
Wilmington, DE 19801
Telephone: (302) 657-4900
Email: LJKotler@duanemorris.com
   SLRoss@duanemorris.com

-and-

Meagen E. Leary, Esq. (admitted *pro hac vice*)
DUANE MORRIS LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA 94105-1127
Telephone: (415) 957-3230
Email: meleary@duanemorris.com

-and-

Brad Lenox, Esq. (admitted *pro hac vice*)
DUANE MORRIS LLP
22 Vanderbilt
335 Madison Avenue, 23rd Floor
New York, NY 10017-4669
Telephone: (212) 692-1094
Email: BLenox@duanemorris.com

*Attorneys for ACORE Capital Mortgage, LP, in its capacity as Administrative Agent of Delphi CRE Funding LLC*