**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| US MAGNESIUM LLC, | Case No. 25-11696 (BLS) |
| Debtor.[1] | **Hearing Date: October 6, 2025 at 11:00 am (ET)**<br>**Objection Deadline: September 29, 2025 at 4:00 pm (ET)** |

**DEBTOR'S MOTION FOR ENTRY OF**
**(I) AN ORDER (A) APPROVING BID PROCEDURES IN CONNECTION WITH THE**
**SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS,**
**(B) APPROVING THE FORM AND MANNER OF NOTICE THEREOF,**
**(C) SCHEDULING AN AUCTION AND SALE HEARING, (D) APPROVING**
**PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND**
**LEASES, AND (E) GRANTING RELATED RELIEF AND (II) AN ORDER**
**(A) APPROVING THE STALKING HORSE APA BETWEEN THE DEBTOR AND**
**THE STALKING HORSE BIDDER, (B) AUTHORIZING THE SALE TO THE**
**STALKING HORSE BIDDER OR THE SUCCESSFUL BIDDER OF SUBSTANTIALLY**
**ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS,**
**ENCUMBRANCES, AND INTERESTS, (C) AUTHORIZING THE ASSUMPTION**
**AND ASSIGNMENT OF CONTRACTS AND LEASES, AND**
**(D) GRANTING RELATED RELIEF**

The above-captioned debtor and debtor in possession, US Magnesium LLC (the "**Debtor**"), moves (the "**Motion**") this Court, pursuant to sections 105(a), 363, 365, and 503 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure (the "**Local Rules**"), for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Bid Procedures Order**"), (i)(a) approving the bid procedures attached as **Exhibit 1** to the Bid Procedures Order (the "**Bid Procedures**") in connection with the proposed sale of substantially all the Debtor's assets (the

---

[1] The last four digits of the Debtor's federal tax identification number are 5446. The Debtor's service address for the purpose of this chapter 11 case is: 238 N. 2200 W. Salt Lake City, UT 84116.

"**Sale**"), (i)(b) approving the form and manner of notice thereof; (i)(c) scheduling an auction (the "**Auction**") if the Debtor receives two or more timely and acceptable Qualified Bids (as defined below) and scheduling a hearing to consider approval of the Sale (the "**Sale Hearing**"), (i)(d) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts; and (i)(e) granting related relief; and, pursuant to Bankruptcy Code sections 105, 363, and 365 and Bankruptcy Rules 2002, 6004, and 6006, for entry of an order (ii)(a) approving the Stalking Horse APA (as defined below) between the Debtor and the Stalking Horse Bidder (as defined below), (ii)(b) authorizing the Sale to the Stalking Horse Bidder or the Successful Bidder, after the Auction, if necessary, free and clear of liens, claims, interests and encumbrances, (ii)(c) authorizing the assumption and assignment of certain executory contracts and unexpired leases to either the Stalking Horse Bidder or a Successful Bidder, and (ii)(d) granting related relief. In support of this Motion, the Debtor relies on and incorporates by reference the *Declaration of Ron Thayer in Support of First Day Motions* [D.I. No. 4] (the "**First Day Declaration**") and further represents as follows:

## Jurisdiction and Venue

1.      This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

### I.      Procedural Background

2.      On September 10, 2025 (the "**Petition Date**"), the Debtor commenced the above captioned case (the "**Chapter 11 Case**") by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is authorized to continue to operate its business and manage

2

its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The circumstances leading to the filing of this Chapter 11 Case is set forth in detail in the First Day Declaration.

3.      On September 12, 2025, this Court entered the *Interim Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing, and (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims; (II) Granting Adequate Protection; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (G) Granting Related Relief* [D.I. No. 32] (the "**Interim DIP Order**"), which authorized the Debtor to obtain post-petition financing ("**DIP Financing**") from Wells Fargo Bank, National Association ("**Wells Fargo**") pursuant to that certain Ratification and Amendment Agreement attached to the Interim DIP Order as Exhibit A (the "**DIP Agreement**"). The DIP Financing consists of two tranches of $5 million term loans-Tranche A DIP Term Loans and Tranche B DIP Term Loans (each as defined in the DIP Agreement). The Debtor's sole equity owner, the Renco Group, Inc. ("**Renco**"), holds a 100% participation interest in the Tranche B DIP Term Loans.

4.      The DIP Financing obtained under the DIP Agreement will provide the Debtor with sufficient liquidity to effectuate the process contemplated by this Motion for the going concern sale of all or substantially all of the Debtor's assets (the "**Sale Process**"), which the Debtor submits will best maximize the value of its bankruptcy estate for the benefit of all stakeholders.

## II.    General Background

### A.  General Background

5.      The Debtor operates a facility on the Great Salt Lake in Rowley, Utah, where historically the Debtor has produced primary magnesium and magnesium alloys, as well as other chemicals and mineral salts such as liquid chlorine, and lithium carbonate (the "**Facility**").  The

Debtor's current operations, for reasons described in the First Day Declaration, are limited to the production of dust suppressants, de-icing products, and raw sodium chloride. As of the Petition Date, the Debtor employed 22 (22) full-time and two (2) part-time employees.

6.      The Debtor operates its business pursuant to a certain Mineral Lease & Option Agreement with the State of Utah's Division of Forestry, Fire & State Lands (the "**State of Utah**"), originally executed by their respective predecessors-in-interest and which has been in place since 1961 (the "**Mineral Lease**"). Prior to the Petition Date, the State of Utah commenced informal adjudicative proceedings to terminate the Mineral Lease, which proceedings are now stayed by virtue of section 362(a) of the Bankruptcy Code. The Debtor seeks to assume and assign the Mineral Lease to the Successful Bidder (as defined in the Bid Procedures) in connection with the Sale Process.

7.      The Debtor is also subject to the Consent Decree (as defined in First Day Declaration) entered into with the United States on behalf of the Environmental Protection Agency ("**EPA**") which resolved heavily contested litigation over various alleged violations of the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901-6992k (the "RCRA") and the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9605 ("**CERCLA**"). The Consent Decree provides, among other things, for certain funds to be deposited into five special accounts (the "**Special Accounts**") to serve as financial assurances for the completion of work required under the Consent Decree, which funds can be used under certain circumstances to reimburse the Debtor for costs of completing work required under the Consent Decree. In connection with the Sale Process, the Stalking Horse Bidder (defined herein) seeks to assume the Debtor's rights and obligations under the Consent Decree, subject to its reaching agreement with the EPA on a reasonable and mutually acceptable plan for completing the work

required thereunder, as well as an agreement in respect of release of funds from the Special Accounts.

B.  Capital Structure

8.      The Debtor is indebted to Wells Fargo pursuant to that certain Loan and Security Agreement, dated June 24, 2002 (as recently amended by the DIP Agreement and, as may be further amended, supplemented, or otherwise modified from time to time, the ("**Prepetition Credit Agreement**"). As of September 9, 2025, the Debtor had approximately $67,171,885.28 million of total funded debt obligations under the Prepetition Credit Agreement, consisting of (i) $40,553,244.80 in principal and interest due under the revolving loans, (ii) $25,817,052.50 in principal and interest under a term loan tranche in which Renco holds a 100% participation interest ("**Term Loan C**"), and (iii) outstanding Letters of Credit in the amount of $821,588 (the "**Letters of Credit**"). Obligations under the Prepetition Credit Agreement are secured by substantially all of the Debtor's assets as more particularly described in the Interim DIP Order.

9.      The Debtor is also indebted to an affiliate of Renco—Renco Global Capital, Inc. ("**Renco Global**")—under that certain Subordinated Loan Agreement dated as of June 26, 2023 by and among the Debtor and Renco Global (as may be amended, supplemented or otherwise modified from time to time, the "**Renco Global Credit Agreement**"). As of the Petition Date, the Debtor has approximately $45 million of total funded debt obligations under the Renco Credit Agreement, which are secured by junior liens in favor of Renco Global in substantially all of the Debtor's assets.

10.     In addition to the foregoing, the Debtor is also indebted to Renco under that certain Subordinated Loan Agreement dated August 28, 2025 (as may be amended, supplemented, or modified from time to time, the "**Subordinated Loan Agreement**"). As of the Petition Date, the

Debtor has approximately $45 million of total funded debt obligations under the Subordinated Loan Agreement, which are secured by junior liens in favor of Renco in substantially all of the Debtor's assets.

C.   The Stalking Horse Bid

11.     The Debtor and LiMag Holdings, LLC, as purchaser (the "**Stalking Horse Bidder**") have entered into an Asset Purchase Agreement which is attached hereto as **Exhibit B** (the "**Stalking Horse APA**").  In the Stalking Horse APA, the Stalking Horse Bidder, which is an affiliate of the Renco Group, Inc., proposes to purchase substantially all of the Debtor's assets (the "**Assets**") for the following Purchase Price considerations (the "**Purchase Price**"):

  a.  a credit bid equal to the total aggregate amount due to Renco in respect of its 100% participation interests in the Term Loan C and the Trance B DIP Term Loans the "**Credit Bid**");

  b.  assumption of all of the Debtor's obligations under each of the Renco Global Credit Agreement and the Subordinated Loan Agreement;

  c.  assumption of all of the Debtor's obligations under the Prepetition Credit Agreement and DIP Agreement (other than in respect of Term Loan C and the Tranche B DIP Term Loans satisfied by the Credit Bid);

  d.  assumption of the Debtor's obligations under its defined benefit pension plan which it maintains subject to Title IV of the Employee Retirement Income Security Act of 1974 ("**ERISA**");

  e.  assumption of the Debtor's obligations under the Consent Decree, subject to agreement with the EPA as described in Paragraph 7 of this Motion;

f. certain Cash Consideration and Cure Costs (each as defined in the Stalking Horse APA), and the assumption of all other Assumed Liabilities as such term is defined in the Stalking Horse APA.

12. The Purchase Price will serve as a competitive baseline of recovery for the Debtor's stakeholders. The Debtor submits that the proposed Sale transaction with the Stalking Horse Bidder, if approved, will generate significant value for the Debtor's estate and, among other things, satisfy a meaningful portion of the prepetition claims against the Debtor and pave the way for the best outcome to this case.

13. The Debtor now seeks authority to market test the transactions contemplated by the Stalking Horse APA (the "**Stalking Horse Bid**") to ensure that the Debtor obtains the highest or otherwise best offer for the Debtor's assets. If approved, the bid procedures (attached as Exhibit 1 to the Bid Procedures Order (the "**Bid Procedures**") will enable the Debtor to move expeditiously towards the best resolution of this case. The Debtor's Independent Manager, in consultation with the Debtor's proposed Chief Restructuring Officer and proposed Investment Banker, has likewise reviewed the terms and conditions of the Stalking Horse APA and concurs with the Debtor that the Sale, the Stalking Horse APA, the Bid Procedures, and the related relief requested in this Motion are in the best interests of the Debtor's estate and its stakeholders. Accordingly, the Debtor requests that the Court grant this Motion.

## Relief Requested

14. By this Motion, the Debtor requests, pursuant to Bankruptcy Code sections 105, 363, 365 and 503 and Bankruptcy Rules 2002, 6004, 6006, 9006, 9007 and 9014, the entry of (A) an order (i) establishing bid procedures for the Sale of the Assets, (ii) establishing procedures relating to the assumption and assignment of executory contracts and unexpired leases, (iii)

approving the form and manner of sale, cure, and other related notices, and (iv) scheduling the

Auction (if necessary) and Sale Hearing; and (B) an order (i) approving the Sale of the Assets free

and clear of all liens, claims, encumbrances and interests; (ii) approving the assumption and

assignment of certain executory contracts and unexpired leases to the Successful Bidder; and (iii)

granting related relief.

15.     The Debtor seeks entry of the Bid Procedures Order:

(a)     authorizing and approving the Bid Procedures attached to the Bid Procedures Order as <u>Exhibit 1</u> in connection with the sale of substantially all of the Debtor's Assets;

(b)     approving the form and manner of notice of an Auction and Sale Hearing with respect to the Sale, attached as <u>Exhibit 2</u> to the Bid Procedures Order (the "**Sale Notice**");

(c)     scheduling the Auction and Sale Hearing;

(d)     approving procedures for the assumption and assignment of executory contracts and unexpired leases (collectively, the "**Contracts**") in connection with the Sale; and

(e)     granting related relief.

16.     In addition, the Debtor will seek entry of the Sale Order at the conclusion of the

Sale Hearing:

(a)     authorizing and approving the Sale of the Assets to the Successful Bidder (as defined in the Bid Procedures) on the terms substantially set forth in the Successful Bid;

(b)     authorizing and approving the Sale free and clear of liens, claims, encumbrances, and other interests to the extent set forth in the Successful Bid;

(c)     authorizing the assumption and assignment of certain Contracts as provided therein and/or in the Stalking Horse APA (collectively, the "**Assumed Contracts**"); and

(d)     granting any related relief.

17.     The Debtor reserves the right to file and serve any supplemental pleading or

declaration that the Debtor deems appropriate or necessary in its reasonable business judgment,

including any pleading summarizing the competitive bidding and sale process and the results

thereof, in support of its request for entry of the Sale Order before the Sale Hearing.

**The Proposed Sale**

**I.      The Proposed Stalking Horse APA and Contemplated Section 363 Sale.**

18.      The Debtor entered into arm's-length negotiations with the Stalking Horse Bidder to finalize the mutual and agreeable terms of the Stalking Horse Bid for the Sale.  The Debtor believes a prompt Sale of the Assets represents the best alternative available for all stakeholders in this case.  Moreover, it is critical for the Debtor to execute on its proposed Sale within the timeframe contemplated by the Stalking Horse APA and DIP Order.  Under the DIP Order, the Debtor is required to obtain entry of the Sale Order no later than sixty (60) days after the Petition Date.

19.      The Debtor requests that the Court approve the following general timeline:

(a) *Contract Cure Objection Deadline*: 4:00 p.m. (ET) seven (7) calendar days from service of the Contract Notice (as defined below), as the deadline to object to the cure amounts listed in the Contract Notice (any such objection, a "**Cure Objection**");

(b) *Bid Deadline*: <u>**October 24, 2025 at 12:00 p.m. (ET)**</u> as the deadline by which bids for the Assets (as well as the deposit and all other documentation required under the Bid Procedures for Qualified Bidders (as defined in the Bid Procedures)) must be actually received (the "**Bid Deadline**");

(c) *Auction*: <u>**October, 31, 2025, at 10:00 a.m. (ET)**</u>, as the date and time the Auction, if needed, will be held at the offices of Gellert Seitz Busenkell & Brown, LLC, 1201 N. Orange St., 3rd Floor, Wilmington, DE 19801;

(d) *Sale Objection/Assumption and Assignment Objection Deadline*: <u>**October 24, 2025 at 4:00 p.m. (ET)**</u> as the deadline to object to the Sale or to object to the assumption and assignment of Contracts in connection with the Sale (other than Cure Objections);

(e) *Sale Hearing*: on or before <u>**November 7, 2025, at T.B.D.**</u>, as the date and time for the Sale Hearing.

20.      The Debtor believes that this timeline maximizes the prospect of receiving a higher or otherwise better offer without unduly prejudicing this estate.  To further ensure that the Debtor's proposed Auction and Sale process maximizes value to the benefit of the Debtor's estate, the Debtor will use the time following entry of the Bid Procedures Order to actively market the Assets

in an attempt to solicit higher or otherwise better bids.  The Debtor believes the relief requested by this Motion is in the best interests of its creditors, its other stakeholders, and all other parties in interest, and should be approved.

## II.  Material Terms of the Stalking Horse APA.

21.    The following chart summarizes the terms and conditions of the Stalking Horse APA (attached hereto as **Exhibit B**) and discloses certain information:[2]

| Stalking Horse APA Provision | Summary Description |
| --- | --- |
| **Parties** | **Sellers:**  US Magnesium LLC<br><br>**Buyer:**  LiMag Holdings LLC |
| **Purchase Price**<br><br>**Local Bankr. R. 6004-1(b)(iv)(N)** | Purchase Price consists of<br><br>(i)    the Credit Bid;<br>(ii)   assumption of all obligations owed under the Prepetition Credit Agreement (other than those satisfied in the Credit Bid);<br>(iii)  assumption of all obligations owed under the Renco Global Credit Agreement and Subordinated Loan Agreement;<br>(iv)   Cure Costs, Cash Consideration and assumption of Assumed Liabilities |
| **Stalking Horse Protections**<br><br>**Local Bankr. R. 6004-1(c)(i)(C)** | None |
| **Purchased Assets** | As set forth in section 2.1 of the Stalking Horse APA |
| **Assumed Liabilities** | As set forth in section 2.3 of the Stalking Horse APA |
| **Assumed Contracts** | As set forth in section 2.1(f) of the Stalking Horse APA |
| **Excluded Assets** | As set forth in section 2.2 of the Stalking Horse APA |

[2] This summary is provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Stalking Horse APA, the Stalking Horse APA shall govern in all respects.  Capitalized terms used in the following summary shall have the meanings ascribed to them in the Stalking Horse APA.  All references to schedules or sections in the summary shall refer to schedules or sections of the Stalking Horse APA.

| | |
|---|---|
| **Representations and Warranties** | As set forth in Articles III and IV of the Stalking Horse APA |
| **Agreements with Management**<br><br>**Local Bankr. R. 6004-1(b)(iv)(D)** | None |
| **Releases**<br><br>**Local Bankr. R. 6004-1(b)(iv)(C)** | The Stalking Horse Bidder will acquire the Assigned Actions pursuant to section 2.1(j) of the Stalking Horse ALA and the Claims and Actions against Renco and/or its Affiliates pursuant to section 2.1(aa) of the Stalking Horse APA |
| **Private Sale/No Competitive Bidding**<br><br>**Local Bankr. R. 6004-1(b)(iv)(D)** | Not Applicable |
| **Closing and Other Deadlines**<br><br>**Local Bankr. R. 6004-1(b)(iv)(E)** | • Auction: on or before 55 days after the Petition Date (section 8.1(j)(i)<br>• Sale Hearing: on or before 60 days after the Petition Date (section 8.1(j)(iii))<br>• Closing: on or before 90 days after the Petition Date (section 8.1(b)) |
| **Interim Arrangements with Proposed Buyer**<br><br>**Local Bankr. R. 6004-1(b)(iv)(G)** | None |
| **Use of Proceeds**<br><br>**Local Bankr. R. 6004-1(b)(iv)(H)** | Application to outstanding indebtedness |
| **Tax Exemption**<br><br>**Local Bankr. R. 6004-1(b)(iv)(I)** | Not applicable |
| **Records Retention**<br><br>**Local Bankr. R. 6004-1(b)(iv)(J)** | As set forth in section 2.2 of the Stalking Horse APA |
| **Sale of Avoidance Actions**<br><br>**Local Bankr. R. 6004-1(b)(iv)(K)** | Avoidance Actions (other than those against Renco and/or its Affiliates) are Excluded Assets under the Stalking Horse APA |

| | |
|---|---|
| **Requested Findings as to Successor Liability**<br><br>**Local Bankr. R. 6004-1(b)(iv)(L)** | As set forth in section 5.10 of the Stalking Horse APA |
| **Executory Contracts and Unexpired Leases**<br><br>**Local Bankr. R. 6004-1(b)(iv)(M)** | As set forth in Schedule 2.1(f) of the Stalking Horse APA |
| **Credit Bid**<br><br>**Local Bankr. R. 6004-1(b)(iv)(N)** | The Purchase Price will include the Credit Bid as set forth in Paragraph 11 herein |
| **Relief from Bankruptcy Rule 6004(h)**<br><br>**Local Bankr. R. 6004-1(b)(iv)(O)** | Pursuant to this Motion, the Debtor is seeking relief from Bankruptcy Rule 6004(h) in order to comply with its obligations under the Interim DIP Order to Close within five (5) days of entry of the Sale Order |

### The Bid Procedures Order

**I.    The Bid Procedures.**

22.    To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Debtor has developed and proposed the Bid Procedures, attached as <u>Exhibit 1</u> to the Bid Procedures Order.  The following describes the salient points of the Bid Procedures and discloses certain information:[3]

- **Bid Requirements.**  To be considered a Qualified Bid, each Bid must be submitted in writing and determined by the Debtor, in its reasonable business judgment, to have satisfied the following requirements (as further stated in the Bid Procedures):

    *Assets and Purchase Price*:  Each Bid must be a bid to purchase all substantially all of the Assets, or, if such Bid is for a subset of the Assets, the Bid must specifically identify the Assets being purchased in the Bid. Each Bid must clearly state which liabilities of the Debtor will be assumed and must clearly set forth the Purchase Price to be paid, including and identifying separately any cash and non-cash components.

---

[3] This summary is qualified in its entirety by the Bid Procedures attached as <u>Exhibit 1</u> to the Bid Procedures Order. All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings in the Bid Procedures. To the extent there are any conflicts between this summary and the Bid Procedures, the terms of the Bid Procedures shall govern.

***Deposit***:  Each Bid, other than the Stalking Horse Bid, must be accompanied by a cash deposit in an amount equal to ten percent (10%) of the aggregate cash purchase price of the Bid to be held in an interest-bearing escrow account to be identified and established by the Debtor (the "**Deposit**").  Any party submitting a credit bid shall not be required to post a Deposit in connection with such credit bid.

***Minimum Bid***:  The aggregate cash consideration proposed by each Bid must equal to, or exceed, the sum of (i) the Purchase Price set forth in the Stalking Horse Bid; plus (ii) the Overbid Increment.

***The Same or Better Terms***: Except as otherwise provided herein each Bid must, in the Debtor's business judgment and in consultation with (a) Wells Fargo, in its capacity as DIP Lender, and (b) the representatives of any duly appointed committee of unsecured creditors ("**Committee Representatives**", and collectively with Wells Fargo, the "**Consultation Parties**") be on terms that are the same as or better than the terms of the Stalking Horse APA.  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid (the "**Bid Documents**"), which shall include either: (i) a schedule of Assumed Contracts (pursuant to the Stalking Horse APA) to the extent applicable to the Bid, and a copy of the Stalking Horse APA clearly marked to show all changes requested by the bidder (including those related to the Purchase Price and Assets to be acquired by such bidder), as well as all other material documents integral to such Bid.  The Debtor may consider multiple Bids, which in the aggregate, are the same as or better than the terms of the Stalking Horse Bid.

***Sources of Financing***: The Bid must indicate the source of cash consideration, including proposed funding commitments and confirm that such consideration is not subject to any contingencies. The Bid should include a detailed sources and uses schedule.

***Structure***: The Bid must identify the structure proposed for undertaking the Sale, including the specific Assets of the Debtor, the proposed steps to accomplish such acquisition, and any financial, legal, or tax considerations upon which the Bid's proposed structure replies.

***Tax Structure***: The Bid must specify with particularity its tax structure, including whether it is intended to be structured in a tax-free manner or if any incremental tax liabilities will be incurred by the Debtor under the Bid.

***Assumption***: The Bid must specify which, if any, of the obligations of the Debtor the bidder proposes to assume. For the avoidance of doubt, any assumption of indebtedness owed under the Pre-Petition Credit Agreement, the DIP Agreement, the Renco Global Credit Agreement, or the Subordinated Loan Agreement may be assumed only with the express written consent of the respective lenders thereunder.

- **Bid Deadline.** Each Bid must be transmitted via email (in .pdf or similar format) or other means so as to be ***actually received*** by the Debtor, counsel to the Debtor, the Consultation

Parties, the Stalking Horse Bidder, and counsel to the Stalking Horse Bidder on or before the Bid Deadline.

- **Right to Credit Bid.** At the Auction, the Stalking Horse Bidder shall have the right to credit bid the Credit Bid Amount as defined in the Stalking Horse APA. The Stalking Horse Bidder may, but shall not be required to, notify the Debtor prior to the Bid Deadline of its intent to credit bid at the Auction, and the Debtor shall take such notice into account before seeking to cancel the Auction. Any credit bid made by a Successful Bidder (other than the Stalking Horse Bidder) must include a cash component (or otherwise provide for cash) sufficient to pay any senior liens on the collateral that is subject to the credit bid.

- **The Auction.** If the Debtor does not receive a Qualified Bid (other than the Stalking Horse Bid), the Debtor, in consultation with the Consultation Parties, will not conduct the Auction and shall designate the Stalking Horse Bidder's Qualified Bid as the Successful Bid (as defined in the Bid Procedures).

- **Bidding Increments.** The Debtor will announce at the outset of the Auction the minimum required increments for Incremental Overbids. The Debtor may, in its discretion, announce increases or reductions to Incremental Overbids at any time during the Auction.

- **Back-Up Bidder.** Notwithstanding anything in the Bid Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid at the Auction for the Assets, as determined by the Debtor in the exercise of its reasonable business judgment, shall be required to serve as a back-up bidder (the "**Back-Up Bidder**"), and each Qualified Bidder shall agree and be deemed to agree to be the Back-Up Bidder if so designated by the Debtor (the "**Back-Up Bid**").

- **Highest or Otherwise Best Bid.** When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtor, in consultation with the Consultation Parties, may consider the following factors in addition to any other factors that the Debtor and the Consultation Parties deem appropriate: (i) the number, type, and nature of any changes to the Stalking Horse APA requested by the Qualified Bidder, including the type and amount of Assets sought and obligations to be assumed in the Bid; (ii) the amount and nature of the total consideration; (iii) the likelihood of the Bidder's ability to close a transaction and the timing thereof; (iv) the net economic effect of any changes to the value to be received by the Debtor's estate from the transaction contemplated by the Bid Documents; (v) the timing of each Qualified Bidder's proposed closing; and (vi) the tax consequences of each Qualified Bid. For the avoidance of doubt, the Debtor may consider multiple Bids which, in the aggregate, would constitute the highest or otherwise best Qualified Bid.

- **Reservation of Rights.** The Debtor reserves its rights to modify the Bid Procedures (after consultation with the Consultation Parties) in its reasonable business judgment in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Assets, including cancelling the Auction or the Sale.

23.     Importantly, the Bid Procedures recognize the Debtor's fiduciary obligations to maximize sale value, and, as such, do not impair the Debtor's ability to consider all Qualified Bid proposals (after consultation with the Consultation Parties), and, as noted, preserve the Debtor's right to modify the Bid Procedures (after consultation with the Consultation Parties) as necessary or appropriate to maximize value for the Debtor's estate.

**II.     Form and Manner of Sale Notice.**

24.     On or within three (3) calendar days after entry of the Bid Procedures Order, the Debtor will cause the Sale Notice to be served on the following parties or its respective counsel, if known: (a) the United States Trustee for the District of Delaware (the "**U.S. Trustee**"); (b) counsel to any statutorily appointed committee; (c) counsel to the Stalking Horse Bidder; (d) counterparties to the Contracts (the "**Contract Counterparties**"); (e) all parties who have expressed a written interest in some or all of the Assets; (f) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or interest in the Assets; (g) the Internal Revenue Service; (h) all applicable state and local taxing authorities; (i) all the Debtor's other creditors; (j) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; and (k) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.

25.     The Debtor submits that the Sale Notice is reasonably calculated to  provide all interested parties with timely and proper notice of the proposed Sale, including: (a) the date, time, and place of the Auction (if one is held); (b) the Bid Procedures; (c) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing; (d) a reasonably specific identification of the Assets; (e) instructions for promptly obtaining a copy of the Stalking Horse APA; (f) a description of the Sale as being free and clear of liens, claims,

interests, and other encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the Sale proceeds; and (g) notice of the proposed assumption and assignment of the Contracts to the Stalking Horse Bidder pursuant to the Stalking Horse APA (or to another Successful Bidder arising from the Auction, if any).[4]

26. The Debtor further submits that notice of this Motion and the related hearing to consider entry of the Bid Procedures Order, coupled with service of the Sale Notice, the Contract Notice, and the Assumption Notice as provided for herein, constitutes good and adequate notice of the Sale in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. The Debtor proposes that no other or further notice of the Sale shall be required. Accordingly, the Debtor requests that this Court approve the form and manner of the Sale Notice.

**III.    Summary of the Assumption Procedures.**

27. The Debtor is also seeking approval of certain procedures to facilitate the fair and orderly assumption and assignment of the Contracts in connection with the Sale (the "**Assumption Procedures**"). Because the Bid Procedures Order sets forth the Assumption Procedures in detail, they are not restated in this Motion. Generally, however, the Assumption Procedures: (a) outline the process by which the Debtor will serve notice to all Contract Counterparties regarding the proposed assumption and assignment and related cure amounts, if any, informing such parties of its right and the procedures to object thereto; and (b) establish objection and other relevant deadlines and the manner for resolving disputes relating to the assumption and assignment of the Contracts to the extent necessary. The Successful Bidder will retain the absolute right to designate

---

[4] Pursuant to the Bid Procedures Order, notice of the proposed assumption and assignment of the Contracts to the Stalking Horse Bidder pursuant to the Stalking Horse APA (or to another Successful Bidder arising from the Auction, if any), the proposed cure amounts, and the right, procedures, and deadlines for objecting, will be provided in a separate notice, attached to the Bid Procedures Order as <u>Exhibit 3</u> (the "**Assumption Notice**") to be sent to the applicable Contract Counterparties.

which Contracts it will assume, with the remaining Contracts likely to be rejected by the Debtor pursuant to separate motion.

**Basis for Relief**

I.  **The Relief Sought in the Bid Procedures Order Is in the Best Interests of the Debtor's Estate and Should Be Approved.**

28.     Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets.  See In re Schipper, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'"); In re Martin, 91 F.3d 389, 395 (3d Cir. 1996); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999); In re Integrated Res., Inc., 147 B.R. 650, 656–7 (S.D.N.Y. 1992) (noting that bidding procedures that have been negotiated by a trustee are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

29.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  See In re Edwards, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); see also Food Barn Stores, Inc., 107 F.3d at 564–65 (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); Integrated Res., 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.").

30.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions.  See Integrated Res., 147

17

B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); In re Fin. News Network, Inc., 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estate"); In re 995 Fifth Ave. Assoc., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (holding that the business judgment standard protects break-up fees and other provisions negotiated in good faith).

31.     At the same time, the Bid Procedures provide the Debtor with a robust opportunity to consider competing bids and select the highest or otherwise best offer for the completion of the Sale.  Entering into the Stalking Horse APA with the Stalking Horse Bidder ensures that the Debtor obtains fair market value by setting a minimum purchase price for the Assets that will be tested in the marketplace.  As such, creditors of the Debtor's estate can be assured that the consideration obtained will be fair and reasonable and at or above market.

32.     The Debtor submits that the proposed Bid Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with other procedures utilized in other cases.  See Burtch v. Ganz (In re Mushroom Transp. Co.), 382 F.3d 325, 339 (3d Cir. 2004) (finding that a debtor had a fiduciary duty to maximize and protect the value of the estate's assets); Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (recognizing that a main goal of any proposed sale of property of a debtor's estate is to maximize value).  Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing the value of a debtor's estate. See Calpine Corp. v. O'Brien Env't Energy, Inc. (In re O'Brien Env't Energy,

Inc.), 181 F.3d 527, 536-37 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); Off. Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing the benefit of sale procedures that "encourage bidding and . . . maximize the value of the debtor's assets").

## II.     The Form and Manner of the Sale Notice Should Be Approved.

33.     Pursuant to Bankruptcy Rule 2002(a), the Debtor is required to provide creditors with 21 days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein.

34.     As noted above, within three (3) calendar days of entry of the Bid Procedures Order, the Debtor will serve the Sale Notice upon the following parties or its respective counsel, if known: (a) the U.S. Trustee; (b) any statutorily appointed committee; (c) the Stalking Horse Bidder; (d) the Contract Counterparties; (e) all parties who have expressed a written interest in some or all of the Assets; (f) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or other interest in the Assets; (g) the Internal Revenue Service; (h) all applicable state and local taxing authorities; (i) all the Debtor's other creditors; (j) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002.

35.     The Debtor submits that notice of this Motion and the related hearing to consider entry of the Bid Procedures Order, coupled with service of the Sale Notice, the Contract Notice, and the Assumption Notice constitutes good and adequate notice of the Sale in compliance with,

and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  Accordingly, the Debtor

requests that this Court approve the form and manner of the Sale Notice.

### III.    The Assumption Procedures Are Appropriate and Should Be Approved.

36.    As set forth above, the Sale contemplates the assumption and assignment of the

Contracts to the Stalking Horse Bidder or Successful Bidder arising from the Auction, if any.  In

connection with this process, the Debtor believes it is necessary to establish a process by which:

(a) the Debtor and Contract Counterparties can reconcile cure obligations, if any, in accordance

with section 365 of the Bankruptcy Code; and (b) such counterparties can object to the assumption

and assignment of the Contracts and/or related cure amounts (the "**Assumption Procedures**").

37.    As set forth in the Bid Procedures Order, the Debtor also requests that any party

that fails to object to the proposed assumption and assignment of any Contract be deemed to

consent to the assumption and assignment of the applicable Contract pursuant to section 365 of

the Bankruptcy Code on the terms set forth in the Sale Order, along with the cure amounts

identified in the Contract Notice.  See In re Tabone, Inc., 175 B.R. 855, 858 (Bankr. D.N.J. 1994)

(by not objecting to sale motion, creditor deemed to consent); In re Gabel, 61 B.R. 661, 667 (Bankr.

W.D. La. 1985) (same).

38.    The Debtor believes that the Assumption Procedures are fair and reasonable,

provide sufficient notice to the Contract Counterparties, and provide certainty to all parties in

interest regarding its obligations and rights in respect thereof.  Accordingly, the Debtor requests

the Court approve the Assumption Procedures set forth in the Bid Procedures Order.

39.    Even though not all Contracts are sought to be assumed by the Stalking Horse

Bidder, the Debtor is, pursuant to the Assumption Procedures, preparing for a potential Successful

Bidder to assume all Contracts at its discretion.  The ultimate selection of the Contracts will be

determined by the Successful Bidder and any listing of any Contract as assumed on any list or for purposes of determining any cure amount is not final until so assumed by the Successful Bidder pursuant to the Assumption Procedures.  The Debtor reserves any and all rights with respect to Contracts not so assumed and assigned pursuant to the Assumption Procedures, and may reject those Contracts or leases subject to further order of this Court.

## IV.     The Sale Should Be Approved as an Exercise of Sound Business Judgment.

40.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  A sale of the debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction. See Martin, 91 F.3d at 395 ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); Schipper, 933 F.2d at 515; In re Lionel Corp., 722 F.2d 1063, 1070 (2d Cir. 1983); In re Telesphere Commc's, Inc., 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999).

41.     Once the debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company." In re S.N.A. Nut Co., 186 B.R. 98, 102 (Bankr. N.D. Ill 1995); see In re Filene's Basement, LLC, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate."); Integrated Res., 147 B.R. at 656; In re Johns-Manville Corp., 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

### a. A Sound Business Purpose Exists for the Sale.

42.      As set forth above, the Debtor has a sound business justification for selling the Assets.  First, the Debtor believes the Sale will maximize the Assets' going-concern value by allowing a party to bid on business assets that would have substantially less value on a stand-alone basis.  Moreover, cure payments required in connection with assumption of the Assumed Contracts under the Stalking Horse APA will result in payment in full for a number of the Debtor's creditors.

43.      Second, the sale of the Assets will be subject to competing bids, enhancing the Debtor's ability to receive the highest or otherwise best value for the Assets.  Consequently, the ultimately successful bid, after being subject to a "market check" in the form of the Auction, will constitute, in the Debtor's reasonable business judgment, the highest or otherwise best offer for the Assets and will provide a greater recovery for its estate than any known or practicably available alternative.  See, e.g., In re Trans World Airlines, Inc., No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (stating, while a "section 363(b) sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

44.      Thus, the Debtor submits that the Successful Bidder's Purchase Agreement (a "**Purchase Agreement**") will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative.  As such, the Debtor's determination to sell the Assets through an Auction process and subsequently to enter into the Successful Bidder's Purchase Agreement will be a valid and sound exercise of the Debtor's business judgment.  The Debtor will submit evidence at the Sale Hearing to support these conclusions.  Therefore, the Debtor requests that the Court make a finding that the

proposed sale of the Assets is a proper exercise of the Debtor's business judgment and is rightly authorized.

### b. Adequate and Reasonable Notice of the Sale Will Be Provided.

45.     As described above, the Sale Notice: (a) will be served in a manner that provides at least 21 days' notice of the deadline for objecting to the Sale and the date, time, and location of the Sale Hearing; (b) informs parties in interest of the deadlines for objecting to the Sale or the assumption and assignment of the Contracts; and (c) otherwise includes all information relevant to parties interested in or affected by the Sale.  Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bid Procedures Order after notice and a hearing before it is served on parties in interest.

### c. The Sale and Purchase Price Reflects a Fair Value Transaction.

46.     It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market.  See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 457 (1999); Trans World Airlines, 2001 WL 1820326, *4 (stating, while a "section 363(b) sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

47.     Moreover, as noted above, even as the Debtor moves forward with the Sale, the Debtor will continue to market the Assets and solicit other offers consistent with the Bid Procedures, including, for example, by contacting previously solicited parties, continuing to provide acceptable bidders with access to requested information, considering a variety of alternative transaction structures, and otherwise assisting the Debtor with all efforts to increase

transaction value.  In this way, the number of bidders that are eligible to participate in a competitive

Auction process will be maximized, or, if no Auction is held because no Auction is necessary, the

Stalking Horse APA's purchase price will, conclusively, be fair value.

      **d.  The Sale Has Been Proposed in Good Faith and Without Collusion, and the Stalking Horse Bidder or Successful Bidder Is a "Good-Faith Purchaser."**

48.     The Debtor requests that the Court find the Stalking Horse Bidder and/or other

Successful Bidder arising from the Auction, if any, are entitled to the benefits and protections

provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Assets.

49.     Section 363(m) of the Bankruptcy Code provides:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

50.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold

pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the

purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser

leased or purchased the assets in "good faith."  While the Bankruptcy Code does not define "good

faith," courts have held that a purchaser shows its good faith through the integrity of its conduct

during the course of the sale proceedings, finding that where there is a lack of such integrity, a

good-faith finding may not be made. See In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 147 (3d

Cir. 1986) ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial

sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an

attempt to take grossly unfair advantage of other bidders."); In re Andy Frain Srvs., Inc., 798 F.2d

1113 (7th Cir. 1986) (same); In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988) (same);

In re Andy Frain Services, Inc., 798 F.2d 1113 (7th Cir. 1986); See In re Trism, 328 F.3d 1003, 1006 (8th Cir. 2003).

51.     The Debtor submits that the Stalking Horse Bidder, or any other Successful Bidder arising from the Auction, is or will be "good faith purchasers" within the meaning of section 363(m) of the Bankruptcy Code, and the Stalking Horse APA, or any marked versions thereof, are or would be good-faith agreements on arms'-length terms entitled to the protections of section 363(m) of the Bankruptcy Code.[5]  First, as set forth in more detail above, the consideration to be received by the Debtor pursuant to the Stalking Horse APA is substantial, fair, and reasonable. Second, the parties entered into the Stalking Horse APA in good faith and after extensive, arm's-length negotiations, during which all parties were represented by competent counsel, and any sale agreement with a Successful Bidder will be the culmination of a competitive Auction process in which all parties will presumably be represented by counsel and all negotiations will be conducted on an arm's-length, good-faith basis.  Third, there is no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Sale or Stalking Horse APA to be avoided under section 363(n) of the Bankruptcy Code.  And, with respect to potential bidders, the Bid Procedures are designed to ensure that no party is able to exert undue influence over the process.  Finally, the Stalking Horse Bidder's offer was evaluated and approved by the Debtor in consultation with its advisors, and any other bids that the Debtor ultimately determines to be a

---

[5] The Debtor believes that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code will be appropriate for any Successful Bidder arising from the Auction.  Pursuant to the Bid Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bid Procedures.  In addition, the Debtor will not choose, after consultation with the Consultation Parties, as the Successful Bidder or Back-Up Bidder (as defined in the Bid Procedures) any entity whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted, and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

Successful Bid will have been evaluated in a similar fashion.  Accordingly, the Debtor believes that the Stalking Horse Bidder (or other Successful Bidder arising from the Auction, if any) and Stalking Horse APA (or marked version thereof) should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

### e.    The Sale Should be Approved "Free and Clear" Under Section 363(f).

52.    Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  See 11 U.S.C. § 363(f). Section 363(f) is supplemented by section 105(a) of the Bankruptcy Code, which provides that '[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. §105(a).

53.    Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Debtor's sale of the Assets free and clear of all interests (i.e., all liens, claims, rights, interests, charges, or encumbrances), except with respect to any interests that may be assumed liabilities under the applicable Purchase Agreement. See In re Kellstrom Indus., Inc., 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

54.    The Debtor submits that one or more of the conditions set forth in section 363(f) of the Bankruptcy Code will be satisfied in respect of the Sale. Section 362(f)(2) will be satisfied because each of the parties holding lines on the Assets will consent, or absent any objection to the

Sale, will be deemed to have consented to the Sale. Any lien interest will also be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Sale, subject to any claims and defenses the Debtor may possess.  The Debtor accordingly requests authority to convey the Assets to the Stalking Horse Bidder or other Successful Bidder arising from the Auction, if any, free and clear of all liens, claims, rights, interests, charges, and encumbrances, with any such liens, claims, rights, interests, charges, and encumbrances to attach to the proceeds of the Sale.

     **f.   Credit Bidding Should Be Authorized Under Section 363(k) of the Bankruptcy Code.**

55.    A secured creditor is allowed to "credit bid" the amount of its claim in a sale. Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property."  11 U.S.C. § 363(k).  Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the claim's economic value.  See In re Submicron Sys. Corp., 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining that "[i]t is well settled among district court and bankruptcy courts that creditors can bid the full face value of its secured claims under section 363(k)").

56.    Absent cause for restricting credit bidding, courts have consistently ruled in favor of reserving a secured creditor's right to credit bid its claim.  See Source Home Entm't, LLC, No. 14-11553 (Bankr. D. Del. July 21, 2014) (order approving bid procedures which authorized parties with secured claims to credit bid); In re PTC Alliance Corp., No. 09-13395 (Bankr. D. Del. Nov. 6, 2009) (order authorizing, but not directing, the administrative DIP Lender to credit bid).

57.      The Stalking Horse Bidder is a wholly owned subsidiary of the Renco Group, Inc. and formed for the purposes of undertaking the Sale pursuant to the Stalking Horse APA, which contemplates, with the consent of Wells Fargo, the Credit Bid. Accordingly, the Stalking Horse Bidder should be entitled to credit bid the full Credit Bid Amount for the Assets, including at the Auction as set forth in the Bid Procedures. The Debtor submits that Wells Fargo should likewise be afforded all rights under section 363(k) of the Bankruptcy Code to credit bid obligations owed to it under the Prepetition Credit Agreement or DIP Agreement.

**V.      The Assumption and Assignment of the Contracts Should Be Approved.**

   **a.   The Assumption and Assignment of the Contracts Reflects the Debtor's Reasonable Business Judgment.**

58.      To facilitate and effectuate the sale of the Assets, the Debtor is seeking authority to assign or transfer the Contracts to the Stalking Horse Bidder or other Successful Bidder arising from the Auction, if any, to the extent required by such bidders.

59.      Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  The Debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment.  See Grp. of Institutional Invs. v. Chicago, Milwaukee, St. Paul & Pac. Ry. Co., 318 U.S. 523 (1943) (applying Bankr. Act section 77(b), predecessor to Bankruptcy Code section 365, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 40 (3d Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider

whether to reject or assume executory contracts under the Code."); In re Network Access Solutions, Corp., 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard").

60.    Here, the Court should approve the decision to assume and assign the Assumed Contracts in connection with the Sale as a sound exercise of the Debtor's business judgment.  First, the Assumed Contracts are necessary to operate the Assets and, as such, they are essential to inducing the best offer for the Assets.  Second, it is unlikely that any purchaser would want to acquire the Assets unless a significant number of the contracts and leases needed to manage the day-to-day operations were included in the transaction.  Third, the Stalking Horse APA provides that the assumption and assignment of the Assumed Contracts is integral to, and inextricably integrated in, the Sale.  Finally, the Assumed Contracts will be assumed and assigned through the process approved by the Court pursuant to the Bid Procedures Order and, thus, will be reviewed by key constituents in this Chapter 11 Case.

61.    Accordingly, the Debtor submits that the assumption and assignment of the Assumed Contracts by way of the Assumption Procedures should be approved as an exercise of its business judgment.

### b.    Defaults Under the Assumed Contracts Will Be Cured Through the Sale.

62.    Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition

defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder.  This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain."  In re Luce Indus., Inc., 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

63.     The Debtor submits that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be promptly satisfied because the Stalking Horse APA requires that all defaults associated with, or that are required to properly assume, the Assumed Contracts be cured and paid by the the Stalking Horse Bidder as promptly as practicable after the Closing Date.  See Stalking Horse APA § 2.5(b).  Because the Bid Procedures Order (once approved) provides a clear process by which to resolve disputes over cure amounts or other defaults, the Debtor is confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-debtor parties.

### c. Non-Debtor Parties Will Be Adequately Assured of Future Performance.

64.     Similarly, the Debtor submits that the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here.  "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case."  In re U.L. Radio Corp., 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982).  Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance."  In re Prime Motor Inns, Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in

managing the type of enterprise or property assigned.  See In re Bygaph, Inc., 56 B.R. 596, 605−06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

65.     The Debtor believes that it can and will demonstrate that the requirements for assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder (or other Successful Bidder arising from the Auction, if any) will be satisfied.  As required by the Bid Procedures, the Debtor will evaluate the financial wherewithal of potential bidders before designating such party a Qualified Bidder (e.g., financial credibility, willingness, and ability of the interested party to perform under the Assumed Contracts) and will demonstrate such financial wherewithal, willingness, and ability to perform under the Assumed Contracts assigned to the Stalking Horse Bidder or any Successful Bidder arising from the Auction.  Further, the Assumption Procedures provide the Court and other interested parties with ample opportunity to evaluate and, if necessary, challenge the ability of the Stalking Horse Bidder or any Successful Bidder arising from the Auction to provide adequate assurance of future performance and object to the assumption of the Assumed Contracts or proposed cure amounts.  The Court therefore should have a sufficient basis to authorize the Debtor to reject or assume and assign the Assumed Contracts as set forth in the Stalking Horse APA.

## VI.     Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.

66.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."   Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the

expiration of fourteen days after the entry of the order, unless the court orders otherwise." The Debtor requests that the Sale Order be effective immediately upon its entry by providing that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

67. The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Comm. Notes to Fed. R. Bankr. P. 6004(h) & 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 COLLIER ON BANKRUPTCY ¶ 6004.10 (15th rev. ed. 2006). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id. The Debtor notes that similar requests to waive the stay imposed under Bankruptcy Rules 6004(h) are routinely granted. See, e.g., In re Bakers Footwear Grp. Inc., No. 12-49658 (CER) (Bankr. E.D. Mo. Nov. 1, 2012); In re ContinentalAFA Dispensing Co., No. 08-45921 (KAS) (Bankr. E.D. Mo. Nov. 12, 2008); In re the Great Atlantic & Pacific Tea Co., Inc., Case No. 15-23007 (SCC) (Bankr. S.D.N.Y. Aug. 11, 2015); In re Delia's, Inc., Case No. 14-23678 (RDD) (Bankr. S.D.N.Y. Feb. 10, 2015); In re Midway Games Inc., Case No. 09-10465 (KG) (Bankr. D. Del. June 3, 2009); In re Nortel Networks Inc., et al., Case No. 09-10138 (Bankr. D. Del. Mar. 3, 2009).

68. To maximize the value received for the Assets, the Debtor seeks to close the Sale as soon as possible after the Sale Hearing. In addition, the terms and conditions of the Debtor's post-petition financing require the closing of the Sale to occur within five (5) days of the entry of

the Sale Order. Accordingly, the Debtor hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## Notice

69.     Notice of this Motion has been given to: (a) all parties who have expressed a written interest in some or all of the Assets; (b) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or interest in the Assets; (c) the Office of the United States Trustee for the District of Delaware; (d) the Debtor's 20 largest unsecured creditors; and (e) the Internal Revenue Service.  In light of the nature of the relief requested, the Debtor submits that no further notice is necessary.

## No Prior Request

70.     No prior request for the relief sought in this Motion has been made to this or any other Court in connection with these Chapter 11 Case.

WHEREFORE, the Debtor requests that the Court: (i) enter the Bid Procedures Order, substantially in the form attached as Exhibit A, (ii) at the conclusion of the Sale Hearing, enter the Sale Order, and (iii) grant such other relief as is necessary.

Dated: September 15, 2025

GELLERT SEITZ BUSENKELL &
BROWN, LLC

*/s/ Michael Busenkell*
Michael Busenkell (DE 3933)
Margaret M. Manning (DE 4183)
Michael Van Gorder (DE 6214)
1201 North Orange Street, Suite 300
Wilmington, Delaware 19801
Telephone: (302) 425-5800
Facsimile: (302) 425-5814
Email: mbusenkell@gsbblaw.com
         mmanning@gsbblaw.com
         mvangorder@gsbblaw.com

*Proposed Counsel to the Debtor and Debtor-in-Possession*