**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| US MAGNESIUM LLC, | Case No. 25-11696 (BLS) |
| Debtor.[1] | **Hearing Date: To be determined**<br>**Objection Deadline: To be determined** |

**MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
FOR ENTRY OF AN ORDER (I) CONVERTING THE DEBTOR'S
CHAPTER 11 CASE TO A CASE UNDER CHAPTER 7 OF THE BANKRUPTCY CODE**

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtor and debtor in possession (the "Debtor"), by and through its undersigned proposed counsel, Eversheds Sutherland (US) LLP and Cole Schotz P.C., hereby submits to this Court its motion (the "Motion") requesting that the Court (as defined below) enter an order converting the Debtor's above-captioned chapter 11 case (the "Chapter 11 Case") to a case under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") and, as grounds therefor, respectfully represents as follows:

**PRELIMINARY STATEMENT**[2]

1.      The Debtor entered chapter 11 seeking Court approval of its restructuring strategy that would (a) burden the Debtor's estate (the "Estate") with DIP Financing that benefits the DIP Lender more than the Estate, (b) use the DIP Financing to draw previously unencumbered assets into the collateral package for the DIP Lender's *prepetition* secured loan, thus transferring those assets' value

---

[1] The last four digits of the Debtor's federal tax identification number are 5446. The Debtor's service address for the purpose of this chapter 11 case is: 238 N. 2200 W. Salt Lake City, UT 84116.

[2] Capitalized terms used but not otherwise defined in the Preliminary Statement shall have the meanings ascribed to them below or, if not defined herein, in the DIP Motion or Bid Procedures Motion (each as defined herein), as applicable.

from unsecured creditors to the Debtor's DIP Lender, and (c) run a sham sale process that is too rushed to support the diligence and planning necessary to buy these types of assets, thus handing the Debtor's assets to the stalking horse bidder, a newly formed subsidiary of the Debtor's parent company, (d) pass the business, cleansed of liabilities, back into the parent company's control, and (e) facilitate the parent company's purchase (*i.e.*, complete release) of all possible claims and causes of action against it and its affiliates for no meaningful value to the creditors that otherwise would receive the proceeds of such claims. All in all, it is a restructuring strategy that successfully maximizes the value of Estate assets—for the Debtor's prepetition secured lender and parent company only. For unsecured creditors and other parties in interest, it is disastrous.

2. As reflected in the Committee's Objection to the DIP Motion and the Bid Procedures Motion, as well as objections by multiple other stakeholders to those motions, the Debtor's proposed DIP Financing and sale scheme lacks fairness, transparency, and legal justification. The DIP Financing and sale terms only benefit insiders and secured lenders, and they obviously are intended to, and would in fact, harm unsecured creditors and the integrity of the bankruptcy process.

3. The Debtor has lost sight of its fiduciary duties. Rather than structure a strategy to maximize value to all creditors to whom fiduciaries duties are owed,[3] the Debtor has chosen a strategy that effectively hands all Estate value to its Prepetition Secured Lenders (notwithstanding all or a

---

[3] The fiduciary duties of a debtor in possession are derived from the trustee's duties under 11 U.S.C. § 1107, which grants the debtor in possession the rights and responsibilities of a trustee. These duties include operating the debtor's business and managing the estate in a manner that benefits creditors. As a debtor in possession, the Debtor "owe[s] fiduciary duties to all creditors, including the Committee's constituents, to maximize the value of the estate." *In re Whittaker Clark & Daniels Inc.*, 2025 WL 2611753, at *12 n. 16 (3d Cir. Sep. 10, 2025) (citing *In re Marvel Ent. Grp., Inc.*, 140 F.3d 463, 471 (3d Cir. 1998) ("The debtor-in-possession is a fiduciary of the creditors and, as a result, has an obligation to refrain from acting in a manner which could damage the estate, or hinder a successful reorganization.")).

portion of the Debtor's obligations to the lenders, even if properly perfected which has not been determined, are insider claims that may be unsecured or recharacterized as equity).

4.      The time has come to put in place a new fiduciary for this case—one that will act for the benefit of the creditors and will be able to liquidate the Debtor's assets more effectively, equitably, and efficiently.

5.      Section 1112(b) of the Bankruptcy Code empowers a court to convert a chapter 11 case to one under chapter 7 for cause.  11 U.S.C. § 1112(b).  "Cause" exists where, among other things, a debtor experiences "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A).

6.      Cause for conversion undoubtedly exists here.  The Debtor's operations have all but shut down in recent years following equipment failures, market pressures, and actions by federal and state authorities alleging violations of environmental and regulatory obligations.  What remains of the Debtor's operations generates significant losses.  Each day operating in chapter 11 only deepens those losses and strips more value from the Estate.

7.      Converting the Chapter 11 Case to a case under chapter 7 at this juncture is in the best interests of the Estate and creditors.[4]  While the Court has already approved liens and claims related to the Interim DIP Order, the Court can preserve value going forward by converting this case to a chapter 7 liquidation while the Unencumbered Assets are still minimally encumbered or unencumbered.[5]  In chapter 7, the Debtor may avoid many of the financial burdens imposed by the proposed DIP Financing.  Without the truncated timeline imposed by the DIP Financing, a chapter

---

[4] If the Court sustains the Committee's objection to the DIP Motion and the Bid Procedures Motion [D.I. 130], there may be no further DIP Financing, which in itself is cause to convert the Chapter 11 Case, as there will be no funding to pay for administrative expense claims incurred in the Chapter 11 Case.

[5] The Committee reserves all rights for itself and any chapter 7 trustee to the extent that the Court determines that the terms of the DIP Financing were not properly presented to the Court.

7 trustee may take more time to market the Debtor's assets to potential buyers, thus maximizing asset values for creditors. Moreover, an independent chapter 7 trustee could investigate, pursue, and ultimately liquidate any claims and causes of action of the Debtor's Estate (including against Renco) for the benefit of creditors.

8.     There is cause here to convert the Debtor's case, and doing so would significantly increase the value of the Estate to unsecured creditors and other parties in interest who would otherwise receive nothing on their claims. The Court should therefore grant this Motion to convert the Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

## JURISDICTION

9.     The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware (the "Court") under 28 U.S.C. § 157 pursuant to the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Committee confirms its consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

10.     Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

11.     The statutory bases for the relief requested herein are sections 1112(b) and 1104(a) of title 11 of the Bankruptcy Code.

4

## BACKGROUND

12.     On September 10, 2025 (the "Petition Date"), the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").  The Debtor continues to operate its business and manage its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Additional information about the Debtor's Chapter 11 Case is set forth in the *Declaration of Ron Thayer in Support of First Day Motions* [D.I. 4] (the "First Day Declaration") filed on the Petition Date.

13.     Pursuant to the First Day Declaration, as of the Petition Date, the Debtor's magnesium operations and lithium carbonate production have been idled for years and cannot be restarted without, at a minimum, significant investment.  First Day Decl. ¶¶ 18-19 ("To restart magnesium production following the Force Majeure Event, USM would need to make substantial capital investments and see a significant increase in magnesium market prices."); *id.* at ¶ 22; Deposition of R. Thayer, Sept. 29, 2025 (hereinafter, "Thayer Dep."),[6] at 23:6–24:9 (estimating the cost to restart Lithium production at "somewhere between 30 and 100 million dollars"); *id.* at 27:12-28:2 (estimating the cost to restart magnesium production at "approximately $40 million dollars"); *Objection of the United States to Debtor's Motion for Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims and (C) Utilize Cash Collateral; (II) Granting Adequate Protection; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* [D.I. 124] (the "EPA Objection"), at 5 ¶ 6 (" . . . the United States' updated projections for future clean-up costs at the Superfund Site and surrounding

---

[6] Attached hereto as **Exhibit B** are excerpts from the deposition transcript of Ron Thayer, referenced herein.

area are more than $100 million inclusive of the funds received from the MagCorp bankruptcy settlement.").  Currently, the Debtor's operations are limited to producing certain products from existing material stocks.  First Day Decl. ¶ 27.

A.      *The Debtor's Prepetition Secured Debt*

14.      As of the Petition Date, the Debtor, which is a fully-owned subsidiary of The Renco Group, Inc. ("Renco"), was party to three secured loans with a combined secured funded debt amount of approximately $115 million.  Wells Fargo, National Association ("Wells Fargo" or "DIP Lender") is the Debtor's first lien secured lender pursuant to that certain pre-petition Loan and Security Agreement dated June 24, 2002 (the "Wells Fargo Prepetition Credit Agreement"), under which the Debtor owed approximately $67 million, including a letter of credit limit of $821,588 (the "Wells Fargo Prepetition Secured Loan").  Pursuant to the Wells Fargo Prepetition Credit Agreement, prepetition loan obligations designated as "Term Loan C", issued by Renco, were issued in the aggregate amount of $25 million.  On information and belief, all or a portion of the remaining loan obligations under the Wells Fargo Prepetition Credit Agreement are guaranteed by Renco.

15.      In 2023, the Debtor entered into a subordinated secured loan funded by Renco Global Capital, Inc. ("Renco-Affiliated Lender"), an affiliate of Renco, as the secured lender under which approximately $45.4 million is outstanding.  Less than two weeks prior to the Petition Date, on August 28, 2025, the Debtor borrowed an additional approximately $2.5 million through a subordinated secured bridge loan offered by its parent company, Renco (Renco, Renco-Affiliated Lender, and Wells Fargo, collectively, the "Prepetition Secured Lenders").

16.      The Debtor's prepetition secured loans were each secured by the Debtor's assets, *except* for certain fully unencumbered assets which have material value.  Those unencumbered

assets include:  (a) an office building (the "Salt Lake City Property") for which there currently is a pending purchase offer (subject to customary contingencies) of $3.5 million,[7] (b) a business interruption insurance claim seeking $56 million in proceeds that is currently in litigation (the "Ace Commercial Tort Claim"),[8] (c) the mineral lease with the State of Utah under which the Debtor obtains the right to extract magnesium chloride and other salts from the Great Sale Lake (the cornerstone of any future operations), which is subject to a non-pledge restriction,[9] (d) the Debtor's interests in a non-debtor subsidiary whose "reasonably substantial" water rights may have material value,[10] (e) any commercial tort claims, including claims against Renco and other insiders[11], and (f) any avoidance actions (collectively, the "Unencumbered Assets").

### B.    The DIP Financing

17.    On the Petition Date, the Debtor filed a motion [D.I. 10] (the "DIP Motion") seeking entry of interim and final orders that, among other things, authorize the Debtor's proposed postpetition debtor-in-possession financing (the "DIP Financing") offered by Wells Fargo as the lender pursuant to that certain *Ratification and Amendment Agreement* attached as Exhibit B to the DIP Motion (the "DIP Agreement"), which ratifies and amends (and, in places, incorporates

---

[7] *See* Thayer Dep., 38:7-39:1.

[8] Thayer Dep., 26:19-27:11.

[9] *See Mineral Lease & Option Agreement*, dated March 8, 1961, § 9 (barring, among other things, encumbrance without the consent of the State of Utah), as amended by the *Agreement*, dated July 31, 1969, § 14 (same).

[10] *See* Thayer Dep., 58:23-59:1.

[11] According to the EPA Objection, this is not the first time a Renco-affiliated entity has been involved in a bankruptcy with significant consequences. In August 2001, Magnesium Corporation of America ("MagCorp") and its parent company, Renco Metals — both subsidiaries of Renco — filed for bankruptcy in the Southern District of New York. *See In re Magnesium Corp. of America, et al.*, Case No. 01-14312 (Bankr. S.D.N.Y. 2001).  Approximately one year later, US Magnesium, a newly formed Renco subsidiary and the Debtor in this case, acquired substantially all of MagCorp's assets.  Following the sale, MagCorp's case was converted to Chapter 7, and a trustee was appointed.  The Chapter 7 Trustee pursued extensive litigation concerning fraudulent transfers involving MagCorp, Renco, and related parties.  After more than a decade of litigation, the Trustee secured a judgment "***against Renco and others***" that ultimately generated over $200 million for MagCorp.'s bankruptcy estate.  EPA Objection, at 5 ¶ 5.  A subsequent settlement with the United States resulted in a payment exceeding $81 million to resolve environmental claims related to the Superfund Site and surrounding federal lands.

without restating) the Wells Fargo Prepetition Credit Agreement.[12]

18.     The Debtor requests DIP Financing that provides for (a) "new money" financing of up to $10 million, plus a roll up of the $821,588 of prepetition letter of credit obligations (the "DIP Term Loan"), and (b) a roll up of up to $10 million of the Wells Fargo Prepetition Secured Loan obligations, on a dollar for dollar basis for all new money financing (the "Roll Up").[13]  The DIP Term Loan has two tranches, which are drawn at the same time on a *pro rata* basis.  Tranche A consists of $5 million funded by Wells Fargo, and Tranche B consists of $5 million effectively funded by Renco through the purchase of a subordinated junior participation interest in that tranche.

19.     Under the DIP Motion, the Debtor seeks a payment waterfall that pays prepetition allegedly secured loan obligations before the DIP Financing obligations (before the Challenge Period has run).  The Debtor seeks to apply "any payments or proceeds arising from the sale of the Debtor's assets" ***first*** to all Wells Fargo Prepetition Secured Loan obligations other than $25 million of those prepetition obligations designated as "Term Loan C" obligations.[14]  *See* Interim DIP Order, at 2 ¶ 2 (describing the DIP Agreement "providing for, among other things:  . . . the application of any payments or proceeds arising from the sale of the Debtor's assets first, to the Pre-Petition Obligations (other than Term Loan C) until such Pre-Petition Obligations are paid and satisfied in full"); *accord* DIP Agreement § 7.3 (providing for same repayment waterfall for unspecified "payments or proceeds").  Only once all such Wells Fargo Prepetition Secured Loan

---

[12] The Wells Fargo Prepetition Credit Agreement was not attached to the DIP Motion.

[13] The Debtor's filings are consistent in these financing terms, except in the DIP Motion's opening paragraph, which requests DIP Financing up to an aggregate amount of $12,500,000.  DIP Motion, at 1.

[14] Term Loan C is wholly participated out to Renco.  US Magnesium LLC Rule 30(b)(6) Dep., R. Mayo, Oct. 1, 2025 (hereinafter, "Mayo Dep."), at 120:12-17; Stalking Horse APA §§ 2.5(a)(ii), 1.1 (providing for the Renco-Affiliated Bidder to credit bid the Term Loan C obligations).

obligations are satisfied, the proceeds of the Debtor's assets would be applied, second, to the Tranche A DIP Term Loan funded by Wells Fargo. *Id.* Third, proceeds would be applied to the remaining $25 million Term Loan C portion of the Wells Fargo Prepetition Secured Loan obligations. *Id.* Finally—***and only if there are any funds left over after satisfying all prepetition and postpetition obligations to Wells Fargo***—the remainder of the superpriority secured DIP Term Loan funded by Renco, Tranche B, would be paid. *Id.*

20.    The Debtor seeks to include as collateral for the DIP Financing obligations (the "<u>DIP Collateral</u>") the Debtor's Unencumbered Assets, as well as all collateral under the Wells Fargo Prepetition Secured Loan and all other Estate property.  Notwithstanding the material potential value of the Unencumbered Assets, the DIP Motion seeks a waiver of the Debtor's rights under sections 506(c) and 552 of the Bankruptcy Code upon entry of a final order approving the DIP Financing (the "<u>Final DIP Order</u>").

21.    On September 12, 2025, the Court entered its *Interim Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing, and (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims; (II) Granting Adequate Protection; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* [D.I. 32] (the "<u>Interim DIP Order</u>").

22.    Following objections to the DIP Motion, the Court declined to approve the Roll Up on an interim basis, but included the Unencumbered Assets as DIP Collateral with respect to the "new money" DIP Term Loan.  *See* Interim DIP Order, at 11 ¶ 5 (conditioning Roll Up on Final DIP Order); *Utah Division of Forestry, Fire, and State Lands' Objection to Debtor's Motion for Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims and (C)*

*Utilize Cash Collateral; (II) Granting Adequate Protection; (III) Modifying the Automatic Stay;*
*(IV) Scheduling Final Hearing; and (V) Granting Related Relief* ¶¶ 12, 14 [D.I. 17].  Though the
Interim DIP Order authorized the payment waterfall requested by the Debtor, it limited the use of
the Unencumbered Assets as DIP Collateral to payment of only the postpetition DIP Financing.
Interim DIP Order, at 11 ¶ 8.

23.     Though not expressly addressed in the DIP Motion or at the first day hearing, the
Debtor's proposed budget that was approved by the Interim DIP Order [D.I. 32-2, p.2-3 of 3]
(the "Budget") provides for the sweep of all Debtor receipts to pay down the Wells Fargo
Prepetition Secured Loan—an estimated nearly $3.9 million payment of the prepetition obligations
that is independent of, and in addition to, the requested $10 million Roll Up.  The Budget provides
for various other payments for the benefit of Wells Fargo, including: (i) adequate protection
interest payments on the Wells Fargo Prepetition Secured Loan totaling over $800,000, (ii) cash
payments of DIP Financing interest of over $435,000, and (iii) unlimited legal fees and expenses
that have been estimated in the Budget at $900,000.  Over the 18-week Budget period, the Estate
would divert around $6.2 million dollars of cash away from the Debtor's operations for payments
to Wells Fargo, which is lending only $5 million of new money over the entire life of the case.
After these cash payments (which could be higher if the Chapter 11 Case extends beyond 18 weeks
or the DIP Lender's attorney's fees exceed the budgeted amount), the Debtor will receive less than
$4 million in new financing, though it will be burdened by $20 million of superpriority liens and
claims on all assets, including the Unencumbered Assets.

## C.     The Proposed Bid Procedures and Stalking Horse Bid

24.     On September 12, 2025, the Debtor filed a motion [D.I. 41] (the "Bid Procedures
Motion") seeking, among other relief, (i) approval of bid procedures for the sale of substantially

all of its assets under section 363 of the Bankruptcy Code (the "Bid Procedures") and (ii) approval

of the stalking horse bid and asset purchase agreement (the "Stalking Horse APA" or "APA", and

"Stalking Horse Bid," respectively) offered by LiMag Holdings, LLC, a newly-formed affiliate of

Renco (the "Renco-Affiliated Bidder"), as the stalking horse bidder.

25.    Given Renco's involvement in the sale process, the Debtor appointed an

"independent' manager (the "Independent Manager") to *impartially* review, negotiate, and decide

whether to approve any transactions proposed between the Debtor and Renco or a Renco affiliate.

First Day Decl. ¶¶ 15, 50. The Independent Manager, however, was selected by Renco without the

Debtor's participation in the decision-making process. *See First Stipulation of Facts Between the*

*Debtor and Official Committee of Unsecured Creditors* [D.I. 128] (the "First Stipulation"), at 2.

That is the very opposite of "independent."

26.    Under the Stalking Horse Bid, the Renco-Affiliated Bidder would purchase, along

with substantially all other Debtor assets, the Unencumbered Assets that may be worth tens of

millions of dollars. Among those Unencumbered Assets, the Renco-Affiliated Bidder would

purchase all claims and causes of action against current and former directors, officers, and

managers, as well as all possible claims and causes of action against Renco and its affiliates—

effectively "purchasing" (though for no apparent value) sweeping plan-like releases. *See* Stalking

Horse APA §§ 2.1, 1.1.[15]   The Debtor agreed to sell its potential claims and causes of action

against Renco and other insiders without any investigation into viable claims, notwithstanding a

corporate history of alleged environmental violations and insider wrongdoing.  Mayo Dep.,[16]

---

[15] It is unclear whether the Stalking Horse Bid would include the purchase of the Salt Lake City Property if it is not otherwise sold beforehand, since it is not an Excluded Asset and the bid documents do not disclose the schedule of real property that will be purchased.

[16] Attached hereto as **Exhibit C** are excerpts from the deposition transcript of Ron Mayo, referenced herein.

67:23-68:15; EPA Objection, at 5 ¶¶ 1-5 (noting the entry of a $200 million judgment against Renco and its affiliates in connection with the MagCorp bankruptcy). Similarly, the Debtor contracted to sell its non-debtor subsidiary interests (*i.e.*, the Debtor's interests in the Skull Valley Joint Venture) without any valuation of the asset. Thayer Dep., 59:10-59:15.

27.    In exchange for stripping the Unencumbered Assets and nearly all other assets from the Estate, the Stalking Horse Bid will provide no more than $250,000 in cash—insufficient funding for even a plan process or wind down of the Estate. APA § 2.5, § 1.1 ("Cash Consideration" definition). The Stalking Horse Bid purchase price is almost entirely comprised of a credit bid[17] and assumption of liabilities—a significant portion of which are liabilities owed to Renco or its affiliate that could be found to be unsecured, recharacterized or equitably subordinated after the sale closes.[18] Under the DIP Financing milestones, the sale must close no later than November 17, 2025 (unless the DIP Lender chooses to extend it),[19] which is before the Challenge Deadline of November 26, 2025. DIP Agreement § 5.4(f); Interim DIP Order, at 24-25 ¶ 32(a) (increasing the Challenge Period from the originally-proposed 45 days to 75 days).

28.    The Bid Procedures require all competing bids to be submitted within only 45 days of the Petition Date, and *less than three weeks* after the hearing on the Bid Procedures Motion— an unrealistic timeline for any competing bidder that may *otherwise* have offered real value for the Estate assets, leaving the Renco-Affiliated Bidder to win by default. The Debtor did not run a

---

[17] The Renco-Affiliated Bidder would credit bid the Renco-funded Tranche B of the DIP Term Loan for up to $5 million and the "Term Loan C" portion of the Wells Fargo Prepetition Secured Loan, for approximately $25 million.

[18] And yet assumption of these likely valueless liabilities is the sole currency for the Unencumbered Assets – the Mineral Lease, the Ace Commercial Tort Claim, the insider claims, etc. (since the credit bid, by definition, cannot be used to bid on assets not subject to the lien being credited).

[19] The DIP Agreement establishes the deadline for entry of an order approving the sale as 60 days after the Petition Date, and the sale must close within five days after entry of that order. Since both milestones fall on weekends, they are moved to November 10, 2025 and November 17, 2025, respectively, pursuant to Bankruptcy Rule 9006.

marketing or sale process for its assets prior to the Petition Date, and the expedited postpetition marketing process simply does not allow enough time for interested buyers to diligence the Debtor's assets (which even the Debtor has not properly evaluated) or reach necessary agreements with state and federal authorities. *See* First Day Declaration, at 18 ¶ 49 (the Debtor first engaged an investment banker to "explore potential going concern transactions and strategic alternatives" in the weeks before the Petition Date); Stalking Horse APA, at 28-29 §§ 6.3, 6.4, and 6.6 (listing the conditions precedent to the obligations of the Stalking Horse Bidder, which include, among other things, satisfaction "in [Renco's] sole discretion" of certain matters related to the Mineral Lease, Consent Decree, and Water Rights (which requires the consent of the State of Utah and the EPA, as applicable)).

29.     Even if the Stalking Horse Bid is the winning bid for the Debtor's assets, *and* if the Court approves the sale at a hearing planned for November 7, 2024, it would be almost impossible for the sale to close by the milestone date under the DIP Agreement, November 14, 2025.  The Stalking Horse APA provides the following conditions precedent that must be met prior to Closing, ***each of which could take months, if not longer***, and are outside the control of the Debtor and the Renco-Affiliated Bidder:

- § 6.3 **Mineral Lease**. A mineral lease and/or royalty agreement with the State of Utah that addresses, **to the reasonable satisfaction of Purchaser**, all matters associated with the mining of magnesium and lithium in the State of Utah shall be in full force and effect as of the Closing Date.

- § 6.4 **Consent Decree**. Seller and Purchaser shall have reached agreement with the United States Environmental Protection Agency and the State of Utah, satisfactory to Purchaser **in its sole discretion**, which agreement shall provide for the following: (i) no work related to process modifications or corrective action under RCRA needs to be undertaken unless and until such work is agreed to by Purchaser and magnesium production is to be restarted at the Facility; (ii) agreement on a reasonable schedule for the completion of the waste pond; and (iii) a framework for releasing funds in the EPA Special Accounts to Purchaser

for use in undertaking any work for which such EPA Special Accounts may be applied, and (iv) agreement by the United States that the facility as operated for the production of magnesium and/or lithium with the modifications set forth in the Consent Decree shall be in compliance with RCRA and no further process modifications will be required. (emphasis added)

- § 6.5 **Receivership Action Dismissal**. The Receivership Court shall have entered an order dismissing the Receivership Action with prejudice.

- § 6.6 **Water Rights**. A voluntary agreement with the State of Utah regarding water rights, in form and substance **satisfactory to Purchaser**, shall be in full force and effect as of the Closing Date. (emphasis added)

Stalking Horse APA §§ 6.3-6.6.

### D. *The Committee's Objections to the DIP Motion and the Bid Procedures Motion*

30.     On September 23, 2025, pursuant to section 1102 of the Bankruptcy Code, the United States Trustee for Region 3 (the "U.S. Trustee") appointed the Committee.  D.I. 70.

31.     On September 24, 2025, the Committee selected Eversheds Sutherland (US) LLP and Cole Schotz P.C. as its proposed counsel, and Province LLC as its proposed financial advisor.

32.     On October 3, 2025, the Committee timely filed an omnibus objection to the DIP Motion and the Bid Procedures Motion.  D.I. 130 (the "Committee Objection").  The Committee Objection is fully incorporated herein in further support of the relief requested.  A hearing to consider the DIP Motion on a final basis and the Bid Procedures Motion is currently scheduled for October 6, 2025 at 11:00 a.m. (ET) (the "October 6 Hearing").

### RELIEF REQUESTED

33.     By this Motion, the Committee requests entry of an order, substantially in the form attached hereto as **Exhibit A**, converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code pursuant to section 1112(b) of the Bankruptcy Code.[20]

---

[20] The proposed Order requires, among other things, that following conversion the Debtor immediately turn over all amounts held in escrow by the Estate's professionals. This relief is consistent with relief previously granted in this

**BASIS FOR RELIEF**

34.    Section 1112(b) of the Bankruptcy Code ("Section 1112(b)") provides:

> Except as provided in paragraph (2)[21] and subsection (c) [which is not relevant here] …, the court *shall* convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1) (emphasis added).

35.    Section 1112(b) calls for a two-step analysis.  *First*, the Court must determine whether there is "cause" to convert or dismiss the Chapter 11 Case.  *Second*, if cause exists, the Court must choose between conversion and dismissal based on "the best interest of creditors and the estate." *See In re Am. Cap. Equip., LLC*, 688 F.3d 145, 161 (3d Cir. 2012) (citing § 1112(b)(1)); *In re SGL Carbon Corp.*, 200 F.3d 154, 159 n.8 (3d Cir. 1999)).

36.    Absent unusual circumstances, "[section 1112(b)] makes conversion *mandatory* once a court finds . . . any of the elements of 'cause.' . . . *The Court does not have discretion*."  *In re Rsrvs. Resort, Spa & Country Club LLC*, No. 12-13316 (KG), 2013 WL 3523289, at *2 (Bankr. D. Del. July 12, 2013) (emphasis added); *accord In re Midwest Properties of Shawano, LLC*, 442 B.R. 278, 283 (Bankr. D. Del. 2010) (noting that the BAPCPA amendments to Section 1112(b) "limit the Court's discretion to refuse to dismiss or convert a chapter 11 case upon a finding of cause").

**A.      *"Cause" for Conversion Exists Here Based on Section 1112(b)(4)(A) of the Bankruptcy Code and Other Factors.***

---

district in connection with the conversion of a case to chapter 7. *See* Order in Aid of Conversion [D.I. 339] at 1, *In re Affirmative Insurance Holdings, Inc.*, No. 15-12136 (CSS) (Bankr. D. Del. Mar. 11, 2016).

[21] Section 1112(b)(2) states that the "court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate," and certain other findings are established as set forth therein.  11 U.S.C. § 1112(b)(2).

15

37.     Section 1112(b)(4)(A) expressly provides that "cause" for conversion exists where there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A).  This "*per se* cause" is satisfied by a showing of two prongs:  (i) either a substantial *or* continuing loss to the Estate or diminution of the Estate; and (ii) no reasonable likelihood of rehabilitation.  *In re Creekside Sr. Apartments, L.P.*, 489 B.R. 51, 61 (B.A.P. 6th Cir. 2013).

### i.      The Debtor's Estate Will Lose Value if it Remains in Chapter 11.

38.     The first prong required for "*per se* cause" under section 1112(b)(4)(A) may be satisfied by "demonstrating that the debtor suffered or has continued to experience a negative cash flow or declining asset values following the order for relief."  *In re Kanterman*, 88 B.R. 26, 29 (S.D.N.Y. 1988) ("All that need be found is that the estate is suffering some diminution in value."); 7 COLLIER ON BANKRUPTCY, ¶ 1112.04[6][a] (Alan N. Resnik & Henry J. Sommer eds., 16th ed. 2014) (hereinafter, "7 Collier") ("[Section 1112(b)(4)(A)] tests whether, after the commencement of the case, the debtor has suffered or continued to experience . . . declining asset values.").  Where a debtor's loss is "sufficiently large given the financial circumstances of the debtor as to materially negatively impact the bankruptcy estate and interest of creditors, the loss is substantial" within the meaning of Section 1112(b)(4)(A).  *In re TMT Procurement Corp.*, 534 B.R. 912, 918 (Bankr. S.D. Tex. 2015) (citing 7 Collier at ¶ 1112.04[6][a][i]).

39.     First, cause to convert this case to a liquidation exists here because the Debtor's operations have been cash flow negative for "a substantial period of time" and the Estate's value will only continue to diminish in chapter 11.  *See* Mayo Dep., 41:25-43:10 (discussing Debtor's ongoing negative cash flow).  The Debtor's limited operations simply do not provide sufficient revenue to cover the costs of running the business, even *after* the Debtor ceased complying with various

environmental obligations. *See* Thayer Dep., 70:5-70:17 (stating that construction of a retrofitted waste pond required by the EPA Consent Decree ceased 18-20 months prior to the Petition Date because the Debtor lacked the revenues to continue it). Even if the Debtor's receipts exceeded its operational costs, however, the Debtor would be unable to apply those receipts to fund its operations. Every dollar of the Debtor's receipts gets swept out of the Estate to pay down the Wells Fargo Prepetition Secured Loan. *See* Budget; *accord* Thayer Dep., 31:2-31:14 (stating the Debtor has "an income stream that is continually swept . . . into the Wells Fargo system"). The Debtor must still pay royalties to the state of Utah on its sales, though the Debtor does not keep the receipts; thus, the Debtor pays out of pocket for the privilege to sell products for Wells Fargo's financial benefit. *Id.*

40.    The Budget paints a stark picture of the Debtor's rapidly eroding financial situation: over 18 weeks, the Debtor's total retained cash receipts are $0.00, whereas total operating disbursements total over $4.4 million.[22] Even if the Debtor's cash receipts were *not* swept to pay down the Debtor's prepetition loan, they still would be insufficient (at less than $3.9 million) to fund business operations ($4.4 million). *Id.* The chapter 11 process does not change that fact.

41.    Second, the costs of continuing the Chapter 11 Case only exacerbate the Estate's negative cash flow, further diminishing the value of the Estate by "burden[ing] the estate with mounting attorney and administrative fees." *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 163 (3d Cir. 2012) (upholding bankruptcy court's conversion of debtor's chapter 11 case to chapter 7).[23]

42.    Third—and most critically—the DIP Financing that the Debtor has requested to fund the Chapter 11 Case would destroy the meaningful value that the Unencumbered Assets could

---

[22] Notably, the Debtor's salary roll, produced to the Committee in response to formal document requests, reflects a monthly budget of $368,701.20 for its 24 employees — inclusive of salaries, payroll taxes, and employee benefits — equating to an average annualized cost of approximately $184,350.60 per employee.

[23] *See* Mayo Dep., 90:6-90:20 (noting that budgeted amounts for professionals may require adjustment).

otherwise provide for unsecured creditors, burden the Estate with unnecessary secured debt, and further deplete Estate assets.  If the proposed DIP Financing terms are approved on a final basis, the Unencumbered Assets would become secured collateral *not only* for the $10 million in "new money" advanced under the DIP Loan, but also the additional $10 million rolled-up amount.[24] The Debtor also proposes a repayment waterfall for the DIP Financing that substantially depletes Estate value by paying off the Wells Fargo Prepetition Secured Loan in full before full payment of the DIP Financing.

43.    Moreover, the Debtor seeks to waive its rights under the marshalling doctrine, and under sections 506(c) and 552(b) of the Bankruptcy Code—rights that otherwise would preserve some unencumbered value for unsecured creditors.  Instead, the Debtor would continue to bear the costs of preserving and selling Wells Fargo's collateral while, in addition, making cash payments to Wells Fargo that surpass the actual value of Wells Fargo's new money contribution.  In short, the longer the Debtor remains in chapter 11, the more value the DIP Financing would divert from unsecured creditors and other stakeholders.

44.    Absent material changes to the DIP Financing and the Bid Procedures, converting the Chapter 11 Case to a chapter 7 liquidation is necessary to preserve and maximize the Estate's remaining value for the benefit of all creditors, not solely the Prepetition Lenders.  First, "[a] Chapter 7 bankruptcy can be accomplished more efficiently, thus halting the mounting liabilities

---

[24] In fact, as noted in footnote 4 of the Committee Objection, the DIP Agreement provides that the Unencumbered Assets would serve as collateral securing **all** of the Wells Fargo Prepetition Secured Loan obligations, not only the Roll Up amount.  However, subsequent to filing the Committee Objection, counsel for Wells Fargo informed Committee counsel that the DIP Lender will retract this position and indicated the proposed Final DIP Order will be revised accordingly.  *See* DIP Agreement § 1.2(c), § 1.1 (definitions); *accord Notice of Filing Proposed Final Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing, and (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims; (II) Granting Adequate Protection; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief*, D.I. 126, Ex. 2 ¶ 8 (proposed Final DIP Order).

against the estate." *See Am. Cap. Equip., LLC*, 688 F.3d at 163.  Second, prompt conversion to a chapter 7 liquidation will cut off any further burdening of the Unencumbered Assets[25], which currently are secured as DIP Collateral by only the approximately $2.3 million budgeted for the DIP Term Loan through the October 6 Hearing.  *Cf.* Mayo Dep., 85:2-15 (stating that Debtor intends to draw DIP Funding through week 6 of the Budget (10/13/25-10/19/25) for a total of $2.8 million of funding prior to the October 6 Hearing).  Last, a chapter 7 sale process may be more effective at maximizing the value of the Estate's assets (most of which are currently non-performing anyway).  Because a chapter 7 sale process can be run more efficiently, chapter 7 could offer prospective buyers more time to conduct due diligence and seek regulatory approvals, thus encouraging competitive bidding for the Estate's assets.

### ii.    The Debtor Does Not Have a Reasonable Likelihood of Rehabilitation in Chapter 11.

45.    The second prong for establishing "cause" under section 1112(b)(4)(A)—the absence of a reasonable likelihood of rehabilitation—is also met here.  "Rehabilitation" is not simply a question of whether a debtor can confirm a plan, but whether "the debtor's business prospects justify continuance of the reorganization effort." *TMT Procurement Corp.*, 534 B.R. at 920 (quoting *In re LG Motors, Inc.*, 422 B.R. 110, 116 (Bankr. N.D. Ill. 2009)).  In other words, it refers to a "debtor's ability to restore the viability of its business." *Loop Corp.*, 379 F.3d 511, 516 (8th Cir. 2004) (citing *In re Gonic Realty Trust*, 909 F.2d 624, 626 (1st Cir. 1990)).

46.    As the Third Circuit Court of Appeals has emphasized, "[h]owever honest in its efforts the debtor may be, and however sincere its motives, the District Court is not bound to clog its docket

---

[25] The Committee does not concede, and reserves all rights to contest, that the encumbrances imposed by the Interim DIP Order on the Unencumbered Assets are binding, due to the incomplete disclosure of the DIP Financing terms in the DIP Motion and at the First Day Hearing.

with visionary or impracticable schemes for resuscitation." *Brown*, 951 F.2d at 572 (quoting *Tennessee Publishing Co. v. American Nat'l Bank*, 299 U.S. 18, 22 (1936)). To remain in chapter 11, "[t]here must be 'a reasonable possibility of a successful reorganization within a reasonable time.'" *Id.* (quoting *United Sav. Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 376 (1988)).

47.     Here, neither the Debtor's business prospects nor its sale process justify continuing, or funding, this chapter 11 reorganization effort.  The Debtor's reorganization strategy is designed solely to benefit the Prepetition Secured Parties at the expense of unsecured creditors.  The Debtor seeks to sell substantially all assets through a chapter 11 process funded by DIP Financing that would strip the Estate of previously unsecured value.  The proposed sale process, however, is not structured to maximize Estate value—it is not even structured to be viable.  The diligence timeline is too short to allow any potentially interested buyer to conduct meaningful diligence or clear the regulatory hurdles to purchase the Estate assets.  As such, the procedures are structured to box out any real competition to the Renco-Affiliated Bidder's Stalking Horse Bid.

48.     But, if the Stalking Horse Bid ultimately becomes the successful bid, the conditions precedent to closing could take months or even years to satisfy—if they can be satisfied at all.  The Renco-Affiliated Bidder must materially amend the Consent Decree, which requires approval by the United States District Court for the District of Utah, as well as negotiate mutually-agreeable resolutions to the mineral lease and water rights disputes with the State of Utah and obtain a dismissal of the Receivership Action by the Utah court overseeing it.  Nothing short of a miracle could accomplish so much by November 17, 2025.  In short, if the Debtor is allowed to implement its restructuring plan, the Estate will take on all of the burdens of the DIP Financing to run a sale process, only to get to the end of the process and be unable to sell the assets as planned.

49.     Even if, for the sake of argument, the Debtor could close the Stalking Horse APA

20

upon its current terms, the sale may well leave the Estate administratively insolvent.  The Estate would receive no more than $250,000 of cash value, which is insufficient funding to confirm a plan or to undertake an orderly winddown, much less return any recovery to unsecured creditors.[26]

50.    Further, if a sale to the Renco-Affiliated Bidder were to close, there is no basis to conclude the sale would lead to a viable operating business—*i.e.*, a rehabilitation.  Restoring the Debtor's magnesium and lithium production operations would, for *each*, require an investment of tens of millions of dollars, and even then, production would only be profitable if there is a change in global prices (or significant outside support).  It is unclear whether the Renco-Affiliated Bidder has any plans to invest the tens of millions of dollars required to restore business operations for either the magnesium or lithium carbonate production lines.  Instead, it may be that the Renco-Affiliated Bidder seeks to purchase the Debtor's near-shuttered operations together with all potential claims and causes of action against Renco and its affiliates, effecting a sweeping release of liabilities that otherwise could have been asserted for the benefit of the Estate, and it may never restore the Debtor's business operations.[27]

51.    Proceeding in chapter 11 under the value-destructive framework sought by the Debtor simply is not justified in this case, where the prospects for rehabilitation are so precarious and the costs of the chapter 11 process so significant (particularly to unsecured creditors).  Unsecured creditors would fare much better in a chapter 7 liquidation.

iii.    **Cause for Conversion Exists for Other Statutory and Equitable Reasons.**

52.    The factors establishing "cause" listed in Section 1112(b)(4) are "not exhaustive"

---

[26] In addition to the typical chapter 11 expenses and winddown costs, the Debtor must satisfy a $7 million tax liability that would not be assumed under the Stalking Horse APA and for which there is no budget or identified strategy to satisfy.  Mayo Dep., 125:6-126:3.

[27] *See supra*, n. 9.

and courts may "consider other factors" in addition to those listed.  *In re Brown*, 951 F.2d 564, 572 (3d Cir. 1991) (citing S. Rep. No. 989, 95th Cong., 2d Sess. 117 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5903; H.R. Rep. No. 595, 95th Cong., 1st Sess. 406 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6362.); *accord SGL Carbon Corp.*, 200 F.3d at 160 ("[A] court may consider whether other facts and circumstances qualify as 'cause.'") (citing *Brown*, 951 F.2d at 572; 7 Collier at 1112–20).

53.     Cause may also exist to convert a chapter 11 case to a case under chapter 7 where a chapter 11 process would benefit only the lender at the expense of unsecured creditors.  *See In re Sugarfina, Inc.,* Sept. 9, 2019 Hrg. Tr. 75:12-75:19, No. 19-11973 (MFW) (Bankr. D. Del. Sept. 9, 2019) (stating "Well, but there is another alternative and that is just convert and liquidate today. The first person being advantaged by a sale is the prepetition lender. So, they have an incentive to assure that the debtor continues to operate until a sale can be concluded. And using that opportunity to extract more money out of the debtor in the form of fees, quite frankly, is a little offensive to me.").[28].

54.     That is clearly the dynamic of this Chapter 11 Case.  As more fully described in the Committee Objection, to fund the Chapter 11 Case, the Debtor currently seeks final approval of DIP Financing that strips the Estate of previously unsecured assets, and would further encumber those assets the longer the Debtor remains in chapter 11, causing an irreversible loss of value for  unsecured creditors.  Meanwhile, the DIP Agreement's milestones would force a rushed sale on a timeline that forecloses competition and, instead, hands substantially all Estate assets (including whatever remains of the Unencumbered Assets) to an affiliate of the Debtor's parent company for negative real value

---

[28] An excerpt of the *Sugarfina* transcript is attached hereto as **Exhibit D**.

to the Estate. Such a chapter 11 process benefits only the Prepetition Secured Lenders at the expense of potentially material returns to unsecured creditors from the Unencumbered Assets. The Chapter 11 Case should not be allowed to go forward on these terms.

55.     Instead, conversion of this Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code is in the best interest of unsecured creditors because conversion would preserve important Estate assets as unencumbered assets that are available to fund distributions to unsecured creditors once the interim funding of the DIP Financing is paid off. A chapter 7 liquidation therefore would create more value for unsecured creditors, and nearly all parties in interest *other than* the Prepetition Secured Lenders.

**B.      *No Unusual Circumstances Exist Here to Prevent Conversion of this Case.***

56.     Although the moving party has the burden to show "cause" by a preponderance of the evidence, once "cause" has been established, the burden of proof shifts to the party opposing conversion to demonstrate "unusual circumstances" establishing that conversion is not in the best interests of the Debtor's creditors and bankruptcy Estate. *See Midwest Properties of Shawano*, 442 B.R. at 283 (initial burden is on the movant to show cause); 11 U.S.C. § 1112(b)(2). The term, "'[u]nusual circumstances,' contemplates conditions that are not common in chapter 11 cases." *LG Motors*, 422 B.R. at 116 (citations omitted).

57.     No conditions or circumstances have been identified in this Chapter 11 Case that could render "cause" overcome and conversion inappropriate. Further, no factors have been identified that would prove conversion is *not* in the best interests of the Estate or creditors. Opposing parties will not be able to sustain their burden to overcome the "cause" shown to convert the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

**C.**    ***The Court Should Convert the Debtor's Case, Rather than Dismiss the Case.***

58.    After the Court has made the threshold determination that "cause" exists here, the Court must decide whether conversion or dismissal "is in the best interest of creditors and the estate." 11 U.S.C. § 1112(b); *see also Matter of NuGelt, Inc.*, 142 B.R. 661, 669 (Bankr. D. Del. 1992). The Court's determination is "discretionary, based on the facts of each case." *Id.* at 669 (citing *In re Winslow*, 123 B.R. 641, 631 (D. Colo. 1991); *In re Sullivan*, 108 B.R. 555, 557 (W.D. Pa. 1989)).

59.    Here, the creditors and the Estate are best served by conversion to chapter 7, rather than dismissal. The Estate's assets, including the *currently*-minimally-secured Unencumbered Assets, may have significant value that could be monetized for the benefit of creditors. Chapter 7, unlike dismissal, offers a cost-effective way to sell the Debtor's assets *and* will provide for the disbursement of the liquidated value among creditors in a fair and equitable manner pursuant to the priority scheme of the Bankruptcy Code. Further, under chapter 7, an independent trustee will be free to investigate and pursue the Debtor's potential claims and causes of action, and market and monetize the Debtor's assets for the benefit of *all* creditors without the rigid and truncated timeline imposed by milestones in the DIP Agreement and Bid Procedures Motion.

60.    As such, "cause" exists to convert the Chapter 11 Case to a chapter 7 case, and conversion is in the best interests of creditors and other parties in interest.

## CONCLUSION

61.    For the reasons set forth above, and in the Committee Objection, and pursuant to sections 1112(b) and 1104(a) of the Bankruptcy Code, the Committee submits that the Chapter 11 Case should be converted to a case under chapter 7 of the Bankruptcy Code.

WHEREFORE, the Committee respectfully requests the entry of an order, substantially in the form attached hereto as Exhibit A, (i) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, and (ii) granting such other relief as is just and proper.

Dated: October 5, 2025
      Wilmington, Delaware

**COLE SCHOTZ P.C.**

*/s/ Justin R. Alberto*
Justin R. Alberto (No. 5126)
Michael E. Fitzpatrick (No. 6797)
500 Delaware Avenue, Suite 600
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
Email: jalberto@coleschotz.com
      mfitzpatrick@coleschotz.com

- and -

**EVERSHEDS SUTHERLAND (US) LLP**
Todd C. Meyers (admitted *pro hac vice*)
Danielle Barav-Johnson (admitted *pro hac vice*)
999 Peachtree Street, NE
Atlanta, GA 30309
Telephone: (404) 853-8000
Email: toddmeyers@eversheds-sutherland.com
      dahnibarav-johnson@eversheds-
      sutherland.com

-and-

Todd C. Meyers (admitted *pro hac vice*)
John J. Ramirez (admitted *pro hac vice*)
Sameer M. Alifarag (admitted *pro hac vice*)
1114 Avenue of the Americas, 40th Floor
New York, NY 10036
Telephone: (212) 389-5000
Email: toddmeyers@eversheds-sutherland.com
      johnramirez@eversheds-sutherland.com
      sameeralifarag@eversheds-sutherland.com

*Proposed Counsel to the Official*
*Committee of Unsecured Creditors*