## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>US MAGNESIUM LLC,<br><br>    Debtor. | Chapter 11<br><br>Case No. 25-11696-BLS<br><br>Re: Docket No. 142 |

### UTAH DIVISION OF FORESTRY, FIRE, AND STATE LANDS' JOINDER IN MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER (I) CONVERTING THE DEBTOR'S CHAPTER 11 CASE TO A CASE UNDER CHAPTER 7 OF THE BANKRUPTCY CODE

The Utah Division of Forestry, Fire, and State Lands ("FFSL"), by its undersigned attorneys, respectfully submits this joinder (the "Joinder") to the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order (I) Converting the Debtor's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code* [Docket No. 142] (the "Motion") filed by the Official Committee of Unsecured Creditors (the "Committee"). FFSL agrees with and supports the Committee's Motion and in support of its Joinder states as follows:

### PRELIMINARY STATEMENT

1. As this Chapter 11 case is currently positioned, it does not present a viable reorganization case, and to this point, US Magnesium, LLC (the "Debtor") has not acted consistent with the fiduciary duties that must be discharged by a Chapter 11 debtor-in-possession. More specifically, the Debtor has attempted to ramrod a sale process through this Court that benefits only the Debtor's equity owner, The Renco Group, LLC ("Renco") and Renco's affiliates, to the detriment of every other creditor constituency.

2. What's worse, the Debtor's current minimal operations do not appear sufficient to meet the Debtor's obligations under its Consent Decree (as defined below) with the EPA. Instead,

it appears one of the primary purposes of this case is to renegotiate the Debtor's environmental obligations, including its obligations to the State of Utah. This is not a proper use of the Chapter 11 reorganization process. Under these circumstances, conversion to a Chapter 7 liquidation is the appropriate remedy.

## BACKGROUND

3.      The Debtor is the cause of the pollution to land, including the sovereign land of the State of Utah, which is the US Magnesium Superfund Site. See Consent Decree, Civ. Case No. 2:01-cv-00040-DAK, Doc. No. 456 (C.D. UT, June 30, 2021).[1]

4.      The Debtor is not in compliance with its obligations under the Consent Decree, as is evidenced by the EPA notices of violation attached as **Exhibit A**.

5.      The Debtor is also not in compliance with its monitoring and reporting requirements with the Utah Division of Water Quality, as evidenced by **Exhibit B**.

6.      One of the obligations of the Debtor under the Consent Decree is the construction of a retrofitted waste pond by the Debtor. Although the Debtor commenced that construction, the construction process ceased about 18-20 months ago according to the Debtor's President, Ron Thayer. The cost to complete that construction according to Mr. Thayer is around $10 million, and the Debtor appears to have no present plans (nor funding) to complete that required construction. See excerpts of Ron Thayer deposition transcript attached as **Exhibit C**.

7.      The Debtor contends that it is not required to comply with parts of the Consent Decree because it is not currently producing Magnesium. But there is no part of the Consent

---

[1]      See also U.S. EPA, Superfund Site: US MAGNESIUM TOOLE COUNTY, UT, https://cumulis.epa.gov/supercpad/cursites/csitinfo.cfm?id=0802704 (providing general information concerning the state of the US Magnesium Superfund Site).

Decree (as Mr. Thayer will admit) which excuses the Debtor's compliance based on that circumstance. Id.

8.      The Debtor has not been a good steward of the land on which it formerly operated, much of which is the sovereign land of the State of Utah.  Among other things, there is an unpermitted toxic waste lagoon on State lands comprised of water filled with acid, chlorine, chromium, PCBs, and a variety of other toxins.  This toxic waste lagoon is within a stone's throw of Great Salt Lake, which lake is also situated on the sovereign land of the State of Utah.

9.      Given the plethora of environmental problems with the land which the Debtor has heavily polluted over the past many years, it is highly unlikely any potential buyer would purchase its business other than the Debtor's proposed DIP lender, which just happens to be related to the Debtor's owners.

10.      Significantly, even if the Debtor succeeds in its objective to transfer its assets to another Renco subsidiary, the conditions precedent to closing that sale are likely to take several months, at a minimum, to satisfy (if they can ever be satisfied), and will require review and approval by multiple federal and state agencies and department leadership.  The Debtor thus claims this is a "hair on fire" emergency to ram the sale through as quickly as possible, and this is certain to be followed by months of delay while Renco attempts to renegotiate the Debtor's key obligations. Specifically, Article VI of the proposed asset purchase agreement (found at Docket 41-2 at pages 34 and 35 of 46), which are the conditions precedent to the obligation of Renco to purchase, includes:

- Section 6.3, renegotiation of its mineral lease with the State of Utah

- Section 6.4, renegotiation of its consent decree with the EPA

- Section 6.4, dismissal of the pending Utah State receivership case (where the only current purpose of the case is for the receiver to test and monitor the Debtor's polluted site)

- Section 6.4, negotiation with the State of Utah concerning the Debtor's water rights

11.     If the Debtor has its way, this case is headed to a rapid Bankruptcy Code § 363 sale, engineered for the Debtor's owners to take ownership of the Debtor's assets, free and clear of liens, claims and interests, accompanied by the renegotiation of the Debtor's obligations to FFSL and under the Consent Decree, while creditors are likely to receive a mere pittance, and environmental problems created through Debtor's former operation continue to fester.

## RELIEF REQUESTED

12.     FFSL joins the Committee in its request to convert the case to Chapter 7. Permitting the case to move forward in Chapter 11 does not preserve any going concern value or otherwise benefit the Debtor's creditors.  Instead, this case, as it is currently prosecuted by the Debtor, benefits only Renco.  Creditors should not be forced to accept through these proceedings less than what they would receive through a Chapter 7 liquidation.  Since the Debtor's course of action would result in creditors receiving less than what they would through liquidation, the Court should convert the case to preserve value for unsecured creditors that would otherwise be taken by Renco.

## BASIS FOR RELIEF

13.     The Code provides the Court "shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(1). The Code does provide for an exception, whereby the Court may not convert a case if it finds and

identifies unusual circumstances that establish conversion is not in the best interests of creditors and the estate, and "the debtor establishes that – (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title…; and (B) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A) [] for which there exists a reasonable justification for the act or omission; and [] that will be cured within a reasonable period of time fixed by the court." § 1112(b)(2).

14.     FFSL agrees with, and echoes, the Committee's analysis that there is a substantial and continuing loss to and diminishment of the estate and no reasonable likelihood of rehabilitation.  Indeed the "plan" of the Debtor is to transfer all of its assets to a Renco related entity; and the Chapter 11 process is only being used to benefit Renco and its affiliates, and Wells Fargo. Instead of repeating what the Committee already stated, FFSL highlights other points constituting cause for conversion.

15.     Section 1112(b)(4) provides examples of "cause" that satisfy cause within § 1112(b). It is well established that the enumerated lists of grounds constituting "cause" is inclusive not exclusive. See In re AIG Fin. Prods. Corp, 651 B.R. 463, 468 (Bankr. D. Del. 2023) ("Section 1112(b)(4) provides a non-exhaustive list of what may constitute cause for dismissal or conversion of a chapter 11 case.").

16.     In this Joinder, FFSL emphasizes the environmental disaster the Debtor created and the Debtor's ongoing violations of the Consent Decree. Considering the Committee's analysis of the economic prospects of the Debtor and the environmental hazard the Debtor created and fails to remedy, "cause" exists as contemplated by § 1112(b) for converting the case from Chapter 11 to a Chapter 7 liquidation.

## I.    The Debtor is in default under the Consent Decree

17.    On July 18, 2024, the EPA provided the Debtor with a notice of noncompliance with the Consent Decree (which is included within Exhibit A). The Debtor's noncompliance consisted of: (1) failure to adjust the amount of financial assurance required for the closure of the retrofitted waste ponds, (2) failure to cease "operation of electrolytic cells in Building 4 or retrofit with wet anode dust handling by the July 15, 2022 deadline," (3) failure to "address the grizzly vault," which paragraph 18 of the Consent Decree refers to "implement[ing] the Courtyard Capping Plan to address soil contamination in the Courtyard," and (4) failure to initiate construction of a filtration system project.

18.    On June 11, 2025, the EPA sent the Debtor a Notice of Noncompliance (Financial Assurance) of the concerning the Consent Decree, which is also included within Exhibit A.

19.    On August 13, 2025, the EPA sent the Debtor a "Determination of Significant Risk Pursuant to Avian Risk Management Plan," which is included within Exhibit A.

20.    Section VII of the Consent Decree requires the Debtor to retrofit the current waste pond and to "eliminate uncontrolled releases of hazardous substances in compliance with the requirements of the Ground Water Discharge Permit and the CERCLA [Statement of Work]." The Debtor's president stated that the Debtor's retrofitting construction ceased approximately 18 to 20 months ago. Thayer Depo. 70:9-10 (excerpts attached as Exhibit C).  Construction ceased because of the Debtor's lack of funding to continue the work.  Id. at 70:11-14.

21.    On March 6, 2023, the EPA issued a Notice of Violation concerning the Debtor's obligations under the Clean Air Act, which is included within Exhibit A.

22.     Beyond the environmental implications, the Debtor's violation of the Consent Decree is a continued violation of a Court Order. As it is today, permitting the Debtor to remain in Chapter 11 potentially shelters the Debtor from the consequences of its violations.

23.     28 U.S.C. § 959(b) provides that "a debtor in possession, shall manage and operate the property in his possession . . . according to the requirements of valid laws of the State in which such property is situated . . ."  The Debtor is in violation of this law.  It is not complying with its obligations under the Consent Decree, and it appears to have no intention (nor the funding) to come into compliance with those obligations.

**II.     Even if there are unusual circumstances, which there are not, there is no reasonable likelihood of plan confirmation and no reasonable justification for the grounds supporting cause and that cause will not be fixed within a reasonable period of time.**

24.     The Committee correctly highlights that there are no unusual circumstances in this case to satisfy § 1112(b)(2). The Debtor has no going-concern value. Moreover, even if the Debtor could demonstrate unusual circumstances, there is no reasonable likelihood of plan confirmation. As the case is proceeding currently, the Debtor asks the Court for permission to sell substantially all its assets prior to confirmation. If the Debtor gets its way, it is unrealistic to think that a Chapter 11 plan could be confirmed. The Debtor cannot satisfy § 1112(b)(2)(A).

25.     Likewise, the Debtor cannot satisfy § 1112(b)(2)(B), because there is no reasonable justification for its failure to comply with the Consent Decree, and there is certainly no likelihood that the purchaser of the Debtor's assets will begin to comply with the Consent Decree in a reasonable period of time. As the Court is aware, the APA expressly contemplates the purchaser will attempt to renegotiate the Consent Decree obligations.

**III.    Conversion to Chapter 7 is in the best interests of creditors and the estate.**

26.    Once cause is established under § 1112(b)(1), and if no unusual circumstances exist, the next question for the Court is whether conversion to Chapter 7 or dismissal of the case is "in the best interests of creditors and the estate." § 1112(b)(1). The Code does not provide factors to consider when determining what is in the best interest of the creditors. FFSL agrees with the Committee that a Chapter 7 liquidation will bring a larger return for creditors. Additionally, a trustee is necessary to address environmental and safety concerns.

27.    Courts have considered environmental and safety concerns when determining whether to convert or dismiss a Chapter 11 case. See In re Camden Ordnance Mfg. Co. of Arkansas, Inc., 245 B.R. 794, 800 (E.D. Pa. 2000).

28.    And in this case, environmental considerations involve a Superfund Site that the EPA estimates clean-up to require more than $100 million, even when considering the amounts received by the EPA from the previous bankruptcy affecting the U.S. Magnesium Superfund Site. See Objection of the United States to Debtor's Mot. for Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims and (C) Utilize Cash Collateral; (II) Granting Adequate Protection; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief [Docket No. 124], at ¶ 6.

29.    Given the Debtor's environmental history, a Chapter 7 trustee would be a better and more responsible candidate for addressing the environmental hazards than the Debtor.

## **CONCLUSION**

FFSL agrees with the Committee that as this case is currently structured, there is cause to convert it to a Chapter 7 liquidation. The estate is substantially diminishing under the Debtor's supervision, as was the intention behind this case. Moreover, the Debtor appears to have no current plan to remedy its numerous violations of the Consent Decree and other laws protecting the environment. If the case remains under Chapter 11 not only do creditors lose, but so does the environment. A Chapter 7 Trustee would serve as a better steward of the estate and environment.

FFSL respectfully requests the Court enter an order converting the Case to a Chapter 7 liquidation.

Date: October 10, 2025

HOGAN♦MCDANIEL

*/s/ Garvan F. McDaniel*
Garvan F. McDaniel (#4167)
1311 Delaware Avenue
Wilmington, DE 19806
(302) 656-7540; (302) 656-7599
gfmcdaniel@dkhogan.com
-and-

COHNE KINGHORN, P.C.
George Hofmann, Esq.
111 East Broadway, 11th Floor
Salt Lake City, UT 84111
(801) 363-4300; (801) 363-4378
ghofmann@ck.law
-and-

DEREK E. BROWN
UTAH ATTORNEY GENERAL
Michael E. Begley, Esq.
Trevor C. Lang, Esq.
1594 W. North Temple, #300
Salt Lake City, UT 84116
mbegley@agutah.gov
tclang@agutah.gov
*Attorneys for Utah Division of
Forestry, Fire and State Lands*