**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>US MAGNESIUM LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 25-11696 (BLS)<br><br>RE: D.I. 142 and 186 |

**DEBTOR'S OPPOSITION TO THE MOTION OF THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER (I) CONVERTING
THE DEBTOR'S CHAPTER 11 CASE TO A CASE UNDER
CHAPTER 7 OF THE BANKRUPTCY CODE**

The above-captioned debtor and debtor-in-possession, US Magnesium LLC (the "Debtor") respectfully submits this opposition (the "Opposition") to the *Motion of the Official Committee of Unsecured Creditors* (the "Committee") *for Entry of an Order (I) Converting the Debtor's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code* (the "Motion") [D.I. 142] and the *Utah Division of Forestry, Fire, and State Lands'* ("FFSL") *Joinder in Motion of the Official Committee of Unsecured Creditors for Entry of an Order (I) Converting the Debtor's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code* (the "Joinder") [D.I. 186]. In support thereof, the Debtor relies on the *Declaration of Ron Thayer in Support of Debtor's Opposition to the Motion*, and states as follows:

**INTRODUCTION**

1. The Committee's Motion to convert this Chapter 11 case to Chapter 7 rests on rhetoric, not record. The Debtor is progressing toward a value-maximizing reorganization supported by the proposed debtor-in-possession financing (the "DIP Facility") and sale process

---

[1] The last four digits of the Debtor's federal tax identification number are 5446. The Debtor's address is 238 N 2200 W, Salt Lake City, Utah 84116.

under the bid procedures (the "Bid Procedures") currently pending before the Court. Conversion at this stage would derail that progress, destroy going concern value, and prejudice all creditors.

2. Rather the Committee merely recasts its objections to the DIP Facility and Bid Procedures in an attempt to establish cause for conversion. As discussed further below, the Committee has not carried its burden under §1112(b) to demonstrate "cause" for conversion, nor shown that conversion would serve the best interests of the estate and creditors. Contrary to the Committee's unsupported position, a chapter 7 liquidation would compromise the Debtor's ability to maximize the value of its assets for the benefit of all creditors. The Debtor should be allowed to conduct the proposed sale process as a sale of the Debtor's business as a going concern is in the best interests of all stakeholders.

3. Similarly, the Joinder filed by FFSL is nothing more than a recast of FFSL's previous objections and is based upon conclusory allegations regarding the Consent Decree, unsupported by fact or law, to establish cause, and a half-hearted attempt to show that the Debtor's stakeholders would be better off in Chapter 7.

## ARGUMENT

### I. The Committee Has Failed to Demonstrate "Cause" Under §1112(b).

4. "Conversion or dismissal of a Chapter 11 case is a drastic measure and the burden is on the movant to prove the relief requested is warranted and not premature." In re Dark Horse Tavern, 189 B.R. 576, 580 (Bankr. N.D.N.Y. 1995). As the movant, the Committee must establish "cause" by a preponderance of the evidence. In re Reserves Resort, Spa & Country Club LLC, 2013 Bankr. LEXIS 2808, at *5 (Bankr. D. Del. July 12, 2013). The court "must engage in a case-specific factual inquiry which focus[es] on the circumstances of each debtor." In re Creekside Sr. Apartments, L.P., 489 B.R. 51, 60 (B.A.P. 6th Cir. 2013).

5. Here, the Committee has failed to meet its burden because it cannot demonstrate cause by a preponderance of the evidence as required under Section 1112(b)(4)(A) of the Bankruptcy Code. More specifically, the Committee has failed to demonstrate "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."

### A. The Committee Cannot Demonstrate that there is a Continuing Loss or Diminution to the Debtor's Estate.

6. Here, the Committee cannot demonstrate a continuing loss or diminution to the Debtor's Estate. Rather, the Committee attempts to establish a new standard, by arguing that a Debtor must have positive cash flow in order to avail itself of Chapter 11 of the Bankruptcy Code. This standard has no basis in law or even in reason. Simply put, why would a healthy and profitable company need to avail itself of Chapter 11?

7. Contrary to the Committee's assertion, "a court must make a full evaluation of the present condition of the estate . . . ." In re AdBrite Corp., 290 B.R. 209, 215 (Bankr. S.D.N.Y. 2003). "A continuing loss or dimination of the estate may be tolerated where reorganization is feasible and the pattern of unprofitable operations can be reversed as a result of a successful reorganization." Id. "In determining whether there is a continuing loss to or diminution of the estate, courts look beyond a debtor's financial statements and make a full evaluation of the present condition of the estate." In re Briggs-Cockerham, L.L.C., 2010 Bankr. LEXIS 4132, at *5 (Bankr. N.D. Tex. Nov. 23, 2010).

8. Here, the Committee attempts to paint a "stark picture" of the Debtor's financial situation by ignoring the point of the proposed DIP facility and the goals of this Chapter 11 case, which is to fund operations while the Company conducts a sale process of the Debtor as a going

3

concern. One of the Debtor's primary purposes for a sale is to allow the Debtor to restart its operations in full, as discussed further below.

9. To be sure, the proposed DIP facility provides liquidity for payroll, vendor payments, and ongoing operations, while preserving enterprise value.[2] Far from suffering continuing losses, the Debtor is preserving and enhancing value for creditors while it conducts the proposed sale process.

10. Finally, the Committee asks this Court to disregard the interests of all stakeholders, and only consider the interests of the unsecured creditors, who have apparently been sold a bill of goods regarding their ability to recover in a chapter 7 liquidation. Tellingly, the Committee does not even attempt to explain how a chapter 7 sale process could be run more efficiently than the current process. The Committee does not have any insight into what a chapter 7 trustee may or may not do if this case were converted, let alone guarantee that a chapter 7 trustee would even run a sale process. Again, the Committee offers hypotheticals and speculation as fact and it should be wholly ignored.

11. The Committee cannot meet its burden by cherry-picking line items from a budget, speculating about the outcome of the proposed sale process, and asking this Court to place its constituents above all of the Debtor's stakeholders. When making a full evaluation of the present condition of the estate, as is required, cause simply cannot be established.

**B. The Debtor Has a Reasonable Likelihood of Rehabilitation.**

12. Even if the Committee could meet its burden in establishing the first prong under Section 1112(b)(4)(A), the Committee does not even attempt to show that the Debtor has no reasonable likelihood of rehabilitation. Instead, the Committee takes issue with the Debtor's

---

[2] The Committee also apparently takes issue with the Debtor's desire to pay its employees, who are also stakeholders of the Debtor.

4

proposed path forward, which amounts to nothing more than disagreement with the economics of the DIP Facility and the sale process.

13. As the record shows, the proposed DIP facility is the best the Debtor could achieve under the circumstances and was the product of arm's length negotiations. The proposed sale process is not designed to favor the proposed Stalking Horse but rather is the product of the Debtor' current situation. In fact, the Debtor has done everything it can do to encourage a robust market check. Notably the proposed Stalking Horse will receive no break up fee, or any bid protections for that matter, as a result of the negotiations between the parties. The Stalking Horse Bid is a true floor.

14. As the record will reflect, the Debtor has already begun the sale process. The Debtor's investment banker, SSG, is running and real and true sale process, having already contacted over 311 parties in interest. To date, 17 of those parties have entered into non-disclosure agreements and have accessed the data room. In other words, the Debtor and its professionals are doing everything in their power to make up for the short sale process, not because it favors the Stalking Horse but rather because it is required to work within the confines of reality, not the Committee's wishful thinking.

15. Finally, the Debtor's operations are able to be rehabilitated, and the business does have a path to profitability. As reflected in the Thayer Declaration, the Debtor does have a path forward, which includes a modified production process for the 10k TPY carbonate plant and a restart of magnesium plant recycle operations. All of which is possible with a reasonable capital investment. Thayer Decl. ¶33. These investments will result in an estimated $79 million in EBITDA by 2029, and an additional $100 million once magnesium recycle operations are ramped

up to full rates. Thayer Decl. ¶34. The Debtor's plan is also projected to create 150 well paying jobs in the near term with over 450 jobs over a longer time horizon. Thayer Decl. ¶35.

16. Finally, it is important to note what the Stalking Horse Bid and the Stalking Horse APA will provide, which includes the assumption of pension liability, a collective bargaining agreement, tax obligations, and most importantly, continued performance under the Consent Decree and the assumption of the Mineral Lease, both of which will require the Stalking Horse to continue addressing the environmental issues being raised here.

17. Put simply, the Committee's request for conversion is premature, and at this early stage of this Chapter 11 case, the Debtor should be provided the opportunity to accomplish its restructuring goals, which the Debtor has concluded is in the best interests of the estate and all stakeholders.

**C. The Committee Fails to Establish Cause for Conversion Under Other Statutory and Equitable Theories.**

18. Knowing that they have failed to establish cause under Section 1112(b)(4)(A), the Committee makes a last ditch effort to establish cause by citing a transcript that neither supports conversion nor had anything to do with a motion to convert. To be sure, the Court's discussion in *In re Sugarfina, Inc.* does not support conversion. In fact, a motion to convert was not even before the *Sugarfina* Court and the language cited by the Committee was not even part of a ruling. Rather it was a colloquy between the Court and a proposed DIP Lender at a first day hearing. It simply has no bearing on the instant matter, and the Committee's attempts to establish cause failsa again.

**II. FFSL's Joinder Does Not Provide Support for Conversion.**

19. In an attempt to further support a showing of cause at this stage of these proceedings, FFSL claims that the Debtor is in violation of the Consent Decree and therefore is in violation of certain state laws. This claim is made despite the fact that the first line of the Notice

of Violation that FFSL relies upon clearly states that: "The U.S. Environmental Protection Agency *alleges* US Magnesium LLC (US Mag) has violated or is violating implementing regulations . . . ." Joinder, Ex. A., p. 1.  Put simply, an allegation does not constitute a violation of a Court Order until the allegation is proven.  The Debtor has been more than forthcoming about its ongoing dispute with the U.S. Environmental Protection Agency (the "EPA") regarding its compliance with the Consent Decree.  FFSL's conclusory contention should be disregarded.

20. Second, FFSL makes the conclusory allegation that the Debtor is in violation of 28 U.S. § 959(b), which necessitates that the Debtor also be in violation of a state law. Nevertheless, FFSL fails to cite what state law it believes the Debtor has violated, or provided any judgment finding the Debtor to be in violation of said law.  Again, FFSL's conclusory statements should be disregarded.

21. Finally, FFSL fails to provide any support that the above referenced contentions support a showing of "cause" under Section 1112(b)(4).  FFSL's contention that the Debtor has "no intention (nor the funding) to come into compliance with" the Consent Decree simply is not supported by the record in this matter.  For all these reasons, FFSL's Joinder provides no further support to the Motion, and the Motion should be denied.

**III. Conversion Would Not Serve the Best Interests of Creditors or the Estate.**

22. Even if "cause" were established, the Court should deny the Motion because conversion would decrease estate value, increase administrative costs, and thwart the Debtors' efforts to bring additional value to creditors through a going concern sale.  At its heart, section 1112(b) requires courts to consider the "interests of creditors and the estate." 11 U.S.C. § 1112(b)(1).  This equitable consideration is fundamental to the Bankruptcy Code, and it recognizes

"that a debtor-in-possession will have a comparative advantage over a trustee." See In re GPA Tech. Consultants, Inc., 106 B.R. at 141–42.

### A. Conversion Would Destroy Going Concern Value.

23. The Debtor's operations depend on specialized personnel, equipment, and long-term customer relationships. Conversion would trigger immediate cessation of operations, liquidation of specialized assets at distressed prices, and loss of customer contracts—obliterating going concern value to the detriment of all stakeholders. It would also result in the loss of those key personnel that are required to protect and maximize value to the estate.

### B. The DIP Financing and Reorganization Process Provide a Better Path for Creditor Recovery.

24. The DIP lender has committed funds to stabilize operations pending the outcome of the proposed sale process. The Debtor believes that the proposed Stalking Horse Bid provides recoveries far exceeding Chapter 7 liquidation value. Conversion now would terminate that process and needlessly expend estate resources on trustee fees and liquidation costs.

## IV. The Equities Strongly Favor Denial of Conversion.

25. The Court's equitable discretion under §1112(b)(1) should be exercised to protect value and allow the reorganization process to continue. The Debtor has acted transparently, stabilized its operations, and is seeking a value-maximizing sale process. Conversion would accomplish only delay, dislocation, and destruction of value. Moreover, the environmental concerns would no longer be addressed. Tellingly, FFSL does not even attempt to explain how a Chapter 7 trustee would address the environmental concerns, which seems to directly contradict what would occur in a liquidation of the Debtor. As previously mentioned, the Debtor has been nothing more than forthcoming about the environmental concerns, and FFSL's unsupported allegations are nothing more than scurrilous.

**CONCLUSION**

For the foregoing reasons, the Debtor respectfully requests that the Court deny the Committee's Motion and permit the Debtor to continue toward a value-maximizing sale process under the supervision of this Court.

Dated: October 12, 2025

GELLERT SEITZ BUSENKELL & BROWN, LLC

*/s/ Michael Busenkell*
Michael Busenkell (DE 3933)
Margaret M. Manning (DE 4183)
Michael Van Gorder (DE 6214)
1201 North Orange Street, Suite 300
Wilmington, Delaware 19801
Telephone: (302) 425-5800
Facsimile: (302) 425-5814
Email: mbusenkell@gsbblaw.com
mmanning@gsbblaw.com
mvangorder@gsbblaw.com

*Counsel to the Debtor and Debtor-in-Possession*