IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>US MAGNESIUM LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 25-11696 (BLS)<br><br>**Re: Docket No. 142, 186 and 187** |

**JOINDER OF THE RENCO GROUP, INC. AND LIMAG HOLDINGS, LLC TO THE DEBTOR'S OPPOSITION TO THE MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER (I) CONVERTING THE DEBTOR'S CHAPTER 11 CASE TO A CASE UNDER CHAPTER 7 OF THE BANKRUPTCY CODE**

The Renco Group, Inc. ("Renco Group") and LiMag Holdings, LLC (the "Stalking Horse Purchaser") hereby join in the objection (the "Objection") by the above-captioned debtor and debtor-in-possession, US Magnesium LLC (the "Debtor") to the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order (I) Converting the Debtor's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code* (the "Motion"), as joined by the Utah Division of Forestry, Fire, and State Lands (the "State") at Doc. No. 186 (the "Joinder"). In support of its joinder to the Objection (this "Response"), Renco Group and the Stalking Horse Purchaser respectfully state as follows:

**OPENING STATEMENT**

1. Renco Group understands the Court's need to understand where this case is headed, and heard the Court loud and clear in respect to its questions and concerns expressed at both the first and second day hearings in this matter. In response to those questions and concerns, Renco Group notes for the Court the following. First, the sale process and bid procedures proposed in this matter establish a stalking horse purchase offer from LiMag Holdings, LLC entirely free of

---

[1] The last four digits of the Debtor's federal tax identification number are 5446. The Debtor's address is 238 N 2200 W, Salt Lake City, Utah 84116

bid protections such as expense reimbursements and break-up fees, and therefore establishes a true floor against which others—including the 17 parties that have signed NDAs and are currently doing diligence—may bid for the assets as a going concern.

2. In response to concerns expressed by the Court and others in respect to the closing conditions in the Stalking Horse Purchaser's offer, attached to this Response as **Exhibit A** is removing the conditionality surrounding receipt of any accommodations from the State in respect of the mineral lease or from the EPA in respect of the Consent Decree, as well as the condition that the state court receivership action pending in Utah be dismissed. The redlined purchase agreement attached as Exhibit A makes clear that the Stalking Horse Purchaser will assume the existing mineral lease with the State without modification, and will assume all obligations under the Consent Decree.

3. From Renco Group's perspective, the Debtor's current business of recycling materials, selling raw sodium chloride, de-icing products, and dust suppressants is a viable business standing on its own, and certainly worthy the protections afforded by the chapter 11 process. Were it otherwise, Renco Group would not have agreed to participate in the DIP Financing and would not be supporting the Stalking Horse Purchaser. To better demonstrate the viability of the Debtor's go-forward operations, the Debtor is preparing and finalizing a preliminary business plan, which Renco Group understands will show that the Debtor's current business operations will be profitable on a standalone basis. Renco Group understands the business plan will also include both the prospect of a partial restart of magnesium production, and a potential restart of the lithium business, with an acknowledgment that future investment from Renco Group and/or other outside investors will be a necessary prerequisite to any such restarts. The Debtor and Renco Group will be presenting this business plan to the State, the EPA, and the Committee in the days leading up to the hearing on the Motion in an effort to achieve consensus

around a going concern sale that can be supported by all constituencies, and will file the business plan of record in advance of the hearing.

4.  As noted above, while Renco Group and the Stalking Horse Purchaser desire to reach resolution in respect of various matters under its mineral lease with the State and in respect of the Consent Decree with the EPA, Renco Group acknowledges that there must be a path forward in the event that such a global resolution cannot be reached. Accordingly, if matters among the State and EPA cannot be resolved consensually, Renco Group submits that the Court can approve the conveyance of the Consent Decree to the Stalking Horse Purchaser upon the Stalking Horse Purchaser demonstrating adequate assurance of future performance thereunder to the Court's satisfaction. Likewise, in respect of the mineral lease, which the State has already admitted remains valid, Renco Group submits that the Court can approve the assignment of the mineral lease without modification to the Stalking Horse Purchaser, provided that Debtor can demonstrate that it is assignable under applicable law and can address outstanding cure amounts, and provided that the Stalking Horse Purchaser can, again, sufficiently demonstrate adequate assurance of future performance.

5.  Notably, none of the foregoing issues need to be resolved by this Court in the context of the Committee's Motion to convert the case, which is without merit and should be denied. Rather, Renco Group highlights the foregoing to demonstrate to this Court and other parties in interest that approval of the sale and of the assignment of the mineral lease to, and assumption of the Consent Decree by, the Stalking Horse Purchaser are achievable outcomes under the Bankruptcy Code regardless of whether any accommodations from those parties can be negotiated. Undoubtedly, the Debtor's facility, assets and operations present difficult challenges for the Stalking Horse Purchaser and any competing bidder for a variety of reasons that have been raised with the Court by the Committee and others. The Debtor is running a legitimate sale process

with a qualified investment banker, there are over a dozen parties actively doing diligence, and there is nothing in the bid procedures that is designed to prevent a fulsome and transparent sale process that will maximize value for all stakeholders.

6.  Finally, and importantly, regardless of whether the Committee or the State agrees with the foregoing, the Committee's Motion and the State's joinder to it are wholly unsupported by the law as well as by the evidentiary record. This bankruptcy case was filed less than 35 days ago, and the Debtor has ongoing operations, and has commenced a going concern sale process with a highly reputable and experienced investment banker. Seeking to destroy the company through conversion to chapter 7 under those circumstances is frankly outrageous, and the Committee and the State have not come close to meeting their heavy burden of demonstrating that conversion is remotely appropriate. Accordingly, the Motion should be denied and this chapter 11 case should move forward towards a value-maximizing going concern transaction.

## ARGUMENT

### I. The Committee Has Failed to Demonstrate Cause for Conversion

7.  "Conversion or dismissal of a Chapter 11 case is a drastic measure and the burden is on the movant to prove the relief requested is warranted and not premature." *In re Dark Horse Tavern*, 189 B.R. 576, 580 (Bankr. N.D.N.Y. 1995). "The harshness of conversion or dismissal mandates that it result only upon a strong evidentiary showing." *Id.*

8.  Section 1112(b)(1) of the Bankruptcy Code allows for the conversion or dismissal of a chapter 11 case for "cause." The Committee relies on section 1112(b)(4)(A) of the Bankruptcy Code to establish cause—which requires the Committee to demonstrate that there is **both** "substantial or continuing loss to or diminution of the estate" and "the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(2)(4). The Committee cannot satisfy either of these prongs and therefore its Motion must be denied.

### A. The Committee Has Not Shown A Substantial or Continuing Loss to, or Diminution of, the Estate

9. The cases cited by the Committee in the Motion, and indeed the exact passages quoted by the Committee from those cases, make clear that this first prong is aimed at losses or diminution suffered by a debtor *following the petition date*. The Committee does not suggest in its Motion (nor could it) that any asset values have declined in the approximately 32 days since the bankruptcy was filed, nor that any "substantial" loss to or diminution of the estate has occurred. By default then, the Committee must rely on a "continuing" loss theory to satisfy this prong. But, because the Committee cannot identify continuing post-petition losses, the Committee complains instead about losses that it thinks may occur *in the future*. *See* Motion, at ¶ 38-39. That is simply not the standard as set forth in the plain language of the statute. Section 1112(b)(4)(A) says "substantial or continuing loss to or diminution of the estate"—it does not say "*a reasonable likelihood of* a substantial or continuing loss to or diminution of the estate." Instead, actual and continuing losses to the bankruptcy estate must have occurred in order to satisfy this prong. Predictions of future losses that have not materialized are certainly not evidence of actual, continuing losses.

10. Even if the Debtor were to experience negative cash flow for some period of time during this case, that alone is not necessarily sufficient to satisfy this prong and to justify such an extreme result as conversion to chapter 7. *See In re AdBrite Corp.*, 290 B.R. 209, 215 (Bankr. S.D.N.Y. 2003) (noting negative cash flow can be tolerated where reorganization is feasible, and losses can be reversed through restructuring). In one recent case, the bankruptcy court suggested that this prong is established where the debtor has "negative cash flow *and no definite source of income*." *In re Zarifian Enters., LLC*, 2024 Bankr. LEXIS 3078, at *6 (Bankr. N.D. Ill. Dec. 17, 2024) (emphasis added). In that case, the bankruptcy court found that this prong was not satisfied,

5

despite the debtor having "no cash, no employees, no cash to hire new employees, no place of business to operate, and only one account receivable," because the debtor had other assets which it could sell to generate revenue. *Id.* Here, the Debtor has 24 employees and a definite source of income from its ongoing business recycling materials, selling raw sodium chloride, de-icing products, and dust suppressants. The budget attached to the Interim DIP Order indicates approximately $4.1 million in revenue from this business over the four-month period at near break-even cash flow when bankruptcy-related expenses are excluded.

11. The Committee's failure to satisfy this prong is dispositive as to the Committee's failure to show "cause" under section 1112(b)(4)(A) of the Bankruptcy Code given that both prongs of that subsection must be satisfied. In any event, the Committee has not remotely satisfied the second prong of section 1112(b)(4)(A) either as demonstrated below.

    **B.**    **The Debtor has a reasonable likelihood of rehabilitation through a going-concern sale.**

12. To attempt to demonstrate the absence of a reasonable likelihood of rehabilitation, both the Committee and the State first complain about the sale process. The Committee accuses the Debtor of structuring the bid procedures to "box out any real competition." *See* Motion, at ¶ 47. The State, at the same time, suggests that no other purchaser would be willing to buy the assets due to environmental concerns, presumably no matter what the bid procedures provide. While these suggestions from the Committee and the State appear irreconcilable, they are both in any event wholly without support and in fact are refuted by the actual record in this case, which will demonstrate that despite bid procedures not having been approved yet, the sale process is well underway and that 17 parties have signed an NDA and are actively doing due diligence. This is, therefore, a legitimate sale process being undertaken and it deserves to be given a chance to succeed.

13. Next, the Committee and the State suggest that the various closing conditions in the stalking horse purchase agreement, and in particular those that require cooperation or accommodation from either the State or the United States Environmental Protection Agency (the "EPA"), either render closing impossible or will delay closing for any number of months. *See* Motion, ¶ 48; Joinder, at ¶ 10. By this Response, Renco Group seeks to assure the Court that this is not the case. While Renco Group continues to seek alignment with the State and with the EPA in respect of the Stalking Horse Purchaser's post-closing obligations, in the event that such alignment cannot be reached, the Stalking Horse Purchaser is prepared to (i) take assignment of the Debtor's mineral lease with the State in its existing form and without modification, (ii) assume all of the Debtor's obligations under the Consent Decree with the EPA, and (iii) remove the condition requiring dismissal of the Utah state court receivership action pending against the Debtor.

14. Likewise, to the extent the State objects to the Stalking Horse Purchaser taking assignment of the Debtor's mineral lease in its current form, Renco Group submits that the Debtor will ultimately be able to demonstrate that the mineral lease is assignable to the stalking horse purchaser over such an objection pursuant to section 365 of the Bankruptcy Code, and that the Court can adjudicate that dispute within the time frame established by the Debtor's proposed sale process. For its part, Renco Group and the Stalking Horse Purchaser understand that for the Court to make such a finding, the Debtor will need to prove that the mineral lease is validly assignable, and that it will need to address alleged cure amounts due under the mineral lease. The Stalking Horse Purchaser further understands that it will ultimately need to demonstrate adequate assurance of future performance under the mineral lease. Again, while Renco Group's preference is to reach a consensual understanding with the State as to the scope and nature of any such adequate assurance, Renco Group is prepared as part of any contested sale hearing to seek a finding from

this Court that its proposed assurances are adequate for purposes of section 365(b) of the Bankruptcy Code.

15. Accordingly, there is a path forward in this case to a going concern sale that is not dependent upon a resolution of matters with the State or upon any concessions from the EPA in respect of the Consent Decree.

16. Finally, the Committee goes on to suggest in its Motion that even if the sale closes, there is no basis to conclude the business will be viable going forward. *See* Motion, at ¶ 50. In the first instance, and as noted above, it is the Committee's burden to show by a preponderance of the evidence that there is no reasonable prospect that this Debtor can rehabilitate itself, despite the fact that, between the Debtor and its predecessors, it has operated its facility since 1972. It is not the Debtor's or the Stalking Horse Purchaser's burden to guarantee a viable business going forward. Nor is it the Debtor's burden to guarantee a recovery for unsecured creditors. Rather, the Debtor's charge as a fiduciary is simply to maximize the value of the estate for the benefit of all stakeholders.

17. Setting aside the burden of proof, as noted above, Renco Group submits that the Debtor is already operating a viable business. To better demonstrate this, the Debtor is preparing a business plan, which the Stalking Horse Purchaser understands will show that the Debtor's business in its current form (recycling materials, selling dust suppressants, raw sodium chloride, and de-icing products) will be able to stand on its own and generate positive cash flow in the very near term, without any dependency on restarting magnesium or lithium production. That said, the business plan will also demonstrate that in the future, assuming a certain level of investment and positive changes to market conditions, the business could enjoy tremendous upside through a full or partial restart of either magnesium or lithium production. In the days leading up to the hearing on the Motion, the Debtor and Renco Group intend to have discussions about the business plan

with the State, EPA, and the Committee, and ultimately file it of record in advance of the hearing for this Court's review.

18. Accordingly, neither the Committee nor the State have met or can meet their burden to show that there is no reasonable likelihood that the Debtor can rehabilitate itself in the context of this chapter 11 case. As such, the Committee has failed to show that cause exists under section 1112(b)(4)(A).

**C. The Other Purported Bases for Cause Cited By The Committee and the State Likewise Fail And Do Not Support Case Conversion**

19. The only basis for "cause" cited by the Committee other than section 1112(b)(4)(A) is a suggestion that "[c]ause may also exist to convert a chapter 11 case to a case under chapter 7 where a chapter 11 process would benefit only the lender at the expense of unsecured creditors." *See* Motion, at ¶ 53. That, however, is not the law, and the only thing cited in support of that proposition is some out-of-context commentary made by Judge Walrath at a first day hearing, and not made in the context of addressing a motion to convert or in the context of discussing what might constitute "cause" under section 1112(b) of the Bankruptcy Code. *See, e.g., In re Sugarfina, Inc.*, No. 19-11973 (MFW) (Bankr. D. Del. Sept. 9, 2019) (first-day colloquy reflecting concerns about fees and alternatives; not an adjudication of "cause"). The Court should reject any attempt by the Committee to shoehorn unrelated commentary into a basis to convert this case.

20. The State, for its part, can only point beyond section 1112(b)(4)(A) to the purported violations of the Consent Decree with EPA, and appears to be seeking to have the case converted based on the environmental conditions at the Debtor's facility alone. But the environmental conditions at the site have existed for decades, and in all that time, not a single individual has alleged or claimed that they have been harmed by the conditions at the site. Furthermore, there is no evidence whatsoever of any immediate or imminent harm being posed to the public health and

welfare by any of the conditions at the site. And in respect of the Consent Decree, as noted above, the Stalking Horse Purchaser is willing to take on all obligations under the Consent Decree, and therefore that should likewise not provide any basis to convert this case to chapter 7.

## II. Even if Cause Did Exist For Conversion (Which It Does Not) There Are Unusual Circumstances That Should Prevent Conversion

21. Among the "unusual circumstances" the Court should consider is that there is no other significant producer of primary magnesium in this country, and primary magnesium is a critical component to United States defense contractors.[2] Notwithstanding that magnesium production has been mothballed since 2022, Renco Group submits that the United States, and in particular the U.S. Department of War, may believe it would not advance the national interest to take a bulldozer to a domestic magnesium facility and sell the debris for scrap value, as the Committee here would have occur. Indeed, the Debtor (and, going forward, the Stalking Horse Purchaser if it is successful in purchasing the business) still remains hopeful that it can re-establish a partnership with ATI and the U.S. Department of War that would bring ATI's titanium sponge production back online and which would necessarily require a partial restart of magnesium production at the Debtor's facility.

22. Secondly, the Direct Lithium Extraction (DLE) process that the Debtor developed for commercial lithium extraction is truly extraordinary, one-of-a-kind technology, into which Renco Group has invested hundreds of millions of dollars over the last decade. No other lithium carbonate manufacturer in North America utilizes this innovative technology.[3] While it is true that additional investment will be required to scale DLE production to profitability, foreclosing on that possibility *today* so that a chapter 7 trustee can sell a state-of-the-art lithium processing facility for

---

[2] *See* Declaration of Ron Thayer in Support of First Day Motions, at Docket No. 4, ¶ 6.
[3] *See id.* at ¶ 21.

scrap prices would represent an enormous and irresponsible waste of value and potential upside. This is particularly the case given the fact that the Debtor's facility is able to produce lithium carbonate from the stockpiles of magnesium production byproduct that is already on site, and therefore the process developed by the Debtor is able to recycle and reuse that which would otherwise be worthless.[4]

## CONCLUSION

23. For the foregoing reasons, the Committee and the State have not met their burden under section 1112(b) of the Bankruptcy Code, and Renco Group asks that the Court deny the Motion and allow the Debtor to proceed with its sale process so as to ensure that the Debtor can maximize the value of its assets. The Committee's suggestion, offered without explanation, that a chapter 7 trustee could somehow "take more time to market the Debtor's assets to potential buyers" without access to DIP financing is nonsensical. Without DIP financing, and without the skilled employees at the Debtor that will all lose their jobs upon case conversion, a chapter 7 trustee will not have any ability to do anything other than liquidate the Debtor's assets in a piecemeal liquidation, at fire sale prices, to the detriment of all stakeholders. A chapter 7 trustee will certainly not be in any position to undertake any performance under the Consent Decree and instead, its liquidation efforts would only have the potential to exacerbate environmental issues at the facility and surrounding site. In contrast, the proposed DIP financing includes funding for environmental monitoring, and continued operation of the facility will permit the assumption by the Stalking Horse Purchaser of significant liabilities of the estate, including all secured indebtedness, pension and collective bargaining obligations, and all obligations under the Consent Decree, and will provide all stakeholders with the greatest chance of recovery.

---

[4] *Id.*

24. In conclusion, Renco Group, after decades of owning the Debtor and certain of its predecessors, still very much believes in this business and believes that it will be profitable in the long term. Renco Group likewise believes in its ability and the ability of the Debtor to make progress with the major constituencies in this case toward a global resolution that will benefit all stakeholders. While Renco acknowledges that further extensions of the case time line will require the Debtor to obtain additional funding, there is no basis in the evidentiary record to justify conversion at this early stage of the bankruptcy case, and accordingly the Committee's Motion should be denied.

Dated: October 12, 2025               **SAUL EWING LLP**

By: */s/ Mark Minuti*
Mark Minuti (DE No. 2659)
Paige N. Topper (DE No. 6470)
1201 North Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6840
Email: mark.minuti@saul.com
        paige.topper@saul.com

and

Mark E. Freedlander
Frank J. Guadagnino
**McGUIREWOODS LLP**
Tower Two Sixty
260 Forbes Avenue, Suite 1800
Pittsburgh, PA 15222
Telephone: (412) 667-6000
Email: mfreedlander@mcgurewoods.com
        fguadagnino@mcguirewoods.com

*Counsel for The Renco Group, Inc.*