**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| US MAGNESIUM LLC, | Case No. 25-11696 (BLS) |
| Debtor.[1] | **Re: D.I. 142, 186, 187, 189, 193** |

**REPLY IN SUPPORT OF THE MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER (I) CONVERTING THE DEBTOR'S CHAPTER 11 CASE TO A CASE UNDER CHAPTER 7 OF THE BANKRUPTCY CODE**

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtor and debtor in possession (the "Debtor"), by and through its undersigned proposed counsel, Eversheds Sutherland (US) LLP and Cole Schotz P.C., hereby submits to this Court its reply (the "Reply") in further support of the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order (I) Converting the Debtor's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code* [D.I. 142] (the "Conversion Motion")[2] and in response to the following pleadings:[3]

- *Debtor's Opposition to the Motion of the Official Committee of Unsecured Creditors for Entry of an Order (I) Converting the Debtor's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code* [D.I. 187] (the "Debtor Objection"); and

- *Joinder of The Renco Group, Inc. and LiMag Holdings, LLC to the Debtor's*

---

[1] The last four digits of the Debtor's federal tax identification number are 5446. The Debtor's service address for the purpose of this chapter 11 case is: 238 N. 2200 W. Salt Lake City, UT 84116.

[2] Capitalized terms used but not defined herein shall have their respective meanings ascribed to them in the Conversion Motion, the Omnibus Committee Objection, the Utah Joinder, or the U.S. Response (each as defined herein), as applicable.

[3] The State of Utah also filed the *Utah Division of Forestry, Fire, and State Lands' Joinder in Motion of the Official Committee of Unsecured Creditors for Entry of an Order (I) Converting the Debtor's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code* [D.I. 186] (the "Utah Joinder") and the United States filed *the United States' Response to the Motion of the Official Committee of Unsecured Creditors for Entry of an Order (I) Converting the Debtor's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code* [D.I. 189] (the "U.S. Response" and, together with the Utah Joinder, the "Joinders"). Tellingly, the other key vocal stakeholders in this case either support the motion (the State of Utah and the USA) or did not file any opposition (Wells Fargo).

*Opposition to the Motion of the Official Committee of Unsecured Creditors for Entry of an Order (I) Converting the Debtor's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code* [D.I. 193] (the "<u>Renco Joinder</u>" and, together with the Debtor Objection, the "<u>Objections</u>").

In support thereof, the Committee respectfully represents as follows:

## PRELIMINARY STATEMENT

1.  At the October 6, 2025, hearing to consider approval of the Debtor's DIP Financing motion on a final basis and approval of the Bid Procedures Motion (the "<u>October 6 Hearing</u>"), the Court expressed concerns with the relief requested by the Debtor and the opposition of multiple key stakeholders to the Debtor's restructuring strategy. The Court reset the hearing for October 16 to consider those motions alongside the Committee's Conversion Motion, which presented an alternative path for this case. The 10-day adjournment gave the Debtor an opportunity to restructure its ill-conceived case strategy from one that loots the Estate to benefit insiders to a chapter 11 restructuring consistent with the letter and fundamental purposes of the Bankruptcy Code.

2.  Unfortunately, the nine days since the October 6th Hearing have not changed the landscape of this case. The Debtor has not proposed any material changes to its restructuring strategy – a strategy that leaves key stakeholders, particularly unsecured creditors, worse off than they would be in a chapter 7 liquidation. The Debtor still seeks to use unencumbered assets to fund a chapter 11 case that will benefit no one other than the insiders and Wells Fargo. The goal of this Chapter 11 Case appears to be unchanged—it seeks to hand the Debtor's assets (including key unencumbered assets, namely, the Mineral Lease, the office building, the $56 million Ace insurance claim,[4] the equity in the Skull Valley Joint Venture, and claims against Renco and

---

[4] Wells Fargo and Renco appear to contend that they have a perfected security interest in the Ace Commercial Tort Claim. The issue of whether an all-assets lien and UCC-1 financing statement perfect a security interest in the proceeds of business interruption insurance is the subject of debate. Compare *Montreal, Maine & Atlantic Ry., Ltd.*,

directors and officers) back to its parent company, stripped free and clear of all liabilities and with a sweeping release for Renco, in a repetition of the bankruptcy strategy of the Debtor's failed predecessor, Magnesium Corporation of America ("MagCorp").  *See* U.S. Response ¶ 5.

3.     The Debtor has not proposed any changes to the DIP Motion or the Bid Procedures Motion that resolve the serious concerns raised by the Committee, as well as other stakeholders. The DIP Motion, for example, would continue to encumber the previously unencumbered Estate assets under $20 Million of DIP Financing Liens in exchange for access to less than $7.2 million of net postpetition funding.[5]  Further, both Renco and the DIP Lender could unilaterally choose to terminate funding under the DIP Financing at will, at any time.  In fact, Renco can choose to do so strategically if a competing bid arises.

4.     Similarly, the Bid Procedures Motion continues to be a bridge to nowhere.  The sale process is not structured to give potential bidders the time or incentive to diligence and structure a bid for such unique and complex assets, and the Stalking Horse Bid offers effectively no value to the Estate while stripping the Estate of previously unencumbered assets that could have offered very significant value to claimholders.[6]  Moreover, there is no certainty the Stalking Horse Bidder would close on the sale even if it is the winning bidder.  It offers no deposit and Renco

---

799 F.3d 1 (1st Cir. 2015) (a creditor's security interest in the debtor's accounts and payment intangibles did not extend to the debtor's right to payment under its business interruption insurance policy because Article 9 does not apply to an interest in or a claim under an insurance policy) with *In re PES Holdings, LLC*, 625 B.R. 822 (D. Del. 2021) (pursuant to the terms of an intercreditor agreement, a bank's perfected security interest in the proceeds of the debtor's business interruption insurance had priority over a Term Loan Agent's apparently perfected security interest in the same insurance proceeds; the agreement gave the bank priority in "general intangibles" relating to accounts and inventory, and expressly defined general intangibles to include insurance policies; the business interruption insurance substitutes for accounts and inventory and, thus, was a general intangible related to accounts and inventory, and the proceeds of the insurance were therefore proceeds of covered general intangibles).  That issue need not be decided today.

[5] Among other things, Wells Fargo will receive a paydown of the prepetition revolver of approximately $3.8 million.
[6] How can a buyer purchase unencumbered assets in exchange for a credit bid of an alleged claim not secured by such assets when the only other consideration therefor is assumption of debt also not secured by such assets?  Unsecured creditors would be better off with a sale of those assets for a dollar.  Like the proposed DIP Financing, the proposed stalking horse bid is just as ill-conceived and robs unsecured creditors of the value to which they are entitled.

(acting for the Stalking Horse Bidder) can effectively terminate the sale process by not funding its DIP Financing participation, creating an Event of Default. To say that the Debtor's reorganization prospects are uncertain would be an understatement.

5.  Though Renco recently filed a proposed amendment to the Stalking Horse APA, that amendment does not fix the fundamental problems with this deal. The most egregious conditions precedent to closing were removed, but they were replaced with new conditions precedent that require either litigation or extended negotiations between the Stalking Horse Bidder, Utah, and the Environmental Protection Agency (the "EPA") over agreed cure terms and adequate assurance—*i.e.*, functionally similar negotiations over the scope of compliance and funding. Though the Debtor could seek assumption and assignment of the Mineral Lease and Consent Decree over the objections of Utah and the United States, it is unlikely to prevail and meet the conditions precedent to closing.[7] In any event, Renco could still terminate the sale process if it determines the cost to cure the many defaults under the Mineral Lease and Consent Decree is too high, leaving the estate in the same perilous position as under the prior Stalking Horse APA.

6.  The Debtor's recent efforts to prop up its restructuring strategy with a business plan also fail to support the direction of this Chapter 11 Case. Even in the limited time the Committee had to review the business plan (filed yesterday), it was clear that the proposed business plan lacked the in-depth analysis and support needed to show it is a realistic and viable plan. Further, it is a plan built upon hopes and unsupported promises, rather than commitments. For example, the business plan does not include a balance sheet, cash flow statement, sources and uses table, debt schedule or capitalization table, nor is there detail on how the business will be capitalized or

---

[7] Neither the Debtor nor Renco provide any precedent for the ability of a Debtor to assume and assign a Consent Decree (which is a court order) and it is unlikely that assumption of a consent decree would be found legally valid over an objection. Moreover, as set forth in the Utah Joinder, there are multiple violations of the Consent Decree that would need to be cured in connection with any purported assumption. Utah Joinder, Exh. A.

where the capital will come from in order to execute on the business plan.

7.     Perplexingly, in light of the outcome of last week's failed attempt by the Debtor to gain approval of the DIP Financing and Bid Procedures, and the pendency of the Committee's Conversion Motion, the Debtor, Renco and the DIP Lender have made zero attempts to resolve the Committee's concerns, though the Committee provided the Debtor with a list of issues and proposed resolutions two weeks ago, on October 1, 2025.  While even a workable business plan would in no way solve the various infirmities with the DIP financing or proposed sale, the Debtor declined the Committee's request that the Debtor present the business plan to the Committee together with Utah and the EPA yesterday.  Ultimately, the Committee did not see the proposed business plan until it was filed last night, which was insufficient time to meaningfully diligence its content or engage in constructive dialogue about it.

8.     There is cause to convert this case to a chapter 7 liquidation for a number of reasons. First and foremost, the DIP Financing should not be approved, leaving the Debtor with insufficient funds to remain in Chapter 11.  Beyond that, as demonstrated in the Conversion Motion, the Debtor's operations are cash flow negative and the Estate is continuously losing value as it operates in chapter 11.  The DIP Financing erodes Estate value for creditors by encumbering the Unencumbered Assets under particularly burdensome financing.  These losses should not be tolerated because there is no reasonable likelihood of rehabilitation here—there is no certainty (or even obligation) that the Stalking Horse Bid will close, and even if it does, there is no viable, supported plan to restore profitable operations.  Even the Debtor has admitted that it cannot justify the investment required to restore Magnesium and Lithium production until global prices for those products rise—a factor entirely outside of the Debtor's control.  Beyond these factors, there is further equitable cause to convert this Chapter 11 Case to a chapter 7 case.  The Debtor should not

be allowed to pursue an uncertain, value-destructive chapter 11 restructuring that benefits only insiders and lenders, when the other stakeholders would fare better in a chapter 7 process. This is not the intended purpose of chapter 11. A chapter 7 process would be the more constructive use of the bankruptcy system, which provides fairness to all stakeholders through an untainted fiduciary.

## OBJECTIONS AND RELATED FILINGS

### A. *The Objections to the Conversion Motion*

9.  The Debtor Objection advances four principal arguments against conversion of the Chapter 11 Case:

> i.   the Debtor contends that the Committee has failed to establish continuing loss or diminution of the estate, arguing that "a continuing loss or diminution of the estate may be tolerated where reorganization is feasible" and that the proposed DIP Financing provides enough liquidity for the Debtor to operate and preserve enterprise value in chapter 11. Debtor Objection, at 3-4 ¶¶ 7, 9.
>
> ii.  the Debtor argues there is a reasonable likelihood of rehabilitation through a viable sale, emphasizing that its investment banker "is running a real and true sale process," the Stalking Horse Bid provides a "true floor" for sale value, and the Debtor has "a path forward" based on a business plan it later filed on the evening of October 14, 2025. *See id.*, at 5-6 ¶¶ 13-15.
>
> iii. the Debtor argues conversion is not in the best interests of creditors, asserting that "the proposed Stalking Horse Bid provides recoveries far exceeding Chapter 7 liquidation value." *Id.*, at 8 ¶ 24.
>
> iv.  the Debtor claims the Committee's Motion is premature, arguing that the Debtor should have "the opportunity to accomplish its restructuring goals" in chapter 11. *Id.*, at 6 ¶ 17.

10.  The Renco Joinder, filed jointly by Renco and LiMag Holdings, LLC (the "Stalking Horse Bidder" or "LiMag"), argues that the Committee has not shown "cause" to convert this Chapter 11 Case because:

i.     the Committee did not show that Estate assets have declined in value in the 32 to 35 days since the Petition Date and that the Committee's argument relies on "predictions of future losses";

ii.    with the proposed changes to the Stalking Horse Bid, the sale process creates a viable reorganization prospect;

iii.   the Debtor's business plan shows the already-existing-viability of the Debtor's business;

iv.    a chapter 11 process that only benefits the lender at the expense of unsecured creditors is not cause for conversion; and

v.     even if cause did exist, "unusual circumstances" exist here because there is "no *other* significant [domestic] producer of primary magnesium," which is a "critical component for defense contractors," and the sale of the Debtor's Direct Lithium Extraction (DLE) technology in chapter 7 would be an "enormous and irresponsible waste of value and potential upside."

Renco Joinder, at ¶ 21-22 (emphasis added).

### B.    *The Amended Stalking Horse APA*

11.    Attached to the Renco Joinder filed on October 13, 2025, Renco (on behalf of the Stalking Horse Bidder) filed an amended Stalking Horse APA (the "Amended APA") that removed the four conditions precedent in the original Stalking Horse APA ("Original APA," and the Stalking Horse's asset purchase agreement generally, the "Stalking Horse APA") discussed at the October 6 Hearing:  (i) a renegotiated Mineral Lease and royalty agreement with the State of Utah (together with the Utah Division of Division of Forestry, Fire, and State Lands, "Utah") that is satisfactory to the Stalking Horse Bidder, (ii) material modifications to the Consent Decree to conform with the Stalking Horse Bidder's listed requests, (iii) dismissal of the Utah receivership action by the presiding court, and (iv) a voluntary agreement with Utah regarding water rights agreeable to the Stalking Horse Bidder.  Renco Joinder, Ex. A §§ 6.3-6.6.

12.    In exchange for those previous conditions precedent to closing, Renco provides for two new conditions precedent:  (i) that this Court finds that the Mineral Lease is valid, enforceable,

7

and assignable to the Stalking Horse Bidder (all facts that are in dispute) *and* that this Court approves the assumption and assignment of the Mineral Lease to the Stalking Horse Bidder under section 365 of the Bankruptcy Code even over Utah's objection, and (ii) that this Court finds that the Consent Decree (of which any material modifications must be approved by the U.S. District Court for Utah) may be assumed by the Debtor and assigned to the Stalking Horse Bidder pursuant to section 365 of the Bankruptcy Code (which likely will be disputed) *and* the Court approves the assumption and assignment of the Consent Decree to the Stalking Horse Bidder even over the United States' objection. *Id.*

13.     The Amended APA also extends certain deadlines governing the proposed sale process by 30 days. Now, the auction must be held no later than December 4, 2025; the sale hearing must be held and sale order must be entered no later than December 9, 2025; and the sale must close no later than December 14, 2025. *Id.*, at 37-38 ¶¶ 8.1(j), 8.1(g), 8.1(b). To date, there has been no corresponding change to the deadline to submit qualifying bids (which is currently October 24, 2025).[8]

14.     On the evening of October 14, 2025, the Debtor filed a notice of the Amended APA, adopting Renco's version as own. *See Notice of Filing Revised Asset Purchase Agreement* [D.I. 199]. To date, neither the Debtor nor Renco has discussed any proposed changes to the Stalking Horse Bid with the Committee, and the changes in the Amended APA do not resolve the Committee's concerns with the sale process or the Stalking Horse Bid.

## C. *The Debtor's Business Plan*

15.     In the Debtor Objection and the accompanying declaration in support of the objection by Mr. Ron Thayer [D.I. 188], the Debtor previewed that it was developing a business

---

[8] Even if the revised timeline was sufficient (which it is not), as of the filing of this Reply there has been no corresponding change to the DIP Milestones that would prevent a default under the DIP Financing.

plan and listed a few terms.    The Debtor ultimately filed the business plan the evening of October 14, 2025.  *See Notice of Filing of Business Plan* [D.I. 200] (the "<u>Business Plan</u>").  The Business Plan has many flaws, however, including that (i) the Business Plan is missing key information like a balance sheet, cash flow statement, sources and uses table, debt schedule and capitalization table; (ii) the Business Plan shows that LiMag would need outside funding—which it does not currently have[9]—to fulfill the obligations under the Consent Decree, which are estimated by Renco to be $11.5 million; (iii) there is little detail about the funding that Renco purportedly commits to provide LiMag or whether it is sufficient to fund LiMag's obligations; and (iv) certain anticipated operations (residual sodium chloride and magnesium chloride recovery) appear to require the shutdown of a third party's operations (Cargill) without any apparent support from that third party.

## <u>ARGUMENT</u>

16.    The Debtor's and Renco's attempts to rehabilitate the proposed DIP Financing and Stalking Horse Bid with window dressing do not change the structural problems with both transactions or the fact that the Debtor's proposed chapter 11 strategy makes the Estate's key stakeholders worse off than a chapter 7 liquidation.

**A.    "Cause" Exists to Convert the Chapter 11 Case to a Chapter 7 Liquidation.**

17.    Section 1112(b) of the Bankruptcy Code provides a *non-exhaustive* list of circumstances that constitute cause for conversion under the Bankruptcy Code.  11 U.S.C. § 1112(b)(4).  The "continuing loss or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" is merely one example of "cause" among many.  *Id.*  The statute

---

[9] The Renco Group, Inc. Rule 30(b)(6) Dep., J. Weiss ("<u>Weiss Dep.</u>"), Oct. 13, 2025, at 137:3-137:7 (noting that Renco neither committed to fund LiMag nor discussed funding LiMag with any specific lenders).  Attached hereto as <u>**Exhibit B**</u> are excerpts from the deposition transcript of Joshua Weiss, the corporate representative for Renco.

provides for conversion upon any cause that warrants conversion, not just the enumerated examples.

18.    As the Third Circuit and this Court, among numerous others, have held, "cause" for conversion exists where a debtor lacks a realistic prospect of reorganization, where the bankruptcy filing serves no valid reorganizational purpose, or where the debtor is using the bankruptcy process to achieve objectives that could not be obtained outside of bankruptcy to the detriment of creditors. *See, e.g., In re SGL Carbon Corp.*, 200 F.3d 154, 166 (3d Cir. 1999) (holding that a petition filed to gain a litigation advantage or for an improper purpose is subject to dismissal or conversion for lack of good faith); *In re Integrated Telecom Express Inc.*, 384 F.3d 108, 119–20 (3d Cir. 2004) (dismissal warranted where the case is not filed to preserve value for creditors or is used to achieve objectives unavailable outside bankruptcy); *In re LTL Management, LLC*, 64 F.4th 84, 101 (3d Cir. 2023) (ordering dismissal where debtor lacked financial distress and a valid reorganizational purpose); *In re Commonwealth Renewable Energy, Inc.*, 550 B.R. 279, 283 (Bankr. W.D. Pa. 2016) ("The Third Circuit has determined that cause exists when there is not "a reasonable possibility of a successful reorganization within a reasonable period of time") (citing *In re Am. Cap. Equipment, LLC*, 688 F.3d 145, 162 (3d Cir. 2012); *see also In re Brown*, 498 B.R. 486, 507 (Bankr. E.D. Pa. 2013) ("Fundamental bankruptcy policy continues to support the proposition that the inability to propose a feasible reorganization or liquidation plan provides 'cause' for dismissal or conversion of a chapter 11 case on request of an interested party."); *In re Hinchlife*, 164 B.R. 45, 52 (Bankr. E.D. Pa. 1994) (Cause existed for converting chapter 11 case to chapter 7 based on debtor's slim prospects of successfully reorganizing and on continuing loss or diminution to the estate).

19.    Cause exists to convert this Chapter 11 Case to a chapter 7 liquidation because, in

short, a chapter 7 process would provide a better path for the Debtor to sell its assets and is in the best interests of creditors and other stakeholders.  As the Committee showed in the Conversion Motion, the Estate is losing value every day that the Debtor bears the cost of the DIP Financing *and* the cost of preserving and selling the DIP Lender's collateral, and any prospects of a sale or profitable business operations seem highly contingent at best.

20.     But those factors are just part of the picture creating cause for conversion here.  The Objections quibble that the Committee did not meet the requirements of section 1112(b)(4)(A) of the Bankruptcy Code for reasons that the Committee contends are inaccurate or inconsequential to the inquiry.  It is notable, however, that the Objections do not refute the value-destructive terms at the heart of the proposed DIP Financing and sale process that, on their own, create cause to convert this case to a case under chapter 7 for the benefit of creditors.

**B.      The DIP Financing Will Burden the Estate but Provide No Guaranteed Funding.**

21.     The Debtor and the DIP Lender have made no changes to the proposed DIP Financing terms.[10]  The terms of the proposed DIP Financing are just as value-destructive as they were when the Conversion Motion was filed.  *See* Conversion Motion ¶¶ 17-23.

22.     More concerning, however, is that the DIP Financing is not committed financing— it is entirely subject to Renco's choice to fund each draw, which Renco can decline on a whim without any recourse.  Renco is not a party to the DIP Agreement and the DIP Agreement does not obligate Renco to provide Tranche B funding.  Similarly, the Debtor's proposed Final DIP Order does not bind Renco to any DIP Financing commitments.  Instead, Renco's participation in the DIP Financing is governed by a separate agreement between Renco and the DIP Lender, that

---

[10] After being raised by the Committee prior to the October 6 hearing the Debtor made one change to the Final DIP Order by eliminating the provision that incredibly granted liens on the unencumbered assets to secure **all prepetition obligations**.

certain *Tranche B Dip Term Loan Participation Agreement* dated as of September 12, 2025 (the "Participation Agreement"), attached hereto as **Exhibit A**.  The Debtor is not a party to the Participation Agreement and therefore cannot enforce any commitments thereunder.  Moreover, the Participation Agreement makes clear that "Borrower [the Debtor] shall not have any rights or remedies under or relating to this Agreement."  Participation Agreement § 4.4.  In short, neither the Debtor nor the Court can compel Renco to lend the $5 million Tranche B portion of the DIP Financing, and the Debtor has no recourse against Renco if it refuses to lend.

23.     This is highly problematic because, under the DIP Agreement, if the Debtor makes a draw request and Renco does not fund the Tranche B participation portion of such request, such failure by Renco constitutes an Event of Default and Wells Fargo is no longer obligated to fund its portion of the DIP Financing.  DIP Agreement § 7.1.  Renco, therefore, has immense power over the Chapter 11 Case because it can trigger an Event of Default at any time by refusing to fund a DIP Financing request—in which case, the DIP Lender can proceed (absent injunctive relief from this Court) to foreclose on the Debtor's Unencumbered Assets (and other collateral).  In fact, the Participation Agreement creates a sanctioned avenue for Renco to do just that—Renco may issue a "Sales Transaction Termination Notice" stating that it no longer wants to consummate the Stalking Horse Bidder's purchase of the Debtor's assets, which would relieve Renco of any further participation obligations beyond funding half of the costs to, effectively, terminate the case.  *See* Participation Agreement § 2.3, § 1.10 (" 'Sales Transaction Termination Notice' means a written notice from Tranche B DIP Term Loan Participant to Lender, in form and substance reasonably satisfactory to Lender, stating that Tranche B DIP Term Loan Participant will no longer proceed to consummate the Sales Transaction.");  DIP Agreement § 1.1(r).  Put another way, if Renco chooses not to fund Tranche B of the DIP Financing for any reason—for example, if another bidder

submits a qualifying bid or if Renco does not achieve its requested concessions from Utah and the EPA –Renco can walk away from all financing obligations without any recourse to the Debtor or the DIP Lender.

24.     Moreover, Wells Fargo is granted unfettered authority under the Interim DIP Order and the proposed Final DIP Order to unilaterally amend, supplement, or otherwise modify any provision of the DIP Agreement, without any requirement for notice, approval, or oversight by the Debtor, the Court, or other parties in interest. *See* Interim DIP Order, at 24 ¶ 31 ("The Lender, *in its sole discretion*, may amend, supplement or otherwise modify, or agree to a waiver or consent in respect of, any provision of the Ratification and Amendment Agreement.") (emphasis added); *Notice of Filing Proposed Final Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing, and (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims; (II) Granting Adequate Protection; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* [D.I. 126], at Exh. 1 ¶ 31 (same).  Wells Fargo could similarly choose to spontaneously cut all funding to the Debtor, or impose even more onerous terms, without any notice or hearing. Thus, not only is the proposed DIP Financing value destructive to unsecured creditors (for reasons set forth above and in the Committee's objection to the DIP Financing [D.I. 130] (the "Omnibus Committee Objection")), including the encumbrance of valuable previously unencumbered assets—on a 2 to 1 roll up basis no less ), it is totally illusory.

**C.     Recent Amendments to the Stalking Horse APA Do Not Meaningfully Improve the Bid Procedures or Sale Terms.**

25.     Even after the amendments to the Stalking Horse Bid, the prospects for consummating the proposed sale remain as uncertain as the DIP Financing.  The Revised APA continues to be dependent on conditions precedent that likely cannot be met, or that may require

more time to fully address.[11]  In particular, it is unclear on what basis the Consent Decree could be assumed and assigned to the Stalking Horse Bidder under section 365 of the Bankruptcy Code under any circumstances, and particularly over the objection of the United States.  The Consent Decree was entered by the District Court for the District of Utah, and any material modification of the Consent Decree requires approval by that court.  Renco did not state what jurisdiction this Court would have to modify the Consent Decree to assign it per the Amended APA.  Similarly, Renco did not state how the Mineral Lease could be assumed and assigned over Utah's objection notwithstanding the protections of section 365(c)(1) of the Bankruptcy Code.

26.    Even if the Consent Decree and the Mineral Lease could be assumed and assigned over the objections of the EPA and Utah, respectively, LiMag likely will be unable or unwilling to show adequate assurance of future performance, pay the full burden of the cure costs, and promptly cure any current defaults.  For example, according to Utah, the Debtor is currently non-compliant with the Consent Decree including for "(1) failure to adjust the amount of financial assurance required for the closure of the retrofitted waste ponds, (2) failure to cease "operation of electrolytic cells in Building 4 or retrofit with wet anode dust handling by the July 15, 2022 deadline," (3) failure to "address the grizzly vault," which paragraph 18 of the Consent Decree refers to "implement[ing] the Courtyard Capping Plan to address soil contamination in the Courtyard," and (4) failure to initiate construction of a filtration system project."[12] The costs to cure these violations are admittedly in the tens of millions of dollars and must be cured ***promptly***. 11 U.S.C. § 365.  At a minimum, these new conditions precedent are structured, like their

---

[11] Renco's corporate representative indicated that there was no plan to raise the issues of whether the Mineral Lease or the Consent Decree could be assumed and assigned under section 365 of the Bankruptcy Code prior to the sale hearing, which is five days before the closing deadline under the Revised APA. Weiss Dep., at 143:1-143:14 ("Q: Is it anticipated that this issue [of whether the Mineral Lease may be assumed and assigned without the consent of Utah] will come before the Court before the final sale hearing? A: I have no idea.").

[12] Utah Joinder, at ¶ 17.

predecessors, to force the EPA and Utah to the negotiating table to address the scope of LiMag's compliance as the parties hammer out cure costs and adequate assurance obligations.[13]  As such, the replacement conditions precedent to closing in the Amended APA leave the Estate in the same position as the prior conditions:  at the mercy of Renco to waive the conditions if, and only if, Renco can get its requested concessions from the EPA and Utah.  In the event Renco does not get the deal it wants, it may choose one of various "off-ramps" to get out of the proposed sale and the Debtor would have no recourse.  The Stalking Horse Bid provides for no deposit.

27.    Even under the Amended APA, the sale-related deadlines do not allow for a truly competitive sale process.  A 30-day extension of the sale deadlines is not meaningful for a business as complex and heavily-regulated as the Debtor's business, particularly where the marketing did not begin until a full week after the petition date.  *See* Victor Dep., at 25:7-25:13.  Moreover, the Chapter 11 Case and the sale process will be governed by the milestones in the DIP Financing, not in the Amended APA.  To date, there has been no change to the DIP Financing milestones and no indication that the DIP Lender will agree to a matching extension, which makes any extension in the Amended APA functionally meaningless.  *See* Weiss Dep., at 146:3-146:15.  Ultimately, though a longer sale process would be helpful, the real issue is structural:  there is no amount of marketing that will motivate a potential bidder to expend the significant time and resources necessary to bid on a superfund site's operations when the parent company can cancel the sale process the minute it faces real competition.

28.    The Amended APA does not change the economics of the Stalking Horse Bid,

---

[13] J. Scott Victor, Deposition Tr. ("<u>Victor Dep.</u>"), at 36:20-41:2 (Oct. 13, 2025) ((in response to the Committee's inquiry on curing defaults to assume and assign the Consent Decree and Mineral Lease as a result of the changes reflected in the Revised APA, Mr. Victor acknowledged that "[the Debtor's and the new buyer's] plan is to negotiate with the State and the EPA over the best path forward . . . .").  Attached hereto as **Exhibit C** are excerpts from the deposition transcript of J. Scott Victor.

which, put simply, is a bad deal for creditors.  Not only would the Stalking Horse Bidder purchase

assets whose book values far exceed the non-insider funded debt that would be assumed under the

Purchase Price[14] but the Stalking Horse APA also provides for the purchase of the Debtor's

Unencumbered Assets, though there has been no valuation of those assets to determine whether

the Purchase Price is appropriate.[15]  In fact, the Unencumbered Assets could have substantial

value, including the Ace Commercial Tort claim that seeks damages in the amount of $56 million[16]

and claims and causes of action against Renco and other insiders which, in the prior MagCorp

bankruptcy yielded a judgment of approximately $200 million.  *See* EPA Objection ¶ 5.  Renco

would not confirm that the Salt Lake City Property was excluded from the sale in the event the

pending $3.5 million purchase offer on that property does not close first, and this likely will not

be confirmed until the schedules to the Stalking Horse APA are filed.  Weiss Dep., at 103:15-

104:3.

29.      In exchange for these material Unencumbered Assets, the Estate would receive no

cash value—no cash to distribute to creditors, no cash to fund a plan process, no cash to wind

down the Estate.  As Renco's corporate representative explained in a deposition, the "Cash

Consideration" in the Purchase Price, totaling no more than $250,000, would be used only to fund

cash payments that are required under the Stalking Horse APA to close the sale.  Weiss Dep., at

95:10-97:6.  To the extent the Revised APA does not require any cash payments to be made to

close the transaction, no Cash Consideration would be paid.  *Id.*  In short, the cash component of

the Purchase Price does not provide any funding to the Estate for winddown or other purposes.

30.      Moreover, the Stalking Horse Bidder cannot credit bid a claim to purchase assets

---

[14] For example, the book value of the Debtor's inventory alone is $47.5 million. Weiss Dep., at 102:6-102:11 (Renco acknowledging this value in the Debtor's balance sheet, though without knowledge of the measure of calculation).
[15] Weiss Dep., at 103:1-103:9; Thayer Dep., at 59:10-59:15; Victor Dep., at 18:19-20:6.
[16] Thayer Dep., at 26:16-27:11.

not securing such claim when the only other consideration is the assumption of debt obligations that are also not secured by such assets.

31.     Though the Objections claim that the proposed Stalking Horse Bid provides a more favorable outcome for creditors than a chapter 7 liquidation because contracts would be assumed and cured, these claims are entirely unsupported.  The Stalking Horse Bidder has yet to prepare, much less file, its schedules to the Stalking Horse APA, and there is no way to determine how many agreements might be assumed and assigned.  Weiss Dep., at 168:13-169:6 (acknowledging that "if [the Debtor and Renco] didn't file [schedules] with the [Stalking Horse] APA, then it probably hasn't been created yet.").  Further, claims that LiMag would create many new jobs and business for vendors are similarly unsubstantiated.  The Business Plan does not reliably back up those claims.

32.     Further, claims by the Debtor and Renco that a sale to the Stalking Horse Bidder would better protect environmental interests than a chapter 7 process are belied by the continued support for conversion by Utah and the United States, the stakeholders most invested in the Debtor's environmental compliance.

**D.     The Debtor's Business Plan Does Not Show a Reasonable Likelihood of Rehabilitation.**

33.     The Business Plan prepared by the Debtor is more of an aspirational statement than a reliable prediction of LiMag's ability to meet its post-sale obligations, much less turnaround the Debtor's flailing business.  The Business Plan is missing important information, including specifics on how the business would be capitalized and the sources of the funding needed to implement the stated plan.  When Renco's corporate representative, Mr. Weiss, was asked in a deposition conducted the day before the Business Plan was filed whether Renco planned to invest in LiMag, Mr. Weiss answered, "potentially."  Weiss Dep., at 137:3-137:4.  Mr. Weiss also

confirmed that Renco had not discussed funding for LiMag with any other lenders. *Id.*, at 137:3-137:7. The Business Plan, and any prospects to restart magnesium or lithium production, requires significant funding but neither Renco nor the Debtor can show concrete plans to provide for that funding.

34.     The Business Plan does not provide the specific, reliable information needed to show a reasonable likelihood of reorganization. *See In re Schriock Const., Inc.*, 167 B.R. 569, 576 (Bankr. D.N.D. 1994) (explaining that the "concept of rehabilitation necessarily hinges upon establishing a cash flow from which current obligations can be satisfied"); *In re Youngwoo Moon*, 2012 WL 6727186, at *2 (Bankr. S.D. Ga. Dec. 13, 2012) (finding that ongoing negative cash flow and an inability to satisfy current expenses but for loans from family members constitutes a loss or diminution of the estate). Currently, it is not clear whether LiMag could even service its immediate liabilities without reliably committed financing, much less expand beyond the current scope of the Debtor's operations. The Debtor's operations have been cash flow negative for years prior to the Petition Date and it is not clear that LiMag, which will take on much of the same prepetition funded debt burden and Consent Decree obligations, could make a profit on the same scope of operations.

35.     Even worse, the Business Plan appears to have been developed without input from Renco, so it may not have Renco's support. Even the day prior to filing the Business Plan, Renco had not yet seen it. Weiss Dep., at 123:3-123:5. In the following exchange from his deposition, Mr. Weiss indicated that if Renco later determines that the Business Plan is not acceptable, Renco could pull one of its various levers to derail this case, making all of the costs and sacrifices of funding this Chapter 11 Case meaningless. Mr. Weiss testified as follows:

6          Q.       How do you know that this business
7    plan will be acceptable to LiMag?
8          A.       I don't.
9          Q.       If it's not acceptable to LiMag, what
10   is the next step to figure out how to make the
11   business profitable after closing?
12         A.       Well, the --
13              MR. HAYES:  Objection to form.
14         A.       There are a lot of options on the
15   table if -- if LiMag ultimately concludes that it
16   cannot make this business work.  And those could be
17   allowing the option to go forward and seeing if a
18   real party steps up to buy the assets, or maybe
19   you'll get what you want and the case will be
20   converted.
21         Q.       If LiMag chooses to allow the auction
22   to go forward, as you say, but there is no competing
23   bid, would LiMag walk away from the stalking horse
24   APA and not close?
25              MR. HAYES:  Objection to form; calls

Page 124

1    for speculation.
2    BY MS. BARAV-JOHNSON:
3          Q.       Do you see that as a potential option
4    for the stalking horse bidder?
5          A.       That we wouldn't consummate the
6    stalking horse transaction?
7          Q.       Yes.
8          A.       As we sit here, I don't know.
9    Anything's possible.

**E.    This Chapter 11 Case Is Not Structured to Prioritize the Best Interest of Creditors.**

36.    This chapter 11 case is being run by and for Renco—no amount of time in chapter

11 will change that.  The Debtor does not appear to be in a position to push back on the Prepetition

19

Secured Lenders, a fact that is apparent in the one-sided terms of the DIP Financing and Stalking Horse Bid.

37.    Though an Independent Manager was appointed so that the Debtor could negotiate and evaluate transactions free of Renco's influence, the Independent Manager is not independent at all.  Renco singlehandedly chose Shaun Martin to be the Debtor's Independent Manager.  *First Stipulation of Facts Between the Debtor and the Official Committee of Unsecured Creditors* [D.I. 128] (the "<u>First Stipulation</u>"), at 2-3 ¶¶ 1-4.  While Renco consulted with Wells Fargo to ensure the lender supported Renco's pick for the Independent Manager [Weiss Dep., at 115:3-116:24], the Debtor did not participate in the selection of the Independent Manager or interview any candidates for the role.  First Stipulation, at 2-3 ¶¶ 1-4.  Mr. Martin is not independent of Renco, and cannot be neutral as he evaluates the terms of the DIP Financing, the Stalking Horse APA, or any other transactions that may be proposed in this Chapter 11 Case.  In any event, Mr. Martin appears to serve as more of a figurehead, since Mr. Thayer (who has worked for the Debtor for over 20 years [Thayer Dep., at 8:1-8:11][17] and who Renco describes as indispensable [Weiss Dep., at 161:7-161:15] appears to have been the one to negotiate the terms of the DIP Financing and Stalking Horse Bid on behalf of the Debtor [Weiss Dep., at 64:22-65:5, 77:16-78:6; Victor Dep., at 9:6-9:12; Mayo Dep., at 46:24-47:14[18]].

**F.    No Unusual Circumstances Weigh Against Conversion.**

38.    The Renco Joinder seeks to argue that there are unusual circumstances here to prevent conversion because there is "no *other* significant producer of primary magnesium" in the United States, and the mineral has important uses.  Renco Joinder, ¶ 21 (emphasis added).  Renco glosses over the fact that the Debtor is not currently a producer of magnesium, it has not been a

---

[17] Attached hereto as **<u>Exhibit D</u>** are excerpts from the deposition transcript of Ron Thayer.
[18] Attached hereto as **<u>Exhibit E</u>** are excerpts from the deposition transcript of Ron Mayo.

producer of magnesium in years, and there are currently no set plans to become a producer of magnesium in the foreseeable future. *See* Thayer Dep., at 26:13-26:15 (noting magnesium production ceased in 2022); *see also Declaration of Ron Thayer in Support of First Day Motions* [D.I. 4] (the "First Day Declaration") ¶ 18; Weiss Dep., at 135:3-136:11.

39.    In fact, there are unusual circumstances here that weigh strongly in *favor* of conversion. As the Court noted, it is rare that a debtor with prepetition secured debt enters chapter 11 with material unencumbered assets—assets that could be worth tens of millions of dollars, if not hundreds of millions of dollars.[19] Every day that the Debtor remains in chapter 11, the Unencumbered Assets are further collateralized or ultimately sold for no value to the unsecured creditors who would have otherwise benefitted from them. The prospects offered by this Chapter 11 Case simply are not worth the cost.

40.    In sum, in the week and a half since the October 6 Hearing, nothing has changed to create a constructive path forward in chapter 11. The Committee, a fiduciary for creditors validly owed approximately $100 million or more by an environmental pariah that blames everyone and everything but its equity holder and management for its problems, has been completely ignored by the other parties. In that same time period, the Committee has only learned more about the infirmities of the DIP Financing and the proposed insider stalking horse bid. This case does not warrant the cost of remaining in chapter 11. The Court should grant the Committee's motion to convert this Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, for the benefit of creditors and other stakeholders.[20]

---

[19] According to the U.S. Response, the chapter 7 trustee in the bankruptcy proceedings for the Debtor's predecessor, MagCorp, pursued fraudulent transfer claims against Renco and related parties. resulting in an approximately $200 million recovery for MagCorp's bankruptcy estate. U.S. Response ¶ 5.

[20] So disillusioned is Renco about these infirmities that it actually characterizes the Conversion Motion as "outrageous."

WHEREFORE, the Committee respectfully requests the entry of an order, substantially in the form attached to the Conversion Motion as <u>Exhibit A</u>, (i) granting the Conversion Motion, (ii) overruling the Objections, (iii) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, and (iv) granting such other relief as is just and proper.

[*Signature Page Follows*]

Dated: October 15, 2025
     Wilmington, Delaware

**COLE SCHOTZ P.C.**

*/s/ Michael E. Fitzpatrick*
Justin R. Alberto (No. 5126)
Michael E. Fitzpatrick (No. 6797)
500 Delaware Avenue, Suite 600
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
Email: jalberto@coleschotz.com
       mfitzpatrick@coleschotz.com

- and -

**EVERSHEDS SUTHERLAND (US) LLP**
Todd C. Meyers (admitted *pro hac vice*)
Danielle Barav-Johnson (admitted *pro hac vice*)
999 Peachtree Street, NE
Atlanta, GA 30309
Telephone: (404) 853-8000
Email: toddmeyers@eversheds-sutherland.com
       dahnibarav-johnson@eversheds-
       sutherland.com

-and-

Todd C. Meyers (admitted *pro hac vice*)
John J. Ramirez (admitted *pro hac vice*)
Sameer M. Alifarag (admitted *pro hac vice*)
1114 Avenue of the Americas, 40th Floor
New York, NY 10036
Telephone: (212) 389-5000
Email: toddmeyers@eversheds-sutherland.com
       johnramirez@eversheds-sutherland.com
       sameeralifarag@eversheds-sutherland.com

*Proposed Counsel to the Official*
*Committee of Unsecured Creditors*