# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>US MAGNESIUM LLC,[1]<br><br>Debtor. | ) <br>) Chapter 11<br>)<br>) Case No. 25- 11696 (BLS)<br>)<br>) **Re: Docket Nos. 10 and 32**<br>) |

### SUPPLEMENTAL REPLY OF LENDER IN SUPPORT OF
### THE MOTION OF THE DEBTOR FOR A FINAL ORDER AUTHORIZING
### POST-PETITION FINANCING AND GRANTING RELATED RELIEF

Wells Fargo Bank, National Association, as lender (the "Lender"), through its undersigned counsel, hereby submits this supplemental reply (the "Reply") to the Objections (the "Objections") of Tooele County [D.I. 99], Forgen, LLC [D.I. 120], Utah Division of Forestry, Fire and State Lands (the "State of Utah") [D.I. 121], the U.S. Environmental Protection Agency (the "EPA") [D.I. 124], ATI Titanium LLC ("ATI") [D.I. 129], and the Official Committee of Unsecured Creditors [D.I. 130] (the "UCC", and, collectively, the "Objectors"), as well as the arguments raised by the Objectors at the October 6, 2025 hearing, to the *Debtor's Motion for Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims and (C) Utilize Cash Collateral; (II) Granting Adequate Protection; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* [D.I. 10] (the "DIP Motion") and, in further support of the DIP Motion, states as follows:

---

[1] The last four digits of the Debtor's federal tax identification number are 5446. The Debtor's address is 238 N 2200 W, Salt Lake City, Utah 84116.

**THERE ARE NO UNSECURED ASSETS OF THE ESTATE
AVAILABLE FOR UNSECURED CREDITORS.**

1.      Wells Fargo Bank, N.A. ("Wells Fargo") is the pre- and post-petition secured lender to the Debtor[2] and files this Reply in opposition to the allegation of the various parties that there are substantial unsecured assets available for unsecured creditors.[3] Wells Fargo is owed in excess of $41,000,000[4] by the Debtor, and these pre- and post-petition advances are secured by valid and perfected liens on all of the personal property of the Debtor and the Salt Lake City Property.

2.      As evidenced by the exhibits previously circulated to the parties, Wells Fargo holds a valid pre-petition lien on all of the personal property of the Debtor, including but not limited to the machinery and fixtures of Debtor, all accounts and contract rights, inventory and the general intangibles of the Debtor, which includes the contract claim being asserted by the Debtor against Ace American Insurance Company ("Ace") and the Debtor's interest in the Skull Valley Joint Venture. Tooele County, a subdivision of the State of Utah, claims a competing interest in the machinery, equipment and fixtures located at the Debtor's facility in Rowley, Utah, as well as the real property owned by the Debtor and located in Tooele County.

3.      Pursuant to the Interim DIP Order, Wells Fargo was granted a mortgage upon the Salt Lake City Property in exchange for the various DIP Term Loans—which at present equal $2,800,000 and may or may not exceed the value of the Salt Lake City Property when sold. In addition, the Interim DIP Order provided Wells Fargo, solely with respect to the DIP Term Loans,

---

[2] Terms used but not otherwise defined herein shall have the meanings assigned to such terms in the *Reply of Lender in Support of the Motion of the Debtor for a Final Order Authorizing Post-Petition Financing and Granting Related Relief* [D.I. 140] (the "DIP Reply").

[3] Oct. 6 Hr'g Tr. 23:13-14.

[4] Although the Debtor owes in excess of $69,800,000 under the Wells Fargo credit facility, since Wells Fargo is paid first under the waterfall in the credit facility, Wells Fargo is only owed between $41,000,000 and $42,000,000.

expanded rights in the Debtor's litigation against Ace. More specifically, Wells Fargo's security interest in the Ace litigation, which already included the existing contract claims against Ace, was expanded to include any future claim by Ace or the Debtor based on a theory of liability other than breach of contract, such as tort. Similarly, the Interim DIP Order expanded Wells Fargo's existing security interest in the interest of the Debtor in the Skull Valley JV (as hereinafter defined) as a general intangible, including the right to receive the Debtor's distributions from the Skull Valley JV, to also include the consent of the Debtor's joint venture partner, ATI Titanium LLC, to the Debtor's pledge of its interests in the Skull Valley JV to Wells Fargo.

**A.    The Ace Commercial Tort Claim Is a Potential Claim, That Has Not Yet Been Brought, in a Lawsuit That Was Encumbered Pre-Petition.**

4.    The Ace Commercial Tort Claim relates to a lawsuit brought by the Debtor against one of its insurers, Ace. On April 9, 2025, the Debtor filed a complaint (the "Complaint") against Ace alleging a single count of breach of contract for wrongfully denying coverage under an "All Risk" property insurance policy following a catastrophic equipment failure at its Rawley, Utah magnesium production facility (the "Ace Contract Claim").

5.    According to the Complaint, a March 2021 turbine breakdown triggered a cascading series of failures—including further turbine damage, spray dryer breakdowns, and eventual destruction of the electrolytic cells—that halted magnesium and chemical production and forced the Debtor to cease production of magnesium and chloride based products. Despite the Debtor providing extensive documentation to, and cooperating, with Ace over four years, Ace has paid only a small portion of the alleged $60 million business-interruption losses and has refused to cover property damage, claiming there is no causal link between the turbine failure and subsequent damage. The Debtor contends that the losses are plainly covered under the policy—

which insures against equipment damage, business-interruption losses, and mitigation costs arising from a single "accident"—and seeks payment of the remaining policy limits, plus interest, attorneys' fees, and other damages.

6. The Ace Contract Claim constituted part of the Lender's collateral as of the Petition Date. On June 2, 2002, the Debtor granted the Lender a security interest in substantially all of the Debtor's present and future personal property, including all "general intangibles." A lawsuit for breach of contract is a "general intangible" under Article 9 of the UCC. *See* Section 9-102(a)(42) defining a "general intangible" as "any personal property, including things in action…"; *see also In re Northview Motors, Inc.*, 202 B.R. 389, 395 (Bankr. W.D. Pa. 1996), *subsequently rev'd (on other grounds) sub nom. Northview Motors, Inc. v. Chrysler Motors Corp.*, 186 F.3d 346 (3d Cir. 1999). A general intangible is perfected by filing a UCC-1 financing statement in the debtor's location. *See* UCC Sections 9-310(a) and 9-307(e). The location of the Debtor is the Delaware Secretary of State. The Lender filed an all asset UCC-1 financing statement against the Debtor with the Delaware Secretary of State covering all present and future personal property of the Debtor (the "<u>Wells UCC-1 Financing Statement</u>"), including all present and future general intangibles. The Wells UCC-1 Financing Statement had been duly continued by the filing of UCC-3 continuation statements within the six-month window before the original Wells UCC-1 Financing Statement expired as required by UCC 9-515(d). As such, the Debtor granted, and the Lender received, a valid security interest in the Ace Contract Claim that was perfected as of the Petition Date.

7. The Complaint describes certain facts and circumstances that could give rise to additional claims that are not presently included in the Complaint. For example, the Complaint suggests that Ace may have acted in bad faith, or was negligent, in processing or denying the

Debtor's insurance claim, potentially giving rise to a commercial tort claim—*i.e.*, the Ace Commercial Tort Claim. The Ace Commercial Tort Claim constitutes different property, and a different type of collateral, under the UCC from the Ace Contract Claim. *See* UCC Section 9-102(a)(42) (stating expressly that a "commercial tort claim" is not a general intangible).  A commercial tort claim is a claim where the claimant is an organization or individual and the claim arose out of the claimant's business or profession and does not include damages arising out of personal injury or the death of an individual. *See* UCC Section 9-102(13). Moreover, a secured party cannot take a security interest in a commercial tort claim solely by virtue of a grant of a security interest in after-acquired property. *See* UCC Section 9-204(b)(2).  In order to obtain a security interest in a commercial tort claim, the debtor must grant a security interest at the time the commercial tort claim arises and the tort claim must be identified with greater specificity than simply "all commercial tort claims."   However, it is sufficient to describe the commercial tort claim after it  arises as all tort claims arising out of the specific event, "even if the exact amount of the claim, the theory on which it may be based, and the identity of the tortfeasor are not described." *See* UCC Section 9-108, comment 5.  Here, the specific events or circumstances are the denial by Ace of the Debtor's insurance claim.

8.    While the Complaint seeks $56 million in damages, the action was commenced only on April 9, 2025. The litigation of the Ace Contract Claim is in its infancy, and it is the Lender's understanding that no settlement discussions have taken place. Given the uncertainty inherent in all litigation, in particular insurance litigation, it may take years to reach a judgment, which then could be appealed.  The Ace Commercial Tort Claim is even more attenuated, because there is the additional uncertainty as to whether any commercial tort claim could (or will) be alleged by the Debtor, as none yet have, or otherwise be found to exist in a judgment.  Although

the Ace Commercial Tort Claim is negligible in the sense that no specific commercial tort has yet been alleged, the facts and circumstances that exist by reason of Ace's denial of the insurance claim give rise to a "commercial tort claim" under the UCC, and therefore, the Ace Commercial Tort Claim is being added to the Lender's collateral as a precaution.

9. In the context of this Chapter 11 Case where there is little value presently available to distribute, the Lender was required to obtain a security interest in the Ace Commercial Tort Claim as part of the DIP Facility. Debtor granted a security interest in the Ace Commercial Tort Claim pursuant to the Ratification and Amendment Agreement and the Interim Order. The Interim Order provided for the perfection of the Ace Commercial Tort Claim through the Interim Order and authorized the filing of UCC financing statements to more fully evidence the perfection of Lender's security interest in the Ace Commercial Tort Claim. The Lender filed a UCC-3 amendment to amend the collateral description to the Wells UCC-1 Financing Statement describing the Ace Commercial Tort Claim properly perfecting its security interest therein. *See, e.g.*, *Shirley Medical Clinic, P.C. v. United States*, 446 F. Supp 2d 1028 (S.D. Iowa 2006). Importantly, the Ace Commercial Tort Claim currently secures only the Lender's new money DIP Term Loans, as ordered by the Court at the interim hearing.

10. Neither the Ace Contract Claim—the only claim that has actually been brought to date—nor the Ace Commercial Tort Claim represents a potential windfall to the unsecured creditors in this case. Both are nascent claims, either partially or fully encumbered, and necessary collateral to the Lender for whom there is presently very little available in this Chapter 11 Case.

**B.      While Unencumbered Prepetition, the Salt Lake City Property Now Secures the Lender's New Money DIP Term Loans.**

11. The Salt Lake City Property is a 2.57-acre property located at 238 North 2200 West, Salt Lake City, UT 84116. Located adjacent to the Salt Lake City International Airport, the property is an approximately 12,000 square foot office building, fixtures and a parking lot. The Salt Lake City Property is owned by the Debtor, and currently serves as the Debtor's headquarters. As of the Petition Date, the Salt Lake City Property was unencumbered, and the Debtor had begun marketing the property for sale. As a result of those prepetition marketing efforts, the Debtor had entered into an agreement with a third party to purchase the property.

12. Obtaining a mortgage on the Salt Lake City Property was essential to the Lender's agreement to provide the DIP Facility. Pursuant to the Ratification and Amendment Agreement and the Interim Order, the Debtor granted the Lender a mortgage and security interest in the Salt Lake City Property. Pursuant to Interim Order, as modified by the Court, the Salt Lake City Property currently secures only the Lender's post-petition advances. As authorized by the Interim Order, the Debtor executed and delivered a leasehold deed of trust and fixture filing covering the Salt Lake City Property which was duly recorded in the real estate records of Salt Lake County.

13. The Lender has already advanced approximately $2.8 million in DIP Term Loans, and agreed to advance DIP Term Loans in the amount of up to $10 million. There is no indication that the proceeds from the sale of the Salt Lake City Property would even cover Wells Fargo's portion of the DIP Term Loans. As noted, given the fact that the Debtor had little in the way of presently valuable property to serve as Collateral, the Lender required the Debtor to grant a mortgage over the Salt Lake City Property as part of the DIP Facility.

## C. The Skull Valley Joint Venture Interests are Encumbered.

14. The Debtor and ATI Titanium LLC ("ATI") are parties to that certain Operating Agreement of Skull Valley Water Group LLC dated February 2, 2007 (the "Skull Valley JV Agreement") wherein each of ATI and the Debtor are members of a joint venture (the "Skull Valley JV"). The Skull Valley JV was formed to operate a water delivery system consisting of wells, pumps, waterpipes and other equipment necessary to supply water (the "Water Delivery System") to a titanium sponge plant operated by ATI and the Debtor's production facility located in Tooele County. The water pumped through the Water Delivery System is also owned by the Skull Valley JV consisting of (i) 2.16 cubic feet per second ("CFS") of Utah water right #16-527, (ii) 2.67 CFS from water right 16-863, (iii) 2.00 CFS of water from Utah water right 16-181, and (iv) the water right from a certain Parsons back-up well. Each of these water rights includes the right to pump and divert the aforementioned quantities of water through the Water Delivery System pipelines and to the facilities of the members of the Skull Valley JV.[5] In sum, the Skull Valley JV appears to consist of rights in four wells and a series of pumps and pipes.

15. The Debtor's membership interest in the Skull Valley JV is a general intangible and a contract right. *See In re Dreiling*, 2007 WL 172364, at 1, 3, 61 U.C.C. Rep. Serv. 2d 837 (Bankr. W.D. Mo. 2007) (finding that creditors who had taken security interest in LLC interests were required to file a UCC-1 to perfect such interest as LLC interests were general intangibles). The general intangibles and contract rights of the Debtor related to the Skull Valley JV were pledged, along with all of the Debtor's other personal property, to Lender to secure the Pre-Petition Obligations and were perfected by the filing of the UCC-1 Financing Statement.

---

[5] *See* https://waterrights.utah.gov/.

16. While the Debtor's interests in the Skull Valley JV were included in the pledge, the pledge was subject to the restrictions on assignment in the Skull Valley JV Agreement. Under Section 8.5 of the Skull Valley JV Agreement, no member may encumber its membership interest as collateral or security for any obligation without the written consent of all members. Notwithstanding the anti-assignment clause in the Skull Valley JV Agreement, Section 8.6 of the Skull Valley JV Agreement clearly contemplates that a third party who receives a membership interest in the Skull Valley JV in contravention of the anti-assignment provisions in the agreement receives only the right to receive distributions of profits and losses with respect to the transferred interest but does not receive any other rights of a member under the Skull Valley JV Agreement, such as the right to participate in management.

17. Accordingly, at a minimum the Lender has a prepetition perfected security interest in the membership interests of the Debtor in the Skull Valley JV Agreement and the right to receive the Debtor's distributions from the Skull Valley JV.

18. As part of the DIP Facility, the Lender requested a pledge of the Debtor's membership interest in the Skull Valley JV to the extent it was not encumbered. Following the Court's ruling at the interim hearing, the Debtor's membership interests in the Skull Valley JV were pledged only to secure the new money DIP advances. Subsequent to the interim hearing, the Debtor obtained the consent of ATI to the pledge of the Debtor's membership interest in the Skull Valley JV. The Lender, the Debtor, and ATI have agreed on language that was to be included in the Final Order.

**CONCLUSION**

19. By reason of all of the foregoing, the Lender agrees with the Debtor that the Court should enter the Final Order in the form submitted, and grant such other and further relief as may be just and proper.

Dated: October 15, 2025

Respectfully submitted,

**BURR & FORMAN LLP**

*/s/ J. Cory Falgowski*
J. Cory Falgowski (No. 4546)
222 Delaware Avenue, Suite 1030
Wilmington, DE 19801
Telephone: (302) 830-2312
Email: jfalgowski@burr.com

- and -

**OTTERBOURG P.C.**
Jonathan N. Helfat (admitted *pro hac vice*)
Adam C. Silverstein (admitted *pro hac vice*)
Matthew Breen (admitted *pro hac vice*)
230 Park Avenue
New York, NY 10169
Telephone: (212) 661-9100
Email: jhelfat@otterbourg.com
         asilverstein@ottterbourg.com
         mbreen@otterbourg.com

*Attorneys for Wells Fargo Bank, N.A.*