**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| US MAGNESIUM LLC, [1] | Case No. 25-11696 (BLS) |
| Debtor. | |

**EMERGENCY MOTION TO ADJOURN**
**OCTOBER 16, 2025 HEARING**

The debtor and debtor in possession in the above-captioned case ("Debtor") requests an order under 11 U.S.C. § 105(a), Fed. R. Bankr. P. 9006 and 9014, and Del. Bankr. L.R. 9006-2 adjourning the October 16, 2025 hearing date and all related deadlines with respect to:

(i)     The *Motion of the Official Committee of Unsecured Creditors for Entry of an Order (I) Converting the Debtor's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code* [Dkt. No. 142] ("Conversion Motion");

(ii)    The *Debtor's Motion For Interim and Final Orders (I) Authorizing The Debtor to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims and (C) Utilize Cash Collateral; (II) Granting Adequate Protection; (III) Modifying The Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related* [Dkt. No. 10] ("DIP Motion"); and

(iii)   The *Debtor's Motion For Entry of (I) an Order (A) Approving Bid Procedures in Connection With The Sale of Substantially All of The Debtor's Assets, (B) Approving The Form and Manner of Notice Thereof, (C) Scheduling an Auction*

---

[1] The last four digits of the Debtor's federal tax identification number are 5446. The Debtor's address is 238 N 2200 W, Salt Lake City, Utah 84116

*and Sale Hearing, (D) Approving Procedures For The Assumption and Assignment of Contracts and Leases, and (E) Granting Related Relief and (II) an Order (A) Approving The Stalking Horse APA Between The Debtor and The Stalking Horse Bidder, (B) Authorizing The Sale to The Stalking Horse Bidder or The Successful Bidder of Substantially All of The Debtor's Assets Free and Clear Of Liens, Claims, Encumbrances, and Interests, (C) Authorizing The Assumption and Assignment of Contracts and Leases, and (D) Granting Related Relief* [Dkt. No. 4] (["Bid Procedures Motion").[2]

In support of this Motion, the Debtor represents as follows:

## PRELIMINARY STATEMENT

1.      At the October 6 hearing in this case, the Court questioned whether there was a path forward in this case that would result in a successful sale or reorganization of the Debtor. At that time, both the United States on behalf of the Environmental Protection Agency ("EPA") and the State of Utah, two stakeholders whose cooperation with the Stalking Horse Bidder[3] is important to the viability of the Stalking Horse Bidder, had filed objections indicating their disinclination to work with the Stalking Horse Bidder. The Official Committee of Unsecured Creditors ("Committee") argued that pursuing a sale process without any meaningful chance of success impaired their interests. On these bases, the Court indicated that it was seriously considering granting the draconian remedy of conversion to a chapter 7 liquidation. But no party addressed the implications of a conversion to chapter 7 on the Debtor's stakeholders (including 24 employees), creditors, and the environment. No other party has grappled with the geopolitical implications of bulldozing a domestic magnesium facility and selling the debris for scrap value. Converting this

---

[2] Collectively, the Bid Procedures Motion, the Conversion Motion, and the DIP Motion are the "Motions."
[3] The proposed Stalking Horse Bidder is LiMag Holdings LLC.

case is premature, and a brief adjournment will allow the parties to continue their negotiations. In the days since the October 6 hearing, there have been meaningful developments that create a "path" to a potential successful sale process.

2.     *First*, and most importantly, the Stalking Horse Bidder has engaged in discussions with the EPA and the State of Utah. As a result, the EPA has indicated its willingness to continue those discussions in the hope of reaching resolution of issues that would pave the way to a successful bid. Principals from the EPA, the U.S. Department of Justice, and the Stalking Horse Bidder will continue their discussions, especially given the strategic importance of domestic magnesium production. The brief adjournment will allow those discussions to continue and will also allow other bidders the opportunity to engage with the EPA and the State of Utah.

3.     *Second*, in the context of those discussions, the Stalking Horse Bidder consulted with the Debtor to develop a business plan showing that the new company will be cash flow positive on an operating basis and capable of meeting its obligations over the projection period. The Debtor filed that business plan at Dkt. No. 200-1. That business plan shows that the Debtor's business in its current form (recycling materials, selling dust suppressants, raw sodium chloride, and de-icing products) can stand on its own and generate positive cash flow in the very near term, without any dependency on restarting magnesium or lithium production. That said, the business plan also demonstrates that in the future, assuming a certain level of investment and positive changes to market conditions, the business could enjoy tremendous upside through a full or partial restart of either magnesium or lithium production. And this is important because the Direct Lithium Extraction (DLE) process that the Debtor developed for commercial lithium extraction is truly extraordinary, one-of-a-kind technology, which required hundreds of millions of dollars in new investments over the last decade. No other lithium carbonate manufacturer in North America uses

this innovative technology.[4] While it is true that additional investment will be required to scale DLE production to profitability, foreclosing on that possibility *today* so that a chapter 7 trustee can sell a state-of-the-art lithium processing facility for scrap prices would represent an enormous and irresponsible waste of value and potential upside. This is particularly the case given the fact that the Debtor's facility is able to produce lithium carbonate from the stockpiles of magnesium production byproduct that are already on site, and therefore the process developed by the Debtor is able to recycle and reuse that which would otherwise be worthless.[5]

4.      *Third*, the Stalking Horse Bidder has obtained substantial financial commitments from its parent to make an equity contribution and backstop a substantial portion of the assumed environmental obligations. The details of those commitments are on page 20 of the business plan [Dkt. No. 200-1]. Those commitments include that (a) The Renco Group, Inc. ("Renco Group") will provide post-petition support of nearly $33 million, which ensures the emergence and viability of the Stalking Horse Bidder, and (b) together with the $32 million currently held by EPA in the "special accounts," EPA will have approximately $42 million of financial assurance.

5.      *Fourth*, the sale process for the Debtor's assets has proven to be robust. According to the deposition testimony of the Debtor's investment banker, 17 potential bidders have signed NDAs to enter the virtual data room. Those 17 parties continue their diligence; the Debtor will continue meeting with potential bidders to discuss its value just as it already has.[6] The Debtor should be allowed to continue with this sale process so that it can maximize that value of its assets.

6.      *Fifth*, as set forth on the Term Sheet attached hereto as **Exhibit A** (the "Term Sheet") the DIP Lender has agreed that, for the 28-day adjournment sought by this Motion, post-

---

[4] *See Declaration of Ron Thayer in Support of First Day Motions*, Dkt. No. 4, at ¶ 21.
[5] *Id.*
[6] In his deposition, Scott Victor, the Debtor's investment banker, explained that the Debtor and its principals had met with a potential strategic acquirer to describe the business and potential synergies.

petition liens in the Salt Lake City Property, the Debtor's equity interests in the Skull Valley joint venture, and the Ace Commercial Tort Claim will be limited to an amount not to exceed $3,000,000.[7] Likewise, the DIP Lender has agreed to withdraw its request to roll up $10 million of pre-petition debt. The Term Sheet, discussed in greater detail below, addresses many of the issues raised by other parties with respect to the DIP financing. For those reasons, the Debtor posits that a brief adjournment will not prejudice any parties-in-interest.

7.      Considering these developments, there is a path forward. EPA does not oppose a brief adjournment of the Motions to allow the parties time to continue to chart that path. Given that this adjournment will not prejudice any stakeholders and potentially avoids the catastrophic results of conversion, it should be granted.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction to consider this motion under 28 U.S.C. §§ 157 and 1334. This motion is a core proceeding under 28 U.S.C. § 157(b). Venue in this district is proper under 28 U.S.C. §§ 1408–09.

9.      The legal predicates for the relief requested in this motion are 11 U.S.C. § 105(a), Fed. R. Bankr. P. 9006, 9014, and Del. Bankr. L.R. 9006-2. The Court can consider this motion on an expedited basis under Fed. R. Bankr. P. 9006.

## RELIEF REQUESTED

10.     By this motion, the Debtor seeks to adjourn the October 16, 2025 hearing on the Conversion Motion, DIP Motion, and Bid Procedures Motion until November 13, 2025.

---

[7] Borrowings to date under the Interim DIP Order total approximately $2,800,000.00, and thus the Lender will only receive $200,000.00 of additional lien protection.

**BASIS FOR RELIEF**

11.     Under 11 U.S.C. § 105, Fed. R. Bankr. P. 9006, and its inherent powers and discretion to control the Court's docket, the Court is empowered to manage its docket and, accordingly, may address scheduling requests and adjournments consistent with the Court's needs and the interests of justice. *See, e.g.*, *Morris v. Slappy*, 461 U.S. 1, 11–12 (1983); *CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.*, 357 F.3d 375, 390-91 (3d Cir. 2004).

12.     Since the second day hearing in this matter, the Debtor has prepared, discussed with the major stakeholders, and filed with the Court a business plan [Dkt. No. 200-1] that shows the Debtor's business in its current state is viable and can be sold as a going concern, which will maximize the value of the Debtor's assets for the benefit of all stakeholders, including the Debtor's current 24 employees.

13.     As described above, the Debtor, as well as the Debtor's sole member, Renco Group, continue to engage productively with the State of Utah and with the EPA in respect of a global resolution that will allow those parties to support a going concern sale of the Debtor's business either to the Stalking Horse Purchaser or to the otherwise successful bidder at the conclusion of the Debtor's proposed sale process. That said, any negotiated solution will simply require more time to achieve.

14.     In order to accommodate this additional time without prejudicing the rights of those parties who have objected to various forms of relief under the DIP Motion and Bid Procedures Motion, the Debtor has conferred with Wells Fargo; Wells Fargo and the Renco Group have agreed to extend loans and advances under the Interim DIP Order upon the terms and conditions set forth on the Term Sheet.

15.     Under the Term Sheet, and in summary,[8] the DIP Lender (with Renco Group participating) will continue to extend loans to the Borrower under the Interim DIP Order for a 28-day period under the terms and conditions set forth in the Term Sheet. For this 28-day adjournment period, the DIP Lender has agreed to limit the extent of its post-petition liens in the Ace Commercial Tort Claim, the Debtor's equity interests in the Skull Valley joint venture, and the Salt Lake City Property to an amount not to exceed $3,000,000.[9]

16.     Likewise, the Ratification and Amendment Agreement, and the Proposed Final DIP Order, will be amended to (i) remove Paragraph 31 (which purported to allow the DIP Lender to modify the DIP loan documents in its sole discretion), (ii) remove the requirement that the DIP Lender receive liens on Avoidance Actions, and (iii) remove the "roll-up" referred to in Paragraph 5 of the Proposed Final DIP Order.

17.     Finally, the line item for the Committee's professional fees in the budget shall be increased from $125,000 to $350,000, and the Carve Out described in Paragraph 17 of the Proposed Final DIP Order shall be increased from $450,000 to $700,000.

18.     In addition, the DIP Lender and the Debtor have agreed to the following milestones:

| Event/Deadline | Date |
| --- | --- |
| Hearing On/Approval of Bid Procedures | November 13, 2025 |
| Final DIP Hearing | November 13, 2025 |
| Hearing On/Approval of Sale of Salt Lake City Property | November 13, 2025 |
| Bid Deadline | November 17, 2025 |
| Sale / Assumption & Assignment Objection Deadline | November 17, 2025 |
| Auction (if necessary) | November 18, 2025 |
| Sale Hearing | November 19, 2025 |
| Entry of Sale Order | November 20, 2025 |
| Closing Deadline | November 25, 2025 |
| Closing Deadline (Salt Lake City Property) | November 25, 2025 |

---

[8] In the event of any inconsistency between this summary and the Term Sheet, the Term Sheet shall control.
[9] *See* footnote 7 herein.

19.     Cause exists to grant—and the EPA does not oppose—the adjournment relief requested by this motion. The Debtor's requested adjournment of the hearing on the Conversion Motion, DIP Motion, and Bid Procedures Motion is in the best interest of the estate and all parties-in-interest. Again, the Debtor continues to work diligently toward negotiating a resolution to all disputed issues with the State of Utah, the EPA, and the Committee. The Debtor further submits that the attached Term Sheet allows for the Debtor to obtain the benefit of that additional negotiating time without unduly prejudicing the rights of other parties in the interim.

20.     During this interim period, the Debtor's marketing process will continue. As the Debtor's investment banker, Scott Victor, testified in his deposition, there are "17 parties that have signed NDAs and [performed] diligence." J. Scott Victor Dep. Tr. 28:16–17. The adjournment sought by this motion will allow those parties to continue their diligence and prepare bids.

21.     Without the brief continuance sought by this motion, the Debtor fears that the parties' positions will become further entrenched, resulting in unnecessary litigation and diminished prospects for a value-maximizing transaction that will rehabilitate the Debtor's operations and bring value to the estate and creditors. Such litigation would undoubtedly be protracted and expensive. It would harm all parties-in-interest. A 28-day adjournment will allow the parties to continue negotiating and reach a consensus. The requested adjournment will not harm any party's interests or litigation position.

## NOTICE

22.     Notice of this Motion will be given to: (i) the United States Trustee for the District of Delaware; (ii) counsel to Wells Fargo; (iii) counsel to the Committee; (iv) counsel for the State of Utah; (v) counsel to the EPA; (vi) counsel to Renco Group; and (vii) all parties who have filed

requests for service of papers under Bankruptcy Rule 2002. The Debtor submits that under the circumstances no other or further notice is necessary.

## CONCLUSION

23.     Because an adjournment is in the best interests of the estate and all parties-in-interest, the Debtor requests that the Court enter an order, substantially in the form attached as **Exhibit B**, granting the relief requested in this motion and such other and further relief as may be just and proper.

Dated: October 16, 2025

GELLERT SEITZ BUSENKELL & BROWN, LLC

*/s/ Michael Busenkell*
Michael Busenkell (DE 3933)
Margaret M. Manning (DE 4183)
Michael Van Gorder (DE 6214)
1201 North Orange Street, Suite 300
Wilmington, Delaware 19801
Telephone: (302) 425-5800
Facsimile: (302) 425-5814
Email: mbusenkell@gsbblaw.com
        mmanning@gsbblaw.com
        mvangorder@gsbblaw.com

*Counsel to the Debtor and Debtor-in-Possession*