**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>US MAGNESIUM LLC, [1]<br><br>Debtor. | Chapter 11<br><br>Case No. 25-11696 (BLS) |

**DEBTOR'S MOTION FOR ENTRY OF (I) AN ORDER (A) APPROVING BID
PROCEDURES AND BID PROTECTIONS IN CONNECTION WITH THE SALE OF
THE TURBINE, (B) APPROVING THE FORM AND MANNER OF NOTICE
THEREOF, (C) SCHEDULING AN AUCTION AND SALE HEARING, AND (D)
GRANTING RELATED RELIEF AND (II) AN ORDER (A) AUTHORIZING THE SALE
OF TURBINE FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND
INTERESTS, AND (C) GRANTING RELATED RELIEF**

The above-captioned debtor and debtor in possession (the "**Debtor**") moves (the

"**Motion**") this Court, pursuant to sections 105(a), 363, and 503 title 11 of the United States Code

(the "**Bankruptcy Code**"), Rules 2002, 6004, 9006, 9007 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 9013-1(f) of the Local Rules of

Bankruptcy Practice and Procedure (the "**Local Rules**"), for entry of an order, substantially in the

form attached hereto as Exhibit A (the "**Bid Procedures Order**"), (i)(a) approving the proposed

auction and bid procedures attached as **Exhibit 1** to the Bid Procedures Order (the "**Bid

Procedures**") to be implemented in connection with the proposed sale (the "**Sale**")of a 26MW

GE Frame 5PA (MS5001) gas turbine (the "**Turbine**" or "**Asset**"), (i)(b) scheduling an auction

(the "**Auction**") if the Debtor receives two or more timely and acceptable Qualified Bids (as

defined below), (i)(c) scheduling a hearing to consider approval of the Sale (the "**Sale Hearing**"),

and (i)(d) approving the form and manner of notice thereof; and, pursuant to Bankruptcy Code

sections 105, and 363 and Bankruptcy Rules 2002 and 6004, for entry of an order (ii)(a) approving

---

[1] The last four digits of the Debtor's federal tax identification number are 5446.  The Debtor's address is 238 N 2200 W, Salt Lake City, Utah 84116

the Stalking Horse Agreement (as defined below) between the Debtor and the Stalking Horse
Bidder (as defined below) including the Bid Protections (defined below), (ii)(b) authorizing the
Sale to the Stalking Horse Bidder[2] or the Successful Bidder, after the Auction, if necessary, free
and clear of liens, claims, interests and encumbrances, and (ii)(d) granting related relief. In support
of this Motion, the Debtor relies on and incorporates by reference the *Declaration of Ron Thayer*
(the "**First Day Declaration**") [D.I. 4] and represents as follows:

## Jurisdiction and Venue

1.     This Court has subject matter jurisdiction to consider this matter pursuant to 28
U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper
before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

2.     On September 10, 2025 (the "**Petition Date**"), the Debtor commenced its
reorganization case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.
The Debtor is authorized to continue to operate its business and manage its properties as a debtor
in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.     Information regarding the Debtor and the events leading up to the Petition Date and
the facts and circumstances supporting the relief requested herein are set forth in the First Day
Declaration.

4.     Prior to the Petition Date, the Debtor attempted to sell the Asset. Specifically, the
Debtor made inquiries to the original manufacturer. The Debtor also engaged with contacts at
Rocky Mountain Power regarding potential customer needs. Limited interest from these initial
efforts prompted the Debtor to reach out to equipment sales groups to gather potential options and,

---

[2] The Debtor reserves the right to select a new Stalking Horse Bidder in the event that The Max Henry Group, LLC
d/b/a Quantum Technology declines to move forward with the purchase of the Asset.

as a result, the Debtor signed a marketing agreement in April of 2025 with Phoenix Equipment to pursue a sale. There were several initial proposals from Phoenix clients that could not be completed due to financing obstacles. Following the Petition Date, the Debtor continued its marketing efforts with SSG Capital Advisors, the Debtor's investment banker.

5. As a result of those marketing efforts, the Debtor and The Max Henry Group, LLC d/b/a Quantum Technology, as purchaser, (the "**Stalking Horse Bidder**") have entered into the Stalking Horse Bid, dated as of November 21, 2025 (the "**Stalking Horse Agreement**"), attached hereto as <u>Exhibit B</u>. In the Stalking Horse Agreement, the Stalking Horse Bidder proposes to purchase a 26MW GE Frame 5PA (MS5001) gas turbine (the "**Turbine**" or "**Asset**") for $7,000,000.00 (the "**Purchase Price**"), which will serve as a competitive baseline of recovery for the Debtor's stakeholders.

6. The Debtor now seeks authority to market test the transaction contemplated by the Stalking Horse Agreement (the "**Stalking Horse Bid**") to ensure that the Debtor obtains the highest or otherwise best offer for the Asset. As set forth in further detail below, the Sale, the Stalking Horse Agreement, the proposed bid procedures (the "**Bid Procedures**"), and the related relief requested in this Motion are in the best interests of the Debtor's estate and its stakeholders. Accordingly, the Debtor requests that the Court grant this Motion.

<u>**Relief Requested**</u>

7. By this Motion, the Debtor requests, pursuant to Bankruptcy Code sections 105, 363 and 503 and Bankruptcy Rules 2002, 6004, 9006, 9007 and 9014, the entry of (A) an order (i) establishing bid procedures for the Sale of the Asset; (ii) approving the Bid Protections pursuant to the Stalking Horse Agreement; and (iii) scheduling the Auction (if necessary) and Sale Hearing;

and (B) an order (i) approving the Sale of the Asset free and clear of all liens, claims, encumbrances and interests; and (iii) granting related relief.

8.      The Debtor seeks entry the Bid Procedures Order:

(a)      authorizing and approving the Bid Procedures attached to the Bid Procedures Order as <u>Exhibit 1</u> and approving the Bid Protections (as defined below) in connection with the sale of substantially all of the Asset;

(b)      approving the form and manner of notice of an Auction and Sale Hearing with respect to the Sale, attached as <u>Exhibit 2</u> to the Bid Procedures Order (the "**Sale Notice**");

(c)      scheduling the Auction and Sale Hearing;

(d)      approving the Bid Protections; and

(e)      granting related relief.

9.      In addition, the Debtor will seek entry of the Sale Order at the conclusion of the Sale Hearing:

(a)      authorizing and approving the Sale of the Asset to the Successful Bidder (as defined in the Bid Procedures) on the terms substantially set forth in the Successful Bid;

(b)      authorizing and approving the Sale free and clear of liens, claims, encumbrances, and other interests to the extent set forth in the Successful Bid; and

(c)      granting any related relief.

10.      The Debtor reserves the right to file and serve any supplemental pleading or declaration that the Debtor deems appropriate or necessary in its reasonable business judgment, including any pleading summarizing the competitive bidding and sale process and the results thereof, in support of its request for entry of the Sale Order before the Sale Hearing.

**The Proposed Sale**

**I.      The Proposed Stalking Horse Bid and Contemplated Section 363 Sale.**

11.      The Debtor requests that the Court approve the following general timeline:

(a) ***Bid Deadline***: <u>**12:00 p.m. (ET), on or before January 9, 2026**</u>, as the deadline by which bids for the Asset (as well as the deposit and all other documentation required under the Bid

Procedures for Qualified Bidders (as defined in the Bid Procedures)) must be actually received (the "**Bid Deadline**");

(b) *Auction*: **January 12, 2026, at 10:00 a.m. (ET)**, as the date and time the Auction, if needed, will be held at the offices of Gellert Seitz Busenkell & Brown, LLC, 1201 N. Orange St., 3rd Floor, Wilmington, DE 19801;

(c) *Sale Objection Deadline*: **4:00 p.m. (ET), on   [_____]**, as the deadline to object to the Sale;

(d) *Sale Hearing*: on or before **[_____], 2026, at T.B.D.**, as the date and time for the Sale Hearing.

12.     The Debtor believes that this timeline maximizes the prospect of receiving a higher or otherwise better offer without unduly prejudicing this estate.  To further ensure that the Debtor's proposed Auction and Sale process maximizes value to the benefit of the Debtor's estate, the Debtor will use the time following entry of the Bid Procedures Order to actively market the Asset in an attempt to solicit higher or otherwise better bids.  The Debtor believes the relief requested by this Motion is in the best interests of its creditors, its other stakeholders, and all other parties in interest, and should be approved.

## II.     Material Terms of the Stalking Horse Bid.[3]

13.     The following chart summarizes the terms and conditions of the Stalking Horse Agreement (attached hereto as **Exhibit B**) and discloses certain information:[4]

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| Parties | **Seller:** US Magnesium LLC.<br><br>**Buyer:** The Max Henry Group, LLC d/b/a Quantum Technology |

---

[3] Because the Asset is a single piece of equipment, the Debtor contemplates closing the transaction via a bill of sale as opposed to an asset purchase agreement.  Execution of a bill of sale remains subject to inspection of the Asset by the Stalking Horse Bidder.  A copy of the proposed bill of sale will be made available as soon as possible.  The Debtor does not anticipate any material changes to the terms of the proposed Sale.

[4] This summary is provided for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the Stalking Horse Agreement, the Stalking Horse Agreement shall govern in all respects. Capitalized terms used in the following summary shall have the meanings ascribed to them in the Stalking Horse Agreement. All references to schedules or sections in the following summary shall refer to schedules or sections of the Stalking Horse Agreement.

| | |
|---|---|
| **Purchase Price**<br><br>**Local Bankr. R. 6004-1(b)(iv)(N)** | $7,000,000 |
| **Stalking Horse Protections**<br><br>**Local Bankr. R. 6004-1(c)(i)(C)** | Break-up Fee of three percent (3%) of the Stalking Horse Purchase Price, totaling Two Hundred Ten Thousand Dollars ($210,000.00).<br><br>Expense reimbursement of reasonable and actual documented "out of pocket" expenses up to One Hundred Thousand Dollars ($100,000.00) (the "Expense Reimbursement"), subject to the Bidder furnishing proof of such expenses. |
| **Acquired Asset** | 26mW General Electric (GE) Model MS5001 turbine |
| **Deposit** | Good faith deposit of $350,000. |
| **Agreements with Management**<br><br>**Local Bankr. R. 6004-1(b)(iv)(D)** | None. |
| **Releases**<br><br>**Local Bankr. R. 6004-1(b)(iv)(C)** | None. |
| **Private Sale/No Competitive Bidding**<br><br>**Local Bankr. R. 6004-1(b)(iv)(D)** | Not Applicable. |
| **Closing and Other Deadlines**<br><br>**Local Bankr. R. 6004-1(b)(iv)(E)** | None. |
| **Interim Arrangements with Proposed Buyer**<br><br>**Local Bankr. R. 6004-1(b)(iv)(G)** | None. |
| **Use of Proceeds**<br><br>**Local Bankr. R. 6004-1(b)(iv)(H)** | Application to outstanding indebtedness |

| Tax Exemption<br><br>Local Bankr. R. 6004-1(b)(iv)(I) | Not applicable. |
|---|---|
| Records Retention<br><br>Local Bankr. R. 6004-1(b)(iv)(J) | None. |
| Sale of Avoidance Actions<br><br>Local Bankr. R. 6004-1(b)(iv)(K) | Not Applicable. |
| Requested Findings as to Successor Liability<br><br>Local Bankr. R. 6004-1(b)(iv)(L) | None. |
| Executory Contracts and Unexpired Leases<br><br>Local Bankr. R. 6004-1(b)(iv)(M) | None. |
| Credit Bid<br><br>Local Bankr. R. 6004-1(b)(iv)(N) | Not applicable. |
| Relief from Bankruptcy Rule 6004(h)<br><br>Local Bankr. R. 6004-1(b)(iv)(O) | Not applicable |

## <u>The Bid Procedures Order</u>

**I.      The Bid Procedures.**

14.     To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Debtor has developed and proposed the Bid Procedures, attached as <u>Exhibit</u>

1 to the Bid Procedures Order. The following describes the salient points of the Bid Procedures and discloses certain information:[5]

- **Bid Requirements.** Any bid by an Acceptable Bidder must be submitted in writing and determined by the Debtor, in its reasonable business judgment, to have satisfied the following requirements (as further stated in the Bid Procedures):

    *Asset and Purchase Price*: Each Bid must be a bid to purchase the Asset, and must clearly state the Purchase Price to be paid.

    *Deposit*: Each Bid, other than the Stalking Horse Bid, must be accompanied by a cash deposit in the amount equal to five percent (5%) of the aggregate cash purchase price of the Bid to be held in an interest-bearing escrow account to be identified and established by the Debtor (the "**Deposit**").

    *Minimum Bid*: The aggregate cash consideration proposed by each Bid must equal, or exceed, the Initial Minimum Overbid, which is $7,500,000.

    *The Same or Better Terms*: Except as otherwise provided herein each Bid must, in the Debtor's business judgment and in consultation with the Agent and the representatives of any duly appointed committee of unsecured creditors ("**Committee Representatives**") be on terms the same as or better than the terms of the Stalking Horse Agreement.  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid (the "**Bid Documents**").

    *Sources of Financing*: The Bid must indicate the source of cash consideration, including proposed funding commitments and confirm that such consideration is not subject to any contingencies.

- **Bid Deadline.** Each bid must be transmitted via email (in .pdf or similar format) or other means so as to be *actually received* by the Debtor, counsel to the Debtor, the Committee Representatives, the Stalking Horse Bidder, and counsel to the Stalking Horse Bidder on or before **January 9, 2026 at 12:00 p.m. (ET)** (the "**Bid Deadline**").

- **The Auction.** If the Debtor does not receive a Qualified Bid (other than the Stalking Horse Bid), the Debtor, in consultation with the Committee Representatives, will not conduct the Auction and shall designate the Stalking Horse Bidder's Qualified Bid as the Successful Bid (as defined below).

---

[5] This summary is qualified in its entirety by the Bid Procedures attached as Exhibit 1 to the Bid Procedures Order. All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings in the Bid Procedures. To the extent there are any conflicts between this summary and the Bid Procedures, the terms of the Bid Procedures shall govern.

- **Bidding Increments.** Any Overbid following the initial Minimum Overbid or following any subsequent Prevailing Highest Bid shall be in increments of $250,000.

- **Back-Up Bidder.** Notwithstanding anything in the Bid Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid at the Auction for the Asset, as determined by the Debtor in the exercise of its reasonable business judgment, shall be required to serve as a back-up bidder (the "**Back-Up Bidder**"), and each Qualified Bidder shall agree and be deemed to agree to be the Back-Up Bidder if so designated by the Debtor (the "**Back-Up Bid**").

- **Highest or Otherwise Best Bid.** When determining the highest or otherwise best Qualified Bid (the "**Successful Bid**"), as compared to other Qualified Bids, the Debtor, in consultation with the Committee Representatives, may consider the following factors in addition to any other factors that the Debtor and the Committee Representatives deem appropriate: (i) the number, type, and nature of any changes to the Stalking Horse Agreement requested by the Qualified Bidder, including the type and amount of Asset sought and obligations to be assumed in the Bid; (ii) the amount and nature of the total consideration; (iii) the likelihood of the Bidder's ability to close a transaction and the timing thereof; (iv) the net economic effect of any changes to the value to be received by the Debtor's estate from the transaction contemplated by the Bid Documents; (v) the timing of Bidder's proposed closing; and (vi) the tax consequences of such Qualified Bid.

- **Reservation of Rights.** The Debtor reserves its rights to modify the Bid Procedures (after consultation with the Committee Representatives) in its reasonable business judgment in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Asset, including cancelling the Auction or the Sale.

15.    Importantly, the Bid Procedures recognize the Debtor's fiduciary obligations to maximize sale value, and, as such, do not impair the Debtor's ability to consider all qualified bid proposals (after consultation with the Committee Representatives), and, as noted, preserve the Debtor's right to modify the Bid Procedures (after consultation with the Committee Representatives) as necessary or appropriate to maximize value for the Debtor's estate.

## II.    Form and Manner of Sale Notice.

16.    On or within three (3) calendar days after entry of the Bid Procedures Order, the Debtor will cause the Sale Notice to be served on the following parties or its respective counsel, if known: (a) the United States Trustee for the District of Delaware (the "**U.S. Trustee**"); (b) counsel to any statutorily appointed committee; (c) counsel to the Stalking Horse Bidder; (d) all parties

who have expressed a written interest in some or all of the Asset; (e) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or interest in the Asset; (f) the Internal Revenue Service; (g) all applicable state and local taxing authorities; (h) all the Debtor's other creditors; (i) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; and (j) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.

17.    The Debtor submits that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including: (a) the date, time, and place of the Auction (if one is held); (b) the Bid Procedures; (c) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing; (d) a reasonably specific identification of the Asset; (e) instructions for promptly obtaining a copy of the Stalking Horse Agreement; and (f) a description of the Sale as being free and clear of liens, claims, interests, and other encumbrances, with all such liens, claims, interests, and other encumbrances attaching with the same validity and priority to the Sale proceeds.

18.    The Debtor further submits that notice of this Motion and the related hearing to consider entry of the Bid Procedures Order, coupled with service of the Sale Notice, as provided for herein, constitutes good and adequate notice of the Sale in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. The Debtor proposes that no other or further notice of the Sale shall be required. Accordingly, the Debtor requests that this Court approve the form and manner of the Sale Notice.

**Basis for Relief**

I.    **The Relief Sought in the Bid Procedures Order is in the Best Interests of the Debtor's Estate and Should Be Approved.**

19.    Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's Asset.  See In re Schipper, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'"); In re Martin, 91 F.3d 389, 395 (3d Cir. 1996); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999); In re Integrated Res., Inc., 147 B.R. 650, 656–7 (S.D.N.Y. 1992) (noting that bidding procedures that have been negotiated by a trustee are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

20.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  See In re Edwards, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); see also Food Barn Stores, Inc., 107 F.3d at 564–65 (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); Integrated Res., 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.").

21.    To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions.  See Integrated Res., 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's Asset"); In re Fin. News Network, Inc., 126 B.R. 152, 156 (Bankr. S.D.N.Y.

1991) ("court-imposed rules for the disposition of Asset . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estate"); In re 995 Fifth Ave. Assoc., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (holding that the business judgment standard protects break-up fees and other provisions negotiated in good faith).

22.     The Debtor believes that the proposed Bid Procedures will promote active bidding from seriously interested parties and will elicit the highest or otherwise best offers available for the Asset.  The proposed Bid Procedures will allow the Debtor to conduct the Sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best value for the Asset and who can demonstrate the ability to close a transaction. Specifically, the Bid Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

23.     At the same time, the Bid Procedures provide the Debtor with a robust opportunity to consider competing bids and select the highest or otherwise best offer for the completion of the Sale.  Entering into the Stalking Horse Agreement with the Stalking Horse Bidder ensures that the Debtor obtains fair market value by setting a minimum purchase price for the Asset that will be tested in the marketplace. As such, creditors of the Debtor's estate can be assured that the consideration obtained will be fair and reasonable and at or above market.

24.     The Debtor submits that the proposed Bid Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with other procedures utilized in other cases. See In re Quicksilver Res., Inc., No. 15-10585 (Bankr. D. Del. Oct. 6, 2015); In re Source Home Entm't, LLC, No. 14-11553 (Bankr. D. Del. July 21, 2014); In re Ultimate Escapes

Holdings, LLC, No. 10-12915 (Bankr. D. Del. Oct. 8, 2010); In re PTC Alliance Corp., No. 09-13395 (Bankr. D. Del. Nov. 6, 2009); In re Hayes Lemmerz Int'l, Inc., No. 09-11655 (Bankr. D. Del. Sept. 22, 2009); In re VeraSun Energy Corp., No. 08-12606 (Bankr. D. Del. Feb. 19, 2009).

**II.    The Bid Protections Have a Sound Business Purpose and Should Be Approved and are Necessary to Preserve the Value of the Debtor's Estate.**

25.    The Debtor is also seeking authority to offer customary bid protections.  The Debtor has agreed to pay the Breakup Fee and the Expense Reimbursement to the Stalking Horse Bidder as an allowed administrative expense priority claim.  The use of a stalking horse in a public auction process for sales pursuant to section 363 of the Bankruptcy Code is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value."  Official Comm. of Unsecured Creditors v. Interforum Holding LLC, 2011 WL 2671254, No. 11-219, *1 (E.D. Wis. July 7, 2011).  As a result, stalking horse bidders virtually always require break-up fees and, in many cases, other forms of bidding protections as an inducement for "setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement."  Id.  Thus, the use of bidding protections has become an established practice in chapter 11 cases.

26.    Indeed, break-up fees and other forms of bidding protections are a normal and, in many cases, necessary component of significant sales conducted under section 363 of the Bankruptcy Code: "Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's Asset . . . . In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize value."  Integrated Res., 147 B.R. at 659-60.  Specifically, bid protections "may be legitimately necessary to convince

a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking." 995 Fifth Ave., 96 B.R. at 28; see Integrated Res., 147 B.R. at 660–61 (bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); In re Hupp Int'l Indus., Inc., 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that its first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence.").

27.     In considering whether to approve bid protections under the business judgment rule, courts have considered, among other things, the following questions: "(1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage, bidding; (3) is the amount of the fee unreasonable relative to the proposed purchase price?" Integrated Res., Inc., 147 B.R. at 657. See also In re Wintz Cos., 230 B.R. 840, 846 (B.A.P. 8th Cir. 1999), aff'd, 219 F.3d 807 (8th Cir. 2000) (noting that courts permit break-up fees "provided the fees create an incentive for increased bidding in sales from bankruptcy Asset"). "A break-up fee . . . should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser." In re President Casinos, Inc., 314 B.R. 786, 789 (E.D. Mo. 2004).

28.     As a result, courts routinely approve such bid protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. See In re O'Brien Envtl. Energy, Inc., 181 F.3d 527 (3d Cir. 1999).[6]  The Debtor believes that the

---

[6] See In re Finlay Enters., Inc., et al., Case No. 09-14873 (JMP) (Bankr. S.D.N.Y. Aug. 20, 2009) (approving break-up fee); In re Lehman Bros. Holdings Inc., et al., Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Oct. 22, 2008) (approving break-up fee and expense reimbursement); In re Steve & Barry's Manhattan LLC, et al., Case No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 5, 2008) (approving break-up fee and expense reimbursement); In re Fortunoff Fine Jewelry and Silverware, LLC, Case No. 08-10353 (JMP) (Bankr. S.D.N.Y. Feb. 22, 2008) (approving break-up fee); In re Bally Total Fitness of Greater New York, Inc., Case No. 07-12395(BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) (approving break-up fee and expense reimbursement); In re G+G Retail, Inc., Case No. 06-10152 (RDD) (Bankr.

allowance of the Bid Protections is in the best interests of the Debtor's estate and its creditors, as the Stalking Horse Bid will establish a floor for further bidding that may increase the consideration given in exchange for the Asset for the benefit of the Debtor's estate.

29.     The Bid Protections here were, and remain, a critical component of the Stalking Horse Bidder's commitment.  The Stalking Horse Bidder has expended and will continue to expend time and resources negotiating, drafting, and performing due diligence activities necessitated by the Sale, despite the fact that its bid will be subject not only to Court approval, but also to overbidding by third parties.  The parties negotiated the requested Bid Protections in good faith and at arm's length with significant give-and-take with respect to the proposed Bid Protections.  As a result, by agreeing to the Bid Protections, the Debtor ensured that its estate would have the benefit of the transactions with the Stalking Horse Bidder without sacrificing the potential for interested parties to submit overbids at the Auction.

30.     Further, there is ample precedent for approving a break-up fee of roughly 3%.  See, e.g., In re Hostess Brands, Inc., Case No. 12-22052 (Bankr. S.D.N.Y. 2013) (break-up fee equal to 3.5%); In re Global Crossing Ltd., Case No. 02- 40187 (Bankr. S.D.N.Y. 2002) (break-up fee equal to 4%); In re LTV Steel Co., Inc., Case No. 00-43866 (Bankr. N.D. Ohio 2000) (break-up fee equal to 7.5%); In re Fruit of the Loom, Inc., Case No. 99-4497 (Bankr. D. Del. 1999) (break-up fee equal to 3.59%); In re Graham-Field Health Prods., Inc., Case No. 99-4457 (Bankr. D. Del. 1999) (break-up fee equal to 4.65%).

---

S.D.N.Y. Jan. 30, 2006); In re Footstar, Inc. Case No. 04-22350 (ASH) (Bankr. S.D.N.Y. Apr. 6, 2004) (authorizing the debtors to enter into purchase agreements with break-up fees); Integrated Res., 147 B.R. 650 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) (approving break-up fee and expense reimbursement); In re Twinlab Corp., et al., Case No. 03-15564 (CB) (Bankr. S.D.N.Y. 2003) (approving break-up fee and expense reimbursement); In re Adelphia Business Solutions, Inc., et al., Case No. 02-11389 (REG) (Bankr. S.D.N.Y. 2002) (approving break-up fee and expense reimbursement).

31.     If the Court does not approve the Bid Protections, the Stalking Horse Bidder may elect not to serve as the stalking horse, to the detriment of the Debtor's estate.  Further, if the Bid Protections were to be paid, it will likely be because the Debtor has received a better offer for the Asset as the minimum overbid includes the value of the Bid Protections.  In short, the proposed Bid Protections are fair and reasonable under the circumstances because it constitutes a "fair and reasonable percentage of the proposed purchase price" and is "reasonably related to the risk, effort, and expenses of the prospective purchaser." <u>Integrated Res.</u>, 147 B.R. at 662.  The Bid Protections are reasonable and appropriate in light of the size and nature of the transactions and considerable effort and expenses that the Stalking Horse Bidder has expended and will continue to expend.  Also, the Bid Protections were a material inducement to the Stalking Horse Bidder to enter into the Stalking Horse Agreement.  The Stalking Horse Bidder's bid serves as a minimum bid for others to exceed, ensuring that during the Auction, if any, the Debtor will receive no less than the Purchase Price for the Asset, and the other bidders should be encouraged to participate in a robust auction process.  Thus, the Bid Protections should be approved under Section 503(b).

## III.    The Form and Manner of the Sale Notice Should Be Approved.

32.     Pursuant to Bankruptcy Rule 2002(a), the Debtor is required to provide creditors with 21 days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein.

33.     As noted above, within three (3) calendar days of entry of the Bid Procedures Order, the Debtor will serve the Sale Notice upon the following parties or its respective counsel, if known: (a) the U.S. Trustee; (b) counsel for the Committee; (c) the Stalking Horse Bidder; (d) all parties who have expressed a written interest in some or all of the Asset; (e) all parties who are known or

reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or other interest in the Asset; (f) the Internal Revenue Service; (g) all applicable state and local taxing authorities; (h) all the Debtor's other creditors; (i) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002.

34.     The Debtor submits that notice of this Motion and the related hearing to consider entry of the Bid Procedures Order, coupled with service of the Sale Notice, constitutes good and adequate notice of the Sale in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  Accordingly, the Debtor requests that this Court approve the form and manner of the Sale Notice.

## IV.    The Sale Should Be Approved as an Exercise of Sound Business Judgment.

35.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A sale of the debtor's Asset should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction. See Martin, 91 F.3d at 395 ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); Schipper, 933 F.2d at 515; In re Lionel Corp., 722 F.2d 1063, 1070 (2d Cir. 1983); In re Telesphere Commc's, Inc., 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999).

36.     Once the debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company." In re S.N.A. Nut Co., 186 B.R. 98, 102 (Bankr. N.D. Ill 1995); see In re Filene's

Basement, LLC, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate."); Integrated Res., 147 B.R. at 656; In re Johns-Manville Corp., 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

### a. A Sound Business Purpose Exists for the Sale.

37.     As set forth above, the Debtor has a sound business justification for selling the Asset.  First, the Debtor believes the Sale will maximize the Asset's value to the estate by monetizing an asset that does not contribute to the Debtor's operations.  Second, the sale of the Asset will be subject to competing bids, enhancing the Debtor's ability to receive the highest or otherwise best value for the Asset.  Consequently, the ultimately successful bid, after being subject to a "market check" in the form of the Auction, will constitute, in the Debtor's reasonable business judgment, the highest or otherwise best offer for the Asset and will provide a greater recovery for its estate than any known or practicably available alternative. See, e.g., In re Trans World Airlines, Inc., No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (stating, while a "section 363(b) sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").  Third, as set forth above, the Debtor began marketing the Asset well before the Petition Date in an effort to maximize the value of the Asset.  Thus, the Asset has already been market tested and will be further tested through the Bid Procedures and Auction.

38.     Thus, the Debtor submits that the Successful Bid will constitute the highest or otherwise best offer for the Asset and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative.  As such, the Debtor's determination to sell

the Asset through the sale process and subsequently accept the Successful Bid will be a valid and sound exercise of the Debtor's business judgment.  The Debtor will submit evidence at the Sale Hearing to support these conclusions.  Therefore, the Debtor requests that the Court make a finding that the proposed sale of the Asset is a proper exercise of the Debtor's business judgment and is rightly authorized.

### b.  Adequate and Reasonable Notice of the Sale Will Be Provided.

39.    As described above, the Sale Notice: (a) will be served in a manner that provides at least 21 days' notice of the deadline for objecting to the Sale and the date, time, and location of the Sale Hearing; (b) informs parties in interest of the deadlines for objecting to the Sale; and (c) otherwise includes all information relevant to parties interested in or affected by the Sale. Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bid Procedures Order after notice and a hearing before it is served on parties in interest.

### c.  The Sale and Purchase Price Reflects a Fair Value Transaction.

40.    It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the Asset sold, as the best way to determine value is exposure to the market. See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 457 (1999); Trans World Airlines, 2001 WL 1820326, *4 (stating, while a "section 363(b) sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

41.    Moreover, as noted above, even as the Debtor moves forward with the Sale, the Debtor will continue to market the Asset and solicit other offers consistent with the Bid Procedures,

including, for example, by contacting previously solicited parties, continuing to provide acceptable bidders with access to requested information, considering a variety of alternative transaction structures, and otherwise assisting the Debtor with all efforts to increase transaction value. In this way, the number of bidders that are eligible to participate in a competitive Auction process will be maximized, or, if no Auction is held because no Auction is necessary, the Stalking Horse Agreement's purchase price will, conclusively, be fair value.

### d. The Sale Has Been Proposed in Good Faith and Without Collusion, and the Stalking Horse Bidder or Successful Bidder Is a "Good-Faith Purchaser."

42.    The Debtor requests that the Court find the Stalking Horse Bidder and/or other Successful Bidder arising from the Auction, if any, are entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Asset.

43.    Section 363(m) of the Bankruptcy Code provides:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

44.    Section 363(m) of the Bankruptcy Code thus protects the purchaser of Asset sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased Asset if the order allowing the sale is reversed on appeal, as long as such purchaser leased or purchased the Asset in "good faith." While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good-faith finding may not be made. See In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 147 (3d Cir. 1986) ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an

attempt to take grossly unfair advantage of other bidders."); <u>In re Andy Frain Srvs., Inc.</u>, 798 F.2d

1113 (7th Cir. 1986) (same); <u>In re Sasson Jeans, Inc.</u>, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same);

<u>In re Andy Frain Services, Inc.</u>, 798 F.2d 1113 (7th Cir. 1986); <u>See</u> <u>In re Trism</u>, 328 F.3d 1003,

1006 (8th Cir. 2003).

     45.      The Debtor submits that the Stalking Horse Bidder, or any other Successful Bidder

arising from the Auction, is or will be "good faith purchasers" within the meaning of section

363(m) of the Bankruptcy Code, and the Stalking Horse Agreement, or any marked versions

thereof, are or would be good-faith agreements on arms'-length terms entitled to the protections

of section 363(m) of the Bankruptcy Code.[7] First, as set forth in more detail above, the

consideration to be received by the Debtor pursuant to the Stalking Horse Agreement is substantial,

fair, and reasonable. Second, the parties entered into the Stalking Horse Agreement in good faith

and after extensive, arm's-length negotiations, during which all parties were represented by

competent counsel, and any sale agreement with a Successful Bidder will be the culmination of a

competitive Auction process in which all parties will presumably be represented by counsel and

all negotiations will be conducted on an arm's-length, good-faith basis. Third, there is no indication

of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to

take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the

Sale or Stalking Horse Agreement to be avoided under section 363(n) of the Bankruptcy Code.

And, with respect to potential bidders, the Bid Procedures are designed to ensure that no party is

---

[7] The Debtor believes that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code will be appropriate for any Successful Bidder arising from the Auction. Pursuant to the Bid Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bid Procedures. In addition, the Debtor will not choose, after consultation with the Agents and the Committee Representatives, as the Successful Bidder or Back-Up Bidder (as defined in the Bid Procedures) any entity whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted, and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

able to exert undue influence over the process. Finally, the Stalking Horse Bidder's offer was evaluated and approved by the Debtor in consultation with its advisors, and any other bids that the Debtor ultimately determines to be a successful bid will have been evaluated in a similar fashion. Accordingly, the Debtor believes that the Stalking Horse Bidder (or other Successful Bidder arising from the Auction, if any) and Stalking Horse Agreement (or marked version thereof) should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

**e. The Sale Should be Approved "Free and Clear" Under Section 363(f).**

46.     Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. See 11 U.S.C. § 363(f).

47.     Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Debtor's sale of the Asset free and clear of all interests (*i.e.*, all liens, claims, rights, interests, charges, or encumbrances). See In re Kellstrom Indus., Inc., 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

48.     The Debtor submits that any interest satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such interest will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Sale, subject to any claims and defenses the Debtor may possess.  The Debtor accordingly requests authority to convey the Asset to the Stalking Horse Bidder or other Successful Bidder

arising from the Auction, if any, free and clear of all liens, claims, rights, interests, charges, and encumbrances, with any such liens, claims, rights, interests, charges, and encumbrances to attach to the proceeds of the Sale.

**V.    Relief Under Bankruptcy Rule 6004(h) Is Appropriate.**

49.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."  The Debtor requests that the Sale Order be effective immediately upon its entry by providing that the fourteen-day stay under Bankruptcy Rule 6004(h) is waived.

50.    The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Comm. Notes to Fed. R. Bankr. P. 6004(h) & 6006(d).  Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 COLLIER ON BANKRUPTCY ¶ 6004.10 (15th rev. ed. 2006). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.  The Debtor notes that similar requests to waive the stay imposed under Bankruptcy Rules 6004(h) are routinely granted. See, e.g., In re Bakers Footwear Grp. Inc., No. 12-49658 (CER) (Bankr. E.D. Mo. Nov. 1, 2012); In re ContinentalAFA Dispensing Co., No. 08-45921 (KAS) (Bankr. E.D. Mo. Nov. 12, 2008); In re the Great Atlantic & Pacific Tea Co., Inc., Case No. 15-23007 (SCC) (Bankr. S.D.N.Y. Aug. 11, 2015); In re Delia's, Inc., Case No. 14-23678 (RDD) (Bankr. S.D.N.Y. Feb. 10, 2015); In re Midway Games Inc., Case No. 09-10465 (KG)

(Bankr. D. Del. June 3, 2009); In re Nortel Networks Inc., et al., Case No. 09-10138 (Bankr. D. Del. Mar. 3, 2009).

51.     To maximize the value received for the Asset, the Debtor seeks to close the Sale as soon as possible after the Sale Hearing. Accordingly, the Debtor hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h).

## Notice

52.     Notice of this Motion has been given to: (a) the Agent, along with its respective counsel; (b) all parties who have expressed a written interest in some or all of the Asset; (c) all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any lien, encumbrance, claim, or interest in the Asset; (d) the Office of the United States Trustee for the District of Delaware; (e) the Debtor's 20 largest unsecured creditors; (f) the Internal Revenue Service.  In light of the nature of the relief requested, the Debtor submits that no further notice is necessary.

## No Prior Request

53.     No prior request for the relief sought in this Motion has been made to this or any other Court in connection with the Chapter 11 Case.

WHEREFORE, the Debtor requests that the Court: (i) enter the Bid Procedures Order, substantially in the form attached as <u>Exhibit A</u>, (ii) at the conclusion of the Sale Hearing, enter the Sale Order, substantial in the form attached as <u>Exhibit C</u>; and (iii) grant such other relief as is necessary.

Dated:  November 24, 2025
 Wilmington, Delaware

GELLERT SEITZ BUSENKELL & BROWN, LLC

<u>*/s/ Michael Busenkell*</u>
Michael Busenkell (No. 3933)
Michael Van Gorder (DE 6214)
1201 North Orange Street , Suite 300
Wilmington, Delaware 19801
Telephone: (302) 425-5800
Facsimile:  (302) 425-5814
Email: mbusenkell@gsbblaw.com
        mvangorder@gsbblaw.com

*Attorneys for US Magnesium LLC, Debtor and Debtor-in- Possession*