**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| US MAGNESIUM LLC,[1] | Case No. 25-11696 (BLS) |
| Debtor. | **Re: D.I. 10, 11, 32, 130, 240, 250, 325** |
| | Hearing Date: December 15, 2025, at 10:00 a.m. (ET) |
| | Objection Deadline: December 4, 2025, at 4:00 p.m. (ET) |

**SUPPLEMENTAL OBJECTION OF THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS TO THE DEBTOR'S MOTION
FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING
THE DEBTOR TO (A) OBTAIN POSTPETITION FINANCING, (B) GRANT
SENIOR SECURED PRIMING LIENS AND SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS AND (C) UTILIZE CASH COLLATERAL; (II) GRANTING
ADEQUATE PROTECTION; (III) MODIFYING THE AUTOMATIC STAY;
(IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee")[2] of the above-captioned debtor and debtor in possession (the "Debtor"), by and through its undersigned counsel, Eversheds Sutherland (US) LLP and Cole Schotz P.C., hereby files this supplemental objection (the "Supplemental Objection") to the *Debtor's Motion for Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims and (C) Utilize Cash Collateral; (II) Granting Adequate Protection; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [D.I. 10] (the "DIP Motion"). This Supplemental Objection supplements the Committee Objection and the Reservation of Rights (each as defined

---

[1] The last four digits of the Debtor's federal tax identification number are 5446. The Debtor's address is 238 N 2200 W, Salt Lake City, Utah 84116.

[2] Capitalized terms used but not defined herein shall have the respective meanings ascribed to them in the DIP Motion, the Committee Objection, the Reservation of Rights, or the Third Interim DIP Order (each as defined herein), as applicable.

1

below), which are incorporated herein by reference and remain pending.³ In support of the Supplemental Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1. Approval of the DIP Motion on a final basis should be denied because, after nearly three months, the Debtor's chapter 11 case still lacks a viable restructuring strategy that would benefit anyone other than Renco, the Debtor's parent, and Wells Fargo, the Debtor's prepetition secured lender and DIP Lender in this chapter 11 case. As such, this chapter 11 process is not worth funding at the expense of unsecured creditors.

2. Just as at the start of this case, the Debtor seeks to use the DIP Financing to fund a sale process that has no reasonable prospect of yielding value for the estate. As is clear from the Debtor's filings, the Debtor's restructuring strategy is to sell its business and its material and valuable unencumbered assets—including the Mineral Lease, the Salt Lake City Property, the Ace Commercial Tort Claim (for $56 million in damages), the Debtor's interests in the Skull Valley Joint Venture, and all real property listed on the Debtor's schedules of assets and liabilities [D.I. 225], as well as, importantly, all potential claims and causes of action against Renco and its affiliated entities—to a Renco affiliate for $0 in cash to the estate.⁴ At best, if the sale closes, it

---

³ Through this Supplemental Objection, the Committee hereby supplements the Previous Objections to clarify its remaining objections in connection with the final relief on the DIP Motion. As this Court is aware, the Committee Objection was filed over two months ago. Since that time, the Court has held numerous hearings and status conferences related to the DIP Motion that led to certain rulings by the Court and settlement of certain issues by the parties with respect to relief sought in the DIP Motion. As such, the Committee files this Supplemental Objection to clarify the issues that remain in dispute.

⁴ Though the Stalking Horse APA contemplates that the Purchase Price will include certain "Cash Consideration" totaling no more than $250,000, that cash is to be used only for payments that are "necessary to close the transactions contemplated [in the Stalking Horse APA]" and would not be paid to the estate as value for the benefit of creditors. *See* Stalking Horse APA §§ 1.1 at 4, 2.5(a)(i); *see also* Joshua Weiss, Deposition Tr., at 96:9-97:6 ("Q: So the amount of cash consideration will only be the amount necessary to fulfill the requirements under the APA and supplemental cash necessary to meet the conditions to close under the APA? A: I think that's generally what the cash consideration concept means, and the answer is if this is the final version of the APA that is ultimately executed, then yes. Q: So assuming there is nothing that needs to be paid in cash under the terms of the stalking horse APA, there would be no cash provided under the terms of the agreement? A: No cash – no cash consideration – you're talking about no cash

will benefit only Renco and Wells Fargo.[5]  At worst, the Debtor will fund a full chapter 11 process only to have the proposed sale to the Stalking Horse, Renco's affiliate, fall apart.  Renco (through the Stalking Horse) can walk away at any time from its obligation to close the sale *and* its obligation to fund the DIP loan through its participation interest, without any recourse or recompense to the Debtor for the time spent funding the chapter 11 case.  Meanwhile, the unsecured creditors will pay the cost of funding this chapter 11 process and will be materially worse off every day this case remains in chapter 11.

3.    The DIP Financing is value-destructive for unsecured creditors, and further funding should not be allowed.  The parties' agreements in connection with the multiple extensions of interim DIP Financing have not changed the fact that unsecured creditors are materially prejudiced by continued DIP Financing.  The DIP Financing will continue to siphon unencumbered value, which otherwise would be available to satisfy the more than $120 million in unsecured claims, into secured and priority claims for the DIP Lender that must be satisfied ahead of unsecured claims.

4.    The Debtor's restructuring strategy, which is opposed by the estate's most invested parties in interest, is not worth this value-destructive funding.  The stated goal of the case—to sell substantially all estate assets—will leave the estate worse off than a chapter 7 liquidation.  The Stalking Horse APA provides for the Stalking Horse's purchase of valuable unencumbered assets through the assumption of liabilities that are largely secured loan obligations owed to Renco (or its affiliate), or owed to Wells Fargo but guaranteed by Renco.  Therefore, virtually all

---

consideration to the Debtor? Q: Yes. A: Again, the document says what it says, but generally, unless there's a provision in the document that I am not thinking of, that's correct.").

[5] Though the Debtor's proposed sale presumably would provide certain benefit to Wells Fargo, the actual exposure of Wells Fargo is limited by Renco's guarantee of or participation in most of Wells Fargo's outstanding loans to the Debtor.

consideration and value from the sale of the Debtor's assets, including valuable unencumbered assets, flows to Renco or Wells Fargo even though they do not have a lien on those unencumbered assets. This is an improper use of the chapter 11 and section 363 sale process that effectively converts value for unsecured creditors into value exclusively for secured creditors, without any corresponding benefit to unsecured creditors. Under these circumstances, the proposed sale process (that has been pending for months), cannot and should not be approved.[6]

5.  The Revised Stalking Horse APA continues to include conditions precedent to closing that cannot be satisfied, thus allowing Renco full discretion over whether to close the sale. Renco can choose to waive those conditions and purchase the assets, or enforce them and walk away. Thus, Renco may use the leverage of the chapter 11 process to extract concessions from the EPA and the State of Utah, safe in the knowledge that if it does not succeed in obtaining those concessions, Renco can refuse to close the sale. In short, the DIP Financing would be used to fund a sale process that may be abused and, in the end, abandoned by the Stalking Horse, leaving the estate with nothing but more secured and priority debts.

6.  Further, there are material flaws in the proposed DIP Financing that have not been resolved. Among other issues, as further described below, the proposed DIP Financing does not provide committed funding for the chapter 11 case. Renco can choose at any time and for any reason to stop funding its participation, which would cause an event of default under the DIP

---

[6] Courts have rejected sale structures that are designed for the sole or primary benefit of secured lenders, at the expense of other creditors. *See, e.g., In re Encore Healthcare Assocs.*, 312 B.R. 52, 54-56 (Bankr. E.D. Pa. 2004) (denying bidding procedures where "the sole purpose of which was to liquidate assets for the benefit of the secured creditor"); *In re Fremont Battery Co.*, 73 B.R. 277 (Bankr. N.D. Ohio 1987) (denying debtor's proposed sale where (i) "[t]he proposed sale would not, as a whole benefit the [d]ebtor or creditors," (ii) the sale would hinder reorganization prospects "as there would remain no assets from which a plan could be proposed," and (iii) "the proceeds from the proposed sale would, at most, benefit one creditor only" and "would not create proceeds that would inure to the benefit of unsecured creditors").

4

Agreement. As such, Renco fully controls the chapter 11 process and can effectively end the chapter 11 restructuring and the sale process if and when it is in Renco's best interest to do so, including if a competing bidder shows interest.

7. Despite the Committee's repeated attempts to engage in constructive settlement discussions, the Debtor, Renco, and Wells Fargo have not meaningfully engaged with the Committee regarding its objections to the Debtor's restructuring strategy since October, and the Committee has no indication that they will do so prior to the December 15 hearing.[7] As such, the Committee has no reason to believe that the Debtor will change its restructuring strategy such that continued funding of the chapter 11 case is warranted.

8. Because the Debtor's chapter 11 process is not worth the cost of continued financing, particularly where the Debtor's proposed DIP Financing erodes material unencumbered value that otherwise could be preserved for creditors, the DIP Motion should be denied.

**BACKGROUND**

9. On the Petition Date, the Debtor filed the DIP Motion.

10. On September 12, 2025, the Court entered the *Interim Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing, and (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims; (II) Granting Adequate Protection; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* [D.I. 32] (the "First Interim DIP Order"), which granted the DIP Motion on an interim basis on the terms contained therein.

---

[7] The Debtor's, Wells Fargo's and Renco's failure to engage with the Committee should not be taken lightly. As of the date hereof, it has been **twenty** days since the Debtor filed and the Court granted the Second Emergency Motion. The repeated last-minute delay tactics, combined with the parties' failure to engage with the Committee on a meaningful restructuring strategy, show blatant disregard of the Court's direction to engage in constructive dialogue, lead to substantial and continuing losses to the estate, and further undermine the Debtor's reorganization prospects.

5

11. On September 15, 2025, the Debtor filed the *Debtor's Motion for Entry of (I) An Order (A) Approving Bid Procedures in Connection with the Sale of Substantially All of the Debtor's Assets, (B) Approving the Form and Manner of Notice Thereof, (C) Scheduling an Auction and Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (E) Granting Related Relief and (II) an Order (A) Approving the Stalking Horse APA Between the Debtor and the Stalking Horse Bidder, (B) Authorizing the Sale to the Stalking Horse Bidder or the Successful Bidder of Substantially All of the Debtor's Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts and Leases, and (D) Granting Related Relief* [D.I. 41] (the "Bid Procedures Motion"), which included the proposed stalking horse asset purchase agreement (the "Original Stalking Horse APA") for the purchase of substantially all of the Debtor's assets between the Debtor and LiMag Holdings, LLC (the "Stalking Horse"), a newly formed subsidiary of the Debtor's parent company, The Renco Group, Inc. ("Renco"), as purchaser.

12. On October 2, 2025, the Debtor filed the *Proposed Final Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing, and (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims; (II) Granting Adequate Protection; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* [D.I. 126-1] (the "Original Proposed Final DIP Order"), which set forth the Debtor's proposed terms for final approval of the DIP Motion.

13. On October 3, 2025, the Committee filed the *Omnibus Objection of the Official Committee of Unsecured Creditors to (1) Debtor's Motion for Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims and (C) Utilize Cash Collateral;*

*(II) Granting Adequate Protection; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief; and (2) Debtor's Motion for Entry of (I) an Order (A) Approving Bid Procedures in Connection with the Sale of Substantially All of the Debtor's Assets, (B) Approving the Form and Manner of Notice Thereof, (C) Scheduling an Auction and Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (E) Granting Related Relief and (II) an Order (A) Approving the Stalking Horse APA Between the Debtor and the Stalking Horse Bidder, (B) Authorizing the Sale to the Stalking Horse Bidder or the Successful Bidder of Substantially All of the Debtor's Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts and Leases, and (D) Granting Related Relief* [D.I. 130] (the "Committee Objection").

14. On October 5, 2025, the Debtor filed an amended form of order approving the DIP Motion on a final basis (a "Final DIP Order"), reflecting certain revisions to the Original Proposed Final DIP Order [D.I. 138-2].

15. On October 5, 2025, the Committee filed the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order (I) Converting the Debtor's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code* [D.I. 142] (the "Conversion Motion"), which requests, among other things, that the Court enter an order converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code. The Conversion Motion includes additional information about the Debtor's chapter 11 case and the Committee's objections to the relief requested under the DIP Motion and Bid Procedures Motion, and such information and objections are expressly incorporated herein by reference.

16. On October 6, 2025, the Court held a hearing to consider final relief on several of the Debtor's "first day" motions, the DIP Motion, and the Bid Procedures Motion. At the

October 6 hearing, the Court expressed concerns with the relief requested in the DIP Motion and the Bid Procedures Motion, and the opposition of multiple key stakeholders to the Debtor's restructuring strategy. In light of these concerns and the Committee's pending Conversion Motion, the Court adjourned the hearing to October 16, 2025 so that the Debtor's DIP Motion and Bid Procedures Motion could be heard together with the Committee's Conversion Motion.

17. On October 14, 2025, the Debtor filed the *Notice of Filing of Revised Asset Purchase Agreement* [D.I. 199], which attached a revised stalking horse asset purchase agreement for the sale of substantially all of its assets (the "Revised Stalking Horse APA" and, together with the Original Stalking Horse APA, the "Stalking Horse APA").

18. On the morning of the October 16 hearing, the Debtor filed, without notice, a 16-page *Emergency Motion to Adjourn October 16, 2025 Hearing* [D.I. 211] (the "First Emergency Motion"), requesting a 28-day adjournment of that day's hearing so that the parties may engage in settlement discussions. The First Emergency Motion attached a Supplemental DIP Loans Term Sheet [D.I. 211-1], presenting the terms on which Wells Fargo would continue to extend loans and advances under the Interim DIP Order for the requested 28-day adjournment period. At the October 16 hearing, the Court granted the First Emergency Motion, resetting the hearing on the Bid Procedures Motion, the Conversion Motion and final approval of the DIP Motion for November 12, 2025, at 10:30 a.m. (ET).

19. At the Court's request, the parties in attendance at the October 16 hearing used the time provided during a recess to negotiate the terms of extended interim DIP Financing consistent with the Court's guidance on certain issues. Such negotiations led to certain agreed terms for the extension of interim DIP Financing through November 12, 2025 and were incorporated into the proposed order granting DIP Financing on an extended interim basis.

20. On October 29, 2025, the Court entered the *Second Interim Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing, and (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims; (II) Authorizing the Use of Cash Collateral; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [D.I. 240] (the "Second Interim DIP Order"), which granted the DIP Motion on a further interim basis on the terms contained therein.

21. On October 31, 2025, the Debtor filed a notice of hearing [D.I. 242] that rescheduled the hearing to consider the Bid Procedures Motion, the Conversion Motion, and the DIP Motion on a final basis for November 17, 2025, at 11:00 a.m. (ET), and set a deadline for further objections to final approval of the DIP Motion for November 4, 2025, at 4:00 p.m. (ET).

22. On November 4, 2025, the Committee timely filed the *Reservation of Rights of the Official Committee of Unsecured Creditors Regarding the Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims and (C) Utilize Cash Collateral; (II) Granting Adequate Protection; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [D.I. 250] (the "Reservation of Rights" and, together with the Committee Objection, the "Previous Objections") to clarify the Committee's position regarding certain issues and objections given the case developments since the Committee Objection was filed.

23. On November 14, 2025, the Debtor again filed an *Emergency Motion of the Debtor to Adjourn November 17, 2025 Hearing* [D.I. 284] (the "Second Emergency Motion"), which requested an adjournment of the hearing on the Conversion Motion, Bid Procedures Motion, and DIP Motion from November 17, 2025 to December 8, 2025. That same day, the Court held a

status conference to discuss the requested adjournment of the November 17 hearing on the Conversion Motion, the Bid Procedures Motion, and the DIP Motion.  At the November 14 status conference, the Court adjourned the November 17 hearing to December 11, 2025 and scheduled a further status conference for November 17, 2025 to discuss the proposed terms for a further extension of interim DIP Financing.

24. In the days leading up to the November 17 status conference, the parties engaged in discussions regarding the terms of further extended DIP Financing.  While they were able to reach consensus on several terms, certain issues remained in dispute.  As a result, ahead of the November 17 status conference, each of the Debtor and the Committee filed proposed forms of orders containing the terms upon which they would agree to an extension of further interim financing.  *See* D.I. 287, 289.  At the November 17 status conference, the Court scheduled a hearing for November 18, 2025 to consider each party's proposed terms.

25. On November 18, 2025, ahead of the scheduled November 18 hearing, each of the Debtor and the Committee submitted revised proposed orders granting the DIP Motion on a further interim basis after reaching agreement on additional issues.  *See* D.I. 298, 300.  At the November 18 hearing, the Court heard arguments on the remaining open issues and provided its ruling with respect to those issues.

26. On November 25, 2025, the Committee filed a *Notice of Hearing Regarding Motion of the Official Committee of Unsecured Creditors for Entry of an Order (I) Converting the Debtor's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code* [D.I. 322].  That notice schedules the hearing to consider the Conversion Motion for December 15, 2025, at 10:00 a.m. (ET).

27. On November 26, 2025, the Court entered the *Third Interim Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing, and (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims; (II) Authorizing the Use of Cash Collateral; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [D.I. 325] (the "<u>Third Interim DIP Order</u>"), which granted the DIP Motion on a further interim basis on the terms contained therein and scheduled a hearing to consider approval of the DIP Motion on a final basis for December 15, 2025, at 10:00 a.m.

28. The Second Interim DIP Order and the Third Interim DIP Order, together, authorized the Debtor to borrow an additional $5.5 million over the initial $3.1 million authorized by the First Interim DIP Order—meaning that the Debtor already has access to $8.6 million of the $10 million of proposed DIP Financing on an interim basis. *See* D.I. 240-1, 325-1.

29. On December 1, 2025, the Debtor filed an *Omnibus Notice of Hearing* [D.I. 332]. That notice schedules the hearing to consider the Bid Procedures Motion and the DIP Motion on a final basis for December 15, 2025, at 10:00 a.m. (ET), and sets a deadline for further objections to final approval of the DIP Motion for December 4, 2025, at 4:00 p.m. (ET).

### **SUPPLEMENTAL OBJECTION**

30. Though the Committee has reached agreement with the Debtor, Renco, and Wells Fargo on certain limited DIP Financing issues in connection with the multiple extensions of the DIP Financing on an interim basis, the parties have not resolved certain fundamental objections to the proposed DIP Financing. As such, the Committee renews the Previous Objections to final

approval of the DIP Financing, and further notes that the following objections, in particular, remain pressing concerns at this juncture:[8]

- Unsecured Borrowing.  To the extent the Court is inclined to approve the DIP Financing on a final basis, any further borrowing by the Debtor should be made on an unsecured, nonpriority basis.  Wells Fargo and Renco should not be permitted to further soak up value from previously unencumbered assets to the detriment of unsecured creditors and other stakeholders to fund a case for their benefit alone.

- Proposed Final DIP Order.  The Debtor has not filed or circulated to the Committee a revised proposed Final DIP Order since October 5, 2025, well before the parties negotiated the extended financing terms under the Second Interim DIP Order or the Third Interim DIP Order.  Given the changes since that time, it is unclear what terms the Debtor seeks in connection with final approval of the DIP Motion or whether the agreed terms in the interim DIP orders will be applied to the final proposed Final DIP Order.

- Administrative Insolvency.  If approved on a final basis, the DIP Financing would leave the estate administratively insolvent.  Committee Objection ¶ 31. The Budget attached to the Third Interim DIP Order provides little to no liquidity cushion for the Debtor's operations during the Budget period and provides only minimal contingency for unexpected expenses.  *See* D.I. 325-1.  Further, the Budget does not adequately provide for the increased administrative costs of the chapter 11 process, including professional fees, that are inherent in the extended restructuring timeline, nor does it provide adequate funding for the wind-down of the Debtor and payment of administrative and priority claims following a sale (if the Debtor succeeds in closing a sale).

- Renco Controls the DIP Financing.  The DIP Financing must be entirely committed if it is approved on a final basis, and Renco should not have the power to trigger an Event of Default by choosing not to fund its 50% participation in the DIP Term Loans.  The DIP Agreement, which was attached to the First Interim DIP Order, provides that the "[DIP] Lender shall have no obligation to make any such DIP Term Loans unless [DIP] Lender has received from [Renco] the proceeds equal to fifty percent (50%) of the amount of the DIP Term Loan being requested and the failure of [Renco] to fund the purchase price of any Tranche B Term Loan Participation shall constitute an Event of Default."  DIP Agreement § 7.1; Committee Objection ¶ 20.  This provision gives Renco undue control over the DIP Financing and creates an uncommitted financing structure that poses significant

---

[8] By objecting to these provisions in bullet point format, the Committee does not suggest that these objections are technical or minor in nature (nor does the Committee waive any objections raised in the Previous Objections to the extent not raised herein).

12

risk to the viability of the chapter 11 process, to the detriment of the Debtor, its creditors, and parties in interest.

- Releases. Any releases in favor of the DIP Lender should be expressly limited to the DIP Lender in its capacity as such. Moreover, such releases should not be extended to each of these parties' unnamed successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns except for in their specific capacity as related to the DIP Facility. In addition, the release of any post-petition claims against the DIP Lender is improper and an end-run around this jurisdiction's restrictions on exculpation. *See* DIP Agreement at § 8.2; Committee Objection ¶ 52.

- Carve-Out. The Committee believes that payment under the Carve-Out should not be conditioned on complying with the timing under the Budget for professional fees. Carve-Out amounts should be payable regardless of when the fees are incurred by estate professionals. *Id.*

- Material Amendments. The Committee should receive advanced notice of any proposed amendments to the Final DIP Order or DIP Agreement, and all material amendments of same should be approved by the Court after notice and a hearing. *Id.*

- Estate Professional Fees. *Id.*

    o The Carve-Out should be fully funded through a professional fee escrow.

    o To the extent the Debtor's professionals have unused fee amounts in the Budget, any excess shall be applied to payment of the Committee's professional fees, if necessary.

- Committee Professional Fee Budget. The Committee's professionals are presently budgeted at $750,000, collectively, which is approximately 23% of the $3,251,500.00 budget for the Debtor's professionals and less than the $1,150,000 budgeted for the DIP Lender's counsel alone, based on the proposed case budget through February 8, 2026, that was most recently provided by Debtor's counsel to the Committee. As the Committee's professionals have already incurred approximately $1.25 million in fees through the end of November, since the Committee has been compelled to represent its constituents' interests through litigation rather than constructive dialogue, the Committee professionals' fee budget must be increased significantly so that the Committee can properly

13

discharge its fiduciary duties in this chapter 11 case. *Id.* (modified to reflect updated figures).

- Preservation of Rights Under Sections 506(c) and 552(b) and Marshaling Rights. Any Final DIP Order should not contain a waiver of sections 506(c) and 552(b) of the Bankruptcy Code or any other related provisions, including, but not limited to, any marshaling rights, and such rights must be expressly preserved. *Id.* ¶¶ 47-51.

- No Liens or Claims on Certain Estate Assets. The Committee objects to the DIP Lender or any other party in interest receiving any liens on, or recourse in respect of any administrative claims (superpriority or otherwise) to, insider causes of action, Avoidance Actions, and proceeds thereof (and, to the extent they are property of the estate, any of the funds escrowed pursuant to the Consent Order and the Debtor's interests therein).[9] *Id.* ¶ 33.

- DIP Lender Fees. The invoice and payment process for the DIP Lender's fees should be consistent with this Court's standard practice. *Id.* ¶ 52.

- Financial Reporting. Any financial reporting the Debtor sends to the DIP Lender should be simultaneously provided to the Committee, and the Committee should receive advance notice of any changes to the Budget. *Id.*

- Calculation of Material Budget Deviation. The fees and expenses of the Professionals should not be included in the calculation of a Material Budget Deviation (as defined in the DIP Agreement). *Id.*

- Adequate Protection for the Prepetition Lenders is Inappropriate. As noted in the Previous Objections, notwithstanding the references in the DIP Motion, the Debtor is not using cash collateral and must remit any revenues on the sale of prepetition collateral to the prepetition lender to pay down the prepetition revolver. In addition, through the proposed waterfall, the prepetition revolver is not being primed because it is receiving payments on principal prior to payments of any Post-Petition

---

[9] With respect to the proposed liens on and claims in proceeds of Avoidance Actions, such relief is fundamentally at odds with the unique purposes served by such actions. *See, e.g., Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 244-245 (3d Cir. 2000) (identifying underlying intent of avoidance powers to recover valuable assets for the benefit of all estate creditors), *rev'd en banc on other grounds*, 330 F.3d 548 (3d Cir. 2003); *In re Tribune Co.*, 464 B.R. 126, 171 (Bankr. D. Del. 2011) (noting "that case law permits all unsecured creditors to benefit from avoidance action recoveries"). DIP financing orders in this District often exclude proceeds from avoidance actions from DIP Collateral, absent the consent of the official committee of unsecured creditors. *See, e.g., In re Akorn, Inc.*, No. 20-11177 (KBO) (Bankr. D. Del. June 15, 2020) ¶ 7 [D.I. 179] (excluding avoidance action proceeds, except for postpetition transfers under section 549 of the Bankruptcy Code); *In re Pronerve Holdings, LLC*, No. 15-10373 (KJC) (Bankr. D. Del. Mar. 20, 2015), ¶ 7 [D.I. 115] (excluding avoidance action proceeds from DIP collateral); *In re Hipcricket, Inc.*, No. 15-10104 (LSS) (Bankr. D. Del. Feb. 11, 2015), ¶ 14 [D.I. 117] (same); *In re LSP Energy Limited Partnership*, No. 12-10460 (MFW) (Bankr. D. Del. Feb. 27, 2012), ¶ 12(a) [D.I. 79] (same). The Debtor has not, and cannot, provide any justification for the grant of liens on the proceeds of Avoidance Actions, or for the potential payment of the DIP Superpriority Claim or Adequate Protection 507(b) Claims with such proceeds. To the contrary, there is no legal basis to grant such relief.

Obligations. For these reasons, the Debtor has not established a legal basis for providing adequate protection and none should be provided. Thus, the payment of interest and fees in respect of the Wells Fargo Prepetition Secured Loan should be eliminated. *Id.* ¶ 39. However, to the extent the Court allows interest payments in respect of the Wells Fargo Prepetition Secured Loan as adequate protection, such interest should be subject to recharacterization as a reduction in the loan's principal if not oversecured.

- <u>Good Faith Finding</u>. Given the various (and significant) issues identified with the DIP Financing, the Court should decline to find any purported "good faith" in accordance with 11 U.S.C. § 364(e). *Id.* ¶ 52.

## **CONCLUSION**

**WHEREFORE**, for the reasons set forth in the Supplemental Objection, the Previous Objections, and the Conversion Motion, the Committee respectfully requests that the Court (i) deny the DIP Motion on a final basis; and (ii) grant such other and further relief as the Court deems just and proper.

[*Signature Page Follows*]

| | |
|---|---|
| Dated: December 4, 2025<br>Wilmington, Delaware | **COLE SCHOTZ P.C.**<br><br>*/s/ Justin R. Alberto*<br>Justin R. Alberto (No. 5126)<br>Michael E. Fitzpatrick (No. 6797)<br>500 Delaware Avenue, Suite 600<br>Wilmington, DE 19801<br>Telephone: (302) 652-3131<br>Facsimile: (302) 652-3117<br>Email: jalberto@coleschotz.com<br>         mfitzpatrick@coleschotz.com<br><br>- and -<br><br>**EVERSHEDS SUTHERLAND (US) LLP**<br>Todd C. Meyers (admitted *pro hac vice*)<br>Danielle Barav-Johnson (admitted *pro hac vice*)<br>999 Peachtree Street, NE<br>Atlanta, GA 30309<br>Telephone: (404) 853-8000<br>Email: toddmeyers@eversheds-sutherland.com<br>         dahnibarav-johnson@eversheds-sutherland.com<br><br>-and-<br><br>Todd C. Meyers (admitted *pro hac vice*)<br>Sameer M. Alifarag (admitted *pro hac vice*)<br>1114 Avenue of the Americas, 40th Floor<br>New York, NY 10036<br>Telephone: (212) 389-5000<br>Email: toddmeyers@eversheds-sutherland.com<br>         sameeralifarag@eversheds-sutherland.com<br><br>*Counsel to the Official Committee*<br>*of Unsecured Creditors* |