**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>US MAGNESIUM LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 25-11696-BLS<br><br>Hearing Date: December 11, 2025 at 11:00 a.m. (ET)<br>Re: Docket No. 292 |

**UTAH DIVISION OF FORESTRY, FIRE, AND STATE LANDS' OBJECTION TO DEBTOR'S MOTION FOR ENTRY OF AN ORDER (A) APPROVING THE PRIVATE SALE OF CERTAIN OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES, WITH SUCH INTERESTS TO ATTACH TO THE PROCEEDS, AND (B) GRANTING RELATED RELIEF**

The Utah Division of Forestry, Fire, and State Lands ("FFSL"), by its undersigned attorneys, respectfully submit this Objection (the "Objection") to the *Debtor's Motion for Entry of an Order (A) Approving the Private Sale of Certain of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances, With Such Interests to Attach to the Proceeds, and (B) Granting Related Relief* [Docket No. 292] (the "Motion") filed by US Magnesium LLC, the debtor and debtor-in-possession (the "Debtor"). In opposition to the Motion, FFSL states as follows:

**PRELIMINARY STATEMENT**

1.     The Debtor asks the Court to approve a sale that violates Utah state law. Utah state law requires that the Debtor have an agreement with FFSL permitting it to sell lithium carbonate and pay royalties to FFSL for minerals and elements extracted from the Great Salt Lake; there is no such agreement and the proposed order does not provide for royalty payments.

2.     Throughout this case FFSL has maintained that the Debtor cannot sell lithium carbonate under Utah state law. Now that issue is squarely before the Court. But the Court may

alternatively sidestep that issue by denying the Motion because the sale fails to satisfy the standard applicable to sales of estate property outside the ordinary course of business.

3. The case continues to develop so that the Debtor's sole member, Renco Group, Inc. ("Renco"), and primary lender, Wells Fargo Bank, NA ("Wells Fargo"), position themselves in front of all others. All receipts are being swept to Wells Fargo under the current DIP financing arrangement, and the Debtor intends that any proceeds from this sale likewise will be paid to Wells Fargo. If the sale is permitted, Wells Fargo will receive approximately $10 million during the first few months of this case, while the only source of operational funds provided to the Debtor comes from DIP financing, in which Renco is a participant. The DIP financing balance is expected to amount to $8.6 million during the term of the Third Interim DIP Financing Order.

## BACKGROUND

### I. FFSL's Powers and Duties

1. "[FFSL] is the executive authority for the management of sovereign lands, and the state's mineral estates on lands other than school and institutional trust lands…." Utah Code § 65A-1-4(1)(b).

2. As part of its mandate, FFSL is the executive authority and trustee tasked with management of sovereign lands and public trust resources, which public trust resources are inclusive of the bed and banks of Great Salt Lake and the minerals held in suspension within the brines of Great Salt Lake. See Utah Code §§ 65A-10-1 and 65A-1-1(8) (defining "sovereign lands" as "those lands lying below the ordinary high water mark of navigable bodies of water at the date of statehood and owned by the state by virtue of its sovereignty."); see also Utah v. United States, 403 U.S. 10, 13 (1971) (finding the following assets were acquired by Utah at

statehood: "…(c) the natural resources and living organisms either within the waters of the Great Salt Lake, or extracted therefrom, lying below the meander line of Great Salt Lake.").

3. Utah law requires that royalties be paid for the removal or extraction of minerals or elements from the Great Salt Lake. Utah Code § 65A-17-302.

4. As the executive authority and trustee over the beds, banks and minerals of Great Salt Lake, FFSL is statutorily empowered to enter into surface use agreements, mineral leases, and royalty agreements concerning the commercial extraction, production and sale of Great Salt Lake elements and minerals. See generally Utah Code § 65A-6-1 et seq.; Utah Code § 65A-17-301 et seq.

5. Utah state law requires FFSL to prescribe rules governing the terms of leases, annual rentals of those leases, the amount of royalties in addition to or in lieu of rental payments, and the basis for computing royalties. See Utah Code §§ 65A-6-2, 65A-6-4(7)(a)(i), and 65A-17-302(1).

6. The rules established by FFSL state that a royalty agreement "is required before the production, processing, and sale of any Great Salt Lake Element or Mineral." Utah Admin. Code R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(2). The rules also require that "[r]oyalties shall be paid by an Operator to [FFSL] pursuant to the applicable royalty rate established in rule." Utah Admin. Code R652-21-804.

II. **The Mineral Lease and the MOU**

7. The Debtor is the successor lessee under a lease agreement entered in 1961 (the "Mineral Lease") that permitted the Debtor to extract magnesium chloride from the Great Salt Lake. FFSL is the successor agency to the lessor that entered into the Mineral Lease. A true and correct copy of the Mineral Lease is attached as Exhibit A.

8. Under Utah Code § 65A-6-4(2)(d)(i), a separate royalty agreement is required for the extraction of elements or minerals from the Great Salt Lake when "a mineral lease, a royalty agreement, or both that are in effect before the operator seeks to extract a particular Great Salt Lake element or mineral do not expressly include the right to extract the particular Great Salt Lake element or mineral[.]"

9. Prior to October 2024, lithium carbonate was not a material covered under Utah rules that govern the extraction, processing, and sale of materials from the Great Salt Lake. As described above, Utah law requires FFSL to establish the rules and regulations that govern mineral leases and royalties. Utah Code § 65A-6-2.

10. In 2019, the Debtor and FFSL negotiated a Memorandum of Understanding (the "MOU") that served "to establish an interim agreement between FFSL and US MAG regarding the respective interim royalty rate and interim procedures to be followed during the interim period between execution of this MOU and completion of formal rulemaking." A true and correct copy of the MOU is attached as Exhibit B.

11. The formal rules designating and establishing lithium carbonate as a royalty bearing substance became effective in October 2024. See Utah Admin. Code R652-21-100 et. seq. (2024). Under those rules, the royalty on lithium carbonate sales depend on the extraction and processing method, and the operator's proper application and certification.

12. Between October 2024 and December 2024, FFSL and the Debtor were unsuccessful in negotiating a royalty agreement to govern lithium carbonate.

13. On December 13, 2024, FFSL sent a notice cancelling the Debtor's mineral lease ("Notice of Lease Cancellation"), and a notice that the MOU is no longer effective ("Notice of MOU Termination"). A true and correct copy of the Notice of Lease Cancellation is attached as

Exhibit C, and a true and correct copy of the Notice of MOU Termination is attached as Exhibit D.

14. Since the December 2024 notices, the Debtor and FFSL have been unsuccessful in negotiating a royalty agreement.

### III. Testimony of the Debtor's President (Ron Thayer)

15. On September 29, 2025, FFSL deposed the Debtor's President, Ron Thayer. A true and correct copy of the relevant excerpts of Mr. Thayer's deposition is attached as Exhibit E. Mr. Thayer stated in his sworn testimony:

- The Debtor has not mined, extracted, or produced any lithium products in 2025. Thayer Depo., 19:23-25. The Debtor has not sold any lithium products during 2025. Thayer Depo, 20:1-3.

- The Debtor was "not actively" marketing the lithium carbonate. Thayer Depo., 40:1. The Debtor did make "an inquiry in terms of the volume and the general quality of the material to a group on the outside that expressed an interest in buying [the lithium carbonate]." Thayer Depo., 40:5-7.

- Renco provided a guarantee to Wells Fargo on the loans Wells Fargo extended to the Debtor. Thayer Depo., 31:21-23. Renco offered collateral to Wells Fargo to secure the loan to the Debtor, and Mr. Thayer's understanding is that the collateral Renco offered included $75 million in cash collateral. Thayer Depo., 32:2-15.

### IV. The Motion

16. The Debtor requests to sell 1,100 metric tons of lithium carbonate in a bulk sale at a price of $7,500 per metric ton. The Debtor requests that the Court approve the sale of lithium

carbonate free and clear of liens and encumbrances, find the buyer is a purchaser in good faith, and waive the stay imposed by Rule 6004(h) of the Federal Rules of Bankruptcy Procedure.

17.     The Debtor submitted a revised proposed order ("Revised Proposed Order") on December 2, 2025. Docket No. 333. In the Revised Proposed Order, the Debtor removed the phrase "and royalty payments" from paragraph 4, which previously called for the payment of "certain costs and royalty payments." In paragraph 6, the Revised Proposed Order explicitly permits Wells Fargo to apply the proceeds to the Debtor's prepetition obligations.

18.     The *Third Interim Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing, and (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims; (II) Authorizing the Use of Cash Collateral; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling Final Hearing; and (VI) Granting Related Relief* [Docket No. 325] (the "Third Interim DIP Financing Order") explicitly states: "For the avoidance of doubt, and notwithstanding anything to the contrary in this Third Interim Order, the Debtor shall be permitted to apply any payments of proceeds of the Lithium Sale in the manner described in this Paragraph 10, subject only to further order of the Court." Third Interim DIP Financing Order, ¶ 10. Paragraph 10 permits proceeds from the sale of pre-petition collateral to be paid to Wells Fargo.

## OBJECTIONS

**I.     Section 363(b)(1) does not permit the Debtor to sell lithium carbonate when the Debtor does not have that right under state law.**

19.     Section 363(b)(1) is an "enabling statute[] that give[s] the trustee the authority to sell or dispose of property if the debtors would have had the same right under state law." In re Schauer, 835 F.2d 1222, 1225 (8th Cir. 1987).

20. Utah state law requires that an operator pay "the applicable royalty rate established in rule" and that those operators have a royalty agreement prior to the sale of elements or minerals extracted from the Great Sale Lake. Utah Admin. Code R652-21-804; Utah Admin. Code R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(2).  Furthermore, Utah Code § 65A-17-302 requires that operators who extract minerals from the Great Salt Lake pay the royalty rate established by FFSL.

21. There is no provision in the Bankruptcy Code that preempts these requirements. There is "a 'presumption against preemption' rooted in the respect for states as independent sovereigns in our federal system." In re Fed.-Mogul Glob. Inc., 684 F.3d 355, 365 (3d Cir. 2012) (quoting Wyeth v. Levine, 555 U.S. 555, 565 n. 3, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009)). The Third Circuit applies this "strong presumption against inferring Congressional preemption in the bankruptcy context." Integrated Sols., Inc. v. Serv. Support Specialties, Inc., 124 F.3d 487, 493 (3d Cir. 1997).

22. The rules promulgated by FFSL require a royalty agreement before the sale of minerals extracted from the Great Salt Lake. Utah Admin. Code R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(2). Utah state law further provides that a person is guilty of a misdemeanor and liable for civil damages if, without written authorization from FFSL, that person "removes, extracts, uses, consumes, or destroys any mineral resource… on state lands; … [or] uses state lands for commercial gain." Utah Code § 65A-3-1(2)(a) & (e).

23. Without the MOU, the Debtor does not have FFSL's written permission to sell lithium carbonate. Likewise, the Mineral Lease does not establish a royalty rate for lithium carbonate.

4927-6586-2523, v. 2

24. The expressly stated intention of the MOU was to enter a separate and new royalty agreement upon FFSL's completion of rules that designate lithium carbonate as a royalty bearing material. Ex. B, 1-2, and 4.

25. Section VII(h) of the MOU provides that the MOU "shall remain in effect until formal rulemaking designating lithium carbonate as a royalty bearing substance, including the applicable royalty rate and structure, occurs and a Lithium Carbonate Royalty Agreement is memorialized and executed." Ex. B, 6.

26. In section VI(b) of the MOU, FFSL agreed to proceed expeditiously with the rulemaking process, and to draft and circulate a proposed royalty agreement "as soon as practical so that a fully executed royalty agreement is in place immediately following rulemaking." Ex. B, 5.

27. The rulemaking concluded in October 2024 and after over a year, negotiations to enter into a new royalty agreement were fruitless. The MOU, after the rulemaking was completed and royalty agreement negotiations failed, is an expired interim agreement. The MOU was never intended to live in perpetuity.

28. The Utah legislature required FFSL to be the body that creates rules governing mineral leases and royalty agreements. Here, there is no royalty agreement between FFSL and the Debtor that permits the Debtor to sell lithium carbonate. If the Debtor sells lithium carbonate, it does so in violation of Utah state law. The United States Code prohibits the Debtor from illegally selling lithium carbonate in violation of Utah state law. 28 U.S.C. § 959(b).

29. Even if there were an existing royalty agreement, the proposed sale does not contemplate paying royalties to FFSL. See Revised Proposed Order. The Revised Proposed Order exhibits blatant disregard for Utah state law. See Utah Code § 65A-17-302 (requiring

operators who extract minerals from the Great Salt Lake to compensate FFSL at the royalty rate established by FFSL); Utah Admin. Code R652-21-804 ("Royalties shall be paid by an Operator to [FFSL] pursuant to the applicable royalty rate established in rule."); Utah Admin. Code R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(2) (requiring a royalty agreement before the sale of any Great Salt Lake element or mineral).

30. The Court should not approve this sale, which violates Utah state law.

## II. The Proposed Sale Fails to Satisfy the Requirements for Sales Outside the Ordinary Course of Business.

31. The Court does not need to decide that the Debtor cannot sell lithium carbonate under Utah state law because the proposed sale does not satisfy the requirements for sales outside the ordinary course of business.

32. The Debtor acknowledges that the proposed sale is not in the ordinary course of business. Mot., ¶ 9.

33. "The sale of assets which is not in the debtor's ordinary course of business requires proof that: (1) there is a sound business purpose for the sale; (2) the proposed sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the buyer has acted in good faith." In re Exaeris, Inc., 380 B.R. 741, 744 (Bankr. D. Del. 2008) (quoting In re Delaware & Hudson Railway Co., 124 B.R. 169, 176 (D.Del.1991)).

34. To satisfy the test, the Debtor attempts to use the business judgment rule. The Court should not be fooled. The sale does not benefit the Debtor, the sale benefits Wells Fargo and Renco.

### A. The Debtor does not have a Valid Business Purpose for the Sale, Which Appears Calculated to Benefit only Wells Fargo and Renco.

9

35. The business judgment standard requires the debtor to show that a sound business purpose justifies the sale, and Delaware courts consider the factors enumerated by the Second Circuit discussed below. In re Culp, 545 B.R. 827, 844 (D. Del. 2016), aff'd, 681 F. App'x 140 (3d Cir. 2017) (citing Montgomery Ward, 242 B.R. at 153-54).

36. Discussing § 363(b) sales, the Second Circuit stated:

> In fashioning its findings, a bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, he should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike. He might, for example, look to such relevant factors as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value. This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.

In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); see In re Montgomery Ward Holding Corp., 242 B.R. 147, 154 (D. Del. 1999).

37. The facts and circumstances surrounding this sale do not weigh in favor of the Debtor's business judgment.

38. The Revised Proposed Order states that "the Debtor shall remit or cause to be remitted all such Sale Proceeds to Wells Fargo Bank, National Association ("Wells Fargo"), on account of Wells Fargo's first priority lien in the Lithium, for application against pre-petition Obligations owing by the Debtor to Wells Fargo." Revised Proposed Order, ¶ 6. The estate receives nothing from this sale. Renco receives paydown on account of the Wells Fargo debt that it guaranteed.

39. The Motion claims that the lithium subject to the sale is an ongoing cost. But the Letter of Intent contemplates purchasing 290 metric tons of lithium carbonate stored at the Debtor's facilities and 810 tons of lithium carbonate stored at an offsite warehouse. Motion Exhibit 1; see also Thayer Depo. 21:10-12. The sale of the 290 metric tons of lithium carbonate located at the Debtor's facility will not reduce the costs or expenses of the Debtor. The lithium at the Debtor's facilities accounts for $2.175 million of the sales price. The only purpose of selling lithium at the Debtor's facility is to generate funds that can be swept by Wells Fargo on account of prepetition debt that Renco guaranteed.

40. Moreover, there is no indication that the costs associated with the offsite warehouse will diminish after the sales. It is not apparent that the lithium carbonate is the only material the Debtor stores at the warehouse and the Debtor has not committed to rejecting the lease. The Motion does not point to any cost or that the sale of lithium will reduce with any particularity.

**B. There is no Evidence the Sale Terms are Fair.**

41. The Motion states that "[s]ince the Petition Date, the Debtor has been actively seeking a buyer for certain inventory currently in its possession, including its inventory of lithium carbonate…." Motion, ¶ 7.

42. Mr. Thayer stated otherwise. Thayer Depo., 40:1-25. When asked "Has the debtor attempted to sell its lithium inventory?", Mr. Thayer stated "not actively." Thayer Depo., 39:24-25, 40:1. The president of the Debtor went on to vaguely describe "an inquiry in terms of the volume and the general quality of the material to a group on the outside that expressed an interest in buying it." Thayer Depo., 40:5-7.

43. The evidence indicates that the Debtor approached one buyer and did not describe that any negotiations actually took place. There is no certainty that the terms of the transaction are reasonable.

**C. There is Insufficient Evidence for the Court to Grant Relief Under § 363(m)**

44. The Third Circuit incorporated a good-faith element in the § 363(b) analysis in <u>In re Abbotts Dairies of Pennsylvania, Inc.</u>, when it stated: "In short, we hold that when a bankruptcy court authorizes a sale of assets pursuant to section 363(b)(1), it is required to make a finding with respect to the "good faith" of the purchaser." 788 F.2d 143, 149–50 (3d Cir. 1986).

45. Here, there is insufficient evidence that the buyer is operating in good faith.

46. The sale process is not transparent. The sale is not in the ordinary course of business. Mr. Thayer stated the Debtor was not actively marketing the lithium carbonate. Thayer Depo., 40:1. These circumstances, without more, do not lend themselves to finding good faith for either purposes of approving the sale under § 363(b) or granting relief under § 363(m).

**III. The Bill of Sale does not Specify any Royalty Payments, as Contemplated in the Motion, and the Revised Proposed Order does not Address Royalty Payments at all.**

47. Even if the Court is inclined to permit the sale, the Motion and the Revised Proposed Order do not specify the royalty payments owed to FFSL. The Motion states in a footnote that the proceeds from the sale "will be subject to certain warehousing costs and royalty payments." Motion page 3 n.2. But the Debtor does not clearly state what those warehousing costs and royalty payments are.

48. The Revised Proposed Order goes even further by removing language that subjects the sale proceeds to royalties. Revised Proposed Order, ¶ 4.

49. FFSL's records indicate that the last royalty payment it received, that cleared, was in 2023 and the royalty rate received was approximately 1%.

50. The applicable royalty rate under the rules hinge on how the lithium carbonate was extracted, and certification concerning the extraction. See Utah Admin. Code R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, 1001, 1002, 1003, 1004, 1005, 1006. The base royalty rate for lithium production is 5%, and that is subject to a reduction to 2.5% if the proper requirements are satisfied. Utah Admin. Code R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, R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, R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.

51. The Debtor has not submitted to FFSL an application or a certification that makes it eligible for a royalty rate reduction as required by the rules.

52. The proposed sale does not account for any royalties owed to FFSL. As described above, state law requires royalty payments to FFSL. The royalty payments should be addressed prior to permitting the sale proceeds to flow to Wells Fargo.

### IV. If the Court Approves the Sale, the Stay Under Rule 6004(h) Should not be Waived.

53. The purpose of the stay imposed by 6004(h) is to permit parties sufficient time to request a stay pending an appeal of orders authorizing sales. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).

54. The Debtor contends that consummating the sale as soon as possible serves to preserve and maximize value. But this is not a new problem, the Debtor has had this lithium carbonate for years. There is no evidence that the lithium carbonate's value is declining.

55. If the Court approves the sale, FFSL will need to consider its options to fulfill its duties to prevent actions in contravention of Utah state law.

4927-6586-2523, v. 2

**CONCLUSION**

FFSL objects to the Debtor's proposed sale of lithium carbonate because the sale violates Utah state law. The Debtor is not authorized to sell lithium in the state of Utah. Additionally, the sale does not satisfy the requirements for a sale outside of the ordinary course of business. The lithium sale only continues to diminish the estate under the Debtor's supervision (for the benefit of Renco and Wells Fargo), as has been the intention since day one of this case.

FFSL respectfully requests the Court deny the Debtor's Motion.

Date: December 5, 2025

HOGAN♦MCDANIEL

/s/ Garvan F. McDaniel
Garvan F. McDaniel (#4167)
1311 Delaware Avenue
Wilmington, DE 19806
(302) 656-7540; (302) 656-7599
gfmcdaniel@dkhogan.com
-and-

COHNE KINGHORN, P.C.
George Hofmann, Esq.
111 East Broadway, 11th Floor
Salt Lake City, UT 84111
(801) 363-4300; (801) 363-4378
ghofmann@ck.law
-and-

DEREK E. BROWN
UTAH ATTORNEY GENERAL
Michael E. Begley, Esq.
Trevor C. Lang, Esq.
1594 W. North Temple, #300
Salt Lake City, UT 84116
mbegley@agutah.gov
tclang@agutah.gov

*Attorneys for Utah Division of Forestry, Fire and State Lands*

4927-6586-2523, v. 2