# **<u>EXHIBIT A</u>**

**Fill in this information to identify the case:**

Debtor      US Magnesium LLC

United States Bankruptcy Court for the District of      District of Delaware

Case number      25-11696

Official Form 410

# Proof of Claim

**04/25**

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

## Part 1:   Identify the Claim

**1. Who is the current creditor?**

Forgen, LLC

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No

☐ Yes.   From whom?

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|

See Additional/Expanded Creditor Address(es) page:

Forgen, LLC
c/o Office of the General Cou...
6025 South Quebec Street, Sui...
Centennial, Colorado 80111
**P:** 720.221.1121
**E:** brichmond@forgen.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

— — — — — — — — — — — — — — — — — — — — — — — — — —

**4. Does this claim amend one already filed?**

☑ No

☐ Yes.   Claim number on court claims registry (if known) _____ Filed on _____
MM/DD/YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No

☐ Yes.   Who made the earlier filing? _____

---

Official Form 410

1403204012637512980000001

**Part 2:**  Give Information About the Claim as of the Date the Case Was Filed

| | | |
|---|---|---|
| 6. | **Do you have any number you use to identify the debtor?** | ☑ No<br><br>☐ Yes.  Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ |

| | | |
|---|---|---|
| 7. | **How much is a claim?** | 7,135,920.04          Does this amount include interest or other charges?<br><br>☐ No<br><br>☑ Yes.  Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | | |
|---|---|---|
| 8. | **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card<br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>Construction Services - See Claim Annex |

| | | |
|---|---|---|
| 9. | **Is all or part of the claim secured?** | ☐ No<br><br>☑ Yes.    The claim is secured by a lien on property<br><br>**Nature of property**<br><br>☑ Real estate.       If the claim is secured by the debtor's principal residence, file a Mortgage Proof of Claim Attachment (Official Form 410-A)with this Proof of Claim.<br><br>☐ Motor vehicle.<br><br>☐ Other. Describe: _____<br><br>**Basis for perfection:**   Constr. Lien Under Utah Code § 38-1a-501 et seq.<br><br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:**   _____<br><br>**Amount of the claim that is secured:**   $ 3,764,100.97<br><br>**Amount of the claim that is unsecured:**   $ 3,371,819.07    (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:**   $ 7,135,902.04<br><br>**Annual Interest Rate (when case was filed)**   _____ %<br><br>☐ Fixed<br>☑ Variable |

| | | |
|---|---|---|
| 10. | **Is this claim based on a lease?** | ☑ No<br><br>☐ Yes.   Amount necessary to cure any default as of the date of the petition.          $ _____ |

| | | |
|---|---|---|
| 11. | **Is this claim subject to a right of setoff?** | ☑ No<br><br>☐ Yes.   Identify the property: _____ |

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? <br><br> A Claim may be partly priority and partly nonpriority.For example, law limits the amount entitled to priority. | ☑ No <br><br> ☐ Yes.   Check one: <br><br> ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). <br><br> ☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). <br><br> ☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4) <br><br> ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). <br><br> ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). <br><br> ☐ Other. Specify subsection of 11 U.S.C. § 507(a)() that applies. <br><br> *Amounts are subject to adjustment on 4/01/28 and every 3 years after that for cases begun on or after the date of adjustment. | Amount entitled to priority <br><br> _____ <br><br> _____ <br><br> _____ <br><br> _____ <br><br> _____ <br><br> _____ |
| 13. | Is all or part of the claim pursuant to 11 U.S.C § 503(b)(9)? | ☑ No <br><br> ☐ Yes.   Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim. | |

## Part 3:  Sign Below

| **The person completing this proof of claim must sign and date it. FRBP 9011(b).** <br><br> If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is <br><br> **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | Check the appropriate box <br><br> ☑ I am the creditor. <br><br> ☐ I am the creditor's attorney or authorized agent. <br><br> ☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004. <br><br> ☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005. <br><br> I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt <br><br> I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct. <br><br> I declare under penalty of perjury that the foregoing is true and correct. |

Executed on date & time     04/01/2026 at 02:12 pm PT
                         MM / DD / YYYY HH : MM

/s/Bruce Diettert
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Bruce | | Diettert |
|---|---|---|---|
| | First Name | Middle Name | Last Name |
| Title | Senior Vice President | | |
| Company | Forgen, LLC | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer | | |
| Address | 6025 South Quebec Street, Suite 300 | | |
| | Number | Street | |
| | Centennial | CO | 80111 |
| | City | State | ZIP Code |
| Contact phone | 9169696589 | | |
| Email | | | |

**Additional/Expanded Creditor Address(es):**

**Primary Address (Expanded)**
Forgen, LLC
c/o Office of the General Counsel
6025 South Quebec Street, Suite 300
Centennial, Colorado 80111
Phone: 720.221.1121
brichmond@forgen.com

Stretto Corporate Restructuring
855.812.6112 inquiries@stretto.com
cases.stretto.com
Proof Of Claim                                                                 Page 4

Fill in this information to identify the case:

Debtor: US Magnesium, LLC

United States Bankruptcy Court for the District of Delaware

Case number: 25-11696 (BLS)

## Official Form 410

# Proof of Claim
04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
| --- | --- |

| 1. Who is the current creditor? | Forgen, LLC |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor: _____ |

| 2. Has this claim been acquired from someone else? | ☒ No |
| | ☐ Yes. From whom? _____ |

| 3. Where should notices and payments to the creditor be sent? | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
| Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Forgen, LLC c/o Office of the General Counsel | |
| | Name | Name |
| | 6025 South Quebec Street, Suite 300 | |
| | Number          Street | Number          Street |
| | Centennial          CO          80111 | |
| | City          State          Zip Code | City          State          Zip Code |
| | Contact phone: 720.221.1121 | Contact phone _____ |
| | Contact email: brichmond@forgen.com | Contact email _____ |
| | **\*SEE ADDITIONAL NOTICE PARTIES IN CLAIM ANNEX** | |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one): | |
| | _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | |

| 4. Does this claim amend one already filed? | ☒ No | |
| | ☐ Yes. Claim number on court claims registry (if known) _____ | Filed on _____ |
| | | MM / DD / YYYY |

| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☒ No |
| | ☐ Yes. Who made the earlier filing? _____ |

| Part 2 | Give Information About the Claim as of the Date the Case Was Filed |
| --- | --- |

| 6. Do you have any number you use to identify the debtor? | ☒ No |
| | ☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: |

| 7. How much is the claim? | $7,135,920.04        Does this amount include interest or other charges? |
| | ☐ No |
| | ☒ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| 8. What is the basis of the claim? | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. |
| | Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). |
| | Limit disclosing information that is entitled to privacy, such as health care information. |
| | **Construction Services - See Claim Annex** |

| 9. Is all of part of the Claim secured? | ☐ No |
| | ☒ Yes. The claim is secured by a lien on property. |

Nature of property:

☒ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.
☐ Motor vehicle
☐ Other. Describe: _____

Basis for perfection:     **Construction Lien Under Utah Code § 38-1a-501 et seq.**_____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of Property:                  $_____
Amount of the claim that is secured:     $3,764,100.97____
Amount of the claim that is unsecured:    $3,371,819.07____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:    $7,135,920.04____

Annual Interest Rate (when case was filed) **See Claim Annex**%
☐ Fixed
☒ Variable

| 10. Is this claim based on a lease? | ☒ No |
| | ☐ Yes. Amount necessary to cure any default as of the date of the petition.    $_____ |

| 11. Is this claim subject to a right of setoff? | ☒ No |
| | ☐ Yes. Identify the property: _____ |

| 12. Is all or part of the claim entitled to priority under | ☒ No |
| | ☐ Yes. *Check one:*                             **Amount entitled to priority** |

| 11 U.S.C. § 507(a)? | | |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)() that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3: Sign Below

| | |
|---|---|
| The person completing this proof of claim must sign and date it. FRBP 9011(b). | *Check the appropriate box:*<br><br>☒ I am the creditor.<br>☐ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005. |
| If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is. | I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt. |
| A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571. | I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>Executed on date  03 / 12 / 2026<br><br>/s/ _____<br>Signature |

Print the name of the person who is completing and signing this claim:

| | |
|---|---|
| Name | Bruce Diettert |
| Title | Senior Vice President |
| Company | Forgen, LLC |
| Address | 6025 South Quebec Street, Suite 300<br>Centennial, CO 80111 |
| Contact phone: | (916) 969-6589. |
| Email: | BDiettert@Forgen.Com |

37259694_v1

---

Official Form 410                     Proof of Claim                     page 3

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re | Chapter 11 |
| US MAGNESIUM, LLC, | Case No. 25-11696 (BLS) |
| Debtor. | |

**ANNEX TO PROOF OF CLAIM**

This is the Annex (this "Annex") to the Proof of Claim (the "Proof of Claim") of Forgen, LLC ("Claimant") against US Magnesium, LLC (the "Debtor"), the debtor in the above-captioned bankruptcy case (the "Bankruptcy Case") pending before this Court (the "Bankruptcy Court"). This Annex is incorporated into and made a part of the Proof of Claim and filed under section 502 of Title 11 of the United States Code (the "Bankruptcy Code").

1.  **Name and Address of Claimant**. Forgen, LLC, 6025 South Quebec Street, Suite 300 Centennial, CO 80111.

2.  **Petition Date**. The Bankruptcy Case was filed on September 10, 2025 ("Petition Date").

3.  **Basis for Proof of Claim**.

    a.  *The Contract and Work Performed*.

        i.  On May 16, 2023, Forgen and the Debtor entered into a Construction Contract (the "Contract"), pursuant to which Forgen furnished all supervision, labor, tools, supplies, equipment, services, materials and other incidentals and performed all the work to timely and competently build an underground pollution mitigation wall at the Debtor's lithium mine in Rowley, Utah (the "Project"). A copy of the Contract is attached as *Exhibit 1*.

ii.      The real property where the Project is located and upon which Forgen performed its work is located in Tooele County, State of Utah, and is commonly known as 12819 N. Rowley Rd., Skull Valley UT 84029 (the "Subject Property").

iii.      The work on the Project is required under the *Consent Decree* entered by the United States District Court for the District of Utah on June 30, 2021 (the "Consent Decree") in the case styled *United States of America v. Magnesium Corporation of America, et al.*, Case No. 2:01CV0040. A copy of the Consent Decree is attached as ***Exhibit 2***.

iv.      On or about June 26, 2023, the Debtor sent Purchase Order No. 574670-0000-000 to Forgen outlining the work Forgen was to complete for the Project (the "Purchase Order"). A copy of the Purchase Order is attached as ***Exhibit 3***. The Contract explicitly incorporates the Purchase Order and all terms and conditions set forth therein. The scope of work was to be detailed in the Purchase Order issued against the Contract.

v.      The total Purchase Order cost was $11,908,144.00. Under the Purchase Order, "monthly progress payments were to be paid Net 45 days and on a percent performed basis with a maximum of 5% held as retention."  Billed amounts not paid within 45 days accrue interest at prime rate plus 1.5% per annum, which at all relevant times equaled 10%.

vi.      On or about June 6, 2023, Forgen began performing under the Contract at the Project.

vii.      On September 5, 2023, Forgen filed a Preliminary Notice with the State Construction Registry, as Entry No. 1053945 (the "Preliminary Notice"), in accordance with Utah Code § 38-1a-501.  A copy of the Preliminary Notice is attached as ***Exhibit 4***.  Pursuant to Utah law, the Preliminary Notice more particularly described the Subject Property by the following

Tax Parcel IDs: 04-019-0-0010, 04-022-0-0010, 04-019-0-0005, 04-021-0-0001, 04-019-0-0002, 04-021-0-0004, 04-019-0-0009, 04-019-0-0001, and 04-021-0-0002.[1]

### b.    *Debtor's Failure to Pay for Work Performed*

i.    Despite Forgen's compliance with its obligations, the Debtor failed to pay all amounts due and owing to Forgen under the Contract, including the following five invoices, each of which accrues interest at the contract rate of 10% per annum.

ii.    On August 4, 2023, Forgen invoiced the Debtor $990,442.84 under the Contract for the work completed in the previous month at the Project.

iii.    On September 12, 2023, Forgen invoiced the Debtor $1,223,288.09 under the Contract for the work completed in the previous month at the Project.

iv.    On October 19, 2023, Forgen invoiced the Debtor $1,678,549.04 under the Contract for the work completed in the previous month at the Project.

v.    On November 8, 2023, Forgen invoiced the Debtor $1,727,483.82 under the Contract for the work completed in the previous month at the Project.

vi.    On November 16, 2023, Forgen invoiced the Debtor $133,000.00 under the Contract for the work completed in the previous month at the Project.

vii.    These amounts are the required payments to Forgen under the Contract. Forgen temporarily ceased working at the Project on or about November 14, 2023 as planned for the winter season shutdown and, due to the Debtor's ongoing failure to pay the above invoices, on or about April 4, 2024 Forgen initiated its suspension right in the Contract.

---

[1]    Under Utah law, Forgen's lien attached to the Subject Property and all "franchises, privileges, appurtenances, machinery, and fixtures pertaining to or used in connection with the improvement" under Utah Code §§ 38-1a-302 and 38-1a-501(1)(b), (c)(i) within five days after it recorded the Preliminary Notice (September 10, 2023). Wells Fargo filed its UCC-1 financing statement against the "as extracted collateral" from the real property on December 7, 2023, after Forgen's first filed lien had attached to the Subject Property.

*c.*        ***The Construction Lien and Foreclosure***

i.        On or about April 4, 2024, Forgen issued a ten-day Notice to Cure to the Debtor (the "Notice to Cure").

ii.        On April 29, 2024, Forgen sent a Notice of Suspension (the "Notice of Suspension") under the terms of the Contract for the Debtor's failure to cure its default. A copy of the Notice of Suspension is attached as ***Exhibit 5***.

iii.        On May 2, 2024, Forgen recorded a Notice of Construction Lien with the Tooele County Recorder, Entry No. 602527 (the "Construction Lien") in accordance with Utah Code § 38-1a-502. A copy of the Construction Lien is attached as ***Exhibit 6***.

iv.        On May 9, 2024, Forgen sent a Notice of Construction Lien and Demand for Payment to the Debtor due to its continued breach of the Contract ("Demand for Payment"), demanding that the Debtor pay all past due amounts by May 17, 2024.  A copy of the Demand for Payment is attached as ***Exhibit 7***. The Debtor failed to pay any of the invoices Forgen sent in compliance with the terms of the Contract and for the work completed at the Project.

v.        On October 4, 2024, Forgen timely filed its Complaint (the "Complaint") asserting claims for breach of contract, breach of covenant of good faith and fair dealing, and lien foreclosure. A copy of the Complaint (without exhibits) is attached as ***Exhibit 8***. On October 21, 2024, Forgen recorded its Notice of Pendency of Action (the "Lis Pendens") against the Subject Property. A copy of the Lis Pendens is attached as ***Exhibit 9***. In accordance with Utah Code § 38-1a-101, *et seq.*, upon filing the Complaint and recording the Lis Pendens, Forgen met all statutory requirements to perfect and foreclose on the Construction Lien.

vi.        Over the course of seven months, the Debtor failed to respond to the Notice of Cure, the Notice of Suspension, or the Demand for Payment, and instead, on November

4

15, 2024, filed an Answer to Complaint in which it made certain admissions, allowed documents to speak for themselves, and otherwise set forth rote denials and affirmative defenses.

4.      **Amount of Proof of Claim**. Total Claim of not less than **$7,135,920.04** for unpaid invoices and interest, comprised of (a) a Secured Claim of at least **$3,764,100.97** plus interest at the rate of Prime plus 1.5% from the Petition Date until paid in full, attorneys' fees and costs, secured by the Construction Lien, and (b) a General Unsecured Claim of not less than **$3,371,819.07** (all subject to the Reservation of Rights section of this Annex). An account statement summarizing the amounts due and copies of the invoices supporting the stated amount of the Proof of Claim are attached to this Annex as *Exhibit 10*.

5.      **Reservation of Rights**. The following inures to the benefit of Claimant and its affiliates:

a.      Claimant asserts, reserves, and preserves (i) all claims against or rights arising out of the Agreement and any other agreement between Claimant and the Debtor, and any other claim or right at law or equity, including any and all contingent, unliquidated, and unmatured claims, of any nature and arising at any time; (ii) all rights of setoff and recoupment whether arising under any agreement, statute, common law, other law, equity, or otherwise; (iii) all lien rights and security interests whether arising under any agreement, statute, common law, other law, equity, or otherwise; and (iv) the right to request payment of administrative expenses at a later date or when required by the Bankruptcy Court, the Bankruptcy Code, or other applicable law.

b.      The execution and filing of the Proof of Claim does not, with respect to Claimant, constitute (i) a consent to the jurisdiction of the Bankruptcy Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimant; (ii) a waiver or release of right to trial by jury in the Bankruptcy Court or any other court

5

in any proceeding as to any and all matters so triable in such courts, whether or not the same be designated legal or private rights or in any case, controversy or related proceeding, notwithstanding the designation or not of such matters as "core proceedings" under 28 U.S.C. § 157(b)(2), and whether such right to jury trial is by statute or the United States Constitution; (iii) a consent to a jury trial in the Bankruptcy Court or any other court in any proceeding as to any and all matters so triable in this Bankruptcy Case or in any case, controversy, or related proceeding under 28 U.S.C. § 157(e) or otherwise; (iv) a waiver or release of any right to have final orders in non-core matters or proceedings entered only after *de novo* review by the applicable United States District Court; or (v) a waiver of the right to move to withdraw the reference with respect to the subject matter of the Proof of Claim, any claim objection or other proceeding which may be commenced in the Bankruptcy Case against or otherwise involving Claimant.

c.    The execution and filing of the Proof of Claim also does not, with respect to Claimant, constitute (i) a waiver or release of rights, at law or equity, against any other entity or person liable for all or part of the Proof of Claim or under any agreement; (ii) a waiver of any right to the subordination of indebtedness or liens held by other creditors of any debtor; (iii) an election of remedies waiving or otherwise affecting any other remedies; (iv) a waiver of any right to arbitration or other alternative dispute resolution mechanism that is otherwise applicable; (v) a waiver of any right with respect to property held by any debtor; or (vi) a waiver of any claims (which includes, but is not exclusive to, causes of action) or defenses in any pleading, notwithstanding any agreement, stipulation, or order temporarily modifying such rights or staying any case or proceeding pending receipt in full of the benefit of the bargain.

d.    Claimant asserts, reserves, and preserves its rights to withdraw, amend, or supplement the Proof of Claim to the full extent permitted by law to specify (and quantify)

6

damages, costs, expenses, and other charges or claims incurred by Claimant and to file additional proofs of claim, including, proofs of claim arising from or relating to (i) post-petition interest, legal fees, and related expenses that are not ascertainable at this time; (ii) the avoidance of transfers (if any) made to Claimant or any other entity, including any payments on the Proof of Claim described in this Annex; (iii) the assumption or rejection of any executory contracts or unexpired leases, or any other claims arising from section 365 of the Bankruptcy Code; and (iv) any debtor's failure to perform its obligations under any agreements.

e.      Claimant asserts, reserves, and preserves all claims, rights, and interests in respect of any prepetition or post-petition breaches of any agreement and/or due to the impairment of any of Claimant's rights or interests, including property interests, in the Bankruptcy Case or otherwise. Claimant also asserts, reserves, and preserves all claims for interest, fees, expenses, professional fees, and other charges relating to any such agreement or otherwise. Claimant also asserts, reserves, and preserves all rights, arguments, claims, and interests to assert any objection to the purported cure amounts proposed to be paid by any debtor to assume any agreement (a "Cure Objection"), as well as any supplement or amendment to such Cure Objection (any Cure Objection and supplement or amendment to such Cure Objection are incorporated by reference). Claimant also reserves the rights to make and enforce any election under section 365 of the Bankruptcy Code to remain in possession of any property, right, license, grant, dedication, covenant, or other interest at any time following rejection or breach of any agreement.

f.      Claimant further reserves any and all rights to assert claims arising from any agreements after confirmation of a chapter 11 plan, conversion, or dismissal of the Bankruptcy Case(s), and/or substantive consolidation of any debtor with any other debtor and/or any non-debtor party or parties.

g.      The assertion of the Proof of Claim by Claimant as set forth in this Annex is in addition to, not in place of, and does not amend, alter, or affect in any way, the assertion of any claims and causes of action made or asserted in other jurisdictions. This Annex and the Proof of Claim are without prejudice to, and are not intended to supersede, any and all additional claims and causes of action that may be filed by Claimant in the Bankruptcy Case or in any other court with competent jurisdiction over the claims. The Proof of Claim is filed without prejudice to any cause of action against any debtor not constituting a "claim" under section 101(5) of the Bankruptcy Code.

6.      **Severability**. If any part of this Annex is for any reason held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other part of this Annex, and the terms and conditions of this Annex shall be construed as if such invalid, illegal, or unenforceable part had never been contained in this Annex.

7.      **Standards of Interpretation**. When used in this Annex, the word "including" means including without limitation. References to "Dollars" and the symbol "$" mean U.S. Dollars.

8.      **Notices**. ALL NOTICES WITH RESPECT TO THE PROOF OF CLAIM SHOULD BE MADE IN WRITING AND SENT TO:

Forgen, LLC
6025 South Quebec Street, Suite 300
Centennial, CO 80111
Attention: Office of the General Counsel

with a copy to:

HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
P.O. Box 8749
Denver, CO 80201-8749
Attention:  Matthew J. Ochs

8

mjochs@hollandhart.com

-and-

HOLLAND & HART LLP
222 South Main Street, Suite 2200
Salt Lake City, UT 84101
Attention:  Engels Tejeda
ejtejeda@hollandhart.com

[*Remainder of Page Intentionally Blank*]

**Exhibit 1**

**(Contract)**

**See attached.**

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

CONTRACT NO. ___MW050423_____

## Construction Contract

THIS CONSTRUCTION CONTRACT (hereinafter this "Contract"), made and entered into this $^{16}$___ day of _May__, 2023, and effective until the _31st_ day of May, 2025, by and between US Magnesium LLC ("US MAGNESIUM LLC"), a Delaware limited liability company, with offices at 238 North 2200 West, in Salt Lake City, Utah (hereinafter referred to as "The Company"), and Forgen, LLC (Forgen) having an address at 6020 W. Oaks Blvd, Suite 220, Rocklin, CA 95765 (hereinafter referred to as "Contractor").

### WITNESSETH

WHEREAS, the Company desires to have certain work performed hereunder and Contractor represents that it is ready, willing and able to perform such work, in a timely professional and competent manner, all on the terms and conditions set forth in this Contract;

NOW, THEREFORE, for and in consideration of the payment or payments to be made to the Contractor by the Company as set forth herein, and the further consideration of the mutual promises and covenants herein contained, and intending to be legally bound, the parties hereto agree as follows:

1. **Contract Documents**

    A. This Contract incorporates by reference all of the documents that are checked below:

    (X)     EXHIBIT A1   -   Lump Sum and Unit Price Payments

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

|       | EXHIBIT A2 | - | Time & Materials Payments |
| (X)   | EXHIBIT B  | - | General Conditions |
| (X)   | EXHIBIT C  | - | Contractors Safety and Security Rules |
| (X)   | EXHIBIT D  | - | Scope of Work |
| (X)   | EXHIBIT E  | - | Specifications |
| (X)   | EXHIBIT F  | - | Contractor's Bid Proposal, as accepted by Company. |
| (X)   | EXHIBIT G  | - | Bidder Confidentiality Agreement |
| ( )   | EXHIBIT H  | - | Labor & Materials Payment Bond |
| ( )   | EXHIBIT I  | - | Performance Bond |
| (X)   | EXHIBIT J  | - | Drawings (lists attached hereto). All drawings, including the Material Control Sheets and Specification Sheets associated with such drawings, working drawings, and other drawings provided Contractor after commencement of the Project, are incorporated herein by reference and shall be a part of this EXHIBIT J. |
| (X)   | EXHIBIT K  | - | Waiver of Lien |
| (X)   | EXHIBIT L  | - | Certification of Completion of Contract |
| (X)   | EXHIBIT X  | - | Change Order Form |

B. All of the above documents, together with such other modifications, Change Orders and documents now or hereafter signed by both parties or incorporated by reference and relating to the subject matter herein, are made a part hereof and are hereinafter referred to as the "Contract."

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

## 2. General Statement of Project and Designation of Personnel

A. Except as otherwise specified in this Contract, Contractor shall furnish all supervision, labor, tools, supplies, equipment, services, materials and other incidentals and shall perform all of the work to timely and competently complete the following:

(i)____Work performed on plant site_____

(ii)_____

_____

(iii)_____

_____

All of the above to be performed at the following location(s):

_____US Magnesium LLC, Rowley Utah Plant site_____

All of the above is hereinafter referred to as the "Project."

B. The Contractor shall designate in writing its representative (which person, or any substitution thereof, is hereinafter referred to as "Contractor Representative") for this Contract within ten (10) days after the signing hereof. Each party reserves the right to change the person so designated from time to time by prior written notice to the other. Such representative shall be responsible for the day-to-day communications between the parties relating to the Project. Except as otherwise directed by the Company, the Company's Representative shall communicate to the Contractor all of the Company's determination, instruction, decisions, positions and Change Orders.

## 3. Service Schedule and Completion Date

The Contractor shall complete the Project on or before the scheduled completion as detailed in purchase orders issued against this contract.

3

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

Within two (2) weeks from the date of execution of this Contract, the Contractor shall submit for Company review and approval a detailed schedule in graphic form showing the proposed sequence of construction operations based upon starting and completion dates of each item given in the proposal or as provided in the Specifications or other Exhibits, and as otherwise necessary to meet the completion date specified above. Changes to meet Company requirements shall be promptly made. Upon approval by the Company the schedule shall be a part of this Contract. If Contractor fails to follow the schedule in whole or in any material part, such failure shall be a default under this Contract; provided Contractor is given reasonable time of no less than ten (10) days to cure the failure under the construction schedule.

## 4. Termination Without Cause

A. The Company shall have the right to terminate this Contract at any time without cause upon at least ten (10) days' prior written notice to Contractor. If Company gives Contractor notice of termination under this paragraph; Company shall thereafter pay only Contractor's documented reasonable out-of-pocket costs of demobilization and shall not be obligated for any lost and/or anticipated profits resulting from the termination. Upon termination, Contractor shall take such reasonable steps as are necessary to promptly effect such termination at the least cost to Company, including returning unused materials for any applicable refunds, terminating at the least possible cost any leases for equipment required for the Project, utilizing equipment on other work of Contractor, and other reasonable steps.

B. Reasonable costs of demobilization shall include the following:

4

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

1) Documented reasonable out-of-pocket costs and expenses of removing, storing and disposing of equipment, suppliers, and materials not used as a result of termination;

2) Documented reasonable out-of-pocket accounting, clerical and similar costs incident to termination;

3) Documented reasonable overhead costs including out-of-pocket costs and expenses of terminating subcontracts, not to exceed the Contract amount for work performed and materials supplied to the date of subcontractor's termination, plus costs incurred by subcontractors under 1 and 2 of this subparagraph B.

4) Other documented reasonable out-of-pocket costs and expenses as approved in advance by Company's Representative.

C. Reasonable costs of demobilization shall not include any of the following:

1) Loss of anticipated profits resulting from termination.

2) Consequential or special damages, howsoever characterized.

3) Costs incurred with respect to supplies, labor, tools, materials, or services, purchased or work done in excess of requirements of the Contract.

4) Costs and expenses due to failure of Contractor to promptly discontinue its work on the Project, demobilize, and affect the termination at the least possible costs to Company.

5) Losses on other contracts or from sales or exchanges of capital assets.

D. For termination under this paragraph, final settlement, including payment of any retaining, will be made pursuant to EXHIBIT A.

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

## 5. Subcontracting

A. Except as provided in Paragraph 11, Contractor shall not award any subcontract for which, the total dollar value individually or collectively with all other subcontracts awarded, exceeds N/A of the awarded Contract amount hereunder. The total dollar value of each subcontract shall be (i) for a lump sum or unit price subcontract, the amounts of all payments to be made under the subcontract and (ii) for a cost plus subcontract or for any other subcontracts where the total payments are not specified in the Contract, the amount, based on the good faith estimate by Contractor approved by the Company's Representative, of the total payments to be made thereunder.

Promptly after signing this Contract, but not to exceed five (5) days, Contractor shall notify the Company's Representative in writing of each subcontract awarded, which notice shall contain the following:

1) Name, address and telephone number of each subcontractor;

2) Scope of work to be performed by each subcontractor;

3) Total dollar value of each subcontract and of all subcontracts in the aggregate;

4) Percent of work to be performed by subcontractor;

5) Scope of each subcontract and completion date for the work to be performed thereunder.

B. No such subcontract shall relieve Contractor of any of its obligations hereunder, and the act or omission of any subcontractor shall be deemed to be the act or omission of Contractor. Each subcontractor shall comply with all obligations and duties of Contractor under this Contract with respect to the work performed and materials supplied by such subcontractor.

6

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

## 6. Indemnification of Company

The Contractor agrees to defend, indemnify and hold the Company harmless from and against any and all third party claims, demands, suits and actions of anyone not a party to this Contract including without limitation the Contractor's employees, agents and licensees, any subcontractor, and any subcontractor's employees, agents and licensees, for loss, injury, damage or liability or any kind whatsoever, arising directly out of the Contractor's performance under this Contract, to the extent of Contractor's negligence. This provision shall survive expiration or earlier termination of this Contract.

## 7. Contractor's Payments, Taxes and Liens

The Contractor agrees that it will promptly pay and discharge all valid charges for all labor, equipment, materials, services and other incidentals necessary or convenient to complete the Project provided by any person under this contact, and for all taxes, lien able claims, charges or other levies and impositions imposed or to be imposed by law arising directly or indirectly out of Contractor's performance under this Contract or our of any equipment, services, labor, supplies, materials or other incidentals furnished under this contract. Contractor shall keep all real and personal property and fixtures of Company free and clear, and shall indemnify and hold Company harmless from, any and all liens and/or encumbrances of any nature arising directly or indirectly out of Contractor's performance under this Contract or out of any equipment, services, labor, supplies, materials or other incidentals furnished under this contract including without limitation, those arising from persons described in the mechanic's lien laws of the State of Utah, as such laws are amended from time to time unless such liens are due to the Company's non-payment. If any time Company receives notice or has reasonable grounds to believe that the

7

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

Contractor has at any time failed to pay for and discharge any of the above, or Company receives any notice that any person has filed, or intends to file, any lien or encumbrance on Company's real or personal property or fixtures arising from Contractor's performance **or failure to perform this agreement** of this Contract, the Company may, but shall not be required to, settle and pay such claims, liens and encumbrances and charge such amounts to the Contractor, Redacted per annum until paid from the time of the Company's payment thereof, or at the highest legal rate, if less, which amounts Contractor will pay Company at Company's demand, or Company may deduct them from any balance or balances due (including any retainage or any final settlement) to the Contractor. The production of receipts showing payment from the items described in this paragraph, including payment of subcontractors, and the furnishing of lien waivers by Contractor from its subcontractors and suppliers furnishings any service, work or materials for the Project in a form acceptable to the Company may be required by the Company before any partial or final payment is made to Contractor. This paragraph shall survive expiration of the Contract.

## 8. Contractor Defaults

A. <u>Contractor's Failure to Perform</u>. Any failure of the Contractor to perform, or to comply with, any provision of this Contract shall, after a written ten (10) day notice and reasonable opportunity to cure, be a default of Contractor under this Contract, and the Company may at its option invoke any one or more of all of the following remedies, in addition to any other remedies granted in this Contract or provided at law or in equity:

1) <u>Termination of Contract</u>. The Company may, upon ten (10) days written notice of Contractor's default, terminate this Contract.

8

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

2) Suspension of Performance. The Company may suspend the Contractor's right of performance of the work wholly or in part for such period of time as it may deem necessary. No extension of time for completion will be granted because of delays caused by any suspension hereunder.

3) Termination of Project. The Company may, after giving ten (10) days' written notice to the Contractor, terminate the right of the Contractor (and any of its subcontractors) to proceed with the Project or any part thereof. In such event, the Contractor shall receive no further payment under this Contract and the Company may take over the Project and may, but shall not be obligated, to complete the same by whatever method the Company may deem expedient, whether by Contractor or otherwise, in which case the Contractor shall be liable to the Company for the sum of any costs incurred by the Company in completing the Project in excess of such costs as the Company would have incurred if this Contract had been fully performed by the Contractor plus any and all damages suffered by the Company by reason of the Contractor's failure to perform.

4) Contractor's Right to Dispute. Contractor reserves the right to dispute any alleged Default due to Contractor's Failure to Perform by the Company through the dispute resolution process set forth in Exhibit B, paragraph 2 Resolution of Disputes in this Contract.

B. Termination of Contract. If Contractor **files** a petition in bankruptcy or for reorganization or for an arrangement pursuant to any federal or state bankruptcy or any similar federal or state law; or shall be adjudicated as a bankrupt or shall make an assignment for the benefit or creditors or shall become insolvent or shall admit in writing its inability to pay its debts generally as they become due, or if a petition of

9

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

answer proposing the adjudication of Contractor as a bankrupt or its reorganization pursuant to any federal state bankruptcy law of any similar federal or state law shall be filed in any court and Contractor shall consent to or acquiesce in the filing thereof or such petition or answer shall not be discharged or denied within thirty (30) days after the filing. thereof; or if a receiver, trustee or liquidator of Contractor or of all or substantially all of the assets of Contractor shall be appointed in any proceeding brought by Contractor; or if any such receiver, trustee or liquidator shall be appointed in any proceeding brought against Contractor, and shall not be discharged within thirty (30) days after such appointment; or if Contractor shall consent to or acquiesce in such appointment; or if, the Contractor persistently or repeatedly refuses or fails, except in cases for which extension of time is provided, to supply enough properly skilled workmen or proper materials; or if the Contractor fails to make prompt payment to subcontractors or for material, equipment or labor or other items described in Paragraph 7, or to furnish the lien waivers required therein; or if Contractor fails to comply with any laws or ordinances, or interferes with, disrupts, or causes the disruption of the Company's operations, whether by reason of a labor dispute or otherwise; or if the Contractor otherwise violates or defaults in any provision of this Contract, then the Company may, upon **notice from** the Company's Representative that sufficient cause exists to justify such action, without prejudice to, and in addition to, any other right or remedy under this Contract, at law or inequity, (i) exercise any remedy provided in subparagraph 8A.

C.  No Waiver. Any failure by the Company at any time to enforce or require strict observance and performance of any term or condition of this Contract or to invoke any remedy or remedies under this Paragraph 8 or elsewhere in this Contract, shall not be deemed to be a

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

waiver by the Company of, or affect, or impair such term or condition in any way or affect the right of the Company to avail itself at any time of any other remedies. All remedies shall be cumulative and not exclusive.

## 9. Independent Contractor

Contractor, and all subcontractors hereunder, are and shall be in the performance of all work under this Contract, independent Contractors and all employees, agents and servants whatsoever, of Contractor and of each subcontractor are and shall be and remain at all times employees, agents and servants of Contractor or of the subcontractor, as the case may be, and shall not in any way at any time be or become or be deemed to be employees, agents or servants of Company.

## 10. Contract Not Assignable

Except to the extent permitted in the five (5) day period as provided in Paragraph 5, the Contractor shall not assign this Contract or sublet or transfer it, in any manner as a whole or in part without the prior written consent of the Company, nor shall the Contractor assign any monies due, or to become due hereunder without the prior written consent of the Company. Any assignment or subletting, or attempt thereof, without such consent is void. Any permitted assignment, subletting or transfer shall not relieve Contractor of its obligations hereunder, and with respect to any permitted assignment, transfers, etc., of monies due or to become due, all such assignment, transfers, etc., shall be subject to rights, claims and defenses of Company against Contractor hereunder.

## 11. Time of the Essence

Time is of the essence with respect to all obligations of the Contractor hereunder. In the event either party shall fail to perform at the time fixed

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

for performance herein, by the terms of this contract, the other party may, at its election terminate the contract. The times for performance set forth herein may be extended by a change order from the Project Manager for such reasonable time as he may determine when in his opinion the work to be performed is delayed by labor disputes, fires, prolonged transportation delays, injuries or other causes beyond Contractor's control or which reasonably justify the delay.

## 12. Notices

Except as specifically provided elsewhere in this Contract, all notices required or permitted by this Contract shall be in writing and shall be deemed given when delivered electronically, or in person to the representative of the party to whom such notice is addressed, or five (5) days after the same is deposited in the United States mail, postage prepaid and sent by registered or certified mail, return receipt requested to the address set forth below:

If to Company:

> US Magnesium LLC
> 238 North 2200 West
> Salt Lake City, Utah 84116
> ATTN: As detailed in purchase orders issued against this contract.

If to Contractor:

> Forgen, LLC
> 6020 W. Oaks Blvd, Suite 220
> Rocklin, CA 95765
> ATTN: Emmett Black
> Contact Email: eblack@forgen.com

12

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

Each party may change its address and contact set forth above, upon prior written notice to the other given in method provided above.

### 13. Final Inspection and Certificate of Completion

In order to determine whether the project has been completed in accordance with the terms and conditions of the contract documents, the owner's Project Manager shall make final inspection as soon as practicable but no later than fourteen (14) days after receipt from contractor of a written request for such inspection.

If Company's Project Manager finds that the project is completed in accordance with the terms and conditions of the contract documents, and the contract has otherwise been fully performed, except payment by owner to Contractor of any sums due and the effect and operation of executory warranties or guaranties by Contractor respecting the work, material, machinery, and equipment, owner's Project Manager shall certify these findings to owner and initiate the warranty period.

If owner's Project Manager on such inspection is not satisfied as to performance, he shall as promptly as practicable inform the parties hereto of the specific respects in which his findings are not favorable to the issuance of the certificate.

### 14. Contractor's Representation

Contractor represents that it has read and understands the Contract and has visited the Project site and is familiar with the site and local conditions and has received a copy of the specifications and drawing pertaining thereto, if any, and has satisfied himself as to the conditions under which he will be obliged to operate or which in any manner affect the work under this Contract.

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

## 15. Limitation of Liability

A. Damages.   Neither Company nor Contractor shall be liable for any consequential, incidental, indirect, special, or punitive damages arising out of the Contract, or out of any breach of any of its obligations hereunder. Further, the Parties agree that Contractor's liability to the Company for any and all claims arising out of this Contract are limited to the amounts paid to Contractor under this Contract.

B. Gross Negligence, Recklessness, or Willfulness. The Damages and Liquidated Damages provisions (14.A and 14.B) do not apply if the Contractor—including but not limited to its agents, employees, or anyone else affiliated with it—was grossly negligent, reckless, or willful.

## 16. Entire Agreement

This Contract, including the exhibits and other documents attached, if any, constitutes the entire agreement of the parties hereto and supersedes any and all other agreements and representations, oral or written, made prior hereto and pertaining to the subject matter herein.  No amendment hereof shall be binding unless in writing and signed by both parties, except as otherwise provided in this Contract.

## 17. Severability

If any provisions of this Contract shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not be impaired.

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

IN WITNESS WHEREOF, the parties have caused this Contract to be executed by their duly authorized representatives as of the date first set forth herein.

| COMPANY | CONTRACTOR |
|---|---|
| US Magnesium LLC | Forgen, LLC |
| By: Mike Worthington | By: Chris Shea |
| *Mike Worthington* | *Chris Shea* |
| Title: Materials Manager | Title: President / CEO |

15

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

CONTRACT NO.  MW050423

## EXHIBIT A1

## LUMP SUM AND UNIT PRICE PAYMENTS

### 1. Type of Payment

A. Except as provided in 1 B (below) for all supervision, labor tools, supplies, equipment, services, materials, and other incidentals whatsoever, furnished and for all work performed, under this Contract, the Contractor shall be paid a lump sum of as detailed in purchase orders issued against this contract.

B. For all items contracted to be paid on a lump sum or unit price basis as set forth in Exhibit F, Proposal, the Contractor shall be paid at the rates set for in Exhibit F, Proposal, attached hereto for each such unit of materials furnished and work completed by the Contractor under this Contract.

### 2. Payment to Contractor

A. Progress Payments. Progressive invoices shall be generated monthly as the work progresses based on determinations and measurements made by the Contractor's Field Supervisor of the materials furnished and work completed by the Contractor under this Contract during the preceding month. The Company's representative will review and revise invoices as necessary. Progress payments will be processed as per the approved invoice and paid according to the Company's payment terms, which will not exceed forty-five (45) days from the date submitted. In the event that the Company fails to pay Contractor any undisputed

16

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

funds pursuant to the payment terms in this Contract and any modified payment terms in a Company-issued Purchase Order for work specified in that Purchase Order, and after a written ten (10) day notice to cure, then Contractor may, at its option, suspend or termination the Work under this Contract, unless otherwise agreed. The monthly cutoff date for measurements of work completed and materials furnished for which payment is requested shall be the last working day of the month unless otherwise agreed.

B. <u>Retainage</u>. The Company may withhold from each monthly payment a percentage of such monthly payment. The Company may also withhold from the final payment as percentage of the total contract value. ██
████████████████████████████████████.

1) No such payment shall be made until the Company's Field Supervisor has made such measurement and Contractor has furnished an interim certification that the materials and work furnished during the preceding month conform, for purposes of payment only, with the requirements of this Contract and that no claims for work, labor or materials are outstanding. No final payment shall be made under this Contract unless and until the Contractor shall have filed with the Company a sworn statement setting forth that all claims for work, labor and materials have been, and are, paid for the entire period of time for which the final payment is to be made, and if any claim for work, labor or materials shall be disputed, the sworn statement shall so state, and the Company may, in addition to its rights elsewhere in the Contract, deduct the amount claimed by third parties from the final payment and retain such amounts until the resolution on the dispute by judicial action or by consent of the parties and then

17

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

pay such amounts to the court or to the person or persons thereby found entitled thereto.

C. <u>Title, Risk</u>. Title to all material and work covered by partial payments made shall pass to Company upon such payment. Notwithstanding the above, until the delivery of the final Certificate of Completion and acceptance thereof by Company, Contractor shall have the risks of loss with respect to such materials and work but only if such damage is caused by Forgen or any contractor under its control. In addition, notwithstanding such payment, until the final Certificate of Completion is delivered and accepted by Company, nothing herein shall be construed either as relieving Contractor of any obligations with respect to such materials and work, or as acceptance by Company of materials and work for any purpose other than payment, or as a waiver by Company of any rights under this Contract.

D. <u>Classifications</u>. The Contractor agrees to breakdown the price per unit stated above into accounting classifications based upon the schedule of accounts submitted by the Company. Such breakdown shall be completed promptly after the schedule of accounts is received by the Contractor and will become a part of this Contract.

E. <u>Final payment</u>. No payment shall be made to the Contractor prior to commencement of the Project. Payment of the amounts of retainage withheld from the monthly progress payments under Paragraph 2B. (above) shall be made within forty-five (45) days after the date of Company's acceptance of the final Certification of Completion for the Project, and only upon receipt of the Contractor's invoice for such amounts, and then only to the extent that Company has not been placed on notice, directly or indirectly, that any claims for labor, work, materials or otherwise are outstanding. Monthly progress payments to

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

be paid Net 45 days and on a percent performed basis with a maximum Redacted . Final bill to be submitted upon completion of work and due in 45 days with no retention held.

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

## EXHIBIT A2

## TIME AND MATERIALS PAYMENTS

The "Contractor" shall furnish the necessary supervision, labor, equipment, tools, transportation, and supplies for Company. As requested by the Project Manager (or his appointed representative) of the Company, such work is to be done on a time and material basis.

1. The Contractor shall provide qualified craftsmen in accordance with Schedule "A", which is attached. The rates shown in Schedule "A" includes fringe benefits, taxes, Contractor's overhead, and profit. The Company shall pay for such labor in accordance with Schedule "A". Total price of this time and materials contract shall not exceed amounts detailed in purchase orders issued against this contract.

2. The Company reserves the right to audit the Contractor's project records to verify the authenticity of the rates and hours charges.

3. Labor hours shall be recorded on time sheets. One time sheet per day shall be used to provide an accurate breakdown of the various jobs performed. Such time sheets are to be submitted daily and approved by the appointed Company representative. Invoice charges shall be compiled from the approved time sheets. Equipment shall be listed on the daily time sheet on the days that the equipment is used.

4. Straight time hours shall be paid for the first eight (8) hours worked on a normal workday Monday through Friday. The Contractor may elect to work ten (10) hours per day for four days per week. Should the Contractor make that election, straight time hours shall be paid for the first ten (10) hours worked on a normal work day Monday through Thursday.

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

5. A normal workday shall be defined as follows:

Eight (8) hour day – The work day begins at 7:30 a.m. and ends at 4:00 p.m. A thirty (30) minute non-paid lunch period is included. The Contractor may, at his option, adjust the start and finish times.

Ten (10) hour day – the workday begins at 7:00 a.m. and ends at 5:30 p.m. A thirty (30) minute non-paid lunch period is included. The Contractor may not adjust the start and finish times without written permission of the Company construction supervisor.

6. Overtime rates will be paid for hours worked in excess of the normal workday or in excess of forty (40) hours per week. The overtime rates are shown in Schedule "A". Overtime must be approved in advance, except for emergencies, by the Company representative. Overtime rates will be paid by the Company only for those employees of the Contractor who receive overtime pay.

7. Holidays – Scheduled holidays include: New Year's Day, Good Friday, Memorial Day, Independence Day, Pioneer Day, Labor Day, Monday after deer season opener, Thanksgiving Day, Day after Thanksgiving, Christmas Eve and Christmas Day. These days will not be worked except for the preservation of life or property without prior written permission from the Company construction supervisor.

8. Redacted

9. At the completion of the work, the Contractor shall submit three (3) copies of an invoice to the Company. The invoice shall show charges applicable to the work charges and shall be itemized according to the requirements of the Company.

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

10. Redacted ███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████ ██████████.

11. The Contractor agrees to furnish safety equipment to his employees. This equipment includes safety glasses, respirators, hard hats, work gloves; safeties shoes, and face shields. Safety equipment shall be subject to inspection and approval by the Company Safety Department.

12. The Company will issue specialty tools and safety equipment not listed in Section 11 on an as need basis. The use of such equipment requires prior approval of the Company representative. These items shall be the responsibility of the Contractor until returned to the Company in good condition.

13. The Company agrees to furnish the Contractor emergency clinic and ambulance service. Contractor will provide transportation for minor injuries.

14. The Contractor will furnish adequate sanitary facilities to its employees.

15. The Contractor will provide its own field office.

16. The Contractor agrees to supply all small tools at his expense. These tools are listed in Schedule "B". Redacted ██████████████████████████ ██
██████ ██████ ████████████████████████████████
██████████████████████████████████ The Contractor shall provide a complete tool and equipment list to the Company Security Department. The list must be updated each time tools and/or equipment are moved on or off the plant site.

17. All work shall be completed in a safe and workmanlike manner and shall be in accordance with the applicable rules, codes and specifications. Improper

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

workmanship shall be corrected during normal working hours and at no cost to the Company.

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

## SCHEDULE "A2"

### LABOR, CONTRACTOR-OWNED EQUIPMENT, AND CONSUMABLES RATES

## As attached to purchase orders issued against this contract.

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

## EXHIBIT B

## GENERAL CONDITIONS

### 1. Insurance

Contractor shall maintain in full force and effect at all times during performance of the Work by Contractor hereunder all insurance required by this paragraph. Before commencement of the Project, satisfactory certificates of Contractor's insurance shall be submitted to Company for the insurance described in (1) and (2) below, and shall be subject to the following: (i) Contractor's policies of insurance will not be canceled without thirty (30) days' prior written notice to Company; (ii) the amounts of converge set forth in Contractor's policies of insurance shall be sufficient to satisfy Contractor's indemnity obligations under this Service Contract Article 6 (Company's Indemnification) (iii) the Contractor's policies of insurance shall name Company as an additional insured thereunder; and (iv) the Contractor's policies of insurance shall provide a waiver of subrogation against the Company and its insurers. In the event Contractor modifies its policies of insurance, satisfactory certificates of Contractor's issuance shall be submitted to Company within fourteen (14) days of modification of Contractor's policies. Before any subcontractor commences work under any subcontract, Contractor shall submit to Company proof of subcontractor's insurance in the same coverage and amounts as required of Contractor by this paragraph or as otherwise agreed by Company.

(A)

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80



(C)    Worker's Compensation Insurance. The Contractor shall take out and maintain during the term (including all extensions) of this Contract, a worker's compensation and employer's liability insurance policy as required by applicable state law for all of the Contractor's employees performing work in connection with this Contract.

## 2. Resolution of Disputes

(A)    Governing Law, Consent to Jurisdiction, and Forum Selection. The construction, validity, and performance of the terms of this Agreement shall be governed by and construed in accordance with the laws of the State of Utah, excluding any conflict of law principles that would require the application of the laws of any other jurisdiction. Because U.S. Magnesium has its principal place of business in Utah, and the Agreement will be performed in Utah, Company and Contractor agree that all disputes should

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

be resolved in a single jurisdiction.  Therefore, Company and Contractor irrevocably consent to personal jurisdiction and venue in the state and federal courts located in Salt Lake County, Utah for any dispute, controversy, or claim arising out of or relating to this Agreement or the breach, enforcement by injunctive relief or otherwise, termination, interpretation, or invalidity thereof ("Dispute").  Each Party expressly waives any objection which it might otherwise have to jurisdiction or venue of any such action or proceeding in the state and federal courts located in Salt Lake County, Utah. The Parties hereby agree that the prevailing party in any such action involving this Agreement is entitled to be awarded its costs and reasonable attorneys' fees incurred in the action from the non-prevailing party, including for any appeals.

(B)     Finality of Company Demands, Instructions, Determinations, and Decisions. The Contractor shall have ten (10) days to challenge a written demand, instruction, determination, or decision made by the Company. If Contractor wishes to challenge a demand, instruction, determination, or decision that the Company has made orally, the Contractor has three (3) days to ask that it be made in writing. Within ten (10) days of receiving a written demand, instruction, determination, or decision, the Contractor may file a written protest with the Company's Representative, stating clearly and in detail the basis of the objection.  Oral and written demands, instructions, determinations, and decisions that Contractor fails to challenge within these time periods shall be final and conclusive. Demands, instructions, determinations, and decisions of the Company that are contained in drawings and transmittal letters, and that are given to the Contractor, shall be considered "written" for purposes of this paragraph.

(C)     Waiver of Jury Trial. EACH PARTY HEREBY UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A JURY TRIAL OF ANY **Dispute**

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

AND AGREES THAT ANY SUCH **Dispute** SHALL BE TRIED BEFORE A JUDGE SITTING WITHOUT A JURY.

(D)     <u>Consent to Consolidation</u>. In the event that a **Dispute** between two or more of the Parties is related to a dispute between one of the Parties and a third party ("**Related Dispute**") and there are common issues of law or fact so that there is a possibility of conflicting rulings if the **Dispute** and the **Related Dispute** are decided by more than one court or in more than a single proceeding, the Parties agree to seek to consolidate the Dispute and the Related Dispute so that they may be heard and determined by a single judge in a single proceeding.

## 3. Materials, Work, Testing and Inspection

A. The Company shall have the right, but not the duty, to inspect all materials and work furnished or performed under this Contract, at any time during manufacture or construction, and at any place where such manufacture or construction is performed so long as such testing and inspection is reasonable and does not delay or interfere in the Contractor's performance of the work. The Company's Representative may notify the Contract of any failure of the materials or work to conform to the specifications or other provisions of this Contract and/or require cure. Materials or work rejected by Company's Representative shall be cured without charge to Company therefore, and the Contractor shall promptly segregate or remove such rejected material. Any work and materials furnished or performed under this Contract beyond the lines and grades shown on the drawings, will not be paid for and Company's Representative may order them removed at the Contractor's expense. If the Contractor fails to comply promptly with any instruction of the Company's Representative made under this subparagraph, the Company's Representative may correct the defects

28

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

and remove defective materials, and deduct the cost from any payment due or to become due to the Contractor.

B. The Contractor shall furnish promptly without additional charge all reasonable facilities, labor and materials necessary for proper and convenient inspection and for any test that may be required by the Company's Representative as defined in Exhibit E to this Agreement. All inspections and tests by the Company's Representative shall be performed in a timely manner and without unnecessarily delaying Contractor's work or the Project. The Contractor shall be charged with the additional cost of inspection when materials or work are not ready at the time inspection is requested.

C. If, at any time prior to final acceptance of the entire Project, Company's Representative deems it prudent to inspect work already completed by removing or tearing out any part of parts of the same, the Contractor shall, upon request, promptly furnish all necessary facilities, labor and materials to conduct such inspections. If any work, materials or incidentals are found materially defective, Contractor shall bear all the costs of such inspection and of satisfactory reconstruction and such costs shall not be billed to Company. If, however, the work and materials meet the requirements of this Contract, a Change Order for the costs of such inspection and such reconstruction will be issued and an equitable adjustment shall be made, in accordance with paragraph B7 of this EXHIBIT B.

D. All materials, supplies and other incidentals proposed to be used for the Project may be tested by Company at any time during their preparation and use. Unless otherwise provided in the Specifications, the sampling and testing of materials will be done in accordance with the current methods approved by the American Society for Testing Materials and

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

the American Petroleum Institute (API), as applicable. If an approved supplier does not furnish a uniform product, or if the products are otherwise unacceptable at any time, the Contractor shall promptly notify Company's Representative who may direct Contractor to furnish approved materials from another approved source. No supplies or materials which, after approval, in any way become unfit for use shall be used in the Project. The Contractor shall give the Company reasonable notice in advance of the manufacture or production of materials to be supplied under this Contract so that the Company may arrange for mill and factory inspection and testing thereof. No materials shipped by the Contractor from the manufacturer or off site assembly location, prior to having satisfactory passed such testing and inspection by the Company, or prior to the receipt of notice from the Company that such testing and inspection will not be required, shall be incorporated in the work. The Contractor shall furnish to the Company six (6) certified copies of all required factory and mill test reports.

E. Contractor shall not be relieved of any of its obligations under this Contractor by reason of any inspection, failure of inspection or negligent inspection whosoever, made by Company or any Company representative, nor shall Contractor have any claim against Company or any Company representative by reason thereof.

## 4. Materials and Workmanship, Tools and Equipment

A. Quality of Workmanship and Materials. All workmanship, equipment, materials, incidentals and articles incorporated in the Project shall be furnished in accordance with the Company provided specifications and shall be new and of the best quality.

B. Handling and Storage of Materials, Tools and Equipment. The Contractor shall, at its expense, unload, store and protect all materials,

30

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

tools, equipment and supplies required for the Project that are furnished by Contractor. If Contractor does not have sufficient labor or equipment to unload and store materials, the Company may, but shall not be required to, unload and store such materials, or cause such material to be unloaded and stored. If such handling and storage is performed, or caused to be performed by the Company, the Contractor will be charged the actual cost to the Company. All demurrage on cars containing materials, supplies, or equipment for the Project shall be paid by the Contractor. If the Project is suspended for any cause whatsoever, the Contractor shall be responsible for all materials, equipment, tools and supplies and shall properly store and protect them.

C. <u>Company Supplied Materials</u>. Materials to be supplied by the Company prior to the Contractor's moving on the jobsite shall be issued to the Contractor from the Company's jobsite warehouse or storage yard. Materials to be supplied by the Company after the Contractor has moved onto the jobsite, shall be issued from Company's warehouse or storage yard or delivered directly to the jobsite. When requested by the Company's Representative, materials furnished by Company shall at the Contractor's expense be unloaded, stored and protected. Responsibility for the care, custody and control of Company supplied materials shall pass to Contractor upon Contractor's exercising any dominion or control over them, or upon the signing of a written receipt therefore, whichever occurs first.

D. <u>Company Furnished Tools and Equipment</u>. If Company furnishes any tools or equipment to Contractor for use under this Contract, all such tools and equipment shall be furnished without any warranty or assurances that such tools or equipment are free from defects or hazards or any other warranties or assurances whatsoever. Contractor

31

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

assumes all risks in connection with the use of such tools and equipment, and shall indemnify and hold Company harmless from any losses, injuries, damages or liabilities whatsoever arising directly or indirectly from such use unless such losses are caused by the negligence of the Company or other parties. Upon completion, or earlier if Company so requests, Contractor shall return such tools and equipment to Company in the same condition as when received ordinary wear and tear accepted. Any of such tools, equipment, etc., shall be arranged through Company's Representative only. This provision shall survive termination of this Contract.

## 5. Operations

A. Drawings. The drawings may be supplemented from time to time by such working drawings as are necessary for the Project. All authorized alterations affecting the requirements and information given on the drawings will be in writing. Working drawings or shop details must be approved by the Company before any work involving such drawings is performed. The approval by the Company of the working drawings relates to the requirements for strength and detail and such approval will not relieve the Contractor from responsibility for reporting discrepancies as provided in Paragraph B14 (C) of this EXHIBIT B. All drawings are the property of the Company and shall be returned to Company upon completion of the Project, unless other arrangements are made with the Company's Representative prior to completion for the disposal thereof. Contractor, and each subcontractor, shall keep such drawings confidential and not disclose the same to any other person.

B. Deviation Allowed. Finished surfaces in all cases shall conform with lines, grades cross sections, and dimensions shown on the drawings and

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

working drawings, or described in the Specifications. Deviations from the drawings and working drawing as may be required by the exigencies of construction will in all cases be made upon prior written approval of the Company's Representative. If the Company's Representative deems it inexpedient to correct work injured or done in an unauthorized manner, an equitable reduction of the payments under this contract will be made.

C. <u>Surveys</u>. Except as otherwise provided in this Contract, or as otherwise specified by the Company, the Company shall furnish the initial site reference survey data and initial benchmarks for the Project. The Contractor shall be responsible for all detailed surveying, working points, lines, staking and elevations required for construction, including without limitation slope stakes, batter boards, pile locations, staking, and other construction controls.

D. <u>Benchmarks and Survey Points</u>. Benchmarks and survey points shall be preserved by the Contractor and, if the same are destroyed or removed by the Contractor or any subcontractors, the same may be replaced at the Contractor's expense. Any mistakes or errors resulting from destruction or removal of such benchmarks and survey points shall be corrected by Contractor at cost to Company.

E. <u>Sanitation</u>. The Contractor shall maintain the jobsite in a neat and clean condition and shall at its own expense, remove and properly dispose of all rubbish, waste and materials from its operations. Contractor shall supply and maintain sufficient sanitary facilities for its work force. The Company's field supervisor may establish additional sanitary and police rules and regulations for all forces employed under this Contract; if the Contractor fails to enforce rules the Company may enforce them at the expense of the Contractor.

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

F. Cleaning Up. Upon completion of the Project, Contractor shall remove all plant, buildings, unused materials, rubbish, concrete forms, equipment and other like materials belonging to the Contractor or used under the Contractor's direction during the construction; and in the event of any failure to do so, the same may be removed by the Company at the expense of the Contractor.

G. Contractor's Supervision. The Contractor shall personally give the Project such constant attention and supervision as is necessary to facilitate the timely progress thereof and shall cooperate with Company's Representative, the Company and with other Contractors in every way possible. The Contractor shall at all times have on the Project a competent superintendent capable of reading and thoroughly understanding the drawings and specifications, as the Contractor's agent on the Project, who shall, as delegated or approved by the Contractor's Project Manager, have the necessary authority to represent the Contractor in all transactions with the Company representative under this Contract. Such superintendent shall always be furnished, regardless of the amount of work sublet. Except as otherwise approved by Company, such superintendent shall be the Contractor's representative as designated in paragraph 2B of the main body of this Contract.

H. Contractor's Employees. The Contractor shall at all times enforce strict discipline and good order among its employees and shall use its reasonable efforts to avoid employing on the Project any unfit person or any person not skilled in the tasks assigned.

I. Company's Rules and Regulations. The Contractor shall comply with the Company's Safety and Security Rules, attached as EXHIBIT D, and such revisions thereto as may be made from time to time. The

34

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

Contractor shall be solely responsible for enforcing such rules among its employees and subcontractors.

## 6. Other Operations and Contractors

A. Other Contractors. The Company reserves the right to award other contracts for additional work on the Project. The Contractor shall fully cooperate and coordinate with such other Contractors, shall afford them reasonable opportunity for storage of materials and shall carefully connect and fit its own work to that provided under the other Contracts as may be directed by the Company's Representative so long as the other contractors do not delay or interfere in Contractor's performance of the work. The Contractor or Company shall not commit or permit any act which will interfere with the performance of work by any other Contractor.  If proper execution of any part of Contractor's work depends on the work of any other Contractor, the Contractor shall inspect such other work and immediately report to the Company's Representative any defects therein that make it unsuitable for the Contractor's execution.

B. Territory Involved in Work. Contractor shall supply its own office and storage facilities for its own use at the jobsite in a location designated by Company's Representative.  Nothing herein contained and nothing marked on the drawings shall be interpreted as giving the Contractor exclusive occupancy of the portion of the premises provided by the Company. The Company and its employees, for any purpose, and other Contractors of the Company, for any purpose required by their respective Contracts, may enter upon or occupy portions of the premises furnished by the Company.  When the premises of one Contract is the necessary or convenient means of access for the execution of another Contract or work by Company or other forces, such

35

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

access or any other reasonable accommodations shall be provided by the Contractor to the extent, amount, in the manner, and at times necessary or convenient. No such joint occupancy or use of the premises shall be made the basis of any claim for delay or damages unless such use delays or interferes in the Contractor's performance of the work.

C. Company Operations. The Project may be in an area adjacent to active Company operations; if so, all such operations shall take precedence over any of the Contractor's work. The Contractor's work shall be conducted in such a manner, including the use of overtime or multiple shifts if necessary, so as to avoid interference with the Company's operations. Work requiring shutdown of the Company's operations shall be performed during normal Company shutdown periods, except as otherwise approved by the Company.

D. Limited Access. The Contractor and Contractor's employees are restricted to those areas of the plant where their presence is required to fulfill this Contract. Contractors have access to the various shops, offices and production areas of the plant only to perform work specifically called for in the scope of their Contract and after arranged for by the Company's Representative.

## 7. Changes to Work

A. Change Orders. The Company may at any time and without notice to the Contractor's sureties order any minor or major changes in drawings or specifications of this Contract or may otherwise change or add to the Project or any part thereof, all within the general scope thereof. All such changes shall be ordered only **when** a written Change Order **form as administered in exhibit X is** signed by **the Project Manager** and delivered by the Company's Representative. No Change Order for

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

more than **$5000.00** is valid **unless** signed on behalf of Company by **the Project Manager and Engineering Manager**. Upon receipt of a Change Order, Contractor shall sign such Change Order and immediately commence to implement such changes. If such changes cause an increase or decrease in the cost of materials or work required by this Contractor or in the time required for its performance, an equitable adjustment shall be noted in the Change Order. If Contractor does not agree with the adjustment of cost and/or time as noted in such Change Order, then Contractor shall so notify the Company's Representative of such disagreement in writing within ten (10) days. Any such disagreements shall be resolved as provided in paragraph B2 relating to Resolution of Disputes. If in Contractor's reasonable opinion a change or delay in the Project has occurred, which is caused by either the Company or other parties, and for which a Change Order should be issued and a price and/or schedule adjustment made, then Contractor must make written demand on the Company's Representative for the Company's Representative to issue a Change Order within ten (10) days after receiving the order or notice of the event giving rise to such changes. EXCEPT AS SUPPORTED BY A WRITTEN CHANGE ORDER SIGNED BY BOTH PARTIES OR AS OTHERWISE PROVIDED IN THIS PARAGRAPH, NO CHARGE FOR ANY EXTRA MATERIALS OR WORK, AND NO EXTENSIONS OF TIME REQUIRED FOR PERFORMANCE, WILL BE ALLOWED. ADDITIONAL COSTS CLAIMED BY THE CONTRACTOR FOR PURPOSES OF MAKING EQUITABLE ADJUSTMENTS MUST BE SUPPORTED BY DOCUMENTATION AS COMPANY MAY REASONABLY REQUEST.

B. Emergency Actions. In any emergency, the Contractor shall take such actions as it reasonably deems prudent to prevent any injury, damage or loss to persons and property. If such emergency occurs, the Contractor

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

shall also take such steps as are necessary to immediately inform the Company's Representative, or such other Company officials as may be available, of the existence of such situation, and shall comply with any reasonable instructions and provide such other cooperation's as may be required by such persons. As soon as practicable after such emergency, the Contractor shall report to the Company's Representative all relevant facts and circumstances relating to such emergency. Provided that such emergency was not the result of the Contractor's acts or omissions, appropriate adjustments in the compensation to be paid Contractor and in the schedule for completion shall be made in accordance with the procedures in A above. As used in this Paragraph B7b, an emergency shall be deemed to exist if serious injury or death, loss or damage to persons or property either is occurring or the threat of such injury, loss or damage is imminent.

## 8. Preservation of Property

A. <u>Property in Construction</u>. Until the Company's final written acceptance of completion of the Project by the Company, pursuant to paragraph 13 of the "Construction Contract," entitled "Final Inspection and Certificate of Completion", the Contractor shall have the charge and care thereof and of the materials, equipment and supplies relating thereto, and shall take every necessary precaution against injury or damage to any part thereof by the action of the elements or from any other cause, whether arising from the execution or the no execution of the work, and whether any of the materials, equipment and supplies thereof were supplied by Company or Contractor. The Contractor shall rebuild, repair, restore, and make good all injuries or damages to any portion of the Project occasioned by any of the above causes before its final completion and Company's acceptance and shall bear the expense thereof. Such expense shall not enter into the computation of any

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

payment due to the Contractor under this Contract, unless otherwise agreed to by the Company.

B. <u>Public and Private Property</u>. The Contractor shall be responsible for the preservation of all public and private property (including Company's) along and adjacent to the construction and shall use every precaution necessary to prevent damage or injury thereto. When direct or indirect damage or injury is done to public or private property by or on account of any act, omission, neglect, or misconduct in the execution of the work or in consequence of the no execution thereof on the part of the Contractor, such property shall be restored by the Contractor at the Contractor's expense to a condition equal to or better than that existing before such damage or injury was done, by repairing, rebuilding, or otherwise restoring the property, or the Contractor shall otherwise make good such damage or injury in any acceptance manner. It shall be the responsibility of the Contractor, when moving or operating equipment, to make all arrangements for temporary crossing of telephone, transmission, and pipelines, and railroad tracks and irrigation ditches, all at the Contractor's expense.

## 9. Right-of-Way

The Company's right-of-way and easements will, in general, be adequate for construction purposes. Any additional land actually needed by the Contractor for the proper location of a plant and equipment or the storage of materials and supplies for the Project shall be furnished by the Contractor unless the Company otherwise directs.

## 10. Public Convenience and Safety

Prosecution of the Project and storage of materials in the vicinity of the public highways and private driveways and on the Company's property

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

shall be handled so as to cause as little obstruction to public and private travel as is necessary. Such detours, including surfacing, guardrails, temporary bridges, and culverts, as may be necessary to accommodate the general public, residents adjacent to the improvements, and the United States mail shall be provided and maintained by the Contractor in a good workmanlike manner. No public road shall be closed by the Contractor except by express permission of the proper public authorities having jurisdiction over the public roads to be closed. The Contractor shall be responsible for obtaining this permission, but shall have the cooperation of the Company when such cooperation is necessary. On such closures the barricades and warning and directional signs and lights will be at the expense of the Contractor. The Contractor shall provide, erect, and maintain all necessary barricades or watchmen and take all necessary precautions for the protection of the work and the safety of the public. Machinery, equipment and other hazards shall be handled and used in accordance within the safety provisions of the most recent issue of the "Manual of Accident Prevention in Construction" of the Associated General Contractors of America, to the extent that such provisions are not inconsistent with local applicable laws and state highway regulations. Highways and driveways closed to traffic shall be protected by effective barricades on which shall be placed warning signs as legally required. The Contractor shall provide, place and maintain all necessary directional and detour signs. No payment shall be made to the Contractor for any expenses incurred in complying with this paragraph. Contractor shall indemnify and hold Company harmless against any third-party actions or liabilities caused by Contractor's failure to comply with this provision.

## 11. Compliance with Laws, Permits and Licenses

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

A. Contractor shall at all times and places comply with all statutes, ordinances, rules, orders, regulations, permits and requirements of federal, state and local governments, and of their departments, agencies and subdivisions, which are applicable to the performance of this Contract. Contractor shall be solely responsible for payment of all fines, penalties, charges and costs imposed for its violations of law, including without limitation health and safety and environmental laws and regulations. Except as maybe otherwise expressly provided for in this Contract. No payment shall be made to Contractor for or on account of any cost or expense incurred in complying with this paragraph.

B. Contractor shall immediately notify Company of any notice of Contractor's violations, citation, orders, or other instructions or actions of any federal, state or local governments or their departments, agencies, and subdivisions. Contractor shall then prepare and submit to Company's Representative a written plan setting forth in detail the measures to be taken by Contractor to remedy such violations and/or comply with such instructions, together with the dates for completion of each measure. The Contractor, at its sole cost, shall take whatever steps necessary to comply with such orders, directives, citations and notices, failing which the Company may, but shall not be required to, do so and charge off the cost of same against the Contractor, Redacted ████████ ████████████ ██ ██ from the time of Company's payment thereof, or at the highest legal rate if less, and Contractor shall pay such amounts to Company on Company's demand, or at Company's option, Company may charge all or part of such amounts against any payments then due or thereafter becoming due under this Contract. Should the Company wish to contest or appeal any such order, directive, citation or notice it may do so at its sole cost; and to the extent to which necessary, the Contractor shall cooperate in all ways with the Company

41

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

in the prosecution of its appear. Any citation, fine withdrawal order, abatement notice or other type of disciplinary action caused or precipitated by Contractor's performance under this Contract which may interrupt or impair the Company's operations shall constitute breach of this Contract and be sufficient cause for termination by Company.

C. Except as otherwise provided in the specifications, Company shall obtain at its cost all building and similar permits and licenses necessary for this Project. Contractor at its own cost, shall comply with all such permits and licenses. No final settlement shall be made unless all requirements in such permits and licenses have been fully satisfied and, as necessary, a certificate of occupancy (or a like certificate) has been issued by the appropriate public authority.

12. **Equal Employment Opportunity/Affirmative Action**

Unless otherwise exempt, the Contractor shall comply with the requirements of Executive Order 11246, the Equal Employment Opportunity Clause, Certification of Non-Segregated Facilities, Section 503 of the Rehabilitation Act of 1974, Section 402 of the Vietnam Era Veterans Readjustment Assistance Act of 1974, and Executive Order 11625 (entitled National Program for Minority Business Enterprises) and all applicable rules and regulations promulgated there under; specifically incorporating by reference the provisions of 41 CFR Sections 60-1.4, 60-1.8(b), 60-741.4, 60-250.4 and 1.1310.2, respectively.

13. **Substitutions**

The listing of the products of one manufacturer in various sections of the specifications is intended to set a standard of quality and is not intended to preclude competitive bidding. Approval of equivalent products of other

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

manufacturers may be made in writing by the Company's Representative. The Company's Representative shall not, however, be required to approve any proposed substitution regardless of quality. If an approved substitution does not, in the opinion of the Company's Representative meet the performance standards of the specified item, upon the request of the Company's Representative, it shall be replaced by the Contractor with the specified item at no cost to the Company, including repairs or damages to other work necessitated by the change. When an approved substitution requires any change in other work, it shall be performed by the Contractor for no additional compensation. No substitution will be allowed which causes an increase in the Contract price or which extends the completion date of this Contract, unless a Change Order is issued for such substitution.

14. **Drawings and Specifications**

A. The Contractor shall install all materials, manufactured items and equipment in accordance with the manufacturer's or industry agency's latest recommended specifications, including without limitation, ACI, AISC, PCA, SCPI, NEMA, and in compliance with all laws, ordinances, codes, rules and regulations applicable to the Project. Should any of the specifications contained in EXHIBIT C be in conflict with the above standards, or if there is any conflict in the above standards, the Contractor shall notify the Company's Representative in writing before proceeding, and the Company's Representative will issue a written instruction on which specification to follow.

B. The drawings and the specifications shall be construed as a whole. Work shown on the drawings and not mentioned in the specifications, or vice versa, shall be performed as though fully set forth in both. Work not particularly detailed, marked, or specified shall be performed in the same manner as similar work that is detailed, marked or specified. In

43

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

working drawings, the precedent shall be drawings of larger scale over those of smaller scale, figured dimensions, over scaled dimensions and noted material over graphic indications.

C. Discrepancies.  If as the Project progresses, the Contractor finds any discrepancies between the drawings and physical conditions or any errors in the drawings, working drawings, or layout as given by survey points or instructions, Contractor shall immediately inform the Company's Representative in writing, and the Company's Representative shall issue written corrections thereof.  No payment will be made for any work done with respect to such items after such discovery, until a written instruction is issued by Company's Representative.  If Contractor discovers a discrepancy or an apparent discrepancy between the drawings and any other provision of this Contract, at Contractor's request, the Company shall give a written explanation of Company's intent.

15.  **Assignment of Warranties**

Contractor and each subcontractor hereby assign's and, during the course of this Contract, shall be deemed to have continued to assign, to Company any and all warranties.  Company shall have the right to enforce all of such warranties in its own name and Contractor and each subcontractor shall assist Company in the enforcement thereof.  Contractor shall, from time to time, furnish to Company such executed instructions and other documents as Company may reasonably request to effectuate the intent of this paragraph.  This paragraph shall survive the termination of this Contract and will terminate on the same date that the applicable warranty expires.

16.  **Confidential Information**

44

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

Contractor and Company shall maintain, and shall require its employees, subcontractors, servants and agents to maintain, the confidentiality of the drawings and of all engineering, economic, technical or other information concerning either Contractor or Company or its operations (whether related to the Project or otherwise) disclosed to or otherwise obtained by the parties, its subcontractors, employees, servants or agents in the performance of the work for the Project, except information that is in the public domain through no fault of such persons, or which is lawfully in their possession prior to disclosure, or which they have obtained from a third party and are free to disclose. This provision shall remain in effect for ten years after completion.

## 17. Unknown Physical Conditions, Climate

A. If the Contractor encounters unknown or latent physical conditions below the surface of the ground or in an existing structure, that differ materially from those ordinarily encountered or recognized as inherent in the work under this Contract, Contractor shall immediately notify Company of the same (but not later than five (5) days thereof) whereupon Company, if it wishes to proceed with such work, will instruct Contractor to proceed and shall issue a Change Order with respect thereto with an equitable adjustment in the amounts to be paid under the contract and/or extend the time for completion, or Company or Contractor may terminate such work as set forth in this Contract.

B. The Company's Representative may order the Contractor to suspend any work that may be subject to damage due to climate conditions. If materially abnormal climatic conditions or other differing site conditions occur resulting in material delays and increased work, an extension of time and/or a Change Order in the amounts to be paid under the contract may be requested by Contractor within ten (10) days

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

after the occurrence of such event. If Company's Representative determines that such abnormal climatic conditions have occurred, the Company may, if it wishes to proceed, extend the time for completion, issue a Change Order, or may terminate the work. No Change Orders requested after such ten (10) day period, except as provided in this paragraph, shall be allowed.

C. Except as provided in this paragraph, Contractor shall bear all risks with respect to (i) unknown or latent conditions as to which the Company is not immediately notified; and (ii) normal climatic conditions.

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

## 18. Contractors Records

Contractor and each subcontractor shall keep and maintain true and complete books and records relating to their respective performance under this Contract, including without limitation, records of payments and invoices made, work performed, materials and equipment furnished, and other matters relating to the Project. Such books and records shall be maintained after completion of the Contract for the entire period of the statute of limitations for Contract actions in the State of Utah. Such books and records shall be subject to audit in the State of Utah. Such books and records shall be subject to audit by the Company at any reasonable time upon at least five (5) day's prior notice to Contractor. This provision shall survive expiration of the Contract for a period of three (3) years.

## 19. Non-Payment of Remuneration to Company's Personnel

Neither Contractor nor any subcontractor under this Project shall pay or provide any commissions, fees, services, gratitude's, rebates, or anything of value whatsoever, to any of Company's personnel in connection with the obtaining or maintaining of this Contract or in the prosecution of the work or furnishing of the materials or equipment hereunder.

## 20. Welding Gases

Unless otherwise provided in the specifications, Company shall supply without cost all tanks of oxygen and acetylene used for any welding for the Project. Such gases and the storage tanks are obtained from commercial gas suppliers by Company. COMPANY MAKES NO WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO SUCH GASES AND/OR TANKS AND SPECIFICALLY DISCLAIMS ANY WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR ANY PARTICULAR PURPOSE. ALL SUCH TANKS AND GASES ARE SUPPLIED AS IS,

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

WHERE IS. The use of such gases and tanks shall be at the sole risk of Contractor and shall be subject to the indemnification provisions of Paragraph 6 of the main body of the Contract. Such tanks shall be returned to Company when empty or at the termination of this Contract, whichever comes first in the same condition as when received, ordinary wear and tear accepted.

### 21. Warranty of Contractor

For a period of one (1) year from the date of final settlement, Contractor guarantees that the work, materials and equipment incorporated into the Project will be free of defects and Contractor hereby agrees, immediately upon notification by Company, to remedy, repair or replace, without cost the Company and to the Company's complete satisfaction, all such defects that may appear at any time or from time to time during such period.

### 22. Power

The Company shall provide electrical power without cost to the Contractor in the following voltages at the following locations:

| VOLTAGE | LOCATION |
| --- | --- |
| As detailed in purchase orders | As detailed in purchase orders |
| Issued against this contract. | Issued against this contract. |

Electrical power furnished by the Company is purchased from one or more public utilities. The Company shall not be responsible for any interruptions of supply of electrical power. THE COMPANY MAKES NO

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

WARRANTY, EXPRESS OR IMPLIED, REGARDING THE DESIGN CAPACITY OR OF THE QUANTITY OR QUALITY OF POWER SO FURNISHED, SPECIFICALLY DISCLAIMING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. ALL SUCH POWER IS SUPPLIED AS IS, WHERE IS. Electrical power supplied by the Company to the Contractor.

23.  **Natural Gas and Propane**

The Company shall provide natural gas or propane without cost to the Contractor. Natural gas furnished by the Company is purchased from one or more public utilities. When natural gas service is interrupted by such utility or for other reasons, vaporized propane may be supplied in lieu of natural gas. THE COMPANY MAKES NO WARRANTY, EXPRESSED OR IMPLIED, REGARDING THIS DESIGN CAPACITY OR THE QUANTITY OR QUALITY OF GAS OR PROPANE TO BE SUPPLIED AND SPECIFICALLY DISCLAIMS ANY WARRANTY OR MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. ALL SUCH GAS OR PROPANE IS SUPPLIED AS IS, WHERE IS. The Company shall not be responsible for any interruptions of supply to the Contractor of natural gas or vaporized propane. Contractor shall use any and all feasible means of controlling the use of said natural gas or vaporized propane. Contractor shall use any and all feasible means of controlling the use of said natural as or vaporized propane for the purpose of minimizing consumption and maximizing the efficient use thereof.

24.  **Additional Provisions**

A. Force Majeure - The obligation of the parties under this Contract may be suspended, and the time for performance extended, during any event of Force Majeure declared by a party. An event of Force Majeure shall

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

be deemed to occur if the performance of a party's obligations is prevented in whole or in any material part by any cause of causes beyond the control and without the fault or negligence of such party, including, without limitation, the following: acts of God or of the public enemy, lightning, storms, i.e., snow, floods and other storms or abnormal serious weather conditions; riots; commotions, shortages or inability to obtain fuel, utilities, gases, power, and other materials; actions of any public authority or body; freight embargoes; strikes or labor disputes (but no party shall have any obligation to settle any strike or labor dispute); pandemic or epidemic related events, delays of other Contractors due to event of Force Majeure; sabotage; compliance with any other cause or causes beyond the reasonable control of such party. A party may declare Force Majeure upon ten (10) day's written notice to the other party, to be given promptly after the event of Force Majeure occurs.

If any event of Force Majeure results in the suspension of obligations of a party for a period of two (2) months, (whether continuous or in the aggregate in any twelve (12 month period), either party may terminate this Contract upon at least fifteen (15) day's prior written notice to the other. Alternatively, the Contractor may submit a request for equitable adjustment as to the amounts to be paid under the contract and/or to extend the time for completion.

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

## EXHIBIT C

## CONTRACTORS' SAFETY AND SECURITY RULES

### 1. Purpose

To promote the safe conduct of all maintenance work or repairs, turnarounds, renovations or specialty work which is performed at US Magnesium LLC.

### 2. Scope

This policy applies to all Contractors or subcontractors and their employees who perform work for US Magnesium LLC. It does not apply to contractors or vendors who provide incidental services which do not influence process safety, such as food and drink services, mobile equipment repairs, laundry service, delivery or other supply services.

All contract work performed for US Magnesium LLC shall be conducted in a safe manner and also complies with applicable federal, state, local and plant codes and regulations. Contract work shall not endanger US Magnesium LLC employees, nor should the action of US Magnesium LLC employees or operating conditions within the plant grounds endanger Contractors.

### 3. Requirements

A. Prequalification's  As a part of Contractor prequalification, each US Magnesium LLC representative who is soliciting contract work will ensure that each prospective Contractor receives a "US Magnesium LLC Contractors safety prequalification form", which must be completed by the prospective Contractor and reviewed by the US Magnesium LLC safety department as a part of the Contractor selection process.

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

The prospective Contractor should return the prequalification form to the US Magnesium LLC representative who is soliciting bids or coordinating contract work (I.E. purchasing agent, maintenance planner etc.). This US Magnesium LLC representative will then review the completed form with the safety department for approval prior to awarding the contract. The completed prequalification form will be kept on file in the safety department and must be updated each year by the Contractor after December 31. A Contractor, whose prequalification form on file is dated in the current calendar year, need not pre-qualify for each additional job during the calendar year. Except when they have been disqualified for a safety related reason.

B. <u>Respiratory Protection</u> In order to receive the full protection afforded by respirators, beards of any kind are not allowed. Mustaches and side burns must be trimmed so as not to come in contact with the sealing edges of the respirator. Any Contractor who does not comply with this requirement will not be allowed entrance into the plant.

In accordance with OSHA regulations, each Contractor employee who comes to work at the US Magnesium LLC plant site must meet the physical qualifications to wear a negative pressure respirator and must be fit tested.

This means that the Contractor must provide written proof that each Contractor employee has been certified by a physician that they are physically fit to wear a negative pressure respirator. This document must be signed by a qualified physician along with his/her address and telephone number for US Magnesium LLC reference. Copies of Respirator certifications and written proof that each employee has been properly fit tested to wear a negative pressure respirator must be

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

forwarded to the US Magnesium LLC safety department prior to commencement of the work.

C. <u>Safety Equipment</u> Each Contractor employee must have appropriate personal protective equipment (PPE), as specified by US Magnesium LLC's representative before beginning work. The Contractor will be responsible to evaluate the need for additional PPE as conditions on the job dictate. However, the Contractor must use at least the same level of protection used by US Magnesium LLC employees or specified by OSHA standards. US Magnesium LLC will not provide PPE unless specified in the contract agreement.

All Contract employees, when entering the plant, must be equipped with the following safety equipment and must be worn at all times while on the plant site.

- Long sleeved shirt

- Long pants

- Hard hat

- Safety glasses with side shields

- Steel toed boots minimum 6" high

- 1/2 mask respirator with organic vapor/acid gas cartridges (must be in possession at all times).

D. <u>Orientation</u> Prior to starting work at US Magnesium LLC, the Contractor's on-site supervisor and <u>all</u> Contractor employees must attend a safety orientation which will be conducted by the safety department or another designated US Magnesium LLC representative. This orientation must be scheduled by the US Magnesium LLC representative and/or Contractor with the Safety department at least 1-day prior to commencement of work.

53

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

The orientation will consist of applicable information on the known hazards related to the Contractor's work and the process. As well as applicable US Magnesium LLC safety policies (i.e. safe work permit, hot work permits, hearing protection, emergency action procedures etc.).

Any time a new employee starts work it is the responsibility of the Contractor on-site supervisor to schedule an orientation with the Safety department. This orientation must be completed prior to allowing the employee to start work on US Magnesium LLC property. Failure to do so may result in removal of all contract employees from the plant site.

E. <u>Safety</u> The Contractor alone is responsible for complying with the requirements of OSHA regulations with regard to his work force.

The Contractor will keep US Magnesium LLC representatives advised of any work which may affect the safety of US Magnesium LLC employees in the area adjacent to the work area.

The Contractor and Contractor's employees will confine themselves to the work site and authorized service facilities only.

The Contractor will not use company tools or equipment, unless specifically authorized by US Magnesium LLC. Should the company, however, at the Contractor's request permit the Contractor to use any of the company's equipment or tools in the performance of such services, the Contractor is responsible to inspect such equipment or tools thoroughly prior to use and assume all risks for the use of the same by the Contractor and his employees as provided in this Contract.

**The Contractor will:**

Keep work area in neat and orderly condition. Clean up waste material as job progresses.

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

Follow rules defined by US Magnesium LLC to protect the Contractor's employees from possible company hazards.

Provide the equipment necessary for the safe performance of his work. All tools and equipment brought onto the site for use are subject to inspection and approval by the company representative.

F. Security US Magnesium LLC security personnel are on duty at all times. The security office is located near the main gate and security and /or emergency assistance may be requested by calling ext. 440 on any in plant phone.

It is US Magnesium LLC's policy to control the passage entry and exit of employee's visitors, materials, and equipment through the plant contractor's gate and to protect personnel and property. The plant Safety and Security department will administer the above policy and will establish and enforce the following rules:

All independent Contractor employees are required to enter and leave ONLY through the gate specified by US Magnesium LLC.

Each Contractor employee will sign themselves in and out in the Security office when entering or leaving the plant.

Only Contractor vehicles which are necessary for the completion of the work will be permitted to enter the plant. Contractor vehicles must be approved by the safety office prior to entering the plant. No vehicles will be allowed in the plant merely for the convenience of the Contractor or its employees. The only exception will be where the employee of the independent Contractor has a physical handicap that would create a hardship for him\her to walk to the job site.

All materials, tools, equipment, etc. entering and/or leaving the plant, must be authorized by US Magnesium LLC and are subject to search.

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

Complete tool lists must be prepared and submitted prior to entry and the same tool list will be used by Security to check out contractors upon leaving.

All hand carried bundles, packages, tool boxes, etc., which leave the plant, must have a gate pass signed by an appropriate US Magnesium LLC representative.  Lunch boxes and bundles of clothing are subject to search when entering or leaving the plant.

All scaffolding, ladders, staging equipment, tools, etc. must bear the contractors identification mark which is easily observed before being brought into the plant.  The contents of any vehicle entering the plant are subject to inspection.

No cameras will be permitted on the plant site without prior written permission from the Manager, Safety and General services.

G. <u>Emergency Procedures and Equipment</u>   Review the Emergency evacuation procedure (RMS # 7)

US Magnesium LLC will provide first aid facilities.  US Magnesium LLC maintains an ambulance at the plant site and will provide ambulance service in the event of a serious accident or illness.  In the event of a non-serious injury or illness requiring medical attention, the Contractor is expected to furnish transportation.

Interference with or damage to fire lines, firefighting equipment, emergency or safety equipment must be immediately reported.

Contractor shall assure that all of its personnel are aware of all  traffic, fire prevention, danger, warning and general safety signs  and that its personnel abide by such signs

Leaking gas should be reported immediately and the area vacated.

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

H. <u>Personal Conduct Regulations</u> All Contractor personnel shall remain in the work area assigned to them and conduct themselves in an acceptable manner and adhere to US Magnesium LLC Work Rules.

No gambling is permitted on the plant site.

No alcoholic beverages, or narcotics, or persons under the influence of alcohol or narcotics will be permitted on the plant site.

Fighting, horseplay or scuffling will not be tolerated on the plant site.

Running is strictly forbidden except in case of emergency on the plant site.

Loitering or taking shortcuts through operating areas or shops is prohibited on the plant site.

Leaving the work area to visit plant employees is prohibited on the plant site.

Anyone guilty of stealing any property which belongs to US Magnesium LLC, to an employee of US Magnesium LLC or to the Contractor or its employees will be barred from the plant and subject to criminal prosecution.

Any mutilation or deliberate destruction of US Magnesium LLC, Contractor or employee property will result in the individual responsible for such destruction or mutilation being barred from the plant.

Contract employees are not permitted to use US Magnesium LLC facilities i.e. restrooms, change rooms, offices etc. without the prior written approval of US Magnesium LLC.

Firearms are prohibited on the plant site. Violators of this prohibition will be barred from the plant.

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

Smoking may be permitted on the plant site on a job-by-job or a day-by-day basis, in compliance with the Utah Indoor Clean Air Act and US Magnesium LLC smoking policies.   However, US Magnesium LLC maintains the right to stop all smoking pm the plant site at its discretion.

No set of rules, however complete, can provide for all situations, contingencies, or emergencies that may arise.  Any questions regarding these regulations should be referred to your US Magnesium LLC contact or the Safety department.

Many of the specific US Magnesium LLC Safety rules and Emergency Evacuation Procedures will be covered during the initial orientation session.  Contractor agrees to comply and cause its employees to comply with all procedures and rules presented to Contractor during its initial orientation session.

Contractor agrees that it shall be responsible for assuring that all of its subcontractors agree to and comply with the rules and guidelines set forth herein.

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

I. Attachments

**The following attachments are made part of this policy:**

A. 1910.119 Process Safety Management Contractor Requirements.

B. Certification of Work Practices Training.

C. US Magnesium LLC Contractors Safety Prequalification Form.

D. Suggested Form for Medical Evaluation Certification.

E. Suggested Form for Respirator Fit Test Record.

F. ANSI Standard 288.2 (7.5) Respirator Fit Test Procedures.

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

**EXHIBIT C**

**ATTACHMENT A**

## 1910.119 - PROCESS SAFETY MANAGEMENT

### 1. Contractors

Application - This paragraph applies to contractors performing maintenance or repair, turnaround, major renovation, or specialty work on or adjacent to a covered process. It does not apply to contractors providing incidental services which do not influence process safety, such as janitorial work, food and drink services, laundry, delivery or other supply services.

### 2. Employer Responsibilities

A. The employer, when selecting a contractor, shall obtain and evaluate information regarding the contract employer's safety performance and programs.

B. The employer shall inform contact employers of the known potential fire, explosion, or toxic release hazards related to the contractor's work and the process.

C. The employer shall explain to contract employers the applicable provisions of the emergency action plan required by paragraph (n) of this section.

D. The employer shall develop and implement safe work practices consistent with paragraph (F) (4) of this section, to control the entrance, presence and exit of contract employers and contract employees in covered process areas.

E. The employer shall periodically evaluate the performance of contract employers in fulfilling their obligations as specified in paragraph 3 of this section.

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

F. The employer shall maintain a contract employee injury and illness log related to the contractor's work in process areas.

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

### 3. Contract Employer Responsibilities

A. The contract employer shall assure that each contract employee is trained in the work practices necessary to safely perform his/her job.

B. The contract employer shall assure that each contract employee is instructed in the known potential fire, explosion, or toxic release hazards related to his/her job and the process, and the applicable provisions of the emergency action plan.

C. The contract employer shall document that each contract employee has received and understood the training required by this paragraph. The contract employer shall prepare a record which contains the identity of the contract employee, the date of training, and the means used to verify that the employee understood the training.

D. The contract employer shall assure that each contract employee follows the safety rules of the facility including the safe work practices required by paragraph (F) (4) of this section.

E. The contract employer shall advise the employer of any unique hazards presented by the contract employer's work, or of any hazards found by the contract employer's work.

### 1910.119 SECTION (F) (4) REFERRED TO ABOVE

The employer shall developed and implement safe work practices to provide for the control of hazards during operations such as lock out/tag out, confined space entry; opening process equipment or piping; and control over entrance into a facility by maintenance, contractor, laboratory or other support personnel. These safe work practices shall apply to employees and contractor employees.

62

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

**EXHIBIT C**

**ATTACHMENT B**

**CERTIFICATION OF WORK PRACTICES TRAINING**

1. _____

   COMPANY NAME OF CONTRACTOR

2. _____

   NAME OF CONTRACTOR EMPLOYEE   (PLEASE PRINT)

3. List specific crafts/skills for which you are trained and qualified, and will be performing as a contractor employee at US Magnesium.

   _____

   _____

4. What training have you received to qualify you to safely perform the above named skills or crafts in your work at US Magnesium? (Specify schooling, job training, length of experience etc.)

   _____

   _____

**CONTRACTOR EMPLOYEE:**

I hereby certify that I am qualified to safely perform my assigned job tasks at US Magnesium as explained above.  I also agree to comply with all applicable OSHA and US Magnesium rules and regulations.

_____     _____

63

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

EMPLOYEE SIGNATURE                          DATE

**CONTRACT EMPLOYER:**

I hereby certify that the above named employee is qualified to safely perform his/her assigned job tasks while working at US Magnesium as a contractor employee of the above named company.  I will also ensure that this person complies with all applicable OSHA and US Magnesium rules and regulations.

_____            _____

AUTHORIZED SIGNATURE                        DATE

64

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

**EXHIBIT C**

**ATTACHMENT C**

## CONTRACTOR SAFETY PREQUALIFICATION FORM

CONTRACTOR COMPANY NAME: _____

ADDRESS: _____

TELEPHONE NUMBER: _____

1. List your firm's Experience Modification Rate (EMR) for the three most recent years. Your EMR should be obtained from your insurance agent.

    YEAR:        20_____        20_____        20_____

    EMR:        _____        _____        _____

2. List your firm's standard industrial code number. This can also be obtained from your insurance agent. _____

3. Please use three most recent year's OSHA No. 200 Log to fill-in: Number of injuries and illnesses:

| | 20 | 20 | 20 |
|---|---|---|---|
| a) Number of Lost Time Accidents | | | |
| b) Number of restricted workday cases | | | |
| c) Number of recordable cases | | | |
| d) Number of fatalities | | | |
| 4. Employee hours worked each year (do not include | | | |

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

| any non-work time, even though paid). | | | |
|---|---|---|---|

5. Do you hold project safety meetings for field supervisors?

Yes _____          No _____

How Often?  Weekly _____, Bi-weekly _____, Monthly _

_____

Less Often as Needed _____

6. Do you conduct project safety inspections?          Yes _____ No

___

If yes, who conducts this inspection (title)? _____

_____

And how often? _____

7. Do you have a written safety program?          Yes _____ No _____

If yes, please return a copy with this form.

8. Do you have safety orientation programs for new employees?

Yes _____ No _____

Do you have a safety program for a newly hired or promoted supervisor?

Yes _____ No _____

If yes, does your supervisor safety program include instruction on the following?

|  | Yes | No |
|---|---|---|
| a) Safe work practices | | |
| b) Safety supervision | | |

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

| | | |
|---|---|---|
| c) Toolbox safety meetings | | |
| d) Emergency procedures | | |
| e) First aid procedures | | |
| f) Accident investigation | | |
| g) Fire protection and prevention | | |
| h) New workers orientation | | |
| i) Chemicals hazardous to health | | |

10. Do you hold "toolbox" safety meetings for employees?     Yes _____ No __

How Often? Weekly _____, Bi-weekly _____, Monthly _____

Less Often as Needed _____

11. Do these "toolbox" safety meetings include instruction on items listed in #9 above and #12 below?     Yes _____ No _____

12. Do you have your own:

| | Yes | No |
|---|---|---|
| a) Written hazard communication program | | |
| b) Written tagout/lockout procedures | | |
| c) Written respiratory protection program | | |
| d) Other written safety requirements | | |

67

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

If yes, please return a written copy with this form.

I hereby certify that the above named information is true and correct to the best of my knowledge.

I understand that falsification of this form or failure to comply with OSHA or US Magnesium LLC regulations may result in disqualification of my Company and cancellation of the contract.

_____          _____

SIGNATURE                                                                DATE


US MAGNESIUM LLC APPROVAL: _____REJECTION: _____


_____          _____

AUTHORIZED SIGNATURE                                         DATE


COMMENTS: _____

_____

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

**EXHIBIT C**

**ATTACHMENT D**

## CERTIFICATION OF PHYSICAL FITNESS TO WEAR A NEGATIVE

## PRESSURE RESPIRATOR AT US MAGNESIUM LLC

_____

COMPANY NAME OF CONTRACTOR

_____                _____

NAME OF CONTRACTOR EMPLOYEE                            DATE
EXAMINED

NAME AND ADDRESS OF EXAMINING PHYSICIAN

_____                _____

_____

_____                TELEPHONE NUMBER

_____                _____

ADDRESS                                                    ZIP CODE

**PHYSICIANS STATEMENT:**

I hereby certify that the above named employee was examined by me, and in my professional opinion he/she is physically fit to wear a negative pressure respirator during the course of his/her employment.

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

_____          _____

**PHYSICIAN'S SIGNATURE**                          **DATE**


**COMMENTS:**

_____

_____

_____

_____

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

**EXHIBIT C**

**ATTACHMENT E**

## US MAGNESIUM LLC CONTRACTORS

## RESPIRATOR FIT TEST CERTIFICATION

**Company Name of Contractor:** _____

**Name:** _____

I certify that the below named individual has been properly trained and has successful passed a fit test for the following respirator:

_____

Make, model and size used for fit test

**Note:**    Respirators used at US Magnesium LLC must have cartridges which are approved for organic vapors and acid gases (yellow).

71

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

**Trainers Name:**

_____          _____
            Print or Type                              Signature

Date:


**Employee Name:**

_____          _____
            Print or Type                              Signature

Date:

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

**EXHIBIT C**

**ATTACHMENT F**

## US MAGNESIUM LLC CONTRACTORS

## RESPIRATOR FIT TEST DATA

CONTRACTOR COMPANY NAME: _____

I certify the following employees were fit tested using the ANSI Standard #288.2 (7.5) fit test procedure,

for negative pressure respirators.

Trainer's Name _____        _____

                      (Print or Type)                               Signature

Type of respirator, make and model used for fit test _____

_____

_____

_____

NOTE:    Respirators used at US Magnesium LLC must have cartridges which are approved for Organic vapors and Acid gases (yellow).

73

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

| (Print or type) Employees Name | Date | Pass | Fail | Comments |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |
| 6. | | | | |
| 7. | | | | |
| 8. | | | | |
| 9. | | | | |
| 10. | | | | |

Additional Comments:

74

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

# EXHIBIT D

## SCOPE OF WORK

**As detailed in purchase orders issued against this contract.**

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

## EXHIBIT E

## SPECIFICATIONS


## As detailed in purchase orders issued against this contract.

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

## EXHIBIT F

## CONTRACTORS BID PROPOSAL

## As attached to purchase orders issued against this contract.

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

CONTRACT NO.

## EXHIBIT G

## BIDDER CONFIDENTIALITY AGREEMENT

PROJECT TITLE_____    As described in purchase orders issued against this contract._____

In consideration of the receipt of the accompanying Bid Package for the Project referenced above, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the undersigned bidder, subcontract agrees as follows:

The undersigned bidder/subcontractor agrees, for itself, its employees and subcontractors, to maintain the confidentiality of, and not disclose, without the prior written consent of US Magnesium LLC (the "Company") any technical, engineering, operational, economic, or other information whatsoever, contained in said Bid Package or disclosed to, developed or otherwise obtained by, the undersigned bidder/subcontractor in connection with said Bid Package, except any such information that is now, or thereafter becomes part of the public domain through no fault of the recipient, or that the undersigned bidder/subcontractor can show was already in its possession at the time of disclosure hereunder and which it is free to disclose to others.

The undersigned bidder/subcontractor shall obtain the prior written consent of the Company of each prospective subcontractor prior to disclosing any such information to such prospective subcontractor.

78

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

The provisions of this confidentiality agreement are in addition to those contained in Paragraph B16 of the Construction Contract included in the Bid Package.

IN WITNESS WHEREOF, the undersigned bidder/subcontractor has caused this Agreement to be signed by its duly authorized officer.

Bidder's Name:

Signature:_____

Title:_____

Date:_____


Subcontractor's Name:_____

Signature:_____

Title:_____

Date:_____


Subcontractor's Name:_____

Signature:_____

Title:_____

Date:_____

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

# EXHIBIT J

## DRAWINGS

**As attached to purchase orders issued against this contract.**

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

## EXHIBIT K

## WAIVER OF LIEN

TO THE INDEPENDENT CONTRACTOR

AGREEMENT DATE: _____

BETWEEN US MAGNESIUM LLC

AND

WHEREAS the undersigned (Contractor, subcontractor, or supplier of equipment and material)_____Contractor

with a principal place of business at _____

is about to furnish certain materials and/or to perform certain labor in the matter of the improvement of certain real property owned by US Magnesium LLC which real property is designated and knows as ___US Magnesium, Rowley Utah Plant Site _____

_____

_____

NOW, THEREFORE, for one dollar and other good and valuable consideration, receipt of which is hereby acknowledged, the undersigned hereby covenants and agrees that upon receipt of payment in full, it will not directly, claim or file a mechanic's lien or other lien against said promises or any part thereof, for any of the materials hereafter furnished by the undersigned or for any work or labor hereafter performed by the undersigned in connection with the stated premises and the undersigned hereby formally and irrevocably releases an waives in writing any and every lien that the undersigned may at any time be entitled to have, against the premises in connection with the improvement.

81

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

IN WITNESS WHEREOF, the Presents have been executed and delivered the____

_____ day of  _____, 20___.

                   (Month)

_____

**Authorized Contractor Representative**

**WITNESS**

_____

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

CONTRACT NO:

## EXHIBIT L

### CERTIFICATION OF COMPLETION OF CONTRACT

This is to certify that all claims for wages, materials, supplies and services used and furnished and all work and labor performed for and under Contract No. _____ _____, with your Company have been fully paid.  There (are) (are no) disputed claims in the amount of $_____

for _____ which are to be withheld from final payment to be paid by you to the person or persons found entitled thereto.

The said Contract was completed as per its terms on the _____ day of _____ _____

20___, and work, equipment and materials furnished and other items required under such Contract, conform in all respects with the requirements of said Contract.

_____
Contractor

By      _____

Title    _____

STATE OF UTAH                )

COUNTY OF _____)

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

The foregoing certification was subscribed and sworn to before me this_____

day of _____, 20__, by _____as ____

_____ of _____.

Witness my hand and seal.

My commission expires:_____

_____

Notary Public

_____

Address

Accepted this _____ day of _____ 20___.

US MAGNESIUM LLC

By_____

**Project Manager**

84

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

## EXHIBIT X

## CONSTRUCTION CONTRACT

## CHANGE ORDER FORM

P. O. #_____    CONTRACT #_____    DATE_____

AR/W.O. #_____

_____

**Description of Additional Work Required**

_____

_____

_____

_____

_____

_____

_____

_____

**Time Required for Completion**

Time Required to Complete Additional Work_____

Original Completion Date_____

85

DocuSign Envelope ID: 555ED8B5-928F-4851-8F22-3A7314D6AC80

New Completion Date_____

---

## Cost

Cost for Additional Work_____    $_____

Original P. O. Amount_____    $_____

New P. O. Total_____    $_____

---

## Approvals

| Title | Name | Signature |
|-------|------|-----------|
| Project Manager | | |
| Contractor | | |
| Engineering Manager | | |
| VP of Operations | | |

86

**Exhibit 2**
(June 26, 2023 Purchase Order – Redacted)

13

# US Magnesium LLC

**Official Copy**

**Purchase Order**

| Date Printed: | Purchase Order Number: |
|---|---|
| 6/12/2023 | 574670-0000-000 |

**To**

FORGEN, LLC
6020 West Oaks Blvd, Suite 220
Rocklin, CA 95765

**Contact** EMMETT BLACK    619-243-4473

**Ship Via** BEST WAY
**Shipping Point**
**Freight** DELIVERED AT PLACE
**Terms** SEE BODY OF ORDER FOR DETAILS
**FOB**
**Buyer** MIKE WORTHINGTON, 801-532-8203
**Date Issued** 6/12/2023

**Submit Invoices To**

US MAGNESIUM LLC
238 NORTH 2200 WEST
SALT LAKE CITY, UTAH 84116
EMAIL: ACCOUNTSPAYABLE@USMAGNESIUM.COM

**Ship To**

US MAGNESIUM LLC
12819 N ROWLEY ROAD
ROWLEY PLANTSITE (NO USPS SERVICE AVAILABLE)
SKULL VALLEY, UT   84029-8010

**Exhibit 2**

**(Consent Decree)**

**See attached.**

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>MAGNESIUM CORPORATION OF<br>AMERICA, et al.,<br><br>　　　　　　Defendants. | Case No. 2:01CV0040<br><br>Judge <u>Dale A. Kimball</u> |

## **CONSENT DECREE**

1

I.       INTRODUCTION ................................................................................3

II.      JURISDICTION AND VENUE ..........................................................7

III.     APPLICABILITY ...............................................................................8

IV.      DEFINITIONS ....................................................................................9

V.       CIVIL PENALTY ..............................................................................18

VI.      RCRA WORK REQUIREMENTS ....................................................19

VII.     CERCLA RESPONSE ACTION .......................................................28

VIII.    SUBSURFACE ESTATE CONVEYANCE ....................................... 43

IX.      US MAGNESIUM ESCROW ACCOUNT .........................................43

X.       FINANCIAL ASSURANCE ...............................................................43

XI.      APPROVAL OF DELIVERABLES ...................................................48

XII.     CERCLA AND RCRA COORDINATION AND TOLLING AGREEMENT .....50

XIII.    REPORTING REQUIREMENTS ......................................................52

XIV.     STIPULATED PENALTIES ...............................................................56

XV.      FORCE MAJEURE .............................................................................59

XVI.     DISPUTE RESOLUTION ...................................................................61

XVII.    INFORMATION COLLECTION AND RETENTION .......................65

XVIII.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS .............67

XIX.     COSTS .................................................................................................72

XX.      NOTICES .............................................................................................72

XXI.     EFFECTIVE DATE .............................................................................75

XXII.    RETENTION OF JURISDICTION .....................................................75

XXIII.   MODIFICATION .................................................................................75

XXIV.    TERMINATION ...................................................................................76

XXV.     PUBLIC PARTICIPATION .................................................................78

XXVI.    SIGNATORIES/SERVICE ...................................................................78

XXVII.   INTEGRATION ....................................................................................79

XXVIII.  FINAL JUDGMENT .............................................................................79

XXIX.    APPENDICES .......................................................................................79

# I. INTRODUCTION

**WHEREAS**, Plaintiff United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), filed a complaint in this action on January 16, 2001, and a Second Amended Complaint on December 5, 2002, alleging that Magnesium Corporation of America ("MagCorp"), Renco Metals, Inc., ("Metals"), the Renco Group, Inc. ("Group"), the Ira Leon Rennert Revocable Trusts ("Trusts"), Mr. Ira Leon Rennert ("Rennert") and US Magnesium LLC ("USM"), collectively "Defendants," violated the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. §§ 6901–6992k, at a magnesium production facility in Rowley, Utah, located approximately 23 miles northwest of Grantsville, Utah (hereinafter, the "Facility");

**WHEREAS**, the Second Amended Complaint ("Complaint") alleges that a certain solid waste ("Anode Dust") and four waste waters ("Chlorine Plant Water Wash Column Water," "High Energy Scrubber Liquor," "Chlorine Reduction Burner Water," and "Chlorine Reduction Burner Seal Leg Water") generated at the Facility, each of which exhibits at least one characteristic of hazardous waste pursuant to Utah's RCRA-authorized program, Utah Code Ann. §§ 19-6-101 to 123, are not exempted from the RCRA regulatory requirements of Subtitle C by the "Bevill Amendment," set forth at 42 U.S.C. § 6921(b)(3)(A)(ii), and the regulation EPA promulgated thereunder for magnesium processing wastes, 40 C.F.R. § 261.4(b)(7)(ii)(O) (the "Bevill Regulation"), and that Defendants MagCorp and USM thus were required to operate the Facility as a Treatment, Storage and Disposal Facility pursuant to Sections 3004 and 3005 of RCRA, 42 U.S.C. §§ 6924-25, and their implementing federal and/or state regulations, but failed to do so;

3

**WHEREAS,** Plaintiff/Intervenor, United Steelworkers of America ("USWA"), which was renamed the United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Services Workers International Union, AFL-CIO/CLC ("USW"), after merging with the Paper Allied-Industrial, Chemical and Energy Workers International Union ("PACE") in 2005, and Local 8319 filed a Complaint in Intervention on July 27, 2004, alleging violations of RCRA at the Facility;

**WHEREAS**, MagCorp and Metals on August 2, 2001, each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York, Case No. 01-14312 ("Bankruptcy Case"), which by order dated September 24, 2003, were converted to cases under chapter 7 of the Bankruptcy Code;

**WHEREAS,** on August 8, 2008, the Court dismissed all but Claims 1, 4-7, and 9-15 of the Second Amended Complaint, as to which claims it had granted summary judgment in favor of Defendants on October 15, 2007, which judgment was reversed by the Tenth Circuit in *U.S. v. Magnesium Corp. of Am.*, 616 F.3d 1129 (10th Cir. 2010), thus reinstating Claims 1, 4-7, and 9-15 of the Second Amended Complaint;

**WHEREAS**, Defendants USM, Group, the Trusts, and Rennert (collectively the "Settling Defendants"), deny the applicability of Subtitle C of RCRA and the regulations promulgated thereunder to certain practices at the USM Facility that are the subject of the Complaint, deny the violations alleged in the Complaint, and maintain that the Facility has been and remains in compliance with RCRA and that Settling Defendants are not liable for civil penalties or injunctive relief arising out of the transactions or occurrences alleged in the Complaint;

4

**WHEREAS,** pursuant to Section 105 of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9605 ("CERCLA"), EPA placed the US Magnesium Site ("Site") on the National Priorities List, set forth at 40 C.F.R. Part 300, Appendix B, by publication in the Federal Register on November 4, 2009, 74 Fed. Reg. 57085, 57088;

**WHEREAS,** EPA has made a number of findings relating to the Site in the exercise of its authorities under CERCLA that are set forth in Section V (EPA Findings of Fact) and Section VI (EPA Conclusions of Law and Determinations) of the Administrative Settlement Agreement and Order on Consent for Remedial Investigation/Feasibility Study, CERCLA Docket No. 08-2011-0013 issued by EPA on August 4, 2011, as amended on August 31, 2016 ("CERCLA RI/FS AOC") and incorporated herein;

**WHEREAS,** after consideration of the factors set forth in Section 300.415(b)(2) of the National Contingency Plan ("NCP"), 40 C.F.R § 300.415(b)(2), EPA has determined the CERCLA Response Action to be performed by Defendant USM pursuant to this Consent Decree is necessary to protect the public health, welfare, or the environment, and if conducted in accordance with this Consent Decree will be consistent with the NCP and with future remedial actions at the Site;

**WHEREAS,** EPA and Defendant USM previously entered into two administrative agreements with EPA for the performance of certain investigative and work activities at the Facility: the CERCLA RI/FS AOC and the RCRA Administrative Order;

5

**WHEREAS**, the United States and Settling Defendants have reached agreement in the Bankruptcy Case regarding the allowed amount of their respective claims and how the disbursements on such claims will be used ("Bankruptcy Settlement");

**WHEREAS**, the objectives of the Parties in this Consent Decree are to resolve the civil claims for violations of RCRA alleged against Settling Defendants in the Second Amended Complaint and to address uncontrolled releases of CERCLA hazardous substances at the Site by: 1) establishing injunctive relief whereby Defendant USM shall modify certain Facility operations with respect to the management of Complaint Wastes and Bevill-Exempt Wastes at the Facility and shall modify the current Worker Health Order to ensure additional safeguards for worker health; 2) requiring Defendant USM to establish appropriate financial assurance for closure or corrective action of certain waste management areas in the operating areas of the Facility; 3) assessing an appropriate penalty; 4) providing for the performance by Defendant USM of the CERCLA Response Action and the payment of EPA costs incurred in connection with the CERCLA Response Action; and 5) implementing the Bankruptcy Settlement to provide conditions for Defendant USM to obtain partial reimbursement of the costs of the CERCLA Response Action;

**WHEREAS**, Settling Defendants have conducted themselves in good faith in their discussions with the Plaintiffs concerning the violations alleged in the Complaint, and Defendant USM has already commenced implementation of certain operational changes and corrective measures at the Facility; and

6

**WHEREAS**, the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation among the Parties, and that this Consent Decree is fair, reasonable, and in the public interest;

**NOW, THEREFORE**, with the consent of the Parties, **IT IS HEREBY ADJUDGED, ORDERED, AND DECREED** as follows:

## II.     JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1345, 1355 and 1367, Section 3008(a) and (g) of RCRA, 42 U.S.C. § 6928(a) and (g), and Sections 106, 107 and 113(b) of CERCLA, 42 U.S.C. § 9606, 9607, and 9613(b), and over the Parties in this action. Venue lies in this District pursuant to 28 U.S.C. §§ 1391(b) and (c), and 1395(a), and Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), because the Facility is located in this judicial district. For purposes of this Decree, or any action to enforce this Decree, Settling Defendants agree to the Court's jurisdiction over this Decree and any such action and over Settling Defendants, and consent to venue in this judicial district.

2.      Pursuant to Section 3008(a)(2) of RCRA, 42 U.S.C. § 6928(a)(2) and Section 106(a) of CERCLA, 42 U.S.C. § 9606(a), notice of the commencement of this action has been given to the State of Utah.

3.      For purposes of this Consent Decree, Settling Defendants agree that the Complaint states claims upon which relief may be granted pursuant to Sections 3004 and 3005 of RCRA, 42 U.S.C. §§ 6924 and 6925.

7

### III. APPLICABILITY

4.     The obligations of this Consent Decree apply to and are binding upon the Plaintiff and upon Settling Defendants as set forth herein, and upon any successors, assigns, or other entities or persons otherwise bound by law. Nothing in this Consent Decree shall apply to administrative or enforcement proceedings other than this action or an action to enforce this Consent Decree. Nor does anything in this Consent Decree relieve Settling Defendants of the obligations to comply with any federal and state laws applicable to activities that are not within the definition of Work in this Consent Decree.

5.     No transfer of ownership or operation of the Facility or any portion of the Site, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Settling Defendants of their obligation to ensure that the terms of the Decree as applicable to each of them are implemented unless (1) the transferee agrees to undertake the obligations required by this Decree and to be substituted for one or more of the Settling Defendants as a Party under the Decree and thus be bound by the terms thereof, and (2) the United States consents to relieve one or more of the Settling Defendants of its/their obligations. The United States' decision to refuse to approve the substitution of the transferee for one or more Settling Defendants shall not be subject to judicial review. At least thirty (30) Days prior to such transfer, Defendant USM shall provide a copy of this Consent Decree to the proposed transferee and shall simultaneously provide written notice of the prospective transfer, together with a copy of the proposed written agreement, to EPA and the United States Department of Justice, in accordance with Section XX of this Decree (Notices). Any attempt to transfer ownership or operation of the Facility without complying with this Paragraph constitutes a violation of this Decree.

6.      Defendant USM shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include compliance with any provision of this Decree, as well as to any contractor retained to perform Work required under this Consent Decree. Defendant USM shall condition any such contract upon performance of the Work in conformity with the terms of this Consent Decree. Defendant USM shall be responsible for ensuring that all employees and contractors involved in performing any Work pursuant to this Consent Decree perform such work in compliance with the requirements of this Consent Decree.

7.      In any action to enforce this Consent Decree, Settling Defendants shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

## IV.    DEFINITIONS

8.      Terms used in this Consent Decree that are defined in RCRA, CERCLA, or in state regulations authorized by RCRA or CERCLA, shall have the meanings assigned to them in RCRA, CERCLA, or such regulations, unless otherwise provided in this Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a.      "Anode Dust" means particulate matter in exhaust gases from the electrolytic cells;

b.      "Bankruptcy Case" means the bankruptcy cases filed by MagCorp and Metals in the United States Bankruptcy Court for the Southern District of New York, Case No. 01-14312;

c.      "Bankruptcy Settlement" means the Settlement Agreement filed in the Bankruptcy Case, attached hereto as Appendix 11 (Bankruptcy Settlement), among the United

9

States, the trustee for the bankruptcy estates for Defendants MagCorp and Metals, and other parties in interest, resolving, among other things, claims asserted by EPA and Settling Defendants against Defendants MagCorp and Metals in the Bankruptcy Case;

d. "Bevill-Exempt Wastes" means "[p]rocess wastewater from primary magnesium processing by the anhydrous process" under the Bevill Amendment. 56 Fed. Reg. 27300 (June 13, 1991). 40 C.F.R. § 261.4(b)(7)(ii)(O); UAC Rule 315-261-4(b)(7)(ii)(O). Bevill-Exempt Wastes do not include the Complaint Wastes generated by Defendant USM;

e. "CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675;

f. "CERCLA Interest" means interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year. Rates are available online at https://www.epa.gov/superfund/superfund-interest-rates;

g. "CERCLA Response Action" means those activities necessary to eliminate uncontrolled releases of hazardous substances from the Current Waste Pond and retrofit it in compliance with the Ground Water Discharge Permit in accordance with the CERCLA SOW attached hereto as Appendix 12 (Statement of Work for the CERCLA Response Action);

10

h.     "CERCLA RI/FS AOC" means the Administrative Settlement Agreement and Order on Consent for Remedial Investigation/Feasibility Study, CERCLA Docket No. 08-2011-0013, issued by EPA on August 4, 2011, as amended on August 31, 2016;

i.     "CERCLA SOW" means the Statement of Work for CERCLA Response Action attached hereto as Appendix 12 (Statement of Work for the CERCLA Response Action).

j.     "CHCs" means Chlorinated Hydrocarbons, which are hydrocarbon molecules where one or more hydrogen atoms have been replaced by chlorine atoms;

k.     "Chlorine Plant Water Wash Column Water" means scrubber solution generated in the water wash column from the scrubbing of residual Anode Dust and hydrogen chloride gas from electrolytic cell exhaust gases;

l.     "Chlorine Reduction Burner Seal Leg Water" means any upsets or overflows of scrubber solution used in devices that protect equipment and ducting from pressure surges;

m.     "Chlorine Reduction Burner Water" means scrubber solution generated in the chlorine reduction burner from the scrubbing of melt/reaction exhaust gases;

n.     "Closure" and "Post-Closure" mean those activities undertaken pursuant to Appendix 4(A) (Salt Cap Closure and Post-Closure Plan) or 4(B) (Statement of Criteria for Alternative Closure of RWP), if applicable, with respect to the RWP;

o.     "Complaint" means the Second Amended Complaint filed by the United States in this action;

11

p. "Complaint Streams" means the Chlorine Reduction Burner Water, Chlorine Reduction Burner Seal Leg Water, High Energy Scrubber Liquor, and the Chlorine Plant Water Wash Column Water;

q. "Complaint Wastes" are Anode Dust and the Complaint Streams when disposed;

r. "Consent Decree" or "Decree" means this Consent Decree and all Appendices attached hereto (listed in Section XXIX of this Decree (Appendices));

s. "Corrective Action" means those activities undertaken pursuant to the Corrective Action Plans required under Subparagraph 16(b) of this Consent Decree;

t. "Corrective Action Plan" ("CAP") means the plan for addressing Waste Material at a Facility unit developed in accordance with the requirements set forth in Paragraph 16(b) and Appendix 4(C) (Statement of Criteria for Corrective Action);

u. "Cost Estimate" means an estimate of costs to perform certain activities, calculated in accordance with the requirements of this Consent Decree;

v. "Courtyard" means the area between Cell Buildings 2 and 3 as described in Appendix 5 (Courtyard Capping Plan);

w. "Current Waste Pond" means the pond currently receiving wastewater from the Facility, including the old waste pond area, and to be retrofitted in compliance with the Ground Water Discharge Permit, as depicted on Map 1 attached hereto as Appendix 1;

x. "Day" means a calendar Day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next business day;

12

y.     "Effective Date" shall have the definition provided in Section XXI (Effective Date);

z.     "EPA" means the United States Environmental Protection Agency and any of its successor departments or agencies;

aa.     "EPA Hazardous Substance Superfund" means the Hazardous Substance Superfund established by the Internal Revenue Code, 26 U.S.C. § 9507;

bb.     "EPA Response Action Costs" means all costs, including, but not limited to, direct and indirect costs, that the United States incurs prior to issuance of the Notice of Completion of Response Action and collection of EPA Response Action Costs in reviewing or developing CERCLA deliverables submitted pursuant to this Consent Decree, in overseeing implementation of the CERCLA Response Action, or otherwise implementing, overseeing, or enforcing performance of the CERCLA Response Action, including but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, community involvement, and all litigation costs. EPA Response Action Costs shall also include costs incurred by the Agency for Toxic Substances and Disease Registry (ATSDR) regarding the CERCLA Response Action;

cc.     "EPA Special Accounts" means the five special accounts within the EPA Hazardous Substance Superfund, established for the Site by EPA pursuant to Section 122(b)(3) of CERCLA, 42 U.S.C. § 9622(b)(3), in accordance with the Bankruptcy Settlement;

dd.     "Facility" means Defendant USM's magnesium production facility in Rowley, Utah, located approximately 23 miles northwest of Grantsville, Utah, and depicted on Map 1 and Map 2 attached hereto as Appendix 1;

13

ee.	"Facility Closing Area" means all areas of the Site outside the operating Facility boundary and outside the boundary of the Retrofitted Waste Pond as depicted on Map 2 attached hereto as Appendix 1;

ff.	"Filtration System Clean-up Project" means clean-up of the future Filtration System area including the ditches and sanitary lagoon in accordance with the RCRA Administrative Order;

gg.	"Filtration System" means the system to remove CHCs from Defendant USM's wastewaters and certain process streams through filtration, to be constructed in accordance with the Filtration System Design, Construction and Operation Plan attached hereto as Appendix 3;

hh.	"Final CERCLA Remedial Action" means the response action to be selected by EPA after manufacturing operations at the Facility cease;

ii.	"Financial Assurance" means the establishment of a financial instrument for the benefit of EPA to ensure (1) coverage for third-party liability, Closure and/or Post-Closure of the RWP and Corrective Action pursuant to Subparagraph 16(b), if required, in accordance with Paragraph 47 and Appendix 13 (Financial Assurance) of this Consent Decree; and (2) for the CERCLA Response Action, in accordance with Paragraph 48 of this Consent Decree;

jj.	"Ground Water Discharge Permit" or "GWDP" means Ground Water Discharge Permit No. UGW450012, issued by UDEQ in accordance with the Utah Administrative Rules for Ground Water Quality Protection (UAC Rule 317-6) and subsequent 5-year permit renewals;

14

kk. "High Energy Scrubber Liquor" means the scrubber solution used to remove residual particulate matter from melt/reaction exhaust gases;

ll. "Interest" means the interest rate specified in 28 U.S.C. § 1961;

mm. "MagCorp Settlement Funds" means funds received by EPA in accordance with the Bankruptcy Settlement;

nn. "National Contingency Plan" or "NCP" means the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto;

oo. "Paragraph" means a portion of this Decree identified by an Arabic numeral;

pp. "Parties" means the United States, USW, and Settling Defendants;

qq. "Post-Removal Site Control" means actions necessary to ensure the effectiveness and integrity of the CERCLA Response Action to be performed pursuant to this Consent Decree consistent with Sections 300.415(l) and 300.5 of the NCP, 40 C.F.R. §§ 300.415(l) and 300.5, and "Policy on Management of Post-Removal Site Control" (OSWER Directive No. 9360.2-02, Dec. 3, 1990);

rr. "RCRA Administrative Order" means the Administrative Order on Consent, RCRA Docket No. 08-2016-0004, entered into by EPA Region 8 and Defendant USM on August 3, 2016;

ss. "Retrofitted Waste Pond" or "RWP" means the Current Waste Pond as retrofitted by the CERCLA Response Action in compliance with the Ground Water Discharge Permit and depicted on Map 2 attached hereto in Appendix 1;

15

tt. "RWP Closure Plan and Post-Closure Plan" means the plan for the Retrofitted Waste Pond developed in accordance with the requirements set forth in Appendix 4(A) (Salt Cap Closure and Post-Closure Plan) or Appendix 4(B) (Statement of Criteria for Alternative Closure of RWP), including a Cost Estimate;

uu. "Salt Cap Closure Plan" means the plan for Closure and Post-Closure of the Retrofitted Waste Pond attached hereto as Appendix 4(A);

vv. "Section" means a portion of this Decree identified by a Roman numeral;

ww. "Settling Defendants" means Defendants USM, Group, the Trusts, and Rennert;

xx. "Site" means the US Magnesium Superfund Site, which includes the Facility, the areal extent of contamination at and from the Facility and all suitable areas in very close proximity to the contamination necessary for implementation of response actions;

yy. "Solid Waste Landfill Permit" means a permit issued by the Utah Solid Waste Program pursuant to UAC Rule 315-310;

zz. "State" means the State of Utah;

aaa. "UDEQ" means the Utah Department of Environmental Quality and any of its successor departments or agencies;

bbb. "United States" means the United States of America, acting on behalf of EPA;

ccc. "US Magnesium Reimbursement Escrow Account" means the escrow account established with the proceeds of the disbursement to Defendant USM on its allowed claim in accordance with the Bankruptcy Settlement;

16

ddd.    "US Magnesium Reimbursement Escrow Agreement" means the escrow agreement between Defendant USM and the bankruptcy trustee established in accordance with the Bankruptcy Settlement;

eee.    "USM" means US Magnesium LLC.  Any references herein to "USM" or "Defendant USM" refer only to USM and not to any other Settling Defendant;

fff.    "USW" means Plaintiff/Intervenor, the United Steelworkers of America, renamed the United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Services Workers International Union, AFL-CIO/CLC, after merging with the Paper Allied-Industrial, Chemical and Energy Workers International Union, acting on behalf of its members employed at the Facility;

ggg.    "Waste Material" means (a) any "hazardous substance" as defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (b) any pollutant or contaminant as defined in Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); (c) any "solid waste" as defined in Section 1004(27) of RCRA, 42 U.S.C. § 6903(27); (d) Complaint Wastes; and (e) any hazardous material regulated under State law;

hhh.    "Wet Removal Process" means a process by which a series of sprays and washes are used to collect Anode Dust into a specially designed chamber or tank prior to disposal;

iii.    "WHO" means the Second Amended Worker Health Order attached hereto as Appendix 10; and

17

jjj.     "Work" means all activities and obligations Settling Defendants are

required to perform under this Consent Decree, except the activities required under Paragraph 86

(Retention of Records).

## V.     **CIVIL PENALTY**

9.     Within thirty (30) Days after the Effective Date of this Consent Decree,

Defendant USM shall pay the sum of $250,000 as a civil penalty, together with Interest accruing

from the date on which the Consent Decree is lodged with the Court, at the rate specified in 28

U.S.C. § 1961 as of the date of lodging. Defendant USM shall pay the civil penalty due by

FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice in accordance

with written instructions to be provided to Defendant USM, following lodging of the Consent

Decree, by the Financial Litigation Unit of the U.S. Attorney's Office for the District of Utah,

185 South State Street, Suite 300, Salt Lake City, Utah 84111, 801-524-5682. At the time of

payment, Defendant USM shall send a copy of the EFT authorization form and the EFT

transaction record, together with a transmittal letter, which shall state that the payment is for the

civil penalty owed pursuant to the Consent Decree in *U.S. v. Magnesium Corp. of America*, and

shall reference the civil action number and DOJ case number 90-7-1-06980, to the United States

in accordance with Section XX of this Decree (Notices); by email to

acctsreceivable.CINWD@epa.gov; and by mail to:

> EPA Cincinnati Finance Office
> 26 Martin Luther King Dr.
> Cincinnati OH 45268

10.     No Settling Defendant shall deduct any penalties paid under this Decree pursuant

to this Section or Section XIV (Stipulated Penalties) in calculating their federal or State or local

18

income tax. Nor shall any Settling Defendant deduct any penalty paid under this Consent Decree by another Settling Defendant.

## VI. RCRA WORK REQUIREMENTS

11. The Project Compliance Schedule sets forth all of Defendant USM's deadlines for deliverables under this Section and is attached hereto as Appendix 14.

12. Defendant USM shall make a RCRA hazardous waste determination, pursuant to UAC Rule 315-262.11, of all solid wastes (other than Bevill-Exempt Wastes and wastes managed in compliance with Paragraphs 13-14 and 16 of this Consent Decree), and leaks and spills from plant operations, including without limitation chlorine and hydrochloric acid production operations, and, if the wastes are hazardous, manage all hazardous wastes in compliance with Sections 3004 and 3005 of RCRA, 42 U.S.C. §§ 6924 and 6925, and the applicable regulations in UAC Rule 315-260 to 270.

13. Complaint Stream Reuse. Defendant USM shall modify operations at its Facility to reuse the Complaint Streams in accordance with the statement of work attached hereto as Appendix 2 (Complaint Waste Re-Use Plan) and the Project Compliance Schedule attached hereto as Appendix 14.

14. Filtration System Clean-up Project. Defendant USM has implemented the clean-up of the future Filtration System area pursuant to the RCRA Carve-Out Clean-up Project as set forth in the RCRA Administrative Order.

15. Filtration System. Defendant USM shall design, construct, and operate the Filtration System at its Facility to filter CHCs from Defendant USM's wastewaters and certain process waters in accordance with the Filtration System Design, Construction and Operation

19

Plan attached hereto as Appendix 3 and the Project Compliance Schedule attached hereto as Appendix 14. Defendant USM is developing a potential alternative magnesium chloride production process which, if successful, will eliminate creation of CHCs from the Melt/Reactor process. If Defendant USM determines, during preparation and review of the Final Filtration System Design Report specified in Task I of Appendix 3, but prior to implementing construction of that system, that the new process will eliminate CHC formation, it may submit a written demonstration of its findings to EPA and request a meeting to propose modifications to the Filtration System design as warranted by the data. EPA shall schedule such a meeting to consider Defendant's demonstration and proposal and, in its sole discretion, may approve modifications to the Filtration System design and implementation schedule.

      a.     <u>Filtration System Wastewaters</u>. Once the Filtration System becomes operational, Defendant USM shall:

      (1)     Dispose of the residual acidic wastewaters following filtration in the Current Waste Pond (designated the RWP following retrofit). Until the Filtration System is operational, Defendant USM may continue to dispose of acidic wastewaters in the Current Waste Pond without filtration.

      (2)     Sample and analyze the residual acidic wastewaters following filtration on a monthly basis during the first fifteen months of Filtration System operation, and quarterly thereafter, and provide all test results to EPA and UDEQ within fourteen (14) Days of Defendant USM's receipt. During the first fifteen months of Filtration System operation, Defendant USM shall operate the Filtration System to maximize its ability to meet the universal treatment standards (UTS) set forth at UAC

20

Rule 315-268-48. After the first fifteen months of Filtration System operation, effluent from the filtration system must meet the UTS, except as provided in Subparagraphs (i) and (ii) below:

(i). Defendant USM may, within sixty (60) Days after the end of the first fifteen months of Filtration System operation, submit to EPA for approval a proposed alternative compliance limit for each UTS constituent for which Defendant USM contends it is technically impracticable to reliably meet UTS limits. Defendant USM may include in its proposal one or more operating parameters that may be used as a compliance limit in lieu of a concentration limit. Any submission shall also include for approval a proposed monitoring frequency. Any proposed alternative compliance limit must reflect the level of filtration that the Filtration System can reliably achieve when operated properly, defined as two standard deviations above the mean, calculated using effluent sampling data from the first fifteen months of Filtration System operation while operating properly, or, based on its review of the data distribution from these sampling data, Defendant USM may propose an alternative statistical methodology for establishing an alternative compliance limit. During the pendency of EPA's review or subsequent dispute resolution, Defendant USM shall comply with the proposed alternative limit.

(ii). Any exceedance of the UTS or approved alternative concentration-based compliance limit by an amount less than or equal to the margin of analytical uncertainty specified in the analytical data report for that

21

sample shall not be considered an exceedance of the UTS or alternative compliance limit. Defendant USM may only exceed the UTS or approved compliance limit (whether based on a concentration limit or operating parameter) once per calendar year. Compliance with concentration-based limits shall be determined on a per sample (not per constituent) basis. Stipulated penalties will apply to each such exceedance after the first exceedance in any calendar year.

    b.     Filtration System Solids. Defendant USM shall manage residual solid material following filtration in compliance with applicable laws. Defendant USM shall maintain a log of all solids generated and tabulate monthly solids quantities to provide to EPA in its semi-annual reporting or upon request.

    c.     Filtration System Closure. Defendant USM shall close the Filtration System in accordance with applicable federal, State, and local regulations and permits.

    16.    Closure and Corrective Action Plans.

    a.     Retrofitted Waste Pond (RWP).

    (1)    Initial Salt Cap Closure and Post-Closure Plan. Attached hereto as Appendix 4(A) is the approved initial Salt Cap Closure and Post-Closure Plan for the RWP based upon a salt cap, including an initial Cost Estimate in accordance with Appendix 13 (Financial Assurance), and a Conditional Partial Assignment and Grant of Rights.

    (2)    Salt Cap Study. In the event EPA determines, based on conditions at the Site or receipt of information previously unknown to EPA, together with any other relevant information, that implementation of the initial Salt Cap Closure and Post-Closure

22

Plan would not be protective of public health or the environment, EPA will provide notice of such determination to Defendant USM ("Notice"). The information and the conditions previously known to EPA will include only that information and those conditions known to EPA as of the date of approval of the initial Salt Cap Closure and Post-Closure Plan for the RWP. Within sixty (60) Days of such Notice, Defendant USM shall submit to EPA for approval a work plan ("Salt Cap Study") to evaluate and address the concerns identified by EPA in the Notice, together with a proposed schedule for completion not in excess of seven years. EPA reserves its right to assert that the Salt Cap Study can be performed in less than seven years. Defendant USM shall perform the Salt Cap Study in accordance with the approved work plan and schedule. EPA's Notice is not subject to Dispute Resolution.

(3)     Initial Alternative RWP Closure and Post-Closure Plan. After the conclusion of the Salt Cap Study, if EPA again determines that a salt cap closure would not be protective of public health or the environment ("Determination"), Defendant USM shall, within one-hundred eighty (180) Days after receiving the Determination from EPA, submit to EPA for approval an initial Alternative Closure and Post-Closure Plan in accordance with the requirements set forth in Appendix 4(B) (Statement of Criteria for Alternative Closure of RWP). Within ninety (90) Days of EPA approval, Defendant USM shall adjust the amount of the Financial Assurance to reflect the approved updated Cost Estimate, in accordance with Appendix 13 (Financial Assurance). Dispute Resolution may be invoked when EPA has made its Determination, based on the administrative record supporting the Determination.

(4)    Final RWP Closure and Post-Closure Plans. At least ninety (90) Days prior to removing the RWP from service, Defendant USM shall submit to EPA for approval a final Closure Plan and Post-Closure Plan pursuant to either Appendix 4(A) (Salt Cap Closure and Post-Closure Plan) or 4(B) (Statement of Criteria for Alternative Closure of RWP), as applicable, including an updated Cost Estimate and implementation schedule. Within ninety (90) Days of EPA approval, Defendant USM shall adjust the amount of the Financial Assurance to reflect the approved updated Cost Estimate, in accordance with Appendix 13 (Financial Assurance).

b.    Other Units Handling Waste Material. At least ninety (90) Days prior to replacing or removing from service: a) the spent liquor tank; b) the sanitary lagoon; c) the smut piles; d) the Gypsum Pile; and/or e) any other units at the Facility (other than the RWP) containing Waste Material, Defendant USM shall provide notice of such replacement/removal to EPA. If EPA determines, at any time, that a release of Waste Material from such unit(s) could adversely affect human health and the environment, Defendant USM shall, within sixty (60) Days of such determination, submit to EPA for approval a Corrective Action Plan ("CAP") for the unit(s), in compliance with the requirements of Appendix 4(C) (Statement of Criteria for Corrective Action). If the release of Waste Material addressed by the CAP occurs prior to the cessation of manufacturing operations at the Facility, Defendant USM shall implement the approved CAP on the approved schedule.

17.    Anode Dust. Defendant USM has implemented a system for handling Anode Dust generated in Electrolytic Cell Buildings 1, 2 and 3 using the Wet Removal Process. In accordance with the requirements of Appendix 14 (Project Compliance Schedule), Defendant

24

USM shall cease operating the electrolytic cells in Electrolytic Cell Building 4 unless Anode

Dust generated in that building is removed by the Wet Removal Process. If Building 4 is re-

commissioned and resumes operations, Anode Dust generated in that building shall be removed

by the Wet Removal Process. Defendant USM shall not revert to a dry removal process in any of

the Electrolytic Cell Buildings. Defendant USM shall collect and dispose of any Anode Dust

from the cleaning of ducts and equipment, and any from any maintenance or retrofit operations

that cannot be handled through the Wet Removal Process, in compliance with applicable laws.

18. Courtyard. Defendant USM shall implement the Courtyard Capping Plan to address soil contamination in the Courtyard among the electrolytic process buildings in accordance with the requirements of Appendix 5 (Courtyard Capping Plan) and Appendix 14 (Project Compliance Schedule).

19. Spent Liquor Tank. Defendant USM shall implement the Spent Liquor Tank Plan in accordance with the requirements of Appendix 6 (Spent Liquor Tank Plan) and Appendix 14 (Project Compliance Schedule).

20. Electrolytic Ducon Scrubber and Sump. Defendant USM shall implement the Electrolytic Ducon Scrubber and Sump Plan in accordance with the requirements of Appendix 7 (Electrolytic Ducon Scrubber and Sump Plan) and Appendix 14 (Project Compliance Schedule).

21. Emergency Offgas System. Defendant USM has implemented the Emergency Offgas System ("EOG") Redesign Plan attached hereto as Appendix 8. Any fugitive emissions controls installed at the EOG as of the Effective Date of this Consent Decree shall not be removed or reconfigured unless Defendant USM, on a schedule approved by EPA, installs alternative fugitive emissions controls that meet or exceed the performance of the current

controls. Defendant USM, in making any changes to processes or operations in the melt/reactor or electrolytics buildings that have the potential to increase fugitive emissions, or render existing controls less effective, shall submit to EPA for approval, within thirty (30) Days of making such changes, a plan and schedule to assess and minimize fugitive emissions relating to such changes, and shall implement the approved plan on the approved schedule. This Paragraph does not require Defendant USM to seek EPA approval for process or operational changes made by Defendant USM.

22.     Landfill. In accordance with the requirements of Appendix 14 (Project Compliance Schedule), Defendant USM shall take all such actions as are necessary to complete its application for, obtain and comply with, a Solid Waste Landfill Permit for the on-site landfill as depicted on Map 1 and Map 2 attached hereto as Appendix 1, from the Utah Division of Waste Management & Radiation Control pursuant to UA C Rule 315-310. Defendant USM shall provide copies of all submittals regarding permitting to EPA at the same time such submittals are made to the Utah Division of Waste Management & Radiation Control, and shall provide additional data, information, reports or records pertaining to the Solid Waste Landfill Permit to EPA upon request.

23.     TSDF Status. Provided that Defendant USM remains in compliance with the requirements set forth in Paragraphs 11 through 22 of this Section VI (RCRA Work Requirements), Section VII (CERCLA Response Action), and Section X (Financial Assurance), the Facility shall not be required to operate as a treatment, storage and disposal facility ("TSDF") pursuant to Section 3005 of RCRA, 42 U.S.C. § 6925, and its implementing federal and/or state regulations.

26

24.     Avian Risk Mitigation Plan. Attached hereto as Appendix 9 is Defendant USM's approved Avian Risk Mitigation Plan to address risks to migratory birds from CHCs. Defendant USM shall implement the approved plan in accordance with the requirements and schedule set forth in Appendix 9 (Avian Risk Mitigation Plan).

25.     Worker Health Order. Pursuant to the WHO (Second Amended Worker Health Order), incorporated herein by reference and attached hereto as Appendix 10, Defendant USM shall implement various measures to further protect the health and welfare of workers, including the construction of a new shower and locker facility in accordance with the requirements set forth in the WHO. Defendant USM shall certify the completion of the new shower and locker facility to the Parties following construction, including the total cost, within sixty (60) Days of completion, pursuant to Paragraph 64. Defendants Group, Trusts and Rennert shall pay toward the cost of that new shower and locker facility the greater of Two Hundred Fifty Thousand Dollars ($250,000) or one-half of the cost of that facility: (a) by payment of Two Hundred Fifty Thousand Dollars ($250,000) to Defendant USM by bank check or wire transfer within thirty (30) Days of entry of this Consent Decree, with notice to the Parties pursuant to Section XX (Notices); and (b) in the event that the shower facility costs more than a total of $500,000, by payment of one-half of the balance of that excess over $500,000 to Defendant USM by bank check or wire transfer within thirty (30) Days of receipt of documentation of the cost of the shower facility, with notice to the Parties pursuant to Section XX (Notices).

26.     Permits. Where any compliance obligation under this Section requires Defendant USM to obtain a federal, state, or local permit or approval, Defendant USM shall submit timely and complete applications and take such actions as are necessary to obtain all such permits or

approvals. Defendant USM may seek relief under the provisions of Section XV of this Consent Decree (Force Majeure) for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Defendant USM has submitted timely and complete applications and has taken such actions as are necessary to obtain all such permits or approvals.

27. Periodic Review of Work Status. Once every three (3) years following the Effective Date of this Consent Decree, or more often if the Parties so agree, Settling Defendants may request a meeting to review the status of the Work and to evaluate whether discrete portions of the Work have either been completed or may be accomplished and supervised under an administrative order or permit in lieu of this Consent Decree. If the Parties agree to such a modification, such agreement shall be memorialized in a written modification to this Consent Decree pursuant to Section XXIII (Modification) and shall not require judicial approval. If the Parties agree that such modifications allow this Consent Decree to be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Consent Decree. The Parties' inability to reach agreement under this Paragraph shall not be subject to dispute resolution or judicial review.

## VII. CERCLA RESPONSE ACTION

28. CERCLA Work to be Performed. Defendant USM shall perform all actions necessary to retrofit the Current Waste Pond and to eliminate uncontrolled releases of hazardous substances in compliance with the requirements of the Ground Water Discharge Permit and the CERCLA SOW attached hereto as Appendix 12 (Statement of Work for the CERCLA Response Action).

29.     Designation of Contractor, Project Coordinator, and On-Scene Coordinator.

        a.      Defendant USM shall retain one or more contractors or subcontractors to perform the CERCLA Response Action, and shall notify EPA of the names, titles, addresses, telephone numbers, email addresses, and qualifications of such contractors or subcontractors within thirty (30) Days after the Effective Date of this Consent Decree. Defendant USM shall also notify EPA of the names, titles, contact information, and qualifications of any other contractors or subcontractors retained to perform the CERCLA Response Action at least ten (10) Days prior to commencement of work performing the CERCLA Response Action. EPA retains the right to disapprove of any or all of the contractors and/or subcontractors retained by Defendant USM. If EPA disapproves of a selected contractor or subcontractor, Defendant USM shall retain a different contractor or subcontractor and shall notify EPA of that contractor's or subcontractor's name, title, contact information, and qualifications within thirty (30) Days after EPA's disapproval. The qualifications of the persons undertaking the CERCLA Response Action for Defendant USM shall be subject to EPA's review for verification based on objective assessment criteria (e.g., experience, capacity, technical expertise) and that they do not have a conflict of interest with respect to the project.

        b.      Within thirty (30) Days after the Effective Date of this Consent Decree, Defendant USM shall designate a Project Coordinator who shall be responsible for administration of all actions by Defendant USM in performing the CERCLA Response Action and shall submit to EPA the designated Project Coordinator's name, title, address, telephone number, email address, and qualifications.

c.      EPA has designated Paul Peronard of EPA Region 8 as its On-Scene

Coordinator (OSC) and Martin McComb as the alternate OSC.

d.      EPA and Defendant USM shall have the right, subject to Subparagraph

(a), above, to change their respective designated OSCs or Project Coordinator. Defendant USM

shall notify EPA ten (10) Days before such a change is made. The initial notification by

Defendant USM may be made orally but shall be promptly followed by a written notice.

e.      The OSC shall be responsible for overseeing Defendant USM's

implementation of the CERCLA Response Action. The OSC shall have the authority vested in an

OSC by the NCP, including the authority to halt, conduct, or direct any CERCLA Response

Action required by this Consent Decree, or to direct any other removal action undertaken at the

Site. Absence of the OSC from the Site shall not be cause for stoppage of work unless

specifically directed by the OSC.

30.      CERCLA Statement of Work and Implementation. In accordance with the

CERCLA SOW attached hereto as Appendix 12 (Statement of Work for the CERCLA Response

Action), Defendant USM shall submit to EPA for approval the RWP Work Plan that includes

design deliverables and documents for the implementation of the CERCLA Response Action,

consistent with the Ground Water Discharge Permit.

31.      Off-Site Shipments.

a.      Defendant USM may ship Waste Material generated from the CERCLA

Response Action from the Site to an off-Site facility only if it complies with Section 121(d)(3) of

CERCLA, 42 U.S.C. § 9621(d)(3), and 40 C.F.R. § 300.440, and applicable Utah Division of

Waste Management & Radiation Control regulations. Defendant USM will be deemed to be in

compliance with CERCLA Section 121(d)(3) and 40 C.F.R. § 300.440 regarding a shipment if Defendant USM obtains a prior determination from EPA that the proposed receiving facility for such shipment is acceptable under the criteria of 40 C.F.R. § 300.440(b).

b.        Defendant USM may ship Waste Material generated from the CERCLA Response Action from the Site to an out-of-state waste management facility only if, prior to any shipment, it provides written notice to the appropriate state environmental official in the receiving facility's state and to the OSC. This written notice requirement shall not apply to any off-Site shipments when the total quantity of all such shipments will not exceed ten (10) cubic yards. The written notice must include the following information, if available: (1) the name and location of the receiving facility; (2) the type and quantity of Waste Material to be shipped; (3) the schedule for the shipment; and (4) the method of transportation. Defendant USM also shall notify the state environmental official referenced above and the OSC of any major changes in the shipment plan, such as a decision to ship the Waste Material to a different out-of-state facility. Defendant USM shall provide the written notice after the award of the contract for the CERCLA Response Action and before the Waste Material is shipped.

c.        Defendant USM may ship Investigation-Derived Waste (IDW) generated from the CERCLA Response Action from the Site to an off-Site facility only if it complies with Section 121(d)(3) of CERCLA, 42 U.S.C. § 9621(d)(3), 40 C.F.R. § 300.440, and EPA's "Guide to Management of Investigation-Derived Waste," OSWER 9345.3-03FS (Jan. 1992). Wastes shipped off-Site to a laboratory for characterization, and RCRA hazardous wastes that meet the requirements for an exemption from RCRA under 40 C.F.R. § 261.4(e) shipped off-Site for treatability studies, are not subject to 40 C.F.R. § 300.440.

32.     Post-Removal Site Control. Defendant USM shall comply with the Ground Water Discharge Permit, and all modifications thereto, which shall serve as Post-Removal Site Control. Defendant USM shall provide copies of all submittals regarding permitting to EPA at the same time such submittals are made to UDEQ. Additional data, information, reports, or records pertaining to the Ground Water Discharge Permit shall be made available to EPA upon request.

33.     Final Report. Within sixty (60) Days after Defendant USM concludes that the CERCLA Response Action has been fully performed (other than continuing obligations listed in Paragraph 34 (Notice of Completion of CERCLA Response Action)), it shall schedule and conduct an inspection to be attended by Defendant USM, EPA and UDEQ. If EPA determines that the CERCLA Response Action is not complete, EPA shall so notify Defendant USM. EPA's notice will include a description of the activities that Defendant USM must perform to complete the CERCLA Response Action, and a schedule for such activities, or will require Defendant USM to submit a schedule for EPA approval. Defendant USM shall submit a pre-final inspection report which describes the activities required by EPA and documents their completion. A re-inspection shall be conducted if requested by EPA or UDEQ. If, after the initial pre-notice inspection or subsequent re-inspection, Defendant USM believes that the CERCLA Response Action has been fully performed, it shall submit to EPA for approval a final report requesting issuance of Notice of Completion of the CERCLA Response Action, pursuant to Section XI (Approval of Deliverables). In the report Defendant USM's Project Coordinator shall state that the CERCLA Response Action has been completed in full satisfaction of the requirements of this Consent Decree. The final report shall comply with the requirements set forth in Section 300.165 of the NCP, 40 C.F.R. § 300.165, entitled "OSC Reports." The final report shall include a good

32

faith estimate of total costs or a statement of actual costs incurred in completing the CERCLA Response Action, a listing of quantities and types of materials removed off-Site or handled on-Site, a discussion of removal and disposal options considered for those materials, a listing of the ultimate destination(s) of those materials, a presentation of the analytical results of all sampling and analyses performed, and accompanying appendices containing all relevant documentation generated during the CERCLA Response Action (e.g., manifests, invoices, contracts and permits). The final report shall also include a certification, pursuant to Paragraph 64, signed by a responsible corporate official of Defendant USM or Defendant USM's Project Coordinator.

34. Notice of Completion of CERCLA Response Action. If EPA determines, after EPA's review of the Final Report, that the CERCLA Response Action has been fully performed in accordance with this Consent Decree, except for any continuing obligations required by this Consent Decree, including Post-Removal Site Control, EPA will provide written notice thereof to Defendant USM. If EPA determines that such CERCLA Response Action has not been completed in accordance with this Consent Decree, EPA will notify Defendant USM, provide a list of the deficiencies, and require that Defendant USM correct such deficiencies within a designated period of time. Defendant USM shall submit a revised Final Report in accordance with the EPA notice. Failure by Defendant USM to correct the deficiencies shall be a violation of this Consent Decree.

35. Payments for EPA Response Action Costs. Defendant USM shall pay to EPA all costs incurred by EPA in connection with the CERCLA Response Action not inconsistent with the NCP (EPA Response Action Costs).

a.  Periodic Bills. On a periodic basis, EPA will send Defendant USM an electronic billing notification to the following email addresses: accountspayable@usmagnesium.com and rhartman@usmagnesium.com.

(1)  The billing notification will include a standard regionally-prepared cost report with the direct and indirect costs incurred by the EPA and its contractors. Defendant USM shall make all payments within thirty (30) Days of receipt of the electronic bill, except as otherwise provided in Paragraph 36 of this Consent Decree. Defendant USM shall make payments using one of the payment methods set forth in the electronic billing notification.

(2)  Defendant USM may change its email billing address by providing notice of the new address to:

Financial Management Office
US EPA Region 8 TMS-FMP
1595 Wynkoop Street
Denver CO  80202-1129

(3)  If the electronic billing notification is undeliverable, the EPA will mail a paper copy of the billing notification to Defendant USM in accordance with Section XX (Notices).

b.  Deposit of Payments for EPA Response Action Costs. The total amount to be paid by Defendant USM pursuant to Subparagraph 35(a) (Periodic Bills), above, shall be deposited by EPA in the EPA Special Account 5 to be retained and used to conduct or finance response actions at or in connection with the Site, or, subject to the conditions in Paragraph 43, to be transferred by EPA to the EPA Hazardous Substance Superfund.

c.       CERCLA Interest. If any payment for EPA Response Action Costs is not made by the date required, Defendant USM shall pay CERCLA Interest on the unpaid balance. The CERCLA Interest shall begin to accrue on the date of the bill. The CERCLA Interest shall accrue through the date of Defendant USM's payment. Payments of CERCLA Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to the United States by virtue of Defendant USM's failure to make timely payments under this Section, including but not limited to, payment of stipulated penalties pursuant to Section XIV (Stipulated Penalties).

36.       Contesting EPA Response Action Costs. Defendant USM may initiate the procedures of Section XVI (Dispute Resolution) regarding payment of any EPA Response Action Costs billed under Paragraph 35 (Payments for EPA Response Action Costs) if it determines that EPA has made a mathematical error or included a cost item that is not within the definition of EPA Response Action Costs, or if it believes EPA incurred excess costs as a direct result of an EPA action that was inconsistent with a specific provision or provisions of the NCP. To initiate such dispute, Defendant USM shall submit a Notice of Dispute in writing to the OSC within thirty (30) Days after receipt of the bill. Any such Notice of Dispute shall specifically identify the contested EPA Response Action Costs and the basis for objection. If Defendant USM submits a Notice of Dispute, Defendant USM shall within the 30-day period, as a requirement for initiating the dispute, (a) pay all uncontested EPA Response Action Costs to EPA in the manner described in Paragraph 35, and (b) establish, in a duly chartered bank or trust company, an interest-bearing escrow account that is insured by the Federal Deposit Insurance Corporation (FDIC) and remit to that escrow account funds equivalent to the amount of the

contested EPA Response Action Costs. Defendant USM shall send to the OSC a copy of the transmittal letter and check paying the uncontested EPA Response Action Costs, and a copy of the correspondence that establishes and funds the escrow account, including, but not limited to, information containing the identity of the bank and bank account under which the escrow account is established as well as a bank statement showing the initial balance of the escrow account. If EPA prevails in the dispute, within five (5) Days after the resolution of the dispute, Defendant USM shall pay the sums due (with accrued CERCLA Interest) to EPA in the manner described in Paragraph 35. If Defendant USM prevails concerning any aspect of the contested costs, Defendant USM shall pay that portion of the costs (plus accrued CERCLA Interest) for which they did not prevail to EPA in the manner described in Paragraph 35. Defendant USM shall be disbursed any balance of the escrow account. The dispute resolution procedures set forth in this Paragraph in conjunction with the procedures set forth in Section XVI (Dispute Resolution) shall be the exclusive mechanisms for resolving disputes regarding Defendant USM's obligation to reimburse the EPA for its Response Action Costs.

37.    Work Takeover.

a.    In the event EPA determines that Defendant USM: (1) has ceased implementation of any portion of the CERCLA Response Action; (2) is seriously or repeatedly deficient or late in their performance of the CERCLA Response Action; or (3) is implementing the CERCLA Response Action in a manner that may cause an endangerment to human health or the environment, EPA may issue a written notice ("Work Takeover Notice") to Defendant USM. Any Work Takeover Notice issued by EPA (which writing may be electronic) will specify the grounds upon which such notice was issued and will provide Defendant USM a period of thirty

(30) Days within which to remedy the circumstances giving rise to EPA's issuance of such notice.

b. If, after expiration of the 30-Day notice period specified in Paragraph 37(a), Defendant USM has not remedied to EPA's satisfaction the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, EPA may at any time thereafter assume the performance of all or any portion(s) of the CERCLA Response Action as EPA deems necessary ("Work Takeover"). EPA will notify Defendant USM in writing (which writing may be electronic) if EPA determines that implementation of a Work Takeover is warranted under this Paragraph 37(b).

c. Defendant USM may invoke the procedures set forth in Paragraph 79 (Formal Dispute Resolution) to dispute EPA's implementation of a Work Takeover under Subparagraph 37(b). However, notwithstanding Defendant USM's invocation of such dispute resolution procedures, and during the pendency of any such dispute, EPA may in its sole discretion commence and continue a Work Takeover under Subparagraph 37(b) until the earlier of (1) the date that Defendant USM remedies, to EPA's satisfaction, the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, or (2) the date that a written decision terminating such Work Takeover is rendered in accordance with Paragraph 79 (Formal Dispute Resolution).

d. Notwithstanding any other provision of this Settlement, EPA retains all authority and reserves all rights to take any and all response actions authorized by law.

38.     Disbursement of EPA Special Account Funds.

        a.      Agreement to Disburse Funds to Defendant USM. In accordance with the Bankruptcy Settlement, EPA has established five EPA Special Accounts with MagCorp Settlement Funds. EPA shall disburse funds from EPA Special Account 1 in accordance with the procedures set forth in this Section. After all the funds in the US Magnesium Reimbursement Escrow Account have been disbursed in accordance with the US Magnesium Reimbursement Escrow Agreement and Section IX (US Magnesium Escrow Account) of this Consent Decree, and subject to the terms and conditions set forth in this Section, EPA agrees to make the funds in EPA Special Account 1, plus accrued CERCLA Interest thereon, available for disbursement to Defendant USM as partial reimbursement for performance of the CERCLA Response Action. Notwithstanding the foregoing, no disbursements will be made if adequate Financial Assurance is not maintained in accordance with Paragraphs 48 and 49(a), or if any such disbursement would result in inadequate Financial Assurance as set forth in Paragraphs 48 and 49(a). At EPA's request, prior to any disbursement, Defendant USM will submit a revised Cost Estimate for the remainder of the CERCLA Response Action.

        b.      Timing, Amount, and Method of Disbursing Funds from the EPA Special Account. Within sixty (60) Days after EPA's receipt of a Cost Summary and Certification, as described in this Section, or if EPA has requested additional information or a revised Cost Summary and Certification as set forth below, within thirty (30) Days after receipt of the additional information or revised Cost Summary and Certification, and subject to the conditions set forth in this Section, EPA shall disburse the funds from the EPA Special Account 1 after completion of a work milestone as set forth in the CERCLA SOW for the CERCLA Response

38

Action. EPA shall disburse the funds from the EPA Special Account 1 to Defendant USM in accordance with the instructions for electronic funds transfer provided by Defendant USM.

39.    Requests for Disbursement of EPA Special Account Funds.

a.    Following EPA's confirmation that a work milestone has been satisfactorily completed, Defendant USM shall submit to EPA a Cost Summary and Certification, as described in this Section.

b.    The Cost Summary and Certification shall include a complete and accurate written cost summary and certification of the necessary costs incurred and paid by Defendant USM in performing the CERCLA Response Action, excluding costs not eligible for disbursement under Paragraph 40 as set forth below (Costs Excluded from Disbursement). The Cost Summary and Certification shall contain a certification, pursuant to Paragraph 64, signed by the Vice President of Finance of Defendant USM or an Independent Certified Public Accountant.

c.    The Vice President of Finance of Defendant USM or an Independent Certified Public Accountant shall also provide EPA a list of the documents that he or she reviewed in support of the Cost Summary and Certification. Upon request by EPA, Defendant USM shall submit to EPA any additional information that EPA deems necessary for its review and approval of a Cost Summary and Certification.

(1)    If EPA finds that a Cost Summary and Certification includes a mathematical error, costs excluded under Paragraph 40 (Costs Excluded from Disbursement), or costs that are inadequately documented, it will notify Defendant USM and provide it an opportunity to cure the deficiency by submitting a revised Cost Summary and Certification.

(2)      If Defendant USM fails to cure the deficiency within thirty (30)

Days after being notified of, and being given the opportunity to cure, the deficiency, EPA

will recalculate Defendant USM's costs eligible for disbursement for that submission and

disburse the corrected amount to Defendant USM in accordance with the procedures in

Subparagraph 38(b) (Timing, Amount, and Method of Disbursing Funds from the EPA

Special Account).

(3)      Defendant USM may dispute EPA's recalculation under this

Paragraph pursuant to Section XVI (Dispute Resolution). In no event shall Defendant

USM be disbursed funds from the EPA Special Account 1 in excess of amounts properly

documented in a Cost Summary and Certification accepted or modified by EPA.

40.      Costs Excluded from Disbursement. The following costs are excluded from, and

shall not be sought by Defendant USM for, disbursement from the EPA Special Account 1:

(a) response costs paid pursuant to Paragraph 35 (Payments for EPA Response Action Costs);

(b) any other payments made by Defendant USM to the United States pursuant to this Consent

Decree, including, but not limited to, any CERCLA Interest, Interest, or penalties paid pursuant

to  Paragraph 35 (Payments for EPA Response Action Costs), Section V (Civil Penalty), or

Section XIV (Stipulated Penalties); (c) costs of any response activities Defendant USM performs

that are not required under, or approved by EPA pursuant to, this Consent Decree; (d) costs of

the RCRA Work Requirements (Section VI) and of Financial Assurance (Section X); (e) costs

related to Defendant USM's litigation, settlement, development of potential contribution claims,

or identification of defendants; (f) internal costs of Defendant USM, including but not limited to,

salaries, travel, or in-kind services, except for those costs that represent the work of employees of

40

Defendant USM directly performing the CERCLA Response Action; (g) any costs incurred by Defendant USM prior to the Effective Date; (h) any costs incurred by Defendant USM pursuant to Section XVI (Dispute Resolution); or (i) any costs incurred by, or payments made by Defendant USM to, Defendants Group, Trusts and Rennert.

41. Termination of Disbursements from the EPA Special Account. EPA's obligation to disburse funds from the EPA Special Account 1 under this Consent Decree shall terminate upon EPA's determination that Defendant USM: (a) has knowingly submitted a materially false or misleading Cost Summary and Certification; (b) has submitted a materially inaccurate or incomplete Cost Summary and Certification, and has failed to correct the materially inaccurate or incomplete Cost Summary and Certification within thirty (30) days after being notified of, and given the opportunity to cure, the deficiency; or (c) failed to submit a Cost Summary and Certification as required by Paragraph 39 (Requests for Disbursement of EPA Special Account Funds) within sixty (60) Days (or such longer period as EPA agrees) after being notified that EPA intends to terminate its obligation to make disbursements pursuant to this Section because of Defendant USM's failure to submit the Cost Summary and Certification as required by Paragraph 39. EPA's obligation to disburse funds from the EPA Special Account 1 shall also terminate upon EPA's determination that Defendant USM has materially violated the terms of this Consent Decree. Defendant USM may dispute EPA's termination of special account disbursements under Section XVI (Dispute Resolution).

42. Recapture of EPA Special Account Disbursements. Upon termination of disbursements from the EPA Special Account 1 under Paragraph 41 (Termination of Disbursements from the EPA Special Account), if EPA has previously disbursed funds from the

EPA Special Account 1 for activities specifically related to the reason for termination, e.g., discovery of a materially false or misleading submission after disbursement of funds based on that submission, EPA shall submit a bill to Defendant USM for those amounts already disbursed from the EPA Special Account 1 specifically related to the reason for termination, plus CERCLA Interest on that amount covering the period from the date of disbursement of the funds by EPA to the date of repayment of the funds by Defendant USM. Within thirty (30) Days after receipt of EPA's bill, Defendant USM shall reimburse the EPA Hazardous Substance Superfund for the total amount billed. Payment shall be made in accordance with Paragraph 35 (Payments for EPA Response Action Costs). Upon receipt of payment, EPA may deposit all or any portion thereof in EPA Special Account 5, EPA Special Account 1, or, subject to the conditions in Paragraph 43 (Balance of EPA Special Account Funds), the EPA Hazardous Substance Superfund. The determination of where to deposit or how to use the funds shall not be subject to challenge by Defendant USM pursuant to the dispute resolution provisions of this Consent Decree or in any other forum. Defendant USM may dispute EPA's determination as to recapture of funds pursuant to Section XVI (Dispute Resolution).

43. Balance of EPA Special Account Funds. After EPA completes all disbursements to Defendant USM in accordance with this Section, if any funds remain in the EPA Special Account 1, EPA may transfer such funds to EPA Special Account 4 or to EPA Special Account 5. Surplus funds may be transferred by EPA to the EPA Hazardous Substance Superfund only as provided in Appendix 11 (Bankruptcy Settlement). Any transfer of funds to the EPA Hazardous Substance Superfund shall be subject to challenge only as to whether the conditions for transfer set forth in Appendix 11 (Bankruptcy Settlement) have been met.

## VIII.   SUBSURFACE ESTATE CONVEYANCE

44.     The United States holds title to the subsurface estate for certain of the parcels at the Site and has determined that this reservation interferes with the CERCLA Response Action, but that the CERCLA Response Action is a more beneficial use of the land in order to protect human health and the environment than any potential mineral development.

45.     Defendant USM is seeking to acquire some or all of the subsurface estate (the mineral interest) currently owned by the United States in accordance with the Federal Land Policy and Management Act (FLPMA) Section 209(b) (43 U.S.C. 1719(b)) and all applicable regulations including, but not limited to, 43 C.F.R. 2720 Subpart 2720 - Conveyance of Federally-Owned Mineral Interests (conveyance regulations).

## IX.   US MAGNESIUM REIMBURSEMENT ESCROW ACCOUNT

46.     The conditions for Defendant USM to seek disbursements from the US Magnesium Reimbursement Escrow Account for reimbursement of costs incurred in performing the Work are set forth in Appendix 11 (Bankruptcy Settlement).

## X.     FINANCIAL ASSURANCE

47.     RCRA Financial Assurance for Operating Facility.

a.      Closure/Post-Closure of Retrofitted Waste Pond.

(1)     Salt Cap Closure. Within thirty (30) Days of the Effective Date of this Consent Decree, Defendant USM shall secure and maintain Financial Assurance in the amount of $10,610,000 for the benefit of EPA, pursuant to the requirements of Appendix 13 (Financial Assurance) of this Consent Decree, based on the initial Salt Cap Closure and Post-Closure Plan and Cost Estimate for the RWP submitted under

43

Paragraph 16(a) (Initial Salt Cap Closure and Post-Closure Plan) and Appendix 4(A) (Salt Cap Closure and Post-Closure Plan), and including the amount required for third-party liability pursuant to 40 C.F.R. 264.147. Within ninety (90) Days of EPA approval of any updated Cost Estimate required by Appendix 13, Section X (Financial Assurance), including the final RWP Closure Plan and Post-Closure Plan, Defendant USM shall adjust the amount of the Financial Assurance to reflect the approved updated Cost Estimate for RWP salt cap Closure and Post-closure, in accordance with Appendix 13 (Financial Assurance).

(2) Alternative Closure. Following any EPA Determination pursuant to Subparagraph 16(a)(3) (Initial Alternative RWP Closure and Post-Closure Plan) that salt cap closure would not be protective of human health or the environment, Defendant USM, within ninety (90) Days of EPA approval of the initial Alternative Closure and Post-Closure Plan submitted pursuant to Paragraph 16(a)(3) and Appendix 4(B) (Statement of Criteria for Alternative Closure of RWP), shall adjust the amount of Financial Assurance to reflect the approved Cost Estimate. Within ninety (90) Days of EPA approval of any updated Cost Estimate required by Appendix 13, Section X (Financial Assurance), including the final Closure and Post-Closure Plan, Defendant USM shall adjust the amount of the Financial Assurance to reflect the approved updated Cost Estimate for RWP Alternative Closure and Post-Closure in accordance with Appendix 13 (Financial Assurance).

b. Continuing RCRA Financial Assurance. Upon cessation of manufacturing operations at the Facility and initiation of a final Site-wide remedial investigation/feasibility

44

study for the Site to select a Final CERCLA Remedial Action, the Financial Assurance maintained for Closure and Post-Closure of the Retrofitted Waste Pond shall be maintained by Defendant USM until EPA selects a Final CERCLA Remedial Action and Defendant USM enters into an agreement with EPA to perform the Final CERCLA Remedial Action. If Defendant USM enters into an agreement to perform the Final CERCLA Remedial Action, the RCRA Financial Assurance for Closure and Post-Closure of the RWP will be adjusted to secure the estimated cost of implementing the Final CERCLA Remedial Action. If Defendant USM does not enter into such an agreement, the Financial Assurance shall continue to secure final Closure and Post-Closure of the RWP under RCRA until released by EPA.

c.      Defendant USM's inability to secure and/or maintain Financial Assurance shall in no way excuse performance of the Work or any other requirements of this Consent Decree or any other statutory or regulatory obligation.

48.     CERCLA Response Action Financial Assurance. Within thirty (30) Days of the Effective Date of this Consent Decree, Defendant USM shall secure and maintain Financial Assurance in the amount of $5.9 million for the benefit of EPA to ensure completion of the CERCLA Response Action, pursuant to the requirements of Appendix 13 (Financial Assurance). Within sixty (60) Days of EPA approval of the revised Cost Estimate, Defendant USM will provide Financial Assurance pursuant to the requirements of Appendix 13 (Financial Assurance) of this Consent Decree. Defendant USM may submit, on any anniversary of the Effective Date or at any other time agreed to by EPA, a request to reduce the amount, or change the form or terms, of the Financial Assurance mechanism. Any such request must be submitted to EPA and must include a Cost Estimate of the remaining work to implement the CERCLA Response Action, an

explanation of the bases for that estimate, and a description of the proposed changes, if any, to the form or terms of the Financial Assurance. EPA will notify Defendant USM of its decision to approve or disapprove a requested reduction or change pursuant to this Paragraph. Defendant USM may reduce the amount of the financial assurance mechanism only in accordance with: (a) EPA's approval; or (b) if there is a dispute, the agreement, final administrative decision, or final judicial decision resolving such dispute under Section XVI (Dispute Resolution). Defendant USM may change the form or terms of the financial assurance mechanism only in accordance with EPA's approval. Any decision made by EPA on a request submitted under this Paragraph to change the form or terms of a financial assurance mechanism shall not be subject to challenge by Defendant USM pursuant to the dispute resolution provisions of this Consent Decree or in any other forum. Within thirty (30) Days after receipt of EPA's approval of, or the agreement or decision resolving a dispute relating to, the requested modifications pursuant to this Paragraph, Defendant USM shall submit to EPA documentation of the reduced, revised, or alternative Financial Assurance mechanism. Defendant USM's obligation to secure Financial Assurance under this Paragraph for the CERCLA Response Action shall terminate upon issuance of the Notice of Completion of CERCLA Response Action under Paragraph 34.

49.     EPA Special Account Funds.

a.     Financial Assurance Offset.

(1)     Any funds held in EPA Special Accounts 2, 3 and 4, as long as such sums are still being held and have not yet been disbursed to Defendant USM or otherwise for environmental actions at the Site, plus any accrued CERCLA Interest, will be taken into account toward satisfying Defendant USM's obligation to provide Financial

46

Assurance under Paragraph 47 (RCRA Financial Assurance for Operating Facility). There are currently ~$11.9M in EPA Special Accounts 2, 3 and 4 and no additional Financial Assurance for RWP Closure and Post-Closure is required at this time.

(2)     Any funds held in EPA Special Account 1, as long as such sums are still being held and have not yet been disbursed to Defendant USM or otherwise for environmental actions at the Site, plus any accrued CERCLA Interest, will be taken into account toward satisfying Defendant USM's obligation to provide Financial Assurance under Paragraph 48 (CERCLA Response Action Financial Assurance). There are currently ~$6.3M in EPA Special Account 1 and no additional Financial Assurance for the CERCLA Response Action is required at this time.

(3)     If requests for disbursements to Defendant USM from Special Accounts 1 through 4 pursuant to Paragraph 38 and 39 of this Consent Decree or other enforceable agreement(s) allowing such disbursement would cause the balances remaining in those Special Accounts to be less than the updated Cost Estimates for the Work secured by those Special Accounts pursuant to Subparagraphs 49(a)(1) and/or (2), above, Defendant USM shall secure and maintain Financial Assurance in the amount of the deficit for the benefit of EPA, pursuant to the requirements of Appendix 13 (Financial Assurance). As provided in Paragraph 38, EPA will not make the requested disbursement(s) until such Financial Assurance is in place.

b.     At the time EPA approves any Cost Estimate or updated Cost Estimate required under Paragraphs 47 or 48, or required by Appendix 13 (Financial Assurance), EPA will identify the value of funds held in the EPA Special Accounts, including any accrued CERCLA

Interest, and approve the amount, or adjustment of the amount, of Defendant USM's Financial Assurance mechanism(s) consistent with Paragraphs 49(a)(1) or 49(a)(2).

c. In addition to the Financial Assurance information included in the reports provided pursuant to this Consent Decree, Defendant USM shall provide to EPA, upon request, any information or reports that EPA is authorized to request pursuant to Section 3007 of RCRA, 42 U.S.C. § 6927, 40 C.F.R. Part 264 Subpart H, or any other statutory or regulatory information-gathering authorities, regarding the financial status of Defendant USM, the financial mechanism(s) provided by Defendant USM to meet its obligations for Financial Assurance for the RCRA operating Facility (Paragraph 47) and the CERCLA Response Action (Paragraph 48) as set forth in this Consent Decree, and the financial institution providing the financial mechanism(s) to secure Defendant USM's obligation. Defendant USM's inability to secure and/or maintain Financial Assurance shall in no way excuse performance of the Work or any other requirements of this Consent Decree or any other statutory or regulatory obligation.

## XI. APPROVAL OF DELIVERABLES

50. Approval of Deliverables. Any plan, report, or other item for implementation of the Work that is required to be submitted by Defendant USM to EPA for approval pursuant to this Consent Decree shall also be submitted to UDEQ for notice purposes and opportunity for review. Upon request, EPA shall forward copies of such deliverables to USW. EPA, following review of the submission and, in its discretion, any consultation with UDEQ or USW, shall in writing: a) approve the submission; b) approve the submission upon specified conditions; c) approve part of the submission and disapprove the remainder; or d) disapprove the submission.

In the event of disapproval of any portion of the submission, EPA shall include a statement of the reasons for such disapproval in its response.

51. If the submission is approved pursuant to Paragraph 50, Defendant USM shall take all actions required by the plan, report, or other document, in accordance with the schedules and requirements of the plan, report, or other document, as approved. If the submission is conditionally approved or approved only in part, pursuant to Paragraph 50, Defendant USM shall, upon written direction from EPA, take all actions required by the approved plan, report, or other item that EPA determines are technically severable from any disapproved portions, subject to Defendant USM's right to dispute only the specified conditions or the disapproved portions, under Section XVI of this Decree (Dispute Resolution).

52. If the submission is disapproved in whole or in part pursuant to Paragraph 50, Defendant USM shall, within forty-five (45) Days or such other time as EPA and Defendant USM agree to in writing, correct all deficiencies and resubmit the plan, report, or other item, or disapproved portion thereof, for approval, in accordance with the preceding Paragraphs. If the resubmission is approved in whole or in part, Defendant USM shall proceed in accordance with the preceding Paragraph.

53. Any stipulated penalties applicable to the original submission, as provided in Section XIV (Stipulated Penalties) of this Decree, shall accrue during the 45-Day or other specified period, but shall not be payable unless the re-submission is untimely or is disapproved in whole or in part; provided that, if the original submission was so deficient as to constitute a material breach of Defendant USM's obligations under this Decree, the stipulated penalties

applicable to the original submission shall be due and payable notwithstanding any subsequent re-submission.

54.     If a re-submitted plan, report, or other item, or portion thereof, is disapproved in whole or in part, EPA may again require Defendant USM to correct any deficiencies, in accordance with the preceding Paragraphs, or may itself correct any deficiencies, subject to Defendant USM's right to invoke Dispute Resolution and the right of EPA to seek stipulated penalties as provided in the preceding Paragraphs. In the event of: 1) material or substantial alterations or additions to the facility or its operations; 2) the receipt of information not available at the time of deliverable approval that would have justified changes to the deliverable; or 3) new statutory requirements or regulations that reveal any need to modify any deliverable, report or other item previously approved by EPA, EPA may notify Defendant USM of such modification and/or require the submission to be revised in accordance with EPA direction and resubmitted to EPA for approval.

## XII.     CERCLA AND RCRA COORDINATION AND TOLLING AGREEMENT

55.     To conserve Superfund resources and avoid duplication of effort, for so long as Defendant USM continues manufacturing operations at the Facility in compliance with this Consent Decreeand RCRA, Defendant USM's obligations at the Facility will be governed by this Consent Decree and RCRA, and CERCLA remedial activities at the operating Facility other than those required by this Consent Decree will be deferred to RCRA authorities and this Consent Decree, subject to Section XVIII (Effect of Settlement/Reservation of Rights).

56.     After entry of this Consent Decree, EPA and Defendant USM will modify the CERCLA RI/FS AOC as follows:

50

a.      Defendant USM will complete the Site-wide remedial investigation report in accordance with the terms of the CERCLA RI/FS AOC; and

b.      Upon completion of the remedial investigation report, Defendant USM will proceed with the feasibility study for the Facility Closing Area in accordance with the terms of the CERCLA RI/FS AOC.

57.      Upon cessation of manufacturing operations at the Facility, EPA will, in accordance with CERCLA and the NCP, initiate a final Site-wide remedial investigation/feasibility study for the Site and select a Final CERCLA Remedial Action. EPA will take into consideration, to the extent practicable, existing information and data in the course of such remedial investigation/feasibility study. EPA will treat the activities required by the final approved RWP Closure and Post-Closure Plan and any CAPs as presumptive remedies under CERCLA, subject to applicable law. Defendant USM's continuing obligations to provide RCRA Financial Assurance are set forth in Subparagraph 47(b). The United States' reservation of rights to require Corrective Action under RCRA is set forth in Paragraph 96.

58.      Tolling Agreement. The United States and the Settling Defendants agree the period commencing as of the Effective Date of this Consent Decree and ending upon EPA's selection of the Final CERCLA Remedial Action (Tolling Period) shall not be included in computing the running of any statute of limitations potentially applicable to any action brought by the United States on Tolled Claims as defined herein (Tolling Agreement). Tolled Claims are any and all claims of the United States pursuant to CERCLA against Settling Defendants for cost recovery and/or injunctive relief at the Site not resolved by Section XVIII (Effect of Settlement/ Reservation of Rights) of this Consent Decree. Settling Defendants shall not assert, plead or raise

51

against the United States in any fashion, whether by answer, motion, or otherwise, any defense of laches, estoppel, or waiver, or other similar defense based on the running of any statute of limitations or the passage of time during the Tolling Period in any action brought on the Tolled Claims. The United States may commence suit on Tolled Claims at any time during the Tolling Period.

59.     This Tolling Agreement does not constitute any admission or acknowledgment of any fact, conclusion of law, or liability by any Party to this Consent Decree. Nor does this Tolling Agreement constitute any admission or acknowledgment on the part of the United States that any statute of limitations, or similar defense concerning the timeliness of commencing a civil action, is applicable to the Tolled Claims. The United States reserves the right to assert that no statute of limitations applies to any of the Tolled Claims and that no other defense based upon the timeliness of commencing a civil action is applicable.

60.     Nothing herein shall affect the rights of the United States to commence any action to protect the public health, welfare, or the environment, or to enforce this Consent Decree.

61.     This Tolling Agreement does not limit or affect the nature or scope of any claims that could be brought by the United States in a complaint against Settling Defendants or the date on which the United States may file such a complaint.

62.     This Tolling Agreement is not intended to affect any claims by or against third parties.

## XIII.  REPORTING REQUIREMENTS

63.     Defendant USM shall submit the following reports to EPA, and to UDEQ for notice purposes. Upon receipt, EPA shall forward copies of such reports to USW.

52

a.    Semiannual Reports.

(1)    On or before January 31ˢᵗ and July 31ˢᵗ of each year following the Effective Date of this Consent Decree, and continuing until termination of this Decree pursuant to Section XXIV (Termination), Defendant USM shall submit a report for the preceding six months that shall include, as applicable to the Work required under this Consent Decree, a list of deliverables submitted to EPA for approval, and their status; a list of any notices submitted to EPA pursuant to this Consent Decree; the status of any construction or compliance measures; completion of milestones; problems encountered or anticipated, together with implemented or proposed solutions; status of permit applications; reports to UDEQ; operation and maintenance difficulties or concerns; reports on the operation of Defendant USM's re-use and filtration systems (including flow rates, hazardous waste characterizations, sludge removal, the log of solids and tabulated monthly solids quantities, and any bypass or upset events); notices of violation, force majeure, disputes and any resolution thereof, and status of Financial Assurance. The report required by this Subparagraph (a) is separate from the annual "WHO Certification" required under the WHO. Defendant USM shall submit the "WHO Certification" required under Paragraph XX of the WHO simultaneously to EPA and USW.

(2)    The report shall also include a description of any non-compliance with the requirements of this Consent Decree and an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation. If Defendant USM violates, or has reason to believe that it may violate, any

53

requirement of this Consent Decree, Defendant USM shall notify the United States (and

UDEQ and USW for notice purposes) of such violation and its likely duration, in writing,

within ten (10) Days of the date Defendant USM first becomes aware of the violation,

with an explanation of the violation's likely cause and of the remedial steps taken, or to

be taken, to prevent or minimize such violation. If the cause of a violation cannot be fully

explained at the time the report is due, Defendant USM shall so state in the report.

Defendant USM shall investigate the cause of the violation and shall then submit to EPA

an amendment to the report, including a full explanation of the cause of the violation,

within thirty (30) Days of the date Defendant USM becomes aware of the cause of the

violation. Upon request, EPA shall forward to UDEQ and USW a copy of this amended

report. Nothing in this Paragraph or the following Paragraph relieves Defendant USM of

its obligation to provide the notice required by Section XV of this Consent Decree (Force

Majeure).

b.      If any event occurs during performance of the Work that causes or

threatens to cause a release of Waste Material on, at, or from the Site that either constitutes an

emergency situation or that may present an immediate threat to public health or welfare or the

environment, Defendant USM shall immediately take all appropriate action to prevent, abate, or

minimize such release or threat of release. Defendant USM shall also immediately notify the

OSC or, in the event of his/her unavailability, the Regional Duty Officer at (303) 293-1788 of the

incident or Site conditions. If Defendant USM fails to take appropriate response action as

required by this Paragraph, and EPA takes such action instead, Defendant USM shall reimburse

EPA for all costs of such response action not inconsistent with the NCP pursuant to Paragraph 35

(Payments for EPA Response Action Costs). Defendant USM shall submit a written report to EPA within seven (7) Days after the onset of such event, setting forth the action or event that occurred and the measures taken, and to be taken, to mitigate any release or threat of release or endangerment caused or threatened by the release and to prevent the reoccurrence of such a release or threat of release.

c. Upon the occurrence of any event during performance of the Work that Defendant USM is required to report pursuant to Section 103 of CERCLA, 42 U.S.C. § 9603, or Section 304 of the Emergency Planning and Community Right-To-Know Act of 1986 (EPCRA), 42 U.S.C. § 11004, Defendant USM shall immediately orally notify the OSC or, in the event of his/her unavailability, the Regional Duty Officer at (303) 293-1788, and the National Response Center at (800) 424-8802. This reporting requirement is in addition to, and not in lieu of, reporting under Section 103 of CERCLA, 42 U.S.C. § 9603, and Section 304 of EPCRA, 42 U.S.C. § 11004.

64. Each report submitted by Defendant USM under this Section shall be signed by a responsible corporate official of Defendant USM and include the following certification:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I have no personal knowledge that the information submitted is other than true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

This certification requirement does not apply to emergency or similar notifications where

compliance would be impractical.

65.     The reporting requirements of this Consent Decree do not relieve Defendant USM of any reporting obligations required by RCRA or implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement. Any information provided pursuant to this Consent Decree may be used by the United States in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

## XIV.   STIPULATED PENALTIES

66.     Defendant USM shall be liable for stipulated penalties to the United States for violations of this Consent Decree as specified below, unless excused under Section XV (Force Majeure). A violation includes failing to perform any obligation required by the terms of this Decree, including any deliverable or schedule approved under this Decree, according to all applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.

67.     Late Payment of Civil Penalty. If Defendant USM fails to pay the civil penalty required to be paid under Section V of this Decree (Civil Penalty) when due, Defendant USM shall pay a stipulated penalty of $3,000 per Day for each Day that the payment is late for the first ten (10) Days. Thereafter, Defendant USM shall pay $5,000 per Day for each Day that the payment is late.

68.     Work Requirements. The following stipulated penalties shall accrue per violation per Day for each violation by Defendant USM of the requirements of Paragraph 5 (transfer of ownership or operation) and of Section VI (RCRA Work Requirements), Section VII (CERCLA Response Action), including failure to comply with the Ground Water Discharge Permit to be

56

obtained for the Retrofitted Waste Pond and the Solid Waste Landfill Permit to be obtained for the on-site landfill, Section X (Financial Assurance), and Section XVII (Information Collection and Retention) of this Consent Decree:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $3,000 | 1st through 14th Day |
| $4,000 | 15th through 30th Day |
| $5,000 | 31st Day and beyond |

If the violations are predicated on Defendant USM's failure to comply with the Ground Water Discharge Permit to be obtained for the Retrofitted Waste Pond and the Solid Waste Landfill Permit to be obtained for the on-site landfill, EPA will consult with UDEQ prior to making a demand for stipulated penalties.

69. Reporting Requirements. The following stipulated penalties shall accrue per violation per Day for each violation by Defendant USM of the requirements of Section XIII of this Consent Decree (Reporting Requirements):

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $1,000 | 1st through 14th Day |
| $2,000 | 15th through 30th Day |
| $3,000 | 31st Day and beyond |

70. Stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases. Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree. Except as provided in Paragraph 71, Defendant USM shall pay any stipulated penalty within thirty (30) Days of receiving the United States' written demand. The United States may, in the

57

unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due under this Consent Decree.

71.     Stipulated penalties shall continue to accrue as provided in Paragraph 70 during any Dispute Resolution, but need not be paid until the following:

a.     If the dispute is resolved by agreement or by a decision of EPA that is not appealed to the Court, Defendant USM shall pay accrued penalties determined to be owing, together with Interest, to the United States within thirty (30) Days of the effective date of the agreement or the receipt of EPA's decision or order.

b.     If the dispute is appealed to the Court and the United States prevails in whole or in part, Defendant USM shall pay all accrued penalties determined by the Court to be owing, together with Interest, within sixty (60) Days of receiving the Court's decision or order, except as provided in Subparagraph c, below.

c.     If the United States or Defendant USM appeals the District Court's decision, Defendant USM shall pay all accrued penalties determined to be owing, together with Interest, within fifteen (15) Days of receiving the final appellate court decision. Defendant USM shall pay stipulated penalties owing to the United States in the manner set forth and with the confirmation notices required by Section XX (Notices), except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

72.     If Defendant USM fails to pay stipulated penalties according to the terms of this Consent Decree, Defendant USM shall be liable for Interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall

be construed to limit the United States from seeking any remedy otherwise provided by law for any failure by Defendant USM to pay any stipulated penalties.

73. Subject to the provisions of Section XVIII of this Consent Decree (Effect of Settlement/Reservation of Rights), the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States for Settling Defendants' violation of this Consent Decree or applicable law. Where a violation of this Consent Decree is also a violation of RCRA or its implementing regulations, Defendant USM or Settling Defendants, as applicable, shall be allowed a credit for any stipulated penalties paid against any statutory penalties imposed for such violation.

## XV. FORCE MAJEURE

74. "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendant USM, of any entity controlled by Defendant USM or of Defendant USM's contractors, that delays or prevents the performance of any of Defendant USM's obligations under this Consent Decree despite Defendant USM's best efforts to fulfill the obligation. The requirement that Defendant USM exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any potential force majeure event (a) as it is occurring and (b) following the potential force majeure event, to minimize the delay and any adverse effects of the delay to the greatest extent possible. "Force majeure" does not include Defendant USM's financial inability to perform any obligation under this Consent Decree.

75. Notice of Force Majeure. If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree and for which Defendant USM intends

a.      If EPA agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation. EPA will notify Defendant USM in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

b.      If EPA does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, EPA will notify Defendant USM in writing of its decision. If Defendant USM elects to invoke the dispute resolution procedures set forth in Section XVI (Dispute Resolution), it shall do so no later than fifteen (15) Days after receipt of EPA's notice. In any such proceeding, Defendant USM shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendant USM complied with the requirements of Paragraphs 74 and 75, above. If Defendant USM carries this burden, the delay at issue shall be deemed not to be a violation by Defendant USM of the affected obligation of this Consent Decree identified to EPA and the Court.

## XVI.   DISPUTE RESOLUTION

77.      The dispute resolution procedures set forth in this Section shall be the exclusive mechanism to resolve disputes between the United States and Settling Defendants regarding this

Consent Decree. USW may not invoke Dispute Resolution under this Consent Decree to dispute any decision, approval, or action by the United States taken pursuant to this Consent Decree. USW reserves all rights it may have under authorities other than this Consent Decree to dispute EPA final action. Any disputes between Defendant USM and USW shall be resolved pursuant to the WHO or by other available means. Nothing in this Section shall affect any USW right to seek appropriate relief from Defendant USM for any alleged violations of the WHO. The failure of any Settling Defendant to seek resolution of a dispute under this Section shall preclude Settling Defendants from raising any disputed issue as a defense to an action by the United States to enforce any obligation arising under this Decree.

78.     Informal Dispute Resolution. Any dispute between the United States and the Settling Defendant raising the dispute shall first be the subject of informal negotiations, which may include any third-party assisted, non-binding alternative dispute resolution process agreeable to the United States and the Settling Defendant raising the dispute. The dispute shall be considered to have arisen when a Settling Defendant sends the United States a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute.

a.     The period of informal negotiations, which may include consultation with UDEQ or USW by EPA in its unreviewable discretion, shall not exceed twenty (20) Days from the date the dispute arises, unless that period is modified by written agreement.

b.     If the United States and the Settling Defendant that raised the dispute cannot resolve the dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless, within thirty (30) Days after the conclusion of the

informal negotiation period, the Settling Defendant invokes formal dispute resolution procedures as set forth below.

79. Formal Dispute Resolution. If a Settling Defendant elects to invoke formal dispute resolution, it shall, within thirty (30) Days after the conclusion of the informal negotiation period, serve on the United States a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting the Settling Defendant's position and any supporting documentation relied upon by such Settling Defendant.

80. The United States shall serve its Statement of Position on the Settling Defendant that raised the dispute within forty-five (45) Days of receipt of such Settling Defendant's Statement of Position. The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States. The United States' Statement of Position shall be binding upon the Parties, unless the United States and the relevant Settling Defendant agree to the exchange of supplemental Statements of Position or such Settling Defendant files a motion for judicial review of the dispute in accordance with the following Paragraph.

81. A Settling Defendant may seek judicial review of the dispute by filing with the Court and serving on the Parties, in accordance with Section XX of this Consent Decree (Notices), a motion requesting judicial resolution of the dispute. The motion must be filed within ten (10) Days of receipt of the United States' Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of the Settling Defendant's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation,

63

and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree. The United States shall respond to the motion of the Settling Defendant that raised the dispute within the time period allowed by the Local Rules of this Court. Such Settling Defendant may file a reply memorandum to the extent permitted by the Local Rules.

82.    Standard of Review.

a.    Disputes Concerning Matters Accorded Record Review. In any dispute pertaining to the adequacy of the performance of Work undertaken pursuant to this Consent Decree or pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules or any other items requiring approval by EPA under this Consent Decree; or that is accorded review on the administrative record under applicable principles of administrative law, Settling Defendants shall have the burden of demonstrating, based on the administrative record, that the position of the United States is arbitrary and capricious or otherwise not in accordance with law.

b.    Other Disputes. In any other dispute, Settling Defendants shall bear the burden of demonstrating that Settling Defendants' position complies with this Consent Decree and furthers the objectives of the Consent Decree.

83.    The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of any Settling Defendant under this Consent Decree, unless and until final resolution of the dispute so provides, or unless EPA agrees otherwise. Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the

dispute. If a Settling Defendant does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XIV (Stipulated Penalties).

## XVII. INFORMATION COLLECTION AND RETENTION

84. The United States, the State and their representatives, including attorneys, contractors, and consultants, shall have the right of entry into the Facility at all reasonable times, upon presentation of credentials, to:

a. monitor the progress of activities required under this Consent Decree;

b. verify any data or information submitted to the United States in accordance with the terms of this Consent Decree;

c. obtain samples and, upon request, splits of any samples taken by Defendant USM or its representatives, contractors, or consultants;

d. obtain documentary evidence, including photographs and similar data; and

e. assess Defendant USM's compliance with this Consent Decree.

85. Upon request, Defendant USM shall provide EPA or its authorized representative's splits of any samples taken by Defendant USM. Upon request, EPA shall provide Defendant USM splits of any samples taken by EPA.

86. Until five years after the termination of this Consent Decree, Defendant USM shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that relate in any manner to Defendant USM's performance of its obligations under this Consent Decree. This information-retention

requirement shall apply regardless of any contrary corporate or institutional policies or procedures. At any time during this information-retention period, upon request by EPA, in consultation with UDEQ and USW, Defendant USM shall provide to EPA copies of any documents, records, or other information required to be maintained under this Paragraph.

87.     At the conclusion of the information-retention period provided in the preceding Paragraph, Defendant USM shall notify EPA at least ninety (90) Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by EPA, in consultation with UDEQ and USW, Defendant USM shall deliver any such documents, records, or other information to EPA.

88.     In connection with any request for documents, records, or other information pursuant to this Consent Decree, including the submission of reports or information required by this Consent Decree, the Parties agree that they remain bound by the following protective orders previously entered in this case relating to confidential business information ("CBI"): Stipulation and Protective Order Regarding Confidential Business Information, Docket No. 52, 1/16/02, as amended by Docket No. 187, 4/19/05, and supplemented by Docket No. 238, 3/10/06, and the Protective Order Regarding Worker Health and Safety, Docket No. 186, 4/19/05 (collectively "CBI Orders"), and that these CBI Orders will govern any subsequent exchanges of documents or information among the Parties relating to Defendant USM's performance of the Work that are claimed to be CBI.

89.     Defendant USM may assert that certain documents, records, or other information is privileged under the attorney-client privilege or any other privilege recognized by federal law. If Defendant USM asserts such a privilege, it shall provide the following: (1) the title of the

66

document, record, or information; (2) the date of the document, record, or information; (3) the name and title of each author of the document, record, or information; (4) the name and title of each addressee and recipient; (5) a description of the subject of the document, record, or information; and (6) the privilege asserted by Defendant USM. However, Defendant USM shall not assert a legal privilege for any data, records, or information generated or received in connection with Defendant USM's obligations pursuant to the requirements of this Consent Decree.

90. This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or USW pursuant to applicable federal laws, regulations, permits, contracts, or the WHO attached hereto as Appendix 10, nor does it limit or affect any duty or obligation of Defendant USM to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

## XVIII. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

91. Subject to the reservations set forth in this Section, below, this Consent Decree resolves the civil claims of the United States against the Settling Defendants for the violations alleged in the Complaint filed in this action, and the civil claims alleged in USW's Complaint in Intervention, through the date of the lodging of the Consent Decree. For continuing violations alleged in the Complaint, provided that Settling Defendants comply with this Consent Decree from the date of lodging of the Consent Decree through its Effective Date, these claims shall also be resolved through the Effective Date of this Consent Decree, as of the Effective Date; and, provided that Settling Defendants comply with this Consent Decree from the Effective Date of this Consent Decree through the date of termination of this Consent Decree pursuant to Section

67

XXIV (Termination), these claims shall be finally resolved as of the date the Consent Decree terminates.

95.     The United States reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree. This Consent Decree shall not be construed to limit the rights of the United States or, as applicable, UDEQ or USW, to obtain penalties or injunctive relief under RCRA or its implementing regulations or under other federal or state laws, regulations, or permit conditions, except as expressly specified in this Section.

96.     The United States reserves the right to seek corrective action and financial assurance under Section 3008(h) of RCRA, 42 U.S.C. § 6928(h), and its implementing regulations for all areas of the Facility where hazardous wastes have been placed on the land. In any such action by the United States seeking corrective action or financial assurance, Settling Defendants reserve all their rights and defenses.

97.     CERCLA Covenant Not to Sue. Except as otherwise provided in Paragraph 98 (CERCLA Reservations of Rights), the United States covenants not to sue or to take administrative action against Settling Defendants pursuant to Sections 106 and 107(a) of CERCLA, 42 U.S.C. §§ 9606 and 9607(a), for the CERCLA Response Action and EPA Response Action Costs. These covenants shall take effect upon the Effective Date. These covenants are conditioned upon the complete and satisfactory performance by Settling Defendants of the requirements of this Consent Decree. These covenants extend only to Settling Defendants and do not extend to any other person. Nothing in this Consent Decree or the Work to be performed pursuant to it shall be deemed to waive or abrogate the pre-enforcement review bar set forth in Section 113(h) of CERCLA, 42 U.S.C. § 9613(h), with respect to the Site.

Nothing in this Consent Decree relieves Defendant USM of its obligations to comply with the CERCLA RI/FS AOC or the RCRA Administrative Order.

98.     CERCLA Reservations of Rights. The covenants set forth in Paragraph 97 (CERCLA Covenant Not to Sue) do not pertain to any matters other than those expressly identified therein. The United States reserves, and this Consent Decree is without prejudice to, all rights against Settling Defendants with respect to all other matters, including, but not limited to:

a.     liability for failure by a Settling Defendant to meet a requirement of this Consent Decree;

b.     liability for costs not included within the definition of EPA Response Action Costs;

c.     liability for performance of response actions other than the CERCLA Response Action;

d.     criminal liability;

e.     liability for violations of federal or state law that occur during or after implementation of the Work;

f.     liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;

g.     liability arising from the past, present, or future disposal, release or threat of release of Waste Materials outside of the Site; and

h.      liability for costs incurred or to be incurred by the Agency for Toxic Substances and Disease Registry related to the Site not paid as EPA Response Action Costs under this Settlement.

99.     Subject to Paragraph 101 (Waiver of Claims by Settling Defendants), Settling Defendants reserve all their rights and defenses with respect to any claims asserted by the United States pursuant to CERCLA.

100.    The United States and, as applicable USW, further reserve all legal and equitable remedies to take, direct, or order all actions necessary to protect public health, welfare, or the environment or to prevent, abate, or minimize an actual or threatened release of hazardous substances, pollutants, or contaminants, or hazardous or solid waste on, at, or from the Site, whether related to the violations addressed in this Consent Decree or otherwise. In any such action, Settling Defendants reserve all their rights and defenses.

101.    Waiver of Claims by Settling Defendants. Settling Defendants covenant not to sue and agree not to assert any claims or causes of action against the United States, or its contractors or employees, with respect to the Work, EPA Response Action Costs, and this Consent Decree, including, but not limited to:

a.      any direct or indirect claim for reimbursement from the EPA Hazardous Substance Superfund through Sections 106(b)(2), 107, 111, 112, or 113 of CERCLA, 42 U.S.C. §§ 9606(b)(2), 9607, 9611, 9612, or 9613, or any other provision of law;

b.      any claims under Sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607 and 9613, Section 7002(a) of RCRA, 42 U.S.C. § 6972(a), or state law regarding the Work, EPA Response Action Costs, and this Consent Decree; or

70

c. any claim arising out of response actions at or in connection with the Site, including any claim under the United States Constitution, the Utah Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, or at common law;

d. any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or USW in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 97 (CERCLA Covenant Not to Sue) of this Section.

102. The covenants not to sue in Paragraph 101 (Waiver of Claims by Settling Defendants) shall not apply in the event the United States brings a cause of action or issues an order pursuant to any of the reservations set forth in Paragraph 98 (CERCLA Reservations of Rights), other than in Subparagraph 98(a) (liability for failure to meet a requirement of this Consent Decree), 98(d) (criminal liability), or 98(e) (violations of federal/state law during or after implementation of the Work), but only to the extent that Settling Defendants' claims arise from the same response action, response costs, or damages that the United States is seeking pursuant to the applicable reservation.

103. The United States reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree. This Consent Decree shall not be construed to limit the rights of the United States or, as applicable, USW, to obtain penalties or injunctive relief under RCRA or its implementing regulations, or under other federal laws, regulations, or permit conditions, except as expressly specified in this Section.

71

104. This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations. Defendant USM is responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws, regulations, and permits; and Defendant USM's compliance with this Consent Decree shall be no defense to liability in any action commenced pursuant to any such laws, regulations, or permits, except as provided in Paragraph 23 (TSDF Status). Compliance with the terms of this Consent Decree does not guarantee compliance with all applicable federal, state, or local laws, regulations, or permits.

105. This Consent Decree does not limit or affect the rights of the Parties against any third-parties (persons not a Party to this Consent Decree), nor does it limit the rights of third-parties against Settling Defendants except as otherwise provided by law.

106. This Consent Decree shall not be construed to create rights or obligations in, or grant any cause of action to, any third-party.

## XIX. COSTS

107. The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States shall be entitled to collect costs (including attorneys' fees) incurred in any action necessary to access Financial Assurance pursuant to Section X (Financial Assurance) of this Consent Decree, or to collect any portion of the CERCLA Response Costs, the civil penalty, or any stipulated penalties or other costs due under this Consent Decree but not paid by Defendant USM.

## XX.   NOTICES

108.   Unless otherwise specified herein, whenever notifications, submissions, or

communications are required by this Consent Decree, they shall be made in writing and

addressed as follows:

To the United States:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Box 7611 Ben Franklin Station
Washington, D.C. 20044-7611
Re: DOJ No. 90-7-1-06980

Ann Stephanos
Office of Civil Enforcement
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., NW
Washington, D.C. 20460

Andrew J. Lensink, Senior Attorney
8ORC-LE
U.S. EPA Region 8
1595 Wynkoop Street
Denver, CO  80202-1129

Annette Maxwell, Physical Scientist
8ENF-RO-R
RCRA/OPA Enforcement Branch
U.S. EPA Region 8
1595 Wynkoop Street
Denver, CO  80202-1129

To Settling Defendants:

Rob Hartman
Environmental Manager
US Magnesium LLC
238 North 2200 West
Salt Lake City, UT 84116-2912

M. Lindsay Ford

Parsons Behle & Latimer
South Main Street, Suite 1800
Salt Lake City, UT 84111

To USW:

Michael Wright
Director, Department of Health, Safety, and Environment
United Steelworkers
5 Gateway Center
Pittsburgh, PA 15222

Steve Sallman
Assistant Director, Department of Health, Safety, and Environment
United Steelworkers
5 Gateway Center
Pittsburgh, PA 15222
Cody Brown
United Steelworkers
P.O. Box 1945
West Jordan, UT 84084

Joseph M. Santarella Jr.
Santarella & Eckert, LLC
7050 Puma Trail
Littleton, CO 80125

To UDEQ:

Michael Storck
Division of Environmental Response and Remediation
195 North 1950 West
P.O. Box 144840
Salt Lake City, Utah  84114-4840

Dan Hall
Ground Water Protection Section Manager
Division of Water Quality
Utah Department of Environmental Quality
P.O. Box 144870
Salt Lake City, Utah 84114-4870

Brad Maulding
Corrective Action Manager
Division of Waste Management and Radiation Control

74

Utah Department of Environmental Quality
P.O. Box 144880
Salt Lake City, Utah 84114-4880

109.    Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above. Notices submitted pursuant to this Section shall be deemed submitted upon mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XXI.    EFFECTIVE DATE

110.    The Effective Date of this Consent Decree shall be the date upon which it is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket; provided, however, that Defendant USM agrees that it shall be bound to perform any duties scheduled to occur prior to the Effective Date as of the date of execution of this Consent Decree. In the event the United States withdraws or withholds consent to this Consent Decree before entry, or the Court declines to enter the Consent Decree, then any requirement to perform Work under this Consent Decree shall terminate.

## XXII.    RETENTION OF JURISDICTION

111.    The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Sections XXIV (Termination) and XVI (Dispute Resolution), or effectuating or enforcing compliance with the terms of this Decree.

## XXIII. MODIFICATION

112.    The terms of this Consent Decree may be modified only as set forth herein. Any modifications or amendments of the WHO must be made by written agreement signed by USW

75

and Defendant USM and shall be effective upon approval by the Court. Except as set forth in Paragraph 124 of this Decree, changes to provisions of this Consent Decree (excluding the WHO) that expressly allow for change upon the written agreement of the United States and Defendant USM or that do not constitute a material change to this Decree, may be made upon written agreement of the United States and Defendant USM with notice to USW and all Settling Defendants. Upon execution, such modifications shall become enforceable under this Consent Decree and periodically shall be filed with the Court. Any modification that constitutes a material change to this Decree must be by written agreement signed by the United States and Defendants USM and Group and shall become effective upon approval by the Court.

113. Any disputes between the United States and Defendant USM concerning modification of this Decree shall be resolved pursuant to Section XVI (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 82 (Standard of Review), the Party seeking judicial review of such a refusal shall bear the burden of demonstrating that it is entitled to the requested modification based on a significant change in factual conditions or the law or other reason that would make inequitable the continued application of the Consent Decree without the modification sought.

## XXIV. TERMINATION

114. After Defendant USM has completed the requirements of Section VI (RCRA Work Requirements) including Corrective Action if required, Section VII (CERCLA Response Action), and Section X (Financial Assurance) of this Consent Decree, and has paid the civil penalty and any accrued stipulated penalties not waived or reduced by the United States pursuant to Paragraph 70, and EPA has issued a notice of completion of the Final CERCLA Remedial

Action, Defendant USM may serve upon the United States a Request for Termination, with notice to USW and all Settling Defendants, stating that Defendant USM has satisfied the requirements of the Consent Decree, together with all necessary supporting documentation.

115.    Following receipt by the United States of Defendant USM's Request for Termination, the United States and Defendant USM shall confer informally concerning the Request and any disagreement that they may have as to whether Defendant USM has satisfactorily complied with the requirements for termination of this Consent Decree. USW may submit comments to EPA for review and comment. If the United States agrees that the Decree may be terminated, the United States and Defendant USM shall submit, for the Court's approval, a joint stipulation terminating the Decree, with notice to USW and to all Settling Defendants. Certain Consent Decree requirements may be excepted from termination upon the agreement of the Parties.

116.    If the United States does not agree that the Decree may be terminated, Defendant USM may invoke Dispute Resolution under Section XVI of this Decree (Dispute Resolution). However, Defendant USM shall not seek Dispute Resolution of any dispute regarding termination until one-hundred eighty (180) Days after service of its Request for Termination.

117.    Notwithstanding the foregoing, the WHO shall survive the termination of this Consent Decree and remain in effect for the life of the Facility unless amended or terminated by written agreement of USW and Defendant USM and court order. Nothing in this Section shall affect any USW right to seek appropriate relief from Defendant USM for any alleged violations of the WHO.

77

## XXV.  **PUBLIC PARTICIPATION**

118.    This Consent Decree shall be lodged with the Court for a period of not less than thirty (30) Days for public notice and comment in accordance with Section 122(d)(2) of CERCLA, 42 U.S.C. § 9622(d)(2), and 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate. This Consent Decree is also subject to RCRA Section 7003(d), 42 U.S.C. § 6973(d). Settling Defendants consent to entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Decree, unless the United States has notified Settling Defendants in writing that it no longer supports entry of the Decree.

## XXVI.  **SIGNATORIES/SERVICE**

119.    Each undersigned representative of Settling Defendants, Plaintiff/Intervenors, and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

120.    This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis. Settling Defendants agree to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court.

## XXVII. **INTEGRATION**

121.    This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein. Other than deliverables that are subsequently submitted and approved pursuant to this Decree, no other document, nor any representation, inducement, agreement, understanding, or promise, constitutes any part of this Decree or the settlement it represents, nor shall it be used in construing the terms of this Decree.

## XXVIII. **FINAL JUDGMENT**

122.    Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States, the Plaintiff/Intervenors, and Settling Defendants. The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

## XXIX. **APPENDICES**

123.    The following appendices are attached to and part of this Consent Decree:

Appendix 1-Map 1 is the Facility Map depicting the Current Waste Pond;

Appendix 1-Map 2 is the Facility Map depicting the Retrofitted Waste Pond;

Appendix 2 is the Complaint Waste Re-Use Plan;

Appendix 3 is the Filtration System Design, Construction and Operation Plan;

Appendix 4(A) is the Salt Cap Closure and Post-Closure Plan;

Appendix 4(B) is the Statement of Criteria for Alternative Closure of RWP;

Appendix 4(C) is the Statement of Criteria for Corrective Action;

Appendix 5 is the Courtyard Capping Plan;

Appendix 6 is the Spent Liquor Tank Plan;

Appendix 7 is the Electrolytic Ducon Scrubber and Sump Plan;

Appendix 8 is the Emergency Offgas System ("EOG") Redesign Plan;

Appendix 9 is the Avian Risk Mitigation Plan;

Appendix 10 is the Second Amended Worker Health Order;

Appendix 11 is the Bankruptcy Settlement;

Appendix 12 is the Statement of Work for the CERCLA Response Action;

Appendix 13 is Financial Assurance; and

Appendix 14 is the Project Compliance Schedule.

124. Changes to the schedules and technical requirements of Appendices 1-9 and 12-14 may be made from time to time upon written agreement of EPA and Defendant USM and are not considered material modifications of this Decree.

Dated and entered this 30th day of June, 2021.

HONORABLE     Dale A. Kimball
UNITED STATES DISTRICT JUDGE
DISTRICT OF UTAH, CENTRAL DIVISION

WE HEREBY CONSENT to the entry of the Consent Decree in <u>United States et al. v.</u> <u>Magnesium Corporation of America, et al.</u>, subject to the public notice requirements of 28 C.F.R. § 50.7.

FOR THE UNITED STATES OF AMERICA:

Date:  1/19/21

Jonathan D. Brighthll
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

Date:  1/19/21

DEBORAH M. REYHER
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044
(202) 514-4113

81

82

WE HEREBY CONSENT to the entry of the Consent Decree in <u>United States et al. v. Magnesium Corporation of America, et al.</u>, subject to the public notice requirements of 28 C.F.R. § 50.7.

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

Date: 1-15-21

SUSAN BODINE, Assistant Administrator
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency
Washington, D.C. 20460

82

WE HEREBY CONSENT to the entry of the Consent Decree in <u>United States et al. v.</u> <u>Magnesium Corporation of America, et al.</u>, subject to the public notice requirements of <u>28</u> <u>C.F.R. § 50.7</u>.

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

Date: _____

                        _____
SUSAN BODINE, Assistant Administrator
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency
Washington, D.C. 20460

Date: 1/15/2021

                        _____
ANN STEPHANOS, Attorney-Advisor
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency
Washington, D.C. 20460

WE HEREBY CONSENT to the entry of the Consent Decree in <u>United States et al. v. Magnesium Corporation of America, et al.</u>, subject to the public notice requirements of <u>28 C.F.R. § 50.7.</u>

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

Date: _____

**DEBRA THOMAS** Digitally signed by DEBRA THOMAS
Date: 2021.01.15 08:46:09 -07'00'

DEBRA H. THOMAS,
Acting Regional Administrator
United States Environmental Protection Agency
Region 8
Denver, CO 80202

Date: _____

**Schefski, Kenneth** Digitally signed by Schefski, Kenneth
Date: 2021.01.15 08:10:10 -07'00'

KENNETH C. SCHEFSKI, Regional Counsel
United States Environmental Protection Agency
Region 8
Denver, CO 80202

Date: _____

**SUZANNE BOHAN** Digitally signed by SUZANNE BOHAN
Date: 2021.01.14 16:04:07 -07'00'

SUZANNE J. BOHAN, Director
Enforcement and Compliance Assurance Divison
United States Environmental Protection Agency
Region 8
Denver, CO 80202

Date: _____

**BETSY SMIDINGER** Digitally signed by BETSY SMIDINGER
Date: 2021.01.15 09:06:43 -07'00'

BETSY SMIDINGER, Director
Superfund and Emergency Management Division
United States Environmental Protection Agency
Region 8
Denver, CO 80202

84

FOR PLAINTIFF/INTERVENORS, UNITED STEEL, PAPER & FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICES WORKERS INTERNATIONAL UNION, AFL-CIO/CLC AND LOCAL 8319

Date: 15 Jan 2021

MICHAEL WRIGHT
USW
Director, Health, Safety and the Environment

Date: 15 Jan 2021

JOSEPH M. SANTARELLA JR
USW
Legal Counsel

85

FOR DEFENDANT US MAGNESIUM LLC

Date: __V/ιA/ᴢι__

RON THAYER
President

DEFENDANT THE RENCO GROUP, INC., ON ITS OWN BEHALF AND ON BEHALF OF
THE IRA LEON RENNERT REVOCABLE TRUSTS AND IRA LEON RENNERT

Date:    January 14, 2021

Michael C. Ryan, Vice Chairman

**<u>Exhibit 3</u>**

**(Purchase Order)**

**See attached.**

DocuSign Envelope ID: B0613C8B-3909-4404-8D2D-9140DBF8A32A

# US Magnesium LLC

*Official Copy*                                                        **Purchase Order**

| Date Printed:<br>6/12/2023 | Purchase Order Number:<br>574670-0000-000 |
|---|---|

| To<br>FORGEN, LLC<br>6020 West Oaks Blvd, Suite 220<br>Rocklin, CA 95765<br><br>Contact    EMMETT BLACK                619-243-4473 | **Ship Via** BEST WAY<br>**Shipping Point**<br>**Freight** DELIVERED AT PLACE<br>**Terms** SEE BODY OF ORDER FOR DETAILS<br>**FOB**<br>**Buyer** MIKE WORTHINGTON, 801-532-8203<br>**Date Issued** 6/12/2023 |
|---|---|
| **Submit Invoices To**<br>US MAGNESIUM LLC<br>238 NORTH 2200 WEST<br>SALT LAKE CITY, UTAH  84116<br>EMAIL: ACCOUNTSPAYABLE@USMAGNESIUM.COM | **Ship To**<br>US MAGNESIUM LLC<br>12819 N ROWLEY ROAD<br>ROWLEY PLANTSITE (NO USPS SERVICE AVAILABLE)<br>SKULL VALLEY, UT    84029-8010 |

DocuSign Envelope ID: B0613C8B-3909-4404-8D2D-9140DBF8A32A

# US Magnesium LLC

## Official Copy

## Purchase Order

| | |
|---|---|
| **Date Printed:** 6/12/2023 | **Purchase Order Number:** 574670-0000-000 |

| Line | Item | Taxable | Quantity | U/M | Unit Cost | Extended Cost | Due Date |
|---|---|---|---|---|---|---|---|
| 1 | MR1345706-01 | N | 1 | JOB | $ 11,908,144.00 | $ 11,908,144.00 | 5/31/2025 |
| | RWP Phase 2 HBW Construction | | | | | | |

RWP Phase 2 Hydraulic Barrier Wall Construction
Retrofitted Waste Pond Phase 2 HBW construction pursuant to USM Construction Contract MW050423 between USM and Forgen, LLC dated May 16, 2023.

Scope of work defined in USM Request for Quotation, including figures and all attachments, dated February 1, 2023.

Redacted

Redacted

Redacted

Total: $11,908,144

Additional PO clarifications per Forgen email dated May 17, 2023:
1. Monthly progress payments to be paid Net 45 days and on a percent performed basis with a maximum of 5% held as retention. Final bill to be submitted upon completion of work and due in 45 days with no retention held. Interest to be charged at Prime plus 1.5% per annum on billings not paid within 45 days.
2. Installation of and/or improvements to ditch crossings and turnouts along the current embankment access roads will be allowed to support material transport.
3. 40-HR HAZWOPER training is required for on-site Forgen personnel and Forgen subcontractor personnel with the exception of Forgen subcontractors performing periodic, short-terms services (e.g., portable toilet service, trash collection service, mobile equipment maintenance, etc.)
4. In accordance with USM MANDATORY CERTIFICATION document, only Forgen personnel and subcontractor personnel working within the US Magnesium operating plant area must have fit testing and pulmonary certification cards, and carry a respirator on their person. Forgen personnel and Forgen subcontractors working only outside the US Magnesium operating plant on the Retrofitted Waste Pond Phase 2 slurry wall project will not need fit testing or pulmonary certifications or carry respirators on their person.



| | |
|---|---|
| | **Total Extended Cost** $ 11,908,144.00 |

Forgen, LLC
**Authorized Signature** _Chris Shea_    6/26/2023
DocuSigned by: 687A0FDD2109461

**<u>Exhibit 4</u>**

**(Preliminary Notice)**

**See attached.**

STATE CONSTRUCTION REGISTRY
A SERVICE FROM UTAH.GOV

# View Preliminary Notice Filing

## Filing Details

*Entry #*: 10539495

*Filed On*: 09/05/2023 at 1:20:05PM MST

*Filed by*: hdegoey

## General Details

I am the:

General_contractor

Project Description:

Work performed for the US Magnesium Rowley Facility Retrofitted Wastewater Pond Phase 2 Slurry Wall/HWB Construction project pursuant to USM Construction Contract MW050423 between USM and Forgen LLC dated 5/16/2023.

Project Owner Name:

US Magnesium LLC

Original Contractor Name:

Forgen, LLC

## Project Property Details

County:

Tooele

Tax Parcel ID(s):

04-019-0-0010, 04-022-0-0010, 04-019-0-0005, 04-021-0-0001, 04-019-0-0002, 04-021-0-0004, 04-019-0-0009, 04-019-0-0001, 04-021-0-0002

Street Address:

12819 North Rowley Road

Legal Description / Meets and Bounds:

US Magnesium LLC Rowley Utah Plant Site

City:

Skull Valley

ZIP Code:

84029

## Contracted By

Contractee Name:

US Magnesium LLC

Contractee Street Address 1:

238 North 2200 W

Contractee City:

Salt Lake City

Contractee State:

UT

Contractee ZIP Code:

84116

## Person Furnishing Labor, Service, Equipment or Material Details

Name:

Forgen, LLC

Street Address 1:

6020 West Oaks Boulevard

Street Address 2:

Suite 220

City:

Rocklin

State:

CA

ZIP Code:

95765

Email:

eblack@forgen.com

Phone:

916-462-6400

## Print and Post



**Contractors**: Please post this notice on the Job Site.

**Suppliers and Subcontractors**: Scan this image with your smart phone to view this filing. You can then file a preliminary notice for this project.

Give Feedback

**Exhibit 5**

**(Notice of Suspension)**

**See attached.**



6558 Lonetree Blvd.
Rocklin, CA 95765

916.462.6400
forgen.com

CA License No. 1010863

April 29, 2024

US Magnesium LLC ("US Mag")
238 North 2200 West
Salt Lake City, Utah 84116

<u>VIA ELECTRONIC MAIL</u>

**Re:    Notice of Suspension**
**Construction Contract No. MW050423 and Purchase Order Number 574670-0000-000 (together the "Contract") for the RWP Phase 2 Hydraulic Barrier Wall Construction Project located at US Magnesium, LLC's Plant Site in Rowley, Utah (the "Project")**

Dear Mr. Worthington:

On or about April 4, 2024, Forgen, LLC ("Forgen") issued a ten-day Notice to Cure to US Mag per the Contract for the five (5) progress invoices that remain past due and owing well past the 45-day time period. The progress invoices total $5,806,375.78 (not including interest) and relate to the work that Forgen satisfactorily completed under the Contract in 2023 that was approved by US Mag. To date, however, Forgen has not received any payments from US Mag on these past due invoices nor has it received a substantive response from US Mag to the Notice to Cure.

Thus, consistent with Exhibit A1, Section 2, of the Contract, Forgen is issuing this formal Notice of Suspension of all further Work under the Contract unless and until it has received payment in full for the past due progress payments plus interest. Forgen is planning to move forward in the short term with the filing of a Claim of Lien and hereby reserves its claims, defenses, and rights under the Contract or applicable law to collect these funds.

While Forgen anticipated a winter shutdown and a return to work in the Spring of 2024, Forgen, again, is not in a position to return to the Project without having received payment of these past due amounts. Thus, Forgen will be fully demobilizing from the site within the next two months and will incur additional costs in doing so that have not yet been invoiced to US Mag.

We look forward to your prompt written response to this important matter and hope that the parties may resolve this payment issue in an amicable fashion. Assuming the payments described above are made, then Forgen would be glad to return to the site to complete the Project per the Contract and other mutually agreeable terms.

Forgen

Sincerely,



George Little, P.E.


Copy to:
Jared Williams, Forgen
Bruce Diettert, Forgen
Bret Richmond, Forgen
Rebecca Ross, Forgen
Mike Worthington, US Magnesium
Jeff Mensinger, US Magnesium
Rob Hartman, US Magnesium
Paula Chu, US Magnesium

**<u>Exhibit 6</u>**

**(Construction Lien)**

**See attached.**

Entry 06/04/26
05/02/2024 04:08 PM  NOTICE OF LIEN
Page: 1 of 4
FEE: $40.00    BY: BELTZER BANGERT & GUNNELL LLP
Jerry Houghton, Tooele County, Recorder

## NOTICE OF CONSTRUCTION LIEN

Pursuant to U.C.A. § 38-1a-502, **Forgen, LLC** ("Lien Claimant") hereby claims this construction lien on the property more particularly described in paragraph 5 below.

1.      Name of the reputed owner(s) of the property: **US Magnesium LLC**

2.      Name of the entity by whom Lien Claimant was employed or to whom the Lien Claimant provided construction work: **US Magnesium LLC**

3.      Lien Claimant first provided construction work on **June 6, 2023**.

4.      Lien Claimant last provided construction work on **November 14, 2023**.

5.      Description of the project property, sufficient for identification:

*Tax Parcel IDs:*

04-019-0-0001, 04-019-0-0002, 04-019-0-0005, 04-019-0-0009, 04-019-0-0010, 04-021-0-0001, 04-021-0-0002, 04-021-0-0004, 04-022-0-0010

*Legal Description:*

Lots 1, 2, 3, 4, 5, 6 and 7 and the Southwest Quarter of the Northeast Quarter, the South One Half of the Northwest Quarter, the Southwest Quarter and the West One-Half of the Southeast Quarter of Section 3, Township 2 North, Range 8 West, Salt Lake Base and Meridian

Parcel No. 04-019-0-0001

The South One-Half of Section 4, Township 2 North, Range 8 West, Salt Lake Base and Meridian.

Parcel No. 04-019-0-0002

All of Section 9, Township 2 North, Range 8 West, Salt Lake Base and Meridian.

Parcel No. 04-019-0-0010

The West One-Half of the East One-Half and the West One-Half of Section 10, Township 2 North, Range 8 West, Salt Lake Base and Maridian.

Parcel No. 04-019-0-0009

The East One-Half of the East One-Half of Section 10, Township 2 North, Range 8 West, Salt Lake Base and Meridian.

Parcel No. 04-019-0-0005

1

Lots 1, 2, 3, 4, 5, 6, and the Southwest Quarter and the South One-Half of the Southeast Quarter of Section 11, Township 2 North, Range 8 West, Salt Lake Base and Meridian

Parcel No. 04-021-0-0001

Lot 1 of Section 12, Township 2 North, Range 8 West, Salt Lake Base and Meridian.

Parcel No. 04-021-0-0002

Lots 1, 2, 3, 4 and the West One-Half of the East One-Half and the West One-Half of Section 14, Township 2 North, Range 8 West, Salt Lake Base and Meridian.

Parcel No. 04-021-0-0004

All of Section 15, Township 2 North, Range 8 West, Salt Lake Base and Meridian
Less & excepting any portion lying within Desert Power P.U.D. Subdivision
Also less & excepting any portion lying within ATI Titanium P.U.D. Subdivision

Parcel No. 04-022-0-0010

*More commonly known as:*

12819 N. Rowley Rd., Skull Valley, UT 84029

6.      Name, current address, and current phone number of Lien Claimant:

Forgen, LLC
6020 W. Oaks Blvd., Ste. 220,
Rocklin, CA 95765
(916) 462-6400

7.      The amount claimed under the construction lien: $3,050,197.36.[1]

8.      Notice is hereby provided in accordance with U.C.A. § 38-11-108 that under Utah law an "owner" may be protected against liens being maintained against an "owner-occupied residence" and from other civil action being maintained to recover monies owed for "qualified services" performed or provided by suppliers and subcontractors as a part of this contract, if either section (1) or (2) is met: (1)(a) the owner entered into a written contract with an original contractor, a factory built housing retailer or a real estate developer; (b) the original contractor was properly licensed or exempt from licensure under Title 58, Chapter 55, Utah Construction Trades Licensing Act at the time the contract was executed; and (c) the owner paid in full the contracting entity in accordance with the written contract and any written or oral amendments to

---

[1] This amount claimed does not include Lien Claimant's attorney's fees and costs or interest on the outstanding amounts owed. Lien Claimant does not waive, and expressly reserves, any and all rights to recover its attorney's fees and costs and pre-and post-judgment interest pursuant to its Contract with US Magnesium LLC and applicable law.

2

the contract; or (2) the amount of the general contract between the owner and the original contractor totals no more than $5,000. An owner who can establish compliance with either section (1) or (2) may perfect the owner's protection by applying for a Certificate of Compliance with the Division of Occupational and Professional Licensing. The application is available at www.dopl.utah.gov/rlrf.

STATE OF __California__

COUNTY OF __Placer__

      I, George W. Little, being of lawful age and being first duly sworn upon oath, do say that I am the Project Director of Forgen, LLC; that I have read the within Notice of Construction Lien and know the contents thereof; and that the same is true and correct, to the best of my knowledge, information, and belief, and is made on behalf of Forgen, LLC.

FORGEN, LLC ("Lien Claimant")

George W. Little, Project Director

      SUBSCRIBED AND SWORN to me by George W. Little, Project Director of Forgen, LLC in the county of __Placer__, state of __California__ this __22__ day of __April__, 2024.

See Attached

Witness my hand and official seal.

_____
Notary Public
My commission expires:_____

3

## JURAT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California }
County of **Placer** }

Subscribed and sworn to (or affirmed) before me on this **22** day of **April**,

20 **24** by **George Little**

_____, proved to me on the

basis of satisfactory evidence to be the person(s) who appeared before me.

LORI L. OESTERLING
Notary Public - California
Placer County
Commission # 2453377
My Comm. Expires Jul 16, 2027

(Seal)                                        Signature

======================================================================

### OPTIONAL DESCRIPTION OF ATTACHED DOCUMENT

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Other Information: _____

California Notary Training Center/Form03-J/2015
www.canotarytrainingcenter.com

**Exhibit 7**

**(Demand for Payment)**

**See attached.**



5420 S. Quebec Street, Suite 103, Greenwood Village, Colorado 80111 ▪ (720) 576-7225 ▪ www.bbglaw.com

**Maria Conversa, Esq.**
**Beltzer Bangert & Gunnell LLP**
**(720) 576-7225**
**mconversa@bbglaw.com**

May 9, 2024

**VIA CERTIFIED MAIL**

US Magnesium LLC             US Magnesium LLC
238 North 2200 West          12819 N. Rowley Rd.,
Salt Lake City, UT 84116     Skull Valley, UT 84029

        **RE: Notice of Construction Lien & Demand for Payment in the Amount of $5,784,512.69**
        **Project: Rowley Utah Plant**

Dear US Magnesium LLC:

        I write on behalf of our client, Forgen, LLC ("Forgen"), in connection with the outstanding payment due for the construction work performed at the Rowley Utah Plant located at 12819 N. Rowley Rd., Skull Valley, UT 84029  pursuant to a Construction Contract dated May 16, 2023 (the "Contract").

        As you are aware, Forgen performed all its work under the Contract. Despite fulfilling its contractual obligations, Forgen has yet to receive payment for services rendered to the Project and is owed the outstanding amount of $5,784,512.69. Forgen's claim amount is detailed as follows:

| | |
|---|---|
| Invoices #1, #2, #3, #4, and #5, less retainage | $5,526,289.98 |
| Interest pursuant to the Contract, through May 7, 2024 | $258,222.71 |
| **TOTAL** | **$5,784,512.69** |

        In compliance with the relevant provisions of Utah law, specifically Utah Code Ann. § 38-1a-502, Forgen has filed a Notice of Construction Lien on the Project. Pursuant to Utah Code Ann. § 38-1a-502(4)(a), this correspondence serves as formal notice to US Magnesium LLC ("US Mag"), the property owner of record, that Forgen has a valid construction lien claim against the Project. A copy of Forgen's recorded Notice of Construction Lien recorded on May 2, 2024, is enclosed with this correspondence for your records.



5420 S. Quebec Street, Suite 103, Greenwood Village, Colorado 80111 ▪ (720) 576-7225 ▪ www.bbglaw.com

Be advised that if payment in the amount of **$5,784,512.69** is not received by **May 17, 2024**, Forgen intends to pursue all available legal remedies to enforce its rights under the lien, pursuant to the terms of the Contract, and in accordance with applicable law. This may include, but is not limited to, filing an action to enforce its lien to recover the outstanding amounts owed for work performed, asserting a claim for breach of contract, and seeking recovery of pre- and post-judgment interest, and attorney's fees and costs from US Mag.

Forgen expressly reserves all rights under the Contract and applicable law and does not waive any of its legal or equitable rights or remedies by the issuance of this Notice. Forgen remains committed to resolving this matter amicably and expeditiously, but prompt payment by US Mag is necessary to avoid further escalation.

We trust that US Mag will promptly address this matter and remit the outstanding payment owed to Forgen in full by May 17, 2024, to avoid commencement of formal dispute resolution proceedings. Should you have any questions regarding this matter, do not hesitate to contact our office.

Sincerely,

**BELTZER, BANGERT, & GUNNELL LLP**

Maria Conversa, Esq.

ENCL. – Forgen's Notice of Construction Lien

CC:    Djenita Svinjar, Esq. (dsvinjar@bbglaw.com)
Rebecca Ross, Esq. (rebecca.ross@forgen.com)
Bret Richmond, Esq. (brichmond@forgen.com)

## NOTICE OF CONSTRUCTION LIEN

Pursuant to U.C.A. § 38-1a-502, **Forgen, LLC** ("Lien Claimant") hereby claims this construction lien on the property more particularly described in paragraph 5 below.

1.      Name of the reputed owner(s) of the property: **US Magnesium LLC**

2.      Name of the entity by whom Lien Claimant was employed or to whom the Lien Claimant provided construction work: **US Magnesium LLC**

3.      Lien Claimant first provided construction work on **June 6, 2023**.

4.      Lien Claimant last provided construction work on **November 14, 2023**.

5.      Description of the project property, sufficient for identification:

*Tax Parcel IDs:*

04-019-0-0001, 04-019-0-0002, 04-019-0-0005, 04-019-0-0009, 04-019-0-0010, 04-021-0-0001, 04-021-0-0002, 04-021-0-0004, 04-022-0-0010

*Legal Description:*

Lots 1, 2, 3, 4, 5, 6 and 7 and the Southwest Quarter of the Northeast Quarter, the South One Half of the Northwest Quarter, the Southwest Quarter and the West One-Half of the Southeast Quarter of Section 3, Township 2 North, Range 8 West, Salt Lake Base and Meridian

Parcel No. 04-019-0-0001

The South One-Half of Section 4, Township 2 North, Range 8 West, Salt Lake Base and Meridian.

Parcel No. 04-019-0-0002

All of Section 9, Township 2 North, Range 8 West, Salt Lake Base and Meridian.

Parcel No. 04-019-0-0010

The West One-Half of the East One-Half and the West One-Half of Section 10, Township 2 North, Range 8 West, Salt Lake Base and Maridian.

Parcel No. 04-019-0-0009

The East One-Half of the East One-Half of Section 10, Township 2 North, Range 8 West, Salt Lake Base and Meridian.

Parcel No. 04-019-0-0005

1

Lots 1, 2, 3, 4, 5, 6, and the Southwest Quarter and the South One-Half of the Southeast Quarter of Section 11, Township 2 North, Range 8 West, Salt Lake Base and Meridian

Parcel No. 04-021-0-0001

Lot 1 of Section 12, Township 2 North, Range 8 West, Salt Lake Base and Meridian.

Parcel No. 04-021-0-0002

Lots 1, 2, 3, 4 and the West One-Half of the East One-Half and the West One-Half of Section 14, Township 2 North, Range 8 West, Salt Lake Base and Meridian.

Parcel No. 04-021-0-0004

All of Section 15, Township 2 North, Range 8 West, Salt Lake Base and Meridian Less & excepting any portion lying within Desert Power P.U.D. Subdivision Also less & excepting any portion lying within ATI Titanium P.U.D. Subdivision

Parcel No. 04-022-0-0010

*More commonly known as:*

12819 N. Rowley Rd., Skull Valley, UT 84029

6.  Name, current address, and current phone number of Lien Claimant:

Forgen, LLC
6020 W. Oaks Blvd., Ste. 220,
Rocklin, CA 95765
(916) 462-6400

7.  The amount claimed under the construction lien: $3,050,197.36.[1]

8.  Notice is hereby provided in accordance with U.C.A. § 38-11-108 that under Utah law an "owner" may be protected against liens being maintained against an "owner-occupied residence" and from other civil action being maintained to recover monies owed for "qualified services" performed or provided by suppliers and subcontractors as a part of this contract, if either section (1) or (2) is met: ( 1 )(a) the owner entered into a written contract with an original contractor, a factory built housing retailer or a real estate developer; (b) the original contractor was properly licensed or exempt from licensure under Title 58, Chapter 55, Utah Construction Trades Licensing Act at the time the contract was executed; and (c) the owner paid in full the contracting entity in accordance with the written contract and any written or oral amendments to

---

[1] This amount claimed does not include Lien Claimant's attorney's fees and costs or interest on the outstanding amounts owed. Lien Claimant does not waive, and expressly reserves, any and all rights to recover its attorney's fees and costs and pre-and post-judgment interest pursuant to its Contract with US Magnesium LLC and applicable law.

the contract; or (2) the amount of the general contract between the owner and the original contractor totals no more than $5,000. An owner who can establish compliance with either section (l) or (2) may perfect the owner's protection by applying for a Certificate of Compliance with the Division of Occupational and Professional Licensing. The application is available at www.dopl.utah.gov/rlrf.

STATE OF _California_

COUNTY OF _Placer_

I, George W. Little, being of lawful age and being first duly sworn upon oath, do say that I am the Project Director of Forgen, LLC; that I have read the within Notice of Construction Lien and know the contents thereof; and that the same is true and correct, to the best of my knowledge, information, and belief, and is made on behalf of Forgen, LLC.

FORGEN, LLC ("Lien Claimant")

George W. Little, Project Director

SUBSCRIBED AND SWORN to me by George W. Little, Project Director of Forgen, LLC in the county of _Placer_, state of _California_, this _22_ day of _April_, 2024.

See Attached

Witness my hand and official seal.

Notary Public
My commission expires:_____

3

## JURAT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California }
County of __Placer_____ }

Subscribed and sworn to (or affirmed) before me on this __22__ day of __April_____,
20_24__ by __George Little_____
_____, proved to me on the
basis of satisfactory evidence to be the person(s) who appeared before me.

LORI L. OESTERLING
Notary Public - California
Placer County
Commission # 2453377
My Comm. Expires Jul 16, 2027

_____(Seal)_____          _Lori L. Oesterling_
                                                Signature

==================================================================

**OPTIONAL DESCRIPTION OF ATTACHED DOCUMENT**

Title or Type of Document: _____

Document Date: _____  Number of Pages: _____

Other Information: _____

California Notary Training Center/Form03-J/2015
www.canotarytrainingcenter.com

**Exhibit 8**

**(Complaint (without exhibits))**

**See attached.**

Engels J. Tejeda (11427)
Thomas M. Alldridge (17927)
HOLLAND & HART LLP
222 S. Main Street, Suite 2200
Salt Lake City, Utah 84111
Telephone: (801) 799-5800
EJTejeda@HollandHart.com
TMAlldridge@HollandHart.com

*Attorneys for Plaintiff Forgen, LLC*

<table>
<tr><td></td><td>THIS PLEADING REQUIRES<br>YOU TO RESPOND. PLEASE SEE<br>THE NOTICE TO RESPONDING<br>PARTY</td></tr>
</table>

## IN THE THIRD JUDICIAL DISTRICT COURT
## IN AND FOR TOOELE COUNTY, STATE OF UTAH

| | |
|---|---|
| FORGEN, LLC, a Delaware limited liability company;<br><br>    Plaintiff,<br><br>vs.<br><br>US MAGNESIUM LLC, a Delaware limited liability company, and JOHN DOES 1-10;<br><br>    Defendants. | **COMPLAINT**<br><br><br>Case No. _____<br><br>Judge _____ |

Plaintiff Forgen, LLC ("**Forgen**" or "**Plaintiff**"), hereby alleges and complains against

Defendant US Magnesium LLC ("**US Mag**" or "**Defendant**") as follows:

### PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff Forgen is a Delaware limited liability company registered, in good

standing, to do business in the state of Utah, with its principal place of business in Centennial,

CO.

2.      Defendant US Magnesium is a Delaware limited liability company registered, in good standing, to do business in the state of Utah, with its principal place of business in Salt Lake City, UT.

3.      The real property referred to in this Complaint is in Tooele County, State of Utah, and is commonly known as 12819 N. Rowley Rd., Skull Valley UT 84029 (the "**Subject Property**").

4.      On information and belief, US Magnesium is and has been the fee owner of the Subject Property at all relevant times.

5.      John Does 1-10 are unknown persons or entities who may claim an interest in, or lien upon, the Subject Property who have not been identified at the time of filing this Complaint. Pursuant to Rule 9(b)(1) of the Utah Rules of Civil Procedure, Forgen reserves the right to amend its Complaint to add the true identities of Defendants Doe as they may appear through discovery.

6.      This Court has jurisdiction over this matter pursuant to Utah Code § 78A-5-101 and the parties' agreement.

7.      Venue is proper in this district pursuant to Utah Code §§ 78B-3a-202.

8.      This case qualifies for Tier 3 discovery under Utah R. Civ. P. 26(c) because Forgen seeks damages that exceed $300,000.

2

**GENERAL ALLEGATIONS**

I.    **BACKGROUND REGARDING THE CONSTRUCTION CONTRACT.**

9.    On May 16, 2023, Forgen and US Magnesium entered into a Construction Contract (the "**Contract**"). A true and correct copy of the Contract is attached hereto as **Exhibit 1.**

10.    Pursuant to the Contract, Forgen furnished all supervision, labor, tools, supplies, equipment, services, materials and other incidentals and performed all the work to timely and competently build an underground pollution mitigation wall at US Magnesium's lithium mine in Rowley, Utah (the "**Project**"). *Id.* at ¶ 2.A.

11.    Forgen was to submit to US Magnesium for approval a detailed schedule showing the proposed sequence of construction operations based upon starting and completions dates of each item given in the proposal or as in the Contract. *Id.* ¶ 3.

12.    The Scope of Work was to be detailed in purchase orders issued against the Contract. *Id.* Ex. D.

13.    Notices under the Contract were to be sent to US Magnesium in accordance with Paragraph 12 to the following:

US Magnesium LLC
238 North 2200 West
Salt Lake City, Utah 84116
ATTN: As detailed in purchase orders issued against this contract

*Id.* ¶ 12.

14.    The Contract required that Forgen send to US Magnesium monthly invoices as the work progressed based on determinations and measurements made by Forgen's Field Supervisor of the materials furnished and work completed by Forgen. *Id.* at Ex. A1, ¶ 2.A.

3

15.     After 45 days of nonpayment by US Magnesium, Forgen could send a written notice to cure. *Id.*

16.     After sending the ten-day notice to cure, Forgen had the option to suspend or terminate work under the Contract if payment on the invoices remained outstanding. *Id.*

17.     Under the terms of the Contract, the prevailing party is entitled to its costs and reasonable attorneys' fees incurred in enforcing the Contract against the non-prevailing party. *Id.* Ex. B, ¶ 2(A).

18.     On or about June 26, 2023, US Magnesium sent Purchase Order No. 574670-0000-000 to Forgen outlining the work Forgen was to complete for the Project (the "**Purchase Order**"). A true and correct copy of the Purchase Order is attached hereto as **Exhibit 2**.

19.     The Contract explicitly incorporates the Purchase Order and all terms and conditions set forth therein. *See* Ex. 1, ¶ 1

20.     The total Purchase Order cost was $11,908,144.00. *See* Ex. 2.

21.     Under the Purchase Order, "monthly progress payments were to be paid Net 45 days and on a percent performed basis with a maximum of 5% held as retention." *Id.*

22.     Billed amounts not paid within 45 days accrue interest at prime rate plus 1.5% per annum, which at all relevant times equaled 10%. *Id.*

23.     On or about June 6, 2023, Forgen began performing under the Contract at the Project.

24.     Forgen continued to perform under the terms of the Contract and provide the work required at the Project.

## II.    FORGEN'S COMPLIANCE WITH THE CONSTRUCTION LIEN STATUTE

25.    On September 5, 2023, Forgen filed a Preliminary Notice with the State Construction Registry, as Entry No. 1053945 (the "**Preliminary Notice**"), in accordance with Utah Code § 38-1a-501.  A true and correct copy of the Notice of Suspension is attached hereto as **Exhibit 3**.

26.    The Preliminary Notice more particularly described the Subject Property by the following Tax Parcel IDs: 04-019-0-0010, 04-022-0-0010, 04-019-0-0005, 04-021-0-0001, 04-019-0-0002, 04-021-0-0004, 04-019-0-0009, 04-019-0-0001, and 04-021-0-0002.  *Id.*

27.    On May 2, 2024, Forgen filed a Notice of Construction Lien with the Tooele County Recorder, Entry No. 602527 (the "**Construction Lien**") in accordance with Utah Code § 38-1a-502. A true and correct copy of the Notice of Suspension is attached hereto as **Exhibit 4**.

28.    The amount claimed under the Construction Lien is $3,050,197.36, which such amount excluded attorneys' fees, costs, and interest.  *Id.*

## III.    US MAGNESIUM'S BREACH OF THE CONTRACT.

29.    Despite Forgen's compliance with its obligations, US Magnesium has failed to pay all amounts due and owing to Forgen under the Contract.

30.    On August 4, 2023, Forgen invoiced US Magnesium $990,442.84 under the Contract for the work completed in the previous month at the Project.

31.    This amount remains due and owing and continues to accrue interest at the contract rate of 10% per annum.

32.    On September 12, 2023, Forgen invoiced US Magnesium $1,223,288.09 under the Contract for the work completed in the previous month at the Project.

5

33. This amount remains due and owing and continues to accrue interest at the contract rate of 10% per annum.

34. On October 19, 2023, Forgen invoiced US Magnesium $1,678,549.04 under the Contract for the work completed in the previous month at the Project.

35. This amount remains due and owing and continues to accrue interest at the contract rate of 10% per annum.

36. On November 8, 2023, Forgen invoiced US Magnesium $1,727,483.82 under the Contract for the work completed in the previous month at the Project.

37. This amount remains due and owing and continues to accrue interest at the contract rate of 10% per annum.

38. On November 16, 2023, Forgen invoiced US Magnesium $133,000.00 under the Contract for the work completed in the previous month at the Project.

39. As a result of US Magnesium's failure to pay the five invoices, Forgen ceased working at the Project.

40. On or about April 4, 2024, Forgen issued a ten-day Notice to Cure to US Magnesium.

41. On April 29, 2024, Forgen sent a Notice of Suspension under the terms of the Contract for US Magnesium's failure to cure its default. A true and correct copy of the Notice of Suspension is attached hereto as **Exhibit 5**.

42. On or about May 9, 2024, Forgen sent a Notice of Construction Lien and Demand for Payment to US Magnesium due to their continued breach of the Contract ("**Demand for Payment**"). A true and correct copy of the Notice of Suspension is attached hereto as **Exhibit 6**.

6

43.     Forgen demanded that US Magnesium pay all past due amounts by May 17, 2024. *Id.*

44.     To date, US Magnesium has never paid any of the invoices that Forgen sent in compliance with the terms of the Contract and for the work completed at the Project.

45.     As of the date of this filing, US Magnesium owes Forgen not less than $5,784,512.69 for unpaid invoices and interest .

46.     This amount continues to accrue interest at the contract rate of 10% per annum.

**FIRST CAUSE OF ACTION**
**(Breach of Contract)**

47.     Forgen incorporates by reference all other allegations of this Complaint.

48.     Forgen and US Magnesium both executed and freely entered into the Contract.

49.     The Contract is a valid and binding agreement whereby US Magnesium agreed to be bound by the terms and obligations contained therein.

50.     Forgen has fully performed its obligations under the Contract.

51.     US Magnesium materially breached the Contract through various acts, including but not limited to, failing to pay invoices due and owing for the work completed by Forgen on the Project as required by the Contract.

52.     Due to these breaches, US Magnesium is currently in breach of the Contract.

53.     As a direct and proximate result of US Magnesium's breaches, Forgen has suffered and will continue to suffer damages in an amount to be proved at trial, but not less than $5,784,512.69, plus interest at the rate of 10 percent (10%) per year until paid in full.

7

54.    In accordance with Ex. B, ¶ 2(A) of the Contract, the total amount of damages will also include additional costs and attorneys' fees that also continue to accrue as this matter progresses.

**SECOND CAUSE OF ACTION**
**(Breach of Covenant of Good Faith and Fair Dealing)**

55.    Forgen incorporates by reference all other allegations of this Complaint.

56.    The Contract is a valid and binding agreement between Forgen and US Magnesium.

57.    Forgen has fully performed its obligations under the Contract.

58.    In addition to the express provisions of the Contract set forth above, the implied covenant of good faith and fair dealing creates a duty on the part of US Magnesium to perform under the Contract in a good faith manner and refrain from intentionally doing anything that would destroy or injure Forgen's right to receive the benefit of the Contract.

59.    As is set forth above, US Magnesium materially breached the Contract through various acts, including but not limited to, failing to pay invoices due and owing for the work completed by Forgen on the Project as required by the Contract

60.    US Magnesium is currently in Default of the Contract due to its numerous breaches of the terms of the Contract.

61.    As a direct and proximate result of US Magnesium's breaches, Forgen has suffered and will continue to suffer damages in an amount to be proved at trial, but not less than $5,784,512.69, plus interest at the rate of ten percent (10%) per year until paid in full.

8

62.    In accordance with Ex. B, ¶ 2(A) of the Contract, the total amount of damages will also include additional costs and attorneys' fees that also continue to accrue as this matter progresses.

### THIRD CAUSE OF ACTION
**(Lien Foreclosure)**

63.    Forgen incorporates by reference all other allegations of this Complaint.

64.    The Contract is a valid and binding agreement between Forgen and US Magnesium.

65.    Forgen has fully performed its obligations under the Contract and completed the work at the Project.

66.    The Preliminary Notice was filed on September 5, 2023, with the Utah State Construction Registry.

67.    The Construction Lien was filed on May 2, 2024, with the Tooele County Recorder.

68.    Notice of the Construction Lien was given to US Magnesium on May 7, 2024

69.    In accordance with Utah Code § 38-1a-101, *et seq.*, Forgen has met all statutory requirements to foreclose the Construction Lien.

70.    The Construction Lien is for $3,050,197.36, plus interest, costs, and attorneys' fees.

71.    Forgen is entitled to recover interest on the amounts owed by US Magnesium pursuant to Utah Code § 38-1a-309 and the Contract.

72.    Forgen is entitled to recover its costs and attorneys' fees incurred in enforcing the Construction Lien pursuant to Utah Code § 38a-1a-707 and the Contract.

9

73.     Forgen is entitled to a sale of the Subject Property to satisfy the Construction Lien in the amount of $3,050,197.36, plus interest at the rate of ten percent (10%) per year until paid in full, plus costs, and attorneys' fees.

74.     Should the sale of the Subject Property fail to satisfy the Construction Lien, Forgen is entitle to a deficiency judgment against Defendants for any of the remainder, plus interest, costs, and attorneys' fees, and a judgment for the foreclosure of the interests of all of the Defendants in the Subject Property, in favor of Forgen.

### FOURTH CAUSE OF ACTION
#### (Unjust Enrichment)

75.     Forgen incorporates by reference all other allegations of this Complaint.

76.     As is set forth above, Forgen has conferred a benefit on US Magnesium in the form of the work completed at the Project despite their failure to pay the amounts due and owed to Forgen under the Contract.

77.     US Magnesium knowingly and willingly accepted these benefits and continued to receive value for Forgen's work on the Project despite their failure to pay Forgen under the Contract.

78.     The retention of these benefits by US Magnesium would be inequitable, because they have no right to benefit from Forgen's labor without paying their invoices, while depriving Forgen of the benefit of US Magnesium's performance.

79.     Forgen is entitled to restitution of the unjustly obtained benefits, the payment all past due amounts owed to Forgen, and/or any other relief that is just and equitable.

### PRAYER FOR RELIEF

WHEREFORE, Forgen prays for relief against US Magnesium as follows:

10

1.     For judgment against US Magnesium for actual and consequential damages in an amount to be proven at trial, but in no event less than $5,784,512.69, plus interest at the rate of ten percent (10%) per year until paid in full;

2.     For an Order that the Subject Property be sold according to law in satisfaction of the Construction Lien and costs as in the case of a foreclosure of a mortgage, subject to the same right of redemption, and that all proceeds of such sale be applied in satisfaction of Forgen's claim as provided in Utah Code § 38-1a-703 and § 38-1a-704, as applicable;

3.     For an award of compensatory damages pursuant to the Contract, the associated implied covenant of good faith and fair dealing, and/or as a result of US Magnesium's unjust enrichment;

4.     For an award of interest on any damages permitted herein at the post judgment interest rate provided in Utah Code § 15-1-4 until all amounts are paid in full;

5.     For an award of Forgen's costs and attorneys' fees pursuant to the Contract and applicable law; and

6.     For an order affording any other relief deemed just by the Court.

DATED this 4th day of October, 2024.

HOLLAND & HART LLP

*/s/ Engel J. Tejeda*
Engel J. Tejeda
Thomas M. Alldridge
*Attorneys for Plaintiff Forgen, LLC*

11

**<u>Exhibit 9</u>**

**(Lis Pendens)**

**See attached.**

Entry: 604987
10/21/2024 04:39 PM  LIS PENDENS
Page: 1 of 3
FEE: $108.00    BY: HOLLAND & HART LLP - SLC
Jerry Houghton, Tooele County, Recorder

Engels J. Tejeda (11427)
Thomas M. Alldridge (17927)
HOLLAND & HART LLP
222 S. Main Street, Suite 2200
Salt Lake City, Utah 84111
Telephone: (801) 799-5800
EJTejeda@HollandHart.com
TMAlldridge@HollandHart.com

*Attorneys for Plaintiff Forgen, LLC*

---

## IN THE THIRD JUDICIAL DISTRICT COURT
## IN AND FOR TOOELE COUNTY, STATE OF UTAH

| | |
|---|---|
| FORGEN, LLC, a Delaware limited liability company; <br><br> Plaintiff, <br><br> vs. <br><br> US MAGNESIUM LLC, a Delaware limited liability company, and JOHN DOES 1-10; <br><br> Defendants. | **Notice of Pendency of Action** <br> **(LIS PENDENS)** <br><br><br> Case No. 240302032 <br><br> Judge L. Douglas Hogan |

NOTICE IS HEREBY GIVEN that a lawsuit is now pending in the Third Judicial District Court, Toole County, Utah, by the above-named Plaintiff Forgen, LLC and against Defendants US Magnesium LLC and John Does 1-10.

The above-entitled matter includes causes of action for Breach of Contract, Breach of Covenant of Good Faith and Fair Dealing, Foreclosure of a Construction Lien against the Property (described below), and Unjust Enrichment. The Construction Lien Foreclosure claim is filed pursuant to that certain Notice of Construction Lien recorded as Entry No. 602527 on May 2, 2024, by the Toole County Recorder, describing the services provided at the Property.

The lands and interests subject to the lawsuit are more particularly described as (the "Property"):

### Municipal Address:
12819 North Rowley Rd.
Skull Valley, Utah, 84029

### Legal Property Descriptions:

Lots 1, 2, 3, 4, 5, 6 and 7 and the Southwest Quarter of the Northeast Quarter, the South One Half of the Northwest Quarter, the Southwest Quarter and the West One-Half the Southeast Quarter of Section 3, Township 2 North, Range 8 West, Salt Lake Base and Meridian

Parcel No. 04-019-0-0001

The South One-Half of Section 4, Township 2 North, Range 8 West, Salt Lake Base and Meridian.

Parcel No. 4-019-0-0002

The East One-Half of the East One-Half of Section 10, Township 2 North, Range 8 West, Salt Lake Base and Meridian

Parcel No. 04-019-0-0005

The West One-Half of the East One-Half and the West One-Half of Section 10, Township 2 North, Range 8 West, Salt Lake Base and Meridian.

Parcel No. 04-019-0-0009

All of Section 9, Township 2 North, Range 8 West, Salt Lake Base and Meridian.

Parcel No. 04-019-0010

Lots 1, 2, 3, 4, 5, 6, and the Southwest Quarter and the South One-Half of the Southeast Quarter of Section 11, Township 2 North, Range 8 West, Salt Lake Base and Meridian

Parcel No. 04-021-0-0001

Lot 1 of Section 12, Township 2 North, Range 8 West, Salt Lake Base and Meridian,

Parcel No. 04-021-0-0002

2

Lots 1, 2, 3, 4 and the West One-Half of the East One-Half and the West One-Half of Section 14, Township 2 North, Range 8 West, Salt Lake Base and Meridian

Parcel No. 04-021-0-0004

All of Section 15, Township 2 North, Range 8 West, Salt Lake Base and Meridian Less & excepting any portion lying within Desert Power P.U.D. Subdivision
Also less & excepting any portion lying within ATI Titanium P.U.D. Subdivision

Parcel No. 04-022-0-0010

DATED this October 18, 2024.

HOLLAND & HART LLP

Engel J. Tejeda
Thomas M. Alldridge
*Attorneys for Plaintiff Forgen, LLC*

STATE OF UTAH              )
                                           :
COUNTY OF SALT LAKE  )

The foregoing instrument was subscribed, sworn to, and acknowledged before me this 18th day of October, 2024, by Engel J. Tejeda, who is personally known to me.

MEGAN MILLER INOUYE
Notary Public
State of Utah
My Comm Expires 11/21/2027
Commission No. 734298

Notary Public
Residing at: Salt Lake County
Exp: 11/21/2027

STATE OF UTAH
COUNTY OF Salt Lake
I hereby certify that the document to which this certificate is attached is a full, true and correct copy of the original filed in the Utah State Courts. WITNESS my hand and seal this 21 day of October 20 24
DISTRICT/JUVENILE COURT
Kathy Bidma CLERK

3

**Exhibit 10**

**(Account Statement & Invoices)**

**See attached.**

| Project Name | US Magnesium HBW Construction |
|---|---|
| Location | Rowley, UT |
| Contract # | MW050423 | PO# | 574670 |

| Interest Accrual Date | 9/19/2024 |
| Interest Accrual Date | 11/8/2024 |
| Interest Accrual Date | 12/19/2024 |
| Interest Accrual Date | 1/8/2026 |

## Invoice Billing Statement Tracking Log

| Billing Year | Billing # | Billing Type | Billing Total | Billing Minus Retention | DESCRIPTION | Invoice Approval/ Submittal Date | Invoice Finance Charge Start Date (Approval Date plus 45) | Prime Rate | Prime Rate + 1.5 | Interest Accrued Through Date | Days Past Net 45 Due Date | Finance Charge | Prime Rate | Prime Rate + 1.5 | Interest Accrued Through Date | Days Past Net 45 Due Date | Finance Charge | Prime Rate | Prime Rate + 1.5 | Interest Accrued Through Date | Days Past Net 45 Due Date | Finance Charge | Prime Rate | Prime Rate + 1.5 | Interest Accrued Through Date | Days Past Net 45 Due Date | Finance Charge | Total Finance Charge | Remaining P.O. Funds | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Period to 9/19/2024 - Prime Rate 8.5% | | | | | Period 9/19/2024-11/8/2024 - Prime Rate 8.0% | | | | | Period 11/8/2024-12/19/2024 - Prime Rate 7.75% | | | | | Peroid 12/19/2024-9/17/2025 - Prime Rate 7.5% | | | | | | | |
| 1 | MR1345706-01 | PO 574670 | $ 11,908,144.00 | | RWP Phase 2 HBW Construction | | | | | | | | | | | | | | | | | | | | | | | | $ 11,908,144.00 | |
| 1 | 230004-1 | Invoice | $ - | $ - | Invoice 1 | 8/4/23 | 9/18/23 | 8.5% | 10.0% | 9/19/24 | 367 | $ - | 8.00% | 9.50% | 11/8/24 | 50 | $ - | 7.75% | 9.25% | 12/19/24 | 41 | $ - | 7.50% | 9.00% | 1/8/26 | 385 | $ - | $ - | $ 11,908,144.00 | Prime Rate based on US Fed Rates |
| 1 | 230004-2 | Invoice | $ - | $ - | Invoice 2 | 9/12/23 | 10/27/23 | 8.5% | 10.0% | 9/19/24 | 328 | $ - | 8.00% | 9.50% | 11/8/24 | 50 | $ - | 7.75% | 9.25% | 12/19/24 | 41 | $ 9,907.55 | 7.50% | 9.00% | 1/8/26 | 385 | $ 90,519.84 | $ 188,857.29 | $ 11,908,144.00 | Prime Rate based on US Fed Rates |
| 1 | 230004-3 | Invoice | $ 1,003,713.54 | $ 953,527.85 | Invoice 3 | 10/19/23 | 12/3/23 | 8.5% | 10.0% | 9/19/24 | 291 | $ 76,020.99 | 8.00% | 9.50% | 11/8/24 | 50 | $ 12,408.92 | 7.75% | 9.25% | 12/19/24 | 41 | $ 9,907.55 | 7.50% | 9.00% | 1/8/26 | 385 | $ 90,519.84 | $ 188,857.29 | $ 10,904,430.46 | Prime Rate based on US Fed Rates |
| 1 | 230004-4 | Invoice | $ 1,727,483.82 | $ 1,641,109.62 | Invoice 4 | 11/8/23 | 12/23/23 | 8.5% | 10.0% | 9/19/24 | 271 | $ 121,846.77 | 8.00% | 9.50% | 11/8/24 | 50 | $ 21,356.91 | 7.75% | 9.25% | 12/19/24 | 41 | $ 17,051.80 | 7.50% | 9.00% | 1/8/26 | 385 | $ 155,793.01 | $ 316,048.49 | $ 9,176,946.64 | Prime Rate based on US Fed Rates |
| 1 | 230004-5 | Invoice | $ 133,000.00 | $ 126,349.99 | Invoice 5 | 11/16/23 | 12/31/23 | 8.5% | 10.0% | 9/19/24 | 263 | $ 9,104.12 | 8.00% | 9.50% | 11/8/24 | 50 | $ 1,644.28 | 7.75% | 9.25% | 12/19/24 | 41 | $ 1,312.83 | 7.50% | 9.00% | 1/8/26 | 385 | $ 11,994.59 | $ 24,055.83 | $ 9,043,946.64 | Prime Rate based on US Fed Rates |
| | | Sum Finance Charge | | | | | | | | | | $ 206,971.88 | | | | | $ 35,410.11 | | | | | $ 28,272.18 | | | | | $ 258,307.44 | $ 528,961.61 | | |
| 2 | MR1345706-01 | PO 574670 | $ 11,908,144.00 | | RWP Phase 2 HBW Construction | | | | | | | | | | | | | | | | | | | | | | | | $ 9,043,946.64 | |
| 2 | 230004-6 | Invoice | $ 186,000.00 | $ 176,700.00 | Invoice | 6/30/24 | 8/14/24 | 8.5% | 10.0% | 9/19/24 | 36 | $ 1,742.79 | 8.00% | 9.50% | 11/8/24 | 50 | $ 2,299.52 | 7.75% | 9.25% | 12/19/24 | 41 | $ 1,835.99 | 7.50% | 9.00% | 1/8/26 | 385 | $ 16,774.40 | $ 22,652.70 | $ 8,857,946.64 | Prime Rate based on US Fed Rates |
| 2 | | Invoice | | | | | | | | | | $ - | | | | | | | | | | | | | | | | | | |
| 2 | | Invoice | | | | | | | | | | $ - | | | | | | | | | | | | | | | | | | |
| 2 | | Invoice | | | | | | | | | | $ - | | | | | | | | | | | | | | | | | | |
| 2 | | Invoice | | | | | | | | | | $ - | | | | | | | | | | | | | | | | | | |
| | | Sum Finance Charge | | | | | | | | | | $ 1,742.79 | | | | | $ 2,299.52 | | | | | $ 1,835.99 | | | | | $ 16,774.40 | $ 22,652.70 | | |
| | | Total Finance Charge | $ 3,050,197.36 | $ 2,897,687.46 | | | | | | | | $ 208,714.67 | | | | | $ 37,709.63 | | | | | $ 30,108.16 | | | | | $ 275,081.84 | $ 551,614.31 | | |

| | | |
|---|---|---|
| Interest | $ | 551,614.31 |
| Attorneys' Fees | | 161,528.00 |
| Costs | | 761.30 |
| | | 713,903.61 |
| Secured | | 3,764,100.97 |
| | | 4,085,722.68 |
| | $ | (713,903.61) |
| Unsecured | | 3,371,819.07 |
| Total | | 7,135,920.04 |

3050197.36

4085722.68
7135920.04

$   3,601,811.67

| Reason Code |
|---|
| 1 - Unsafe |
| 2 - Cannot Licence Existing Facility |
| 3 - Existing will not work |
| 4 - Other |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| Total |