**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| US MAGNESIUM LLC,[1] | Case No. 25-11696 (BLS) |
| Debtor. | **Hearing Date: June 16, 2026 at 10:00 a.m. (ET)**<br>**Objection Deadline: June 5, 2026 at 4:00 p.m. (ET)**<br>**Related to Docket No. 860** |

**OBJECTION OF THE RENCO GROUP, INC. AND RENCO GLOBAL CAPITAL, LLC**
**TO CONFIRMATION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN**

The Renco Group, Inc. ("**Renco Group**") and Renco Global Capital, LLC ("**Renco Global**" and, together with Renco Group, "**Renco**") object to confirmation of the *Official Committee of Unsecured Creditors' Modified Amended Combined Disclosure Statement and Plan of Liquidation of US Magnesium LLC Under Chapter 11 of the Bankruptcy Code* [Docket No. 860] (the "**Plan**"). In support of this objection, Renco respectfully represents as follows:

**PRELIMINARY STATEMENT**

1.      Regardless of whether the Committee is prepared to acknowledge it, Renco is the largest liquidated unsecured creditor of this bankruptcy estate.  Notwithstanding that fact, the Committee's Plan is blatantly designed to ensure that Renco can have no meaningful voice in respect of how this bankruptcy estate should be liquidated.  Specifically, the Plan places substantially similar unsecured claims in three separate impaired classes—Class 5 (Deficiency Claims), 6 (Insider Unsecured Claims), and 7 (General Unsecured Claims)—even though holders of Claims in each Class receive identical treatment. There is no remotely rational business or economic reason for the Committee to create these separate classes under circumstances where the

---

[1] The last four digits of the Debtor's federal tax identification number are 5446. The Debtor's address is 238 N. 2200 W., Salt Lake City, Utah 84116.

Debtor is liquidating and where all allowed general unsecured creditors (regardless of classification) will simply recover *pro rata* from a single trust. Instead, the sole purpose of the classification scheme is obviously to gerrymander an accepting class of general unsecured creditors by ensuring that Renco's sizeable claims against the bankruptcy estate are isolated and excluded from that calculus. As noted below, many courts including the Third Circuit have made it abundantly clear that this is not permissible—a plan proponent may not classify similar claims differently for purposes of manipulating the voting process. Nevertheless, that is exactly what the Committee seeks to do here and, as such, the Plan was not proposed in good faith and should not be confirmed by this Court.  Rather than being effectively disenfranchised by the Committee, Renco should instead have a voice in the estate's liquidation that is commensurate with its position, and that can only occur if its general unsecured claims are classified with all other general unsecured claims.

2.      Separately, the liquidation analysis filed by the Committee in support of the Plan is dependent upon flawed assumptions regarding projected recoveries in respect of certain assets under the Plan compared to a hypothetical chapter 7 liquidation, as well as in respect of estimated professional fees to be incurred by the Liquidating Trust post-effective date compared to those that would be incurred by a hypothetical chapter 7 trustee.  Once these faulty assumptions are taken into account, it becomes clear that unsecured creditors of the bankruptcy estate will fare better in a chapter 7 liquidation than they would under this Plan.  Accordingly, the Committee has failed to satisfy section 1129(a)(7) of the Bankruptcy Code, and the Court should deny confirmation on that basis as well.

## JURISDICTION AND VENUE

3.      The Court has jurisdiction over this objection under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of*

*Delaware*, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue in this Court is proper under 28 U.S.C. §§ 1408 and 1409.

4.      Renco consents, pursuant to Rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware, to the entry of a final order by the Court in connection with this objection to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

**FACTUAL BACKGROUND**

5.      On September 10, 2025 (the "**Petition Date**"), the Debtor filed its voluntary petition for relief under the Bankruptcy Code. On September 23, 2025, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "**Committee**" or "**Plan Proponent**") under § 1102 [Docket No. 70]. The Committee subsequently filed the Plan. Renco Group and Renco Global are among the Debtor's largest creditors, holding secured, unsecured, and contingent claims as described in detail on pages 2–7 of the *Motion of The Renco Group, Inc. and Renco Global Capital, LLC for Temporary Allowance of Their Claims Solely for Voting Purposes Pursuant to Bankruptcy Rule 3018* [Docket No. 902] (the "**3018 Motion**"), which is incorporated herein by reference. Capitalized terms used but not defined in this objection have the meanings given them in the 3018 Motion or the Plan, as applicable.

**ARGUMENT**

**A.      The Plan's Classification Scheme is Improperly Designed to Gerrymander an Impaired Accepting Class in Violation of Section 1122.**

6.      Section 1122(a) of the Bankruptcy Code provides that a plan may "place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). "Substantially similar claims" are "those

3

which share common priority and rights against the debtor's estate" and "should be placed in the same class." *In re Greystone III Joint Venture*, 995 F.2d 1274, 1278 (5th Cir. 1991). Unsecured claims—whether trade, tort, publicly held debt, or a secured creditor's deficiency—"are claimants of equal legal rank entitled to share pro rata in values remaining after payment of secured and priority claims." *FGH Realty Credit Corp. v. Newark Airport/Hotel Ltd. P'ship*, 155 B.R. 93, 99 (D.N.J. 1993). Although § 1122(a) does not expressly forbid separate classification of substantially similar claims, the Third Circuit has held that the Bankruptcy Code does not give a plan proponent "complete freedom to place substantially similar claims in separate classes." *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993). The classification must be reasonable, and in a cramdown case, each class must represent a voting interest "sufficiently distinct and weighty to merit a separate voice" on whether the plan should proceed. *Id.* at 159.

7.      In *Route 37*, the Third Circuit held that separate classification of trade creditors from a secured lender's deficiency claim was impermissible because the plan proponent failed to demonstrate that the trade creditors' voting interest was "sufficiently distinct and weighty to merit a separate voice." 987 F.2d at 159. The debtor offered no legitimate business or legal rationale other than the practical necessity of obtaining an impaired accepting class—a rationale the court found insufficient. *Id.* at 161. This case presents a strikingly similar fact pattern.

8.      Courts apply these principles to prevent vote gerrymandering. The "one clear rule that emerges from otherwise muddled caselaw on § 1122 claims classification" is that "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." *Greystone*, 995 F.2d at 1279; *accord Route 37*, 987 F.2d at 158–59. A plan proponent must provide a legitimate reason—supported by credible proof—for separate classification of similar unsecured claims; "separate classification of unsecured claims solely to

4

create an impaired assenting class will not be permitted." *In re Boston Post Rd. Ltd. P'ship*, 21 F.3d 477, 483 (2d Cir. 1994).

9.      In *Greystone*, the Fifth Circuit rejected a debtor's argument that differing expectations and "realities of business" justified separate classification of trade creditors from a secured creditor's deficiency claim, holding that when claims receive identical treatment, there can be no valid basis for separate classification. 995 F.2d at 1279–81. This reasoning applies here: the Plan provides identical Liquidating Trust Interests to Classes 5, 6, and 7 while segregating Renco's claims solely and exclusively for purposes of neutralizing its vote.

10.     The appropriate focus for "substantial similarity" is on the claims' legal status against the Debtor—not the claimant's identity, history, or expected vote. The manner in which claims arose does not alter their current legal character and thus does not warrant separate classification. *See Route 37*, 987 F.2d at 161; *In re Torgro Atl. City, LLC*, No. 08-32838, 2009 WL 1288367, at *12–13 (Bankr. D.N.J. May 7, 2009) (rejecting classification based on how claims arose). "Insider status alone does not make an unsecured claim dissimilar." *In re Frascella Enters., Inc.*, 360 B.R. 435, 443 (Bankr. E.D. Pa. 2007); *see also In re Coram Healthcare Corp.*, 315 B.R. 321, 349–50 (Bankr. D. Del. 2004) (holding that separate classification of an affiliate's unsecured claim was improper when the claim shared the same legal attributes as trade creditors' claims).

11.     The Plan violates these principles. Class 5 Deficiency Claims, Class 6 Insider Unsecured Claims, and Class 7 General Unsecured Claims all share the same legal rank—non-priority unsecured—and look to the same limited pool of Liquidating Trust Assets for their sole and exclusive source of recovery. Each class receives the same essential consideration: Liquidating Trust Interests entitling holders to a pro rata share of net proceeds, with estimated recoveries of 5–16%. The Plan thus labels the claims differently but treats them identically. *See Combined*

*Disclosure Statement and Plan* §§ 10.5, 10.6, 10.7 (each class receives a "Pro Rata share of the Liquidating Trust Interests").

12.     The Fourth Circuit has squarely addressed this scenario. Separate classification is "highly suspect" where unsecured claims receive the same treatment; such a scheme is "clearly for the purpose of manipulating voting and it may not stand." *In re Bryson Props., XVIII*, 961 F.2d 496, 502 (4th Cir. 1992). And "classification of claims should not be permitted solely on the basis of how the plan proponent thinks the creditor will vote." *Coram*, 315 B.R. at 351.

13.     The Plan Proponent cannot escape this precedent by simply pointing to Renco's insider status. The Code expressly addresses insider votes where they matter: § 1129(a)(10) excludes insider acceptances from the impaired-accepting-class calculation. *See Coram*, 315 B.R. at 350 n.18. The Code does not, however, authorize a plan proponent to quarantine an insider creditor's substantially similar unsecured claims in a separate class simply because those claims may defeat acceptance if counted with other unsecured claims. *See id.* Here, the Plan Proponent has not alleged—and cannot demonstrate—that Renco's deficiency or unsecured claims have legal attributes different from the General Unsecured Claims in Class 7.

14.     *Coram Healthcare* addressed analogous facts. There, the court rejected separate classification of an affiliate's unsecured claim, holding that "a proper determination of what claims are 'substantially similar' focuses on the legal attributes of the claims, not who holds them." 315 B.R. at 350. As the court explained, § 1129(a)(10)'s exclusion of insider votes is "the only mechanism Congress provided for addressing insider voting" and that a plan proponent may not create a "parallel scheme through classification." *Id.* at 350 n.18.

15.     Nor can the Committee point to the fact that the Renco claims are the subject of litigation as a justification for separate classification. Setting aside that the litigation has absolutely

6

no merit and is being brought solely on the basis that Renco is an insider,[2] the litigation is being pursued by the Committee itself. The Committee cannot manufacture litigation against Renco and then use that same litigation as a basis for disenfranchising Renco under the Plan. Secondly, the fact that Renco's claims are being challenged does not make them any different from any other disputed general unsecured claim in Class 7.  For example, Kaiser Aluminum Warrick, LLC's sizeable $68 million claim against the estate is disputed by the Debtor and is subject to an appeal which has been stayed by the bankruptcy filing.[3]

16.     The result is an impermissible voting architecture. The Plan isolates Renco's unsecured claims in Class 6, separates deficiency claims in Class 5, and leaves other general unsecured claims in Class 7, even though each class shares the same legal rank and receives the same core distribution from the same Liquidating Trust Assets. Neither Class 5 nor Class 6 represents a voting interest "sufficiently distinct and weighty" to merit a separate voice—the classification exists solely to quarantine Renco's vote and manufacture an impaired accepting class. *Route 37*, 987 F.2d at 159. This classification scheme fails § 1122(a), which in turn means § 1129(a)(1) is not satisfied. *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 243 n.59 (3d Cir. 2004). Because the improper classification infects every element of the Plan's confirmation strategy—including its path to § 1129(a)(10)—the Court should deny confirmation.

**B.     The Court Must Evaluate Compliance with Section 1129(a)(10) Only After Renco's Claims Are Properly Classified.**

17.     Section 1129(a)(10) requires at least one impaired class of claims to accept a plan, determined without including any acceptance by an insider. 11 U.S.C. § 1129(a)(10). This

---

[2] By way of just one example, the Committee appears to have challenged Renco Group's Reimbursement Claim (as defined in the 3018 Motion) without any investigation.  The Committee shoehorned the challenge into the Complaint it filed on January 29, 2026 despite only being made aware of it on January 20, 2026 when Renco Group filed the claim.

[3] *See Kaiser Aluminum Warrick, LLC v. US Magnesium LLC,* Case No. 22-3105 (S.D.N.Y.), at Docket No. 259.

requirement prevents a plan proponent from constructing an artificial classification scheme to secure acceptance from an arbitrarily designed impaired class. *Route 37*, 987 F.2d at 158; *In re 266 Wash. Assocs.*, 141 B.R. 275, 287 (Bankr. E.D.N.Y. 1992). The Plan Proponent bears the burden of establishing compliance with § 1129(a)(10). *See* 11 U.S.C. § 1129(a); *In re PWS Holding Corp.*, 228 F.3d 224, 239 (3d Cir. 2000).

18.     Section 1126(c), in turn, provides that a "class of claims has accepted a plan if such plan has been accepted by creditors . . . that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors . . . that have accepted or rejected such plan." 11 U.S.C. § 1126(c). By its plain language, section 1126(c) does not provide any carve-outs or exceptions for creditors who are also insiders. Thus, the votes of insider creditors must be counted for purposes of section 1126(c).

19.     However, to properly account for Renco's votes for purposes of section 1126(c), Renco's unsecured claims must first be classified appropriately alongside all other general unsecured creditors in Class 7. Otherwise, the vote of Class 7 will be completely manufactured and artificial and will not truly reflect the position of the general unsecured creditor body in respect of the Plan. Satisfaction of section 1129(a)(10) cannot depend upon illegal gerrymandering in violation of section 1122.

**C.     The Plan Was Not Proposed in Good Faith as Required by Section 1129(a)(3)**

20.     Section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The touchstone is whether the plan will "fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000). Courts require that the plan foster a result consistent with the Code's objectives, be proposed with honesty, good intentions, and a basis for

expecting that the plan can be effectuated, and that it exhibit fundamental fairness in dealing with creditors. *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 609 (Bankr. D. Del. 2001).

21.    Attempts to gerrymander classes to obtain an impaired accepting non-insider class raise good-faith concerns. *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 246–47 (3d Cir. 2004). Here, the concern is substantial given that the Plan, through its separate classification of Classes 5, 6, and 7, acts to completely disenfranchise Renco despite Renco holding the largest liquidated claims against the bankruptcy estate. Indeed, by denying Renco a meaningful vote on the Plan, the Plan essentially ignores Renco's status as a creditor altogether.

22.    There is no good-faith basis to treat Renco's claims in this manner.  The fact that the Committee has challenged Renco's claims does not render them invalid.  None of Renco's claims have been disallowed, and so it is wholly improper to pre-emptively treat Renco for voting purposes as though they are an effectively subordinated creditor under the Plan. *See In re Union Meeting Partners*, 160 B.R. 757, 774 (Bankr. E.D. Pa. 1993).  A plan that minimizes a creditor's voice while preserving estate resources to prosecute claims against that creditor does not reflect fundamental fairness. *Genesis*, 266 B.R. at 609. The Committee's improper classification scheme is designed to do exactly that and that is not consistent with the obligation to propose a plan in good faith. *See Coram*, 315 B.R. at 349–50.  By denying the largest liquidated unsecured creditor the right to meaningfully vote on the Plan, the Plan as proposed does not "fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code," and therefore was not proposed in good faith.  *PWS Holding*, 228 F.3d at 242.  Accordingly, confirmation should be denied for failure to satisfy section 1129(a)(3) of the Bankruptcy Code.

**D.    The Committee Has Not Satisfied the "Best Interests of Creditors" Test Under Section 1129(a)(7).**

23.    The Committee's liquidation analysis[4] is flawed and fails to demonstrate that unsecured creditors will recover more under the Plan than they would in a hypothetical chapter 7 liquidation. As a result, the Committee cannot satisfy section 1129(a)(7) of the Bankruptcy Code. On its face, the Liquidation Analysis purports to demonstrate that unsecured creditors would recover 4–5% in a chapter 7 case versus 5–6% under the Plan—representing an admission by the Committee that even under its own analysis the Plan is preferable to chapter 7 by only a razor thin margin. However, that razor thin margin appears to be dependent upon certain flawed assumptions in the Liquidation Analysis.

24.    Specifically, the Liquidation Analysis assumes that a chapter 7 trustee would recover only 18–23% of book value for Inventory and 3–9% of book value for M&E, while the post-effective date Debtor would recover 24–27% and 5–12%, respectively.[5]   The Liquidation Analysis offers no basis for this disparity. The practical reality is that regardless of whether a chapter 7 trustee or a post-effective date Debtor is in place, the M&E and Inventory will need to be liquidated as expeditiously as possible given that the State of Utah Division of Forestry, Fire and State Lands now owns the underlying real estate.  Further, a chapter 7 trustee would likely continue to engage the same professionals already engaged to sell these assets. There is therefore no reason to conclude that a chapter 7 trustee would obtain such significantly lower recoveries than the post-effective date Debtor would achieve.

25.    Separately, the Committee suggests only $1.5–$2.5 million will be incurred in professional fees by the Liquidating Trust, including not just legal counsel but also a contemplated

---

[4] *See* Liquidation Analysis, filed at Docket No. 854-1 (the "**Liquidation Analysis**").

[5] *See* Liquidation Analysis, Notes 2 and 3.

financial advisor and tax and accounting professionals.[6] That figure appears to be severely understated given that the Plan contemplates the Liquidating Trust not only continuing the Committee Challenge (which litigation is in its infancy) but also investigating and potentially pursuing a variety of other claims.[7] Indeed, this raises serious concerns that unsecured creditor recoveries will be severely diminished by inflated professional fees incurred by the Liquidating Trust.

26.     The Committee's assumptions are undermined by its own fee applications.  By March 31, 2026, Committee counsel had already billed over $3.14 million to this bankruptcy estate: $2,305,319.15 from Eversheds Sutherland and $837,156.50 from Cole Schotz.[8] Accordingly, the Committee's assumption that, at most, only $2.5m in professional fees will be incurred by the Liquidating Trust in total (including a financial advisor, legal counsel, and tax and accounting professionals) is risible.  Again, the Committee Challenge is at the complaint stage and there is clearly additional litigation contemplated or that at least must be thoroughly investigated. The Liquidation Trust (which itself creates tax and accounting complexities requiring professional assistance) is therefore highly likely to be active for a period measured in years post-effective date.

---

[6] *See* Liquidation Analysis, at Note No. 8.

[7] *See* Exhibit E to the Plan Supplement (Schedule of Retained Causes of Action), filed at Docket No. 908.

[8] *See* First Monthly Fee Application of Cole Schotz P.C. at 1, In re US Magnesium LLC, No. 25-11696 (Bankr. D. Del. Nov. 25, 2025), Dkt. No. 320; Second Monthly Fee Application of Cole Schotz P.C. at 1, In re US Magnesium LLC, No. 25-11696 (Bankr. D. Del. Feb. 2, 2026), Dkt. No. 560; Third Monthly Fee Application of Cole Schotz P.C. at 1, In re US Magnesium LLC, No. 25-11696 (Bankr. D. Del. Feb. 6, 2026), Dkt. No. 593; Fourth Monthly Fee Application of Cole Schotz P.C. at 1, In re US Magnesium LLC, No. 25-11696 (Bankr. D. Del. Feb. 25, 2026), Dkt. No. 649; Fifth Monthly Fee Application of Cole Schotz P.C. at 1, In re US Magnesium LLC, No. 25-11696 (Bankr. D. Del. Apr. 7, 2026), Dkt. No. 784; Sixth Monthly Fee Application of Cole Schotz P.C. at 1, In re US Magnesium LLC, No. 25-11696 (Bankr. D. Del. May 4, 2026), Dkt. No. 848; First Combined Monthly Fee Application of Eversheds Sutherland (US) LLP at 1, In re US Magnesium LLC, No. 25-11696 (Bankr. D. Del. Nov. 25, 2025), Dkt. No. 319; Second Monthly Fee Application of Eversheds Sutherland (US) LLP at 1, In re US Magnesium LLC, No. 25-11696 (Bankr. D. Del. Feb. 2, 2026), Dkt. No. 559; Third Monthly Fee Application of Eversheds Sutherland (US) LLP at 1, In re US Magnesium LLC, No. 25-11696 (Bankr. D. Del. Feb. 6, 2026), Dkt. No. 592; Fourth Monthly Fee Application of Eversheds Sutherland (US) LLP at 1, In re US Magnesium LLC, No. 25-11696 (Bankr. D. Del. Feb. 25, 2026), Dkt. No. 648; Fifth Monthly Fee Application of Eversheds Sutherland (US) LLP at 1, In re US Magnesium LLC, No. 25-11696 (Bankr. D. Del. Apr. 9, 2026), Dkt. No. 789; Sixth Monthly Fee Application of Eversheds Sutherland (US) LLP at 1, In re US Magnesium LLC, No. 25-11696 (Bankr. D. Del. May 4, 2026), Dkt. No. 847.

27.     Conversely, the Liquidation Analysis assumes without explanation that a chapter 7 trustee would incur significantly *higher* professional fees than the Liquidating Trust.[9]   Renco submits that a chapter 7 trustee's fees would almost certainly be lower.  In the first place, a chapter 7 trustee would not need to create and administer a complex liquidating trust from which to distribute cash and bring litigation claims. Further, the chapter 7 trustees in this district are highly experienced and routinely investigate potential causes of action held by a bankruptcy estate as part of their duties.  An objective chapter 7 trustee concerned with maximizing the value of the bankruptcy estate is better suited to perform an appropriate cost-benefit analysis of spending estate funds to pursue highly speculative claims—such as those seeking to recharacterize fully documented and funded loans made through or with the advance written consent of a third party senior lender.

28.     The margin for error here is minimal. Under the Liquidation Analysis, the difference between unsecured creditors' worst-case chapter 7 recovery ($5.2 million) and their best-case Liquidating Trust recovery ($6.4 million) is only $1.2 million. If post-effective date professional fees of the Liquidation Trust even modestly exceed the Committee's projections—as they almost certainly would as described above—the Plan's supposed advantage over a chapter 7 liquidation disappears. Unsecured creditors would then fare worse under the Plan than in a chapter 7 case.

29.     The Liquidation Analysis is thus skewed in favor of the Plan, and only barely, as a result of flawed professional fee estimates and unsupported assumptions that a chapter 7 trustee would obtain an artificially depressed recovery for the assets that the post-effective date Debtor could somehow avoid. Neither of these assumptions are reasonable and—without them—the

---

[9] *See* Liquidation Analysis, at Note No. 9.

Liquidation Analysis demonstrates that creditors will recover more in a chapter 7 liquidation than under the Plan. Thus, section 1129(a)(7) has not been satisfied, and the Court should deny confirmation of the Plan.

**E.      Additional Plan Issues**

30.      For the reasons outlined above, Renco submits that the Plan is not confirmable. However, in the event that the Court is nevertheless inclined to confirm the Plan, Renco submits that the Plan should be confirmed only if the following additional objections are addressed.

i.      *The Liquidating Trustee Should Make Distributions Without Regard to Intercreditor Agreements Among Wells Fargo and Renco*

31.      The Plan provides that the Liquidating Trustee will only make distributions on account of Class 4 or Class 5 Claims "pursuant to the terms of the applicable Intercreditor Agreements" and the Plan shields the Liquidating Trustee from liability for not making those distributions. *Combined Disclosure Statement and Plan* §§ 10.4(b); 10.5(b). The Debtor is not party to those agreements and Renco should not have to rely on the Liquidating Trustee's interpretation of those agreements for any distributions to which it would otherwise be entitled. *See In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 226 (Bankr. D.N.J. 2000) (recognizing that § 510(a) enforces subordination agreements between the parties thereto but does not create new rights for nonparties).

32.      The Intercreditor Agreements reflect a contractual arrangement by and among Wells Fargo and Renco, enforceable by those parties alone. Accordingly, to the extent Renco receives a distribution under the Plan in purported violation of an Intercreditor Agreement, that is an issue to be addressed by and among Wells Fargo and Renco and there is no reason for the Liquidating Trustee to interfere in intercreditor dynamics.

       ii.      *Renco Should Receive a Seat on the Liquidating Trust Oversight Committee*

33.      The Plan establishes a Liquidating Trust Oversight Committee (the "**Oversight Committee**") consisting of three members, all of whom are to be selected by the Committee, to oversee the administration and disposal of the Liquidating Trust Assets.[10] Given its status as the largest liquidated creditor of the Debtor's bankruptcy estate, Renco should have a seat on the Liquidating Trust Oversight Committee so that it can receive the periodic reporting related to the status of that administration and disposal, and so that it can provide an appropriate check over the fees and expenses incurred by the Liquidating Trustee. This is particularly important given that neither the Plan nor the Liquidating Trust Agreement appear to provide any cap or budget on litigation-related spending by the Liquidating Trust, and where such spending has the potential to consume whatever modest recovery might otherwise be available for general unsecured creditors.

34.      The fact that Renco's claims are being challenged by the Committee is not an appropriate basis to exclude Renco from the Oversight Committee. Indeed, each of the creditors currently proposed to hold seats on the Committee hold claims that are disputed by the Debtor in its bankruptcy schedules.[11]  In the event that any Renco-related matters must be discussed or determined among the Oversight Committee or by and among the Oversight Committee and the Liquidating Trustee, Renco would of course abstain from any such discussions or determinations. Renco's interest in serving on the Oversight Committee is not to attempt to influence litigation against it but rather to ensure that recoveries by all general unsecured creditors in this case are not needlessly wasted on outsized professional fees.

---

[10] *See* Plan, at Section 3.109, p. 20.

[11] *See* Schedules of Assets and Liabilities for US Magnesium, Schedule E/F, Nos. 3.135, 3.167, 3.216, 3.217, 3.251, and 3.252.

iii.   *The Plan Should Provide for the Assumption of the Debtor's Pension Plan By Renco Group*

35.   The Debtor is the sponsor of the US Magnesium LLC Hourly Defined Benefit Pension Plan (the "**Pension Plan**")—a single-employer defined benefit plan insured by the Pension Benefit Guaranty Corporation ("**PBGC**").   Section 5.12 of the Plan describes the Pension Plan and suggests that the Pension Plan could either be subject to termination or it could be assumed by a member of the Debtor's controlled group.   Section 5.12 then suggests that if the Pension Plan is in fact assumed by a member of the Debtor's controlled group, the PBGC will withdraw all of its claims against the Debtor's bankruptcy estate.

36.   Renco wishes to assume the Pension Plan.   The Pension Plan is funded in significant part by alternative assets, such as investments into various third-party hedge funds, partnerships, and other private equity funds that are not readily saleable at their full value.   A termination of the Pension Plan would force a liquidation of these alternative assets at a steep discount, and thus the concern is that a termination of the Pension Plan shortly after confirmation of the Plan will render the Pension Plan underfunded and create a potential multi-million dollar liability for the bankruptcy estate.

37.   To avoid that result, the Plan should be modified to expressly provide that the Pension Plan shall be assumed by the Renco Group as soon as practicable following the effective date of the Plan, and that the post-effective date Debtor shall continue administration of the Pension Plan until such time as that assumption by Renco Group can be effectuated.

**RESERVATION OF RIGHTS**

38.   Renco expressly reserves all rights to supplement, modify, or amend this objection, including after the voting record is finalized, after the Court rules on the 3018 Motion, and after further discovery or disclosures concerning the Plan, the Liquidation Analysis, the Intercreditor

Agreements, the Committee Challenge, or the Plan Proponent's proposed evidence in support of confirmation. The allowance and classification of the Renco Claims as proposed herein shall not constitute or be construed as an admission by Renco of any limitation on the ultimate allowed amount of any of the Renco Claims. Renco does not waive, and expressly reserves, all rights, arguments, counterarguments, and defenses.

## CONCLUSION

WHEREFORE, Renco respectfully requests that the Court deny confirmation of the Plan and grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: June 5, 2026

**SAUL EWING**

*/s/ Mark Minuti*
Mark Minuti (DE No. 2659)
Paige N. Topper (DE No. 6470)
1201 North Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6840
Email:  mark.minuti@saul.com
         paige.topper@saul.com

**McGUIREWOODS LLP**

Mark E. Freedlander (admitted pro hac vice)
Frank J. Guadagnino (admitted pro hac vice)
Tower Two-Sixty
260 Forbes Avenue, Suite 1800
Pittsburgh, PA 15222
Telephone: (412) 667-6000
Facsimile: (412) 667-6050
Email:  mfreedlander@mcguirewoods.com
         fguadagnino@mcguirewoods.com

*Counsel to The Renco Group, Inc. and Renco Global Capital, LLC*