**Exhibit A**

**Redline**

> **THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN APPROVED BY THE BANKRUPTCY COURT ON AN INTERIM BASIS FOR SOLICITATION PURPOSES ONLY; IT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT ON A FINAL BASIS. THIS COMBINED DISCLOSURE STATEMENT AND PLAN IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| US MAGNESIUM LLC, | ) | Case No. 25-11696 (BLS) |
| | ) | |
| Debtor.[1] | ) | |
| | ) | |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' ~~SECOND~~ SECOND AMENDED COMBINED DISCLOSURE STATEMENT AND PLAN OF LIQUIDATION OF US MAGNESIUM LLC UNDER CHAPTER 11 OF THE BANKRUPTCY CODE (TECHNICAL MODIFICATIONS)**

**COLE SCHOTZ P.C.**
Justin R. Alberto (No. 5126)
Michael E. Fitzpatrick (No. 6797)
500 Delaware Avenue, Suite 600
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
Email: jalberto@coleschotz.com
        mfitzpatrick@coleschotz.com

**EVERSHEDS SUTHERLAND (US) LLP**
Todd C. Meyers (admitted *pro hac vice*)
Danielle Barav-Johnson (admitted *pro hac vice*)
600 Peachtree Street NE, Suite 5200
Atlanta, GA 30308
Telephone: (404) 853-8000
Email: toddmeyers@eversheds-sutherland.com
        dahnibarav-johnson@eversheds-sutherland.com

-and-

Todd C. Meyers (admitted *pro hac vice*)
John J. Ramirez (admitted *pro hac vice*)
Sameer M. Alifarag (admitted *pro hac vice*)
1114 Avenue of the Americas, 40th Floor
New York, NY 10036
Telephone: (212) 389-5000
Email: toddmeyers@eversheds-sutherland.com
        johnramirez@eversheds-sutherland.com
        sameeralifarag@eversheds-sutherland.com

---

[1] The last four digits of the Debtor's federal tax identification number are 5446. The Debtor's service address for the purpose of this chapter 11 case is: 238 N. 2200 W. Salt Lake City, UT 84116.

~~54276737.50~~54276737.51

*Counsel to the Official Committee of Unsecured Creditors*

**TABLE OF CONTENTS**

**Page**

SECTION 1 INTRODUCTION ............................................................................................3

SECTION 2 SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS
    AND  INTERESTS UNDER THE COMBINED DISCLOSURE STATEMENT
    AND PLAN AND IMPORTANT SOLICITATION AND CONFIRMATION
    DATES AND DEADLINES .............................................................................5

    2.1    Summary of Classification and Treatment of Claims and Interests. ...........5
    2.2    Important Dates and Deadlines ...................................................................9

SECTION 3 DEFINED TERMS ........................................................................................9

SECTION 4 BACKGROUND ...........................................................................................27

    4.1    General Background. ..................................................................................27
    4.2    Corporate History and Structure. ..............................................................28
    4.3    Consent Decree. ........................................................................................29
    4.4    Events and Circumstances Leading to the Bankruptcy Cases. ...................29
    4.5    Operations as of the Petition Date. ............................................................32
    4.6    Debtor's Prepetition Capital Structure. ......................................................32

SECTION 5 THE CHAPTER 11 CASE ...........................................................................33

    5.1    First Day and Other Early Relief. ..............................................................33
    5.2    Retention of Professionals. ........................................................................33
    5.3    Debtor's Schedules and Statements of Financial Affairs. ..........................34
    5.4    Initial DIP Financing. ................................................................................34
    5.5    The Committee's Motion to Convert. ........................................................35
    5.6    The Sale Motion, the Stalking Horse Bid, and the FFSL Sale. ..................35
    5.7    Other Asset Sales. .....................................................................................36
    5.8    Committee Challenge. ...............................................................................37
    5.9    Use of Cash Collateral. .............................................................................37
    5.10    Committee Settlement. ..............................................................................38
    5.11    Bar Date Motion. ......................................................................................39
    5.12    Pension Plan Matters. ................................................................................39

SECTION 6 CONFIRMATION AND VOTING PROCEDURES ......................................40

    6.1    Procedures for Objections. ........................................................................40
    6.2    Requirements for Confirmation. ................................................................41
    6.3    Classification of Claims and Interests. ......................................................41
    6.4    Impaired Claims or Interests. ....................................................................43
    6.5    Confirmation With Rejecting Classes; Cramdown. ...................................43
    6.6    Feasibility. ................................................................................................44
    6.7    Best Interests Test and Liquidation Analysis. ............................................45
    6.8    Eligibility to Vote on the Combined Disclosure Statement and Plan. ........46
    6.9    Solicitation Package. .................................................................................46
    6.10    Voting Procedures, Voting Deadline, and Applicable Deadlines. ..............46

6.11    Acceptance of the Combined Disclosure Statement and Plan. ........... 47

SECTION 7 CERTAIN RISK FACTORS, TAX CONSEQUENCES, AND OTHER
    DISCLOSURES ................................................................................... 48

7.1    Certain Risk Factors to be Considered. ......................................... 48
7.2    The Combined Disclosure Statement and Plan May Not Be Accepted. ... 48
7.3    The Combined Disclosure Statement and Plan May Not Be Confirmed. ... 48
7.4    Distributions to Holders of Allowed Claims Under the Combined Disclosure
       Statement and Plan May be Inconsistent with Projections. ............. 49
7.5    Objections to Classification of Claims. ......................................... 49
7.6    Failure to Consummate the Combined Disclosure Statement and Plan. .... 50
7.7    Reductions to Estimated Creditor Recoveries. .............................. 50
7.8    Certain U.S. Federal Income Tax Consequences. .......................... 50
7.9    Tax Consequences for U.S. Holders of Certain Claims. .................. 52
7.10   Tax Consequences in Relation to Liquidating Trust. ...................... 53
7.11   Information Reporting and Withholding. ....................................... 55
7.12   Releases, Exculpations, and Injunctions. ..................................... 56
7.13   Alternatives to the Combined Disclosure Statement and Plan. .......... 57
7.14   The Distributions May Be Different Than Projected. ...................... 57

SECTION 8 UNCLASSIFIED CLAIMS ..................................................... 58

8.1    Unclassified Claims. ................................................................. 58
8.2    Administrative Claims. .............................................................. 58

SECTION 9 CLASSIFICATION OF CLAIMS AND INTERESTS ............... 60

9.1    Summary of Classification. ........................................................ 60
9.2    Special Provision Governing Unimpaired Claims. .......................... 60
9.3    Vacant and Abstaining Classes. .................................................. 60

SECTION 10 TREATMENT OF CLAIMS AND INTERESTS ..................... 61

10.1   Class 1—Priority Non-Tax Claims. ............................................. 61
10.2   Class 2—Other Secured Claims. ................................................. 61
10.3   Class 3—Senior Secured Claims. ................................................ 62
10.4   Class 4—Subordinated Secured Claims. ....................................... 62
10.5   Class 5—Deficiency Claims. ...................................................... 63
10.6   Class 6—Insider Unsecured Claims. ............................................ 63
10.7   Class 7—General Unsecured Claims. ........................................... 63
10.8   Class 8—Interests. ................................................................... 64

SECTION 11 DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS .... 64

11.1   Distribution Dates. .................................................................. 64
11.2   Subsequent Distributions. ......................................................... 64
11.3   Distribution Record Date. ......................................................... 64
11.4   Manner of Cash Payments Under the Combined Disclosure Statement and Plan or
       Liquidating Trust Agreement. .................................................... 65
11.5   Time Bar to Cash Payments by Check. ........................................ 65
11.6   Liquidating Trust Assets Account. .............................................. 66

SECTION 12 PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND
        REDISTRIBUTIONS .................................................................................................66

    12.1    No Distributions Pending Allowance. ..............................................................66
    12.2    Resolution of Disputed Claims. .......................................................................66
    12.3    Authority to Object to, Settle, and Resolve Claims. ........................................66
    12.4    Objection Deadline. .........................................................................................67
    12.5    Estimation of Claims. .......................................................................................67
    12.6    Disallowance of Claims. ...................................................................................67
    12.7    Claims Register ................................................................................................67
    12.8    Reserve Provisions for Disputed Claims. ........................................................68
    12.9    *De minimis* Distributions, Rounding. .............................................................69
    12.10  Tax Identification Numbers. .............................................................................69
    12.11  Unclaimed and Undeliverable Distributions. ...................................................70
    12.12  Books and Records and Vesting of Privileges. ................................................70
    12.13  Claims Payable by Third Parties. .....................................................................72

SECTION 13 TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
        LEASES ..................................................................................................................72

    13.1    Rejection of Executory Contracts and Unexpired Leases. ..............................72
    13.2    Rejection Claims. .............................................................................................73
    13.3    Insurance Policies. ...........................................................................................73

SECTION 14 MEANS FOR IMPLEMENTATION OF THE COMBINED
        DISCLOSURE STATEMENT AND PLAN .............................................................74

    14.1    Establishment and Administration of Liquidating Trust Assets Account; Other
           Accounts. .........................................................................................................74
    14.2    Dissolution of Debtor; Corporate Action by Debtor. ......................................74
    14.3    Appointment of the Liquidating Trustee, Liquidating Trust Oversight Committee,
           and the Wind-Down Officer. ...........................................................................75
    14.4    The Liquidating Trust. ......................................................................................75
    14.5    Removal or Resignation of the Liquidating Trustee. .......................................77
    14.6    Rights and Powers. ...........................................................................................77
    14.7    Fees and Expenses. ...........................................................................................78
    14.8    Transfer of Liquidating Trust Interests. ...........................................................79
    14.9    Litigation. .........................................................................................................79
    14.10  Continued Corporate Existence. .......................................................................79
    14.11  Management of the Post-Effective Date Debtor. ..............................................80
    14.12  Dissolution of the Committee. ..........................................................................81
    14.13  Termination After Five Years and Extension. ..................................................81

SECTION 15 EFFECT OF CONFIRMATION .........................................................................82

    15.1    Binding Effect of the Combined Disclosure Statement and Plan. ...................82
    15.2    Vesting of Liquidating Trust Assets in the Liquidating Trust. .........................82
    15.3    Vesting of Property in the Post-Effective Date Debtor. ...................................82
    15.4    Property Free and Clear. ...................................................................................83

SECTION 16 EXCULPATIONS, INJUNCTIONS, AND RELEASES ......................................83

16.1     Exculpation. ........................................................................................... 83
16.2     Debtor/Estate Release of Released Parties. ......................................... 84
16.3     Injunction. ............................................................................................ 85
16.4     Post-Confirmation Liability of the Liquidating Trustee, the Wind-Down Officer, and the Collateral Liquidation Manager. ......................... 86
16.5     Preservation of Rights of Action. ........................................................ 87
16.6     No Discharge. ....................................................................................... 88

SECTION 17 CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ............................................................................................................... 88

17.1     Conditions to Confirmation of the Combined Disclosure Statement and Plan. ... 88
17.2     Conditions to the Effective Date. ......................................................... 88
17.3     Waiver of Conditions Precedent. .......................................................... 89

SECTION 18 RETENTION OF JURISDICTION ............................................................ 89

18.1     Retention of Jurisdiction. ..................................................................... 89

SECTION 19 MISCELLANEOUS PROVISIONS ........................................................... 90

19.1     Payment of Statutory Fees / Closing of Chapter 11 Case. ................. 90
19.2     Revocation of the Combined Disclosure Statement and Plan. ........... 91
19.3     Severability of Provisions. ................................................................... 91
19.4     Rules of Interpretation. ......................................................................... 91
19.5     Exhibits. ................................................................................................ 91
19.6     Notices. ................................................................................................. 92
19.7     Reservation of Rights. .......................................................................... 93
19.8     Defects, Omissions and Amendments. ................................................ 93
19.9     Filing of Additional Documents. .......................................................... 93
19.10    Successors and Assigns. ....................................................................... 93
19.11    Setoffs and Recoupments. .................................................................... 94
19.12    Tax Exemption. ..................................................................................... 94
19.13    Securities Exemption. ........................................................................... 94
19.14    Implementation. .................................................................................... 94
19.15    Record Date. .......................................................................................... 94
19.16    Certain Actions. .................................................................................... 95
19.17    Substantial Consummation. .................................................................. 95
19.18    Waiver of Fourteen-Day Stay. .............................................................. 95
19.19    Governing Law. ..................................................................................... 95
19.20    Final Decree. ......................................................................................... 95
19.21    Entire Agreement. ................................................................................. 96

SECTION 20 RECOMMENDATION .............................................................................. 96

EXHIBIT A: LIQUIDATION ANALYSIS

## DISCLAIMERS

EACH HOLDER OF A CLAIM AGAINST THE DEBTOR ENTITLED TO VOTE TO ACCEPT OR REJECT THE COMBINED DISCLOSURE STATEMENT AND PLAN SHOULD READ THE COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY BEFORE VOTING. NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE COMBINED DISCLOSURE STATEMENT AND PLAN MAY BE MADE EXCEPT PURSUANT TO THE TERMS HEREOF AND SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE. IF YOU ARE ENTITLED TO VOTE TO ACCEPT THE COMBINED DISCLOSURE STATEMENT AND PLAN, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THE COMBINED DISCLOSURE STATEMENT AND PLAN. THE PLAN PROPONENT URGES YOU TO VOTE TO ACCEPT THE COMBINED DISCLOSURE STATEMENT AND PLAN.

THE COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 3016 AND 3017, AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST OR INTERESTS IN THE DEBTOR SHOULD EVALUATE THE COMBINED DISCLOSURE STATEMENT AND PLAN IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED. THE COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTOR. YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE COMBINED DISCLOSURE STATEMENT AND PLAN.

THE COMBINED DISCLOSURE STATEMENT AND PLAN CONTAINS SUMMARIES OF CERTAIN STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE COMBINED DISCLOSURE STATEMENT AND PLAN, AND EVENTS AND ANTICIPATED EVENTS IN THE CHAPTER 11 CASE. ALTHOUGH THE PLAN PROPONENT BELIEVES THAT THE STATEMENTS AND DESCRIPTIONS CONTAINED IN THE COMBINED DISCLOSURE STATEMENT AND PLAN ARE TRUE AND ACCURATE, THEY ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE DOCUMENTS RELATED TO THE COMBINED DISCLOSURE STATEMENT AND PLAN AND APPLICABLE STATUTORY PROVISIONS. THE TERMS OF THE DOCUMENTS RELATED TO THE COMBINED DISCLOSURE STATEMENT AND PLAN AND APPLICABLE STATUTES GOVERN IN THE EVENT OF ANY DISCREPANCY WITH THE COMBINED DISCLOSURE STATEMENT AND PLAN. CREDITORS AND OTHER INTERESTED PARTIES SHOULD READ THE COMBINED DISCLOSURE STATEMENT AND PLAN, THE DOCUMENTS RELATED TO THE COMBINED DISCLOSURE STATEMENT AND PLAN, AND THE APPLICABLE STATUTES

1

THEMSELVES FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE FACTUAL STATEMENTS AND REPRESENTATIONS CONTAINED IN THE COMBINED DISCLOSURE STATEMENT AND PLAN ARE MADE BY THE PLAN PROPONENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED, AND THE PLAN PROPONENT DISCLAIMS ANY OBLIGATION TO UPDATE ANY SUCH STATEMENTS AFTER THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE COMBINED DISCLOSURE STATEMENT AND PLAN. THE DELIVERY OF THE COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT NECESSARILY BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

ALL FORWARD-LOOKING STATEMENTS CONTAINED HEREIN OR OTHERWISE MADE BY THE PLAN PROPONENT INVOLVE MATERIAL RISKS AND UNCERTAINTIES AND ARE SUBJECT TO CHANGE BASED ON NUMEROUS FACTORS, INCLUDING FACTORS THAT ARE BEYOND THE PLAN PROPONENT'S OR THE DEBTOR'S CONTROL. ACCORDINGLY, THE DEBTOR'S FUTURE PERFORMANCE AND FINANCIAL RESULTS MAY DIFFER MATERIALLY FROM THOSE EXPRESSED OR IMPLIED IN ANY SUCH FORWARD-LOOKING STATEMENTS. SUCH FACTORS INCLUDE, BUT ARE NOT LIMITED TO, THOSE DESCRIBED IN THE COMBINED DISCLOSURE STATEMENT AND PLAN. THE PLAN PROPONENT DOES NOT INTEND TO UPDATE OR REVISE ITS FORWARD-LOOKING STATEMENTS EVEN IF EXPERIENCE OR FUTURE CHANGES MAKE IT CLEAR THAT ANY PROJECTED RESULTS EXPRESSED OR IMPLIED THEREIN WILL NOT BE REALIZED.

ANY PROJECTED RECOVERIES TO CREDITORS SET FORTH IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN ARE BASED UPON THE ANALYSES PERFORMED BY THE PLAN PROPONENT AND ITS ADVISORS. ALTHOUGH THE PLAN PROPONENT AND ITS ADVISORS HAVE MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN, THE PLAN PROPONENT AND ITS ADVISORS CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THIS INFORMATION.

IN CONNECTION WITH THE PLAN PROPONENT'S SOLICITATION OF ACCEPTANCES OF THE COMBINED DISCLOSURE STATEMENT AND PLAN PURSUANT TO SECTION 1126(B) OF THE BANKRUPTCY CODE, THE PLAN PROPONENT IS FURNISHING A SOLICITATION PACKAGE, CONSISTING OF THE

**COMBINED DISCLOSURE STATEMENT AND PLAN, THE EXHIBITS HERETO, COMBINED HEARING NOTICE, THE SOLICITATION PROCEDURES ORDER (INCLUDING THE TABULATION PROCEDURES), AND AN APPLICABLE BALLOT, TO EACH RECORD HOLDER OF CLAIMS ELIGIBLE TO VOTE OR ITS COUNSEL. THE COMBINED DISCLOSURE STATEMENT AND PLAN IS TO BE USED BY EACH SUCH ELIGIBLE HOLDER SOLELY IN CONNECTION WITH ITS EVALUATION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN; USE OF THE COMBINED DISCLOSURE STATEMENT AND PLAN FOR ANY OTHER PURPOSE IS NOT AUTHORIZED. NOTHING STATED IN THE COMBINED DISCLOSURE STATEMENT AND PLAN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR, THE PLAN PROPONENT, OR ANY OTHER PARTY.**

## SECTION 1
## INTRODUCTION

The Official Committee of Unsecured Creditors (the "Committee" or "Plan Proponent") appointed in the above-captioned chapter 11 case (the "Chapter 11 Case") of US Magnesium LLC, the debtor and debtor-in-possession (the "Debtor" or "Company"), hereby proposes the following combined disclosure statement and plan of liquidation pursuant to sections 1121(a) and 1125(b) of title 11 of the United States Code (as may be modified, amended, or supplemented from time to time, the "Combined Disclosure Statement and Plan"). Capitalized terms used in the Combined Disclosure Statement and Plan and not otherwise defined have the meanings ascribed to such terms in Section 3.

The Debtor commenced its Chapter 11 Case to address the Debtor's prepetition liabilities, including its legacy environmental liabilities arising out of its former operations, and to implement a sale of its assets to maximize value for the Debtor's estate and its Creditors. The Debtor was successful in this goal. As described in more detail herein, with Bankruptcy Court approval and the support of the Committee, the Debtor sold certain of its unencumbered assets to FFSL, with the primary consideration being $30 million and the assumption of certain liabilities, including certain of the Debtor's legacy environmental liabilities and certain tax liabilities.

Following the consummation of the sale to FFSL, the main objective in the Chapter 11 Case has been to determine a process to liquidate the Debtor's Prepetition Collateral and propose and consummate a chapter 11 plan that distributes the Debtor's remaining value to its Creditors as soon as reasonably possible and in a fair and efficient manner. The Committee, as Plan Proponent, believes that the Combined Disclosure Statement and Plan accomplishes this objective.

**MOREOVER, THE DEBTOR SUPPORTS THE PLAN AND BELIEVES THAT CONFIRMATION AND CONSUMMATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR AND ITS CREDITORS.**

On May 8, 2026, the Bankruptcy Court entered the Solicitation Procedures Order, which, among other things, approved (i) the Disclosure Statement, finding that it contains "adequate

3

information," as that term is used in section 1125(a)(1) of the Bankruptcy Code on an interim basis, and authorized the Plan Proponent to solicit votes to accept or reject the Combined Disclosure Statement and Plan, and (ii) certain procedures and notices related to the solicitation and tabulation of acceptances and rejections of the Combined Disclosure Statement and Plan. The Bankruptcy Court, however, has not yet ruled on the merits of the Combined Disclosure Statement and Plan.

In short, the Combined Disclosure Statement and Plan provides for, as of the Effective Date, a Liquidating Trust to liquidate, collect, sell, or otherwise dispose of the remaining assets of the Debtor's Estate including, without limitation: (i) Causes of Action of the Debtor and Estate, (ii) the Salt Lake City Property, and (iii) the Prepetition Collateral, primarily consisting of the inventory and equipment, if and to the extent such assets were not previously monetized to Cash or otherwise transferred or abandoned by the Debtor prior to the Effective Date, and to distribute all net proceeds to Creditors generally in accordance with the priority scheme under the Bankruptcy Code and subject to the terms of the Combined Disclosure Statement and Plan and Liquidating Trust Agreement. There will be no Distributions to Holders of Interests.

The Plan Proponent submits that the Combined Disclosure Statement and Plan and/or notice thereof will be distributed to all holders of Claims and Interests in accordance with section 1125(b) of the Bankruptcy Code; Bankruptcy Rules 2002, 3016, and 3017; and any applicable Bankruptcy Court order. The Combined Disclosure Statement and Plan and the exhibits hereto include a discussion of: (i) the nature and history of the Debtor's business and liabilities; (ii) events during the Chapter 11 Case; (iii) the requirements for Confirmation of the Combined Disclosure Statement and Plan and procedures for voting to accept or reject the Combined Disclosure Statement and Plan; (iv) additional factors and disclosures to be considered, including risk factors and certain U.S. federal income tax consequences of the Combined Disclosure Statement and Plan; and (v) the terms of the Combined Disclosure Statement and Plan, including the treatment of holders of Claims and Interests under the Combined Disclosure Statement and Plan. The Combined Disclosure Statement and Plan was prepared with the intent to provide "adequate information" (as defined in the Bankruptcy Code) to enable holders of Claims against and Interests in the Debtor to make informed judgments about the Combined Disclosure Statement and Plan.

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in section 19.2 of the Combined Disclosure Statement and Plan, if any, the Plan Proponent expressly reserves the right for the Plan Proponent, prior to the Effective Date of the Combined Disclosure Statement and Plan, or the Liquidating Trustee, following the Effective Date of the Combined Disclosure Statement and Plan, to alter, amend, or modify the Combined Disclosure Statement and Plan, including the Plan Supplement, one or more times, before substantial consummation thereof.

**PLEASE READ THE COMBINED DISCLOSURE STATEMENT AND PLAN, THE EXHIBITS, OTHER SUPPORTING MATERIALS, AND ANY APPROPRIATE BALLOT CAREFULLY AND FOLLOW THE INSTRUCTIONS SET FORTH BELOW**

**AND ON THE APPROPRIATE BALLOT TO VOTE ON THE COMBINED DISCLOSURE STATEMENT AND PLAN.**

**BASED ON THE CURRENTLY KNOWN FACTS AND CIRCUMSTANCES AND THE INFORMATION PROVIDED BY THE DEBTOR AND ITS PROFESSIONALS, THE COMMITTEE, WHICH IS THE PLAN PROPONENT, BELIEVES THAT THE COMBINED DISCLOSURE STATEMENT AND PLAN PROVIDES THE BEST METHOD OF MAXIMIZING THE RECOVERIES FOR THE HOLDERS OF CLAIMS AGAINST THE DEBTOR, INCLUDING THE UNSECURED CREDITORS OF THE DEBTOR. THEREFORE, THE PLAN PROPONENT RECOMMENDS THAT ALL CREDITORS WHO ARE ENTITLED TO VOTE SHOULD VOTE IN FAVOR OF THE COMBINED DISCLOSURE STATEMENT AND PLAN.**

Unless otherwise specified, all section or exhibit references in the Combined Disclosure Statement and Plan are to the respective section in, or exhibit to, the Combined Disclosure Statement and Plan, as the same may be amended, waived, or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Combined Disclosure Statement and Plan as a whole and not to any particular section, subsection, or clause contained herein. The headings in the Combined Disclosure Statement and Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; and (c) unless otherwise noted above, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply.

**SECTION 2**
**SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE COMBINED DISCLOSURE STATEMENT AND PLAN AND IMPORTANT SOLICITATION AND CONFIRMATION DATES AND DEADLINES**

2.1     <u>Summary of Classification and Treatment of Claims and Interests.</u>

All Claims against or Interests in the Debtor, other than Administrative Claims and Priority Tax Claims, are classified for purposes of voting and Distributions under the Combined Disclosure Statement and Plan. A summary of the classification of these Claims and Interests, the proposed treatment of each Class of Claims or Interests, and the voting status of each Class of Claims or Interests follows.

| Class | Treatment | Status | Entitled to Vote? |
|---|---|---|---|
| **Unclassified**: Administrative Claims, | Except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment, each Holder of an Allowed Administrative Claim, other than a Professional Fee Claim, shall receive, without interest, Cash equal to the Allowed | Unimpaired | No |

5

| Class | Treatment | Status | Entitled to Vote? |
|---|---|---|---|
| Estimated total: TBD<br>**Estimated Recovery: 100%** | amount of such Claim: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order Allowing such Claim; (b) with respect to any Administrative Claims representing obligations incurred in the ordinary course of the Debtor's business, upon such regular and customary payment or performance terms as may exist in the ordinary course of the Debtor's business or as otherwise provided in the Combined Disclosure Statement and Plan; or (c) with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), as and when due under applicable law. | | |
| **Unclassified**:<br>Priority Tax Claims,<br>Estimated total: $0<br>**Estimated Recovery: 100%** | Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction of each Allowed Priority Tax Claim, the Debtor, or the Liquidating Trust, as the case may be, shall pay each holder of an Allowed Priority Tax Claim, the full unpaid amount of such Allowed Priority Tax Claim on or as soon as practicable after the Effective Date or, if later, the date such Allowed Priority Tax Claim becomes an Allowed Claim; *provided that*, after becoming an Allowed Claim, such Allowed Priority Tax Claim may be paid at a later date pursuant to applicable non-bankruptcy law. | Unimpaired | No |
| **Class 1:**<br>Priority Non-Tax Claims,<br>Estimated total: TBD<br>**Estimated Recovery: 100%** | Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction of each Allowed Priority Non-Tax Claim, the Liquidating Trust shall pay, the Allowed amount of each Priority Non-Tax Claim to each Entity holding a Priority Non-Tax Claim as soon as practicable following the later of: (a) the Effective Date and (b) the date such Priority Non-Tax Claim becomes an Allowed Claim (or as otherwise permitted by law). The Liquidating Trust shall pay each Entity holding a Priority Non-Tax Claim in Cash in full in respect of such Allowed Claim without interest from the Petition Date. | Unimpaired | No |
| **Class 2:**<br>Other Secured Claims,<br>Estimated total (approx.): $0 - $5,800,000<br>**Estimated Recovery: 100%** | Except to the extent that (i) an Other Secured Claim previously has been paid in full or (ii) the liability for an Other Secured Claim has been assumed by the Purchaser under the FFSL APA, at the option of the Liquidating Trustee, one of the following treatments shall be provided: (i) the Holder of an Other Secured Claim shall retain its Lien on its Collateral until such Collateral is sold, and the applicable proceeds of such sale, *less* costs and expenses of disposing of such Collateral, shall be paid to such Holder of an Allowed Other Secured Claim in full satisfaction and release of such Allowed Other Secured Claim; (ii) on or as soon as practicable after the later of (a) the Effective Date, or (b) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim, or as otherwise agreed between the Holder of such Claim and the Debtor or Liquidating | Unimpaired | No |

6

| Class | Treatment | Status | Entitled to Vote? |
|---|---|---|---|
| | Trustee, the Holder of such Other Secured Claim will receive a Cash payment equal to the amount of its Allowed Other Secured Claim in full satisfaction and release of such Other Secured Claim; (iii) the Collateral securing the Creditor's Other Secured Claim shall be abandoned to such Creditor, in full satisfaction and release of such Other Secured Claim; or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.  Other Secured Claims which have been (i) previously paid in full or (ii) assumed by the Purchaser under the FFSL APA shall be expunged from the Claims Register. | | |
| **Class 3:** Senior Secured Claims, Estimated total (approx.):[2] $41,400,000 – 68,600,000 **Estimated Recovery: 35 - 53%** | The Holder of an Allowed Senior Secured Claim shall retain its Lien on its Prepetition Collateral until such Prepetition Collateral is sold, and the proceeds of such sale, *less* costs and expenses of disposing such Prepetition Collateral *and* any amounts to be paid to the Debtor's estate, all in accordance with the Cooperation Agreement and Ace Settlement, shall be promptly paid to such Holder, up to the amount of the Allowed Senior Secured Claim; *provided* that the Holder of an Allowed Senior Secured Claim may release its interest in the Prepetition Collateral pursuant to the FFSL Sale Order, or otherwise. The allowance and treatment under the Combined Disclosure Statement and Plan of the Senior Secured Claims shall be subject and without prejudice to any non-barred claims and defenses, whether asserted or unasserted, against the Prepetition Secured Lenders in the Committee Challenge or otherwise, which shall be preserved under the Combined Disclosure Statement and Plan for prosecution by the Liquidating Trustee. Any Deficiency Senior Secured Claims shall be placed in Class 5 and treated as set forth therein. | Impaired | Yes |
| **Class 4:** Subordinated Secured Claims, Estimated total (approx.): $0 - 48,000,000 **Estimated Recovery:** | The Holder of an Allowed Subordinated Secured Claim shall retain its Lien on its Prepetition Collateral until such Prepetition Collateral is sold, and the proceeds of such sale, *less* costs and expenses of disposing of such Prepetition Collateral *and* any amounts to be paid to the Debtor's estate in accordance with the Cooperation Agreement and Ace Settlement, up to the amount of the Allowed Subordinated Secured Claim, all in accordance with the Cooperation Agreement and Ace Settlement, shall be promptly paid to such Holder of an Allowed Subordinated Secured Claim; *provided, however*, in accordance with the terms | Impaired | Yes |

---

[2] The estimated Claim amounts for Senior Secured Claims reflect balances as of the Petition Date and do not reflect any paydowns made by the Debtor after the Petition Date.

7

| Class | Treatment | Status | Entitled to Vote? |
|---|---|---|---|
| **0%** | and conditions of the applicable Intercreditor Agreements, only after all Allowed Senior Secured Claims have been paid in full or otherwise satisfied; *provided further*, *however*, that the Holder of an Allowed Subordinated Secured Claim may release its interest in any Prepetition Collateral in accordance with the FFSL Sale Order, or otherwise. The allowance and treatment under the Combined Disclosure Statement and Plan of the Subordinated Secured Claims shall be subject and without prejudice to any claims and defenses, whether asserted or unasserted, against the Prepetition Secured Lenders in the Committee Challenge or otherwise, which shall be preserved under the Combined Disclosure Statement and Plan for prosecution by the Liquidating Trustee. Any Deficiency Subordinated Secured Claims shall be placed in Class 5 and treated as set forth therein. | | |
| **Class 5**: Deficiency Claims, Estimated total (approx.): $7,900,000 –93,500,000 **Estimated Recovery: 5 - 16%** | Holders of Allowed Deficiency Claims shall receive, in exchange for their Allowed Deficiency Claims, their Pro Rata share of the Liquidating Trust Interests, which entitle the Liquidating Trust Beneficiaries thereof to a Pro Rata share of any net proceeds of the Liquidating Trust Assets. The Liquidating Trustee shall not be required to make Distributions with respect to Allowed Deficiency Claims pursuant to the terms of the applicable Intercreditor Agreements, nor shall the Liquidating Trustee—or any entity acting on its behalf—incur any liability on account of such Distributions. The allowance and treatment under the Combined Disclosure Statement and Plan of the Deficiency Claims shall be subject to and without prejudice to any relevant claims and defenses whether asserted or unasserted against the Prepetition Secured Lenders in the Committee Challenge or otherwise, which shall be preserved under the Combined Disclosure Statement and Plan for prosecution by the Liquidating Trustee. | Impaired | Yes |
| **Class 6**: Insider Unsecured Claims, Estimated total (approx.): $0 – 95,000,000 **Estimated Recovery: 5 - 9%** | Holders of Allowed Insider Unsecured Claims shall receive, in exchange for their Allowed Insider Unsecured Claims, their Pro Rata share of the Liquidating Trust Interests, which entitle the Liquidating Trust Beneficiaries thereof to a Pro Rata share of any net proceeds of the Liquidating Trust Assets. The allowance and treatment under the Combined Disclosure Statement and Plan of the Insider Unsecured Claims shall be subject to and without prejudice to any relevant claims and defenses, whether asserted or unasserted against the Insiders in the Committee Challenge or otherwise, which shall be preserved under the Combined Disclosure Statement and Plan for prosecution by the Liquidating Trustee. | Impaired | Yes |
| **Class 7**: General Unsecured | Holders of Allowed General Unsecured Claims shall receive, in exchange for their Allowed General Unsecured Claims, a Pro Rata share of the Liquidating Trust Interests, which entitle the Liquidating Trust Beneficiaries thereof to a Pro Rata share of any | Impaired | Yes |

8

| Class | Treatment | Status | Entitled to Vote? |
|---|---|---|---|
| Claims<br><br>Estimated total (approx.): $100,000,000<br><br>**Estimated Recovery:**<br><br>**5 – 16%** | net proceeds of the Liquidating Trust Assets. | | |
| **Class 8**:<br><br>Interests<br><br>**Estimated Recovery: 0%** | There shall be no Distribution on account of Class 8 Interests. Upon the Effective Date, all Interests will be deemed cancelled and will cease to exist, other than for administrative purposes. | Impaired | No |

## 2.2    Important Dates and Deadlines

| Event | Date[3] |
|---|---|
| Voting Record Date | May 7, 2026, at 4:00 p.m. |
| Solicitation Deadline | Three (3) Business Days after entry of the Solicitation Procedures Order, or as soon as reasonably practicable thereafter |
| Publication Deadline | Three (3) Business Days after entry of the Solicitation Procedures Order, or as soon as reasonably practicable thereafter |
| Deadline for Creditors to File Rule 3018 Motions | May 20, 2026, at 4:00 p.m. |
| Deadline to file Plan Supplement | May 27, 2026, at 4:00 p.m. |
| Deadline to Respond to Rule 3018 Motions | June 5, 2026, at 4:00 p.m. |
| Voting Deadline | June 5, 2026, at 4:00 p.m. |
| Combined Objection Deadline | June 5, 2026, at 4:00 p.m. |
| Deadline to File Replies to any Objections, Confirmation Brief, and Other Evidence Supporting the Combined Disclosure Statement and Plan | June 11, 2026, at 4:00 p.m., or 12:00 p.m., three (3) Business Days prior to any adjourned Combined Hearing |
| Deadline to File Voting Tabulation Affidavit | June 11, 2026, at 4:00 p.m. |
| Combined Hearing | June 16, 2026, subject to the Bankruptcy Court's availability |

---

[3] All times noted are in prevailing Eastern Time.

# SECTION 3
# DEFINED TERMS

As used in the Combined Disclosure Statement and Plan, capitalized terms not otherwise defined have the meanings set forth below. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

3.1    "*Access Agreement(s)*" means (i) the Limited Access Agreement and (ii) any future access agreements with respect to the Rowley Property executed among FFSL, Wells Fargo, and the Debtor.

3.2    "*Ace*" means Ace American Insurance Company.

3.3    "*Ace Claims*" means any contract claims, commercial tort claims or other claims, and the proceeds thereof, of the Debtor against Ace, related to the claims against Ace under the Ace Insurance Policy for certain physical damage to certain of the Debtor's equipment and business interruption insurance related to a mechanical failure at the Company's property in the litigation commenced by the Debtor against Ace in the Court of Common Pleas, Philadelphia, Pennsylvania.[4]

3.4    "*Ace Insurance Policy*" means that certain "All Risk" property insurance policy issued by Ace for the policy period August 31, 2020 to August 31, 2021, wherein the Debtor is the named insured.

3.5    "*Ace Settlement*" means the settlement contained in that certain Settlement Agreement among Wells Fargo, Renco, the Debtor and the Committee, dated as of March 30, 2026, wherein the parties therein agreed to resolve the Committee Challenge solely with respect to the Ace Claims, as described in greater detail in section 5.9 hereof.

3.6    "*Administrative Claim*" means a Claim for an expense of administration of the Chapter 11 Case arising under Sections 503(b), 507(b), 503(b)(9) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate; (b) the value of any goods received by the Debtor within 20 days before the Petition Date to the extent that goods were sold to the Debtor in the ordinary course of the Debtor's business; (c) Professional Fee Claims; (d) all fees and charges assessed against the Estate under 28 U.S.C. §1930; (e) all obligations designated as Allowed Administrative Claims pursuant to an order of the Bankruptcy Court; (f) administrative claims that were timely filed prior to the applicable Administrative Expense Bar Date; and (g) any Tax Claims incurred by the Debtor after the Petition Date or relating to a tax year or period which occurs after the Petition Date and that were not assumed by the Purchaser.

---

[4] Any description of the Ace Claims herein is qualified in its entirety to the complaint filed by the Debtor in the Court of Common Pleas with respect to the Ace Claims.

3.7     "*Administrative Expense Bar Date*" means the applicable last date, at 5:00 p.m. Eastern time, set by the Bankruptcy Court for a Claimant to file a request for payment of any Administrative Claim (excluding Professional Fee Claims) arising on or after the Petition Date, through and including the Effective Date. The Administrative Expense Bar Date as to Administrative Claims arising or deemed to be arisen after entry of the Bar Date Order shall be thirty (30) days after the Effective Date. The Administrative Expense Bar Date as to Administrative Claims arising or deemed to be arisen on or prior to entry of the Bar Date Order is subject to prior Court order [Docket No. 706].

3.8     "*Allowed*" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that has been scheduled by the Debtor on the Schedules as other than disputed, contingent, or unliquidated and, as to which, the Debtor, the Liquidating Trustee or other party in interest has not filed an objection on or before the Claims Objection Deadline; (b) a Claim that is set forth in a timely filed Proof of Claim as to which no objection has been filed and which is not otherwise a Disputed Claim; (c) a Claim that has been allowed by a Final Order; (d) a Claim that is allowed: (i) in any stipulation of amount and nature of Claim executed by the Debtor prior to the Effective Date and approved by the Bankruptcy Court; (ii) in any stipulation of amount and nature of Claim executed by the Liquidating Trustee on or after the Effective Date; (iii) in any stipulation of amount and nature of any Administrative Claim, Priority Non-Tax Claim, or Priority Tax Claim executed by (y) the Debtor and approved by the Bankruptcy Court, or (z) the Liquidating Trustee; or (iv) in any contract, instrument, indenture or other agreement entered into or assumed by Debtor in connection with and in accordance with the Combined Disclosure Statement and Plan; (e) a Claim relating to a rejected executory contract or unexpired lease that either (i) is not a Disputed or Disallowed Claim or (ii) has been allowed by a Final Order, in either case only if a Proof of Claim has been timely filed by the Claimant before the Rejection Bar Date for such claim or has otherwise been deemed timely filed under applicable law; or (f) a Claim that is allowed pursuant to the terms of the Combined Disclosure Statement and Plan. For the purpose of determining Distributions pursuant to the Combined Disclosure Statement and Plan, allowance under subsections (a) and (b) only is applicable once any of the following occur (1) before the Claims Objection Deadline, the Debtor or the Liquidating Trustee, as applicable, determine not to object to the Claim, (2) the Claims Objection Deadline passes without an objection being filed, or (3) after the Debtor or the Liquidating Trustee timely objects to the Claim, the Claim is allowed as provided in subparagraphs (c), (d) or (e) above.  For the avoidance of doubt, any Claim which has been Disputed (including by the Committee Challenge) shall not be considered an Allowed Claim until such Claim has been allowed by Final Order of the Bankruptcy Court, or by a Resolution Event.

3.9     "*Allowed Claim*" or "*Allowed … Claim*" means a Claim, of the nature described if any, that has been Allowed.

3.10     "*Available Cash*" means the aggregate amount of all Cash held by the Debtor on the Effective Date, other than the net proceeds of the Prepetition Collateral; *provided* that any amounts held in escrow pursuant to paragraph 42 of the FFSL Sale Order shall be transferred to the Liquidating Trust on the Effective Date, but shall not constitute Available Cash, unless and until such amounts are released from escrow pursuant to the terms and conditions therein.

11

3.11    "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies which any of the Debtor, the Estate, the Liquidating Trustee or other appropriate party in interest has asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

3.12    "*Ballots*" means the applicable ballots upon which the Holders of Impaired Claims, as of the Voting Record Date, shall indicate their acceptance or rejection of the Combined Disclosure Statement and Plan in accordance with the Solicitation Procedures Order and the Voting Instructions.

3.13    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

3.14    "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Case.

3.15    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Case, promulgated under 28 U.S.C. § 2075 and the General and Local Rules of the Bankruptcy Court.

3.16    "*Bar Date*" means, as applicable, the General Claims Bar Date, the Administrative Expense Bar Date, or any other applicable deadline to file Claims referenced in the Combined Disclosure Statement and Plan.

3.17    "*Bar Date Order*" means the *Order Establishing Bar Dates for Filing Claims and Approving Form and Manner of Notice Thereof* [Docket No. 706], entered by the Bankruptcy Court in the Chapter 11 Case, which established the General Claims Bar Date, the Administrative Expense Claim Bar Date, and certain other deadlines and procedures.

3.18    "*Bid Procedures*" means those certain procedures for the sale of substantially all of the Debtor's assets as approved by the Bid Procedures Order.

3.19    "*Bid Procedures Order*" means that *Order (I) (a) Approving Bid Procedures in Connection With the Sale of Substantially All of the Debtor's Assets, (B) Approving the Form and Manner of Notice Thereof (C) Scheduling an Auction and Sale Hearing, (D) Approving Procedures for the Assumption And Assignment of Contracts and Leases, and (E) Granting Related Relief and (II) an Order (A) Approving the Stalking Horse APA Between the Debtor and the Stalking Horse Bidder, (B) Authorizing the Sale to the Stalking Horse Bidder or the Successful Bidder of Substantially All of the Debtor's Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts and Leases, and (D) Granting Related Relief* [Docket No. 395], entered by the Bankruptcy Court in the Chapter 11 Case.

3.20    "*Business Day*" means any day, other than a Saturday, Sunday or legal holiday as defined in Bankruptcy Rule 9006(a).

3.21    "***Cash***" means cash and cash equivalents, including, but not limited to, bank deposits, wire transfers, checks, and readily marketable securities, instruments, and legal tender of the United States of America or instrumentalities thereof.

3.22    "***Cash Collateral Motion***" means the *Debtor's Motion for an Order (A) Authorizing the Post-Petition Use of Cash Collateral; (B) Granting Adequate Protection; and (C) Granting Related Relief* [Docket No. 608].

3.23    "***Cash Collateral Orders***" means the *Order (A) Authorizing the Debtor's Use of Cash Collateral; and (B) Granting Related Relief* [Docket No. 630], and any other future orders with respect to cash collateral, entered by the Bankruptcy Court in the Chapter 11 Case.

3.24    "***Causes of Action***" means all claims, actions, causes of action, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of setoff, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims, including, without limitation, all claims and any avoidance, preference, recovery, subordination or other actions of the Debtor and/or the Estate (unless the context expressly states that such Causes of Action belong to another Entity) against Creditors, insiders, and/or any other Persons or Entities, based in law or equity, including, without limitation, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the Effective Date.

3.25    "***CERCLA***" means the Comprehensive Environmental Response, Compensation & Liability Act, 42 U.S.C. § 9601, *et seq*. and any rules and regulations promulgated thereunder.

3.26    "***Chapter 11 Case***" means the Chapter 11 Case commenced when the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on the Petition Date, being administered under Case No. 25-11696 (BLS).

3.27    "***Claim***" means a claim (as defined in Section 101(5) of the Bankruptcy Code) against the Debtor, including, but not limited to: (a) any right to payment from the Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for breach of performance if such performance gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

3.28    "***Claimant***" means the Holder of a Claim.

3.29    "***Claims Agent***" means the party responsible for the Debtor's claims, noticing, and balloting, which prior to the Effective Date was Stretto, Inc.

3.30    "***Claims Objection Deadline***" means, with respect to all Claims other than Professional Fee Claims, (a) 180 days after the Effective Date, or (b) such other period as may be fixed or extended by an order of the Bankruptcy Court for objecting to Claims upon request of the Liquidating Trustee for cause shown.

3.31    "*Class*" means a category of Holders of Claims or Interests, as set forth in Section 9 of the Combined Disclosure Statement and Plan.

3.32    "*Collateral*" means any property or interest in property of the Debtor's Estate that is subject to a valid and enforceable Lien to secure a Claim.

3.33    "*Collateral Liquidation Manager*" initially means Michael P. Grau or another member of Focus Management, who shall serve as the liquidation manager and shall be an authorized representative for the Post-Effective Date Debtor appointed by the Bankruptcy Court to perform the Collateral Liquidation Wind-Down Tasks in accordance with the terms of the Prepetition Credit Agreement, the Committee Settlement, the Combined Disclosure Statement and Plan, and the Confirmation Order, or such successor appointed as the Collateral Liquidation Manager in accordance with section 14.11(b) hereof.

3.34    "*Collateral Liquidation Wind-Down Tasks*" means the following tasks that the Collateral Liquidation Manager is authorized to undertake as an authorized representative of the Post-Effective Date Debtor appointed by the Bankruptcy Court: (i) managing, selling, and distributing the net proceeds of the property of the Post-Effective Date Debtor in accordance with the terms and conditions of the Prepetition Credit Agreement, the Combined Disclosure Statement and Plan, and the Committee Settlement, and any applicable orders entered by the Bankruptcy Court; and (ii) any other necessary tasks as determined by the Collateral Liquidation Manager, either with the consent of the Liquidating Trustee or with Bankruptcy Court approval. For the avoidance of doubt, the Collateral Liquidation Manager shall not (i) require approval from the Wind-Down Officer to undertake the Collateral Liquidation Wind-Down Tasks, or (ii) be responsible for the Post-Effective Date Debtor Wind-Down Tasks.

3.35    "*Combined Disclosure Statement and Plan*" means this *Official Committee of Unsecured Creditors' Combined Disclosure Statement and Plan of Liquidation Under Chapter 11 of the Bankruptcy Code*, as may be modified, amended, or supplemented from time to time.

3.36    "*Combined Hearing*" means that certain hearing to consider final approval of the adequacy of the disclosures contained in, and confirmation of, the Combined Disclosure Statement and Plan.

3.37    "*Combined Objection Deadline*" means the deadline established by the Bankruptcy Court for filing and serving objections to Confirmation of the Combined Disclosure Statement and Plan.

3.38    "*Commercial Tort Claims*" means all commercial tort claims of the Debtor.

3.39    "*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Chapter 11 Case.

3.40    "*Committee Challenge*" means that certain adversary proceeding styled as *Official Committee of Unsecured Creditors of US Magnesium LLC, on behalf of the Debtor's estate v. Wells Fargo Bank, National Association, the Renco Group, Inc. and Renco Global*

14

*Capital, LLC*, Adv. Pro. No. 26-50012 (Bankr. D. Del. Jan. 29, 2026), as described in greater detail in section 5.8 hereof.

3.41    "*Committee Settlement*" means that certain settlement, as documented in the Access Agreement, the Ace Settlement, and the Cooperation Agreement, as described in greater detail in section 5.9 hereof.

3.42    "*Company*" means the Debtor.

3.43    "*Confirmation*" means the entry of the Confirmation Order, subject to all conditions specified in Section 17.1 hereof having been (a) satisfied or (b) waived.

3.44    "*Confirmation Date*" means the date upon which the Confirmation Order is entered by the Bankruptcy Court on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

3.45    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Combined Disclosure Statement and Plan pursuant to section 1129 of the Bankruptcy Code, in form and substance acceptable to the Committee.

3.46    "*Consent Decree*" shall have the meaning set forth in section 4.3 hereof.

3.47    "*Consummation*" or "*Consummate*" means the occurrence of the Effective Date.

3.48    "*Contingent Claim*" means any Claim for which a Proof of Claim has been filed with the Bankruptcy Court but was not filed in a sum certain and which Claim has not been estimated, fixed, or liquidated by the Bankruptcy Court at a sum certain as of the Effective Date, or a Claim that has accrued but nonetheless remains dependent on the occurrence of a future event that may never occur.

3.49    "*Cooperation Agreement*" means that certain Cooperation Agreement among the Debtor, the Committee, Wells Fargo, and Renco, dated as of March 30, 2026, wherein the parties therein agreed to cooperate, support, and not object to certain motions in the Chapter 11 Case with respect to the liquidation of certain Prepetition Collateral located on the Rowley Property, as described in greater detail in section 5.9 hereof, as may be amended, modified, or supplemented.

3.50    "*Creditor*" means any Holder of a Claim against the Debtor as specified in Section 101(10) of the Bankruptcy Code.

3.51    "**De Minimis *Sale Procedures Order***" means the *Order Authorizing and Approving Procedures for the Sale, Transfer, or Abandonment of* De Minimis *Assets* [Docket No. 793], entered by the Bankruptcy Court in the Chapter 11 Case, as may be amended, modified, or supplemented.

3.52    "*Debtor*" means US Magnesium LLC, debtor and debtor-in-possession in the Chapter 11 Case.

3.53    "*Debtor/Estate Release*" has the meaning set forth in Section 16.2 hereof.

3.54    "*Debtor/Estate Releasors*" has the meaning set forth in Section 16.2 hereof.

3.55    "*Deficiency Claims*" means all Deficiency Bridge Loan Claims, Deficiency Senior Secured Claims, Deficiency Subordinated Loan Claims, and any other unsecured Claims against the Debtor for the difference between (a) the aggregate amount of an Allowed Claim, and (b) the value of the portion of such Allowed Claim that is a Secured Claim, unless the Holder of such Claim validly elects under section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent allowed.

3.56    "*Deficiency Bridge Loan Claim*" means a Deficiency Claim arising under the Prepetition Bridge Loan Agreement.

3.57    "*Deficiency Senior Secured Claim*" means a Deficiency Claim arising under the Prepetition Credit Agreement (including the Deficiency Term Loan C Claims).

3.58    "*Deficiency Subordinated Loan Claim*" means a Deficiency Claim arising under the Prepetition Subordinated Loan Agreement.

3.59    "*Deficiency Term Loan C Claim*" means a Deficiency Claim arising under the Prepetition Term Loan C Facility.

3.60    "*DIP Liquidation Order*" means the *Order (I) Authorizing the Debtor to Obtain Postpetition Financing, (II) Authorizing the Lender to Make DIP Liquidation Advances to the Debtor to Liquidate the Lender's Pre-Petition Collateral; (III) Authorize the Debtor to Repay the DIP Liquidation Advances from the Net Cash Proceeds of the Sale of Prepetition Collateral; (IV) Modifying the Automatic Stay and (V) Granting Related Relief* [Docket No. 751], entered by the Bankruptcy Court in the Chapter 11 Case, as may be amended, modified, or supplemented by further order of the Bankruptcy Court.

3.61    "*Disallowed*" means, with respect to any Claim or any portion thereof: (a) that has been disallowed by a Final Order or by other agreement of a Claimant; (b) that is listed by the Debtor in the Schedules as zero or as disputed and as to which no Proof of Claim has been timely filed; or (c) that is deemed disallowed pursuant to the terms of the Combined Disclosure Statement and Plan.

3.62    "*Disallowed Claim*" or "*Disallowed . . . Claim*" means a Claim, of the nature described, if any, that has been Disallowed.

3.63    "*Disclosure Statement*" means the portion of this Combined Disclosure Statement and Plan that satisfies the disclosure requirements of section 1125 of the Bankruptcy Code.

16

3.64    "*Disputed*" means, with respect to any Claim or Interest, or portion thereof, any Claim or Interest: (a) that is not a Disallowed Claim and is listed on the Schedules as unliquidated, disputed, or contingent and as to which no Proof of Claim has been filed; or (b) as to which the Debtor, the Liquidating Trustee, or any other party in interest has interposed an objection or request for estimation as of any deadline fixed under the Combined Disclosure Statement and Plan or by order of the Bankruptcy Court in accordance with the Bankruptcy Code and the Bankruptcy Rules, or is otherwise disputed by the Debtor or the Liquidating Trustee in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order.  For the avoidance of doubt, this shall include the Claims (or portions thereof) disputed in the Committee Challenge.  To the extent that an objection or adversary proceeding relates to the allowance of only a portion of a Claim, such Claim shall be a Disputed Claim only to the extent of the objection or adversary proceeding.

3.65    "*Disputed Claim*" or "*Disputed . . . Claim*" means a Claim, of the nature described, if any, that has been Disputed.

3.66    "*Disputed Claim Reserve*" has the meaning set forth in Section 12.8 hereof.

3.67    "*Distribution Dates*" means collectively the Initial Distribution Date, any Subsequent Distribution(s) Date, and the date of the Final Distribution.

3.68    "*Distribution Record Date*" means the close of business on the Business Day immediately preceding each Distribution Date, which shall be the day before the Effective Date for the Initial Distribution Date.

3.69    "*Distribution(s)*" means the distribution(s) to be made in accordance with the Combined Disclosure Statement and Plan and the Liquidating Trust Agreement.

3.70    "*Effective Date*" means the date selected by the Plan Proponent on which the Combined Disclosure Statement and Plan goes into effect in accordance with its terms, which shall be a Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect, and (b) all conditions specified in Section 17.2 hereof have been satisfied, unless waived by the Plan Proponent. Within three (3) Business Days after the occurrence of the Effective Date, notice of the Effective Date shall be filed with the Bankruptcy Court by the Liquidating Trustee.

3.71    "*Entity*" means an entity as defined in Section 101(15) of the Bankruptcy Code and, where applicable, the Committee.

3.72    "*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001-1461.

3.73    "*Estate-Retained Causes of Action*" means all Causes of Action of the Debtor and Estate as of the Effective Date that are not expressly released pursuant to the Combined Disclosure Statement and Plan.

3.74     "*Estate*" means the Estate of the Debtor in the Chapter 11 Case created pursuant to Section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

3.75     "*Exculpated Parties*" has the meaning set forth in Section 16.1 hereof.

3.76     "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

3.77     "*FFSL*" means State of Utah Division of Forestry, Fire and State Lands.

3.78     "*FFSL APA*" means that certain Asset Purchase Agreement by and between the Debtor, as Seller, and FFSL, as Purchaser, dated January 26, 2026, wherein the Purchaser agreed to purchase the Sold Unencumbered Assets and assume, among other liabilities, the Debtor's obligations under the Consent Decree.

3.79     "*FFSL Sale*" means the sale of certain assets by the Debtor to the Purchaser pursuant to the FFSL APA, wherein the Purchaser purchased the Sold Unencumbered Assets, which include, but are not limited to, the Rowley Property and the Mineral Lease.

3.80     "*FFSL Sale Order*" means the *Order (A) Approving the Purchase Agreement Between the Debtor and the Successful Bidder, (B) Authorizing the Sale of the Purchased Assets Free and Clear of All Liens, Claims, Encumbrances and Interests, and (C) Granting Related Relief* [Docket No. 583], wherein the Bankruptcy Court approved the FFSL Sale of certain of the Debtor's assets to the Purchaser in this Chapter 11 Case.

3.81     "*Final Distribution*" means the last payment to Holders of Allowed Claims in accordance with the provisions of the Combined Disclosure Statement and Plan and the Liquidating Trust Agreement.

3.82     "*Final Order*" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction: (i) that has not been reversed, stayed, modified, or amended; (ii) as to which the time to or the right to appeal or seek reconsideration, review, rehearing, or certiorari has expired or been waived (without regard to whether the time to seek relief from a judgment under Bankruptcy Rule 9024 has expired); and (iii) as to which no appeal or petition for reconsideration, review, rehearing, or certiorari is pending.

3.83     "*Focus Management*" means Focus Management Group USA Inc.

3.84     "*Focus Management Retention*" means the Debtor's retention of Focus Management as the liquidation project manager with respect to the liquidation of certain Prepetition Collateral located on the Rowley Property.

3.85     "*General Claims Bar Date*" means April 27, 2026, at 5:00 p.m. prevailing Eastern Time, which was the general deadline set pursuant to the Bar Date Order for filing Proofs of Claim for any Claims against the Debtor that arose prior to the Petition Date.

3.86 "*General Unsecured Claim*" means any Claim against the Debtor or Estate that is not an Administrative Claim, a Priority Tax Claim, a Priority Non-Tax Claim, an Other Secured Claim, a Senior Secured Claim, a Subordinated Secured Claim, a Deficiency Claim, or an Insider Unsecured Claim.

3.87 "*Governmental Unit*" means the United States; State; Commonwealth, District, Territory, municipality, foreign state, department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under Chapter 11), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.

3.88 "*Holder*" means an Entity holding a Claim against or an Interest in the Debtor.

3.89 "*Impaired*" means with respect to a Claim or Class of Claims, a Claim or Class of Claims that is impaired within the meaning of section 1124 of the Bankruptcy Code.

3.90 "*Indemnified Parties*" has the meaning set forth in Section 16.4 hereof.

3.91 "*Initial DIP Facility*" shall have the meaning set forth in Section 5.4 hereof.

3.92 "*Initial Distribution Date*" means the Effective Date, or as soon as practicable thereafter when the initial Distribution shall be made to the Holders of Allowed Claims, as determined by the Liquidating Trustee.

3.93 "*Insider*" means an insider of the Debtor, as defined in Section 101(31) of the Bankruptcy Code.

3.94 "*Insider Unsecured Claims*" means any Claims asserted on a non-priority unsecured basis and held by Insiders and irrespective of whether they otherwise meet the definition of General Unsecured Claims, which for the avoidance of doubt, includes (but shall not be limited to) the Renco Claims and the Thayer Claims, but shall not include any Senior Secured Claims, Subordinated Secured Claims, or the Deficiency Claims.

3.95 "*Insurance Policies*" means all insurance policies maintained by or on behalf of the Debtor or the Post-Effective Date Debtor as of or after the Petition Date, specifically including, but not limited to, director and officer insurance and malpractice insurance policies, the Ace Insurance Policy, and any other insurance policies procured by or on behalf of the Debtor, the Post-Effective Date Debtor, or Liquidating Trustee for purposes of the liquidation of certain Prepetition Collateral located at the Rowley Property, including (but not limited to) commercial general liability insurance and employers' liability and worker's compensation insurance.

3.96 "*Intercreditor Agreements*" means (a) that certain *Intercreditor and Subordination Agreement*, by and between Wells Fargo and Renco Global Capital, Inc., dated as of June 26, 2023, and (b) that certain *Intercreditor and Subordination Agreement*, by and between Wells Fargo and Renco Group, Inc., dated as of August 27, 2025.

19

3.97    "*Interest*" means any equity interest in the Debtor, including, but not limited to, all issued, unissued, authorized, or outstanding shares or stock, whether common or preferred or vested or non-vested, together with any warrants, options, or contract rights to purchase or acquire such interests at any time.

3.98    "*Interim DIP Orders*" refers to the interim Orders of the Bankruptcy Court [Docket Nos. 32, 240, 325, and 416] approving debtor-in-possession financing in this Chapter 11 Case.

3.99    "*Lien*" means any charge against or interest in property (including, but not limited to, any mortgage, lien, pledge, charge, security interest, encumbrance, or other security device of any kind) to secure payment of a debt or performance of an obligation.

3.100    "*Limited Access Agreement*" means that certain Limited Access Agreement, among FFSL, the Debtor, and Wells Fargo, dated March 13, 2026, that provides for, among other things, (a) a limited access license for the Debtor and its designees to the Rowley Property for the purpose of liquidating certain Prepetition Collateral located thereon for a period of approximately ninety (90) days and (b) payment of certain royalty rates related to any minerals liquidated, in each case, subject to the terms and conditions therein, as described in greater detail in section 5.9 hereof.

3.101    "*Liquidating Trust*" means the grantor trust to be created upon the Effective Date for the benefit of the Liquidating Trust Beneficiaries.

3.102    "*Liquidating Trust Agreement*" means the agreement, substantially in the form to be included in the Plan Supplement governing the Liquidating Trust, as it may be subsequently modified from time to time.

3.103    "*Liquidating Trust Assets*" means all assets held in the Liquidating Trust. For the avoidance of doubt, Liquidating Trust Assets include, without limitation, (i) all Available Cash as of the Effective Date, (ii) the Estate-Retained Causes of Action of the Debtor and its Estate including those against directors, officers, managers, members and shareholders of the Debtor, in each case as of the Effective Date, (iii) all Avoidance Actions, (iv) all books and records, subject to section 12.12 hereof, (v) any excess amount remaining in the Professional Fee Reserve after payment in full of all claims and amounts for which such funds were reserved, (vi) the Debtor's interests in the Special Accounts, (vii) the Ace Claims, (viii) all unencumbered real or personal property, including the Salt Lake City Property, (ix) any amounts owed to the Debtor or its estate pursuant to the Cooperation Agreement, (x) to the extent all Allowed Senior Secured Claims and Allowed Subordinated Secured Claims are paid in full, the Prepetition Collateral, except to the extent the transfer of any such asset to the Liquidating Trust is disavowed or rejected by the Liquidating Trustee, in which case such asset shall be deemed abandoned, (xi) the Debtor's interests in Skull Valley, subject to any alleged security interests thereon, (xii) any assets of the Pension Plan in which the Debtor has a reversionary interest, (xiii) any Adequate Assurance Deposits, upon return by the applicable Utility (each, as defined in the Final Utility Order [Docket No. 159]) (xiv) all other assets of the Debtor that do not vest in the Post-Effective Date Debtor pursuant to section 15.3 hereof, and (xv) all proceeds of any of the foregoing.

20

3.104   "*Liquidating Trust Assets Account*" means one or more interest-bearing bank accounts or money-market accounts to be established and held in trust by the Liquidating Trustee on or after the Effective Date for the purpose of holding any Cash that constitutes a Liquidating Trust Asset.

3.105   "*Liquidating Trust Assets Proceeds*" means any Cash or other consideration or proceeds paid to or realized by the Liquidating Trustee upon the collection, sale, transfer, assignment, litigation, settlement, compromise, or other disposition of the Liquidating Trust Assets, as applicable, together with any funds, that may be obtained by the Liquidating Trust after the Effective Date pursuant to the Combined Disclosure Statement and Plan.

3.106   "*Liquidating Trust Beneficiaries*" means the Holders of Allowed Deficiency Claims, Allowed Insider Unsecured Claims, and Allowed General Unsecured Claims entitled to receive Liquidating Trust Interests under the Combined Disclosure Statement and Plan, whether or not such Claims were Allowed on the Effective Date.

3.107   "*Liquidating Trust Expenses*" means any fees, costs, and expenses incurred by the Liquidating Trustee or the Liquidating Trust from and after the Effective Date to liquidate or administer the Liquidating Trust Assets.

3.108   "*Liquidating Trust Interests*" means the non-transferable interests in the Liquidating Trust.

3.109   "*Liquidating Trust Oversight Committee*" means the committee consisting of four (4) members, which shall be selected by the Committee, that will oversee the administration and disposal of the Liquidating Trust Assets, as set forth in the Combined Disclosure Statement and Plan and the Liquidating Trust Agreement.

3.110   "*Liquidating Trustee*" means the Person or entity selected by the Committee to act as trustee of the Liquidating Trust in accordance with the terms of the Combined Disclosure Statement and Plan, the Confirmation Order, and the Liquidating Trust Agreement, or such successor appointed as the trustee in accordance with the Liquidating Trust Agreement.

3.111   "*Lithium MOU*" means that certain Memorandum of Understanding Between US Magnesium LLC and the Utah Division of Forestry, Fire & State Lands Concerning Interim Royalty Agreement for Lithium Carbonate Mining, Extraction and/or Production from the Great Salt Lake, dated October 24, 2019.

3.112   "*Litigation*" means the interest of the Estate, the Debtor, or the Liquidating Trust, as applicable, in any and all claims, rights, and Causes of Action that have been or may be commenced by the Debtor or the Liquidating Trust, as applicable, except as against any Released Parties. Litigation includes, without limitation not otherwise stated herein, any action: (i) to avoid and recover any transfers of property determined to be preferential, fraudulent, or avoidable pursuant to Sections 544, 545, 547, 548, 549(a), and 550 of the Bankruptcy Code; (ii) for the turnover of property to the Debtor or the Liquidating Trust, as applicable; (iii) for the recovery of property or payment of money that belongs to or can be asserted by the Debtor or the Liquidating Trust, as applicable; (iv) for compensation for damages incurred by the Debtor or the

21

Liquidating Trust; (v) equitable subordination actions against Creditors; and (vi) the Committee Challenge.

3.113    "*Materiality Threshold*" shall have the meaning ascribed in section 12.3 hereof.

3.114    "*Mineral Lease*" means that certain Mineral Lease & Option Agreement, dated March 8, 1961, entered into among the State Land Board (predecessor-in-interest to FFSL), as lessor, and James E. Hogle, George E. Hogle, James G. Macey, Bonneville-on-the-Hill, Rico-Argentine Mining Company, and Kearns-Tribune Corporation (predecessors in interest to the Debtor), as lessee, as later amended by that certain Agreement, dated July 31, 1969, among the State Land Board and H-K, Inc. and National Lead Company (predecessors in interest to the Debtor).

3.115    "*Other Secured Claim*" means any Secured Claim against the Debtor, other than a Senior Secured Claim or Subordinated Secured Claim.

3.116    "*PBGC*" means the Pension Benefit Guaranty Corporation, a wholly owned United States government corporation, and an agency of the United States, created under Title IV of ERISA to administer the federal pension insurance program.

3.117    "*Pension Plan*" means the US Magnesium LLC Hourly Defined Benefit Pension Plan, a single-employer defined benefit plan insured by the PBGC.

3.118    "*Person*" means any individual, corporation, limited liability company, general partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, Governmental Unit, or other Entity.

3.119    "*Petition Date*" means September 10, 2025, the date on which the Debtor filed its voluntary petition for relief commencing the respective Chapter 11 Case.

3.120    "*Plan Proponent*" means the Committee.

3.121    "*Plan Supplement*" means the pleading or pleadings identified in the Combined Disclosure Statement and Plan for filing with the Bankruptcy Court by the deadline established by the Bankruptcy Court, as modified and/or amended from time to time, which shall include certain exhibits and schedules to the Combined Disclosure Statement and Plan, as well as documents, agreements, and instruments evidencing and effectuating the Combined Disclosure Statement and Plan, including, without limitation, (a) identification of the Liquidating Trustee, (b) the form of Liquidating Trust Agreement, (c), identification of the Wind-Down Officer, (d) a list of any executory contracts or unexpired leases to be assumed by the Debtor, and (e) non-exclusive lists and descriptions of Causes of Action to be preserved and retained by the Liquidating Trust after the Effective Date.

3.122    "*Post-Effective Date Debtor*" means the Debtor on and after the Effective Date.

3.123    "*Post-Effective Date Debtor Wind-Down Tasks*" means the following tasks that the Liquidating Trustee is authorized to undertake as an authorized representative of the Post-Effective Date Debtor appointed by the Bankruptcy Court: (i) the winding down and

dissolution of the Post-Effective Date Debtor in accordance with the Combined Disclosure Statement and Plan; (ii) preparing and filing quarterly operating reports, statutory fees under 28 U.S.C. § 1930, and closing the Chapter 11 Case; and (iii) any other tasks related to the wind-down of the affairs of the Post-Effective Date Debtor (excluding the Collateral Liquidation Wind-Down Tasks), which may include, among other things, the preparation, execution, and filing of final tax returns, and the administration or termination of the Pension Plan.  For the avoidance of doubt, the Liquidating Trustee shall not have authority or be responsible for the Collateral Liquidation Wind-Down Tasks.

3.124 "*Prepetition Bridge Loan Agreement*" means that certain Subordinated Loan Agreement, dated as of August 28, 2025, by and between The Renco Group, as lender, the Debtor, as borrower.  Pursuant to the Prepetition Bridge Loan Agreement, The Renco Group agreed to provide up to $2.5 million of funding to the Debtor.  The obligations under the Prepetition Bridge Loan Agreement are secured by a junior security interest in the Prepetition Collateral.

3.125 "*Prepetition Collateral*" means all collateral of Wells Fargo as of the Petition Date, as identified and described in the Prepetition Credit Agreement, together with any assets of the Debtor acquired after the Petition Date, in each case, that remain subject to valid, perfected, and unavoidable liens of Wells Fargo pursuant to any debtor-in-possession financing or Cash Collateral Orders entered in this Chapter 11 Case.

3.126 "*Prepetition Credit Agreement*" means that certain Loan and Security Agreement dated as of June 24, 2002, as has been amended, restated, supplemented or modified from time to time, by and between the Debtor and Wells Fargo.  The obligations under the Prepetition Credit Agreement are secured by a senior lien on the Prepetition Collateral.

3.127 "*Prepetition Secured Lenders*" means those certain lenders under the Prepetition Credit Agreement (including the Prepetition Term Loan C Facility), the Prepetition Subordinated Loan Agreement, and the Prepetition Bridge Loan Agreement.

3.128 "*Prepetition Subordinated Loan Agreement*" means that certain Subordinated Loan Agreement, dated as of June 26, 2023, by and between the Debtor, as borrower, and Renco Global Capital, Inc., as lender.  The purported obligations under the Prepetition Subordinated Loan Agreement are secured by a junior security interest on the Prepetition Collateral.

3.129 "*Prepetition Term Loan C Facility*" means that certain facility under an amendment of the Prepetition Credit Agreement by and between the Debtor and Wells Fargo wherein the Prepetition Credit Agreement was amended to provide an additional $25 million in funds to the Debtor.  The Prepetition Term Loan C Facility was funded by the proceeds that Wells Fargo received from the sale of 100% of the Prepetition Term Loan C Facility to The Renco Group.

3.130 "*Priority Non-Tax Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

3.131 "***Priority Tax Claim***" means a Claim of a Governmental Unit of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

3.132 "***Pro Rata***" means proportionately so that, with respect to a Claim, the ratio of: (a) (i) the amount of property distributed on account of a particular Claim to (ii) the Allowed amount of such Claim, and is the same as the ratio of (b) (i) the amount of property distributed on account of all Allowed Claims in the Class or Classes entitled to share in the applicable distribution to (ii) the amount of all Allowed Claims in such Class or Classes.

3.133 "***Professional***" means an Entity: (a) employed pursuant to a Final Order in accordance with Sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to Sections 327, 328, 329, 330, and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b)(4) of the Bankruptcy Code.

3.134 "***Professional Fee Claim***" means those fees and expenses claimed by Professionals pursuant to Sections 330, 331, or 503 of the Bankruptcy Code, and accrued and unpaid as of the Effective Date.

3.135 "***Professional Fee Reserve***" means an interest-bearing account held by the Liquidating Trustee free and clear of all liens and claims (including without limitation those of the Prepetition Secured Lenders), to be funded on or prior to the Effective Date by the Debtor (and used for the payment of Professional Fee Claims as further provided for in Section 8.2 hereof) in an amount equal to the amount of any unpaid professional fees accrued through the Effective Date.

3.136 "***Proof of Claim***" means a proof of claim filed pursuant to section 501 of the Bankruptcy Code or any order of the Bankruptcy Court, together with supporting documents.

3.137 "***Purchaser***" means FFSL.

3.138 "***Record Date***" has the meaning set forth in Section 19.15 hereof.

3.139 "***Rejection Bar Date***" means the last date for any Entity whose claims arise out of the Bankruptcy Court approved rejection of an executory contract or unexpired lease to file a Proof of Claim for damages related to such rejection. The Rejection Bar Date for such Claims will be, (i) with respect to executory contracts and unexpired leases rejected pursuant to a Court order other than the Confirmation Order, the date provided by an order approving the rejection, and, (ii) with respect to executory contracts and unexpired leases rejected pursuant to the Confirmation Order, the date that is thirty (30) days after the Effective Date.

3.140 "***Released Parties***" means, collectively, (a) the Debtor's Retained Professionals, in their respective capacities as such; and (b) the Committee, its Retained Professionals, and the individual members thereof in their capacity as such.  For the avoidance of doubt, Renco shall not be considered a Released Party under the Plan.

3.141 "***Renco***" means The Renco Group, Inc., together with any affiliated entities, other than the Debtor, including the Renco Stalking Horse Purchaser and Renco Global Capital, Inc.

3.142 "***Renco Claims***" means that certain Proof of Claim filed by The Renco Group in the amount of $75,000,000.00 and any other Proofs of Claim filed by Renco or Scheduled by the Debtor in favor of Renco in the Chapter 11 Case, other than the Senior Secured Claims, the Subordinated Secured Claims, or the Deficiency Claims.

3.143 "***Renco Stalking Horse Purchaser***" means LiMag Holdings, LLC.

3.144 "***Resolution Event***" means with respect to any Disputed Claim the occurrence of one or more of following events no later than two (2) Business Days prior to the Voting Deadline: (i) after notice and hearing, an order of the Bankruptcy Court is entered (a) allowing such Claim pursuant to section 502(b) of the Bankruptcy Code (b) temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018, (c) approving a stipulation or other agreement between the Holder of such Claim and the movant resolving the objection and allowing such Claim in an agreed upon amount, or (d) approving a stipulation or other agreement between the Holder of such Claim and the movant temporarily allowing the Holder to vote its Claim in an agreed upon amount for voting purposes only; (ii) the pending claim objection is voluntarily withdrawn by the movant; or (iii) the pending adversary proceeding disputing the validity, priority, or Class of the Claim is reduced to final judgment or dismissed with prejudice.

3.145 "***Retained Professionals***" means any outside legal or financial professional of the Debtor or the Committee which has been retained by order of the Bankruptcy Court in accordance with Sections 327, 328, 363(b), and/or 1103 of the Bankruptcy Code.

3.146 "***Rowley Property***" means that certain plant site, which is approximately 4,500 acres of land adjacent to the southwest shore of the Great Salt Lake in Utah; approximately 247 acres in the northeast ¼ of section 32, plus lots 1-4 of section 32, T2N R6W SLBM; all improvements on the Debtor's real property; all easements, rights to rail lines, infrastructure constituting fixtures, all appurtenant rights to the foregoing real property, and all water rights used in connection with or appurtenant to the Debtor's Business, including water rights 15-616, 15-2161, 16-727, 16-748, 15-1952, 16-160, 16-765, and all other water rights necessary for the Debtor's Business.

3.147 "***Rule 9019 Motion***" means the *Debtor's Motion for Entry of an Order (A) Approving Settlement Agreements with Official Committee of Unsecured Creditors, Wells Fargo Bank, NA, Renco Global Capital, LLC, and The Renco Group, Inc. Pursuant to Federal Rule of Bankruptcy Procedure 9019 and (B) Granting Related Relief* [Docket No. 724].

3.148 "***Sale Motion***" means the *Debtor's Motion For Entry of (I) an Order (A) Approving Bid Procedures in Connection with the Sale of Substantially All of the Debtor's Assets, (B) Approving the Form and Manner of Notice Thereof, (C) Scheduling an Auction and Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (E) Granting Related Relief and (II) an Order (A) Approving the Stalking Horse APA Between the Debtor and the Stalking Horse Bidder, (B) Authorizing the Sale to the Stalking Horse Bidder or the Successful Bidder of Substantially All of the Debtor's Assets Free and Clear*

25

*of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts and Leases, and (D) Granting Related Relief* [Docket No. 41].

3.149   "***Salt Lake City Property***" means that certain office building and land owned by the Debtor, located at 238 North 2200 West in Salt Lake City, Utah.

3.150   "***Schedules***" means the schedules of assets and liabilities and statements of financial affairs filed by the Debtor pursuant to Section 521 of the Bankruptcy Code, the Official Bankruptcy Forms, and the Bankruptcy Rules, as they may be amended and supplemented from time to time.

3.151   "***Secured Claim***" means any Claim that is secured in whole or part, as of the Petition Date, by a Lien which is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or subject to setoff under Section 553 of the Bankruptcy Code, to the extent of the value of such Lien or right of setoff as determined under Sections 506(a) or 1129(b) of the Bankruptcy Code, as applicable.

3.152   "***Senior Secured Claims***" mean any and all Claims against the Debtor arising under the Prepetition Credit Agreement, which shall include, for the avoidance of doubt, any and all Claims arising under the Prepetition Term Loan C Facility.

3.153   "***Sold Unencumbered Assets***" means those certain unencumbered assets of the Debtor acquired by the Purchaser pursuant to the FFSL APA.

3.154   "***Solicitation Package***" shall have the meaning ascribed to such term in Solicitation Procedures Motion.

3.155   "***Solicitation Procedures Order***" means the *Order (I) Approving the Combined Plan and Disclosure Statement on an Interim Basis For Solicitation Purposes Only; (II) Establishing Procedures for Solicitation and Tabulation Of Votes To Accept or Reject the Combined Plan and Disclosure Statement; (III) Approving the Form of Ballot and Solicitation Packages; (IV) Establishing the Voting Record Date; (V) Scheduling a Combined Hearing for Final Approval of the Adequacy of Disclosures In, and Confirmation of, the Combined Plan and Disclosure Statement; (VI) Approving the Form of Notice, and (VII) Granting Related Relief* [Docket No. 874], and the exhibits thereto, entered by the Bankruptcy Court in the Chapter 11 Case.

3.156   "***Special Accounts***" shall have the meaning ascribed to such term in section 4.3 hereof.

3.157   "***SSG***" means SSG Advisors, LLC, the Debtor's investment banker.

3.158   "***Standing Motion***" means *The Official Committee of Unsecured Creditors' Motion for Leave, Standing and Authority to Commence, Prosecute and Settle Certain Claims and Causes of Action on Behalf of the Debtor's Estate* [Docket No. 433].

3.159   "*Stalking Horse APA*" means that certain APA by and between the Debtor and the Renco Stalking Horse Purchaser, as described in section 4.4 hereof.

3.160   "*Stalking Horse Bid*" shall have the meaning ascribed to such term in section 5.6 hereof.

3.161   "*Subordinated Secured Claims*" mean any and all Claims related to the Prepetition Subordinated Loan Agreement or the Prepetition Bridge Loan Agreement.

3.162   "*Subsequent Distribution Date*" means any date(s) after the Initial Distribution Date, as determined by the Liquidating Trustee, upon which the Liquidating Trust makes a distribution to any Liquidating Trust Beneficiaries.

3.163   "*Tax*" means any tax, charge, fee, levy, impost, or other assessment by any federal, state, local, or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, *ad valorem*, estimated, severance, stamp, occupation, and withholding tax. "*Tax*" shall include any interest or additions attributable to, imposed on, or with respect to such assessments.

3.164   "*Tax Claim*" means all or that portion of an Allowed Claim held by a Governmental Unit for a Tax assessed or assessable against the Debtor.

3.165   "*Thayer Claims*" means any non-priority unsecured Scheduled Claims in favor of Ron L. Thayer against the Debtor in the Chapter 11 Case, and any non-priority unsecured Proofs of Claim filed by Ron L. Thayer in the Chapter 11 Case.

3.166   "*The Renco Group*" means The Renco Group, Inc.

3.167   "*Unimpaired Claim*" means an unimpaired Claim within the meaning of Section 1124 of the Bankruptcy Code.

3.168   "*U.S. Trustee*" means the Office of the United States Trustee for Region 3, serving the District of Delaware.

3.169   "*Voting Instructions*" means the instructions for voting on the Combined Disclosure Statement and Plan contained on the Ballots.

3.170   "*Voting Record Date*" means the date as of which the identity of Holders of Claims is set for purposes of determining the Entities entitled to receive and vote on the Combined Disclosure Statement and Plan.

3.171   "*Wells Fargo*" means Wells Fargo Bank, National Association.

3.172   "*Wind-Down Officer*" means the person who shall serve as the managing member for the Post-Effective Date Debtor through the date of resignation or dissolution in accordance with the terms of the Combined Disclosure Statement and Plan, and the

Confirmation Order, or such successor named by the Liquidating Trustee in the event of such person's resignation or dissolution.

3.173  "**Wind-Down Tasks**" means, collectively, the Collateral Liquidation Wind-Down Tasks and the Post-Effective Date Debtor Wind-Down Tasks.

**SECTION 4**
**BACKGROUND**

4.1  General Background.

The Company was, at one time, the largest producer of primary magnesium in North America. It operated a facility adjacent to the Great Salt Lake in Rowley, Utah, approximately sixty miles west of Salt Lake City (the "Facility"), where magnesium has been produced from the waters of the Great Salt Lake (the "GSL") since 1972.

The Debtor blames its financial difficulties over the last decade due primarily to prolonged periods of depressed market pricing as a result of offshore producers (China in particular) flooding the international market with low-cost magnesium products. In addition, the State of Utah endeavored to terminate the Mineral Lease between itself and the Company, which was executed by their respective predecessors-in-interest in 1961, due to purported breaches thereof. Without the Mineral Lease and access to GSL water rights, the Debtor likely cannot conduct profitable business operations or justify any new investments in its facilities. The Mineral Lease was a critical asset of the Debtor's estate.

Compounding these difficulties, in September 2021, the Debtor suffered a catastrophic failure of critical components of its magnesium and chemical production processes. Specifically, certain gas turbines and associated generators used in connection with the spray dryers to dehydrate magnesium chloride brine, unexpectedly failed. This dramatically reduced the volume of magnesium chloride feed, which then had a cascading negative impact on the remaining steps of the production process and ultimately compromised the Debtor's ability to produce magnesium at the Facility (collectively, the "Force Majeure Event"). The shortage of critical materials, parts and labor caused by COVID-19 stymied the Debtor's repair efforts and ultimately led to the cessation of magnesium production. The Debtor is currently pursuing business interruption claims under applicable insurance policies in respect of the Force Majeure Event.

In 2019, to reduce reliance on magnesium production, the Company launched a new commercial project to produce lithium carbonate materials that had accumulated over many years from magnesium production. The Company had raw materials to produce lithium carbonate because it had substantial stockpiles of the extracted chloride ores left over and stockpiled as a byproduct from the Company's magnesium production processes (the "Feedstock"). The Company owned approximately 1.5 million tons of Feedstock stored on the Rowley Property. The Company sought to capitalize on increased market demand and prices for lithium carbonate, driven primarily by an increased interest in electric vehicles and, in turn, increased manufacturing of lithium-ion batteries.

28

Accordingly, the Company built a lithium processing facility to monetize its readily available access to Feedstock, independent of its magnesium production. This facility utilizes multiple different technologies to convert lithium chloride salts from the Feedstock into battery grade lithium carbonate. Although the Company was purportedly successful in developing this technology on a commercial scale, it was never profitable due—according to the Company—to a number of factors including falling market prices for lithium carbonate, which had dropped precipitously from a high of approximately $80,000 per ton in mid-2022 to less than $10,000 per ton. At the same time, the Company's cost of critical inputs to process its Feedstock increased.

The Debtor attempted to address these issues by developing newer technology known as "direct lithium extraction" or "DLE" which would allow the Company to produce lithium carbonate from the Feedstock more efficiently. However, the Company anticipated that significant capital investment would be required in order to modify, update, replace, and/or supplement the Debtor's existing equipment to implement the new direct lithium extraction technology, and which could not be justified without resolution of the Mineral Lease and GSL water rights. Accordingly, lithium carbonate production at the Rowley Property has remained idled.

4.2     Corporate History and Structure.

The Facility operated by the Company was constructed in 1972 by National Lead, Inc. In 1979, the Facility and its operations were purchased by AMAX, Inc., which operated the Facility through its subsidiary AMAX Magnesium Corp. Then, in 1989, RENMAG, Inc. purchased AMAX Magnesium Corp. and changed its name to Magnesium Corporation of America ("MagCorp"). In 1993, Renco Metals Corporation became MagCorp's 100% direct equity owner. Following its acquisition of substantially all of MagCorp's assets out of bankruptcy in 2002, the Company began operations at the Facility.[5]

The Debtor is a Delaware limited liability company. As of the Petition Date, The Renco Group was the Debtor's sole member. The Debtor's manager is Ron Thayer, who serves as its President. On August 25, 2025, the Debtor appointed an independent manager, Shaun Martin, in connection with the Debtor's anticipated restructuring (the "Current Independent Manager"). The Current Independent Manager is charged with reviewing any transactions proposed between the Debtor and its member (or any of its affiliates) in connection with the Chapter 11 Case, and has the sole discretion to approve or not approve any such transactions.

4.3     Consent Decree.

On June 30, 2021, the United States District Court for the District of Utah entered a Consent Decree in Case No. 01-cv-40 (the "Consent Decree"). The Consent Decree resolved complaints filed by the United States on behalf of the United States Environmental Protection Agency ("EPA") and the United Steelworkers of America filed against the Company and other defendants (the "Settling Defendants"), in 2002 and 2004, respectively. The complaints alleged various violations of the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901,

---

[5] See *In re Magnesium Corporation of America*, Case No. 01-14312, Docket No. 283 (Bankr. S.D.N.Y.)

*et seq.* ("RCRA") at the Facility. In particular, EPA alleged that certain waste streams associated with magnesium production were not exempt from RCRA under the Bevill Amendment and, therefore, the Facility was a treatment, storage, and disposal facility ("TSD") under RCRA and subject to the regulation applicable to TSDs. Although the Company strongly disputes these assertions, it consented to the entry of the Consent Decree as part of an effort to fully and finally resolve more than 20-years of litigation with EPA.

The Consent Decree provided, among other things, for the Company to repair, modify, and/or install certain production equipment and other infrastructure at the Facility to ensure that identified waste streams, as specified in the Consent Decree, generated in connection with magnesium production would be properly managed. The Consent Decree also addressed EPA's contentions that the Company was required to take certain actions to prevent releases from and retrofit a waste pond on its property and bring the pond in compliance with the Ground Water Discharge Permit issued to the Company by the Utah Department of Environmental Quality.

As part of the Consent Decree, EPA agreed to put proceeds it had received on account of its claims against the MagCorp bankruptcy estate ($32.9 million of present value) into five special accounts (the "Special Accounts"). The Special Accounts served a dual purpose: (1) to reimburse the Company, under certain circumstances, for costs of completing work required under the Consent Decree, and (2) to serve as financial assurance for completion of the work required by the Consent Decree. Wells Fargo asserts that it has a security interest in any interest of the Debtor in the Special Accounts. Notwithstanding that the Company disputes whether and the extent to which it is out of compliance with the Consent Decree, as more fully described in section 5.6 hereof, such disputes have been obviated by the sale of certain of the Debtor's assets.

    4.4    <u>Events and Circumstances Leading to the Bankruptcy Cases.</u>

    (a)    **Issues With EPA**

On July 18, 2024, EPA sent the Company a Notice of Noncompliance in respect of the Consent Decree, alleging that the Company has failed to comply with the Consent Decree by: (i) failing to provide additional financial assurance, (ii) failing to complete modifications to the magnesium production process (even though it is no longer operating), (iii) failing to retrofit its waste pond, and (iv) failing to deliver a Conditional Partial Assignment and Grant of Rights in favor of EPA to ensure that EPA would have access to necessary resources to implement the Salt Cap Closure Plan in the event of a default by the Debtor (which also required consent of the State of Utah, which it has refused to give). The Debtor disputes that it has failed to comply with the Consent Decree. EPA contends that, as of the Petition Date, the Debtor is not in compliance with the Consent Decree.

    (b)    **Issues with the State of Utah.**

Prior to the Petition Date, the Company operated its business pursuant to that certain Mineral Lease with FFSL, which lease was originally executed by parties' respective predecessors-in-interest in 1961, and which was later amended in 1969. The Mineral Lease authorized the lessee "the right to use all of the leased premises . . . for the extraction of magnesium chloride and other salts from the waters of the Great Salt Lake, together with the

right to mine, extract or remove salts from the surface of the lands leased thereunder subject to payment of royalties . . . and the production, manufacture, processing and sale thereof . . ." *See* Mineral Lease, § 8.  The Mineral Lease provided for the payment of royalties to the State for extracted magnesium chloride at the rates set forth in Section 17 therein. With respect to "any other salts" that are beneficially recovered and sold by the Company, the Mineral Lease provided that the Company would pay FFSL a royalty at the rate fixed by regulation, if any, then in effect. Otherwise, "said royalty shall be as fixed by agreement between the parties. *See* Mineral Lease, § 17.

At the time that the Debtor began engaging in lithium carbonate production, the State of Utah had not yet designated either lithium or lithium carbonate within its controlling administrative rule and/or regulation as they pertain to royalty rates attributable to extracted minerals, ores, and/or commercial materials. Therefore, in accordance with Section 17 of the Mineral Lease, the parties entered into the Lithium MOU.

Under the Lithium MOU, the Company agreed to pay royalties for lithium carbonate at the rate of 0.5% per ton for the first two years of production, 1.5% per ton for the third year of production, 2.5% per ton for the fourth year of production, and 3.8% for the fifth year of production and for so long thereafter as lithium carbonate is extracted and sold in commercial paying quantities, or until market conditions dictate otherwise. The Lithium MOU contemplated that "upon completion of FFSL rulemaking as specified in this MOU, the above-stated royalty rates and royalty structure will be incorporated into an entirely separate 'Lithium Carbonate Royalty Agreement,' which terms and conditions will govern the rights, responsibilities and obligations between FFSL and US MAG regarding the lithium project and all of the terms and conditions of this MOU will be void and of no further legal or equitable effect."

On December 13, 2024, FFSL sent notices to the Debtor seeking to terminate both the Mineral Lease and the Lithium MOU. FFSL contends that it has the right to terminate the Mineral Lease because the Debtor allegedly breached various provisions thereof. The Debtor contends that the alleged breaches lack merit.  In respect of the Lithium MOU, FFSL contends that because the Debtor and FFSL did not enter into a "Lithium Carbonate Royalty Agreement" following the formal rulemaking which designated lithium carbonate as a royalty bearing substance, which FFSL suggests occurred in October 2024, the Lithium MOU is now terminated and of no force and effect. FFSL also claims, based on Utah Code § 65A-6-4(2)(d) that because the Mineral Lease does not expressly include the right to extract lithium chloride, a separate royalty agreement is required.

Also on December 13, 2024, FFSL filed a complaint in the Third Judicial District Court in Salt Lake County, along with an *ex parte* motion for the appointment of a receiver.[6]  The complaint, like the notices, is focused on purported violations of the Consent Decree as well as Utah environmental protection laws, and included causes of action for trespass, public nuisance, and other counts seeking the appointment of a receiver under Utah Code § 78B-21-101 *et seq.* or

---

[6] *Utah Division of Forestry, Fire and State Lands v. US Magnesium LLC,* Civil No. 240909983.

Utah R. Civ. P. 66, respectively. Following these filings, the Court responded immediately and entered an *ex parte* order appointing a receiver over the Debtor and its assets on the same day.

On December 19, 2024, the Debtor moved to vacate the receivership order, following which a hearing was held on December 20, 2024. At that hearing, the Court granted the motion to vacate the receivership order given that the Debtor was given no notice and had no opportunity to be heard at the December 13 hearing, and because the Debtor contends that FFSL presented no evidence to support its contention that *ex parte* relief was necessary to prevent a threat of imminent harm to the environment. However, the Company agreed to allow the receiver to remain in place solely to monitor any environmental harm. The receiver engaged a consultant to assess the existence of any imminent threat cited by FFSL as the basis for *ex parte* relief. That consultant visited the Rowley Property and the Debtor does not believe that, at that time, any imminent threat to the environment existed. At no time since appointment of the limited scope receiver has the receiver notified the Court of any environmental issues or concerns associated with the Rowley Property.

At the hearing on December 20, 2024, the Court ordered an evidentiary hearing on January 3, 2025. However, prior to the evidentiary hearing, the parties agreed to stay the proceedings to allow them to focus on settlement discussions which would involve negotiation of a new mineral lease, water usage agreement and a lithium royalty agreement. The parties engaged in settlement negotiations for months, but these discussions ultimately broke down.

(c)     **The Debtor's Prepetition Sale Process.**

On August 21, 2025, the Debtor engaged SSG to explore potential going concern transactions and strategic alternatives for the Debtor. SSG prepared a list of potential purchasers, a confidentiality agreement for the sale process, and marketing materials including an Executive Summary.  SSG also populated a virtual data room to provide potential purchasers with diligence materials upon execution of the confidentiality agreement.

The Company received a proposed asset purchase agreement from the Renco Stalking Horse Purchaser, an affiliate of Renco, under which the Renco Stalking Horse Purchaser would serve as the stalking horse purchaser for substantially all assets of the Debtor, which would be acquired pursuant to section 363 of the Bankruptcy Code. Leading up to the Petition Date, the Debtor, including the Current Independent Manager, and its professional advisors negotiated the terms of the Renco Stalking Horse Purchaser's offer, culminating in the Stalking Horse APA. The focus of the Debtor's chapter 11 process was to continue to market its business in accordance with its Bid Procedures with the benefit of a stalking horse bidder.

4.5     Operations as of the Petition Date.

As of the Petition Date, the Debtor's operations were limited to the production of dust suppressants, de-icing products, and raw sodium chloride from existing lease property material stocks, which the Debtor sold to end users pursuant to supply agreements, and via spot sales in some instances. The Debtor's employee headcount was reduced significantly to match its scope of operations as of the Petition Date. As of the Petition Date, the Debtor employed 22 full-time

and 2 part-time employees. Subsequent to the FFSL Sale (as described in additional detail herein), the Debtor currently employs approximately 14 full-time employees.

    4.6    <u>Debtor's Prepetition Capital Structure</u>.

    (a)    **Secured Debt.**

The Debtor, as borrower, and Wells Fargo as lender, are party to the Prepetition Credit Agreement. The obligations arising under the Prepetition Credit Agreement are secured by the Prepetition Collateral, which excludes, *inter alia*, the Debtor's owned real property, the Debtor's Cash, Claims and Causes of Action against Insiders, and Avoidance Actions. As of the Petition Date, the Debtor purportedly had approximately $67 million, including contingent letter of credit obligations of $821,588, in total funded debt obligations under the Prepetition Credit Agreement.

The Debtor, as borrower, and Renco Global Capital, Inc., as lender, are party to the Prepetition Subordinated Loan Agreement. The purported obligations arising under the Prepetition Subordinated Loan Agreement are secured by a junior security interest in the Prepetition Collateral. The respective rights of Wells Fargo and Renco Global Capital, Inc. as lenders to the Debtor are governed by the applicable Intercreditor Agreement. As of the Petition Date, the Debtor purportedly had approximately $45 million in total funded debt obligations under the Prepetition Subordinated Loan Agreement.

In addition to the foregoing, on August 28, 2025, The Renco Group, as lender, and the Debtor, as borrower, entered into the Prepetition Bridge Loan Agreement. Pursuant to the Prepetition Bridge Loan Agreement, The Renco Group purportedly provided bridge funding to the Debtor in the maximum amount of $2,500,000. The obligations arising under the Prepetition Bridge Loan Agreement are secured by a junior lien in the Prepetition Collateral.[7] The respective rights of Wells Fargo and The Renco Group as lenders to the Debtor are governed by the applicable Intercreditor Agreement. As of the Petition Date, the Debtor purportedly had $1,068,039.73 in total funded debt obligations under the Prepetition Bridge Loan Agreement.

    (b)    **Unsecured Debt and Trade Debt.**

In addition to the Company's secured indebtedness, as of the Petition Date, the Company has accrued an estimated $37 million to third-party suppliers, vendors, contractors and other ordinary course creditors. In addition, several of the Debtor's creditors have obtained judgments against the Debtor including, most notably, Kaiser Aluminum Warrick, LLC, which obtained a judgment in the amount of approximately $68 million plus interest at 9% on August 5, 2025. Many other trade vendors incurred claims arising from the Debtor's efforts to either (x) improve lithium carbonate operations or (y) comply with its requirements under the Consent Decree. Beyond these Unsecured Claims, Renco asserts that the Debtor owes it $75 million, purportedly

---

[7] Pursuant to the Committee Challenge, the Committee seeks to recharacterize the purported obligations under the Prepetition Subordinated Loan Agreement, the Prepetition Term Loan C Facility, and the Prepetition Bridge Loan Agreement as Interests in the Debtor.

on account of a reimbursement claim for cash collateral paid to Wells Fargo on the Debtor's behalf.

## SECTION 5
## THE CHAPTER 11 CASE

The following is a brief description of certain material events that have occurred during the Chapter 11 Case.

5.1   First Day and Other Early Relief.

On the Petition Date, the Debtor filed a voluntary petition for relief under the Bankruptcy Code. The Debtor continues to operate its business and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code,

In order to facilitate the Chapter 11 Case, minimize disruption to the Debtor's affairs, and preserve the value of the Estate, the Debtor filed motions with the Bankruptcy Court on or shortly after the Petition Date seeking certain relief, including, without limitation:

(a)   authority to honor and pay certain prepetition workforce compensation and expenses and other related obligations, subject to certain caps;

(b)   authority to continue using the Debtor's existing cash management system;

(c)   approval of adequate assurance procedures for utility providers;

(d)   authority to continue to maintain their insurance policies and programs, honor all insurance obligations, and renew, extend, supplement, or purchase and finance their insurance policies; and

(e)   the appointment of Stretto, Inc. as the Claims Agent in the Chapter 11 Case.

5.2   Retention of Professionals.

The Debtor filed applications or motions, as applicable, to employ certain professionals, including (i) Gellert Seitz Busenkell & Brown, LLC as bankruptcy counsel (approved pursuant to an order entered on October 7, 2025 [Docket No. 161]); (ii) Carl Marks Advisory Group LLC, as financial advisor to the Debtor, and Ron Mayo, as Chief Restructuring Officer to the Debtor (approved pursuant to an order entered on October 7, 2025 [Docket No. 162]; and (iii) SSG, as investment banker to the Debtor (approved pursuant to an order entered on October 7, 2025 [Docket No. 163]).

The Committee retained (i) Eversheds Sutherland (US) LLP as co-counsel to the Committee (approved pursuant to an order entered on November 10, 2025 [Docket No. 271]); (ii) Cole Schotz P.C. as co-counsel (approved on November 10, 2025 [Docket No. 272]); and (iii) Province, LLC as financial advisor (approved pursuant to an order entered on November 12, 2025 [Docket No. 278]).

5.3     Debtor's Schedules and Statements of Financial Affairs.

On November 5, 2025, the Debtor filed with the Bankruptcy Court its Schedules and Statements of Financial Affairs [Docket Nos. 255-256].

5.4     Initial DIP Financing.

On the Petition Date, the Debtor filed the *Debtor's Motion for Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims and (C) Utilize Cash Collateral; (II) Granting Adequate Protection; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* [Docket No. 10] (the "Initial DIP Motion") seeking approval of DIP financing pursuant to the terms of the Ratification and Amendment Agreement (the "Ratification Agreement") and authority for the Debtor to enter into the Ratification Agreement. The Ratification Agreement provides a debtor-in-possession financing facility (the "Initial DIP Facility") of an aggregate principal amount of up to $20,821,588 consisting of the roll-up of up to $10 million of the Prepetition Credit Agreement and $10 million in new money.

On September 12, 2025, the Bankruptcy Court entered the *Interim Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing, and (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims; (II) Granting Adequate Protection; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* [Docket No. 32] (the "First Interim DIP Order").

On October 3, 2025, the Committee filed the *Omnibus Objection of the Official Committee of Unsecured Creditors to (1) Debtor's Motion for Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims and (C) Utilize Cash Collateral; (II) Granting Adequate Protection; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief; and (2) Debtor's Motion for Entry of (I) an Order (A) Approving Bid Procedures in Connection with the Sale of Substantially All of the Debtor's Assets, (B) Approving the Form and Manner of Notice Thereof, (C) Scheduling an Auction and Sale Hearing, (D) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (E) Granting Related Relief and (II) an Order (A) Approving the Stalking Horse APA Between the Debtor and the Stalking Horse Bidder, (B) Authorizing the Sale to the Stalking Horse Bidder or the Successful Bidder of Substantially All of the Debtor's Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts and Leases, and (D) Granting Related Relief* [D.I. 130] (the "Committee DIP Objection"). The Committee DIP Objection objected to certain terms of the Initial DIP Facility, including the proposed roll-up and the proposed granting of liens on certain of the Debtor's assets that were unencumbered as of the Petition Date.

Thereafter, the Bankruptcy Court entered the Interim DIP Orders that were substantially similar to the First Interim DIP Order except that the Debtor's borrowing limit was increased, the

35

budget was revised, the Challenge Deadline (as defined below) was extended, and the Debtor's proposed roll-up of prepetition debt was removed, among other things.

In connection with the FFSL Sale, described below, the advances made to the Debtor under the Interim DIP Orders were repaid pursuant to paragraph 49 of the FFSL Sale Order.

5.5    The Committee's Motion to Convert.

On October 5, 2025, the Committee filed the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Converting the Debtor's Chapter 11 Case to a Case Under Chapter 7 of the Bankruptcy Code* [Docket No. 142] (the "Conversion Motion"), which requested, among other things, that the Bankruptcy Court enter an order converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.

The Conversion Motion argued, among other things, the Debtor's Chapter 11 Case should be converted to a case under chapter 7 of the Bankruptcy Code because the Initial DIP Financing and the proposed sale to the Stalking Horse Bidder sought to encumber and transfer the Debtor's unencumbered assets, including:  (a) the Salt Lake City Property, (b) the Ace Claims, (c) the Mineral Lease, (d) the Debtor's interests in Skull Valley, (e) any unencumbered Commercial Tort Claims, (f) claims against Renco and other insiders, (g) any avoidance actions, and (h) the Debtor's Rowley Property, while providing no value to the Debtor's unsecured creditors.

The Debtor, Renco, and Wells Fargo objected to the Conversion Motion. On December 15, 2025, the Bankruptcy Court held a hearing on and denied the Conversion Motion.

5.6    The Sale Motion, the Stalking Horse Bid, and the FFSL Sale.

On September 15, 2025, the Debtor filed the Sale Motion seeking approval of, among other things, (i) the Bid Procedures and (ii) the Stalking Horse Bid.  On December 19, 2025, the Bankruptcy Court entered the Bid Procedures Order approving the Bid Procedures and the Stalking Horse Bid, with certain modifications to the originally proposed terms.

The Stalking Horse Bid provided for the acquisition of substantially all of the Debtor's assets—including certain unencumbered assets, namely the Rowley Property and the Mineral Lease. The proposed Stalking Horse Bid's purchase price included: (i) a credit bid of the secured obligations under the Prepetition Term Loan C Facility (approximately $25 million) and the DIP Financing's Tranche B DIP Term Loan (approximately $5 million); (ii) the assumption of certain enumerated liabilities and obligations consisting primarily of the Debtor's purported secured loan obligations under (a) the Wells Prepetition Revolver (as defined in the Stalking Horse APA), of approximately $40.5 million, (b) the Tranche A DIP Term Loan funded by Wells Fargo, of approximately $5 million; (c) the Prepetition Subordinated Loan Agreement (approximately $45.4 million), and (d) the Prepetition Bridge Loan Agreement (approximately $1,068,039.73), as well as the assumption of the Tooele County tax obligations, certain limited obligations for retained employees, and obligations to comply with the Consent Decree and applicable environmental legal requirements; (iii) the payment of all cure amounts that must be satisfied to assume and/or assign the elected contracts, leases or permits pursuant to section 365 of the Bankruptcy Code; and (iv) the payment of Cash only in the amount that must be paid to consummate the transaction (e.g., closing costs), not to exceed $1 million.

The Committee and FFSL, among others, filed objections to the Stalking Horse Bid, arguing, among other things, that the Stalking Horse Bidder (i) cannot acquire the Mineral Lease without the consent of FFSL and (ii) must pay Cash for the unencumbered assets it sought to purchase.

On January 16, 2026, FFSL submitted a bid for $15 million to purchase certain of the Debtor's unencumbered assets including the Rowley Property and the Mineral Lease. Thereafter, the Debtor deemed FFSL a Qualified Bidder (as defined in the Bid Procedures).

On January 21, 2026, the Debtor commenced an auction between the two Qualified Bidders—the Stalking Horse Bidder and FFSL. The auction concluded on January 23, 2026. The Debtor ultimately selected FFSL as the highest and best bid with a purchase price of $30 million in Cash, and the assumption by FFSL of certain liabilities of the Debtor, including the Debtor's obligations under the Consent Decree and certain tax obligations. On February 5, 2026, the Bankruptcy Court entered the FFSL Sale Order [Docket No. 583] approving the Sale to FFSL pursuant to the terms of the FFSL APA. On February 6, 2026, the FFSL Sale closed.

Pursuant to paragraph 42 of the FFSL Sale Order, the EPA Superfund Liens (as defined in the FFSL Sale Order) attached to no more than $2 million of the proceeds of the FFSL Sale. Consistent with the FFSL Sale Order, the Debtor is holding in escrow $2 million from the proceeds of the FFSL Sale until the earlier of: (1) the entry of an order fixing the amount of EPA's allowed secured claim (the "EPA Allowed Secured Claim") and directing the Debtor, Debtor's estate, or Liquidating Trustee to disburse from such escrow to EPA the unpaid amount of the EPA Allowed Secured Claim (not to exceed $2 million), in which case the Debtor or the Debtor's Estate shall pay to EPA such unpaid amount within sixty (60) days of entry of such order; (2) EPA authorizes in writing for the Debtor or the Debtor's estate to release any proceeds thereof held in escrow, or (3) EPA does not file a secured claim by the governmental bar date for filing proofs of claim set by the Bankruptcy Court. In the event that: (1) any amount held in escrow is not used to satisfy the EPA Allowed Secured Claim; or (2) EPA does not file a secured proof of claim by the governmental bar date, then any remaining amounts held in escrow shall be

37

released therefrom and disbursed in accordance with the Combined Disclosure Statement and Plan. FFSL acknowledged and agreed that to the extent the EPA Allowed Secured Claim exceeds $900,000, any such amounts in excess of $900,000 constitute obligations for compliance with environmental laws and as such were assumed by FFSL under section 2.3(h) of the FFSL APA.

5.7    Other Asset Sales.

On November 11, 2025, the Debtor filed the *Debtor's Motion for Entry of an Order (A) Approving the Private Sale of Certain of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances, with such Interests to Attach to the Proceeds, and (B) Granting Related Relief* [Docket No. 292], pursuant to which the Debtor requested approval to sell certain lithium carbonate (the "Lithium Sale"), which lithium carbonate assets constitute Collateral of the Prepetition Secured Lenders. On December 22, 2025, the Bankruptcy Court entered an order approving the Lithium Sale [Docket No. 408]. The purchase price for the Lithium Sale was $7,500.00 per metric ton of lithium carbonate for up to 1,100 metric tons or a maximum of $8,250,000.00.

On February, 4, 2026, the Debtor filed the *Motion of the Debtor for an Order (A) Authorizing and Approving the Private Sale of the Turbine Free and Clear of Liens, Claims, Encumbrances and Interests, with the such Interests to Attach to the Proceeds; and (B) Granting Related Relief* [Docket No. 578] (the "Turbine Sale Motion"), pursuant to which the Debtor requested approval of the sale of a 26MW GE Frame 5PA (MS5001) gas turbine generator package (the "Turbine") for a purchase price of $7,511,010.19  On March 24, 2026, the Bankruptcy Court entered an order granting the Turbine Sale Motion [Docket No. 744].

5.8    Committee Challenge.

On December 29, 2025, the Committee filed the *Motion for Leave, Standing and Authority to Commence, Prosecute and Settle Certain Claims and Causes of Action on Behalf of the Debtor's Estate* [Docket No. 422] (the "Standing Motion") seeking standing to pursue, among other claims, (i) declaratory judgments that the Ace Claims and certain other Commercial Tort Claims (including causes of action against insiders) are not subject to valid and enforceable security interests or liens as of the Petition Date; (ii) the avoidance of any and all security interests that purport to encumber the Ace Claims and certain other Commercial Tort Claims (including causes of action against insiders); (iii) a declaratory judgment that the Debtor's interests in Skull Valley Water Group, LLC ("Skull Valley") are not subject to enforceable security interests or liens as of the Petition Date; (iv) the disallowance of claims of the Prepetition Secured Lenders related to their alleged security interests in and liens against the Ace Claims, certain other Commercial Tort Claims (including causes of actions against insiders), and the Debtor's interests in Skull Valley; and (v) the recharacterization of the Prepetition Term Loan C Facility, the Prepetition Subordinated Loan Agreement, the Prepetition Bridge Loan Agreement, and certain Renco Claims as equity (the "Recharacterization Request").

Both Renco and Wells Fargo objected to the Standing Motion [Docket Nos. 456, 486]. On January 29, 2026, the Bankruptcy Court entered an order granting the Standing Motion

38

[Docket No. 553]. Also on January 29, 2026, the Committee filed the *Complaint* [Adv. Pro. Docket No. 1] commencing the Committee Challenge.

5.9    Use of Cash Collateral.

On February 13, 2026, the Debtor filed the Cash Collateral Motion, pursuant to which the Debtor sought approval to use $400,000 of the proceeds from the Lithium Sale for the following expenses: (i) Debtor's payroll and payroll expenses, including payroll taxes, medical benefits, and insurance; (ii) the compensation of the Current Independent Manager; and (iii) an advance deposit for Focus Management.  On February 19, 2026, the Bankruptcy Court entered the Cash Collateral Order, granting the Cash Collateral Motion.

5.10    Committee Settlement.[8]

On March 19, 2026, the Debtor filed the Rule 9019 Motion, wherein the Debtor sought approval for the Committee Settlement. Pursuant to the Committee Settlement, the Debtor, the Committee, Renco, and Wells Fargo agreed to enter into the Cooperation Agreement and the Ace Settlement (in each case, subject to the terms and conditions thereto).

(a)    **Cooperation Agreement**

Pursuant to the Cooperation Agreement, the parties thereto agreed, among other things, to cooperate and support (a) the Debtor in its liquidation of certain Prepetition Collateral located at the Rowley Property, the costs and expenses of which will be funded by Wells Fargo through the DIP Liquidation Order, in accordance with the liquidation budget and the Limited Access Agreement, (b) the entry of the DIP Liquidation Order, and (c) the Focus Management Retention. In addition, pursuant to the Cooperation Agreement, Wells Fargo agreed to (a) reimburse the Debtor's Estate to the extent it incurs costs related thereto, up to the Maximum Reimbursement Amount (as defined in the Cooperation Agreement), and (b) release to the Debtor's Estate a certain amount of the proceeds from the liquidation of certain Prepetition Collateral located on the Rowley Property.

(b)    **Ace Settlement**

Pursuant to the Ace Settlement, the Debtor, the Committee, Wells Fargo, and Renco agreed to settle the Committee Challenge solely with respect to the Ace Claims by stipulating that, among other things, (a) the Debtor's estate shall be entitled to manage and resolve the underlying litigation related to the Ace Claims; (b) Wells Fargo and Renco will receive 55% of any net proceeds for application to their respective remaining allowed secured claims, if any; and (c) 45% of any net proceeds arising from the Ace Claims shall be assigned to the Debtor's Estate for the benefit of unsecured creditors, free and clear of any alleged liens of Wells Fargo or Renco, in the preceding (a) – (c) of this paragraph, subject to the various conditions set forth in the Ace Settlement.

---

[8] Any description of the terms of the Committee Settlement herein, or any documents executed pursuant thereto, is qualified in its entirety by reference to the operative document.

39

(c)      **Other Agreements Contemplated by the Committee Settlement**

On March 4, 2026, the Debtor filed a motion seeking approval of the DIP Liquidation Order [Docket No. 677], pursuant to which the Debtor sought approval to, among other things, borrow up to $3,276,794 from Wells Fargo in accordance with the budget set forth therein to be used by Debtor to fund the liquidation of certain Prepetition Collateral located on the Rowley Property, and grant liens on all Prepetition Collateral to secure the obligations in connection with such advances.  Pursuant to the Cooperation Agreement and the Committee Settlement, the Committee agreed to support and to not object to the DIP Liquidation Order.  On March 26, 2026, the Bankruptcy Court entered the DIP Liquidation Order.

On March 16, 2026, the Debtor, Wells Fargo, and FFSL executed the Limited Access Agreement.  Pursuant to the Limited Access Agreement, among other things, FFSL granted the Debtor and its representatives a license for a period of approximately ninety (90) days to enter and use the Rowley Property for purposes of liquidating certain Prepetition Assets in accordance with the agreed upon Liquidation Plan (as defined in the Limited Access Agreement).  The Debtor agreed to, among other things, (a) pay FFSL certain royalties for any products, elements, or minerals liquidated, (b) maintain and keep certain insurance policies and name FFSL as an additional insured, and (c) indemnify FFSL for any damage incurred as a result of the Debtor's liquidation of certain Prepetition Collateral during the term of the Limited Access Agreement.  Pursuant to the Limited Access Agreement, the parties contemplate entry into an additional Access Agreement for the purpose of liquidation of certain Prepetition Collateral located on the Rowley Property beyond the initial 90-day period.

On February 18, 2026, the Debtor sought to appoint Focus Management as Liquidation Project Manager, *nunc pro tunc*, to February 11, 2026 [Docket No. 624], in order to assist the Debtor in the liquidation of certain Prepetition Collateral located on the Rowley Property.  On March 27, 2026, the Bankruptcy Court approved the Focus Management Retention [Docket No. 756].

On March 26, 2026, the Bankruptcy Court entered an order granting the Rule 9019 Motion [Docket No. 751], approving the Committee Settlement, including the Debtor's entry into the Cooperation Agreement, the Ace Settlement, and the Limited Access Agreement.

5.11    Bar Date Motion.

On February 25, 2026, the Debtor filed the *Debtor's Motion for an Order (I) Establishing Deadlines for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Approving the Form and Manner for Submitting such Proofs of Claim, (III) Establishing Deadline for Submitting Administrative Expense Claims, and (IV) Approving Notice Thereof* [Docket No. 650] (the "Bar Date Motion"), pursuant to which the Debtor sought an order establishing the date that is forty (40) calendar days after entry of the Bar Date Order as the deadline to file Proofs of Claim for General Unsecured Claims, Claims of Governmental Units, and Administrative Expense Claims.  On March 17, 2026, the Bankruptcy Court entered the Bar Date Order.

5.12    Pension Plan Matters.

40

The Debtor is a contributing sponsor of the Pension Plan, 29 U.S.C. § 1301(a)(13), which is covered by Title IV of ERISA. PBGC guarantees the payment of certain pension benefits upon termination of a pension plan covered by Title IV of ERISA.

A single-employer pension plan that is covered by Title IV of ERISA may only be terminated through the following methods: (i) a voluntary termination by the sponsor through the standard termination procedure described in 29 U.S.C. § 1341(b); (ii) a voluntary termination by the sponsor through the distress termination procedure described in 29 U.S.C. § 1341(c); or (iii) a PBGC-initiated termination under 29 U.S.C. § 1342.  For either a standard termination or a distress termination, the pension plan administrator must, among other things, satisfy certain notice requirements to the pension plan's participants, beneficiaries, alternate payees, and any employee organization representing participants.

PBGC has filed three Proofs of Claim in unliquidated amounts against the Debtor for: (i) any unpaid minimum funding contributions owed to the Pension Plan under 29 U.S.C. §§ 1082, 1083, 1362(b) and 26 U.S.C. §§ 412, 430; (ii) the Pension Plan's unfunded benefit liabilities under 29 U.S.C .§ 1362(b); and (iii) pension insurance premiums under 29 U.S.C. §§ 1306 and 1307, including termination premiums at the rate of $1,250 per plan participant per year for three years under 29 U.S.C. § 1306(a)(7) (collectively, the "PBGC Claims").  PBGC asserts that if the Pension Plan terminates under 29 U.S.C. §§ 1341(c) or 1342, the Debtor and each of its controlled group members will be jointly and severally liable to PBGC for the PBGC Claims.  *See* 29 U.S.C. § 1362(a), 26 U.S.C. § 412 and 29 U.S.C. § 1307.

As an alternative to termination, the Pension Plan can be assumed and maintained by an ongoing member of the Debtor's controlled group.  If a member of the Debtor's controlled group assumes the Pension Plan, the PBGC Claims will be deemed withdrawn upon that assumption.

Nothing in the Combined Disclosure Statement and Plan alters the Debtor's or the Debtor's controlled group's obligations for (i) satisfying the minimum funding requirements for the Pension Plan under 26 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083; (ii) paying all required premiums for the Pension Plan, if any, owed to PBGC under 29 U.S.C. §§ 1306 and 1307; and (iii) administering the Pension Plan in accordance with the applicable provisions of ERISA and the Internal Revenue Code.

Nothing in the Combined Disclosure Statement and Plan, the Confirmation Order, or any other document filed in this Chapter 11 Case shall be construed to discharge, release, limit, or relieve any natural individual from any claim by PBGC or the Pension Plan for breach of any fiduciary duty under ERISA, including prohibited transactions, with respect to the Pension Plan, subject to any and all applicable rights and defenses of such parties, which are expressly preserved. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duty or related liability by any of the provisions of the Combined Disclosure Statement and Plan, Confirmation Order, Bankruptcy Code, or other document filed in this Chapter 11 Case.  Nothing in the Combined Disclosure Statement and Plan alters the Debtor's liability or obligation under ERISA, the Internal Revenue Code, and any other applicable law relating to the Pension Plan.

## SECTION 6
## CONFIRMATION AND VOTING PROCEDURES

6.1     Procedures for Objections.

Pursuant to the Solicitation Procedures Order, any objection to final approval of the Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and/or Confirmation of the Combined Disclosure Statement and Plan must be made in writing and filed with the Bankruptcy Court by no later than **June 5, 2026, at 4:00 p.m. (prevailing Eastern Time)**. **Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Combined Hearing.**

6.2     Requirements for Confirmation.

The Bankruptcy Court will confirm the Combined Disclosure Statement and Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code. Among the requirements for Confirmation of the Combined Disclosure Statement and Plan in this Chapter 11 Case, is that the Combined Disclosure Statement and Plan be: (i) accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, that the Combined Disclosure Statement and Plan "does not discriminate unfairly" against, and is "fair and equitable" with respect to, such Class; and (ii) feasible. The Bankruptcy Court must also find that:

(a)     the Combined Disclosure Statement and Plan has classified Claims and Interests in a permissible manner;

(b)     the Combined Disclosure Statement and Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and

(c)     the Combined Disclosure Statement and Plan has been proposed in good faith.

The Plan Proponent believes that the Combined Disclosure Statement and Plan complies, or will comply, with all such requirements.

6.3     Classification of Claims and Interests.

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Combined Disclosure Statement and Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified).

Section 1122 of the Bankruptcy Code requires the Combined Disclosure Statement and Plan to place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests in such class. The Combined Disclosure Statement and Plan creates separate Classes to deal respectively with Priority Non-Tax Claims, various Secured Claims, Unsecured Claims, and Interests. The Plan Proponent believes that the

42

Combined Disclosure Statement and Plan's classifications place substantially similar Claims or Interests in the same Class and, thus, meet the requirements of section 1122 of the Bankruptcy Code.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Plan Proponent believes that the Combined Disclosure Statement and Plan complies with such standard. A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving Distributions pursuant to the Combined Disclosure Statement and Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Plan Proponent believes that the Combined Disclosure Statement and Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a Holder of a Claim or Interest may challenge the Plan Proponent's classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Combined Disclosure Statement and Plan to be confirmed. If such a situation develops, the Plan Proponent intends, in accordance with the terms of the Combined Disclosure Statement and Plan, to make such permissible modifications to the Combined Disclosure Statement and Plan as may be necessary to permit its Confirmation. Any such reclassification could adversely affect holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Combined Disclosure Statement and Plan.

**EXCEPT AS SET FORTH IN THE COMBINED DISCLOSURE STATEMENT AND PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE COMBINED DISCLOSURE STATEMENT AND PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE COMBINED DISCLOSURE STATEMENT AND PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.**

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein or the actual Distribution received by Creditors. The projected recoveries are

43

based on information available to the Plan Proponent as of the date hereof and reflect the Plan Proponent's views as of the date hereof only.

The classification of Claims and Interests and the nature of Distributions to members of each Class are summarized herein. The Plan Proponent believes that the consideration, if any, provided under the Combined Disclosure Statement and Plan to holders of Allowed Claims reflects an appropriate resolution of their Allowed Claims taking into account the differing nature and priority of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Combined Disclosure Statement and Plan. Many of these tests are designed to protect the interests of holders of Claims or Interests who are not entitled to vote on the Combined Disclosure Statement and Plan, or do not vote to accept the Combined Disclosure Statement and Plan, but who will be bound by the provisions of the Combined Disclosure Statement and Plan if it is confirmed by the Bankruptcy Court.

6.4     Impaired Claims or Interests.

Pursuant to section 1126 of the Bankruptcy Code, only the holders of Claims in Classes Impaired by the Combined Disclosure Statement and Plan and receiving a payment or Distribution under the Combined Disclosure Statement and Plan may vote to accept or reject the Combined Disclosure Statement and Plan. Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims may be Impaired if the Combined Disclosure Statement and Plan alters the legal, equitable, or contractual rights of the holders of such Claims or Interests treated in such Class. The holders of Claims not Impaired by the Combined Disclosure Statement and Plan are deemed to accept the Combined Disclosure Statement and Plan and do not have the right to vote on the Combined Disclosure Statement and Plan. The holders of Claims or Interests in any Class which will not receive any payment or Distribution or retain any property pursuant to the Combined Disclosure Statement and Plan are deemed to reject the Combined Disclosure Statement and Plan and do not have the right to vote. Finally, the holders of Claims or Interests whose Claims or Interests are not classified under the Combined Disclosure Statement and Plan are not entitled to vote on the Combined Disclosure Statement and Plan.

Under the Combined Disclosure Statement and Plan, Holders of Claims in Class 1 (Priority Non-Tax Claims) and Class 2 (Other Secured Claims) are Unimpaired and, therefore, not entitled to vote on the Combined Disclosure Statement and Plan and are deemed to accept the Combined Disclosure Statement and Plan. Holders of Claims in Class 3 (Senior Secured Claims), Class 4 (Subordinated Secured Claims), Class 5 (Deficiency Claims), Class 6 (Insider Unsecured Claims), and Class 7 (General Unsecured Claims) are Impaired and entitled to vote on the Combined Disclosure Statement and Plan. Holders of Interests in Class 8 (Interests) will not receive any payment or Distribution or retain any property pursuant to the Combined Disclosure Statement and Plan and, therefore, are deemed to reject the Combined Disclosure Statement and Plan and do not have the right to vote.

**ACCORDINGLY, BALLOTS FOR ACCEPTANCE OR REJECTION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ARE BEING PROVIDED TO CLAIMHOLDERS IN CLASS 3, CLASS 4, CLASS 5, CLASS 6, AND CLASS 7.**

6.5     Confirmation With Rejecting Classes; Cramdown.

In the event that any impaired class of claims or interests does not accept a plan, a plan proponent nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, determined without including any acceptance of the plan by any insider holding a claim in that class, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests. Here, because holders of Interests in Class 8 are deemed to reject the Combined Disclosure Statement and Plan, the Plan Proponent will seek confirmation of the Combined Disclosure Statement and Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Plan Proponent believes that such requirements are satisfied, as no holder of a Claim or Interest junior to those in Class 7 is entitled to receive any property under the Combined Disclosure Statement and Plan.

The concept of "unfair discrimination" is not defined in the Bankruptcy Code, but has been suggested in recent case law to arise when a difference in a plan's treatment of two classes of equal priority results in a materially lower percentage recovery for the non-accepting class. Based upon their understanding of existing case law, the Plan Proponent does not believe that the Combined Disclosure Statement and Plan unfairly discriminates against any Class of Claims.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors, and equity holders, as follows:

a.     Secured Creditors. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

b.     Unsecured Creditors. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

c.     Interests. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

45

As discussed above, the Plan Proponent believes that the distributions provided under the Combined Disclosure Statement and Plan satisfy the absolute priority rule, where required.

6.6     Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor (unless such liquidation or reorganization is proposed in the Combined Disclosure Statement and Plan). Because the Combined Disclosure Statement and Plan proposes a liquidation of all of the Debtor's remaining assets, for purposes of this test, the Plan Proponent has analyzed the ability of the Debtor and the Liquidating Trust to meet their obligations under the Combined Disclosure Statement and Plan. Based on the Committee's analysis, the Debtor and the Liquidating Trust will have sufficient assets to accomplish their tasks and satisfy their obligations under the Combined Disclosure Statement and Plan. Therefore, the Plan Proponent believes that the Combined Disclosure Statement and Plan will meet the feasibility requirements of the Bankruptcy Code.

6.7     Best Interests Test and Liquidation Analysis.

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires the Bankruptcy Court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its Chapter 11 Case were converted to cases under chapter 7 of the Bankruptcy Code as of the proposed Effective Date. To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses, and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

The Plan Proponent, with the assistance of its advisors, has prepared a liquidation analysis that summarizes the Plan Proponent's best estimate of recoveries by holders of Claims if the Chapter 11 Case were converted to a case under chapter 7 (the "Liquidation Analysis"), which is attached hereto as **Exhibit A**.  Based upon the current projections, Holders of Allowed Administrative Claims, Priority Claims, and Other Secured Claims will be paid in full under the

46

Combined Disclosure Statement and Plan, while Holders of Claims in Class 3-7 will receive less than full payments.

If the Chapter 11 Case were converted to a proceeding under Chapter 7 of the Bankruptcy Code, the Debtor's Estate would incur the costs of payment of a statutorily allowed commission to the Chapter 7 trustee, as well as the costs of counsel and other professionals retained by the trustee. The Plan Proponent believes that, among other things, such amounts would exceed the amount of expenses that will be incurred in implementing the Combined Disclosure Statement and Plan and winding up the affairs of the Debtor in the Chapter 11 Case. The Plan Proponent contemplates an orderly administration and winding down of the Estate by parties utilizing professionals that are already familiar with the Debtor, its remaining assets and affairs, and its Creditors and liabilities. Such familiarity will facilitate the completion of the liquidation of the remaining assets (including prosecution of the applicable Causes of Action), and the distribution of the net proceeds to creditors more efficiently and expeditiously than a Chapter 7 trustee. Additionally, the Estate would suffer additional delays, as a Chapter 7 trustee and his/her counsel took time to develop a necessary learning curve in order to complete the administration of the Estate (including the prosecution of the applicable Causes of Action). Also, a new time period for the filing of Proofs of Claims would commence under Bankruptcy Rule 1019(2), possibly resulting in the filing of additional Claims against the Estate.

Based upon the foregoing and the Liquidation Analysis attached as **Exhibit A** hereto, the Plan Proponent believes that Creditors will receive at least as much or more under the Combined Disclosure Statement and Plan than they would receive if the Chapter 11 Case were converted to a case under Chapter 7.

6.8    Eligibility to Vote on the Combined Disclosure Statement and Plan.

Unless otherwise ordered by the Bankruptcy Court, only holders of Claims in Class 3, Class 4, Class 5, Class 6, and Class 7 may vote on the Combined Disclosure Statement and Plan. Further, subject to the tabulation procedures that were approved by the Solicitation Procedures Order, in order to vote on the Combined Disclosure Statement and Plan, you must hold an *Allowed* Claim in Class 3, Class 4, Class 5, Class 6, or Class 7, or be the holder of a Claim that has been temporarily Allowed for voting purposes only pursuant to the approved tabulation procedures or under Bankruptcy Rule 3018(a).  Claims which are Disputed as of the Voting Record Date shall not be permitted to vote on the Combined Disclosure Statement and Plan, subject to such Holder's right to seek temporary allowance of such Claim pursuant to Bankruptcy Rule 3018(a) in accordance with the Solicitation Procedures Order.

6.9    Solicitation Package.

All holders of Allowed Claims in Classes 3, 4, 5, 6, and 7 will receive a Solicitation Package. The Solicitation Packages will contain: (i) the Combined Disclosure Statement and Plan; (ii) the Solicitation Procedures Order, including the tabulation procedures; (iii) the Combined Hearing Notice, attached as Exhibit 2 to the Solicitation Procedures Order; (iv) the applicable form of Ballot, including the Voting Instructions; and (v) such other materials as the Bankruptcy Court may direct or approve.

All other Creditors and parties in interest not entitled to vote on the Combined Disclosure Statement and Plan will receive only a copy of the Notice of Non-Voting Status (as defined in the Solicitation Procedures Order), attached as Exhibit 4 to the Solicitation Procedures Order.

Copies of the Combined Disclosure Statement and Plan shall be available on the Claims Agent's website at https://cases.stretto.com/usmagnesium/.  Any creditor or party-in-interest can request a hard copy of the Combined Disclosure Statement and Plan be sent to them by regular mail by calling the Claims Agent at **(833) 836-1881 (U.S./Canada) or +1 (949) 617-1778 (International)** (during regular business hours), or by email at TeamUSMagnesium@stretto.com.

6.10   Voting Procedures, Voting Deadline, and Applicable Deadlines.

The Voting Record Date for determining which holders of Claims in Classes 3, 4, 5, 6, and 7 may vote on the Combined Disclosure Statement and Plan is May 7, 2026.

In order for your Ballot to count, you must (1) complete, date, and properly execute the Ballot and (2) properly deliver the Ballot to the Claims and Balloting Agent by either (a) mailing the Ballot to the Claims Agent at the following address: US Magnesium LLC, Ballot Processing, c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602, or (b) submitting the Ballot on the Claims and Balloting Agent's online balloting platform available at https://cases.stretto.com/usmagnesium/.  Instructions for casting a Ballot will be available on the Claims Agent's website.

Ballots must be submitted electronically, or the Claims Agent must actually receive physical, original Ballots by mail or overnight delivery, on or before the Voting Deadline, which is **June 5, 2026 at 4:00 p.m. (prevailing Eastern Time)**. Subject to the tabulation procedures approved by the Solicitation Procedures Order, any Ballot that is timely and properly submitted electronically or received physically will be counted and will be deemed to be cast as an acceptance, rejection or abstention, as the case may be, of the Combined Disclosure Statement and Plan.

**IF YOU ARE ENTITLED TO VOTE ON THE COMBINED DISCLOSURE STATEMENT AND PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL THE BALLOT YOU RECEIVE. PLEASE BE SURE TO COMPLETE ALL BALLOT ITEMS PROPERLY AND LEGIBLY. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE COMBINED DISCLOSURE STATEMENT AND PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE COMBINED DISCLOSURE STATEMENT AND PLAN OR PROCEDURES FOR VOTING ON THE COMBINED DISCLOSURE STATEMENT AND PLAN, PLEASE CONTACT THE CLAIMS AGENT BY (I) TELEPHONE AT (833) 836-1881 (U.S./CANADA) OR +1 949-617-1778 (INTERNATIONAL), OR (II) EMAIL AT TEAMUSMAGNESIUM@STRETTO.COM. THE CLAIMS AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

6.11    Acceptance of the Combined Disclosure Statement and Plan.

If you are a holder of an Allowed Claim in Classes 3, 4, 5, 6, or 7, your acceptance of the Combined Disclosure Statement and Plan is important. In order for the Combined Disclosure Statement and Plan to be accepted by an Impaired Class of Claims, a majority in number (*i.e.*, more than half) and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims permitted to vote) must vote to accept the Combined Disclosure Statement and Plan. At least one Impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept the Combined Disclosure Statement and Plan. The Plan Proponent urges that you vote to accept the Combined Disclosure Statement and Plan.

**SECTION 7**
**CERTAIN RISK FACTORS, TAX CONSEQUENCES, AND OTHER DISCLOSURES**

7.1    Certain Risk Factors to be Considered.

THE COMBINED DISCLOSURE STATEMENT AND PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE COMBINED DISCLOSURE STATEMENT AND PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE COMBINED DISCLOSURE STATEMENT AND PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE COMBINED DISCLOSURE STATEMENT AND PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE COMBINED DISCLOSURE STATEMENT AND PLAN AND ITS IMPLEMENTATION.

7.2    The Combined Disclosure Statement and Plan May Not Be Accepted.

The Plan Proponent can make no assurances that the requisite acceptances of the Combined Disclosure Statement and Plan will be received, and the Plan Proponent may need to obtain acceptances of an alternative plan of liquidation for the Debtor, or otherwise, that may not have the support of the Creditors and/or the Debtor may be required to liquidate the Estate under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to Creditors as those proposed in the Combined Disclosure Statement and Plan.

7.3    The Combined Disclosure Statement and Plan May Not Be Confirmed.

Even if the Plan Proponent receives the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm the Combined Disclosure Statement and Plan. Even if the Bankruptcy Court determined that the Combined Disclosure Statement and Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Combined Disclosure Statement and Plan if it finds that any of the statutory requirements for Confirmation had not

49

been met. As is described in greater detail in Section 6.3 hereof, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan. While, as more fully set forth Section 6 hereof, the Plan Proponent believes that the Combined Disclosure Statement and Plan complies with or will comply with all such requirements, there can be no guarantee that the Bankruptcy Court will agree.

Moreover, there can be no assurance that modifications to the Combined Disclosure Statement and Plan will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes. If the Combined Disclosure Statement and Plan is not confirmed, it is unclear what distributions holders of Claims ultimately would receive with respect to their Claims in a subsequent plan of liquidation. If an alternative could not be agreed to, it is possible that the Debtor would have to liquidate its remaining assets in Chapter 7, in which case it is likely that the holders of Allowed Claims would receive substantially less favorable treatment than they would receive under the Combined Disclosure Statement and Plan.

7.4    Distributions to Holders of Allowed Claims Under the Combined Disclosure Statement and Plan May be Inconsistent with Projections.

Projected Distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution. There can be no assurance that the estimated Claim amounts set forth in the Combined Disclosure Statement and Plan are correct. These estimated amounts are based on certain assumptions with respect to a variety of factors. Both the actual amount of Allowed Claims in a particular Class and the funds available for distribution to such Class may differ from the Plan Proponent's estimates. If the total amount of Allowed Claims in a Class is higher than the Plan Proponent's estimates, or the funds available for distribution to such Class are lower than the Debtor's estimates, the percentage recovery to holders of Allowed Claims in such Class will be less than projected.

7.5    Objections to Classification of Claims.

Section 1122 of the Bankruptcy Code provides that a plan may place a Claim or an equity interest in a particular class only if such Claim or equity interest is substantially similar to the other Claims or equity interests in such class. As is described in greater detail in Section 6.2 hereof, the Plan Proponent believes that the classification of Claims and Interests under the Combined Disclosure Statement and Plan complies with the requirements set forth in the Bankruptcy Code. Nevertheless, there can be no assurance the Bankruptcy Court will reach the same conclusion.

To the extent that the Bankruptcy Court finds that a different classification is required for the Combined Disclosure Statement and Plan to be confirmed, the Plan Proponent would seek to (i) modify the Combined Disclosure Statement and Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such holder was initially a member, or any other Class under the Combined Disclosure Statement and Plan, by changing the composition of such Class and

50

the vote required for approval of the Combined Disclosure Statement and Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Combined Disclosure Statement and Plan based upon such reclassification. Except to the extent that modification of classification in the Combined Disclosure Statement and Plan requires re-solicitation, the Plan Proponent will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Combined Disclosure Statement and Plan by any holder of Claims pursuant to this solicitation will constitute a consent to the Combined Disclosure Statement and Plan's treatment of such holder, regardless of the Class as to which such holder is ultimately deemed to be a member. The Plan Proponent believes that under the Bankruptcy Rules, it would be required to re-solicit votes for or against the Combined Disclosure Statement and Plan only when a modification materially and adversely affects the treatment of the Claim or Interest of any holder.

The Bankruptcy Code also requires that the Combined Disclosure Statement and Plan provide the same treatment for each Claim or Interest of a particular Class unless the holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Plan Proponent believes that the Combined Disclosure Statement and Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Combined Disclosure Statement and Plan does not satisfy such requirement, the Bankruptcy Court could deny Confirmation of the Combined Disclosure Statement and Plan. Disputes relating to classification and/or treatment could result in a delay in the Confirmation and Consummation of the Combined Disclosure Statement and Plan and could increase the risk that the Combined Disclosure Statement and Plan will not be Consummated.

7.6    Failure to Consummate the Combined Disclosure Statement and Plan.

Although the Plan Proponent believes that the Effective Date will occur and may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

7.7    Reductions to Estimated Creditor Recoveries.

The Allowed amount of Claims in any Class could be greater than projected, which, in turn, could cause the amount of distributions to Creditors in such Class to be reduced substantially. The amount of Cash realized from the monetization of the Debtor's remaining assets could be less than anticipated, which could cause the amount of distributions to Creditors to be reduced substantially.

7.8    Certain U.S. Federal Income Tax Consequences.

The following discussion is a summary of certain material U.S. federal income tax consequences of the Combined Disclosure Statement and Plan to the Debtor and to certain holders (which solely for purposes of this discussion means the beneficial owner for U.S. federal income tax purposes) of Claims. The following summary does not address the U.S. federal income tax consequences to holders of Claims or Interests not entitled to vote on the Combined Disclosure Statement and Plan. This summary is based on the Internal Revenue Code, Treasury

Regulations promulgated and proposed thereunder, judicial decisions, and published administrative rules and pronouncements of the IRS, all as in effect on the date hereof and all of which are subject to change or differing interpretations, possibly with retroactive effect. No legal opinions have been requested or obtained from counsel with respect to any of the tax aspects of the Combined Disclosure Statement and Plan and no rulings have been or will be requested from the IRS with respect to any of the issues discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtor or to certain holders of Claims in light of their individual circumstances, nor does the discussion deal with tax issues with respect to holders of Claims or Interests subject to special treatment under the U.S. federal income tax laws (including, for example, insurance companies; banks or other financial institutions; brokers, dealers, or traders in securities; real estate investment trusts; governmental authorities or agencies; tax-exempt organizations; retirement plans; individual retirement or other tax-deferred accounts; certain expatriates or former long-term residents of the United States; small business investment companies; regulated investment companies; S corporations, partnerships, or other pass-through entities for U.S. federal income tax purposes and their owners; persons whose functional currency is not the U.S. dollar; persons who use a mark-to-market method of accounting; persons required to report income on an applicable financial statement; persons holding Claims or Interests as part of a straddle, hedge, constructive sale, conversion transaction, or other integrated transaction; and persons who are not U.S. Holders (as defined below)). Furthermore, this discussion assumes that a holder of a Claim holds such Claim as a "capital asset" within the meaning of Section 1221 of the Internal Revenue Code (generally property held for investment). This discussion does not address any U.S. federal non-income (including estate or gift), state, local, or foreign taxation, alternative minimum tax, or the Medicare tax on certain net investment income.

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim or Interest that is, for U.S. federal income tax purposes: (i) an individual who is a citizen or resident of the United States; (ii) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any state thereof, or the District of Columbia; (iii) an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or (iv) a trust, if (a) the administration of such trust is subject to the primary supervision of a court within the United States and one or more United States persons have the authority to control all substantial decisions of such trust, or (b) such trust has a valid election in effect under the applicable Treasury Regulations to be treated as a United States person for U.S. federal income tax purposes.

If a partnership (or other Entity or arrangement classified as a partnership for U.S. federal income tax purposes) is a holder of Claims or Interests, the U.S. federal income tax treatment of a partner in the partnership will generally depend on the status of the partner and the activities of the partnership. A holder of a Claim or Interest that is a partnership and the partners in such partnership should consult their tax advisors with regard to the U.S. federal income tax consequences of the Combined Disclosure Statement and Plan.

52

Holders of Claims or Interests that are not U.S. Holders ("Non-U.S. Holders") may be subject to U.S. federal income tax consequences that materially differ from those described herein, including, without limitation, the potential imposition of U.S. federal withholding tax (including withholding under section 1441, 1442, 1445, or 1446 of the Internal Revenue Code) on Distributions received pursuant to the Combined Disclosure Statement and Plan or in respect of the Liquidating Trust Interests.  The tax treatment of Non-U.S. Holders may depend on, among other things, the particular circumstances of such Non-U.S. Holder, the nature of the Claim or Interest held, and the availability of benefits under an applicable income tax treaty between the United States and the Non-U.S. Holder's country of residence.  This discussion does not address the U.S. federal income tax consequences to Non-U.S. Holders, and each Non-U.S. Holder is strongly urged to consult its own tax advisor regarding the U.S. federal, state, local, and foreign tax consequences of the Combined Disclosure Statement and Plan, including the potential application of U.S. withholding taxes and any applicable treaty provisions.

**THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE COMBINED DISCLOSURE STATEMENT AND PLAN.**

7.9     Tax Consequences for U.S. Holders of Certain Claims.

Generally, a Holder of a Claim should in most, but not all, circumstances recognize gain or loss equal to the difference between the "amount realized" by such Holder in exchange for its Claim and such Holder's adjusted tax basis in the Claim. The "amount realized" is equal to the sum of the Cash and the fair market value of any other consideration received under a plan of reorganization in respect of a holder's Claim. The tax basis of a Holder in a Claim will generally be equal to the Holder's cost therefor. To the extent applicable, the character of any recognized gain or loss (*e.g.*, ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the Holder, the nature of the Claim in the Holder's hands, the purpose and circumstances of its acquisition, the Holder's holding period of the Claim, and the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. Generally, if the Claim is a capital asset in the Holder's hands, any gain or loss realized will generally be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the Holder has held such Claim for more than one year.

A creditor who receives Cash in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest. A creditor who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Combined Disclosure Statement and Plan, will be treated as having received interest income to the extent that any consideration received is characterized for U.S. federal income tax purposes as interest, regardless of whether such creditor realizes an overall gain or loss as a result of surrendering its Claim. A creditor who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest

is not satisfied, regardless of whether such creditor realizes an overall gain or loss as a result of the distribution it may receive under the Combined Disclosure Statement and Plan on account of its Claim.

Under the Combined Disclosure Statement and Plan, the Holders of certain Claims will likely receive only a partial distribution of their Allowed Claims. Whether the applicable Holder of such Claims will recognize a loss or any other tax treatment will depend upon facts and circumstances that are specific to the nature of the Holder and its Claims. Creditors should consult their own tax advisors.

7.10    Tax Consequences in Relation to Liquidating Trust.

As of the Effective Date, the Liquidating Trust will be established for the benefit of the Holders of certain Allowed Claims. The tax consequences of the Combined Disclosure Statement and Plan in relation to the Liquidating Trust and the Liquidating Trust Beneficiaries thereof are subject to uncertainties due to the complexity of the Combined Disclosure Statement and Plan and the lack of interpretative authority regarding certain changes in the tax law.

Allocations of taxable income of the Liquidating Trust (other than taxable income allocable to the Liquidating Trust's claims reserves) among Liquidating Trust Beneficiaries will be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all of its assets (valued at their tax book value) to the Liquidating Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining trust assets.

The tax book value of the trust assets for this purpose will equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Internal Revenue Code of 1986, as amended, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements. Uncertainties with regard to federal income tax consequences of the Combined Disclosure Statement and Plan may arise due to the inherent nature of estimates of value that will impact tax liability determinations.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an IRS private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee may (a) elect to treat any trust assets allocable to, or retained on account of, Disputed Claims (the "Trust Claims Reserve") as a "disputed ownership fund" governed by Treasury Regulation Section 1.468B-9, and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Accordingly, any Trust Claims Reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the trust assets in such reserves, and all distributions from such reserves will be treated as received by holders in respect of their Claims as if distributed by the Debtor. All parties (including, without limitation, the Liquidating Trustee

and the Liquidating Trust Beneficiaries) will be required to report for tax purposes consistently with the foregoing.

The Liquidating Trust is intended to qualify as a liquidating trust for federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994.28 I.R.B. 124, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a Chapter 11 plan. The Liquidating Trust has been structured with the intention of complying with such general criteria. Pursuant to the Combined Disclosure Statement and Plan and Liquidating Trust Agreement, and in conformity with Revenue Procedure 94-45, *supra*, all parties (including the Liquidating Trustee and the Liquidating Trust Beneficiaries) are required to treat, for federal income tax purposes, the Liquidating Trust as a grantor trust of which the Liquidating Trust Beneficiaries are the owners and grantors. While the following discussion assumes that the Liquidating Trust would be so treated for federal income tax purposes, no ruling has been requested from the IRS concerning the tax status of the Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust as a grantor trust. If the IRS were to challenge successfully such classification, the federal income tax consequences to the Liquidating Trust and the Liquidating Trust Beneficiaries could materially vary from those discussed herein.

In general, each Creditor who is a Liquidating Trust Beneficiary will recognize a gain or loss in an amount equal to the difference between (i) the "amount realized" by such Liquidating Trust Beneficiary in satisfaction of its Allowed Claim, and (ii) such Liquidating Trust Beneficiary's adjusted tax basis in such Claim. The "amount realized" by a Liquidating Trust Beneficiary will equal the sum of Cash and the aggregate fair market value of the property received by such party pursuant to the Combined Disclosure Statement and Plan (such as a Liquidating Trust Beneficiary's undivided beneficial interest in the assets transferred to the Liquidating Trust). Where gain or loss is recognized by a Liquidating Trust Beneficiary in respect of its Allowed Unsecured Claim, the character of such gain or loss (*i.e.*, long-term or short-term capital, or ordinary income) will be determined by a number of factors including the tax status of the party, whether the Claim constituted a capital asset in the hands of the party and how long it had been held, whether the Claim was originally issued at a discount or acquired at a market discount and whether and to what extent the party had previously claimed a bad debt deduction in respect of the Claim.

After the Effective Date, any amount that a Creditor receives as a Distribution from the Liquidating Trust in respect of its beneficial interest in the Liquidating Trust should not be included, for federal income tax purposes, in the party's amount realized in respect of its Allowed Claim, but should be separately treated as a distribution received in respect of such party's beneficial interest in the Liquidating Trust.

In general, a Liquidating Trust Beneficiary's aggregate tax basis in its undivided beneficial interest in the assets transferred to the Liquidating Trust will equal the fair market value of such undivided beneficial interest as of the Effective Date and the Liquidating Trust Beneficiary's holding period in such assets will begin the day following the Effective Date. Distributions to any Beneficiary will be allocated first to the original principal portion of the

55

Liquidating Trust Beneficiary's Allowed Claim as determined for federal tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim. However, there is no assurance that the IRS will respect such allocation for federal income tax purposes.

For all federal income tax purposes, all parties (including the Liquidating Trustee and the Liquidating Trust Beneficiaries) will treat the transfer of assets to the Liquidating Trust, in accordance with the terms of the Combined Disclosure Statement and Plan and Liquidating Trust Agreement, as a transfer of those assets directly to the Holders of the applicable Allowed Claims followed by the transfer of such assets by such Holders to the Liquidating Trust. Consistent therewith, all parties will treat the Liquidating Trust as a grantor trust of which such Holders are to be owners and grantors. Thus, such Holders (and any subsequent holders of interests in the Liquidating Trust) will be treated as the direct owners of an undivided beneficial interest in the assets of the Liquidating Trust for all federal income tax purposes. Accordingly, each Holder of a beneficial interest in the Liquidating Trust will be required to report on its federal income tax return(s) the Holder's allocable share of all income, gain, loss, deduction or credit recognized or incurred by the Liquidating Trust.

The Liquidating Trust's taxable income will be allocated to the Liquidating Trust Beneficiaries in accordance with each such Liquidating Trust Beneficiary's Pro Rata share. The character of items of income, deduction and credit to any Holder and the ability of such Holder to benefit from any deductions or losses may depend on the particular situation of such Holder.

The federal income tax reporting obligation of a Holder of a Liquidating Trust Interest is not dependent upon the Liquidating Trust distributing any Cash or other proceeds. Therefore, a Holder of a Liquidating Trust Interest may incur a federal income tax liability regardless of the fact that the Liquidating Trust has not made, or will not make, any concurrent or subsequent distributions to the Holder. If a Holder incurs a federal tax liability but does not receive distributions commensurate with the taxable income allocated to it in respect of its Liquidating Trust Interests, the Holder may be allowed a subsequent or offsetting loss.

The Liquidating Trustee will file with the IRS returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a). The Liquidating Trust will also send to each holder of a beneficial interest in the Liquidating Trust a separate statement setting forth the Holder's share of items of income, gain, loss, deduction or credit and will instruct the Holder to report such items on its federal income tax return.

Events subsequent to the date of this Combined Disclosure Statement and Plan, such as the enactment of additional tax legislation, could also change the federal income tax consequences of the Combined Disclosure Statement and Plan and the transactions contemplated thereunder.  All Holders are urged to consult with their own tax advisors in connection with the tax consequences described herein.

7.11   Information Reporting and Withholding.

In connection with the Combined Disclosure Statement and Plan, the Debtor and, on and after the Effective Date, the Liquidating Trustee will comply with all applicable withholding and information reporting requirements imposed by U.S. federal, state, local, and foreign taxing

authorities, and all Distributions under the Combined Disclosure Statement and Plan will be subject to those withholding and information reporting requirements. Holders of Claims may be required to provide certain tax information as a condition to receiving Distributions pursuant to the Combined Disclosure Statement and Plan.

In general, information reporting requirements may apply to Distributions pursuant to the Combined Disclosure Statement and Plan. Additionally, under the backup withholding rules, a U.S. Holder may be subject to backup withholding with respect to Distributions made pursuant to the Combined Disclosure Statement and Plan, unless a U.S. Holder provides the applicable withholding agent with a taxpayer identification number, certified under penalties of perjury, as well as certain other information, or otherwise establish an exemption from backup withholding. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a credit against a U.S. Holder's U.S. federal income tax liability, if any, and may entitle a U.S. Holder to a refund, provided the required information is timely furnished to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders of Claims or Interests are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Combined Disclosure Statement and Plan would be subject to these regulations and require disclosure on the holder's tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE COMBINED DISCLOSURE STATEMENT AND PLAN.**

7.12    Releases, Exculpations, and Injunctions.

This Combined Disclosure Statement and Plan contains certain releases, exculpations, and injunction language. In particular, generally the Released Parties have played an important role in furthering and facilitating the Debtor's efforts in the Chapter 11 Case and as part of the Combined Disclosure Statement and Plan process. The Plan Proponent is not presently aware of any potentially viable claims or Causes of Action held by the Debtor or its Estate against the Released Parties that would provide a material net benefit to Creditor recoveries. The Plan Proponent expects to present evidence to the extent necessary at the Combined Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  Importantly, there is no third-party release contemplated by the Combined Disclosure Statement and Plan.

Parties are urged to read these provisions carefully to understand how Confirmation and Consummation of the Combined Disclosure Statement and Plan will affect any Claim, interest, right, or action with regard to the Debtor and the Released Parties.

**THE COMBINED DISCLOSURE STATEMENT AND PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS AGAINST THE DEBTOR TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND ALL OTHER APPLICABLE LAW.**

    7.13    <u>Alternatives to the Combined Disclosure Statement and Plan</u>.

If the requisite acceptances are not received or the Combined Disclosure Statement and Plan is not Confirmed and Consummated, the theoretical alternatives to the Combined Disclosure Statement and Plan would be (a) formulation of an alternative chapter 11 plan, (b) conversion of the Chapter 11 Case to cases under chapter 7 of the Bankruptcy Code, or (c) dismissal of the Chapter 11 Case. The Plan Proponent does not believe that any of these alternatives, even if viable, would afford holders of Claims or Interests a greater recovery than what is provided by the Combined Disclosure Statement and Plan.

If the Combined Disclosure Statement and Plan is not confirmed, then the Debtor, the Committee, or any other party in interest (subject to the exclusivity requirements contained in section 1121 of the Bankruptcy Code) could attempt to formulate a different chapter 11 plan. The additional costs, including, among other amounts, additional professional fees, all of which would constitute Administrative Claims (subject to allowance thereof), however, may be so significant that one or more parties in interest could request that the Chapter 11 Case be converted to a case under chapter 7 of the Bankruptcy Code. At this time, the Plan Proponent does not believe that there are viable alternative plans available in this Chapter 11 Case.

If the Combined Disclosure Statement and Plan is not Confirmed, the Chapter 11 Case may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate and distribute the Debtor's remaining assets in accordance with the priorities established by the Bankruptcy Code. As discussed above and indicated in the Liquidation Analysis attached hereto as **Exhibit A**, the Plan Proponent believes that the Combined Disclosure Statement and Plan provides a better outcome for holders of Claims than a chapter 7 liquidation would provide.

If the Combined Disclosure Statement and Plan is not confirmed, the Chapter 11 Case also could be dismissed. Among other effects, dismissal would result in the termination of the automatic stay, thus permitting Creditors and other parties-in-interest to assert state-law rights and remedies against the Debtor and its assets, likely to the detriment of other Creditors. While it is impossible to predict precisely what would happen in the event the Chapter 11 Case are dismissed, it is unlikely that dismissal would result in a ratable distribution of the Debtor's assets among Creditors as provided in the Combined Disclosure Statement and Plan. Thus, the vast majority of Creditors, including General Unsecured Creditors, could expect to receive less in the dismissal scenario than they would receive under the Combined Disclosure Statement and Plan.

7.14    The Distributions May Be Different Than Projected.

The amount of Cash realized from the liquidation of the Debtor's remaining assets could be materially less than anticipated, which could cause the amount of Distributions to Creditors to be reduced substantially.

Additionally, the projected Distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution. There can be no assurance that the estimated Claim amounts set forth in the Combined Disclosure Statement and Plan are correct. These estimated amounts are based on certain assumptions with respect to a variety of factors. Indeed, there are certain large claims filed by purported Creditors of the Debtor, including an approximately $4.4 billion contingent claim filed by the State of Utah Natural Resources Trustee on behalf of the Utah Department of Natural Resources, which if allowed, could materially reduce recoveries for Holders of Allowed Claims. Both the actual amount of Allowed Claims in a particular Class and the funds available for Distribution to such Class may differ from the Plan Proponent's estimates.

If the total amount of Allowed Claims in a Class is higher than the Plan Proponent's estimates, or the funds available for Distribution to such Class are lower than the Plan Proponent's estimates, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected herein.

## SECTION 8
## UNCLASSIFIED CLAIMS

8.1    Unclassified Claims.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified for purposes of voting or receiving Distributions. Rather, all such Claims are treated separately as unclassified Claims as set forth in this Section, and the holders thereof are not entitled to vote on the Combined Disclosure Statement and Plan.

8.2    Administrative Claims.

(a)    Except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment, each Holder of an Allowed Administrative Claim, other than a Professional Fee Claim, shall receive Cash equal to the Allowed amount of such Claim: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order Allowing such Claim; (b) in accordance with the terms and conditions of agreements between the Holder of such Claim and the Debtor, Post-Effective Date Debtor, or Liquidating Trust, as the case may be; (c) with respect to any Administrative Claims representing obligations incurred in the ordinary course of the Debtor's business, upon such regular and customary payment or performance terms as may exist in the ordinary course of the Debtor's business or as otherwise provided in the Combined Disclosure Statement and Plan; or (d) with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), as and when due under applicable law.

59

(i)     Holders of Administrative Claims (including, without limitation, Professionals requesting compensation or reimbursement of such expenses pursuant to Sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code, which filing requirements are set forth below) that do not file such requests by the applicable deadline provided for herein may be subject to objection for untimeliness and may be prohibited by order of the Bankruptcy Court from asserting such claims against the Debtor, the Estate, the Liquidating Trust, or their successors or assigns, or their property.

(ii)     All fees due and payable on the Effective Date under 28 U.S.C. § 1930 that have not been paid shall be paid on or before the Effective Date.

(b)     Professional Fees.

(i)     Professionals requesting compensation or reimbursement of expenses pursuant to Sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code or required to file fee applications by order of the Bankruptcy Court for services rendered prior to the Effective Date must file and serve pursuant to the notice provisions of the Interim Fee Order [Docket No. 202], which established certain procedures for the interim compensation and reimbursement of expenses of Professionals in the Chapter 11 Case, an application for final allowance of compensation and reimbursement of expenses no later than thirty (30) days after the Effective Date. All such applications for final allowance of compensation and reimbursement of expenses of Professionals will be subject to the authorization and approval of the Bankruptcy Court. Any objection to Professional Fee Claims shall be filed on or before the objection deadline specified in the application for final compensation or order of the Bankruptcy Court.

(ii)     Upon approval of the fee applications by the Bankruptcy Court, the Professionals' respective accrued and Allowed fees and reimbursement of expenses arising prior to the Effective Date, plus reasonable fees for services rendered, and actual and necessary costs incurred, in connection with the preparation, filing, service and prosecution of any applications for allowance of Professional Fees pending on the Effective Date or filed and/or served after the Effective Date, shall be paid out of the Professional Fee Reserve to the applicable Professionals.

On or prior to the Effective Date, the Debtor shall appropriately fund the Professional Fee Reserve, in an amount equal to (a) the budgeted Professional Fees, plus (b) if the budgeted Professional Fees are insufficient to satisfy estimated accrued Professional Fee Claims incurred through the Effective Date in full, such additional amount (if any) required to satisfy such accrued Professional Fee Claims. The Professional Fee Reserve shall be held in trust by the Liquidating Trustee for the applicable professionals until all allowed fee and expense claims have been paid in full. The amounts deposited into the Professional Fee Reserve shall be free and clear of all Liens, claims and encumbrances of any Persons or Entities except to the extent that any excess amounts remain in the Professional Fee Reserve after payment in full of all Allowed Claims in the preceding categories (a) – (b) of this paragraph, which such excess amounts remaining after payment of the Allowed Professional Fees shall vest in the Liquidating Trust as Liquidating Trust Assets and distributed in accordance with the Combined Disclosure Statement and Plan and the Liquidating Trust Agreement. For the avoidance of doubt, the Professional Fee

60

Reserve shall not constitute a cap or limitation upon the obligation to pay Professional Fee Claims pursuant to this Combined Disclosure Statement and Plan.

(c)    Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Priority Tax Claim, the Liquidating Trustee shall pay each holder of an Allowed Priority Tax Claim the full unpaid amount of such Allowed Priority Tax Claim on or as soon as practicable after the Effective Date or, if later, the date such Allowed Priority Tax Claim becomes an Allowed Claim; *provided that*, after becoming an Allowed Claim, such Allowed Priority Tax Claim may be paid at a later date pursuant to applicable non-bankruptcy law.

## SECTION 9
## CLASSIFICATION OF CLAIMS AND INTERESTS

9.1    Summary of Classification.

The provisions of this Section 9 govern Claims against and Interests in the Debtor. Any Class that is vacant will be treated in accordance with Section 9.3 hereof.

The following table designates the Classes of Claims against, and Interests in, the Debtor and specifies which of those Classes are (i) Impaired or Unimpaired by the Combined Disclosure Statement and Plan, (ii) entitled to vote to accept or reject the Combined Disclosure Statement and Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to accept or reject the Combined Disclosure Statement and Plan. A Claim or portion thereof is classified in a particular Class only to the extent that such Claim or portion thereof qualifies within the description of such Class and is classified in a different Class to the extent that the portion of such Claim qualifies within the description of such different Class.

pecial Provision Governing Unimpaired Claims.

xcept as otherwise provided in the Combined

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| 3 | Senior Secured Claims | Impaired | Yes |
| 4 | Subordinated Secured Claims | Impaired | Yes |
| 5 | Deficiency Claims | Impaired | Yes |
| 6 | Insider Unsecured Claims | Impaired | Yes |
| 7 | General Unsecured Claims | Impaired | Yes |
| 8 | Interests | Impaired | No (presumed to reject) |

Disclosure Statement and Plan, nothing under the Combined Disclosure Statement and Plan shall affect the rights of the Debtor or the Liquidating Trustee, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

61

9.3     Vacant and Abstaining Classes.

Any Class of Claims or Interests that is not occupied as of the commencement of the Combined Hearing by an Allowed Claim or Interest or a Claim or Interest temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from the Combined Disclosure Statement and Plan for purposes of voting to accept or reject the Combined Disclosure Statement and Plan and for purposes of determining acceptance or rejection of the Combined Disclosure Statement and Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**SECTION 10**
**TREATMENT OF CLAIMS AND INTERESTS**

10.1     Class 1—Priority Non-Tax Claims.

(a)     Classification. Class 1 consists of all Priority Non-Tax Claims.

(b)     Treatment. Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction of each Allowed Priority Non-Tax Claim, the Liquidating Trust shall pay the Allowed amount of each Priority Non-Tax Claim to each Entity holding a Priority Non-Tax Claim as soon as practicable following the later of: (a) the Effective Date and (b) the date such Priority Non-Tax Claim becomes an Allowed Claim (or as otherwise permitted by law). The Liquidating Trust shall pay each Entity holding a Priority Non-Tax Claim in Cash in full in respect of such Allowed Claim without interest from the Petition Date.

(c)     Impairment and Voting. Class 1 is Unimpaired. Holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Combined Disclosure Statement and Plan pursuant to section 1126(f) of the Bankruptcy Code and, accordingly, are not entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

10.2     Class 2—Other Secured Claims.

(a)     Classification. Class 2 consists of Other Secured Claims.

(b)     Treatment. Except to the extent that (i) an Other Secured Claim previously has been paid in full or (ii) the liability for an Other Secured Claim has been assumed by the Purchaser under the FFSL APA, at the option of the Liquidating Trustee, one of the following treatments shall be provided: (i) the Holder of an Other Secured Claim shall retain its Lien on its Collateral until such Collateral is sold, and the applicable proceeds of such sale, *less* costs and expenses of disposing of such Collateral, shall be paid to such Holder of an Allowed Other Secured Claim in full satisfaction and release of such Allowed Other Secured Claim; (ii) on or as soon as practicable after the later of (a) the Effective Date, or (b) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim, or as otherwise agreed between the Holder of such Claim and the Debtor or Liquidating Trustee, the Holder of such Other Secured Claim will receive a Cash payment equal to the amount of its Allowed Other Secured Claim in full satisfaction and release of such Other Secured Claim; (iii) the Collateral securing the Creditor's Other Secured Claim shall be abandoned to such Creditor; or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with

section 1124 of the Bankruptcy Code, in full satisfaction and release of such Other Secured Claim. Other Secured Claims which have been (i) previously paid in full or (ii) assumed by the Purchaser under the FFSL APA shall be expunged from the Claims Register.

(c)    Impairment and Voting. Class 2 is Unimpaired. Holders of Other Secured Claims are conclusively presumed to have accepted the Combined Disclosure Statement and Plan pursuant to section 1126(f) of the Bankruptcy Code and, accordingly, are not entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

10.3    Class 3—Senior Secured Claims.

(a)    Classification. Class 3 consists of all Senior Secured Claims.

(b)    Allowance. The Senior Secured Claims, other than any Claims arising under or related to the Prepetition Term Loan C Facility, shall be Allowed in the amount of $41,362,236.82 as of the Petition Date, *less* any amounts applied thereto after the Petition Date through the Effective Date. For the avoidance of doubt, notwithstanding the Allowance of the Senior Secured Claims in the foregoing amount, Wells Fargo shall be entitled to assert additional Senior Secured Claims (including but not limited to claims for additional interest, costs, and fees) by asserting such additional claim amounts in an original or amended proof of claim. Such additional Senior Secured Claims in excess of the Allowed amount set forth herein shall be subject to the claims resolution procedures set forth in Section 12 of this Combined Disclosure Statement and Plan.

(c)    Treatment. The Holder of an Allowed Senior Secured Claim shall retain its Lien on its Prepetition Collateral until such Prepetition Collateral is sold, and the proceeds of such sale, less costs and expenses of disposing such Prepetition Collateral and any amounts to be paid to the Debtor's estate, all in accordance with the Cooperation Agreement and Ace Settlement, shall be promptly paid to such Holder, up to the amount of the Allowed Senior Secured Claim; *provided* that the Holder of an Allowed Senior Secured Claim may release its interest in the Prepetition Collateral pursuant to the FFSL Sale Order, or otherwise. The allowance and treatment under the Combined Disclosure Statement and Plan of the Senior Secured Claims shall be subject and without prejudice to any non-barred claims and defenses, whether asserted or unasserted, against the Prepetition Secured Lenders in the Committee Challenge or otherwise, which shall be preserved under the Combined Disclosure Statement and Plan for prosecution by the Liquidating Trustee. Any Deficiency Senior Secured Claims shall be placed in Class 5 and treated as set forth therein.

(d)    Impairment and Voting. Class 3 is Impaired. Holders of Senior Secured Claims are entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

10.4    Class 4—Subordinated Secured Claims.

(a)    Classification. Class 4 consists of all Subordinated Secured Claims, solely to the extent that the Bankruptcy Court does not recharacterize such Claims as Interests in the Debtor pursuant to the Committee Challenge. If the Bankruptcy Court determines that the

Subordinated Secured Claims should be recharacterized as Interests in the Debtor, Class 4 shall be vacant.

(b)    Treatment. The Holder of an Allowed Subordinated Secured Claim shall retain its Lien on its Prepetition Collateral until such Prepetition Collateral is sold, and the proceeds of such sale, less costs and expenses of disposing of such Prepetition Collateral and any amounts to be paid to the Debtor's estate in accordance with the Cooperation Agreement and Ace Settlement, up to the amount of the Allowed Subordinated Secured Claim, all in accordance with the Cooperation Agreement and Ace Settlement, shall be promptly paid to such Holder of an Allowed Subordinated Secured Claim; *provided*, *however*, in accordance with the terms and conditions of the applicable Intercreditor Agreements, only after all Allowed Senior Secured Claims have been paid in full or otherwise satisfied; *provided further*, *however*, that the Holder of an Allowed Subordinated Secured Claim may release its interest in any Prepetition Collateral in accordance with the FFSL Sale Order, or otherwise. The allowance and treatment under the Combined Disclosure Statement and Plan of the Subordinated Secured Claims shall be subject and without prejudice to any claims and defenses, whether asserted or unasserted, against the Prepetition Secured Lenders in the Committee Challenge or otherwise, which shall be preserved under the Combined Disclosure Statement and Plan for prosecution by the Liquidating Trustee. Any Deficiency Subordinated Secured Claims shall be placed in Class 5 and treated as set forth therein.

(c)    Impairment and Voting. Class 4 is Impaired, and the Holders thereof are entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

10.5    Class 5—Deficiency Claims.

(a)    Classification. Class 5 consists of all Deficiency Claims.

(b)    Treatment. Holders of Allowed Deficiency Claims shall receive, in exchange for their Allowed Deficiency Claims, their Pro Rata share of the Liquidating Trust Interests, which entitle the Liquidating Trust Beneficiaries to a Pro Rata share of any net proceeds of the Liquidating Trust Assets. The Liquidating Trustee shall not be required to make Distributions with respect to Allowed Deficiency Claims pursuant to the terms of the applicable Intercreditor Agreements, nor shall the Liquidating Trustee—or any entity acting on its behalf—incur any liability on account of such Distributions.  The allowance and treatment under the Combined Disclosure Statement and Plan of the Deficiency Claims shall be subject to and without prejudice to any relevant claims and defenses, whether asserted or unasserted against the Prepetition Secured Lenders in the Committee Challenge or otherwise, which shall be preserved under the Combined Disclosure Statement and Plan for prosecution by the Liquidating Trustee.

(c)    Impairment and Voting. Class 5 is Impaired. Holders of Deficiency Claims are entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

10.6    Class 6—Insider Unsecured Claims.

(a)    Classification. Class 6 consists of all Insider Unsecured Claims.

(b)      Treatment. Holders of Allowed Insider Unsecured Claims shall receive, in exchange for their Allowed Insider Unsecured Claims, their Pro Rata share of the Liquidating Trust Interests, which entitle the Liquidating Trust Beneficiaries to a Pro Rata share of any net proceeds of the Liquidating Trust Assets.  The allowance and treatment under the Combined Disclosure Statement and Plan of the Insider Unsecured Claims shall be subject to and without prejudice to any relevant claims and defenses, whether asserted or unasserted against the Insiders in the Committee Challenge or otherwise, which shall be preserved under the Combined Disclosure Statement and Plan for prosecution by the Liquidating Trustee.

(c)      Impairment and Voting. Class 6 is Impaired. Holders of Insider Unsecured Claims are entitled to vote to accept or reject the Combined Disclosure Statement and Plan.

10.7    Class 7—General Unsecured Claims.

(a)      Classification. Class 7 consists of all General Unsecured Claims.

(b)      Treatment. Holders of Allowed General Unsecured Claims shall receive, in exchange for their Allowed General Unsecured Claims, a Pro Rata share of the Liquidating Trust Interests, which entitle the Liquidating Trust Beneficiaries to a Pro Rata share of any net proceeds of the Liquidating Trust Assets.

(c)      Impairment and Voting. Class 7 is Impaired. Holders of General Unsecured Claims are entitled to vote to accept or reject the Combined Disclosure Statement and Plan

10.8    Class 8—Interests.

(a)      Classification. Class 8 consists of all Interests.

(b)      Treatment. There shall be no Distribution on account of Class 8 Interests. Upon the Effective Date, all Interests will be deemed cancelled and will cease to exist.

(c)      Impairment and Voting. Holders of Interests are deemed to have rejected the Combined Disclosure Statement and Plan, and are not entitled to vote.

**SECTION 11**
**DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS**

11.1    Distribution Dates.

The Liquidating Trustee and the Collateral Liquidation Manager shall make Distributions to Holders of Allowed Claims, as applicable. Subject to the terms of the Combined Disclosure Statement and Plan and the Liquidating Trust Agreement, the Liquidating Trustee and Collateral Liquidation Manager may, in their discretion, make a full or partial Pro Rata Distribution to the Holders of Allowed Claims on the Initial Distribution Date or any Subsequent Distribution Date(s), which dates shall be determined by the Liquidating Trustee or Collateral Liquidation Manager, as applicable.  For the avoidance of doubt, there is no requirement hereunder for the

65

Liquidating Trustee and the Collateral Liquidation Manager to make Distributions contemporaneously.

11.2    Subsequent Distributions.

Any Distribution not made on the Initial Distribution Date or a Subsequent Distribution Date because the Claim relating to such Distribution had not been Allowed on that Distribution Date shall be held by the Liquidating Trustee or Collateral Liquidation Manager, as applicable, for Distribution on any Subsequent Distribution Date after such Claim is Allowed. No interest shall accrue or be paid on the unpaid amount of any Distribution.

11.3    Distribution Record Date.

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date will be treated as the Holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Distribution Record Date. The Liquidating Trustee or Collateral Liquidation Manager, as applicable, shall have no obligation to recognize any transfer of any Claim occurring after any Distribution Record Date. In making any Distribution with respect to any Claim, the Liquidating Trustee or Collateral Liquidation Manager, as applicable, shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the Proof of Claim filed with respect thereto or on the Schedules as the Holder thereof as of the close of business on the Distribution Record Date and upon such other evidence or record of transfer or assignment that is known to the Liquidating Trustee or Collateral Liquidation Manager, as applicable, as of the Distribution Record Date.

11.4    Manner of Cash Payments Under the Combined Disclosure Statement and Plan or Liquidating Trust Agreement.

Cash payments made pursuant to the Combined Disclosure Statement and Plan or the Liquidating Trust Agreement shall be in United States dollars by checks drawn on a domestic bank selected by the Liquidating Trustee or Collateral Liquidation Manager, as applicable, or by wire transfer from a domestic bank, at the option of the Liquidating Trustee or Collateral Liquidation Manager, as applicable. Any and all Distributions and/or written communications pertaining to Distributions shall be made to Creditors or Liquidating Trust Beneficiaries at each Creditor or Liquidating Trust Beneficiary's respective address listed in the Claims Register, as reported pursuant to Section 12.7 herein, unless the Liquidating Trustee or Collateral Liquidation Manager, as applicable, receives a written change of address form from a Creditor or Liquidating Trust Beneficiary consistent with the terms of the Combined Disclosure Statement and Plan or the Liquidating Trust Agreement, as applicable.

11.5    Time Bar to Cash Payments by Check.

Distribution checks issued to Creditors or Liquidating Trust Beneficiaries shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof. The Liquidating Trustee or Collateral Liquidation Manager, as applicable, shall not reissue any check except upon directly receiving a request in writing from the Creditor or Liquidating Trust

Beneficiary that was originally issued such check within one-hundred and eighty (180) days of the disbursement of the Distribution. If the 180-day period elapses without the Creditor requesting the check be reissued, the unresponsive Holder's Distribution shall be deemed unclaimed property as provided in the Combined Disclosure Statement and Plan or the Liquidating Trust Agreement, as applicable. The foregoing notwithstanding, ninety (90) days after the final Distribution under section 1194 of the Bankruptcy Code, the Liquidating Trustee or Collateral Liquidation Manager, as applicable, shall stop payment on any check remaining unpaid, the corresponding Distribution shall be deemed unclaimed property, and all unclaimed property shall be redistributed to Creditors or Liquidating Trust Beneficiaries or, as may be necessary, donated to a qualifying charity in accordance with the provisions of the Combined Disclosure Statement and Plan or the Liquidating Trust Agreement.

11.6    Liquidating Trust Assets Account.

Unless otherwise provided in the Confirmation Order, the Liquidating Trust Assets Accounts shall be invested by the Liquidating Trustee in a manner consistent with the objectives of Section 345(a) of the Bankruptcy Code and in its reasonable and prudent exercise of discretion. The Liquidating Trustee shall have no obligation or liability to Liquidating Trust Beneficiaries in connection with such investments in the event of any unforeseeable insolvency of any financial institution where such funds are held.

**SECTION 12**
**PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND REDISTRIBUTIONS**

12.1    No Distributions Pending Allowance.

Notwithstanding any other provision of the Combined Disclosure Statement and Plan, the Liquidating Trustee or Collateral Liquidation Manager, as applicable, shall not distribute any Cash or other property on account of any Disputed Claim unless and until such Claim becomes Allowed. Nothing contained herein, however, shall be construed to prohibit or require payment or Distribution on account of any undisputed portion of a Claim.

12.2    Resolution of Disputed Claims.

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, subject to the Combined Disclosure Statement and Plan and the Liquidating Trust Agreement, the Liquidating Trustee shall have the right to make, file, prosecute, settle, withdraw, or resolve objections to Claims.  Except as expressly provided in the Combined Disclosure Statement and Plan, the costs of pursuing the objections to Claims by the Liquidating Trustee shall be considered a Liquidating Trust Expense and be borne by the Liquidating Trust. From and after the Confirmation Date, all objections made by the Liquidating Trustee with respect to Disputed Claims shall be litigated to a Final Order except to the extent the Liquidating Trustee elects to withdraw any such objection or the Liquidating Trustee and the applicable Claimant elect to compromise, settle, or otherwise resolve any such objection, in which event they may settle, compromise, or otherwise resolve any Disputed Claim or Disputed Interest without approval of the Bankruptcy Court.

12.3    Authority to Object to, Settle, and Resolve Claims.

Subject to the approval of the Liquidating Trust Oversight Committee with respect to Claims in an aggregate amount greater than $500,000.00 (the "Materiality Threshold"), the Liquidating Trustee shall have sole authority to object to and compromise, settle, or otherwise resolve any Claims and may object to and compromise, settle, or otherwise resolve such Claims, without approval of the Bankruptcy Court; *provided* that the Liquidating Trustee or the Claimant may move for Bankruptcy Court approval of any settlement.

12.4    Objection Deadline.

All objections to Claims shall be filed and served upon the Claimant not later than the Claims Objection Deadline, as such may be extended by order of the Bankruptcy Court from time to time.

12.5    Estimation of Claims.

At any time, (a) prior to the Effective Date, the Debtor or the Committee, and (b) after the Effective Date, the Liquidating Trustee (on behalf of the Liquidating Trust) may request that the Bankruptcy Court estimate any contingent, disputed, or unliquidated Claim to the extent permitted by section 502(c) of the Bankruptcy Code regardless of whether the Debtor or the Liquidating Trust has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during Litigation relating to such Claim, including during the pendency of any appeal relating to any such objection.

If the Bankruptcy Court estimates any contingent, disputed, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the Claim, the Debtor, the Committee, or the Liquidating Trust, as applicable, may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim. All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism of the Bankruptcy Court.

12.6    Disallowance of Claims.

On the Confirmation Date, any Claim that is scheduled by the Debtor in the Schedules as Disputed or listed at zero and as to which no Proof of Claim has been timely filed (or deemed timely filed by Final Order entered by the Bankruptcy Court) shall be deemed a Disallowed Claim and expunged from the Claims Register.

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or Entities that are transferees of transfers avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code; *provided* that such Cause of Action is retained by the Liquidating Trust, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any

68

Distributions on account of such Claims until such time as such Causes of Action the Debtor holds or may hold against any Entity have been resolved or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Estate by that Entity have been turned over or paid to the Debtor or Liquidating Trust.

12.7    Claims Register

At the Effective Date or as soon thereafter as practicable, the Claims Agent shall file a complete copy of the Claims Register onto the docket of the Chapter 11 Case. After the Effective Date, the Liquidating Trustee shall be responsible for maintaining a register of Liquidating Trust Beneficiaries' interests in the Liquidating Trust. The Liquidating Trustee shall be entitled to initially rely on the Claims Register as reported in the Claims Agent's filing on the Effective Date for all purposes as an accurate ledger of the status, amount, and class of all Claims. The Liquidating Trustee may engage a claims agent (including the Claims Agent) to continue to maintain and update the Claims Register throughout the administration of the Liquidating Trust, and such claims register may serve as the Liquidating Trustee's register of the Liquidating Trust Beneficiaries, as well as the Collateral Liquidation Manager's register of Holders of Senior Secured Claims and Subordinated Secured Claims.

The Collateral Liquidation Manager shall be responsible for maintaining a register of the Holders of Senior Secured Claims and Subordinated Secured Claims.  The Collateral Liquidation Manager shall be entitled to initially rely on the Claims Register as reported in the Claims Agent's filing on the Effective Date for all purposes as an accurate ledger of the status, amount, and class of all Claims.  The Collateral Liquidation Manager shall inform the Liquidating Trustee and the Claims Agent in writing of all distributions made to Holders of Senior Secured Claims and Subordinated Secured Claims within seven (7) days of such distributions, in order to keep the Liquidating Trustee's claims register current.

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register at the direction of the Post-Effective Date Debtor or the Liquidating Trustee, as applicable, without an objection being filed, by the filing of a Notice of Satisfaction, with service upon the affected claimant(s), by the Liquidating Trustee, and without any further notice to or action, order, or approval of the Bankruptcy Court.

12.8    Reserve Provisions for Disputed Claims.

(a)    **Liquidating Trust**

Before making any Distribution to Holders of Allowed Claims, the Liquidating Trustee shall reserve Cash required for distribution on Disputed Claims as if such Claims were Allowed as filed with any Disputed Claims that are unliquidated or contingent being reserved in an amount reasonably determined by the Liquidating Trustee (a "Disputed Claim Reserve") from the Liquidating Trust Assets. On each Distribution Date after the Effective Date in which the Liquidating Trustee makes Distributions to Holders of Allowed Claims, the Liquidating Trustee shall retain on account of Disputed Claims an amount the Liquidating Trustee estimates is necessary to fund the Pro Rata share of such Distributions to Holders of Disputed Claims if such

69

Claims were Allowed, with any Disputed Claims that are unliquidated or contingent being reserved in an amount reasonably determined by the Liquidating Trustee.

The Liquidating Trustee shall hold property in the Disputed Claim Reserve in trust for the benefit of the Holders of Disputed Claims that are ultimately determined to be Allowed. Each Disputed Claim Reserve shall be closed and extinguished by the Liquidating Trustee when all Distributions and other dispositions of Cash or other property required to be made hereunder will have been made in accordance with the terms of the Combined Disclosure Statement and Plan and Liquidating Trust Agreement. Upon closure of a Disputed Claim Reserve, all Cash or other property held in that Disputed Claim Reserve shall revest in and become property of the Liquidating Trust. All funds or other property that vest or revest in the Liquidating Trust, as applicable pursuant to this paragraph or otherwise shall be used by the Liquidating Trustee in accordance with the Combined Disclosure Statement and Plan and the Liquidating Trust Agreement.

Except as expressly set forth in the Combined Disclosure Statement and Plan, neither the Debtor, Post-Effective Date Debtor, nor the Liquidating Trustee shall have any duty to fund any Disputed Claim Reserve except from the Liquidating Trust Assets.

(b)     **Post-Effective Date Debtor**

Pursuant to the Committee Challenge, after all Allowed Senior Secured Claims (other than any claims arising from or related to the Prepetition Term Loan C Facility) are paid in full or satisfied, the Collateral Liquidation Manager shall hold any Distributions due and payable on account of Claims arising from or related to the Prepetition Term Loan C Facility or on account of Subordinated Secured Claims in reserve pending a Resolution Event with respect to the Recharacterization Request or any other reason that such Claims may be Disputed.  If the Bankruptcy Court determines that any Senior Secured Claims or Subordinated Secured Claims disputed by the Recharacterization Request or otherwise are ultimately Allowed Secured Claims, the Collateral Liquidation Manager shall Distribute any reserved amounts to the Holder of such Allowed Secured Claims in accordance with the terms of the Combined Disclosure Statement and Plan.  However, if the Bankruptcy Court determines that all remaining Senior Secured Claims and Subordinated Secured Claims disputed by the Recharacterization Request or otherwise are not Allowed Secured Claims, the Collateral Liquidation Manager shall transfer any remaining assets of the Post-Effective Date Debtor to the Liquidating Trust as Liquidating Trust Assets, free and clear of any Liens or encumbrances, except to the extent the transfer of any such asset to the Liquidating Trust is disavowed or rejected by the Liquidating Trustee, in which case such asset shall be deemed abandoned by the Post-Effective Date Debtor.

12.9     *De minimis* Distributions, Rounding.

Notwithstanding anything herein to the contrary, the Liquidating Trustee shall not be required to make: (i) partial Distributions or payments of fractions of dollars or (ii) a Distribution if the amount to be distributed is or has an economic value of less than one-hundred dollars ($100.00). Any funds so withheld and not distributed shall be held in reserve and distributed in subsequent Distributions, if any.

70

12.10    Tax Identification Numbers.

The Liquidating Trustee or Collateral Liquidation Manager, as applicable, may require any Creditor or Liquidating Trust Beneficiary to furnish its taxpayer identification number as assigned by the Internal Revenue Service by submitting a Form W-8, Form W-9, or other form completed in writing to the Liquidating Trustee or Collateral Liquidation Manager, as applicable, and may condition any Distribution to any Creditor or Liquidating Trust Beneficiary upon receipt of such completed form. If a Creditor or Liquidating Trust Beneficiary does not timely provide the Liquidating Trustee or Collateral Liquidation Manager, as applicable, with its taxpayer identification number in the manner and by the deadline established by the Liquidating Trustee—to be not less than forty-five (45) days from the service of the request to the Creditor or Liquidating Trust Beneficiary for its tax identification information—then the Liquidating Trustee or Collateral Liquidation Manager, as applicable, may set aside the holder's Distribution for a period of one-hundred-and-eighty (180) days following service of the request. If the Creditor or Liquidating Trust Beneficiary of the Distribution set aside provides the information in the manner requested in the 180-day period, the Liquidating Trustee or Collateral Liquidation Manager, as applicable, shall disburse the set-aside-Distribution, without interest, to the Creditor or Liquidating Trust Beneficiary. However, if the Creditor or Liquidating Trust Beneficiary fails to provide the requested information within the 180-day period, then the unresponsive Creditor's Distribution or Liquidating Trust Beneficiary's Distribution may be irreversibly deemed "unclaimed property" and redistributed to the other Creditors or Liquidating Trust Beneficiaries in accordance with the provisions of the Combined Disclosure Statement and Plan or the Liquidating Trust Agreement, as applicable.

12.11    Unclaimed and Undeliverable Distributions.

If any Distribution to a Creditor or Liquidating Trust Beneficiary is returned to the Liquidating Trustee as undeliverable or is unclaimed or pursuant to section 12.10 herein a Distribution is deemed "unclaimed property", no further Distributions to such Creditor or Liquidating Trust Beneficiary shall be made unless and until the Creditor or Liquidating Trust Beneficiary claims the missed Distribution by timely notifying the Liquidating Trustee in writing of its current address along with any other information necessary to make the Distribution to the Creditor or Liquidating Trust Beneficiary in accordance with this Combined Disclosure Statement and Plan, the Liquidating Trust Agreement, and applicable law.

If the Creditor or Liquidating Trust Beneficiary provides the Liquidating Trustee with its current address and such other information necessary to make the Distribution within one hundred and eighty (180) days of the original disbursement, the missed Distribution shall be made to the Creditor or Liquidating Trust Beneficiary as soon as is reasonably practicable, without interest. However, if any Distribution that is undeliverable or otherwise unclaimed is not claimed within one-hundred-and-eighty (180) days of the original disbursement, such Distribution may be deemed "unclaimed property" under section 347(b) of the Bankruptcy Code and forfeited by the Creditor or Liquidating Trust Beneficiary, as applicable, and the forfeiter shall consequentially lose his status as a Creditor or Liquidating Trust Beneficiary as applicable. After the 180 day period to claim property has elapsed, the unclaimed property or interests in property shall revert to the Liquidating Trust for redistribution to Creditors or Liquidating Trust Beneficiaries or other disposition in accordance with the terms of the Combined Disclosure

71

Statement and Plan and the Liquidating Trust Agreement; the Claim to such unclaimed property or interest in property shall be forever barred, expunged, and deemed Disallowed; and the holder of said Claim deemed Disallowed shall be enjoined from receiving any Distributions under this Combined Disclosure Statement and Plan or Liquidating Trust Agreement and from asserting such Disallowed Claim against the Liquidating Trust or Post-Effective Date Debtor.

The Liquidating Trustee may, in its sole discretion, attempt to determine a Creditor's or Liquidating Trust Beneficiary's current address or otherwise locate a Creditor or Liquidating Trust Beneficiary, but nothing in this Combined Disclosure Statement and Plan or the Liquidating Trustee Agreement shall require the Liquidating Trustee to do so.

For the avoidance of doubt, any unclaimed Distributions made by the Liquidating Trust which constitute unclaimed property as set forth above, shall be retained by or transferred to, as applicable, and become unrestricted property of, the Liquidating Trust, and shall become Liquidating Trust Assets and distributed in accordance with the Combined Disclosure Statement and Plan and the Liquidating Trust Agreement.

12.12   <u>Books and Records and Vesting of Privileges</u>.

The Debtor shall transfer its books and records, including, without limitation, those books and records relating to the Liquidating Trust Assets, regardless of original form, manner or media, to the Liquidating Trust on the Effective Date, in a form accessible and viewable by the Liquidating Trustee. The Debtor shall provide any and all digital account information, including passwords, necessary for the Liquidating Trustee to access the Debtor's books and records. In connection with the Liquidating Trust's control and custody, as of the Effective Date, of the Debtor's books and records, the Liquidating Trustee will, for the avoidance of doubt, be authorized and empowered to exercise on and after the Effective Date any and all rights and powers of the Debtor relating to any contracts and/or other arrangements between the Debtor and third parties, for the storage of the Debtor's books and records.  The Post-Effective Date Debtor may keep a copy of the Debtor's books and records solely with respect to any matters necessary for the Collateral Liquidation Wind-Down Tasks, including, but not limited to, (a) the Intercreditor Agreements, (b) the Prepetition Collateral located at the Rowley Property, and (c) an updated holder registry with respect to the (i) Senior Secured Claims, and (ii) Subordinated Secured Claims.  To the extent necessary to complete the Wind-Down Tasks, the Liquidating Trustee shall provide copies of any additional and necessary items from the Debtor's books and records, upon the reasonable request of the Collateral Liquidation Manager.  Such costs shall be shared equally between the Liquidating Trust, as Liquidating Trust Expenses, and the Post-Effective Date Debtor, from the net proceeds of the liquidation of the assets of the Post-Effective Date Debtor.

Upon and after such transfer, the Liquidating Trustee acting on behalf of the Liquidating Trust may destroy and/or otherwise discard, delete, and dispose of any remaining records and/or copies of the books and records, including those maintained in electronic format, unless the Liquidating Trustee has determined to retain such records upon or as soon as reasonably practicable after the Effective Date. The Liquidating Trustee shall preserve all such books and records until the earlier of (i) such time as the Liquidating Trustee determines that such records are no longer required to be preserved or (ii) the termination of the Liquidating Trust; *provided*

72

*that* in the case of the preceding clause (i), the Liquidating Trustee shall file a notice of its intention to destroy and discard the relevant records and serve said notice on the U.S. Trustee and any other parties which have requested notice of filings in the Chapter 11 Case under Bankruptcy Rule 2002 after the Effective Date; in the event that any party objects within 14 days of service, the objection shall be heard on an expedited basis and adjudicated by the Bankruptcy Court; in the event no objection is timely filed, the Liquidating Trustee may proceed with the document disposal. The collection and preservation of such records by the Liquidating Trustee shall be at the expense of the Liquidating Trust.

For the avoidance of doubt, as provided in Section 14.5, on the Effective Date, the attorney-client privilege, the attorney work product doctrine and any similar privilege against disclosure, and all other similar immunities (all together, the "Privileges") belonging to the Debtor or the Estate that concern or in any way relate to any of the Liquidating Trust Assets or any Claim, or that would apply to communications, documents, or records recorded in magnetic, optical, or other form of electronic medium concerning or in any way relating to any assets of the Post-Effective Date Debtor or Liquidating Trust Assets, shall vest in the Liquidating Trust. The Liquidating Trustee shall have the sole right to waive Privileges that concern or in any way relate to any of the Liquidating Trust Assets or that would apply to communications, documents, or electronic records concerning or in any way relating to any assets of the Post-Effective Date Debtor or Liquidating Trust Assets.

12.13   Claims Payable by Third Parties.

The availability, if any, of insurance policy proceeds for the satisfaction of an Allowed Claim shall be determined by the terms of the Debtor's Insurance Policies. To the extent that one or more of the Debtor's insurers pays or agrees to satisfy a Claim, in whole or in part (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' payment or agreement, such Claim may be expunged to the extent of any payment or satisfaction on the Claims Register without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

## SECTION 13
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

13.1   Rejection of Executory Contracts and Unexpired Leases.

Except with respect to executory contracts or unexpired leases: (i) that were previously assumed or rejected by order of the Bankruptcy Court, (ii) specifically described in the Combined Disclosure Statement and Plan as to be assumed in connection with Confirmation thereof, are specifically scheduled to be assumed or assumed and assigned pursuant to the Combined Disclosure Statement and Plan or the Plan Supplement, or otherwise are specifically described in the Combined Disclosure Statement and Plan to not be rejected, or (iii) that are the subject of a pending motion to assume or reject, pursuant to section 365 of the Bankruptcy Code, on the Effective Date, each executory contract and unexpired lease entered into by the Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to Section 365 of the Bankruptcy Code; *provided however,* that nothing in this Section shall cause the rejection, breach, or termination of any contract of

insurance benefiting the Debtor, the Estate, the Debtor's officers, managers and directors, and/or the Liquidating Trust. To the extent that any executory contract or unexpired lease is assumed by the Debtor, the Debtor, the Post-Effective Date Debtor, or the Liquidating Trust, as applicable, shall pay the cure costs therefrom on the Effective Date (or as soon as reasonably practicable thereafter), or if assumed after the Effective Date, within thirty (30) days of such assumption, or, in each case, on such other terms as the parties to such executory contract or unexpired lease may agree.

Nothing in this Section shall be construed as an acknowledgement that a particular contract or agreement is executory or is properly characterized as an unexpired lease. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections pursuant to Section 365 of the Bankruptcy Code, as of the effective date of such rejection. The non-Debtor parties to any rejected personal property leases shall be responsible for taking all steps necessary to retrieve the personal property that is the subject of such executory contracts and leases, and neither the Debtor nor the Liquidating Trust shall bear any liability for costs associated with such matters.

Notwithstanding anything to the contrary in the Combined Disclosure Statement and Plan, the Liquidating Trust reserves the right to alter, amend, modify, or supplement the Assumed Executory Contract and Unexpired Lease List at any time through and including 60 days after the Effective Date.

13.2   Rejection Claims.

All Proofs of Claim with respect to Claims arising from the rejection of executory contracts or unexpired leases pursuant to Confirmation of the Combined Disclosure Statement and Plan, if any, must be filed with the Claims Agent within thirty (30) days after the Effective Date, or if rejected after the Effective Date, within thirty (30) days after the later of the notice of or effective date of the rejection of such executory contract or unexpired lease. Any Claim arising from the rejection of an executory contract or unexpired lease, pursuant to Confirmation of the Combined Disclosure Statement and Plan that is not filed within such time will not be considered timely, and shall be forever barred expunged, and deemed Disallowed; and the holder of said Claim deemed Disallowed shall be enjoined from receiving any Distributions under this Combined Disclosure Statement and Plan or Liquidating Trust Agreement and from asserting such Disallowed Claim against the Liquidating Trustee. All such Claims for which Proofs of Claim are timely and properly filed and ultimately Allowed will be treated as General Unsecured Claims.

13.3   Insurance Policies.

Notwithstanding anything to the contrary contained herein, Confirmation of the Combined Disclosure Statement and Plan shall not discharge, impair or otherwise modify any obligations of the non-Debtor parties to the Insurance Policies, owed to the Debtor or any other parties including any additional insureds.[9] For the avoidance of doubt, the Debtor, the

---

[9] For the avoidance of doubt, nothing in the Combined Disclosure Statement and Plan shall be construed as an acknowledgement that a particular Insurance Policy is an executory contract under Section 365 of the Bankruptcy Code.

Post-Effective Date Debtor, and the Liquidating Trustee, as applicable, reserve all of their rights, claims, offsets, setoffs, defenses, counterclaims and all other interests relating to any and all Insurance Policies.

To the extent one or more of the Insurance Policies provide potential coverage related to one or more Causes of Action the Debtor holds or may hold against any Entity, the Debtor shall, notwithstanding any provision of any Insurance Policy that purports to restrict or limit the transfer of the Debtor's rights under such Insurance Policy, assign all rights thereunder with respect to such Causes of Action to the Liquidating Trust or Post-Effective Date Debtor, as applicable. All net proceeds (including, for the avoidance of doubt, net of any deductibles or retentions) of Insurance Policies received by the Liquidating Trust or Post-Effective Date Debtor, as applicable shall be treated as proceeds of such Causes of Action for all purposes under the Combined Disclosure Statement and Plan.

Nothing herein shall diminish or impair the enforceability by the Debtor, the Post-Effective Date Debtor or the Liquidating Trust of the Insurance Policies and related agreements that may cover Claims and Causes of Action against the Debtor or any other Entity.

## SECTION 14
## MEANS FOR IMPLEMENTATION OF THE
## COMBINED DISCLOSURE STATEMENT AND PLAN

14.1    Establishment and Administration of Liquidating Trust Assets Account; Other Accounts.

On or as soon as reasonably practicable after the Effective Date, the Liquidating Trustee shall (i) open, or cause to be opened, the Liquidating Trust Assets Accounts and any further accounts to hold the Liquidating Trust Assets; and (ii) fund said accounts or reserves with Available Cash, in accordance with the Combined Disclosure Statement and Plan, all of which accounts and reserves shall constitute Liquidating Trust Assets. The Professional Fee Reserve shall continue to be maintained and administered by the Liquidating Trustee.

From time to time, upon receipt of any other Liquidating Trust Asset Proceeds, the Liquidating Trustee shall deposit such funds into the Liquidating Trust Assets Account, and they shall become part of the Liquidating Trust Assets. The Liquidating Trust Assets shall be used by the Liquidating Trust to fund distributions to Creditors and other payments to be made pursuant to or otherwise consistent with the Combined Disclosure Statement and Plan.  To fund the administration of the Liquidating Trust and pay Liquidating Trust Expenses, the Liquidating Trustee shall have and may use the Liquidating Trust Assets in a manner consistent with the Combined Disclosure Statement and Plan and the Liquidating Trust Agreement, subject to the requisite approvals by the Liquidating Trust Oversight Committee with respect to the monetization and disposal of Liquidating Trust Assets; *provided* that no such consultation or approval shall be required to pay the fees and expenses of the Liquidating Trustee and the Liquidating Trustee's retained professionals in the ordinary course.

14.2    Dissolution of Debtor; Corporate Action by Debtor.

75

On the Effective Date, the matters under the Combined Disclosure Statement and Plan involving or requiring any corporate actions of the Debtor, including but not limited to actions requiring a vote or other approval of the board of directors, managers, members, partners, or other equity holders of the Debtor or the execution of any documentation incident to or in furtherance of the Combined Disclosure Statement and Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the managers, members, directors, or officers of the Debtor.

From and after the Effective Date, (i) the Debtor, for all purposes other than those detailed herein, shall be deemed to have withdrawn its business operations from any states in which it was previously conducting or is registered or licensed to conduct business operations, and the Debtor shall not be required to file any document, pay any sum or take any other action, in order to effectuate such withdrawal, and (ii) the Debtor shall not be liable in any manner to any taxing authority for franchise, business, license, withholding or other similar taxes accruing on or after the Effective Date; *provided* that the Liquidating Trust or Post-Effective Date Debtor, as applicable, may sell or otherwise monetize any Liquidating Trust Assets or Prepetition Collateral, as applicable, as detailed herein.

After the Effective Date, upon completion of the Wind-Down Tasks, the Collateral Liquidation Manager and the Liquidating Trustee may file a joint certification with the Bankruptcy Court that the Combined Disclosure Statement and Plan has been substantially administered for the Debtor, and upon such certification, the Post-Effective Date Debtor shall be deemed dissolved without further order of the Bankruptcy Court or action by the Liquidating Trustee or Collateral Liquidation Manager, including the filing of any documents with the secretary of state for the state in which the Debtor is formed or any other jurisdiction. After the filing of a joint certification, or otherwise with the consent of the Collateral Liquidation Manager or Bankruptcy Court approval, the Liquidating Trustee is authorized to take all necessary or appropriate actions to close the Chapter 11 Case and dissolve the Post-Effective Date Debtor in and withdraw the Post-Effective Date Debtor from the applicable states.

14.3    Appointment of the Liquidating Trustee, Liquidating Trust Oversight Committee, and the Wind-Down Officer.

The identity of the Liquidating Trustee and the members of the Liquidating Trust Oversight Committee, each of whom shall be selected by the Committee, will be disclosed in the Plan Supplement. The identity of the Wind-Down Officer, who will be selected by the Committee with the consent of the majority (by amount) of the Holders of the Allowed Senior Secured Claims, will be disclosed in the Plan Supplement. From and after the Effective Date, professionals may be retained by the Liquidating Trust and the Post-Effective Date Debtor (including, in each case, without limitation, at the election of the Liquidating Trustee or Collateral Liquidation Manager, as applicable, counsel and other professionals of the Debtor or Committee) as set forth in the Liquidating Trust Agreement, without need for Bankruptcy Court approval.

All fees and expenses incurred by the Liquidating Trust or the professionals retained by the Liquidating Trust following the Effective Date, including all expenses related to the

76

Post-Effective Date Debtor Wind-Down Tasks, shall be considered a Liquidating Trust Expense and paid (or reimbursed) by the Liquidating Trust from the Liquidating Trust Assets in accordance with the Combined Disclosure Statement and Plan and the Liquidating Trust Agreement.

All fees and expenses incurred by the Collateral Liquidation Manager, the professionals retained thereby, or the professionals retained by the Post-Effective Date Debtor shall be considered an expense of the Post-Effective Date Debtor and paid by the Post-Effective Date Debtor in accordance with section 14.7(b) hereof.

14.4    The Liquidating Trust.

On the Effective Date, the Liquidating Trust shall be established pursuant to the Liquidating Trust Agreement for the purpose of, *inter alia*, (a) administering the Liquidating Trust Assets, (b) prosecuting and/or resolving all Disputed Claims, (c) investigating and pursuing any Causes of Action that constitute Liquidating Trust Assets, and (d) making all Distributions to the Liquidating Trust Beneficiaries as provided for under the Combined Disclosure Statement and Plan.

The Liquidating Trust is intended to qualify as a liquidating trust pursuant to Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of the trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. Accordingly, the Liquidating Trustee shall, in an orderly manner, liquidate and convert to Cash the Liquidating Trust Assets, and make timely Distributions to the Liquidating Trust Beneficiaries, and not unduly prolong the duration of the Liquidating Trust. Neither the Liquidating Trust nor the Liquidating Trustee shall be or shall be deemed a successor-in-interest of the Debtor for any purpose other than as specifically set forth herein or in the Liquidating Trust Agreement.

The Liquidating Trust Agreement shall provide the Liquidating Trust Oversight Committee with approval rights with respect to sales, liquidations, settlements, or prosecutions of the Liquidating Trust Assets greater than the Materiality Threshold in the aggregate.

On the Effective Date, the Liquidating Trust Assets shall vest automatically in the Liquidating Trust. The Combined Disclosure Statement and Plan shall be considered a motion pursuant to Sections 105, 363 and 365 of the Bankruptcy Code for such relief. The transfer of the Liquidating Trust Assets to the Liquidating Trust shall be made for the benefit and on behalf of the Liquidating Trust Beneficiaries. The assets comprising the Liquidating Trust Assets will be treated as being transferred by the Debtor, to the Liquidating Trust Beneficiaries pursuant to the Combined Disclosure Statement and Plan in exchange for their Allowed Claims and then by the Liquidating Trust Beneficiaries to the Liquidating Trust in exchange for the Liquidating Trust Interests. The Liquidating Trust Beneficiaries shall be treated as the grantors and owners of the Liquidating Trust. Upon the transfer of the Liquidating Trust Assets, the Liquidating Trust shall succeed to all rights, title and interest of the Debtor's in the Liquidating Trust Assets, and the Debtor will have no further interest in or with respect to the Liquidating Trust Assets. For the avoidance of doubt, after they vest in the Liquidating Trust, the Debtor and the Post-Effective

77

Date Debtor shall have no interest in or control over the Liquidating Trust Assets or any distributions therefrom to Liquidating Trust Beneficiaries.

Except to the extent definitive guidance from the IRS or a court of competent jurisdiction (including the issuance of applicable Treasury Regulations or the receipt by the Liquidating Trustee of a private letter ruling if the Liquidating Trustee so requests one) indicates that such valuation is not necessary to maintain the treatment of the Liquidating Trust as a liquidating trust for purposes of the Internal Revenue Code and applicable Treasury Regulations, as soon as possible after the Effective Date, the Liquidating Trustee shall make a good-faith valuation of the Liquidating Trust Assets. The valuation shall be used consistently by all parties (including, without limitation, the Debtor, the Liquidating Trust, the Liquidating Trust Beneficiaries) for all federal income tax purposes.

14.5    Removal or Resignation of the Liquidating Trustee.

The Liquidating Trustee may be removed by order of the Bankruptcy Court, for: (x) fraud, gross negligence or willful misconduct in connection with the affairs of the Liquidating Trust; (y) physical or mental disability that substantially prevents the Liquidating Trustee from performing the duties as Liquidating Trustee of the Liquidating Trust; or (z) breach of fiduciary duty.

The Liquidating Trustee may resign by giving not less than thirty (30) days' prior written notice thereof to counsel to the Liquidating Trustee and the U.S. Trustee. Such resignation shall be effective no earlier than thirty (30) days after delivery thereof.  Upon such resignation or removal, the Liquidating Trust Oversight Committee shall appoint a new Liquidating Trustee. Notice of such appointment shall be filed with the Bankruptcy Court.

14.6    Rights and Powers.

(a)     Liquidating Trustee

The Liquidating Trustee shall be deemed the Estate's representative with respect to the Liquidating Trust Assets in accordance with section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the Liquidating Trust Agreement, including, without limitation, the powers of a trustee under sections 506(c), 704 and 1106 of the Bankruptcy Code and Bankruptcy Rule 2004 to act on behalf of the Liquidating Trust. Without limiting the foregoing, the Liquidating Trustee will have the rights and powers to, among other things, (1) effect all actions and execute all agreements, instruments and other documents necessary to implement the applicable provisions of the Combined Disclosure Statement and Plan and the Liquidating Trust Agreement; (2) liquidate the Liquidating Trust Assets in accordance with the Combined Disclosure Statement and Plan; (3) subject to the consultation and approval rights contained in section 14.4 herein, investigate, prosecute, settle, abandon or compromise any Causes of Action the Debtor holds or may hold against any Entity that constitute Liquidating Trust Assets; (4) make certain Distributions to Unsecured Creditors in accordance with the Combined Disclosure Statement and Plan, including the Liquidating Trust Beneficiaries in accordance with the Combined Disclosure Statement and Plan and the Liquidating Trust Agreement; (5) administer the Liquidating Trust and pursue Causes of Action that constitute

78

Liquidating Trust Assets in accordance with the Combined Disclosure Statement and Plan and the Liquidating Trust Agreement; (6) take actions consistent with, and ensure the performance of the Debtor's obligations after the Effective Date under, all purchase agreements governing the Debtor's sales of the Debtor's assets to third parties entered into prior to the Effective Date; (7) take actions consistent with, and ensure the performance of the Debtor's obligations after the Effective Date; (8) establish and administer any necessary reserves for Disputed Claims that may be required; (9) object to Disputed Claims and prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court such objections; (10) assert or waive any attorney-client privilege on behalf of the Debtor and Estate with regard to the Liquidating Trust Assets; (11) undertake and complete the Post-Effective Date Debtor Wind-Down Tasks; and (12) employ and compensate professionals and other agents, including, without limitation, Professionals previously employed by the Debtor or the Committee, in accordance with the Liquidating Trust Agreement or the Combined Disclosure Statement and Plan, *provided however*, that any such compensation shall be made only out of the Liquidating Trust Assets, to the extent not inconsistent with the status of the Liquidating Trust as a liquidating trust within the meaning of Treas. Reg. § 301.7701-4(d) for federal income tax purposes.

Any abatement, interruption, or tolling of the statutes of limitation pertaining to the Liquidating Trust Assets in favor of the Debtor or the Estate shall also apply to the benefit of the Liquidating Trustee; for the avoidance of doubt, the Liquidating Trustee shall be construed to be a "trustee" for purposes of 11 U.S.C. § 108.

(b) **Collateral Liquidation Manager**

The Collateral Liquidation Manager shall have the rights and powers to undertake and complete the Collateral Liquidation Wind-Down Tasks. The liquidation of the assets of the Post-Effective Date Debtor shall be pursuant to the procedures set forth in *De Minimis* Sale Procedures Order and the Combined Disclosure Statement and Plan. The Collateral Liquidation Manager shall make Distributions to the Liquidating Trust, and to Holders of Allowed Senior Secured Claims and Allowed Subordinated Secured Claims, in accordance with the terms of the Prepetition Credit Agreement, the Intercreditor Agreements, the Committee Settlement, and the Combined Disclosure Statement and Plan. In connection with managing the liquidation of the assets of the Post-Effective Date Debtor, the Collateral Liquidation Manager shall take actions consistent with, and ensure the performance of the Debtor's obligations after the Effective Date under, all agreements governing the Debtor's sales of the Debtor's assets to third parties entered into prior to or after the Effective Date, and may employ and compensate professionals and other agents, including, without limitation, Professionals previously employed by the Debtor or the Committee, or employed by the Liquidating Trust in accordance with the Combined Disclosure Statement and Plan.

14.7    Fees and Expenses.

(a) **Liquidating Trust**

Subject to payment in full of all Allowed Administrative Claims, and except as otherwise ordered by the Bankruptcy Court, Liquidating Trust Expenses shall be paid in accordance with

the Combined Disclosure Statement and Plan and the Liquidating Trust Agreement without further order of the Bankruptcy Court.

(b)     **Post-Effective Date Debtor**

Except as otherwise ordered by the Bankruptcy Court, the reasonable and necessary expenses related solely to the administration of the Post-Effective Date Debtor, and unrelated to the liquidation of the Prepetition Collateral vested in the Post-Effective Date Debtor, namely the Post-Effective Date Debtor Wind-Down Tasks, shall be paid by the Liquidating Trust (or if prepaid, reimbursed by the Liquidating Trust) without further order of the Bankruptcy Court.

The fees and expenses of the Post-Effective Date Debtor related to the Collateral Liquidation Wind-Down Tasks, including those fees and expenses incurred by the Collateral Liquidation Manager and any professionals retained by the Collateral Liquidation Manager or the Post-Effective Date Debtor, as applicable, shall be paid out of the net proceeds of any property of the Post-Effective Date Debtor which has been liquidated in accordance with the Combined Disclosure Statement and Plan, the Prepetition Credit Agreement, and the Committee Settlement, or any other source of funding provided by the Prepetition Secured Lenders, as agreed upon by the Collateral Liquidation Manager, with the consent of the Liquidating Trustee, or by Bankruptcy Court order.

The fees and expenses of the Wind-Down Officer shall be paid by the Liquidating Trust, as Liquidating Trust Expenses.

14.8    Transfer of Liquidating Trust Interests.

Liquidating Trust Interests shall not be transferable except upon death of the interest holder or by operation of law. The Liquidating Trust shall not have any obligation to recognize any transfer of Claims or Interests occurring after the Distribution Record Date.

14.9    Litigation.

Except as otherwise provided herein and except as to Causes of Action assigned to third parties prior to the Effective Date, all Litigation (including, for the avoidance of doubt, the Committee Challenge) is retained, vested in the Liquidating Trust and preserved pursuant to section 1123(b) of the Bankruptcy Code. From and after the Effective Date, all Litigation will be prosecuted or settled by the Liquidating Trustee in accordance with the terms of the Combined Disclosure Statement and Plan and the Liquidating Trust Agreement, as applicable. To the extent any Litigation is already pending on the Effective Date, the Liquidating Trustee, as successor to the Debtor or the Committee (in any derivative capacity or as an intervening party), may in the Liquidating Trustee's discretion continue the prosecution of such Litigation and shall be substituted as plaintiff, defendant, or in any other capacity for the Debtor or the Committee pursuant to the Combined Disclosure Statement and Plan and the Confirmation Order on the Effective Date, without need for any further motion practice or notice in any case, action, or matter.

14.10   Continued Corporate Existence.

The Debtor will continue to exist after the Effective Date as a separate limited liability company entity, with all of the powers of a corporation under applicable law in the jurisdiction in which it is incorporated or otherwise formed and pursuant to its organizational documents in effect prior to the Effective Date, without prejudice to the right of the Liquidating Trustee to dissolve the Post-Effective Date Debtor (subject to its obligations under this Combined Disclosure Statement and Plan) in accordance with section 14.2 hereof; *provided* that the Post-Effective Date Debtor and/or the Liquidating Trust shall not have any further obligations under the Consent Decree.

The entry of the Confirmation Order shall constitute authorization for the Debtor to take or to cause to be taken all corporate and limited liability company actions necessary or appropriate to consummate and implement the provisions of the Combined Disclosure Statement and Plan prior to, on and after the Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court.  All such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by the member or the directors of the Debtor.  On the Effective Date, the appropriate officers and managers of the Debtor are authorized and directed to execute and deliver the agreements, documents and instruments contemplated by the Combined Disclosure Statement and Plan and the Plan Supplement in the name and on behalf of the Debtor.  On the Effective Date (a) the authority, power and incumbency of the Persons then acting as officers, managers, and directors of the Debtor shall be terminated as officers, managers, and directors of the Debtor and such officers, managers, and directors shall be deemed to have resigned; *provided*, that this termination as officers, managers, and directors of the Debtor does not prevent such persons from being employees of the Post-Effective Date Debtor or the Liquidating Trust, and (b) the Wind-Down Officer shall be deemed the managing member of the Debtor, and shall be deemed to have succeeded to such powers as would have been previously exercisable by the sole member of the Debtor; *provided*, that the Wind-Down Officer's sole role on and after the Effective Date shall be expressly limited to only such administrative functions as required by applicable law for the Post-Effective Date Debtor to maintain its status as a Delaware limited liability company; *provided*, *further* that the Wind-Down Officer shall be entitled to rely on the Post-Effective Date Debtor's advisors and the Liquidating Trustee's advisors with respect to such functions and shall not be liable for any action taken or suffered by the Wind-Down Officer in reliance upon advice of such advisors.

14.11   Management of the Post-Effective Date Debtor.

All rights and obligations of the Debtor under this Combined Disclosure Statement and Plan that exist or continue on or after the Effective Date shall vest in the Post-Effective Date Debtor. In addition to any reporting required as part of the Focus Management Retention, any other agreement or Bankruptcy Court order, which after the Effective Date shall be provided to the Liquidating Trustee, the Collateral Liquidation Manager shall provide monthly reports to the Liquidating Trustee of all sales or dispositions of Prepetition Collateral and all disbursements made.

(a)      **Authorized Representatives**

On the Effective Date, the Collateral Liquidation Manager (with respect to the Collateral Liquidation Wind-Down Tasks) and the Liquidating Trustee (solely with respect to the Post-Effective Date Debtor Wind-Down Tasks) shall each be deemed authorized representatives to act on behalf of the Post-Effective Date Debtor and shall have the power and authority to, undertake and complete their respective Wind-Down Tasks in accordance with the terms of the Combined Disclosure Statement and Plan. Professionals and personnel retained or employed by the Post-Effective Date Debtor or the Collateral Liquidation Manager need not be disinterested as that term is defined in the Bankruptcy Code.

(b)      **Removal or Resignation of the Collateral Liquidation Manager**

The Collateral Liquidation Manager may be removed by order of the Bankruptcy Court, for: (x) fraud, gross negligence or willful misconduct in connection with the affairs of the Post-Effective Date Debtor; or (y) physical or mental disability that substantially prevents the Collateral Liquidation Manager from performing the duties as Collateral Liquidation Manager of the Post-Effective Date Debtor.

The Collateral Liquidation Manager may resign by giving not less than thirty (30) days' prior written notice thereof to counsel to the Post-Effective Date Debtor and the Liquidating Trustee. Such resignation shall be effective no earlier than thirty (30) days after delivery thereof. Upon such resignation or removal, the holder of the majority (by amount) of the Allowed Senior Secured Claims shall appoint a new Collateral Liquidation Manager; *provided* that if all Allowed Senior Secured Claims have been paid in full, then the majority (by amount) of the Holders of the Allowed Subordinated Secured Claims shall appoint the new Collateral Liquidation Manager; *provided*, *further*, that to the extent that the Recharacterization Claims are still Disputed by the Committee Challenge or otherwise at such time, the Liquidating Trustee shall appoint the new Collateral Liquidation Manager, after consulting with the Wind-Down Officer. Notice of such appointment shall be filed with the Bankruptcy Court.

14.12   Dissolution of the Committee.

On the Effective Date, the Committee will dissolve automatically, and the members of the Committee (solely in their capacities as Committee members) and the Committee's Professionals shall be released, exculpated, and discharged from all their duties relating to the Chapter 11 Case, except with respect to (a) any applications for Professional Fee Claims or expense reimbursements for members of such Committee, including preparing same, objecting to same, defending same and attending any hearing with respect to same; and (b) any motions or other actions seeking enforcement or implementation of (i) the provisions of the Combined Disclosure Statement and Plan, or (ii) the Confirmation Order, or (c) any appeals related to sub-clause (a) or (b) herein. The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any actions taken with respect to subsection (a), (b), or (c) of this Section. Nothing in the Combined Disclosure Statement and Plan shall prohibit or limit the ability of the Debtor's or Committee's

Professionals to represent the Liquidating Trust and/or the Post-Effective Date Debtor or to be compensated or reimbursed in accordance with the Combined Disclosure Statement and Plan and the Liquidating Trust Agreement in connection with such representation.

14.13   Termination After Five Years and Extension.

If on the fifth anniversary of the Effective Date, the Liquidating Trust has not been previously terminated in accordance with the terms of the Liquidating Trust Agreement because all Liquidating Trust Expenses have not been paid and/or all Liquidating Trust Assets have not been fully distributed, then the Liquidating Trustee shall immediately distribute all Liquidating Trust Assets to the Liquidating Trust Beneficiaries in accordance with this Combined Disclosure Statement and Plan; immediately thereafter, the Liquidating Trust shall terminate and the Liquidating Trustee shall have no further responsibility in connection therewith except as otherwise set forth in the Liquidating Trust Agreement.

Notwithstanding the foregoing, within 90 days of the expiration of the five-year period, the Liquidating Trustee may file a motion with the Bankruptcy Court requesting an extension of the term of the Liquidating Trust. An extension shall only be granted if the Bankruptcy Court determines that: (i) an extension is necessary to facilitate or complete the recovery on Liquidating Trust Assets and (ii) further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust for federal income tax purposes. For purposes of this Section, a favorable letter ruling from the Internal Revenue Service shall be conclusive proof that further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust for federal income tax purposes.

## SECTION 15
## EFFECT OF CONFIRMATION

15.1   Binding Effect of the Combined Disclosure Statement and Plan.

The provisions of the confirmed Combined Disclosure Statement and Plan shall bind the Debtor, the Post-Effective Date Debtor, the Collateral Liquidation Manager, the Liquidating Trust, the Liquidating Trustee, any Entity acquiring property under the Combined Disclosure Statement and Plan, any Liquidating Trust Beneficiary, and any Creditor or Interest Holder, whether or not such Creditor or Interest Holder has filed a Proof of Claim or Interest in the Chapter 11 Case, whether or not the Claim of such Creditor or the Interest of such Interest Holder is impaired under the Combined Disclosure Statement and Plan, and whether or not such Creditor or Interest Holder has accepted or rejected the Combined Disclosure Statement and Plan. All Claims and Debts shall be fixed and adjusted pursuant to the Combined Disclosure Statement and Plan. The Combined Disclosure Statement and Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, or Governmental Unit or parish in which any instrument related to under the Combined Disclosure Statement and Plan or related to any transaction contemplated under the Combined Disclosure Statement and Plan is to be recorded with respect to any taxes of the kind specified in section 1146(a) of the Bankruptcy Code.

15.2    Vesting of Liquidating Trust Assets in the Liquidating Trust.

Upon the Effective Date, title to all Liquidating Trust Assets shall vest exclusively in the Liquidating Trust and shall be retained by the Liquidating Trust for the purposes contemplated under the Combined Disclosure Statement and Plan pursuant to the Liquidating Trust Agreement.  In addition to the above, to the extent that the proceeds of the Prepetition Collateral which vested in the Post-Effective Date Debtor, *less* costs and expenses of disposing such Prepetition Collateral *and* any amounts to be paid to the Debtor's estate in accordance with the Cooperation Agreement and Ace Settlement, exceeds the total amount of the Allowed Senior Secured Claims and Allowed Subordinated Secured Claims, such excess amounts may, in the Liquidating Trustee's discretion, become Liquidating Trust Assets and vest free and clear in the Liquidating Trust.  Subject to the consent of the Liquidating Trust Oversight Committee, at such time, the Liquidating Trustee may liquidate any such Prepetition Collateral which has vested free and clear in the Liquidating Trust in its discretion, and may retain a professional to assist in and manage such liquidation. Without limiting the generality of the foregoing, all Liquidating Trust Assets shall vest exclusively in the Liquidating Trust upon the Effective Date, or such later date, and shall no longer constitute property of the Post-Effective Date Debtor or the Estate.

15.3    Vesting of Property in the Post-Effective Date Debtor.

Upon the Effective Date, to the extent that such assets constitute Prepetition Collateral, title to the Debtor's existing inventory, accounts receivable, equipment, fixtures, and intellectual property, and in each case, the proceeds thereof, shall vest in the Post-Effective Date Debtor to be liquidated by the Collateral Liquidation Manager subject and pursuant to the Prepetition Credit Agreement, the Committee Settlement, the Access Agreement, the Combined Disclosure Statement and Plan, the *De Minimis* Sale Procedures Order, and any other applicable orders entered by the Bankruptcy Court; *provided*, *however*, for the avoidance of doubt, all other assets of the Debtor, including without limitation, the Debtor's Available Cash, the proceeds of the FFSL Sale, the Ace Claims, the Debtors' books and records, the Debtor's owned real property, the Avoidance Actions, the Special Accounts, and all assets subject to the Committee Challenge, including, the Debtor's interests in Skull Valley and the Commercial Tort Claims, shall not vest in the Post-Effective Date Debtor.

15.4    Property Free and Clear.

Except as otherwise provided in the Combined Disclosure Statement and Plan or the Confirmation Order, all property that shall vest in the Liquidating Trust shall be free and clear of all Claims, Interests, Liens, charges, or other encumbrances of Creditors or Interest Holders; *provided* that the Prepetition Secured Lenders shall retain their Liens on all Prepetition Collateral, including, without limitation, the Debtor's interests in Skull Valley, pending a Resolution Event with respect to such claims in the Committee Challenge, and the Ace Claims as set forth in the Ace Settlement. The Holders of Allowed Other Secured Claims shall retain their liens on the collateral securing such Other Secured Claims until such Other Secured Claims are satisfied in accordance with the terms and conditions of the Combined Disclosure Statement and Plan.

84

Following the Effective Date, the Liquidating Trustee may transfer and dispose of any Liquidating Trust Assets free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Rules and without further approval of the Bankruptcy Court or notice to Creditors, except as may otherwise be required under the Combined Disclosure Statement and Plan, the Liquidating Trust Agreement, or the Confirmation Order; *provided*, that none of the Liquidating Trust Assets that are Prepetition Collateral may be sold, transferred, disposed of, or otherwise encumbered without the prior written consent of a majority (by amount) of: (a) Holders of Senior Secured Claims, or (b) if all of the Allowed Senior Secured Claims are fully satisfied, Holders of Allowed Subordinated Secured Claims, to the extent provided in the Prepetition Credit Agreement, the Prepetition Subordinated Loan Agreement, the Prepetition Bridge Loan Agreement, and the Intercreditor Agreements, as applicable, or by Bankruptcy Court order; *provided, further* that none of the Liquidating Trust Assets that are subject to the Liens of the Holders of Other Secured Claims may be sold, transferred, disposed of, otherwise encumbered without the prior written consent of the Holders of such Lien securing such Liquidating Trust Assets or Bankruptcy Court order.

## SECTION 16
## EXCULPATIONS, INJUNCTIONS, AND RELEASES

16.1    Exculpation.

**The Debtor, the Debtor's current and former directors, managers, and officers, the Debtor's Retained Professionals, the Committee and its Retained Professionals and the members of the Committee, each solely in their capacities as such who served during the Chapter 11 Case (collectively, the "Exculpated Parties"), will neither have nor incur any liability to any entity for any action in good faith taken or omitted to be taken between the Petition Date and Effective Date in connection with or related to the Chapter 11 Case, the sale or other disposition of the Debtor's assets or the formulation, preparation, dissemination, implementation, Confirmation, or Consummation of the Combined Disclosure Statement and Plan, or any agreement created or entered into in connection with the Combined Disclosure Statement and Plan; *provided however*, that this limitation will not affect or modify the obligations created under the Combined Disclosure Statement and Plan, or the rights of any Holder of an Allowed Claim to enforce its rights under the Combined Disclosure Statement and Plan, and shall not exculpate any action (or inaction) constituting willful misconduct, actual fraud, or gross negligence (in each case subject to determination of such by final order of a court of competent jurisdiction). Without limiting the generality of the foregoing, each Exculpated Party shall be entitled to and granted the protections of section 1125(e) of the Bankruptcy Code.**

16.2    Debtor/Estate Release of Released Parties.

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Combined Disclosure Statement and Plan or in the Committee Settlement, for good and valuable consideration, on and after and subject to the occurrence of the Effective Date, the Debtor, and the Estate (collectively, the "Debtor/Estate Releasors") shall release (the "Debtor/Estate Release") each Released Party, and each Released Party is deemed released by the Debtor/Estate Releasors from any and all claims,**

85

obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtor/Estate Releasors, as applicable, whether known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, existing or hereinafter arising, in law, equity, or otherwise, that the Debtor/Estate Releasors would have been legally entitled to assert in its own right, or on behalf of the Holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's business(es) or assets, the Consent Decree, the Committee Settlement, the Ace Settlement, the Access Agreements, the Cooperation Agreement, the Debtor's postpetition liquidation, sale, and operational efforts, the Chapter 11 Case, the purchase, sale, transfer of any security, asset, right, or interest of the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Combined Disclosure Statement and Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Case, the negotiation, formulation, or preparation of the Combined Disclosure Statement and Plan or related agreements, instruments, or other documents, any other act or omission, transaction, agreement, event, or other occurrence taking place on and before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence (in each case, subject to determination by final order of a court of competent jurisdiction); *provided however*, the foregoing Debtor/Estate Release shall not operate to waive or release any obligations of any party under the Combined Disclosure Statement and Plan or any other document, instrument, or agreement executed to implement the Combined Disclosure Statement and Plan or the Committee Settlement.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtor/Estate Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor/Estate Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) in the best interests of the Debtor and all Holders of Claims and Interests; (c) fair, equitable, and reasonable; (d) given and made after due notice and opportunity for hearing; and (e) a bar to any of the Debtor/Estate Releasors asserting any Claim or Cause of Action released pursuant to the Debtor/Estate Release.

16.3    Injunction.

In implementation of the Combined Disclosure Statement and Plan, except as otherwise expressly provided in the Confirmation Order or the Combined Disclosure Statement and Plan, and except in connection with the enforcement of the terms of the Combined Disclosure Statement and Plan or any documents provided for or contemplated in the Combined Disclosure Statement and Plan, all entities who have held, hold or may hold Claims against or Interests in the Debtor, the Post-Effective Date Debtor, the Liquidating Trust, or the Estate that arose prior to the Effective Date are permanently enjoined from: (a) commencing or continuing in any manner, directly or indirectly, any

**action or other proceeding of any kind against the property of the Debtor, the Post-Effective Date Debtor, the Estate, the Liquidating Trust, or any of the Liquidating Trust Assets, with respect to any such Claim or Interest; (b) the enforcement, attachment, collection, or recovery by any manner or means, directly or indirectly, of any judgment, award, decree, or order against the property of the Debtor, the Post-Effective Date Debtor, the Estate, the Liquidating Trust, or any of the Liquidating Trust Assets, with respect to any such Claim or Interest; (c) creating, perfecting, or enforcing, directly or indirectly, any Lien or encumbrance of any kind against the property of the Debtor, the Post-Effective Date Debtor, the Estate, or the Liquidating Trust, or any of the Liquidating Trust Assets, with respect to any such Claim or Interest; and (d) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Combined Disclosure Statement and Plan with respect to such Claim or Interest; *provided, however*, that the Debtor, the Post-Effective Date Debtor, and the Liquidating Trust shall receive the benefit of the Injunction through and until the date upon which all remaining property of the Debtor's Estate vested in the Post-Effective Date Debtor or Liquidating Trust has been fully liquidated, administered, and distributed in accordance with the terms of the Combined Disclosure Statement and Plan and the Liquidating Trust Agreement and the Post-Effective Date Debtor is dissolved under applicable law.  Notwithstanding anything to the contrary in the Combined Disclosure Statement and Plan, the Plan Supplement, or the Confirmation Order, the automatic stay pursuant to section 362 of the Bankruptcy Code shall remain in full force and effective with respect to the Post-Effective Date Debtor and the Liquidating Trust until the closing of the Chapter 11 Case. Nothing contained in this Section shall prohibit the Holder of a timely filed Proof of Claim from litigating its right to seek to have such Claim declared an Allowed Claim and paid in accordance with the distribution provisions of the Combined Disclosure Statement and Plan, or enjoin or prohibit the interpretation or enforcement by the Claimant of any of the obligations of the Debtor, the Post-Effective Date Debtor, or the Liquidating Trust under the Combined Disclosure Statement and Plan.**

87

16.4     Post-Confirmation Liability of the Liquidating Trustee, the Wind-Down Officer, and the Collateral Liquidation Manager.

The Wind-Down Officer, the Collateral Liquidation Manager, and the Liquidating Trustee, in each case, together with each of their consultants, agents, advisors, attorneys, accountants, financial advisors, other representatives and the professionals engaged by the foregoing (collectively, the "Indemnified Parties"), shall not be liable for any and all liabilities, losses, damages, claims, Causes of Action, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, to the Holders of Claims or Interests for any action or inaction taken in good faith in connection with the performance or discharge of their duties under the Combined Disclosure Statement and Plan, except the Indemnified Parties will be liable for actions or inactions that are grossly negligent, fraudulent, or which constitute willful misconduct (in each case, liability shall be subject to determination by final order of a court of competent jurisdiction); provided that the Collateral Liquidation Manager, the Liquidating Trustee, or their agents, advisors, or attorneys (in each case, exclusively in their capacity as such) shall not be liable for the Debtor's environmental liabilities at the US Magnesium Superfund site (the "Site"), arising from the Debtor's actions or omissions, pursuant to any federal, state, local, or common law (including, without limitation, under CERCLA or RCRA) except to the extent that: (1) the actions of the Collateral Liquidation Manager or their agents, advisors, or attorneys (in each case, exclusively in their capacity as such) result in the exacerbation of any pre-existing contamination or releases of hazardous substances at the Site; or (2) the Post-Effective Date Debtor transfers to the Liquidating Trust any Prepetition Collateral located at the Site, and the actions of the Liquidating Trustee or their agents, advisors, or attorneys (in each case, exclusively in their capacity as such) result in the exacerbation of any pre-existing contamination or releases of hazardous substances at the Site.  For the avoidance of doubt, neither the Collateral Liquidation Manager, the Liquidating Trustee, nor their agents, advisors or attorneys, shall be liable under federal, state, or local environmental law (including, without limitation, CERCLA or RCRA, as a potentially responsible party or otherwise), solely as a result of the fact of their appointment as the Collateral Liquidation Manager or the Liquidating Trustee.

After the Effective Date, any act or omission taken in accordance with the Combined Plan and Disclosure Statement or otherwise with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute gross negligence, fraud, or willful misconduct. In addition, the Liquidating Trust, the Post-Effective Date Debtor, and the Estate shall, as applicable and to the fullest extent permitted by the laws of the State of Delaware, indemnify and hold harmless the Indemnified Parties from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Liquidating Trust, the Post-Effective Date Debtor, and the Estate or the implementation or administration of the Combined Disclosure Statement and Plan if the Indemnified Party acted in good faith and in a manner reasonably believed to be in or not opposed to the best interest of the Liquidating Trust and the Estate. To the extent the Liquidating Trust or Post-Effective Date Debtor, as applicable, indemnifies and holds harmless the Indemnified Parties as provided above, the legal fees and related costs incurred by counsel to the Liquidating Trustee or Collateral Liquidation Manager, as applicable, in monitoring and participating in the defense of such claims giving rise to the right of indemnification shall be

88

paid as Liquidating Trust Expenses or expenses of the Post-Effective Date Debtor, as applicable. All rights of the Persons exculpated and indemnified pursuant hereto shall survive Confirmation of the Combined Disclosure Statement and Plan.

16.5    Preservation of Rights of Action.

(a)    **Vesting of Causes of Action.**

Except as otherwise expressly provided in the Combined Disclosure Statement and Plan or the Confirmation Order, in accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtor holds or may hold against any Entity shall vest upon the Effective Date in the Liquidating Trust.

Except as otherwise provided in the Confirmation Order, after the Effective Date, the Liquidating Trustee shall have the exclusive right to institute, prosecute, abandon, settle, or compromise any Causes of Action the Debtor holds or may hold against any Entity, in accordance with the terms of the Combined Disclosure Statement and Plan and the Liquidating Trust Agreement, as applicable, and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in the Chapter 11 Case.

Liquidating Trust Assets and recoveries therefrom shall remain the sole property of the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries as contemplated herein, and holders of Claims shall have no direct right to or interest in any such Liquidating Trust Assets or recovery therefrom.

(b)    **Preservation of All Causes of Action Not Expressly Settled or Released.**

Unless a Cause of Action against a holder of a Claim or other Entity is expressly waived, relinquished, released, compromised, or settled in the Combined Disclosure Statement and Plan (including, without limitation, pursuant to the Debtor/Estate Release) and/or or any Final Order (including the Confirmation Order), the Debtor and the Liquidating Trustee, as applicable, expressly reserve such retained Cause of Action for adjudication by the Liquidating Trustee (including, without limitation, Causes of Action not specifically identified or described in the Plan Supplement or elsewhere, or of which the Debtor may be presently unaware, or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time, or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Combined Disclosure Statement and Plan, or Confirmation Order, except where such Causes of Action have been released or otherwise resolved by a Final Order (including the Confirmation Order). In addition, the Debtor and the Liquidating Trustee expressly reserve the right to pursue or adopt claims alleged in any lawsuit in which the Debtor are defendants or interested parties against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

Subject to the immediately preceding paragraph, any Entity to which the Debtor has incurred an obligation (whether on account of services, the purchase or sale of goods, or otherwise), or that has received services from the Debtor or a transfer of money or property of the Debtor, or that has transacted business with the Debtor, or that has leased property from the Debtor, should assume and is hereby advised that any such obligation, transfer, or transaction may be reviewed by the Liquidating Trustee subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether (i) such Entity has filed a Proof of Claim against the Debtor in the Chapter 11 Case; (ii) the Debtor or Liquidating Trustee have objected to any such Entity's Proof of Claim; (iii) any such Entity's Claim was included in the Schedules; (iv) the Debtor or Liquidating Trustee have objected to any such Entity's scheduled Claim; (v) any such Entity's scheduled Claim has been identified by the Debtor or Liquidating Trustee as disputed, contingent, or unliquidated; or (vi) the Debtor has identified any potential claim or Cause of Action against such Entity herein or in the Combined Disclosure Statement and Plan.

16.6    No Discharge.

Nothing contained in the Combined Disclosure Statement and Plan shall be deemed to constitute a discharge of the Debtor under Bankruptcy Code section 1141(d)(3). Section 1141(c) of the Bankruptcy Code nevertheless provides, among other things, that the property dealt with by the Combined Disclosure Statement and Plan is free and clear of all Claims and Interests against the Debtor, the Post-Effective Date Debtor, or the Liquidating Trust.

## SECTION 17
## CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN

17.1    Conditions to Confirmation of the Combined Disclosure Statement and Plan.

Confirmation of the Combined Disclosure Statement and Plan is conditioned upon the satisfaction of each of the following conditions precedent, any one or more of which may be waived by the Plan Proponent: (i) the Bankruptcy Court shall have approved this Combined Disclosure Statement and Plan in form and substance acceptable to the Plan Proponent; (ii) the Plan Proponent shall have determined that there will be sufficient Cash on the Effective Date to pay (or with respect to Disputed Claims to reserve for as required pursuant to the Combined Disclosure Statement and Plan) Allowed Administrative Claims, Non-Tax Priority Claims, Priority Tax Claims, and, if applicable, Allowed Other Secured Claims; (iii) the Plan Proponent and the proposed Liquidating Trustee believe that the Liquidating Trust Assets are sufficient to pay for anticipated or projected Liquidating Trust Expenses; and (iv) the Confirmation Order to be presented to the Bankruptcy Court at the Combined Hearing shall be acceptable to the Plan Proponent.

17.2    Conditions to the Effective Date.

The occurrence of the Effective Date is conditioned upon the satisfaction of each of the following conditions precedent: (i) a Confirmation Order in form and substance acceptable to the Plan Proponent shall have been entered by the Bankruptcy Court and become a Final Order which is not subject to any stay of effectiveness; (ii) the Liquidating Trust shall have been

90

created pursuant to the terms of the Combined Disclosure Statement and Plan, the Liquidating Trustee shall have been appointed by order of the Bankruptcy Court (which may be the Confirmation Order), and the Liquidating Trust Agreement shall have been executed by the Liquidating Trustee; (iii) the Liquidating Trust Assets shall have been transferred the Liquidating Trust upon the Effective Date; (iv) the Professional Fee Reserve shall have been fully funded as described herein and the Debtor and the Committee shall have agreed to the amount of such funding, and (v) all other actions and documents determined by the Plan Proponent to be necessary to implement the Combined Disclosure Statement and Plan shall have been effected and executed.

17.3    Waiver of Conditions Precedent.

To the fullest extent permitted by law, the conditions to the Effective Date set forth in Section 17.2 may be waived or modified in whole or in part at any time in writing by the Plan Proponent without leave from or an order of the Bankruptcy Court.

**SECTION 18**
**RETENTION OF JURISDICTION**

18.1    Retention of Jurisdiction.

From and after the Confirmation Date, the Bankruptcy Court shall retain such jurisdiction as is legally permissible, including, but not limited to, for the following purposes:

(a)    To hear and determine any and all objections to the allowance of a Claim, proceedings to estimate a Claim for any purpose, actions to equitably subordinate a Claim, proceedings seeking approval of any necessary claims reconciliation protocols, or any controversy as to the classification of a Claim in a particular Class under the Combined Disclosure Statement and Plan;

(b)    To administer the Combined Disclosure Statement and Plan, the Liquidating Trust, the Liquidating Trust Assets and the proceeds thereof;

(c)    To estimate or liquidate any Disputed Claims;

(d)    To enforce the terms and provisions of the FFSL Sale Order, as provided in paragraphs 31, 37, and 43 therein.

(e)    To hear and determine any and all adversary proceedings, contested matters or applications pending on the Effective Date or otherwise relating to, arising from, or in connection with the Litigation; *provided however*, that the Liquidating Trustee shall reserve the right to commence actions in all appropriate jurisdictions;

(f)    To hear and determine any and all motions and/or objections to fix, estimate, allow and/or disallow any Claims arising therefrom;

(g)     To hear and determine any and all applications by Professionals for an award of on account of any Professional Fee Claims;

(h)     To enable the Liquidating Trustee, as applicable, to commence and prosecute any Litigation which may be brought after the Effective Date;

(i)     To interpret and/or enforce the provisions of the Combined Disclosure Statement and Plan and the injunction provided for in the Combined Disclosure Statement and Plan and to determine any and all disputes arising under or regarding interpretation of the Combined Disclosure Statement and Plan or any agreement, document, or instrument contemplated by the Combined Disclosure Statement and Plan;

(j)     To enter and implement such orders as may be appropriate in the event Confirmation is for any reason stayed, reversed, revoked, modified, or vacated;

(k)     To modify any provision of the Combined Disclosure Statement and Plan to the extent permitted by the Bankruptcy Code and to correct any defect, cure any omission, or reconcile any inconsistency in the Combined Disclosure Statement and Plan or in the Confirmation Order as may be necessary to carry out the purposes and intent of the Combined Disclosure Statement and Plan;

(l)     To enter such orders as may be necessary or appropriate in furtherance of Confirmation and the successful implementation of the Combined Disclosure Statement and Plan and to determine such other matters as may be provided for in the Confirmation Order or as may be authorized under the provisions of the Bankruptcy Code;

(m)     To enter any orders as required by Rule 23 of the Federal Rules of Civil Procedure, to the extent made applicable to any adversary proceeding pursuant or contested matter pursuant to Bankruptcy Rules 7023 and 9014(c), as applicable; and

(n)     To close the Chapter 11 Case when the administration of the Chapter 11 Case has been completed.

**SECTION 19**
**MISCELLANEOUS PROVISIONS**

19.1     <u>Payment of Statutory Fees / Closing of Chapter 11 Case</u>.

All fees pursuant to section 1930 of Title 28 of the U.S. Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the U.S. Code to the extent applicable ("<u>U.S. Trustee Fees</u>") due and payable before the Effective Date shall be paid by the Debtor on the Effective Date. On or after the Effective Date, all U.S. Trustee Fees shall be paid by the Liquidating Trustee, on behalf of the Liquidating Trust and/or the Post-Effective Date Debtor, when due and payable. To the extent such U.S. Trustee Fees are on account of the disbursement of assets of the Post-Effective Date Debtor, the Post-Effective Date Debtor shall reimburse the Liquidating Trust for such portion of the U.S. Trustee Fees paid by the Liquidating Trust.

92

The Debtor shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Liquidating Trust (acting through the Liquidating Trustee) shall file with the Bankruptcy Court UST Form 11-PCR reports and, as applicable, any UST FORM 11-MOR reports due after the Effective Date, when they become due. The Collateral Liquidation Manager shall cooperate with the Liquidating Trustee in the preparation of any monthly operating reports or post-confirmation reports, as and when required. The Liquidating Trustee, on behalf of the Liquidating Trust and/or the Collateral Liquidation Manager, on behalf of the Post-Effective Date Debtor, shall remain obligated to pay U.S. Trustee Fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. The Liquidating Trustee may seek to close the Chapter 11 Case on motion to the Bankruptcy Court. The U.S. Trustee shall not be required to file any Administrative Claim in the case, and shall not be treated as providing any release under the Combined Disclosure Statement and Plan.

19.2     Revocation of the Combined Disclosure Statement and Plan.

The Plan Proponent reserves the right to revoke and withdraw the Combined Disclosure Statement and Plan at any time on or before the Confirmation Date. If the Plan Proponent revokes or withdraws the Combined Disclosure Statement and Plan, or if Confirmation or the Effective Date does not occur, then the Combined Disclosure Statement and Plan shall be deemed null and void and, in such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtor or any other Entity or to prejudice in any manner the rights of the Committee, the Debtor or any other Entity in any further proceedings involving the Debtor.

19.3     Severability of Provisions.

In the event that, prior to the Confirmation Date, any term or provision of the Combined Disclosure Statement and Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall, with the consent of the Plan Proponent, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision hereof, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

19.4    Rules of Interpretation.

In the event of an inconsistency between the Combined Disclosure Statement and Plan and the Plan Supplement, the Plan shall control. In the event of any inconsistency between any of the Combined Disclosure Statement and Plan or the Plan Supplement, on the one hand, and the Confirmation Order on the other hand, the Confirmation Order shall control.

19.5    Exhibits.

All exhibits attached to the Combined Disclosure Statement and Plan and the Plan Supplement are, by this reference, hereby incorporated herein. The Plan Proponent reserves the right to make changes and corrections to such Exhibits in advance of the Combined Hearing. If any Exhibits are changed or corrected, the replacement Exhibits will be filed with the Bankruptcy Court prior to the commencement of the Combined Hearing.

19.6    Notices.

All notices required or permitted to be made in accordance with the Combined Disclosure Statement and Plan shall be in writing and shall be delivered personally or by nationally recognized overnight or next-day courier service, first-class mail, electronic mail, or via facsimile with electronic confirmation of receipt as follows:

| Counsel for the Committee | Counsel for the Debtor |
|---|---|
| **COLE SCHOTZ P.C.**<br>Justin R. Alberto<br>Michael E. Fitzpatrick<br>500 Delaware Avenue, Suite 600<br>Wilmington, DE 19801<br>Telephone: (302) 652-3131<br>Facsimile: (302) 652-3117<br>Email: jalberto@coleschotz.com<br>mfitzpatrick@coleschotz.com<br><br>-and-<br><br>**EVERSHEDS SUTHERLAND (US) LLP**<br>Todd C. Meyers<br>Danielle Barav-Johnson<br>600 Peachtree St NE, Suite 5200<br>Atlanta, GA 30308<br>Telephone: (404) 853-8000<br>Email:  toddmeyers@eversheds-sutherland.com<br>dahnibarav-johnson@eversheds-sutherland.com<br><br>-and-<br><br>Todd C. Meyers<br>John J. Ramirez | **GELLERT SEITZ BUSENKELL & BROWN, LLC**<br>Michael Busenkell<br>Margaret M. Manning<br>Michael Van Gorder<br>1201 North Orange Street, Suite 300<br>Wilmington, Delaware 19801<br>Telephone: (302) 425-5800<br>Facsimile: (302) 425-5814<br>Email: mbusenkell@gsbblaw.com<br>mmanning@gsbblaw.com<br>mvangorder@gsbblaw.com |

94

Sameer M. Alifarag
1114 Avenue of the Americas, 40th Floor
New York, NY 10036
Telephone: (212) 389-5000
Email:  toddmeyers@eversheds-sutherland.com
johnramirez@eversheds-sutherland.com
sameeralifarag@eversheds-sutherland.com

After the Effective Date, any party who wishes to participate and continue to receive notices in this Chapter 11 Case must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Liquidating Trustee is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to (i) those Entities who have filed such renewed requests and (ii) those Entities whose rights are affected by such documents and/or the relief requested therein.

19.7    Reservation of Rights.

Neither the filing of the Combined Disclosure Statement and Plan nor any statement or provision contained in the Combined Disclosure Statement and Plan, nor the taking by any party in interest of any action with respect to the Combined Disclosure Statement and Plan, shall: (a) be or be deemed to be an admission against interest and (b) until the Effective Date, be or be deemed to be a waiver of any rights any party in interest may have (i) against any other party in interest, or (ii) in or to any of the assets of any other party in interest, and, until the Effective Date, all such rights are specifically reserved. In the event that the Combined Disclosure Statement and Plan is not confirmed or fails to become effective, neither the Combined Disclosure Statement and Plan nor any statement contained in the Combined Disclosure Statement and Plan may be used or relied upon in any manner in any suit, action, proceeding, or controversy within or without the Chapter 11 Case involving the Debtor, except with respect to Confirmation of the Combined Disclosure Statement and Plan.

19.8    Defects, Omissions and Amendments.

The Plan Proponent may, with the approval of the Bankruptcy Court and without notice to all Holders of Claims or Interests, insofar as it does not materially and adversely affect Holders of Claims, correct any defect, omission, or inconsistency in the Combined Disclosure Statement and Plan in such manner and to such extent as may be necessary or desirable to expedite the execution of the Combined Disclosure Statement and Plan. The Combined Disclosure Statement and Plan may be altered or amended before or after Confirmation as provided in section 1127 of the Bankruptcy Code if, in the opinion of the Bankruptcy Court, the modification does not materially and adversely affect the interests of Holders of Claims, so long as the Combined Disclosure Statement and Plan, as modified, complies with sections 1122 and 1123 of the Bankruptcy Code and the Plan Proponent has complied with Section 1125 of the Bankruptcy Code.

The Combined Disclosure Statement and Plan may be altered or amended before or after the Confirmation Date but, prior to substantial Consummation, in a manner which, in the opinion of the Bankruptcy Court, materially and adversely affects Holders of Claims, so long as the

Combined Disclosure Statement and Plan, as modified, complies with sections 1122 and 1123 of the Bankruptcy Code, the Plan Proponent has complied with section 1125 of the Bankruptcy Code and, after notice and a hearing, the Bankruptcy Court confirms such Combined Disclosure Statement and Plan, as modified, under section 1129 of the Bankruptcy Code.

19.9     Filing of Additional Documents.

The Plan Proponent shall file with the Bankruptcy Court such agreements, instruments, pleadings, orders, papers, or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Combined Disclosure Statement and Plan.

19.10   Successors and Assigns.

The rights, benefits, and obligations of any Entity named or referred to in the Combined Disclosure Statement and Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and/or assigns of such Entity.

19.11   Setoffs and Recoupments.

The Liquidating Trust may, but shall not be required to, set off against or recoup from the payments to be made pursuant to the Combined Disclosure Statement and Plan in respect of a Claim, any claim of any nature whatsoever that the Debtor, the Liquidating Trust, or the Estate, as applicable, may have against the Holder of such Claim, but neither the failure to do so or the allowance of any Claim hereunder shall constitute a waiver or release of any such claim by the Debtor, the Liquidating Trust, or the Estate, against such Holder.

19.12   Tax Exemption.

Pursuant to Section 1146 of the Bankruptcy Code, the issuance, transfer, or exchange of any security under the Combined Disclosure Statement and Plan, or the execution, delivery, or recording of an instrument of transfer pursuant to, in implementation of, or as contemplated by the Combined Disclosure Statement and Plan, including, without limitation, any transfers to or by the Debtor, if on the Effective Date, and the Liquidating Trustee, if after the Effective Date, of the Debtor's property in implementation of or as contemplated by the Combined Disclosure Statement and Plan (including, without limitation, any subsequent transfer of property by the Liquidating Trust) shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee.

Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

19.13   Securities Exemption.

To the extent the Liquidating Trust Interests are deemed or asserted to constitute securities, the Liquidating Trust Interests and the issuance and distribution thereof shall be

exempt from Section 5 of the Securities Act of 1933, if applicable, and from any state or federal securities laws requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security, and shall otherwise enjoy all exemptions available for distributions of securities under a plan of reorganization in accordance with all applicable law, including without limitation, section 1145 of the Bankruptcy Code.

19.14   Implementation.

Upon Confirmation, the Plan Proponent shall be authorized to take all steps and execute all documents necessary to effectuate the provisions contained in the Combined Disclosure Statement and Plan.

19.15   Record Date.

To the extent a "Record Date" is required for implementation of the Combined Disclosure Statement and Plan, the record date shall be the voting record date established by the Bankruptcy Court in the Solicitation Procedures Order or such other date as the Bankruptcy Court may set.

19.16   Certain Actions.

By reason of entry of the Confirmation Order, prior to, on, or after the Effective Date (as appropriate), all matters provided for under the Combined Disclosure Statement and Plan that would otherwise require approval of directors, members, managers or other Interest Holders of the Debtor under the Combined Disclosure Statement and Plan, including, without limitation, (i) the Distribution of Cash or Liquidating Trust Assets pursuant to the Combined Disclosure Statement and Plan, (ii) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Combined Disclosure Statement and Plan, and (iii) the adoption, execution, and implementation of other matters provided for under the Combined Disclosure Statement and Plan involving the Company or organizational structure of the Debtor, shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate), pursuant to applicable corporation/limited liability company laws, without any requirement of further action by the directors, members, managers or other Interest Holders of the Debtor, irrespective of whether the Confirmation Order specifically authorizes any such action.

Effective upon the Effective Date, the Debtor's formation documents shall be deemed amended to prohibit the issuance by the Debtor of nonvoting securities to the extent required under section 1123(a)(6) of the Bankruptcy Code.

On or as soon as reasonably practicable following the Effective Date, the Post-Effective Date Debtor shall be authorized to cancel, annul, and extinguish all Interests.

19.17   Substantial Consummation.

On the Effective Date, the Combined Disclosure Statement and Plan shall be deemed substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

19.18   Waiver of Fourteen-Day Stay.

The Plan Proponent requests as part of the Confirmation Order a waiver from the Bankruptcy Court of the 14-day stay of Bankruptcy Rule 3020(e) and, to the extent applicable, a waiver of the 14-day stay of Bankruptcy Rule 6004(g).

19.19   Governing Law.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Combined Disclosure Statement and Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

19.20   Final Decree.

On or after the Effective Date, the Liquidating Trustee, with the consent of the Collateral Liquidation Manager (such consent not to be unreasonably withheld or delayed), shall have the power and authority to file a motion with the Bankruptcy Court seeking the entry of a Final Decree closing the Chapter 11 Case in accordance with section 350(a) of the Bankruptcy Code and Bankruptcy Rule 3022.

19.21   Entire Agreement.

On the Effective Date, the Combined Disclosure Statement and Plan and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Combined Disclosure Statement and Plan.

**SECTION 20**
**RECOMMENDATION**

The Plan Proponent strongly recommends that all Creditors receiving a Ballot vote in favor of the Combined Disclosure Statement and Plan. The Plan Proponent believes that the Combined Disclosure Statement and Plan is in the best interests of all Creditors. The Combined Disclosure Statement and Plan as structured, among other things, allows the Debtor's creditors with Allowed Claims to participate in distributions believed to be in excess of those that would otherwise be available were the Chapter 11 Case dismissed or converted to a case under Chapter 7 of the Bankruptcy Code and minimizes delays in recoveries to the Debtor's creditors.

**FOR ALL THE REASONS SET FORTH IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN, THE PLAN PROPONENT BELIEVES THAT THE CONFIRMATION AND CONSUMMATION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN IS PREFERABLE TO ALL OTHER ALTERNATIVES.**

Dated: June ~~12~~15, 2026          Respectfully submitted,

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF
US MAGNESIUM LLC

_/s/ John Donnan_

John Donnan for Kaiser Aluminum Corporation,
solely in its capacity as Chairperson of the Official
Committee of Unsecured Creditors, and not in any
individual capacity

99

## EXHIBIT A

### Liquidation Analysis

54276737.25

| Summary report: Litera Compare for Word 11.6.0.100 Document comparison done on 6/15/2026 4:32:39 PM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://cloudimanage.com/CLOUD_US/54276737/50 | |
| **Modified DMS:** iw://cloudimanage.com/CLOUD_US/54276737/51 | |
| **Changes:** | |
| Add | 9 |
| Delete | 5 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 14 |