**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>US MAGNESIUM LLC,<br><br>       Debtor. | Chapter 11<br><br>Case No. 25-11696-BLS<br><br>**Re: Docket No. 999** |

**UTAH DIVISION OF FORESTRY, FIRE, AND STATE LANDS'
OBJECTION TO DEBTOR'S NOTICE OF DE MINIMIS ASSET SALE
<u>FILED AT DOCKET NO. 999</u>**

Pursuant to the procedures set forth in the *Order Authorizing and Approving Procedures for the Sale, Transfer, or Abandonment of De Minimis Assets* [Docket No. 793] (the "De Minimis Asset Sale Order") entered on April 10, 2026, the Utah Division of Forestry, Fire, and State Lands ("FFSL"), by its undersigned attorneys, respectfully submits this Objection (the "Objection") to the Debtor's *Notice of De Minimis Asset Sale* [Docket No. 999] (the "Notice of Sale") filed on June 19, 2026. In support of the Objection, FFSL respectfully states as follows:

**<u>PRELIMINARY STATEMENT</u>**

1.      FFSL purchased the Debtor's land and all "improvements" to the land. FFSL now holds all rights as the owner of the land. The Debtor and Wells Fargo Bank, N.A. ("Wells") are attempting to remove and sell essential components of the improvements that FFSL purchased – an electrical system permanently affixed and fully integrated into a facility where the Debtor formerly operated. The Bus Bar[1] was, and is, a permanent improvement to the building and the real property, and a critical component of the building's electrical system. It is not readily removable. Its removal would damage and destroy the improvements, and render the building

---

[1]      The term "Bus Bar" refers to the bus bar identified in the Notice of Sale.

useless. FFSL is the owner of a magnesium alloy producing facility, not a collection of alleged "fixtures" that can be haphazardly removed. FFSL purchased a magnesium production facility (on real property formerly owned by USM), whether currently capable of production or otherwise, and it is entitled to its quiet enjoyment of the real property purchased through tens of millions of dollars in consideration already afforded to the estate.

2.      The proposed sale rests on a disputed assertion that Wells Fargo ("Wells") holds a perfected and enforceable security interest in the Bus Bar. A "bus bar" is "a conductor or an assembly of conductors for collecting electric currents and distributing them to outgoing feeders." Bus bar, Meriam Webster Online Dictionary, https://www.merriam-webster.com/dictionary/bus%20bar (last visited June 25, 2026). "In other words, it is a type of electrical junction in which all the incoming and outgoing electrical current[s] meet[]. Thus, the electrical bus bar collects the electric power at one location." Electrical Bus-Bar and its Types, https://circuitglobe.com/electrical-bus-bar-and-its-types.html. In short, the Bus Bar functions as the backbone for electrical current distribution for the property's industrial power system.

3.      FFSL does not dispute that (i) Wells has a security interest in certain removable fixtures and equipment located on the real property nor that (ii) FFSL did not purchase those encumbered assets. Conversely, Wells does not purport to own, or enjoy a security interest in, the real property and improvements purchased by FFSL. As such, FFSL takes issue with Wells' attempt to strip down the facility on the premise that integral and permanent improvements to the real property are – without any explanation from Wells' – chattels subject to Wells' perfected liens rather than essential structural components of the building that were, and are, permanent improvements to the land.

4.	There is a procedural issue with the sale of disputed assets because the Federal Rules of Bankruptcy Procedure require an adversary proceeding to determine the extent of interests in property.

5.	FFSL has concerns with dismantling of the superfund site. The Bus Bar is attached to the areas that produced hazardous waste. This is different than other property sold by the Debtor thus far because (w) the Bus Bar's proximity to the creation of hazardous waste – the Bus Bar is attached to the electrolytic cells that produced hazardous waste; (x) removal of the Bus Bar may disturb toxic anode dust posing a safety hazard to those who remove Bus Bar and those who will perform work on site after the Bus Bar's removal; (y) the removal of the Bus Bar may destroy evidence and information necessary to protect the health and safety of FFSL and its agents, or those of the Debtor, and Wells; and (z) if the Court permits the Bus Bar's removal, evidence pertaining to the Consent Decree may be destroyed, and could impede the remedial investigation and response actions required by CERCLA.

6.	The underlying sale noticed by the Debtor is improper for four reasons: (i) FFSL acquired the Bus Bar as part of its purchase of the real property and improvements thereto as described in the Purchase Agreement and confirmed by the Court pursuant to the FFSL Sale Order, (ii) the Bus Bar is part and parcel with the real property such that the Bus Bar is no longer a chattel that could simply be removed at the whim of Wells, (iii) the resolution of a dispute over an asset's ownership requires more than a mere notice of sale, objection, and summary disposition through a contested matter, and (iv) the Debtor should provide assurance that, if it is permitted to remove the Bus Bar, that it will not be jeopardizing human and environmental health.

7.      FFSL respectfully requests that the Court deny the sale contemplated in the Notice of Sale (the "Proposed Sale"). Or in the alternative, require that the respective interests in the property be resolved by an adversary proceeding, which would allow the parties to fully brief, engage in discovery, and provide for a more extensive record before the Court rules on this important issue.

## BACKGROUND

### I.      The Facility and the Bus Bar

8.      The Debtor was in the business of producing and marketing minerals and salts, including magnesium, before and throughout the bankruptcy until the sale of property to FFSL.

9.      For at least fifty years magnesium was produced from this mining operation using much of the same infrastructure originally installed on real property owned by the Debtor – now owned by FFSL.

10.     The process by which the Debtor used to produce and isolate magnesium salts required significant amounts of electricity – that process being electrolysis.[2] The Debtor used approximately 125 megawatt hours of electricity while the Debtor was actively producing magnesium via electrolysis.

11.     To supply this large amount of power, the Debtor constructed an electrical substation. The electrical substation accepts transmission level voltage, as much as 125 megawatt

---

[2]      As an overview of the basic process used in Debtor's operation: (1) Great Salt Lake brine is sent to a series of evaporation ponds where water evaporates over the course of several years, thus concentrating salt within the remaining brine; (2) the concentrated brine is sent to holding ponds; (3) the brine is then transported to the reactor where impurities are removed; (4) molten magnesium chloride salt is transported to the electrolytic cells; (5) the molten magnesium chloride is subject to electrolysis, and the products of the electrolysis are collected; and (6) the magnesium metal is sent to the foundry for casting into metal ingot. Steps 3, 4, 5, and 6 are all conducted, in one way or another, in the same facility, under the same roof. The facility – this joint reactor-electrolysis-foundry building – contains four separate electrolysis wings, each approximately 40,000 square feet, and connected to the much larger joint reactor-electrolysis-foundry building.

hours, in the form of three-phase alternating current from Rocky Mountain Power's electric transmission system, and then the transmission level voltage is stepped down and converted into direct current for use by the electrolytic cells in the facility.

12.     The Bus Bar is the conduit through which the electricity flows inside the buildings in a DC current. In the facility, the Bus Bar distributes the DC current to electrolytic cells, which is where the fundamental step of electrolysis occurred when the Debtor formerly produced magnesium.

13.     The Debtor operated out of one massive facility with multiple, and substantial, "wings" where various processes took place. These wings are all under one roof. The Debtor commonly referred to the wings where electrolysis took place as Magnesium Buildings 1, 2, 3, and 4. But again, those wings are all under one roof. In essence it is one building with a reactor wing, electrolysis wings, and a foundry wing. In this respect, the facility is like a sprawling hospital, where different specialty wings are part of one larger facility.

14.     The Bus Bar in the facility is welded together to form one unit throughout the facility. The Bus Bar runs through the walls, in or around the floor and ceiling, and between four wings of the facility that contain electrolytic cells. Below, and attached as Exhibit "1", is an image that shows the Bus Bar running between two wings of the facility – "Magnesium Building One" and "Magnesium Building Two".



15.    Below, and attached as Exhibit "2", is an image of the Bus Bar entering the facility.



16.    Below, and attached as Exhibit "3", is an image of the Bus Bar that shows two sections of the Bus Bar: one section of the Bus Bar that bends down to be distributed to the electrolytic cells in that wing, the "Magnesium Building One" wing, and another section of the Bus Bar that runs from the opposite side of that wing out to the second wing, "Magnesium Building Two".



17.      Below, and attached as Exhibits "4", "5", and "6", are images that show the Bus Bar after it runs the length of the wing and bends within the facility. Notably how the Bus Bar is housed within the structures of the facility, and portions of structures that will need to be removed to remove the Bus Bar.







18.     Below, and attached as Exhibit "7", is an image showing an example of the Bus Bar's connections to individual electrolytic cells. This is an area where possible exposure to anode dust is particularly concerning.



19.     Below is an image showing the interior of the wing that the Debtor refers to as "Magnesium Building One." The wing is lined with electrolytic cells throughout its length.



20.     The Bus Bar is attached to facility via many large bolts that assist in securing the hundreds of thousands of pounds of material to the facility. The Debtor approximates the weight of the Bus Bar to be 700,000 to 800,000 pounds. See Notice of Sale.

**II.     The Sale to FFSL**

21.     On September 10, 2025, the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code.

22.     After an extensive auction spanning three days, multiple status conferences with the Court concerning the same, the Court entered its Order authorizing the sale of certain unencumbered property of the Debtor to FFSL on February 4, 2026 at Docket No. 583 (the "FFSL Sale Order").

23.     The FFSL Sale Order approved the Asset Purchase Agreement between FSSL and the Debtor (the "Purchase Agreement"). The Purchase Agreement is attached to a notice filed at Docket No. 528.

24.     The sale of certain unencumbered assets to FFSL closed on February 6, 2026.

**III.    The Proposed Bus Bar Sale**

25.     The Debtor filed its Notice of Sale on June 19, 2026.

26.     In the Notice of Sale, the Debtor identified the property to be sold as "Bus Bar in Magnesium Building One" and further specified that the property quantity is "[a]pproximately 700,000 to 800,000 pounds[.]" The Debtor identified the purchaser as "Compass Metal Traders."

27.     The language "Magnesium Building One" does not truly describe the facility. As described above, the Debtor performed several critical processes in magnesium production in several wings of one facility, and one of those wings is what the Debtor refers to as "Magnesium Building One." But "Magnesium Building One" is not its own separate building but is one part of the facility where the Debtor formerly operated.

28.     The Bus Bar is an improvement to the building and the land. It is a critical building component and a permanent part of the facility's infrastructure. It is, or at least is an

essential part of, the building's electrical system and serves a key role in the electrical operation of the facility. Without the Bus Bar, the facility is unable to operate as intended.

29.     Moreover, the nearly 80 square miles, inclusive of the evaporation ponds, that Debtor occupied is pointless without the key transformative process of electrolysis, which split magnesium chloride into chlorine gas and magnesium metal.

30.     The Bus Bar in the facility is welded together to form one integrated unit throughout the facility. The Bus Bar runs through the walls and in or around the floor and ceiling. The Bus Bar is attached to the facility via many large bolts that assist in securing the hundreds of thousands of pounds of material to the facility.

31.     FFSL understands that the facility has multiple wings, four of which contain electrolytic cells and were designed for the sole purpose of housing and operating the electrolytic cells. Without the Bus Bar (and without substantial DC current) Magnesium Building One is unable to function as intended and unable to function for any purpose without significant investment and improvement.

32.     To remove the Bus Bar in the facility, the Bus Bar needs to be cut apart and detached from the facility. Besides the inherent risks of removing tons of metal that is integrated into the facility – which include possible damage to the facility – the removal may disturb "anode dust," which contains PCBs and other harmful material.

33.     Anode dust, and "Waste Material" in general, is specifically discussed and defined in the Consent Decree. Removal of any asset that may contain Anode Dust (or other Waste Material) requires notice to the EPA and compliance with required corrective action plans. Consent Decree, ¶¶ 16, & 17.

34.     Relatedly, it is unclear whether, or to what extent, the anode dust was collected and disposed of based upon currently available environmental compliance reports. If indeed, the dust has been removed, then Debtor should have a record of that, and it will be instructive as to the health and safety concerns for this asset removal.

**OBJECTION TO THE DE MINIMIS ASSET SALE**

35.     The Proposed Sale is improper because (1) FFSL acquired the Bus Bar under the Purchase Agreement and the FFSL Sale Order, (2) the Bus Bar is part and parcel with the real property such that it is no longer a chattel, (3) a dispute over an ownership of an asset requires an adversary proceeding, and (4) the Debtor should provide assurance that, if it is permitted to remove the Bus Bar, that it will not be jeopardizing human and environmental health.

36.     The term "fixture" is a term of art in real property law and, more importantly, in lien law. This term is highly susceptible to confusion because its colloquial use (and several of the common dictionary definitions of the term) contradicts the legal use of the word as a term of art. In everyday conversation, people use "fixtures" to describe things that are <u>permanently attached</u> to a building. In real estate law, however, property is divided into two strict categories: (i) real property – land and anything permanently attached to it, *i.e.*, "improvements;" and (ii) personal property (chattels) – movable items not legally tied to the land.

37.     A legal "fixture" is the bridge between these two. It is an item that started its life purely and unequivocally as personal property, but which is temporarily attached to a building or the land with the intent that it remain separate from the land, i.e., it is not affixed with the intent that it remain on the land or part of the building permanently.

38.     Laypeople look at plumbing pipes behind a wall or electrical wiring and call them "plumbing fixtures" or "electrical fixtures." Under real property law and the Uniform

Commercial Code, calling raw pipes or wiring a "fixture" is a misnomer. These are building components. They have been entirely integrated into the structure. They lose their identity as distinct items and are simply part of the real property itself. You cannot legally sever or repossess copper wiring inside a wall without destroying the building. Therefore, it is never analyzed under the law of fixtures; it is just "the house."

### I.      FFSL purchased the Bus Bar in the Purchase Agreement.

39.      In the FFSL Sale Order, the Court approved the "Purchase Agreement and the provisions thereof relating to the Purchased Assets. . . ." FFSL Sale Order, ¶ 1. The Sale was free and clear of liens pursuant to Bankruptcy Code §§ 105, 363(b), and 363(f).

40.      In the Purchase Agreement FFSL acquired, *inter alia*, "Owned Real Property". Purchase Agreement, ¶ 2.1(a). The Purchase Agreement defines "Owned Real Property" as:

> [T]he Seller's Rowley, UT plant site which is approximately 4,500 acres of land adjacent to the southwest shore of the Great Salt Lake; approximately 247 acres in the northeast ¼ of section 32, plus lots 1-4 of section 32, T2N R6W SLBM; all improvements on the Seller's real property; all easements, rights to rail lines, infrastructure constituting fixtures, all appurtenant rights to the foregoing real property, and all water rights used in connection with or appurtenant to the Seller's Business, including water rights 15-616, 15-2161, 16-727, 16-748, 15-1952, 16-160, 16-765, and all other water rights necessary for the Seller's Business.

Purchase Agreement, pp. 7-8 (emphasis added).

41.      The Bus Bar is an improvement to the real property. The Bus Bar, much like the metal exterior paneling to the facility or tin roof, adds substantial value to the real property and is integral to the building and any future use of that building. Without the Bus Bar, the facility loses its ability to perform its one and only function. Under a plain reading of the APA, the Owned Real Property of FFSL includes the Bus Bar.

42.     The clear terms of the Purchase Agreement contemplate that FFSL acquired the improvements to the Owned Real Property and that the parties understood Wells did not encumber improvements. The FFSL Sale Order does not alter that language in the Purchase Agreement.

43.     The FFSL Sale Order makes clear that, unless the underlying sale to FFSL was free and clear of liens or encumbrances, it "would adversely impact the Debtor's estate, and the sale of the Purchased Assets other than one free and clear of all Liens would be of substantially less value to the Debtor's estate." FFSL Sale Order, p. 10, ¶ S.  The value paid for the real property necessarily included the ability to operate that property as intended.  Wells itself has noted that the "Rowley Property and its fixtures are the lynchpins to the continued operation of the Debtor's business."  Wells' Objection, p. 9 [Doc. 526].

44.     The Debtor, FFSL, and other parties involved in negotiating the Purchase Agreement did not contemplate that Wells' collateral included improvements to Owned Real Property, including the Bus Bar. The intent of the parties when they drafted the Purchase Agreement was to avoid the purchase of any Wells' collateral, not to burden the estate with a series of adversary proceedings over what was and was not purchased.

45.     FFSL purchased the real property and all improvements to the land for substantial consideration to the benefit of the Debtor's estate. The Debtor should not be permitted to remove and sell improvements now owned by FFSL. Here, the Debtor is not even selling the Bus Bar as a bus bar. It is being sold as "scrap." The Bus Bar is not being sold (or valued) as stand-alone equipment. The Bus Bar is an essential building component that cannot be removed without both destroying the Bus Bar itself and permanently damaging the building. Just as the Debtor cannot

remove the metal sheeting or tin roof of the facility, or the cross-beams and trusses, the Debtor should not be permitted to remove the Bus Bar.

**II.      The Bus Bar is not a severable "fixture." It is "improvement" and an integral and integrated piece of the real property. As such, FFSL acquired the Bus Bar in the FFSL Sale.**

46.     Even if the FFSL Sale Order and the Purchase Agreement do not explicitly dictate that FFSL acquired the Bus Bar, the Bus Bar is so integrated into the facility that it is real property and no longer a chattel. The Bus Bar lost all characteristics of personal property when it was integrated into the building. Wells' encumbrance of severable fixtures does not include the Bus Bar.

47.     Utah Code § 70A-9a-334(1) permits security interests to be created in fixtures. There is an exception, however, that prevents a security interest from existing "under this chapter in ordinary building materials incorporated into an improvement on land." Utah Code Ann. § 70A-9a-334(1).

48.     The Comments to the UCC, as adopted by the State of Utah, explain that it "recognizes three categories of goods: (1) those that retain their chattel character entirely and are not part of the real property; (2) ordinary building materials that have become an integral part of the real property and cannot retain their chattel character for purposes of finance; and (3) an intermediate class that has become real property for certain purposes, but as to which chattel financing may be preserved." Utah Code Ann. § 70A-9a-334, cmt. 3.

49.     In Utah and elsewhere, courts apply a three-part test to classify property as personalty, realty, or a fixture[3] by analyzing "(1) [the] manner in which the item is attached or

---

[3]     "The line between fixtures and real property has not received as much attention as the line between chattels and fixtures." In re Swerwinski, No. 09-64294, 2010 WL 3074389, at *4 (Bankr. N.D. Ohio Aug. 5, 2010) (unpublished).

annexed to realty; (2) whether the item is adaptable to the particular use of the realty; and (3) the intention of the annexor to make an item a permanent part of the realty." <u>Paul Mueller Co. v. Cache Valley Dairy Ass'n</u>, 657 P.2d 1279, 1283 (Utah 1982) (analyzing whether whey drying equipment was a fixture or personal property); <u>Workman v. Henrie</u>, 71 Utah 400, 266 P. 1033, 1035 (1928) ("In considering whether a structure annexed to land is itself legally a part of the land, the chief determining factors are the mode of attachment or annexation, the character of the structure, and the intention of the person making the annexation, which generally is regarded the most important or controlling factor, and the mode of annexation and the character of the structure merely as evidence on the question of intention.").

### A. Annexation

50.     First, the Bus Bar is fully annexed into the property. The Bus Bar in Magnesium Building One is welded to form one continuous conduit for electricity. The Bus Bar runs throughout the building.

51.     This is not a case where the item of property in question – the Bus Bar – can be easily removed. The Bus Bar was not designed to be removed. It is not modular pieces bolted together. It is welded together and must be destroyed (or at least significantly altered) to be removed.  The Bus Bar's integration into the building structure is critical to the function and sole purpose of the building – to facilitate electrolysis by moving huge amounts of electricity. Again, the Bus Bar is more akin to the structural portions of the buildings like the metal exterior paneling – which paneling could be cut away and sold as scrap but would undoubtedly constitute an improvement to real property.

### B. Adaptation

52.     Second, the Bus Bar is adapted to the particular realty and the use of that realty. In fact, the use of the realty – electrolysis – depends entirely on the Bus Bar supplying electricity to the electrolytic cells. Moreover, the Bus Bar was molded and welded together so that it would fit and conform to electrolytic cells that exist in the four electrolysis wings of the facility.

53.     Removing the Bus Bar, necessarily requires that the Debtor physically chop the Bus Bar into pieces – requiring extensive time and effort. That is because the Bus Bar was adapted for the sole purpose of use in the facility. This Bus Bar is not a "one-size fits all" but is instead particular and unique to the facility and cannot simply be dropped in to another commercial building like moving light bulbs from one socket to another.

### C. Intention

54.     Third, the apparent intent of the integrating the Bus Bar in Magnesium Building One was to continuously use the Bus Bar to provide electricity for electrolysis.

55.     The Supreme Court of Utah described the intent of the annexor as the most important factor. Workman v. Henrie, 71 Utah 400, 266 P. 1033, 1035 (1928) ("the intention of the person making the annexation … generally is regarded [as] the most important or controlling factor, [while] the mode of annexation and the character of the structure [constitute] evidence on the question of intention") (cleaned up). Further, "[w]here goods affixed to realty can only be removed by doing serious damage to either the goods or the realty, an inference that the goods were intended to be permanently incorporated into the realty may be inferred as a matter of law." In re Reese, 194 B.R. 782, 792 (Bankr. D. Md. 1996) (citing cases).

56.     Here, the Bus Bar, being welded into one solid piece, must be cut into scrap to be removed. Removing the Bus Bar requires serious damage to it. The difficulty with removing the

Bus Bar, which again is welded to form one piece, is just one indication that the Debtor (or its predecessor) intended the Bus Bar to remain on the property such that it would not be removed.

57. Another fact that strongly indicates the intention that the annexor intended the Bus Bar be a permanent improvement to the property is the necessity of the Bus Bar to the Debtor's (and its predecessor's) former business operations. Simply, without the Bus Bar, the Debtor could not produce magnesium via electrolysis.

58. The Bus Bar goes beyond a fixture and is actually a part of the realty.

59. Applying the above test, the Bus Bar is part of the real property. It was intended to remain on site to deliver DC current to the facility, was adapted specifically to Magnesium Building One, and is welded into one solid piece within that building.

III. **Procedurally, a dispute over an ownership of an asset requires more than a mere notice of sale and an objection.**

60. The shortened de minimis sale process does not generate a sufficient record for the Court to formulate a decision as to who owns the property.

61. Rule 7001 of the Federal Rules of Bankruptcy Procedure requires an adversary proceeding to "determine the validity, priority, or extent of a lien or other interest in property . . . ." Fed. R. Bankr. P. 7001(a). Accordingly, resolving this dispute based only on notice and an objection thereto is improper and short circuits the procedural requirements of the Federal Bankruptcy Rules.

62. Additional time to permit the parties to pursue further discovery and retain additional experts would also allow the parties to continue in discussions regarding an amicable solution to the Bus Bar.

63. It is important to consider that the real property is still a superfund site. Pursuant to the Consent Decree, any liquidation must adhere to an approved corrective action plan from

the EPA during removal. The concerns with the Bus Bar is that (as described above) it is integrated into the facility that produced hazardous waste – even worse, it is literally attached to electrolytic cells that produced that hazardous waste.

64.     The Proposed Sale only pays down a fraction of the obligations the Debtor owes Wells. The circumstances and facts surrounding the Bus Bar requires careful and deliberate consideration, and an Adversary Proceeding offers an avenue where the respective interested parties would be afforded the opportunity to conduct discovery and provide the Court with important information regarding environmental concerns.

65.     Unlike the prior assets sold through the de minimis sale procedures approved by the Court, the Bus Bar is subject to a legitimate ownership dispute and is attached to where hazardous waste was produced. Accordingly, a more formal procedure is required. This is true especially considering that the real property at issue remains a superfund site.

## IV.     Risk of Environmental Harm

66.     The Debtor and Wells fail to address the risk of environmental harm caused by the removal of the Bus Bar. Before the Court addresses the Proposed Sale, there is substantial risk to the environment and personnel and the Debtor should provide assurances that environmental liabilities will not increase as a result of the Debtor's actions. The risk of the anode dust is substantial – FFSL understands that the anode dust is highly carcinogenic.

67.     As described above, the Bus Bar is affixed to the electrolytic cells that produce carcinogenic material. FFSL is unaware of testing that confirms the Bus Bar is safe to remove.

68.     From a human health and environmental safety perspective, FFSL is rightfully concerned that removing the Bus Bar will expose individuals on site to carcinogenic materials.

The limited information available to FFSL does not demonstrate that the Bus Bar is safe to remove.

## CONCLUSION

FFSL objects to the Debtor's proposed sale referenced in the Notice of Sale.

FFSL respectfully requests the Court deny the Debtor's sale of the Bus Bar located in Magnesium Building One.

In the alternative, FFSL respectfully requests the respective interests in the property be resolved by an adversary proceeding.

FFSL respectfully requests that, if the Proposed Sale is approved, the Court require assurances that further environmental and human harm will not occur.

Date: June 26, 2026

/s/ Garvan F. McDaniel
Garvan F. McDaniel (#4167)
HOGAN♦MCDANIEL
1311 Delaware Avenue
Wilmington, DE 19806
(302) 656-7540; (302) 656-7599
gfmcdaniel@dkhogan.com

-and-

COHNE KINGHORN, P.C.
George Hofmann, Esq.
111 East Broadway, 11th Floor
Salt Lake City, UT 84111
(801) 363-4300; (801) 363-4378
ghofmann@ck.law

-and-

DEREK E. BROWN
UTAH ATTORNEY GENERAL
Michael E. Begley, Esq.
Trevor C. Lang, Esq.
1594 W. North Temple, #300
Salt Lake City, UT 84116

mbegley@agutah.gov
tclang@agutah.gov

*Attorneys for Utah Division of Forestry, Fire and State Lands*

21