**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
| US MAGNESIUM LLC,[1] | ) |
|  | ) Case No. 25-11696 (BLS) |
| Debtor. | ) |
|  | ) |
|  | ) RE: D.I. 793, 999, 1012, 1013 |

**RESPONSE OF WELLS FARGO BANK, N.A. TO (A) UTAH DIVISION
OF FORESTRY, FIRE AND STATE LANDS' OBJECTION, AND (B) FORGEN, LLC'S
RESERVATION OF RIGHTS AND LIMITED OBJECTION, TO
DEBTOR'S NOTICE OF DE MINIMIS ASSET SALE [D.I. 999]**

Wells Fargo Bank, National Association, as lender (the "Lender" or "Wells Fargo"),

through its undersigned counsel, hereby submits this Response (the "Response") to (a) the *Utah*

*Division of Forestry, Fire and State Lands' Objection to Debtor's Notice of De Minimis Asset Sale*

[D.I. 1013] ("FFSL" and the "FFSL Objection"); and (b) *Forgen, LLC's Reservation of Rights and*

*Limited Objection to that Certain Notice of De Minimis Asset Sale* [D.I. 1012] (the "Forgen

Limited Objection" and together with the FFSL Objection, the "Objections").  In support of its

Response, the Lender respectfully states as follows:

**INTRODUCTION**

1.      Wells Fargo strongly supports the Court's approval of the De Minimis Asset Sale

noticed by the Debtor on June 19, 2026 [D.I. 999].  The assets noticed to be sold are approximately

700,000 to 800,000 pounds of bus bar ("Bus Bar") located in one of the buildings – "Magnesium

Building One" ("Building One") – located at the Rowley property (the "Property") formerly owned

---

[1] The last four digits of the Debtor's federal tax identification number are 5446. The Debtor's address is
238 N 2200 W, Salt Lake City, Utah 84116.

10044465.1

by the Debtor and now owned by the Utah Division of Forestry, Fire and State Lands ("FFSL"). The Bus Bar is a specialized electrical conductor located in Building One that had been used by the Debtor to transport and distribute electrical power for use in connection with its magnesium production.  It is made entirely, or almost entirely, of aluminum, which is a marketable commodity. Approval of the noticed sale would enable the now Post-Effective Date Debtor to liquidate assets, reduce the Debtor's outstanding secured debt obligations, and pave the way for future sales of bus bar located elsewhere at the Property, which sales, individually and in totality, will benefit the Estate.

2.      The only two objections that have been filed in opposition to the proposed sale are both legally and factually meritless.  FFSL asserts that, because it purchased the Bus Bar as an "improvement" on the Property acquired earlier this year pursuant to the Asset Purchase Agreement [D.I. 528] (the "APA") that the Court approved on February 5, 2026 [D.I. 583], the Post-Effective Date Debtor cannot now sell the Bus Bar.  It is beyond dispute, however, that the specific assets that FFSL acquired are determinable from the four corners of the APA.  That agreement makes plain that FFSL did *not* acquire (i) "Equipment" (broadly defined to include any equipment and "other personal property, operation[al] or nonoperational" held by the Debtor prior to the sale), which are among the APA's enumerated "Excluded Assets," and (ii) "fixtures upon which Wells has a properly perfected security interest, and which Wells does not elect to abandon," which the APA expressly carves out from the "Fixtures" that FFSL did purchase.

3.      As set forth below, and as will be shown at the hearing of this contested matter, the Bus Bar comfortably falls within the contours of "personal property," as delineated by Utah's highest court, and, thus, fits squarely within the APA's definition of Equipment *excluded* from FFSL's asset purchase.  And even if the Bus Bar were found to constitute a "fixture" (as FFSL

2

contends), it is a fixture on which Wells Fargo "has a properly perfected security interest," and thus, for that reason too, is not property that FFSL acquired.  FFSL is bound by that conclusion pursuant to the numerous DIP orders that have been entered in this case. And, in all events, the evidence will show that under the Uniform Commercial Code ("UCC"), Wells Fargo acquired from the Debtor a security interest in the Debtor's fixtures other than "ordinary building materials incorporated into an improvement on land."  The evidence will further show that the Bus Bar is no "ordinary building material" *and* was not "incorporated into" Building One, and that Wells Fargo properly perfected its security interest in the Debtor's fixtures.  As such, even if the Bus Bar constituted a fixture rather than equipment, it still was not acquired by FFSL under the APA. Either way, the Bus Bar is the Post-Effective Date Debtor's property to sell.

4.      As for Forgen, LLC ("Forgen"), it "has not had time to conduct proper discovery" and, hence, "must rely on the information available from the FFSL Objection for purposes of" its objection.  On that basis, it reserves its rights – and objects to the limited extent that – the Bus Bar is found to be a fixture, in which case Forgen asserts a construction lien upon it.  The Forgen Limited Objection should be overruled for the same reasons that the FFSL Objection should be overruled:  the Bus Bar is Equipment as to which no construction lien could, or did, attach, and (2) even if found to be a fixture, Wells Fargo has a properly perfected, first priority security interest in the Bus Bar.  In all events, the evidence will show that even if the Bus Bar is found to be a fixture, Forgen's construction lien did not attach to it because, among other things, Forgen's work did not extend to Building One or the Bus Bar.

5.      Accordingly, the Bus Bar is property of the Post-Effective Date Debtor, encumbered solely by the liens of Wells Fargo, which consents to the sale.  The sale thus should be approved and the proceeds paid to Wells Fargo.

10044465.1

## I.  RELEVANT BACKGROUND

### A.  <u>Wells Fargo's Security Interests</u>

6.  By the terms of the *Interim Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing, and (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims; (II) Authorizing the Use of Cash Collateral; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay* [D.I. 32] (the "<u>Interim DIP Order</u>"), and each interim DIP order entered thereafter (collectively, the "<u>DIP Orders</u>"),[2] Wells Fargo holds "valid, binding, enforceable, non-avoidable and properly perfected" "Pre-Petition Liens in the Collateral" that are "senior in priority over any and all other liens on the Collateral." *E.g.* Interim DIP Order, Debtor's Stipulations, D(i)(3).  "Collateral" (or "Pre-Petition Collateral") under the DIP Orders consists of "all now existing and hereafter acquired real and personal property" of the Debtor, including "all goods, including . . . Equipment" and all "fixtures." *E.g.*, Interim DIP Order n. 2 & Ratification and Amendment Agreement [D.I. 10-2], §1.2(c).

7.  Under the DIP Orders, the Debtor stipulated to the validity, perfection and priority of Wells Fargo's Pre-Petition Liens, and those stipulations became "forever binding upon the Debtor's estate and all creditors, interest holders and other parties in interest in this Chapter 11

---

[2] *See Second Interim Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing, and (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims; (II) Authorizing the Use of Cash Collateral; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [D.I. 240] (the "<u>Second Interim DIP Order</u>"); *Third Interim Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing, and (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims; (II) Authorizing the Use of Cash Collateral; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [D.I. 325] (the "<u>Third Interim DIP Order</u>"); and *Fourth Interim Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing, and (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims; (II) Authorizing the Use of Cash Collateral; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [D.I. 416] (the "<u>Fourth Interim DIP Order</u>").

10044465.1

Case," upon the expiration of a defined Challenge Period, which expired long ago with no Challenges having been asserted to Wells Fargo's prepetition liens on either Equipment or Fixtures, in general, or on the Bus Bar, specifically. *E.g.*, Debtor's Stipulations, D(i)(3); Interim DIP Order, ¶¶ 32(a) & (b); *see* Main Docket *passim*. Each of FFSL and Forgen was at the time of the DIP Orders, and remains today, a party-in-interest, party and/or person in the case. *See, e.g., Notice of Appearance and Request for Service of Papers* [D.I. 48] (FFSL) and *Forgen, LLC's Omnibus Objection to the Debtor's Motion for Interim and Final Orders Authorizing the Debtor to Obtain Postpetition Financing*, *et al.* [D.I. 120] (Forgen). And, thus, they are now bound by the Debtor's stipulations in the DIP Orders that Wells Fargo has valid, perfected, first-priority pre-petition liens on all "Collateral," which would include the Bus Bar. They cannot challenge such liens now.[3]

8.      Regardless of the binding effect of the Debtor's stipulations in the DIP Orders, this Court on February 6, 2026 entered the Order approving the APA [D.I. 583] (the "Sale Order") which expressly acknowledged and preserved the security interest and liens of Wells Fargo in its Prepetition Collateral including the equipment and fixtures (see Paragraph 49 of the Sale Order). Accordingly, Wells Fargo's pre-petition lien on the Debtor's Equipment and Fixtures is unassailable. Wells Fargo's lien on "[a]ll now existing or hereafter arising or acquired property and assets of the Debtor, including, without limitation, all . . . equipment and other goods" and "fixtures" traces back, without interruption to 2002. At that time, Debtor granted such lien to

---

[3] While Forgen negotiated for protective language to be included in the Second, Third and Fourth Interim DIP Orders, that protective language ensured only that the "Liens provided for in this Order [*i.e.,* Post-Petition Liens] shall not *prime* any enforceable statutory liens held by Forgen" (*e.g.,* Second Interim DIP Order, ¶ 38). Such protective language did *not* carve out the binding impact on Forgen as a party in interest, party and/or person in the case, with respect to the Debtor's stipulations as to the validity, perfection and first-priority of Wells Fargo's *pre-petition* liens.

10044465.1

Wells Fargo in a loan and security agreement in accordance with New York law, which was amended multiple times over the years and then further amended and ratified post-petition. None of the amendments materially narrowed Wells Fargo's liens against the Bus Bar or fixtures. Wells Fargo's liens were perfected by the filing of a UCC-1 Financing Statement, and timely and continuously extended by the filing of UCC-3 Financing Statement Amendments, in the Department of State of the State of Delaware, where the Debtor is incorporated, in accordance with the New York UCC.

9.      In addition, in 2024, Wells Fargo filed a fixture filing with Tooele County Real Estate Records and Box Elder County Real Estate Records to further establish its lien priority against any holders of interests in the Debtor's real property interests in accordance with New York and Utah law.

      **B.**      **The Sale Order and De Minimis Asset Sale Order**

10.      On February 5, 2026, this Court entered the Order approving the APA [D.I. 583] (the "<u>Sale Order</u>"); and on February 6, 2026, the Debtor and FFSL closed the sale transaction contemplated under the Sale Order.

11.      On April 10, 2026, the Bankruptcy Court entered the *Order Authorizing and Approving Procedures for the Sale, Transfer or Abandonment of De Minimis Assets* [D.I. 793] (the "<u>De Minimis Asset Sale Order</u>") authorizing the Debtor to sell, transfer or abandon De Minimis Assets in accordance with the De Minimis Asset Sale Procedures (all as defined in the order). Paragraph 3(ii) of the order provides:

> Any such transaction(s) shall be free and clear of all liens, provided that: (a) with respect to the sale of any asset that does not constitute a fixture Wells Fargo's liens shall attach to the proceeds of the sale, and such sale proceeds shall be paid to Wells Fargo on account of its security interest as soon as practicable after the date of the Debtor's receipt thereof (the "Receipt Date") and in any event, no later than three (3) business days after the Receipt Date; and (b) with respect to any sale of fixtures,

6

liens (if any) shall attach to the proceeds of the sale with the same validity, extent, and priority as had attached to fixtures immediately prior to such sale or transfer, and with the disposition of such proceeds from the sale of fixtures to be subject to further order of the Court.

12.    Paragraph 4 of the De Minimis Asset Sale Order amplifies paragraph 3's treatment of liens on sold assets:

(a) with respect to the sale of any asset that does not constitute a fixture, Wells Fargo's Liens shall attach to the proceeds of the sale, and such sale proceeds shall be paid to Wells Fargo on account of its security interest as soon as practicable after the Receipt Date, and in any event, no later than three (3) business days after the Receipt Date; and (b) with respect to any sale of fixtures, Liens (if any) shall attach to the proceeds of the sale with the same validity, extent, and priority as had attached to fixtures immediately prior to such sale or transfer, and with the disposition of such proceeds from the sale of fixtures to be subject to further order of the Court.

13.    The De Minimis Asset Sale Order notes, for illustrative purposes, that a "fixture" excludes any "goods or assets not affixed to real property."  De Minimis Asset Sale Order, n. 4. The order further contemplates that disputes may arise concerning whether any property noticed for sale pursuant to the De Minimis Asset Sale Order constitutes a fixture or not.  The order provides in relevant part: "to the extent that a party-in-interest asserts that any De Minimis Asset listed in a De Minimis Asset Sale Notice constitutes a fixture which is subject to paragraph 3(ii)(b) of this Order, such party shall file an objection setting forth its position as to why such De Minimis Asset constitutes a fixture."  *Id.*, ¶ 3.vii.

C.    **The Notice of Sale of Bus Bar, the Objections, and the Effective Date**

14.    On June 1, 2026, the Court entered an Order approving the Debtor's application to retain and employ SB360 Capital Partners, LLC as Liquidation Consultants ("SB360") [D.I. 923]. In furtherance of its retention, SB360 has marketed and located a buyer to purchase approximately 700,000 to 800,000 pounds of Bus Bar located in Building One.

10044465.1

15.     On June 19, 2026, the Debtor filed a "Notice of De Minimis Asset Sale" [D.I. 999] in accordance with the De Minimis Asset Sale Procedures, providing notice that the Debtor intends to sell or transfer certain De Minimis Assets as identified on Schedule 1 to the Notice, *i.e.,* the Bus Bar in Building One.

16.     According to SB360, in order for it to deliver the Bus Bar to the purchaser, which has stated it is interested in the Bus Bar's aluminum commodity value, SB360 first must decommission the Bus Bar.  The Bus Bar in Building One consists of a series of bus bar assemblies.  Each assembly served one of the Debtor's magnesium cells in Building One.  It was in each magnesium cell that, through the process of electrolysis using electricity conducted by the Bus Bar, magnesium chloride was converted into magnesium metal and chlorine gas.

17.     Each bus bar assembly weighs approximately 57,000 pounds, and is supported by an independent support structure.  The evidence at the hearing will be uncontroverted that the Bus Bar itself is neither affixed to, nor incorporated into, either the Property (*i.e.*, the land) or Building One (*i.e.,* an improvement upon the Property).  It provides no support to Building One.  Nor is it a source of, or otherwise connected to, the building's electrical system.  Indeed, the evidence will show that, given the substantial voltage of DC (direct current) electricity conducted through the Bus Bar when operational, connecting the Bus Bar to Building One would have been extremely unsafe and inconsistent with sound electrical design, particularly because Building One, like most other buildings and residences, is powered by AC (alternating current) electricity.  The evidence will further show that the Bus Bar is not only capable of being removed without any removal or alteration of Building One's walls, roof or floor, but also that it has previously been removed and replaced (over time and in sections) in its totality.

10044465.1

18.     According to SB360, the decommissioning process will require SB360 to remove the Bus Bar from Building One and, once removed, to cut the Bus Bar into smaller sections in order to transport those sections by rail to mills for processing.  SB360 and its independent contractors will effectuate the removal of the Bus Bar in accordance with a removal plan attached hereto as **Exhibit A** (the "Removal Plan").

19.     The Removal Plan provides for the removal of the Bus Bar from Building One without any damage to the building.  No walls, roofs or floor in Building One, or any parts thereof, need or will be removed in order to effectuate the removal.  Under the Removal Plan, each bus bar assembly will be removed individually without compromising the building structure.  In short, the removal process will not disturb the building's structural integrity or condition.   Indeed, removal of the bus bar assemblies will not require modification to, or removal of, the building structural framing, roofing system, wall systems, foundations, HVAC systems, lighting systems, fire protection systems, or permanent utility systems serving the building.

20.     Further, the removal process will be conducted under the supervision of an environmental consultant acceptable to both FFSL and to the carriers that have issued environmental insurance policies with respect to the Property.

21.     On June 26, 2026, FFSL and Forgen filed their Objections to the Notice of Sale.

22.     On July 7, 2026 (the "Effective Date"), the Chapter 11 Plan (the "Plan"), which the Court confirmed by *Findings of Fact, Conclusions of Law, and Order Approving on a Final Basis and Confirming the Second Amended Combined Disclosure Statement and Plan of Liquidation of US Magnesium LLC Under Chapter 11 of the Bankruptcy Code* [Docket No. 1000] (the "Confirmation Order"), became effective.  *See Notice of (I) Entry of Order Confirming the Official Committee of Unsecured Creditors' Second Amended Combined Disclosure Statement and Plan*

10044465.1

*of Liquidation of US Magnesium LLC Under Chapter 11 of the Bankruptcy Code, (II) Occurrence of Effective Date, and (III) Supplemental Administrative Claim* [D.I. 1040].  Under the confirmed Plan, the Collateral Liquidation Manager, *i.e.*, Michael P. Grau and other representatives of Focus Management, are authorized to act on behalf of the Post-Effective Date Debtor to liquidate Wells Fargo's Prepetition Collateral pursuant to the De Minimis Asset Sale Order.  *See* Plan, §14.6(b).

## II.    ARGUMENT

### A.    The Court Has the Authority to Approve the Sale of the Bus Bar Pursuant to the De Minimis Asset Sale Order Without the Commencement of an <u>Adversary Proceeding</u>

23.    As a threshold matter, the Court has the authority to resolve the disputes raised, and to approve the sale of Bus Bar requested, in this contested matter.  And FFSL's assertion to the contrary is baseless.

24.    FFSL argues that, under Bankruptcy Rule 7001, an adversary proceeding is required to "determine the validity, priority, or extent of a lien or other interest in property," and "resolving this dispute" outside an adversary proceeding "is improper and short circuits . . . procedural requirements."  FFSL Objection, ¶¶ 60-61.  But FFSL fails to cite any intra-Circuit decisions supporting that proposition.  That is not surprising, because the caselaw within the Circuit goes the other way.

25.    *In re Orfa Corn, of Phila.*, 170 B.R. 257, 275 (E.D. Pa. 1994), is on point.  There, a creditor argued, like FFSL does here, argued that the debtor's motion was improperly brought as a contested matter rather than an adversary proceeding and therefore should have been dismissed. The court rejected that contention, observing that "courts have concluded that where the rights of the affected parties have been adequately presented so that no prejudice has arisen, form will not be elevated over substance and the matter will be allowed to proceed on the merits as originally

filed." *Id.* (quoting *In re Command Servs. Corp.*, 102 B.R. 905, 908 (Bankr. N.D.N.Y. 1989)); *see also In re Catalano*, 643 B.R. 555, 560–61 (Bankr. D.N.J. 2022) (citing *In re Vill. Mobile Homes, Inc.*, 947 F.2d 1282, 1283 (5th Cir. 1991)); *In re Vandy, Inc.*, 189 B.R. 342, 346 (Bankr. E.D. Pa. 1995); *In re Little*, 220 B.R. 13, 17 (Bankr. D.N.J. 1998); *In re Russo*, 2008 WL 5412106 at *3 n. 9 (Bankr. E.D. Pa. Oct. 20, 2008).

26.     So, too, here.  FFSL both noticed and took a deposition, and made one of its own witnesses available for deposition, prior to the hearing of this contested matter.  It has not sought, either formally or informally, to obtain or offer any other discovery.  Nor has FFSL identified in its objection any additional discovery it would seek to take if provided with more time.  Even more critically, FFSL fails to cite any procedural mechanisms that would be available to it in an adversary proceeding under Rule 7001, *et seq.* that are not available to it here in this contested matter under Bankruptcy Rule 9014.

27.     FFSL's procedural objection is especially hollow, because, at bottom, FFSL is asking the Court to determine that the Bus Bar cannot be sold due the fact that it is an asset it acquired pursuant to the Sale Order.  But that determination – involving the Court's interpretation of its own orders – is unquestionably within the province of the Court, *without* any adversary proceeding.  To the contrary, caselaw holds that where a proceeding involves an interpretation of a court's prior order, an adversary proceeding is not required.  *See, e.g., In re Lazy Days' RV Ctr. Inc.*, 724 F.3d 418 (3d Cir. 2013) (finding that when bankruptcy court was adjudicating a motion to interpret and enforce its existing prior order, an adversary proceeding was not necessary); *In re WorldCorp, Inc.*, 252 B.R. 890, 895 (Bankr. D. Del. 2000) (concluding that "an adversary proceeding is not necessary where the relief sought is the enforcement of an order previously obtained"); *In re Nortel Networks, Inc.*, No. 09-10138 (KG), 2013 WL 1385271 (Bankr. D. Del.

11

Apr. 3, 2013) (holding that an adversary proceeding was not required because the motion at issue was an "effort to enforce an agreement" the court had previously approved).

28.    In the absence of any supporting caselaw, or any specific procedural devices unavailable to it in this contested matter, FFSL's procedural objection reduces to a naked bid for delay.  That bid should be denied – especially since the hearing has been noticed, scheduled and will be heard pursuant to the express provisions of the De Minimis Asset Sale Order, which expressly contemplates the hearing and resolution of the dispute – as to whether property is a fixture – raised in the FFSL Objection.

**B.    The Court Should Approve the Sale of the Bus Bar Pursuant to the De Minimis Asset Sale Order**

*1.    FFSL Did Not Acquire the Equipment under the APA, and the Bus Bar Is Equipment.*

29.    The APA is crystal clear: "all Equipment (other than the Wells Abandoned Collateral)"[4] are among the "Excluded Assets" that were "*not* being sold, assigned, transferred, or conveyed" to FFSL under the APA.  APA, § 2.2(r) (emphasis added).  And, under the APA, the definition of "Equipment" is broad: it includes any "personal property, operation[al] or nonoperational, . . . Related to the Business, wherever located." *Id.* § 1.1 (Definition of "Equipment").  "Related to the Business" is equally broad:  it is defined to mean "related to, owned, leased, licensed, used, or held for use or in consignment, in connection with the Business as conducted by Seller prior to the Closing." *Id.* § 1.1 (Definition of "Related to the Business").  Applying the law of Utah, where the property is located, the Bus Bar is personal property, not a

---

[4] FFSL does not contend – nor could it – that the Bus Bar constitutes Wells Abandoned Collateral under the APA.

12

fixture[5]; and it indisputably was related to the Debtor's business prior to the sale to FFSL. Thus, FFSL did not acquire the Bus Bar under the APA; and the Post-Effective Date Debtor is free to sell it pursuant to the De Minimis Asset Sale Order.

30.     The standard – established by Utah's highest court – as to whether any particular piece of property constitutes personal property, on the one hand, or a fixture, on the other, is not in dispute. The Supreme Court of Utah set out that standard in *Paul Mueller Co. v. Cache Valley Dairy Ass'n*, 657 P.2d 1279 (Utah 1982); *see* FFSL Objection, ¶ 49. There, Utah's highest court observed:

> In distinguishing between real and personal property, for statutory lien purposes, this Court has adapted a tripartite test, giving consideration to the following factors:
>
> (1) [the] manner in which the item is annexed to the realty; (2) whether the item is adaptable to the particular use of the realty; and (3) the intention of the annexor to make an item a permanent part of the realty.

*Id.* at 1283.

31.     *Mueller* is instructive. In *Mueller*, the Utah Supreme Court reviewed a trial court's post-trial decision that the appellants, a subcontractor (Mueller) and installer (Dahle), did not obtain statutory mechanic's liens on whey drying equipment that they constructed, assembled and installed on property owned by the respondent (Cache Valley Dairy). The court affirmed. Reviewing the evidence presented at trial, the Utah Supreme Court, after considering each of the factors, agreed that the whey drying equipment was personal property. *Id.* at 1282-85.

32.     As to annexation, the court found that while the evidence showed that "the whey drying equipment was attached to the building by means of ducts, wiring and welding and that

---

[5] Notably, confirming that Bus Bar was treated as equipment by the Debtor and the State of Utah, the Debtor itemizes the Bus Bar as personal property on its tax return.

13

some equipment was bolted into the cement floor," the evidence also showed that "the ducts and wires connecting equipment to the metal building consisted of detachable sections designed for easy removal" and that "the bolts securing machinery to the floor could be disconnected easily." *Id*., at 1283.  On that record, the appellate court concluded the "evidence did not compel a finding that the whey dryer was annexed to the respondent's property." *Id.*  On the question of adaptation, the Utah Supreme Court observed that "the real property in question consists of a prefabricated metal building with a concrete floor, a manlift, walkways and supporting structures," with "no characteristics which in any way limit its use to whey drying." *Id.* at 1284.  Thus, the court concurred with the trial court that the "whey drying equipment [was] not . . . made or constructed for the particular use of the building"; rather, the "building was constructed for and adapted to house this machinery in the same way that many building[s] are constructed to house farm machinery or fabricated machinery." *Id.*  Lastly, as to intention, the court considered various pieces of evidence – including the "easy disconnection of the equipment," the equipment lease "characteriz[ing] the whey drying equipment as personal property," and witness testimony as to the "versatility" of the "metal building" in order to provide "maximum flexibility" to move equipment – that "tend[ed] to show an absence of intention to annex the equipment." *Id.* at 1285.

33.    The evidence will support the same conclusion here.  Indeed, the evidence of lack of annexation is even more compelling here, where the Bus Bar – unlike the whey drying equipment in *Mueller* – is *not* attached to Building One by "ducts, wiring, and welding"; to the contrary, given the amounts of DC electricity it conducted when operational, the Bus Bar could *not* be connected to the building.  *Id.* at 1283; *see also General Leasing Co. v. Manivest Corp*., 667 P.2d 596, 597 (Utah 1983) (affirming holding that HVAC units hung from ceiling hooks and resting on timbers were not fixtures because they were easily removable without damage to the

14

premises).   Nevertheless, the same features the court in *Mueller* found disfavored a finding of annexation *are* present here:  like the whey drying system in *Mueller*, the Bus Bar assembly system here can be dissembled into "detachable sections" that are able to be "lifted and transported from the building," and the Bus Bar can "be removed without damage to the building."  *Id.*  In short, the evidence concerning Bus Bar here militates the same conclusion of lack of annexation as was reached in *Mueller*.

34.      The same is true regarding evidence of adaptation.  As the Court will observe from photographs and learn from witness testimony, Building One fits the description of the building in *Mueller*.  It, too, is a non-descript corrugated metal building with a cement floor and installed walkways that "has no characteristics which in any way limits its use."  *Id.*, at 1284.  In short, the Utah Supreme Court's conclusion in *Mueller* is equally applicable here: "Equipment is not 'adapted' to the use of real property where the real property itself is adaptable to multiple uses and where it is solely the presence of the equipment itself which determines the purpose served by the real property."  *Id.*

35.      Finally, the same types of evidence found to belie an intention to annex the whey drying equipment to the real property in *Mueller* will be introduced here with respect to the Bus Bar.  As in *Mueller*, the evidence demonstrating a lack of annexation and adaption also supports a finding of lack of intention.  Like the lease in *Mueller*, the Debtor's itemization of the Bus Bar on personal property – rather than real estate – in its tax returns is a powerful admission.  And witness testimony will confirm that the Bus Bar not only was intended to be removable, but has been removed and replaced (over time, and in sections) in order to address degradation resulting from the regular conducting of high voltages of electricity.

10044465.1

36.    In sum, the record more strongly supports the conclusion that the property at issue is personal property (and not a fixture) here than it did in *Mueller*. And once the Court determines that the Bus Bar *is* personal property under Utah law, then it must overrule the FFSL Objection. By the plain terms of the APA, personal property related to the Debtor's prepetition business, like the Bus Bar, meets the definition of Equipment in the agreement; and Equipment is expressly excluded from the assets FFSL purchased from the Debtor. Accordingly, the Bus Bar remained the property of the Debtor, is now the property of the Post-Effective Date Debtor, and is properly sold pursuant to the terms of the De Minimis Asset Sale Order. The De Minimis Asset Sale of Bus Bar thus should be approved.

2.    *Even If the Bus Bar Were Found to be a Fixture, It Still Was Not Acquired by FFSL.*

37.    Even if the Court were to conclude after taking evidence that the Bus Bar is not personal property, but rather is a fixture, the Court still should overrule the FFSL Objection. Fixtures "upon which Wells has a properly perfected security interest, and which Wells does not elect to abandon" are expressly carved out from those Fixtures that FFSL acquired pursuant to the APA. And, here, there can be no legitimate dispute that Wells Fargo has a properly perfected security interest in the Bus Bar.

38.    To start, FFSL is legally *bound* by that conclusion. In the DIP Orders, the Debtor stipulated, among other things, that Wells Fargo's liens on Pre-Petition Collateral – consisting of all prepetition property of the Debtor, *including* fixtures – "were and continue to be valid, binding, enforceable, non-avoidable and *properly perfected*." *E.g.*, Fourth Interim DIP Order, Debtor's Stipulations (i)(3) (emphasis added). The DIP Orders further provide that if "no Challenge is timely and properly filed prior to the expiration of the Challenge Period," then the "Stipulations shall be of full force and effect and forever binding upon the Debtor's estate and all creditors,

16

10044465.1

interest holders and other parties in interest in this Chapter 11 Case." *E.g. id.*, ¶ 28(b).  At all relevant times, FFSL has been a party in interest in the Chapter 11 Case; and the record is incontrovertible that no Challenge was brought during the Challenge Period as to Wells Fargo's Pre-Petition Liens on fixtures, in general, or the Bus Bar, specifically.  *See* ¶ 7 *supra*.  Thus, FFSL cannot now dispute that Wells Fargo has a "properly perfected security interest" in the Bus Bar. As such, even if the Bus Bar were found to be a fixture, it is a fixture – "upon which Wells has a properly perfected security interest" – that is expressly *carved out* from the fixtures that FFSL acquired under the APA.  Furthermore, this Court ruled that the security interests and liens of Wells Fargo in its Prepetition Collateral, which includes the Bus Bar, whether equipment or fixture, was expressly confirmed and preserved, and FFSL is bound by that decision.  FFSL therefore did not acquire the Bus Bar from the Debtor; the Bus Bar remains property of the Post-Effective-Date Debtor; and the Post-Effective Date Debtor can sell the Bus Bar pursuant to the De Minimis Asset Sale Order.

39.     The conclusion that the Bus Bar is a fixture "upon which Wells has a properly perfected security interest" – and, thus, did not become the property of FFSL under the APA – is unassailable even absent the binding effect of the DIP Orders.  The UCC recognizes that "[a] security interest under this chapter may be created in goods that are fixtures or may continue in goods that become fixtures," *except for* "ordinary building materials incorporated into an improvement on land."  UT ST § 70A–9a–334(1).[6]  In order to perfect such a security interest, the

---

[6] "[W]hile . . . goods. . . [are] located in a jurisdiction, the local law of that jurisdiction governs: (A) perfection of a security interest in the goods by filing a fixture filing…" 6 *Del. Code* § 9-301; UT ST § 70A-9a-301. Accordingly, the Utah version of the UCC governs the perfection of Wells Fargo's security interest in the Bus Bar.

10044465.1

secured party must file a fixture filing in "the office designated for the filing or recording of a record of a mortgage on the related real property." *Id.*, § 70A-9a-501(1)(a). Such fixture filing, must: (a) provide the name of the debtor; (b) provide the name of the secured party or a representative; and (c) indicate the collateral covered. *Id.* § 70A-9a-502. It also is required to: (a) indicate that it covers fixture-type collateral; (b) indicate that it is to be filed for record in the real property records; (c) provide a legal description of the real property to which the collateral is related; and (d) if the debtor does not have an interest of record in the real property, provide the name of the record owner. *Id.*

40.     The evidence will be uncontroverted that, even if the Bus Bar is found to be a fixture, Wells Fargo satisfied all the requirements for perfecting a security interest in it. Wells Fargo was granted a lien on all of the Debtor's fixtures in a security agreement tracing back to 2002. *See* ¶ 8 *supra*. And that lien attached to the Bus Bar, because it was not "ordinary building material []." To the contrary, the evidence will show that this particular Bus Bar was custom ordered and has no application other than magnesium production. Wells Fargo's lien also attached to the Bus Bar, because, as set forth above, *see* ¶17 *supra*, it was not "incorporated into" Building One or any other improvement on the Property. Further, the evidence will show that, prior to the Petition Date, Wells Fargo filed proper fixture filings, satisfying the requirements of the UCC, in the appropriate office, in Tooele County. *See* ¶ 9 *supra*.

41.     For all of these reasons, even if the Bus Bar were found to be a fixture, it is a fixture "upon which Wells has a properly perfected security interest" and, thus, was expressly carved out from the assets sold to FFSL under the APA. The Bus Bar thus continued to be an asset of the Debtor, became an asset of the Post-Effective Date Debtor, and is now appropriately sold by the Post-Effective Date Debtor pursuant to the De Minimis Asset Sale Order.

18

*3.      FFSL's Remaining Arguments Are Meritless*

42.      FFSL's other arguments for opposing the De Minimis Asset Sale of Bus Bar fare no better.

43.      After initially speculating that the "removal [of the Bus Bar] *may* disturb 'anode dust,' which contains PCBs and other harmful material," FFSL Objection ¶ 32 (emphasis added), FFSL later asserts, without any evidentiary support, that "the risk of anode dust is substantial" and, thus, that removal of the Bus Bar in fact poses "substantial risk to the environment and personnel." *Id.* at ¶ 66. But FFSL has not supplied, and will not supply at the hearing, any competent evidence to support that speculation. To the contrary, the evidence will show that removal of the Bus Bar – which will take place under the supervision of an approved environmental consultant – poses no material risk to either the environment or to human safety.

44.      Along similar lines, FFSL also bemoans that the removal of the Bus Bar "would damage and destroy the improvements, and render the building useless."  FFSL Objection, ¶ 1. But this too, is unsupported speculation. And it will be shown to be false at the hearing. In any event, even if damage would ensue, the UCC supplies the remedy: "A secured party that removes collateral shall promptly reimburse any encumbrancer or owner of the real property, other than the debtor, for the cost of repair of any physical injury caused by the removal."  UT ST § 70A-9a-604(4).

45.      In short, nothing in the FFSL Objection warrants the Court's rejection of the proposed De Minimis Asset Sale of the Bus Bar, which should be approved.

*4.      To the Extent Forgen Is Objecting to the Sale, It Has No Grounds to Do So.*

46.      Forgen disclaims sufficient information to take a firm position on the "Notice of De Minimis Asset Sale" [D.I. 999].  Yet it nonetheless piggybacks off the FFSL Objection to assert

19

10044465.1

that "*if*" the Bus Bar is as described in the FFSL Objection, then "it is a fixture under Utah Law and subject to Forgen's liens." Forgen Limited Objection, ¶ 19. To the extent Forgen presses its objection, it fails for the same reasons that the FFSL Objection does.

47.    *First*, the Bus Bar is equipment, not a fixture to which Forgen's asserted construction lien does, or could, attach. *See* ¶ 29-36 *supra*. *Second*, even if the Bus Bar were found to be a fixture, the Stipulations in the DIP Orders – conceding Wells Fargo's valid, perfected, *first-priority lien* on Pre-Petition Collateral, *including* fixtures – is binding on Forgen; and Forgen cannot now assert otherwise in this contested matter. *See* ¶¶ 7- 8 *supra*. Those two principles defeat Forgen's objection to the noticed sale, in the event Forgen is even still opposed to the sale.

48.    There is yet another reason Forgen's objection to the noticed sale, if pursued, would fail. Under Utah law, construction liens are limited in scope to the land and improvements that are "necessary for the convenient use and occupation of [such] land." Utah Code § 38-1a-302(1); *New Star General Contractors, Inc. v. Dumar, LLC*, 2025 UT 14, ¶ 23, 570 P.3d 339 (Utah 1990) (liens are limited against the property that has been improved); *Volker-Scowcroft Lumber Co. v. Vance*, 103 P. 970, 974 (Utah 1909) (Construction lien extended only to such lands as were necessary for the convenient use and occupation of the building constructed thereon, and for which the material was furnished). The evidence will be uncontroverted that Forgen's construction work at the property was entirely unrelated, not in close proximity, and temporally distant from the installation of the Bus Bar in Building One. Thus, even if Forgen has a construction lien under Utah law, the lien does not attach to the Bus Bar. Accordingly, the Forgen Limited Objection, too, should be overruled.

10044465.1

## CONCLUSION

49.     By reason of all of the foregoing, Wells Fargo respectfully requests that the Court overrule the Objections, enter an Order permitting the sale of the Bus Bar to proceed in accordance with the Notice of Sale and grant such other and further relief as the Court deems just and proper.

Dated:  July 10, 2026                               Respectfully submitted,


**BURR & FORMAN LLP**

 */s/ J. Cory Falgowski*
J. Cory Falgowski (No. 4546)
222 Delaware Avenue, Suite 1030
Wilmington, DE 19801
Telephone: (302) 830-2312
E: mail: jfalgowski@burr.com


- AND –

**OTTERBOURG P.C.**
Jonathan N. Helfat (admitted *pro hac vice*)
Adam C. Silverstein (admitted *pro hac vice*)
230 Park Avenue
New York, NY 10169
Telephone: (212) 661-9100
Facsimile:  (212) 682-6104
Email:  jhelfat@otterbourg.com
            asilverstein@ottterbourg.com

*Attorneys for Wells Fargo Bank, N.A.*

21

10044465.1